# EXHIBIT 1

IN THE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.:   12-cv-61735-WJZ

| | |
|---|---|
| BROWARD BULLDOG, and | ) |
| DAN CHRISTENSEN, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| U.S. DEPARTMENT OF JUSTICE, and | ) |
| FEDERAL BUREAU OF INVESTIGATION, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)     I am currently the Section Chief of the Record/Information Dissemination Section

("RIDS"), Records Management Division ("RMD"), formerly at Federal Bureau of Investigation

Headquarters ("FBIHQ") in Washington, D.C., and currently relocated to Winchester, Virginia.  I

have held this position since August 1, 2002.  Prior to joining the FBI, from May 1, 2001 to July

31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law.  In that capacity,

I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and

litigation for the Navy.  From October 1, 1980 to April 30, 2001, I served as a Navy Judge

Advocate at various commands and routinely worked with FOIA matters.  I am also an attorney

who has been licensed to practice law in the State of Texas since 1980.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 272

employees who staff a total of ten (10) FBIHQ units and two (2) field operational service center

units whose collective mission is to effectively plan, develop, direct, and manage responses to

requests for access to Federal Bureau of Investigation ("FBI") records and information pursuant to the FOIA, amended by the OPEN Government ACT of 2007; Privacy Act; Executive Order 13526; Presidential, Attorney General and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith. My responsibilities also include the review of FBI information for classification purposes as mandated by Executive Order ("E.O.") 13526,[1] and the preparation of declarations in support of Exemption 1 claims under the FOIA.[2] I have been designated by the Attorney General of the United States as an original classification authority and a declassification authority pursuant to E.O. 13526, §§ 1.3 and 3.1. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am familiar with the FBI's responses to FOIA requests that were received from plaintiffs seeking access to records pertaining to the address 4224 Escondito Circle, near Sarasota, Florida.

(4)    The FBI has processed a total of 35 pages of potentially responsive material to plaintiffs' October 27, 2011 request. In accordance with Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), this declaration provides an explanation of the FBI's record-keeping system and the procedures used to search for records responsive to plaintiffs' October 27, 2011 request, and

---

[1]  75 Fed. Reg. 707 (2010).

[2]  5 U.S.C. § 552 (b)(1).

provides justifications for the FBI's withholding of information from these records pursuant to FOIA Exemptions 1, 3, 6,7(C), 7(D), and 7(E), 5 U.S.C. §§ 552 (b)(l), (b)(3), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

## CHRONOLOGY OF PLAINTIFFS' FOIA REQUESTS

(5)     Set forth below is a chronology and description of the pertinent correspondence concerning plaintiffs' FOIA requests.   Copies of this correspondence are attached hereto as **Exhibits A - J**.

### FOIPA 1174909-000

(6)     By letter dated September 26, 2011, plaintiffs submitted a FOIA request to FBIHQ for "information pertaining to a closed anti-terrorism investigation into the activities of Saudi nationals who lived in and/or owned a residence at 4224 Escondito Circle, near Sarasota, Florida prior to 9/11."   Additionally, the request stated "[t]he residents were Abdullazziz Al-Hijji and his wife, Anoud.   The home's owners were Anoud Al-Hijji's parents, Essam and Deborah Ghazzawi. The FBI investigation began in the fall of 2001 and continued into at least 2003."   Finally, plaintiffs sought a fee waiver.   **(See Exhibit A.)**

(7)     By letter dated October 6, 2011, the FBI advised plaintiffs that the records they requested concern a third party and cannot be released without a third party privacy waiver or proof of death.   Additionally, plaintiffs were advised that, if they requested, a search for public records contained within FBI files could be conducted without a third party privacy waiver or proof of death.   Finally, the FBI advised plaintiffs that they could appeal the FBI's response within sixty (60) days by writing to the U.S. Department of Justice, Office of Information Policy ("OIP").   **(See Exhibit B.)**

### FOIPA 1176403-000

3

(8)   By email dated October 27, 2011, plaintiffs submitted a FOIA request to FBIHQ

for "information pertaining to an anti-terrorism investigation regarding activities at the residence

at 4224 Escondito Circle, in the Prestancia development near Sarasota, Florida prior to 9/11/2001.

The activities involve apparent visits to that address by some of the deceased 9/1/ hijackers."

Plaintiffs' request also notes that this request is a modified version of FOIPA request 1174909-000

and does not concern any third parties.   Plaintiffs sought a fee waiver and expedited processing.

**(See Exhibit C.)**

(9)   By letter dated November 8, 2011, the FBI informed plaintiffs that their request had

been received and had been assigned FOIPA Request Number 1176403-000.   Additionally, the

FBI advised that the Central Records System was being searched and their fee waiver was being

considered.   **(See Exhibit D.)**

(10)   By letter dated December 22, 2011, the FBI advised plaintiffs that their request for

expedited processing was granted.   **(See Exhibit E.)**

(11)   By letter dated February 7, 2012, the FBI advised plaintiffs that the records they

sought are governed by the provisions of the Privacy Act and that disclosure of those records could

constitute an unwarranted invasion of personal privacy pursuant to FOIA Exemptions (b)(6) and

(b)(7)(C).   Additionally, the FBI informed plaintiffs that while they received a large number of

calls concerning suspicious activity in the aftermath of the 9/11 attack, no credible evidence was

developed to connect the address at 4224 Escondito Circle, Sarasota, Florida to any of the 9/11

hijackers.   Finally, the FBI advised plaintiffs that they could appeal the FBI's response by writing

to OIP within sixty (60) days.   **(See Exhibit F.)**

(12)   By letter dated February 23, 2012, plaintiffs appealed the FBI's February 7, 2012

response.   **(See Exhibit G.)**

4

(13)     By letter dated March 8, 2012, OIP responded to plaintiffs' February 23, 2012 appeal letter by acknowledging receipt of the request. Plaintiffs were informed that their appeal had been assigned number AP-2012-01599 and that OIP would issue an answer as soon as possible. **(See Exhibit H.)**

(14)     OIP responded to plaintiffs' February 23, 2012 appeal on May 23, 2012 and advised plaintiffs that the FBI's action was being affirmed, on partly modified grounds. OIP noted that while the FBI did conduct a search, it was not required in the absence of a written waiver by third parties. Additionally, OIP denied plaintiffs request for itemizing and justifying each item of information withheld. OIP further advised that if plaintiffs were dissatisfied with the results of the appeal, that they could file a lawsuit in accordance with 5 U.S.C. §552(a)(4)(B). **(See Exhibit I.)**

(15)     On September 5, 2012, plaintiffs filed a Complaint in the U.S. District Court for the Southern District of Florida requesting immediate release of all responsive records.

(16)     By letter dated March 28, 2013, the FBI released 31 pages to plaintiffs. The FBI stated that it had reviewed 35 pages responsive to plaintiffs' October 27, 2011 request. Furthermore, the FBI indicated that it had withheld information pursuant to FOIA Exemptions (b)(1), (b)(3), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E). Additionally, the FBI informed plaintiffs that Other Government Agency ("OGA") information had been located within the responsive records. The OGA had been consulted and their response was incorporated within this release. The FBI advised plaintiffs that they could appeal the FBI's response within sixty (60) days by writing to OIP. **(See Exhibit J.)**

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(17)     The Central Records System ("CRS"), which is utilized to conduct searches in response to FOIA and Privacy Act requests, enables the FBI to maintain all information which it

5

has acquired in the course of fulfilling its mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter (or program). Certain records in the CRS are maintained at FBIHQ. Records that are pertinent to specific field offices of the FBI are maintained in those field offices. Although the CRS is primarily designed to serve as an investigative tool, the FBI utilizes the CRS to conduct searches that are likely to yield documents responsive to FOIA and Privacy Act requests. The mechanism that the FBI uses to search the CRS is the Automated Case Support System ("ACS").

(18)    Access to the CRS is obtained through the General Indices, which are arranged in alphabetical order. The General Indices consist of index cards on various subject matters that are searched either manually or through the automated indices. The entries in the General Indices fall into two categories:

> (a) A "main" entry -A "main" entry, or "main" file, carries the name corresponding with a subject of a file contained in the CRS.
>
> (b) A "reference" entry -A "reference" entry, sometimes called a "cross-reference," is generally only a mere mention or reference to an individual, organization, or other subject matter, contained in a document located in another "main" file on a different subject matter.

(19)    Access to the CRS files in FBI field offices is also obtained through the General Indices (automated and manual), which are likewise arranged in alphabetical order, and consist of an index on various subjects, including the names of individuals and organizations. Searches made in the General Indices to locate records concerning a particular subject, such as 4224 Escondito Circle, are made by searching the subject requested in the index. FBI field offices have

6

automated indexing functions.

(20)     On or about October 16, 1995, the ACS system was implemented for all field

offices, Legal Attaches ("Legats"), and FBIHQ in order to consolidate portions of the CRS that

were previously automated.   Because the CRS cannot electronically query the case files for data,

such as an individual's name or social security number, the required information is duplicated and

moved to the ACS so that it can be searched.   Over 105 million records from the CRS were

converted from automated systems previously utilized by the FBI.   Automation did not change

the CRS; instead, automation has facilitated more economic and expeditious access to records

maintained in the CRS.

(21)     ACS consists of three integrated, yet separately functional, automated applications

that support case management functions for all FBI investigative and administrative cases:

> (a)     Investigative Case Management ("ICM") - ICM provides the ability to
> open, assign, and close investigative and administrative cases as well as set, assign,
> and track leads.   The Office of Origin ("OO"), which sets leads for itself and other
> field offices, as needed, opens a case.   The field offices that receive leads from the
> OO are referred to as Lead Offices ("LOs") formerly known as Auxiliary Offices.
> When a case is opened, it is assigned a Universal Case File Number ("UCFN"),
> which is utilized by all FBI field offices, Legats, and FBIHQ that are conducting or
> assisting in the investigation.   Using a fictitious file number "111-HQ-12345" as
> an example, an explanation of the UCFN is as follows: "111" indicates the
> classification for the specific type of investigation; "HQ" is the abbreviated form
> used for the OO of the investigation, which in this case is FBIHQ; and "12345"
> denotes the individual case file number for the particular investigation.
>
> (b)     Electronic Case File ("ECF") -ECF serves as the central electronic
> repository for the FBI's official text-based documents.   ECF supports the
> universal serial concept, in that only the creator of a document serializes it into a
> file.   This provides a single-source entry of serials into the computerized ECF
> system.   All original serials are maintained in the OO case file.
>
> (c)     Universal Index ("UNI") -UNI continues the universal concepts of ACS by
> providing a complete subject/case index to all investigative and administrative
> cases.   Only the OO is required to index; however, the LOs may index additional
> information as needed.   UNI, an index of approximately 115.9 million records,
> functions to index names to cases, and to search names and cases for use in FBI

7

investigations. Names of individuals or organizations are recorded with identifying applicable information such as date or place of birth, race, sex, locality, Social Security number, address, and/or date of event.

(22)     The decision to index names other than subjects, suspects, and victims is a

discretionary decision made by the FBI Special Agent ("SA") assigned to work on the

investigation, the Supervisory SA ("SSA") in the field office conducting the investigation, and the

SSA at FBIHQ.  The FBI does not index every name in its files; rather, it indexes only that

information considered to be pertinent, relevant, or essential for future retrieval.   Without a "key"

(index) to this enormous amount of data, information essential to ongoing investigations could not

be readily retrieved.   The FBI files would thus be merely archival in nature and could not be

effectively used to serve the mandated mission of the FBI, which is to investigate violations of

federal criminal statutes.   Therefore, the General Indices to the CRS files are the means by which

the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a

particular subject matter or individual, 4224 Escondito Circle.

## SEARCH FOR RECORDS RESPONSIVE TO PLAINTIFFS' REQUEST

(23)     In response to plaintiffs' October 27, 2011 FOIA request, the FBI conducted a

search of the CRS to identify all potentially responsive main and cross-reference files indexed

under the following terms: "Address 4224 Escondito Circle Sarasota FL" and "Four Two Two

Four Escondito Circle."   In an abundance of caution, the FBI took an additional step to conduct a

text search of the ECF to identify all potentially responsive main and cross-reference files indexed

under the search terms "Escondito Circle" and "Escondito AND Sarasota."[3]   As a result of these

searches, six documents were located.   These records were originally withheld in full pursuant to

---

[3] It is not the FBI's current policy to conduct text searches of the ECF.   However, because of the nature of the case, the FBI erred on the side of caution in order to locate any responsive documents.   Because the decision to index names in a specific document can vary from document to document, the text search provided a more comprehensive search of the CRS.

8

FOIA exemptions (b)(6) and (b)(7)(C).   (See ¶11.)

(24)   Subsequent to learning of this litigation, the Tampa Field Office ("TPFO") was contacted regarding this matter.   TPFO would be the most logical FO which could assist with the search for responsive records, should they exist, since it was the FO which handled the alleged complaint in regard to the address subject of this FOIA request.   TPFO canvassed personnel who were directly involved in the 2001 investigation, as they have a more direct knowledge of the investigation, to determine whether they have any records that are potentially responsive to this particular FOIA request.   Given their specialized knowledge and familiarity with responsive records on this issue, TPFO also canvassed personnel responsible for assisting in the FBI's response to a prior Congressional request from Senator Graham related to 4224 Escondito Circle.   These personnel familiar with the investigation into 4224 Escondito Circle and/or the prior request from Senator Graham conducted additional searches of FBI files.   Included in this search for files were those specifically related to the 9/11 investigation to determine whether any additional documents existed.   The searches conducted by these personnel also consisted of additional text searches of the ECF and searches of known telephone numbers in order to locate potentially responsive documents.   As a result of these searches, fourteen documents, consisting of 35 pages, were located.   The 35 pages located as a result of this search included the pages previously located during the administrative phase.

## PROCESSING OF PLAINTIFFS' REQUEST

(25)   Search efforts yielded a total of 35 pages of potentially responsive material to plaintiffs' October 27, 2011 request.   It is the FBI's current policy to search for and identify only "main" files responsive to FOIA requests at the initial stage; however, due to plaintiff's specific request, the FBI took the extraordinary step of reviewing potentially responsive cross-reference

9

material. All documents were processed to achieve maximum disclosure consistent with the access provisions of the FOIA. Every effort was made to provide plaintiff with all material in the public domain and with all reasonably segregable portions of releasable material. No reasonably non-exempt portions have been withheld from plaintiff.

## EXPLANATION OF CODED FORMAT USED FOR THE JUSTIFICATION OF REDACTED MATERIAL

(26)   In processing the documents responsive to plaintiffs' October 27, 2011 request, the FBI sought to achieve maximum disclosure consistent with the access provisions of the FOIA. Every effort was made to provide plaintiffs with all material in the public domain and with all reasonably segregable portions of releasable material. No reasonably segregable, nonexempt portions were withheld from plaintiffs. The exemptions asserted by the FBI as grounds for non-disclosure of portions of documents are FOIA Exemptions 1, 3, 6, 7(C), 7(D), and 7(E), 5 U.S.C. §§ 552 (b)(1), (b)(3), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

(27)   The FBI has processed a total of 35 pages of potentially responsive material. Of these 35 pages, six pages have been released in full, 25 pages have been released in part, and four pages have been withheld in their entireties pursuant to FOIA Exemptions. Each page of the processed documents is Bates-numbered sequentially – Sarasota-1 through Sarasota-35. **(See Exhibit K.)** Additionally, pages withheld in their entirety were replaced by a "Deleted Page Information Sheet" ("DPIS") which identifies the reason and/or the applicable FOIA exemptions relied upon to withhold the page in full, as well as the Bates number for the withheld pages. The documents contain, on their faces, coded categories of exemptions which detail the nature of the information withheld pursuant to the provisions of the FOIA. The coded categories are provided to aid the Court's and plaintiffs' review of the FBI's explanations of the FOIA exemptions it has asserted to withhold the material. Accordingly, a review of this information will demonstrate that

10

all material withheld is exempt from disclosure pursuant to FOIA exemptions, or it is so intertwined with protected material that segregation is not possible without revealing the underlying protected material.

(28)  Each withholding of information is accompanied by a code that corresponds to the categories listed below.  For example, if "(b)(7)(C)-1" appears on the page, the "(b)(7)(C)" designation refers to "Exemption (b)(7)(C)" of the FOIA concerning "Unwarranted Invasion of Personal Privacy."  The subcategory "1" narrows the main category into the more specific subcategory "Names and/or Identifying Information of FBI Special Agents ('SAs') and Support Personnel."

(29)  The coded categories of exemptions used in the processing of documents responsive to plaintiffs' request are set forth as follows:

| SUMMARY OF JUSTIFICATION CATEGORIES | |
|---|---|
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| **Category (b)(1)** | **CLASSIFIED INFORMATION** |
| **(b)(1)** | Classified Information |
| **Category (b)(3)** | **INFORMATION PROTECTED BY STATUE** |
| **(b)(3)-1** | National Security Act of 1947 - 50 U.S.C.  § 403-1(i)(1) |
| **Categories (b)(6) and (b)(7)(C)** | **CLEARLY UNWARRANTED AND UNWARRANTED INVASION OF PERSONAL PRIVACY** |
| **(b)(6)-1 and (b)(7)(C)-1** | Names and/or Identifying Information of FBI Special Agents and Support Personnel |
| **(b)(6)-2 and (b)(7)(C)-2** | Names and/or Identifying Information of Third Parties of Investigative Interest |
| **(b)(6)-3 and (b)(7)(C)-3** | Names and/or Identifying Information Concerning Third Parties Merely Mentioned |
| **(b)(6)-4 and (b)(7)(C)-4** | Names and/or Identifying Information of Third Parties Who Provided Information to the FBI |
| **(b)(6)-5 and (b)(7)(C)-5** | Names and/or Identifying Information of Local Law Enforcement |

| Category (b)(7)(D) | CONFIDENTIAL SOURCE INFORMATION |
|---|---|
| (b)(7)(D)-1 | Information Provided by a Local Law Enforcement Agency Under an Implied Assurance of Confidentiality |
| (b)(7)(D)-2 | Name, Identifying Information and/or Information Provided by an Individual Under an "Implied" Assurance of Confidentiality |
| Category (b)(7)(E) | INVESTIGATIVE TECHNIQUES AND PROCEDURES |
| (b)(7)(E)-1 | File Numbers |
| (b)(7)(E)-2 | Dates and Types of Investigations (Preliminary of Full Field Investigations) |
| (b)(7)(E)-3 | Internal Non-Public Facsimile Numbers |
| (b)(7)(E)-4 | Information Pertaining to Investigative Techniques and Procedures |
| (b)(7)(E)-5 | Intelligence Analyst Analytical Techniques and Procedures |
| (b)(7)(E)-6 | Database and Database Information |

## JUSTIFICATIONS FOR SPECIFIC DELETIONS OF INFORMATION

(30)     The paragraphs that follow explain the FBI's rationale for withholding each

particular category of information under the specific exemption coded categories described above.

A review of this information will reveal that all material which the FBI has withheld is exempt

from disclosure pursuant to one or more FOIA exemptions, including Exemptions (b)(l), (b)(3),

(b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E) or it is otherwise so intertwined with protected material

that segregation is not possible without revealing the very underlying material the FBI is trying to

protect.

## EXEMPTION (b)(1)
## CLASSIFIED INFORMATION

(31)     The FBI's analysis of the withholding of classified information contained in these

documents is based on the standards articulated in the FOIA statute, 5 U.S.C. § 552 (b)(1).[4]

Exemption (b)(l) protects from disclosure those records that are:

---

[4]  Exemption (b)(1) has been asserted on the following pages: Sarasota-6 and 35.

(A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy; and

(B) are in fact properly classified pursuant to such Executive Order.

(32)     Before I consider an Exemption (b)(l) claim for withholding agency records, I determine whether the information in those records is information that satisfies the requirements of E.O. 13526, the Executive Order which governs the classification and protection of information that affects the national security,[5] and whether the information complies with the various substantive and procedural criteria of the Executive Order.   E.O. 13526, which was signed by President Barack Obama on December 29, 2009, is the Executive Order that currently applies to the protection of national security information.   I am bound by the requirements of E.O. 13526, when making classification determinations.

(33)     For information to be properly classified, and thus properly withheld from disclosure pursuant to Exemption (b)(1), the information must meet the requirements set forth in E.O. 13526 § 1.1 (a):

(1) an original classification authority is classifying the information;

(2) the information is owned by, produced by or for, or is under the control of the United States Government;

(3) the information falls within one or more of the categories of information listed in § 1.4 of this order;

(4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

(34)     All information which I determined to be classified, and which is under the control of the United States Government, is marked at the "Secret" level since the unauthorized disclosure

---

[5]  Section 6.1 (cc) of E.O. 13526, defines "National Security" as "the national defense of foreign relations of the United States."

13

of this information reasonably could be expected to cause serious damage ("Secret") to national security.  See E.O. 13526 § 1.2 (a)(2).  In addition to this substantive requirement, certain procedural and administrative requirements of E.O. 13526, must be followed before information can be considered to be properly classified, such as proper identification and marking of documents.  I made certain that all procedural requirements of E.O. 13526, were followed in order to ensure that the information was properly classified.  I made certain that:

> (a) each document was marked as required and stamped with the proper classification designation;
>
> (b) each document was marked to indicate clearly which portions are classified and which portions are exempt from declassification as set forth in E.O. 13526 § 1.5 (b);
>
> (c) the prohibitions and limitations on classification specified in E.O. 13526 § 1.7, were adhered to;
>
> (d) the declassification policies set forth in E.O. 13526 §§ 3.1 and 3.3 were followed; and
>
> (e) any reasonably segregable portion of these classified documents that did not meet the standards for classification under E.O. 13526, were declassified and marked for release, unless withholding was otherwise warranted under applicable law.

## FINDINGS OF DECLARANT REGARDING EXEMPTION (b)(1)

(35)    With the above requirements in mind, I personally and independently examined the information withheld from plaintiffs pursuant to FOIA Exemption 1.   As a result of this, I determined that the classified information continues to warrant classification at the "Secret" level, respectively, and is exempt from disclosure pursuant to E.O. 13526, § 1.4, categories "(c) intelligence activities (including covert action), intelligence sources or methods, or cryptology."

## INTELLIGENCE ACTIVITIES, SOURCES, AND METHODS

(36)    E.O. 13526, § 1.4(c), exempts intelligence activities (including covert action), intelligence sources or methods, or cryptology from disclosure.  An intelligence activity or

14

method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest. An intelligence method is used to indicate any procedure (human or non-human) utilized to obtain information concerning such individual or organization. An intelligence activity or method has two characteristics. First, the intelligence activity or method - and information generated by it - is needed by U. S. Intelligence/Counterintelligence agencies to carry out their missions. Second, confidentiality must be maintained with respect to the activity or method if the viability, productivity and usefulness of its information are to be preserved. The information withheld in these documents pursuant to Exemption (b)(1) was withheld to protect an intelligence method utilized by the FBI for gathering intelligence data.

(37)     The classification redactions were made to protect from disclosure information that would reveal the actual intelligence activities and methods used by the FBI against specific targets of foreign counterintelligence investigations or operations; identify a target of a foreign counterintelligence investigation; or disclose the intelligence gathering capabilities of the activities or methods directed at specific targets. The information obtained from the intelligence activities or methods is very specific in nature, provided during a specific time period, and known to very few individuals.

(38)     It is my determination that the disclosure of the specific information which describes the intelligence activities or methods withheld in this case which are still used by the FBI today to gather intelligence information, could reasonably be expected to cause serious damage to the national security for the following reasons: (1) disclosure would allow hostile entities to discover the current intelligence gathering methods used; (2) disclosure would reveal current specific targets of the FBI's national security investigations; and (3) disclosure would reveal the

15

determination of the criteria used and priorities assigned to current intelligence or counterintelligence investigations. With the aid of this detailed information, hostile entities could develop countermeasures which would, in turn, severely disrupt the FBI's intelligence gathering capabilities. This severe disruption would also result in severe damage to the FBI's efforts to detect and apprehend violators of the United States' national security and criminal laws.

(39)    The FBI protected detailed intelligence activity information compiled regarding a specific individual or organization of national security interest because disclosure reasonably could be expected to cause serious damage to the national security. Below is a more detailed discussion of this category.

**Detailed Intelligence Activities**

(40)    The classified information withheld on Sarasota-6 and 35 contains detailed intelligence activities information gathered or compiled by the FBI on a specific individual or organization of national security interest. The disclosure of this information could reasonably be expected to cause serious damage to the national security, as it would:   (a) reveal the actual intelligence activity or method utilized by the FBI against a specific target; (b) disclose the intelligence-gathering capabilities of the method; and (c) provide an assessment of the intelligence source penetration of a specific target during a specific period of time. This information is properly classified at the "Secret" level, withheld pursuant to E.O. 13526, § 1.4(c), and is exempt from disclosure pursuant to Exemption 1.

**DEFENDANT'S BURDEN OF ESTABLISHING EXEMPTION (b)(1) CLAIMS**

(41)    The information withheld in this case pursuant to Exemption 1 was examined in light of the body of information available to me concerning the national defense and foreign relations of the United States. This information was not examined in isolation. Instead, each

piece of information was evaluated with careful consideration given to the impact that disclosure of this information will have on other sensitive information contained elsewhere in the United States intelligence community's files. Equal consideration was given to the impact that other information either in the public domain or likely known or suspected by present or potential adversaries of the United States, would have upon the information I examined.

(42) In those instances where, in my judgment, the disclosure of this information could reasonably be expected to cause serious damage to the national security, and its withholding outweighed the benefit of disclosure, I exercised my prerogative as an original classification authority and designated that information as classified in the interest of national security, and invoked Exemption 1 of the FOIA to prevent disclosure. Likewise, the justifications for the withheld classified information were prepared with the intent that they be read with consideration given to the context in which the classified information is found. This context includes not only the surrounding unclassified information, but also other information already in the public domain, as well as information likely known or suspected by other hostile intelligence entities. It is my judgment that any greater specificity in the descriptions and justifications set forth with respect to information relating to foreign activities and intelligence sources and methods of the United States could reasonably be expected to jeopardize the national security of the United States.

## FINDINGS OF DECLARANT

(43) With the above requirements in mind, I personally and independently examined the FBI information withheld pursuant to Exemption (b)(I). As a result of this examination, I determined that this classified information continues to warrant classification at the "Secret" level, and is exempt from disclosure pursuant to E.O. 13526, §1.4, category (c) intelligence activities or methods and intelligence sources, as the unauthorized disclosure of the information could

17

reasonably be expected to cause serious damage to the national security.

## EXEMPTION (b)(3)
## INFORMATION PROTECTED BY STATUTE

(44)    5 U.S.C. § 552 (b)(3) exempts from disclosure information which is: specifically

exempted from disclosure by statute ... provided that such statute

> (A)(i) requires that the matters be withheld from the public in such
> a manner as to leave no discretion on the issue,; or (ii) establishes
> particular criteria for withholding or refers to particular types of
> matters to be withheld; and (B) if enacted after the date of
> enactment on the OPEN FOIA Act of 2009, specifically cites to
> this paragraph.

### (b)(3)-1:    National Security Act of 1947 [50 U.S.C. § 403-1(i)(1)]

(45)    Exemption 3 was asserted to withhold information pursuant to Section 102A(i)(1)

of the National Security Act of 1947 ("NSA"), as amended by the Intelligence Reform and

Terrorism Prevention Act of 2004 ("IRTPA"), 50 U.S.C. § 403-1(i)(1), which provides that the

Director of National Intelligence ("DNI") "shall protect from unauthorized disclosure intelligence

sources and methods."    As relevant to U.S.C. § 552 (b)(3)(B), the National Security Act of 1947

was enacted before the date of enactment of the OPEN FOIA Act of 2009.[6]  On its face, this federal

statute leaves no discretion to agencies about withholding from the public information about

intelligence sources and methods.    Thus, the protection afforded to intelligence sources and

methods by 50 U.S.C. § 403-1(i)(1) is absolute.    See CIA v. Sims, 471 U.S. 159 (1985).

(46)    In order to fulfill its obligation of protecting intelligence sources and methods, the

DNI is authorized to establish and implement guidelines for the Intelligence Community ("IC") for

the classification of information under applicable laws, Executive Orders, or other Presidential

Directives, and for access to and dissemination of intelligence.    50 U.S.C. §§ 403-1(i)(2)(A), (B).

---

[6]    The OPEN FOIA Act of 2009 was enacted October 28, 2009, Pub.L. 111-83, 123 Stat. 2142, 2184; 5 U.S.C.
§552(b)(3)(B).

18

The FBI is one of 17 member agencies comprising the IC, and as such must protect intelligence sources and methods.

(47)     As described above, Congress enacted the NSA, as amended by the IRTPA, to protect the IC's sources and methods of gathering intelligence.  Disclosure of such information presents the potential for individuals to develop and implement countermeasures, which would result in the loss of significant intelligence information, relied upon by national policymakers and the IC.  Given that Congress specifically prohibited the disclosure of information pertaining to intelligence sources and methods used by the IC as a whole, I have determined that the FBI's intelligence sources and methods would be revealed if any of the withheld information is disclosed to plaintiffs, and thus, the FBI is prohibited from disclosing the information under 50 U.S.C. § 403-1(i)(1).  Thus, this information was properly withheld pursuant to Exemption 3, based on 50 U.S.C. § 403-1(i)(1).[7]

## EXEMPTION (b)(7) THRESHOLD

(48)     Exemption (b)(7) of the FOIA protects from mandatory disclosure records or information compiled for law enforcement purposes, but only to the extent that disclosure could reasonably be expected to cause one of the harms enumerated in the subpart of the exemption.  See 5 U.S.C. § 552 (b)(7).  In this case, the harm that could reasonably be expected to result from disclosure concerns the invasion of personal privacy (b)(7)(C), revealing the identity of confidential sources (b)(7)(D), and revealing sensitive law enforcement techniques (b)(7)(E).

(49)     Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes.  Law enforcement agencies such as the FBI must demonstrate that the records at issue

---

[7]     The FBI has withheld information pursuant to Exemption 3 on Bates-numbered page Sarasota-6.  This information was also withheld pursuant to Exemption 1.

are related to the enforcement of federal laws and that the enforcement activity is within the law

enforcement duties of that agency. Documents responsive to plaintiffs' October 27, 2011

request relate to the FBI's investigation into the residence at 4224 Escondito Circle. This falls

within the FBI's performance of its mission to protect and defend the United States against

terrorist and foreign intelligence threats. Accordingly, the information readily meets the

threshold requirement of Exemption (b)(7). The remaining inquiry is whether disclosure "could

reasonably be expected to constitute an unwarranted invasion of personal privacy," "disclose the

identity of confidential sources," or "reveal sensitive law enforcement techniques."

## FOIA EXEMPTIONS (b)(6) AND (b)(7)(C)
## CLEARLY UNWARRANTED AND UNWARRANTED
## INVASION OF PERSONAL PRIVACY

(50)   5 U.S.C. § 552 (b)(6) exempts from disclosure "personnel and medical files and

similar files" when the disclosure of such information would constitute a clearly unwarranted

invasion of personal privacy. Similarly, 5 U.S.C. § 552 (b)(7)(C) exempts from disclosure:

> records or information compiled for law enforcement purposes, but
> only to the extent that the production of such law enforcement records
> or information ... could reasonably be expected to constitute an
> unwarranted invasion of personal privacy.[8]

(51)   When withholding information pursuant to these exemptions, the FBI is required to

balance the privacy interests of the individuals mentioned in these records against any public

interest in disclosure. In asserting this exemption, the FBI has scrutinized each item of

information to determine the nature and strength of the privacy interest of every individual whose

name and/or identifying information appears in the documents at issue. In conducting this

---

[8]  The practice of the FBI is to assert Exemption (b)(6) in conjunction with (b)(7)(C). Although the balancing test for
(b)(6) uses a "would constitute a clearly unwarranted invasion of personal privacy" and the test for (b)(7)(C) uses the
lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the
analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion. The
privacy interests are balanced against the public's interest in disclosure under the analysis of both exemptions.

analysis, the public interest in disclosure of this information is determined by whether the information in question would shed light on the FBI's performance of its mission to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners. In this case, the FBI concluded that the information should be withheld under Exemptions (b)(6) and (b)(7)(C), and determined that the individuals' privacy interests were not outweighed by any public interest in disclosure.

### Exemptions (b)(6)-1 and (b)(7)(C)-1:    Names and/or Identifying Information of FBI Special Agents and Support Personnel

(52)    Exemptions (b)(6) and (b)(7)(C) have been asserted to protect the names and/or identifying information of FBI SAs and support personnel who were responsible for conducting, supervising, and/or maintaining the investigative activities reported in the documents responsive to plaintiffs' October 27, 2011 request. Publicity (adverse or otherwise) regarding any particular investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations. The privacy consideration is also to protect FBI SAs and support personnel, as individuals, from unnecessary, unofficial questioning as to the course of an investigation, whether or not they are currently employed by the FBI.

(53)    FBI SAs conduct official inquiries into violations of various criminal statutes and national security cases. They come into contact with all strata of society, conducting searches and making arrests, both of which result in reasonable but nonetheless serious disturbances to people and their lives. It is possible for an individual targeted by such law enforcement actions to carry a grudge which may last for years, and to seek revenge on the agents involved in a particular investigation. The publicity associated with the release of an agent's identity in connection with a

21

particular investigation could trigger hostility toward a particular agent. There is no public interest to be served by disclosing the identities of the SAs to the public. Thus, disclosure of this information would constitute a clearly unwarranted invasion of personal privacy, and could reasonably be expected to constitute an unwarranted invasion of their personal privacy.[9]

(54)  The names of FBI support personnel are also withheld pursuant to FOIA Exemptions (b)(6) and (b)(7)(C). These employees were assigned to handle tasks related to the investigation into the residence located at 4224 Escondito Circle. They were, and possibly are, in a position to access information regarding official law enforcement investigations, and therefore could become targets of harassing inquiries for unauthorized access to investigations if their identities were released. These individuals maintain substantial privacy interests in not having their identities disclosed. There is no public interest to be served by releasing the identities of these individuals. Thus, disclosure of this information would constitute a clearly unwarranted and unwarranted invasion of their personal privacy. The FBI properly protected this information pursuant to FOIA Exemptions (b)(6)-1 and (b)(7)(C)-1.[10]

**Exemptions (b)(6)-2 and (b)(7)(C)-2:**    **Names and/or Identifying Information Concerning Third Parties of Investigative Interest**

(55)  Exemptions 6 and 7(C) have been asserted to protect the names and/or identifying information of third party individuals who were of investigative interest to the FBI and/or other law enforcement agencies. Identifying information withheld concerning these third parties may include addresses, dates of birth, social security numbers, and other personally identifying

---

[9] For the convenience of the reader, rather than repeat this phrase "clearly unwarranted invasion of personal privacy under the standard of Exemption 6 and an unwarranted invasion of personal privacy under the standard of Exemption 7C" every time the FBI asserts Exemptions 6 and 7(C) we will simply use the phrase "clearly unwarranted and unwarranted invasion of personal privacy" to refer to both standards.

[10] Exemptions (b)(6)-1 and (b)(7)(C)-1 have been asserted on the following pages: Sarasota-5, 7, 12-15, 17-19, 21, 23, 26, 28, 30, and 33-35.

information.  Being linked with any law enforcement investigation carries a strong negative

connotation and a stigma.  To release the identities of these individuals to the public could subject

them to harassment or embarrassment, as well as undue public attention.  Accordingly, the FBI

has determined that these individuals maintain a substantial privacy interest in not having their

identities disclosed.  In deciding whether to release the names and personal information

concerning these third parties, the public's interest in disclosure was balanced against their privacy

interests.  It was determined that this information would not enlighten the public on how the FBI

conducts its internal operations and investigations.  Accordingly, the FBI concluded that the

disclosure of this information would constitute a clearly unwarranted and unwarranted invasion of

their personal privacy.  The FBI properly withheld this information pursuant to FOIA Exemptions

(b)(6)-2 and (b)(7)(C)-2.[11]

## Exemptions (b)(6)-3 and (b)(7)(C)-3:      Names and/or Identifying Information of Third Parties Merely Mentioned

(56)   Exemptions (b)(6) and (b)(7)(C) have been asserted to withhold the names and/or

identifying information concerning third parties merely mentioned in records responsive to

plaintiffs' October 27, 2011 request.  These third parties maintain significant personal privacy

interests in not having their identifying information disclosed.  If the FBI were to disclose their

names and other personal information, the disclosure would reveal that these third parties were

connected in some way with the FBI.  Disclosure of these third parties' names and/or identifying

information in connection with the FBI carries an extremely negative connotation.  Disclosure of

their identities would subject these individuals to possible harassment or criticism and focus

derogatory inferences and suspicion on them.  Accordingly, the FBI has determined that these

third parties have substantial privacy interests in not having information about them found in

---

[11]   Exemptions (b)(6)-2 and (b)(7)(C)-2 have been asserted on the following pages: Sarasota-1-2, 5-7, 9-10, 15, 18, 23-24, 26, 29-32, and 34-35.

23

records of the FBI. After identifying the substantial privacy interests of these third party individuals, who are merely mentioned in the investigative files, the FBI balanced these privacy interests against the minimal public interest in the disclosure of the information. The FBI determined that the personal privacy interests in non-disclosure outweighed the public interest in disclosure, as disclosure would not shed light on the operations and activities of the FBI. Disclosure of this information would constitute a clearly unwarranted and unwarranted invasion of their personal privacy. Accordingly, the FBI properly protected this information from disclosure pursuant to FOIA Exemptions (b)(6)-3 and (b)(7)(C)-3.[12]

**Exemptions (b)(6)-4 and (b)(7)(C)-4:**    **Names and/or Identifying Information of Third Parties who Provided Information to the FBI**

(57)    Exemptions (b)(6) and (b)(7)(C) have been asserted to protect the names and/or identifying information of third parties who provided information to the FBI. The FBI has found that information provided by individuals during an interview is one of the most productive investigative tools used by law enforcement agencies. The FBI's experience has shown that individuals interviewed by the FBI fear that their identity may be exposed and, consequently, that they could be harassed, intimidated, or threatened with legal consequences, economic reprisal, or possible physical harm. To surmount these fears, individuals interviewed by the FBI must be assured that their names and personally-identifying information will be held in the strictest of confidence.

(58)    In this case, the FBI balanced the significant personal privacy interests of the third party interviewees in not having their name and identifying information disclosed against the negligible public interest in the disclosure of their identities. Disclosure of the third parties'

---

[12] Exemptions (b)(6)-3 and (b)(7)(C)-3 have been asserted on the following pages: Sarasota-1-2, 5-13, 19, 21, 23, 26-27, 29-32, and 34-35.

24

names and/or identifying information would shed no light on the operations and activities of the FBI. Accordingly, the FBI concluded that the disclosure of this information would constitute a clearly unwarranted and unwarranted invasion of their personal privacy. The FBI therefore, properly withheld the names and/or identifying information concerning third parties who provided information to the FBI pursuant to Exemptions (b)(6)-4 and (b)(7)(C)-4.[13]

| **Exemptions (b)(6)-5 and (b)(7)(C)-5:** | **Names and/or Identifying Information of State and/or Local Law Enforcement Officers** |
|---|---|

(59)    Exemptions (b)(6) and (b)(7)(C) have been asserted to withhold the names and/or identifying information of local law enforcement personnel. These law enforcement officers were acting in their official capacities and aided the FBI in its law enforcement efforts. Disclosure of the identities of these personnel could subject them, as individuals, to unofficial inquiries not anticipated in connection with their assistance to the FBI. Thus, these personnel have substantial interests in protecting their identities. There is no public interest to be served in releasing the identities of these third parties. Therefore, the FBI concluded that the disclosure of this information would constitute a clearly unwarranted invasion of their personal privacy and could reasonably be expected to constitute an unwarranted invasion of personal privacy. Exemptions (b)(6)-5 and (b)(7)(C)-5 have been asserted to protect the names and/or identifying information of local law enforcement officers.[14]

## EXEMPTION (b)(7)(D)
## INFORMATION FROM CONFIDENTIAL SOURCES

(60)    5 U.S.C. § 552 (b)(7)(D) provides protection for:

records or information compiled for law enforcement purposes [which] could

---

[13] Exemptions (b)(6)-4 and (b)(7)(C)-4 have been asserted on the following pages: Sarasota-12, 15, 17-19, 21, 23, 26-27, 29-32, and 34.

[14] Exemptions (b)(6)-5 and (b)(7)(C)-5 have been asserted on Bates pages Sarasota-18 and 28-32.

25

reasonably be expected to disclose the identity of a confidential source, including a state, local or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source.

(61)   Numerous confidential sources report to the FBI on a regular basis and are "informants" within the common meaning of the term.   Some of these sources provide information under an express assurance of confidentiality.   Other individuals are interviewed under circumstances from which assurances of confidentiality can reasonably be inferred.   These individuals are considered to be confidential sources since they furnished information only with the understanding that their identities and the information provided will not be released outside the FBI.   Information provided by these individuals is singular in nature, and if released, could reveal their identities.

**Exemption (b)(7)(D)-1:      Information Provided by a Local Law Enforcement Agency Under an Implied Assurance of Confidentiality**

(62)   Exemption (b)(7)(D) has been asserted to protect police reports and information obtained by local law enforcement agencies that were provided to the FBI by law enforcement agencies.   The police reports and information obtained by various law enforcement agencies were given to the FBI in conjunction with the local law enforcement agency's investigation into suspicious activity at 4224 Escondito Circle.   Confidentiality must be maintained to facilitate this type of law enforcement cooperation, which is necessary in criminal investigations.   The release of such confidential information could have a chilling effect on the cooperation of various law enforcement agencies.   In investigations such as this, which require multi-jurisdictional resources, the destruction of confidences among members of the law enforcement community could be disastrous.   Furthermore, the precedent set by the FBI if this information were to be disclosed would have a significant impact and ripple effect -- other local law enforcement agencies

26

could refuse to cooperate and refuse to provide the FBI with essential information during future

investigations for fear the information might be released to the public at large. Accordingly, the

FBI has properly withheld this information under FOIA Exemption (b)(7)(D)-1.[15]

### Exemption (b)(7)(D)-2:     Names, Identifying Data and/or Information Provided by an Individual under an "Implied" Assurance of Confidentiality

(63)     Exemption (b)(7)(D)-2 has been asserted to protect the name, identifying

information, and/or information provided by a third party under an implied assurance of

confidentiality.

(64)     The FBI has withheld information which the release of the information could

clearly identify the source. The sensitivity of the information, and the position of the source, is

such that it may be inferred that the information was provided with the expectation of

confidentiality. This source provided valuable information that is detailed and singular in nature.

As discussed earlier, the disclosure of the identity of this individual is in direct contradiction to the

interests of the FBI. If the FBI were forced to disclose the identity of -- and information provided

by -- a confidential source who provided information based on an expectation of confidentiality

(whether express or implied), such disclosure would have a chilling effect on the activities and

cooperation of this and other future FBI confidential sources. The FBI has released as much

segregable information as possible without disclosing the source's identity. As a result, the FBI

has properly withheld this information pursuant to FOIA Exemption (b)(7)(D)-2.[16]

---

[15]  Exemption (b)(7)(D)-1 has been asserted on the Bates pages Sarasota-29-32.

[16]  Exemption (b)(7)(D)-2 has been asserted on Bates pages Sarasota-30-32.

## EXEMPTION (b)(7)(E)
## INVESTIGATIVE TECHNIQUES AND PROCEDURES

(65)     5 U.S.C. § 552 (b )(7)(E) provides for the withholding of:

> law enforcement records which would disclose techniques and
> procedures for law enforcement investigations or prosecutions,
> or would disclose guidelines for law enforcement investigations
> or prosecutions if such disclosure could reasonably be expected
> to risk circumvention of the law.

### Exemption (b)(7)(E)-1:       File Numbers

(66)     Exemption (b)(7)(E) was asserted to protect sensitive case file numbers.   The FBI has determined that this exemption is appropriate for protecting these file numbers.   The release of file numbering convention identifies the investigative interest or priority given to such matters. Applying a mosaic analysis, suspects could use these numbers (indicative of investigative priority), in conjunction with other information known about other individuals and/or techniques, to change their pattern of activity to avoid detection, apprehension, or create alibis for suspected activities, etc.   Thus, the FBI properly protected this information from disclosure pursuant to FOIA Exemption (b)(7)(E)-1.[17]

### Exemption (b)(7)(E)-2:       Dates and Types of Investigations (Preliminary or Full Investigations)

(67)     Exemption 7(E) has been asserted to protect from disclosure information pertaining to the types and dates of investigations referenced in the records at issue in this case.   Specifically, the information withheld, when referenced in connection with an actual investigation and not in general discussion, pertains to the type of investigation, whether it is a "preliminary" or "full" investigation and the date it was initiated.   Disclosure of this information would allow individuals to know the types of activities that would trigger a full investigation as opposed to a preliminary

---

[17]   Exemption (b)(7)(E)-1 has been asserted on the following pages:   Sarasota-5-8, 10, and 34.

28

investigation and the particular dates that the investigation covers, which would allow individuals to adjust their behavior accordingly. Moreover, the knowledge that a specific activity in general warrants investigation could likewise cause individuals to adjust their conduct to avoid detection. Because disclosure of this information could reasonably be expected to impede the FBI's effectiveness and potentially aid in circumvention of the law, the FBI has properly withheld this information pursuant to Exemption 7(E)-2.[18]

## Exemption (b)(7)(E)-3:      Internal Non-Public Facsimile Numbers

(68)    Exemption (b)(7)(E) has been asserted to protect internal non-public facsimile numbers of FBI SAs and support personnel. Internal non-public fax numbers are used daily and routinely by the FBI in order to transmit and receive investigatory records during the performance of the FBI's law enforcement mission. The relative benefit of these techniques and/or procedures could be diminished if the actual numbers were revealed in these records. Release of the information could subject FBI SAs and support personnel to massive, disruptive, and misleading amounts of documents as well as harassment and threats. It could also enable circumvention of the law by allowing criminals to gain access to an internal communication channel used by the FBI to communicate and transmit information internally and externally with other law enforcement agencies. As such, release of these numbers would clearly disrupt official business by impeding the ability of SAs and support personnel to conduct and conclude law enforcement investigations in a timely manner. Because disclosure of this information could reasonably be expected to impede the FBI's effectiveness and potentially aid in circumvention of the law, the FBI has properly withheld this information pursuant to Exemption (b)(7)(E)-3.[19]

---

[18]  Exemption (b)(7)(E)-2 has been asserted on Bates page Sarasota-5.

[19]  Exemption (b)(7)(E)-3 has been asserted on the following pages:   Sarasota-9 and 28-32.

29

### Exemption (b)(7)(E)-4:   Investigative Techniques and Procedures

(69)    Exemption (b)(7)(E) has been asserted to protect procedures and techniques used by FBI agents to conduct national security investigations.   Disclosure of this information could enable subjects of FBI investigations to circumvent similar currently used techniques and procedures by law enforcement.   The relative benefit of these techniques and procedures could be diminished if the actual techniques and procedures were revealed in these records.   This in turn could facilitate the accumulation of information by other investigative subjects regarding the circumstances under which these techniques and procedures were used or requested and the value of the information obtained.

(70)    Release of this type of information could enable criminals to educate themselves about the law enforcement investigative techniques and procedures employed for the location and apprehension of individuals and therefore allow these individuals to take countermeasures to circumvent the effectiveness of these techniques and procedures and to continue to violate the law. Thus, the FBI properly protected this information from disclosure pursuant to FOIA Exemption (b)(7)(E)-4.[20]

### Exemption (b)(7)(E)-5:   Intelligence Analyst Analytical Techniques and Procedures

(71)    Exemption (b)(7)(E) has been asserted to protect procedures and techniques used by the FBI to conduct national security investigations.   Specifically, FOIA Exemption (b)(7)(E) is being asserted to protect an analyst's note in regards to his/her interpretation and/or analysis regarding the investigation at issue.   FBI intelligence personnel undergo specialized training in order to develop and apply analytical skills to develop and support particular investigations. Disclosure of these analytical techniques and procedural methods could enable subjects of FBI

---

[20]  Exemption (b)(7)(E)-4 has been asserted on Bates page Sarasota-33.

investigations to circumvent the law by disclosing the very analytical processes, patterns, and techniques used by the FBI in its law enforcement mission to develop investigations. The relative benefit of these analytical techniques and procedures would be diminished if the actual techniques and procedures were revealed in these records. This in turn could facilitate the accumulation of information by other investigative subjects regarding the circumstances and direction under which these techniques and procedures were used or requested and the value of the information obtained. It could also enable criminals to educate themselves about the law enforcement investigative techniques and procedures employed for the location and apprehension of individuals and therefore allow these individuals to take countermeasures to circumvent the effectiveness of these techniques and procedures and to continue to violate the law. Thus, the FBI properly protected this information from disclosure pursuant to FOIA Exemption (b)(7)(E)-5.[21]

### (b)(7)(E)-6:  Database and Database Information

(72)   Exemption (b)(7)(E) has been asserted to protect non-public databases and data search results. The FBI used databases in order to query information needed for its investigations using advanced software tools. These investigative tools and techniques provide a platform for Special Agents, support personnel, and Intelligence Analysts to develop investigative leads from a variety of source data using state-of-the-art analytical tools. In some circumstances access to these databases are restricted and limited only to FBI and/or members of the law enforcement community. The manner in which these databases are searched, organized and reported to the FBI is an internal technique that is not ordinarily known to the public. Disclosure of this information serves no public interest, and in fact, could enable criminals to employ countermeasures to undermine the effectiveness of the use of these databases, thus jeopardizing

---

[21]   Exemption (b)(7)(E)-5 has been asserted on Bates pages Sarasota-34-35.

the FBI's investigative mission. Classified data could also be released if these databases were made available to the public. Because disclosure would not serve any public interest, and because disclosure would impede the FBI's effectiveness and potentially aid in circumvention of the techniques if disclosed, the FBI properly withheld this information pursuant to Exemption (b)(7)(E)-6.[22]

## CONCLUSION

(73)    The FBI has processed and released all reasonably segregable information from the records responsive to plaintiffs' October 27, 2011 request to the FBI. Information has been properly withheld pursuant to FOIA Exemptions 1, 3, 6, 7(C), 7(D), and 7(E), 5 U.S.C. §§ 552 (b)(1), (b)(3), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E). The FBI carefully examined the responsive documents and determined that the information withheld from plaintiffs, if disclosed, could reasonably be expected to cause serious damage to national security; could reasonably reveal information protected by statute; could cause a clearly unwarranted and unwarranted invasion of personal privacy; could compromise a confidential source; and could disclose investigative techniques and procedures for law enforcement investigations, the disclosure of which could reasonably be expected to risk circumvention of the law.

---

[22] Exemption (b)(7)(E)-6 has been asserted on Bates page Sarasota-35.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct, and that Exhibits A through K attached hereto are true and correct copies.

Executed this ____9th____ day of May, 2013.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, Virginia