# Ex. 1

*(Under Seal)*

# Ex. 2

*(Under Seal)*

# Ex. 3

*(Under Seal)*

# Ex. 4

*(Under Seal)*

# Ex. 5

*(Under Seal)*

# Ex. 6

*(Under Seal)*

# Ex. 7

*(Under Seal)*

# Ex. 8

*(Under Seal)*

# Ex. 9

*(Under Seal)*

# Ex. 10

*(Under Seal)*

# Ex. 11

*(Under Seal)*

Ex. 12

| | (b)(3), (b)(6), (b)(7)(c) |
| **From:** | (b) (6), (b) (7)(C), (b)(3) |
| **Sent time:** | 01/26/2022 08:04:05 AM |
| **To:** | John Simms <(b) (6), (b) (7)(C) > |
| **Cc:** | Jason Metrick <(b) (6), (b) (7)(C) >; Brett Baker <(b) (6), (b) (7)(C) >; Thomas A Monheim <(b) (6), (b) (7)(C), (b)(3) > |
| **Subject:** | RE: Request for a meeting regarding potential high level spillage |

Good Morning,

Tom has time tomorrow at 0800 or 1:30 to join via Google Meet.

**From:** Thomas A Monheim <(b) (6), (b) (7)(C), (b)(3) >
**Sent:** Wednesday, January 26, 2022 7:51 AM        (b)(3), (b)(6), (b)(7)(c)
**To:** John Simms <(b) (6), (b) (7)(C) >
**Cc:** Jason Metrick <(b) (6), (b) (7)(C) >;       <(b) (6), (b) (7)(C), (b)(3) >
**Subject:** Re: Request for a meeting regarding potential high level spillage
                        (b)(3), (b)(6), (b)(7)(c)
Oops, sorry. Further evidence of why I need      help.

Since I will be working in the office today, I think we would need to just do a teleconference. I will be working from home tomorrow and could do Google meet. My days are fairly full but      can make some time by rearranging meetings if necessary. Thanks.                        (b)(3), (b)(6), (b)(7)(c)

**From:** "John Simms" <(b) (6), (b) (7)(C) >
**Date:** Wednesday, January 26, 2022 at 6:26:14 AM
**To:** "Thomas A Monheim" <(b) (6), (b) (7)(C), (b)(3) >
**Cc:** "Jason Metrick" <(b) (6), (b) (7)(C) >, "Brett Baker" <(b) (6), (b) (7)(C) >
**Subject:** Re: Request for a meeting regarding potential high level spillage

Sir,
        (b)(3), (b)(6), (b)(7)(c)

I did not see      email address anywhere, could you please forward it to me, or this email to them? Our agency uses Google Meet and I can send out an invite if that works for you. Our IG has a meeting 8:30 to 12:10, but he said he could make it work if the only time you could meet was in that block. Please just let me know if Google Meet works and what time could work for you. Thank you, sir.

Respectfully,

John Simms
Counsel to the Inspector General
Office of Inspector General
National Archives and Records Administration
(b) (6), (b) (7)(C)

**CAUTION!** This message may contain Controlled Unclassified Information (CUI) that requires safeguarding or dissemination controls, in part because it may contain information protected by the attorney-client, attorney work product, deliberative process, or other privilege; Inspector General Protected information (PRIIG); Investigation information (INV); General Law Enforcement information (LEI); Law Enforcement - Communications (LCOMM); privacy information; and/or information exempted from release under the Freedom of Information Act or Privacy Act. Do not disseminate without the approval of the NARA IG. If received in error, please notify the sender by reply e-mail and delete all copies of this message.

On Tue, Jan 25, 2022 at 6:56 PM Thomas A Monheim <(b) (6), (b) (7)(C), (b)(3) > wrote:
    Yes, I can make time.
(b)(3), (b)(6), (b)(7)(c)
        (copied) can help facilitate, thanks.

    **From:** "John Simms" <(b) (6), (b) (7)(C) >
    **Date:** Tuesday, January 25, 2022 at 5:06:51 PM

OIG000080

**To:** "Thomas Monheim" <(b) (6), (b) (7)(C), (b)(3)>
**Cc:** "Jason Metrick" <(b) (6), (b) (7)(C)>, "Brett Baker" <(b) (6), (b) (7)(C)>
**Subject:** Request for a meeting regarding potential high level spillage

Sir,

Our agency just gave us a quick brief on what appears to be a very high level potential spillage and records management issue. When they notified the DoJ the office of the Deputy Attorney General told them to contact us and your office. Do you have some time tomorrow or the next day to meet virtually? Please let us know.

Respectfully,

John Simms
Counsel to the Inspector General
Office of Inspector General
National Archives and Records Administration
(b) (6), (b) (7)(C)

**CAUTION!** This message may contain Controlled Unclassified Information (CUI) that requires safeguarding or dissemination controls, in part because it may contain information protected by the attorney-client, attorney work product, deliberative process, or other privilege; Inspector General Protected information (PRIIG); Investigation information (INV); General Law Enforcement information (LEI); Law Enforcement - Communications (LCOMM); privacy information; and/or information exempted from release under the Freedom of Information Act or Privacy Act. Do not disseminate without the approval of the NARA IG. If received in error, please notify the sender by reply e-mail and delete all copies of this message.

Ex. 13

**John Simms**

| | |
|---|---|
| **From:** | Windom, Thomas (USADC) █████████ (b) (6), (b) (7)(C) ████████ |
| **Sent:** | Tuesday, February 1, 2022 11:49 AM |
| **To:** | █████ (b) (6), (b) (7)(C) █████ |
| **Cc:** | Jason Metrick |
| **Subject:** | RE: [EXTERNAL] Fwd: Issue re Potential Destruction of Presidential Records |

Sure thing
tw

**From:** █████ (b) (6), (b) (7)(C) ███████████████
**Sent:** Tuesday, February 1, 2022 11:40 AM
**To:** Windom, Thomas (USADC) ████ (b) (6), (b) (7)(C) ████
**Cc:** Jason Metrick ██ (b) (6), (b) (7)(C) ██
**Subject:** [EXTERNAL] Fwd: Issue re Potential Destruction of Presidential Records

Hi Thomas,

Might we have a moment to discuss the below matter concerning ██ (b) (5) ████████ with you tomorrow as well?

Thanks,

████ (b) (6), (b) (7)(C) ████
███████
Special Agent in Charge
NARA-OIG
████ (b) (6), (b) (7)(C) ████

**INSPECTOR GENERAL SENSITIVE INFORMATION**

This email including any attachments is intended only for authorized recipients. Recipients may not further disseminate this information without the express permission of the sender or other Office of the Inspector General personnel. This email may contain Inspector General sensitive information that is confidential, sensitive, work product, attorney-client privileged, or protected by Federal law, including protection from public disclosure under the Freedom of Information Act (FOIA), *5 U.S.C. § 552.* Accordingly, the use, dissemination, distribution or reproduction of this information to or by unauthorized or unintended recipients may be unlawful. If you have received this email in error, please notify us immediately by return email, and destroy all copies of the email received in error.

**From:** GaryM Stern <garym.stern@nara.gov>
**Sent:** Friday, January 28, 2022 6:08:33 PM
**To:** Brett Baker ██ (b) (6), (b) (7)(C) ██ ; Jason Metrick ███ (b) (6), (b) (7)(C) ███ ; Simms, John ██ (b) (6), (b) (7)(C) ██
**Cc:** Bosanko, William <william.bosanko@nara.gov>
**Subject:** Issue re Potential Destruction of Presidential Records

OIG000054





Please let us know if you think this is a matter that warrants further consideration (b) (5), (b) (7)(A)

Thanks,
Gary

Gary M. Stern
General Counsel
National Archives and Records Administration
8601 Adelphi Road
College Park, MD  20740
(b) (6)         (cell)
301-837-3026 (office)
301-837-0293 (fax)
garym.stern@nara.gov



2

OIG000055

Ex. 14

| From: | John Hamilton <john.hamilton@nara.gov> |
|---|---|
| Sent time: | 02/09/2022 02:25:05 PM |
| To: | Ferriero, David <david.ferriero@nara.gov>; Wall, Debra <debra.wall@nara.gov>; Bosanko, William <william.bosanko@nara.gov>; Stern, GaryM <garym.stern@nara.gov>; John Valceanu <john.valceanu@nara.gov>; Stanwich, Maria <maria.stanwich@nara.gov>; NARA Executive Secretariat <ExecSec@nara.gov>; Donius, Susan <susan.donius@nara.gov>; Laster, John <john.laster@nara.gov> |
| BCc: | (b) (6) @nara.gov |
| Subject: | Fwd: Letter for The Honorable David S. Ferriero, Archivist of the United States, National Archives and Records Administration |
| Attachments: | 2022-02-09.CBM to Ferriero-NARA re Trump Mar-a-Lago.pdf |

Here is the letter we knew was coming.....I have acknowledged our receipt of this letter.

John

---------- Forwarded message ---------
From: (b) (6) <(b) (6)>
Date: Wed, Feb 9, 2022 at 2:17 PM
Subject: Letter for The Honorable David S. Ferriero, Archivist of the United States, National Archives and Records Administration
To: john.hamilton@nara.gov <john.hamilton@nara.gov>, garym.stern@nara.gov <garym.stern@nara.gov>, congress.affairs@nara.gov <congress.affairs@nara.gov>
Cc: (b) (6) <(b) (6)>, (b) (6) <(b) (6)>, (b) (6) <(b) (6)>, (b) (6) <(b) (6)>, (b) (6)>

Hello—

Please see the attached letter from Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform, for The Honorable David S. Ferriero, Archivist of the United States, National Archives and Records Administration.

Please acknowledge receipt of the letter.  Thank you.

Sincerely,

(b) (6)

Staff Assistant | Committee on Oversight & Reform

Chairwoman Carolyn B. Maloney

(b) (6)

--
John O. Hamilton
Director of Congressional Affairs

15B000116

National Archives and Records Administration
700 Pennsylvania Avenue, NW
Washington, DC 20408-0001
PH: 202-357-6832
Cell: (b) (6)
Fax: 202-3575959

15B000117

2022-02-09.CBM to Ferriero-NARA re Trump Mar-a-Lago.pdf

CAROLYN B. MALONEY, NEW YORK
CHAIRWOMAN

ONE HUNDRED SEVENTEENTH CONGRESS

JAMES COMER, KENTUCKY
RANKING MINORITY MEMBER

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY   (202) 225–5051
MINORITY   (202) 225–5074
https://oversight.house.gov

February 9, 2022

The Honorable David S. Ferriero
Archivist of the United States
National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740-6001

Dear Mr. Ferriero:

The Committee is seeking information about the 15 boxes of presidential records that the National Archives and Records Administration (NARA) recently recovered from former President Trump's Mar-a-Lago residence.  I am deeply concerned that these records were not provided to NARA promptly at the end of the Trump Administration and that they appear to have been removed from the White House in violation of the Presidential Records Act (PRA).  I am also concerned by recent reports that while in office, President Trump repeatedly attempted to destroy presidential records, which could constitute additional serious violations of the PRA.

The PRA preserves the records made by a sitting president, while giving legal ownership of those records to the American people.[1]  Congress enacted the PRA in response to President Nixon's attempts to destroy presidential records during the Watergate scandal.

President Trump is required not only to preserve presidential records, but to turn them over to the National Archives at the end of his presidential term.  The PRA specifically states:

Upon the conclusion of a President's term of office, or if a President serves consecutive terms upon the conclusion of the last term, **the Archivist of the United States shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President**.[2]

On February 7, 2022, the *Washington Post* reported that former President Trump improperly removed 15 boxes of records from the White House and transported them to his Mar-a-Lago residence.  These boxes reportedly contained correspondence and letters from world leaders, including correspondence with North Korean leader Kim Jong-un, and a letter President

---

[1] *See* 44 U.S.C. §§ 2201–2209.

[2] 44 U.S.C. § 2203(g)(1) (emphasis added).

15B000118

2022-02-09-CBM to Ferriero-NARA re Trump Mar-a-Lago.pdf

The Honorable David S. Ferriero
Page 2

Obama left for his successor.[3]  The records recovered from Mar-a-Lago also reportedly include several newspaper clippings.  A previous Committee investigation revealed that President Trump wrote notes on press clippings, which could mean that even those clippings were likely presidential records.[4]

On February 5, 2022, it was reported that while in office, former President Trump "tore up briefings and schedules, articles and letters, memos both sensitive and mundane."[5]

Removing or concealing government records is a criminal offense punishable by up to three years in prison.  Former National Security Advisor Sandy Berger, for example, was prosecuted for taking classified documents from NARA.[6]  Former President Trump and his senior advisors must also be held accountable for any violations of the law.  Republicans in Congress obsessively investigated former Secretary of State Hillary Clinton for her use of a private email server for official communications.  Former President Trump's conduct, in contrast, involves a former president potentially violating a criminal law by intentionally removing records, including communications with a foreign leader, from the White House and reportedly attempting to destroy records by tearing them up.

In order for the Committee to examine the extent and impact of former President Trump's violations of the PRA, please provide responses to the following requests by February 18, 2022:

1.      Did NARA ask the representatives of former President Trump about missing records prior to the 15 boxes being identified?  If so, what information was provided in response?

2.      Has NARA conducted an inventory of the contents of the boxes recovered from Mar-a-Lago?

3.      Please provide a detailed description of the contents of the recovered boxes, including any inventory prepared by NARA of the contents of the boxes.  If an inventory has not yet been completed, please provide an estimate of when such an inventory will be completed.

---

[3] *National Archives Had to Retrieve Trump White House Records from Mar-a-Lago,* Washington Post (Feb. 7, 2022) (online at www.washingtonpost.com/politics/2022/02/07/trump-records-mar-a-lago/).

[4] Committee on Oversight and Reform, *Press Release: Committee Chairs Release New Documents Showing Mar-a-Lago Trio Violated Transparency Law and Improperly Influenced Veterans Policies Under President Trump* (Sept. 27, 2021) (online at https://oversight.house.gov/news/press-releases/committee-chairs-release-new-documents-showing-mar-a-lago-trio-violated).

[5] *"He Never Stopped Ripping Things Up": Inside Trump's Relentless Document Destruction Habits*, Washington Post (Feb. 5, 2022) (online at www.washingtonpost.com/politics/2022/02/05/trump-ripping-documents).

[6] *See e.g.*, National Archives and Records Administration, *Notable Thefts from the National Archives* (online at www.archives.gov/research/recover/notable-thefts html) (accessed Feb. 8, 2022).

The Honorable David S. Ferriero
Page 2

4.     Are the contents of the boxes of records recovered by NARA undergoing a review to determine if they contain classified information?  If so, who is conducting that review and has any classified information been found?

5.     Is NARA aware of any additional presidential records from the Trump Administration that may be missing or not yet in NARA's possession?

6.     What efforts has NARA taken, and is NARA taking, to ensure that any additional records that have not been turned over to NARA are not lost or destroyed?

7.     Has the Archivist notified the Attorney General that former President Trump removed presidential records from the White House?  If not, why not?

8.     Is NARA aware of presidential records that President Trump destroyed or attempted to destroy without the approval of NARA?  If so, please provide a detailed description of such records, the actions taken by President Trump to destroy or attempt to destroy them, and any actions NARA has taken to recover or preserve these documents.

The Committee on Oversight and Reform is the principal oversight committee of the House of Representatives and has broad authority to investigate "any matter" at "any time" under House Rule X.  In addition, House Rule X states that the Committee on Oversight and Reform has jurisdiction to "study on a continuing basis the operation of Government activities at all levels, including the Executive Office of the President."

An attachment to this letter provides additional instructions for responding to the Committee's request. If you have any questions regarding this request, please contact the Oversight Committee staff at (202) 225-5051.

Thank you for your prompt attention to this matter.

Sincerely,

*Carolyn B. Maloney*

Carolyn B. Maloney
Chairwoman

Enclosure

cc:    The Honorable James Comer, Ranking Member

15B000120

2022-02-09.CBM to Ferriero-NARA re Trump Mar-a-Lago.pdf

**Responding to Oversight Committee Document Requests**

1.    In complying with this request, produce all responsive documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf.  Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2.    Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Committee.

3.    In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4.    The Committee's preference is to receive documents in electronic form (i.e., CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions.

5.    Documents produced in electronic format should be organized, identified, and indexed electronically.

6.    Electronic document productions should be prepared according to the following standards:

    a.    The production should consist of single page Tagged Image File ("TIF"), files accompanied by a Concordance-format load file, an Opticon reference file, and a file defining the fields and character lengths of the load file.

    b.    Document numbers in the load file should match document Bates numbers and TIF file names.

    c.    If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

    d.    All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

    BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD,

INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

7.      Documents produced to the Committee should include an index describing the contents of the production.  To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

8.      Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

9.      When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

10.     The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

11.     The pendency of or potential for litigation shall not be a basis to withhold any information.

12.     In accordance with 5 U.S.C. § 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

13.     Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

14.     If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date.  An explanation of why full compliance is not possible shall be provided along with any partial production.

15.     In the event that a document is withheld on the basis of privilege, provide a privilege log containing the following information concerning any such document:  (a) every privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the privilege(s) asserted.

16.     If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control.

17.     If a date or other descriptive detail set forth in this request referring to a document is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

15B000122

18.     This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

19.     All documents shall be Bates-stamped sequentially and produced sequentially.

20.     Two sets of each production shall be delivered, one set to the Majority Staff and one set to the Minority Staff. When documents are produced to the Committee, production sets shall be delivered to the Majority Staff in Room 2157 of the Rayburn House Office Building and the Minority Staff in Room 2105 of the Rayburn House Office Building.

21.     Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and (2) all documents located during the search that are responsive have been produced to the Committee.

## **Definitions**

1.     The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2.     The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic

15B000123

message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, or otherwise.

3.      The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope.   The singular includes plural number, and vice versa.  The masculine includes the feminine and neutral genders.

4.      The term "including" shall be construed broadly to mean "including, but not limited to."

5.      The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments,  branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6.      The term "identify," when used in a question about individuals, means to provide the following information:  (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7.      The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8.      The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9.      The term "individual" means all natural persons and all persons or entities acting on their behalf.

15B000124

# Ex. 15

*(Under Seal)*

Ex. 16

| From: | William Bosanko <william.bosanko@nara.gov> |
|---|---|
| Sent time: | 02/09/2022 03:03:55 PM |
| To: | John Hamilton <john.hamilton@nara.gov> |
| Cc: | Ferriero, David <david.ferriero@nara.gov>; Wall, Debra <debra.wall@nara.gov>; Stern, GaryM <garym.stern@nara.gov>; John Valceanu <john.valceanu@nara.gov>; Stanwich, Maria <maria.stanwich@nara.gov>; NARA Executive Secretariat <ExecSec@nara.gov>; Donius, Susan <susan.donius@nara.gov>; Laster, John <john.laster@nara.gov> |
| BCc: | (b) (6)        @nara.gov |
| Subject: | Re: Letter for The Honorable David S. Ferriero, Archivist of the United States, National Archives and Records Administration |

Thanks John.  Gary and I have alerted NARA OIG, ODNI OIG, and DOJ.

Jay

On Wed, Feb 9, 2022 at 2:25 PM John Hamilton <john.hamilton@nara.gov> wrote:

Here is the letter we knew was coming.....I have acknowledged our receipt of this letter.

John

---------- Forwarded message ---------
From: (b) (6)          <(b) (6)                     >
Date: Wed, Feb 9, 2022 at 2:17 PM
Subject: Letter for The Honorable David S. Ferriero, Archivist of the United States, National Archives and Records Administration
To: john.hamilton@nara.gov <john.hamilton@nara.gov>, garym.stern@nara.gov <garym.stern@nara.gov>, congress.affairs@nara.gov <congress.affairs@nara.gov>
Cc: (b) (6)          <(b) (6)                 >, (b) (6)          <(b) (6)                >, (b) (6)        <(b) (6)                 >, (b) (6)          <(b) (6)                      >, (b) (6)          <(b) (6)                 >, (b) (6)          <(b) (6)                >

Hello—

Please see the attached letter from Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform, for The Honorable David S. Ferriero, Archivist of the United States, National Archives and Records Administration.

Please acknowledge receipt of the letter.  Thank you.

Sincerely,

(b) (6)

Staff Assistant | Committee on Oversight & Reform

Chairwoman Carolyn B. Maloney

(b) (6)

--
John O. Hamilton
Director of Congressional Affairs
National Archives and Records Administration
700 Pennsylvania Avenue, NW
Washington, DC 20408-0001
PH: 202-357-6832
Cell: (b) (6)
Fax: 202-3575959

Ex. 17

**John Simms**

| | |
|---|---|
| **From:** | Keller, John (CRM) (b) (6), (b) (7)(C) |
| **Sent:** | Thursday, February 10, 2022 1:52 PM |
| **To:** | (b) (6), (b) (7)(C) |
| **Cc:** | Jason Metrick; Bratt, Jay (NSD) |
| **Subject:** | RE: [EXTERNAL] Re: Issue re Potential Destruction of Presidential Records |
| **Signed By:** | (b) (6), (b) (7)(C) |

Thank you for the email, (b) (6), (b) (7)(C) and Jason.  I appreciated you taking the time to discuss these matters in more detail in our virtual meeting this afternoon. (b) (5), (b) (7)(A)

Please do not hesitate to reach out to discuss these or related matters further.

-John


John D. Keller
Principal Deputy Chief
Public Integrity Section
United States Department of Justice
1301 New York Ave. NW | Washington, D.C. 20350
(b) (6), (b) (7)(C) (Desk) | (b) (6), (b) (7)(C) (Cell)



**From:** (b) (6), (b) (7)(C)
**Sent:** Wednesday, February 9, 2022 5:07 PM
**To:** Keller, John (CRM (b) (6), (b) (7)(C)
**Cc:** Jason Metrick (b) (6), (b) (7)(C)
**Subject:** Fwd: [EXTERNAL] Re: Issue re Potential Destruction of Presidential Records

Mr. Keller,

# (b) (5), (b) (6), (b) (7)(C), (b) (7)(A)





(b) (5), (b) (6), (b) (7)(C), (b) (7)(A)

(b) (5), (b) (6), (b) (7)(C), (b) (7)(A)

Respectfully,

(b) (6), (b) (7)(C)

Special Agent in Charge
NARA-OIG

(b) (6), (b) (7)(C)

**INSPECTOR GENERAL SENSITIVE INFORMATION**

This email including any attachments is intended only for authorized recipients. Recipients may not further disseminate this information without the express permission of the sender or other Office of the Inspector General personnel. This email may contain Inspector General sensitive information that is confidential, sensitive, work product, attorney-client privileged, or protected by Federal law, including protection from public disclosure under the Freedom of Information Act (FOIA), *5 U.S.C. § 552.* Accordingly, the use, dissemination, distribution or reproduction of this information to or by unauthorized or unintended recipients may be unlawful. If you have received this email in error, please notify us immediately by return email, and destroy all copies of the email received in error.

4

# Ex. 18

*(Under Seal)*

# Ex. 19

*(Under Seal)*

# Ex. 20

*(Under Seal)*

# Ex. 21

*(Under Seal)*

Ex. 22

**MONDAY, FEB 28**



**Oliver Potts**  Feb 28, 2022, 3:19 PM

hi Jay...any headway on getting WH to consider fate of the books with us?



**William Bosanko**  Feb 28, 2022, 3:20 PM                    ⋮

None - the 15 boxes from mar-a-lago have consummed all of our discussions

DO you have bullets or something I can crib from to send an email

**Oliver Potts**  Feb 28, 2022, 3:21 PM

definitely...will send

**William Bosanko**  Feb 28, 2022, 3:21 PM

Thx!  That will help

# Ex. 23

*(Under Seal)*

Ex. 24



Archivist *of the*
United States

May 10, 2022

Evan Corcoran
Silverman Thompson
400 East Pratt Street
Suite 900
Baltimore, MD 21202
*By Email*

Dear Mr. Corcoran:

I write in response to your letters of April 29, 2022, and May 1, 2022, requesting that the National Archives and Records Administration (NARA) further delay the disclosure to the Federal Bureau of Investigation (FBI) of the records that were the subject of our April 12, 2022 notification to an authorized representative of former President Trump.

As you are no doubt aware, NARA had ongoing communications with the former President's representatives throughout 2021 about what appeared to be missing Presidential records, which resulted in the transfer of 15 boxes of records to NARA in January 2022. In its initial review of materials within those boxes, NARA identified items marked as classified national security information, up to the level of Top Secret and including Sensitive Compartmented Information and Special Access Program materials. NARA informed the Department of Justice about that discovery, which prompted the Department to ask the President to request that NARA provide the FBI with access to the boxes at issue so that the FBI and others in the Intelligence Community could examine them. On April 11, 2022, the White House Counsel's Office—affirming a request from the Department of Justice supported by an FBI letterhead memorandum—formally transmitted a request that NARA provide the FBI access to the 15 boxes for its review within seven days, with the possibility that the FBI might request copies of specific documents following its review of the boxes.

Although the Presidential Records Act (PRA) generally restricts access to Presidential records in NARA's custody for several years after the conclusion of a President's tenure in office, the statute further provides that, "subject to any rights, defenses, or privileges which the United States or any agency or person may invoke," such records "shall be made available . . . to an incumbent President if such records contain information that is needed for the conduct of current business of the incumbent President's office and that is not otherwise available." 44 U.S.C. §

2205(2)(B). Those conditions are satisfied here. As the Department of Justice's National Security Division explained to you on April 29, 2022:

> There are important national security interests in the FBI and others in the Intelligence Community getting access to these materials. According to NARA, among the materials in the boxes are over 100 documents with classification markings, comprising more than 700 pages. Some include the highest levels of classification, including Special Access Program (SAP) materials. Access to the materials is not only necessary for purposes of our ongoing criminal investigation, but the Executive Branch must also conduct an assessment of the potential damage resulting from the apparent manner in which these materials were stored and transported and take any necessary remedial steps. Accordingly, we are seeking immediate access to these materials so as to facilitate the necessary assessments that need to be conducted within the Executive Branch.

We advised you in writing on April 12 that, "in light of the urgency of this request," we planned to "provid[e] access to the FBI next week," i.e., the week of April 18. *See* Exec. Order No. 13,489, § 2(b), 74 Fed. Reg. 4,669 (Jan. 21, 2009) (providing a 30-day default before disclosure but authorizing the Archivist to specify "a shorter period of time" if "required under the circumstances"); *accord* 36 C.F.R. § 1270.44(g) ("The Archivist may adjust any time period or deadline under this subpart, as appropriate, to accommodate records requested under this section."). In response to a request from another representative of the former President, the White House Counsel's Office acquiesced in an extension of the production date to April 29, and so advised NARA. In accord with that agreement, we had not yet provided the FBI with access to the records when we received your letter on April 29, and we have continued to refrain from providing such access to date.

It has now been four weeks since we first informed you of our intent to provide the FBI access to the boxes so that it and others in the Intelligence Community can conduct their reviews. Notwithstanding the urgency conveyed by the Department of Justice and the reasonable extension afforded to the former President, your April 29 letter asks for additional time for you to review the materials in the boxes "in order to ascertain whether any specific document is subject to privilege," and then to consult with the former President "so that he may personally make any decision to assert a claim of constitutionally based privilege." Your April 29 letter further states that in the event we do not afford you further time to review the records before NARA discloses them in response to the request, we should consider your letter to be "a protective assertion of executive privilege made by counsel for the former President."

The Counsel to the President has informed me that, in light of the particular circumstances presented here, President Biden defers to my determination, in consultation with the Assistant Attorney General for the Office of Legal Counsel, regarding whether or not I should uphold the former President's purported "protective assertion of executive privilege." *See* 36 C.F.R. § 1270.44(f)(3). Accordingly, I have consulted with the Assistant Attorney General for the Office of Legal Counsel to inform my "determination as to whether to honor the former President's claim of privilege or instead to disclose the Presidential records notwithstanding the claim of privilege." Exec. Order No. 13,489, § 4(a).

The Assistant Attorney General has advised me that there is no precedent for an assertion of executive privilege by a former President *against an incumbent President* to prevent the latter from obtaining from NARA Presidential records belonging to the Federal Government where "such records contain information that is needed for the conduct of current business of the incumbent President's office and that is not otherwise available." 44 U.S.C. § 2205(2)(B).

To the contrary, the Supreme Court's decision in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977), strongly suggests that a former President may not successfully assert executive privilege "against the very Executive Branch in whose name the privilege is invoked." *Id.* at 447-48. In *Nixon v. GSA*, the Court rejected former President Nixon's argument that a statute requiring that Presidential records from his term in office be maintained in the custody of, and screened by, NARA's predecessor agency—a "very limited intrusion by personnel in the Executive Branch sensitive to executive concerns"—would "impermissibly interfere with candid communication of views by Presidential advisers." *Id.* at 451; *see also id.* at 455 (rejecting the claim). The Court specifically noted that an "incumbent President should not be dependent on happenstance or the whim of a prior President when he seeks access to records of past decisions that define or channel current governmental obligations." *Id.* at 452; *see also id.* at 441-46 (emphasizing, in the course of rejecting a separation-of-powers challenge to a provision of a federal statute governing the disposition of former President Nixon's tape recordings, papers, and other historical materials "within the Executive Branch," where the "employees of that branch [would] have access to the materials only 'for lawful Government use,'" that "[t]he Executive Branch remains in full control of the Presidential materials, and the Act facially is designed to ensure that the materials can be released only when release is not barred by some applicable privilege inherent in that branch"; and concluding that "nothing contained in the Act renders it unduly disruptive of the Executive Branch").

It is not necessary that I decide whether there might be *any* circumstances in which a former President could successfully assert a claim of executive privilege to prevent an Executive Branch agency from having access to Presidential records for the performance of valid executive functions. The question in this case is not a close one. The Executive Branch here is seeking access to records belonging to, and in the custody of, the Federal Government itself, not only in order to investigate whether those records were handled in an unlawful manner but also, as the National Security Division explained, to "conduct an assessment of the potential damage resulting from the apparent manner in which these materials were stored and transported and take any necessary remedial steps." These reviews will be conducted by current government personnel who, like the archival officials in *Nixon v. GSA*, are "sensitive to executive concerns." *Id.* at 451. And on the other side of the balance, there is no reason to believe such reviews could "adversely affect the ability of future Presidents to obtain the candid advice necessary for effective decisionmaking." *Id.* at 450. To the contrary:  Ensuring that classified information is appropriately protected, and taking any necessary remedial action if it was not, are steps essential to preserving the ability of future Presidents to "receive the full and frank submissions of facts and opinions upon which effective discharge of [their] duties depends." *Id.* at 449.

Because an assertion of executive privilege against the incumbent President under these circumstances would not be viable, it follows that there is no basis for the former President to make a "protective assertion of executive privilege," which the Assistant Attorney General

informs me has never been made outside the context of a congressional demand for information from the Executive Branch. Even assuming for the sake of argument that a former President may under some circumstances make such a "protective assertion of executive privilege" to preclude the Archivist from complying with a disclosure otherwise prescribed by 44 U.S.C. § 2205(2), there is no predicate for such a "protective" assertion here, where there is no realistic basis that the requested delay would result in a viable assertion of executive privilege against the incumbent President that would prevent disclosure of records for the purposes of the reviews described above. Accordingly, the only end that would be served by upholding the "protective" assertion here would be to delay those very important reviews.

I have therefore decided not to honor the former President's "protective" claim of privilege.  *See* Exec. Order No. 13,489, § 4(a); *see also* 36 C.F.R. 1270.44(f)(3) (providing that unless the incumbent President "uphold[s]" the claim asserted by the former President, "the Archivist discloses the Presidential record"). For the same reasons, I have concluded that there is no reason to grant your request for a further delay before the FBI and others in the Intelligence Community begin their reviews. Accordingly, NARA will provide the FBI access to the records in question, as requested by the incumbent President, beginning as early as Thursday, May 12, 2022.

Please note that, in accordance with the PRA, 44 U.S.C. § 2205(3), the former President's designated representatives can review the records, subject to obtaining the appropriate level of security clearance. Please contact my General Counsel, Gary M. Stern, if you would like to discuss the details of such a review, such as you proposed in your letter of May 5, 2022, particularly with respect to any unclassified materials.

Sincerely,

DEBRA STEIDEL WALL
Acting Archivist of the United States

# Ex. 25

*(Under Seal)*

# Ex. 26

*(Under Seal)*

# Ex. 27

*(Under Seal)*

# Ex. 28

*(Under Seal)*

# Ex. 29

*(Under Seal)*

# Ex. 30

*(Under Seal)*

# Ex. 31

*(Under Seal)*

# Ex. 32

*(Under Seal)*

# Ex. 33

*(Under Seal)*

Ex. 34

**Olsen, Matthew (NSD)**

| | |
|---|---|
| **Subject:** | Search Warrant Discussion |
| **Location:** | FBIHQ (b)(7)(E) per FBI |
| | |
| **Start:** | Monday, August 1, 2022 10:30 AM |
| **End:** | Monday, August 1, 2022 11:15 AM |
| **Show Time As:** | Tentatively accepted |
| | |
| **Recurrence:** | (none) |
| | |
| **Meeting Status:** | Not yet responded |
| | |
| **Organizer:** | Olsen, Matthew (NSD) |
| **Required Attendees:** | Newman, David A. (ODAG); Bratt, Jay (NSD); Toscas, George (NSD); Jones, Jason Allen (OGC) (FBI); Kohler, Alan E. Jr. (CD) (FBI); Riedlinger, Anthony T. (WF) (FBI); D'Antuono, Steven Michael (WF) (FBI) |
| **Optional Attendees:** | Freedman, Brett (NSD); (b)(6),(b)(7)(C) per NSD (NSD) |

# Ex. 35

*(Under Seal)*

Ex. 36

**From:**        Newman, David A. (ODAG)
**Subject:**     Judicia  Watch Motion
**To:**          Toscas, George (NSD); ████ (b)(6),(b)(7)(C) per NSD (NSD)
**Sent:**        August 10, 2022 2:12 PM (UTC-04:00)
**Attached:**    Judicia -Watch-Motion-to-Unsea -Search-Warrant-08332.pdf

FYI.

Document ID: 0.7.500.34946

**From:**      Atkinson, Lawrence (ODAG)
**Subject:**   Fwd: Can you send me the litigation filed this morning?
**To:**        ▇▇▇▇▇▇ (NSD)
**Sent:**      August 10, 2022 2:12 PM (UTC-04:00)
**Attached:**  Judicia-Watch-Motion-to-Unsea-Search-Warrant-08332.pdf

Begin forwarded message:

**From:** "Evers, Austin (ODAG)" <**(b) (6)** ▇▇▇▇▇▇▇▇▇▇
**Date:** August 10, 2022 at 2:10:41 PM EDT
**To:** "Atkinson, Lawrence (ODAG)" <**(b) (6)** ▇▇▇▇▇▇▇▇▇▇
**Subject: RE: Can you send me the litigation filed this morning?**

**From:** Atkinson, Lawrence (ODAG) <**(b) (6)** ▇▇▇▇▇▇▇▇
**Sent:** Wednesday, August 10, 2022 2:10 PM
**To:** Evers, Austin (ODAG) <**(b) (6)** ▇▇▇▇▇
**Subject:** Can you send me the litigation filed this morning?

01715-00212

Ex. 37

**From:** Evers, Austin (ODAG)
**Subject:** Motion
**To:** Newman, David A. (ODAG); Loeb, Emi y M. (ODAG)
**Sent:** August 10, 2022 11:12 AM (UTC-04:00)
**Attached:** Judicia -Watch-Motion-to-Unsea -Search-Warrant-08332.pdf

**Austin R. Evers**
Office of the Deputy Attorney General
U.S. Department of Justice
(b) (6) (m)
(b) (6) (o)

01715-00201

Ex. 38

**From:** Toscas, George (NSD)
**Subject:** FW: [EXTERNAL] RE: today's events
**To:** Osen, Matthew (NSD); ██████ (NSD); Newman, David A. (ODAG) ██████ (NSD)
**Sent:** August 12, 2022 1:17 PM (UTC-04:00)

**From:** Bratt, Jay (NSD) ██████
**Sent:** Friday, August 12, 2022 1:15 PM
**To:** Toscas, George (NSD) ██████ >; Gonzalez, Juan Antonio (USAFLS) ██████ usa.doj.gov>
**Cc:** ██████ (NSD) ██████
**Subject:** Fwd: [EXTERNAL] RE: today's events

Begin forwarded message:

**From:** Evan Corcoran ██████
**Date:** August 12, 2022 at 2:11:25 PM ADT
**To:** "Bratt, Jay (NSD)" ██████ James Trusty <██████ ██████ (NSD)" ██████
**Subject:** [EXTERNAL] RE: today's events

See below.

Thank you.

**From:** Bratt, Jay (NSD ██████
**Sent:** Friday, August 12, 2022 7:55 AM
**To:** James Trusty ██████ >; ██████ (NSD) ██████
**Cc:** Evan Corcoran ██████
**Subject:** RE: today's events

Jim/Evan:

In light of President Trump's statement last night on his social media platform that he wouldn't oppose the release of the court documents and encouraged their "immediate release," may we represent to the court that you have confirmed that this constitutes non-opposition/consent to the motion? YES If so, I think that also would obviate the need for a call at 2. AGREED. Thanks.

Jay

**From:** James Trusty ██████
**Sent:** Thursday, August 11, 2022 4:10 PM
**To:** Bratt, Jay (NSD) ██████ (NSD) ██████
**Cc:** Evan Corcoran ██████
**Subject:** [EXTERNAL] today's events

Jay   can we have a call with you and ██████ at 4:30? 5? Later?

Jim

James Trusty | Ifrah Law PLLC | 1717 Pennsylvania Ave. N.W. Suite 650 | (b) (6)

Document ID: 0.7.973.28770

01777-00043

Ex. 39

| | |
|---|---|
| **From:** | Bratt, Jay (NSD) |
| **Subject:** | Re: CNN - Mar-a-Lago CCTV Footage |
| **To:** | Rosse o, Luis (PAO) |
| **Cc:** | Toscas, George (NSD); Pietranton, Ke sey (PAO); <span style="background:black;color:white">(b)(6),(b)(7)(C) per NSD</span> (NSD); Iverson, Dena (PAO); <span style="background:black;color:white">(b)(6),(b)(7)(C) per NSD</span> (NSD); <span style="background:black;color:white">(b)(6),(b)(7)(C) per NSD</span> (NSD); Co ey, Anthony D. (PAO); Atkinson, Lawrence (ODAG); Newman, David A. (ODAG); O sen, Matthew (NSD); <span style="background:black;color:white">(b)(6),(b)(7)(C) per NSD</span> (NSD); Mi er, Marsha (ODAG) |
| **Sent:** | August 17, 2022 7:28 PM (UTC-04:00) |

We did. This was in the call (b)(6), (7)(C), 7(E) per FBI and I had with Evan Corcoran before the search. It is standard for (b)(6), (7)(C), 7(E) per FBI

> On Aug 17, 2022, at 7:19 PM, Rossello, Luis (PAO) <Luis.Rossello@usdoj.gov> wrote:
>
> Got a call from Evan. As Jay says, Trump team is still weighting the release. Per Evan, some say it will energize base, others say not a good look for FPOTUS to have it out there.
>
> CNN is working on a story that Jay requested Trump team to turn off the cameras and they refused.
>
> Sent from my iPhone
>
> > On Aug 17, 2022, at 7:04 PM, Bratt, Jay (NSD) <(b)(6),(b)(7)(C) per NSD wrote:
> >
> > CNN is saying FPOTUS is still weighing whether to release the footage.
> >
> > > On Aug 17, 2022, at 7:03 PM, Toscas, George (NSD) <(b)(6),(b)(7)(C) per NSD wrote:
> > >
> > > Marshall, Matt, and (b)(6),(b)(7)(C) per NSD
> > >
> > > > On Aug 17, 2022, at 6:59 PM, Pietranton, Kelsey (PAO) <Kelsey.Pietranton@usdoj.gov> wrote:
> > > >
> > > > Plus Anthony and Luis, and ODAG for awareness. Standby.
> > > >
> > > > **From:** (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD
> > > > **Sent:** Wednesday, August 17, 2022 6:57 PM
> > > > **To:** Iverson, Dena (PAO) <Dena.I.DeBonis@usdoj.gov>; Pietranton, Kelsey (PAO) <Kelsey.Pietranton@usdoj.gov>; Toscas, George (NSD) <(b)(6),(b)(7)(C) per NSD Bratt, Jay (NSD) <(b)(6),(b)(7)(C) per NSD (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD (b)(6),(b)(7)(C) per NSD (NSD)

**(b)(6),(b)(7)(C) per NSD**

**Subject:** CNN - Mar-a-Lago CCTV Footage
**Importance:** High

Good evening all,

I just received a call from our case agents at FBI, and apparently the Bureau has been given a heads-up by CNN that CNN has CCTV footage from Mar-a-Lago (presumably of agents executing the search) that they may air as soon as tonight **(b)(5) per NSD**

I have no further info on what, specifically, CNN has. But **(b)(5) per NSD**

**(b)(6),(b)(7)(C) per NSD**

Trial Attorney
Counterintelligence and Export Control Section
National Security Division, U.S. Department of Justice
Washington, D.C. 20530
**(b)(6),(b)(7)(C) per NSD**

Ex. 40

| | |
|---|---|
| **From:** | Newman, David A. (ODAG) |
| **Subject:** | RE: CNN - Mar-a-Lago CCTV Footage |
| **To:** | Mi er, Marsha  (ODAG); Toscas, George (NSD) |
| **Cc:** | Rosse o, Luis (PAO); Bratt, Jay (NSD); Pietranton, Ke sey (PAO); (b)(6),(b)(7)(C) per NSD (NSD); Iverson, Dena (PAO); (b)(6),(b)(7)(C) per NSD (NSD); (b)(6),(b)(7)(C) per NSD (NSD); Co ey, Anthony D. (PAO); Atkinson, Lawrence (ODAG); O sen, Matthew (NSD); (b)(6),(b)(7)(C) per NSD (NSD) |
| **Sent:** | August 17, 2022 8:15 PM (UTC-04:00) |

George and I agree. (b) (5) ███████████████████████

---

**From:** Miller, Marshall (ODAG) <(b) (6) ████
**Sent:** Wednesday, August 17, 2022 8:15 PM
**To:** Toscas, George (NSD) <(b)(6),(b)(7)(C) per NSD ███
**Cc:** Rossello, Luis (PAO) <Luis.Rossello@usdoj.gov>; Bratt, Jay (NSD) <(b)(6),(b)(7)(C) per NSD ██ Pietranton, Kelsey (PAO)
<Kelsey.Pietranton@usdoj.gov>; (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD Iverson, Dena (PAO)
<Dena.I.DeBonis@usdoj.gov>; (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD (b)(6),(b)(7)(C) per NSD (NSD)
<(b)(6),(b)(7)(C) per NSD Coley, Anthony D. (PAO) <(b) (6) ████ Atkinson, Lawrence (ODAG)
<(b) (6) ██████ Newman, David A. (ODAG) <(b) (6) ███ Olsen, Matthew (NSD)
<(b)(6),(b)(7)(C) per NSD (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD
**Subject:** Re: CNN - Mar-a-Lago CCTV Footage

Just wondering if (b) (5) ████████████████████████████████.

Sent from my iPhone

> On Aug 17, 2022, at 8:06 PM, Toscas, George (NSD) <(b)(6),(b)(7)(C) per NSD wrote:
>
> (b)(5) per NSD ████████████████████████████████████
> ██████████████████████████████████████████. Thanks.

> On Aug 17, 2022, at 7:47 PM, Miller, Marshall (ODAG) <(b) (6) ██████ wrote:
>
> (b) (5) ████████████████████████████████████████
> ██████?

---

**From:** Toscas, George (NSD) <(b)(6),(b)(7)(C) per NSD ██
**Sent:** Wednesday, August 17, 2022 7:22 PM
**To:** Rossello, Luis (PAO) <Luis.Rossello@usdoj.gov>
**Cc:** Bratt, Jay (NSD) <(b)(6),(b)(7)(C) per NSD ██ Pietranton, Kelsey (PAO) <Kelsey.Pietranton@usdoj.gov>;
(b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD Iverson, Dena (PAO) <Dena.I.DeBonis@usdoj.gov>;
(b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD
Coley, Anthony D. (PAO) <(b) (6) ███ Atkinson, Lawrence (ODAG)
<(b) (6) ██████ Newman, David A. (ODAG) <(b) (6) ███████ Olsen,
Matthew (NSD) <(b)(6),(b)(7)(C) per NSD (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD
Miller, Marshall (ODAG) <(b) (6) ████
**Subject:** Re: CNN - Mar-a-Lago CCTV Footage

We're waiting to hear back from FBIHQ on their recommended approach. (b) (5) █████
███████████████████████████████████



On Aug 17, 2022, at 7:19 PM, Rossello, Luis (PAO) <Luis.Rossello@usdoj.gov> wrote:

Duplicative Records

Ex. 41

**From:** Toscas, George (NSD)
**Subject:** Re: CNN - Mar-a-Lago CCTV Footage
**To:** Mi er, Marsha (ODAG)
**Cc:** Rosse o, Luis (PAO); Bratt, Jay (NSD); Pietranton, Ke sey (PAO); (b)(6),(b)(7)(C) per NSD (NSD); Iverson, Dena (PAO); (b)(6),(b)(7)(C) per NSD (NSD); (b)(6),(b)(7)(C) per NSD (NSD); Co ey, Anthony D. (PAO); Atkinson, Lawrence (ODAG); Newman, David A. (ODAG); O sen, Matthew (NSD); (b)(6),(b)(7)(C) per NSD (NSD)
**Sent:** August 17, 2022 8:16 PM (UTC-04:00)

Yes. Handling that now.

On Aug 17, 2022, at 8:14 PM, Miller, Marshall (ODAG) <(b) (6)                wrote:

Duplicative Records

Ex. 42

**From:** Coey, Anthony D. (PAO)
**Subject:** Re: CNN - Mar-a-Lago CCTV Footage
**To:** Bratt, Jay (NSD)
**Cc:** Rosse o, Luis (PAO); Toscas, George (NSD); Pietranton, Ke sey (PAO); [(b)(6),(b)(7)(C) per NSD] (NSD); Iverson, Dena (PAO); [(b)(6),(b)(7)(C) per NSD] (NSD); [(b)(6),(b)(7)(C) per NSD] (NSD); Atkinson, Lawrence (ODAG); Newman, David A. (ODAG); Osen, Matthew (NSD); [(b)(6),(b)(7)(C) per NSD] (NSD); Mi er, Marsha (ODAG)
**Sent:** August 17, 2022 10:13 PM (UTC-04:00)

Thanks, Jay. Sending now…

On Aug 17, 2022, at 9:59 PM, Bratt, Jay (NSD) <[(b)(6),(b)(7)(C) per NSD] wrote:

I am good with this.  Thanks.

**From:** Coley, Anthony D. (PAO) <(b) (6)
**Sent:** Wednesday, August 17, 2022 9:48 PM
**To:** Bratt, Jay (NSD) <[(b)(6),(b)(7)(C) per NSD] Rossello, Luis (PAO) <Luis.Rossello@usdoj.gov>
**Cc:** Toscas, George (NSD) <[(b)(6),(b)(7)(C) per NSD] Pietranton, Kelsey (PAO)
<Kelsey.Pietranton@usdoj.gov>; [(b)(6),(b)(7)(C) per NSD] (NSD) <[(b)(6),(b)(7)(C) per NSD] Iverson, Dena
(PAO) <Dena.I.DeBonis@usdoj.gov>; [(b)(6),(b)(7)(C) per NSD] (NSD) <[(b)(6),(b)(7)(C) per NSD] [(b)(6),(b)(7)(C) per NSD]
(NSD) <[(b)(6),(b)(7)(C) per NSD] Atkinson, Lawrence (ODAG) <(b) (6)
Newman, David A. (ODAG) <(b) (6)                    Olsen, Matthew (NSD)
<[(b)(6),(b)(7)(C) per NSD] [(b)(6),(b)(7)(C) per NSD] (NSD) <[(b)(6),(b)(7)(C) per NSD] Miller, Marshall
(ODAG) <(b) (6)
**Subject:** RE: CNN - Mar-a-Lago CCTV Footage



**From:** Bratt, Jay (NSD) <[(b)(6),(b)(7)(C) per NSD]

01715-01069

**Sent:** Wednesday, August 17, 2022 8:59 PM
**To:** Rossello, Luis (PAO) <Luis.Rossello@usdoj.gov>
**Cc:** Toscas, George (NSD) <(b)(6),(b)(7)(C) per NSD Pietranton, Kelsey (PAO)
<Kelsey.Pietranton@usdoj.gov>; (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD Iverson, Dena
(PAO) <Dena.I.DeBonis@usdoj.gov>; (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD (b)(6),(b)(7)(C) per NSD
(NSD) <(b)(6),(b)(7)(C) per NSD Coley, Anthony D. (PAO) <(b) (6) Atkinson,
Lawrence (ODAG) <(b) (6) Newman, David A. (ODAG)
<(b) (6) Olsen, Matthew (NSD) <(b)(6),(b)(7)(C) per NSD (b)(6),(b)(7)(C) per NSD
(NSD) <(b)(6),(b)(7)(C) per NSD Miller, Marshall (ODAG) <(b) (6)
**Subject:** Re: CNN - Mar-a-Lago CCTV Footage

After consultations with George and David, I just sent the attached to Evan Corcoran and Alan Garten,
general counsel for the Trump Organization.

> On Aug 17, 2022, at 8:18 PM, Rossello, Luis (PAO) <Luis.Rossello@usdoj.gov> wrote:
>
> https://www.cnn.com/2022/08/17/po t cs/trump-re ease-surve ance-footage-fb -mar-a- ago/ ndex.htm
>
> Sent from my iPhone
>
>> On Aug 17, 2022, at 7:19 PM, Rossello, Luis (PAO) <Luis.Rossello@usdoj.gov>
>> wrote:

Duplicative Records

Ex. 43

**From:**      Newman, David A. (ODAG)
**Subject:**   08.17.22 Letter
**To:**        Toscas, George (NSD)
**Sent:**      August 17, 2022 8:50 PM (UTC-04:00)
**Attached:**  08.17.22 Letter .docx

Draft version for editing

Document ID: 0.7.500.35541

# Ex. 44

**From:**      Newman, David A. (ODAG)
**Subject:**   Letter
**To:**        Bratt, Jay (NSD)
**Cc:**        Toscas, George (NSD)
**Sent:**      August 17, 2022 8:48 PM (UTC-04:00)
**Attached:**  Letter -- 08.17.22.pdf

See attached PDF.  This letter reflects the concerns shared with us this evening from FBI about threats and safety to their personnel.  FBI leadership is grateful for the willingness to send this letter.  I know you've been in touch with George about this letter   and appreciate your reviewing and sending.

--David

Ex. 45

**From:** Bratt, Jay (NSD)
**Subject:** FW: News Media intervention in Trump v. United States, No. 22-civ-81294
**To:** Gonzalez, Juan Antonio (USAFLS)
**Cc:** ████████ (NSD); Toscas, George (NSD); Newman, David A. (ODAG)
**Sent:** August 30, 2022 9:59 AM (UTC-04:00)

Tony:

I don't think ████████████████████████████████████████████████████ Thoughts (including those cc'd)?

Jay

---

**From:** Mark R. Caramanica <mcaramanica@tlolawfirm.com>
**Sent:** Tuesday, August 30, 2022 9:54 AM
**To:** Gonzalez, Juan Antonio (USAFLS) ████████ @usa.doj.gov>; Bratt, Jay (NSD) <████████
**Cc:** Dana J. McElroy <DMcElroy@tlolawfirm.com>
**Subject:** [EXTERNAL] News Media intervention in Trump v. United States, No. 22-civ-81294

Dear Messrs. Gonzalez and Bratt:

On behalf of a news media coalition (comprising many of the same entities who intervened before Judge Reinhart regarding the search warrant materials), we plan to file a motion today to intervene in this matter as well. We will be opposing any sealing of records filed under seal pursuant to the Court's August 27, 2022 order (ECF No. 29). Please let us know your position on: 1) intervention and 2) whether the United States will oppose unsealing of those records. We are happy to discuss if you'd like.

Thank you.

-Mark Caramanica



**Mark R. Caramanica**

60 South Boulevard
Tampa, FL 33606

**ph:** 8 3 984 3060   **direct** ████
**fax:** 8 3 984 3070   **toll free:** 866 395 7 00
www.tlolawfirm.com

**Tampa   South Florida**

**To upload large documents, please click here**



**CONFIDENTIALITY NOTICE:** The nfo mat on conta ned n th s ema message s ntended fo the pe sona and conf dent a use of the ec p ent(s) des gnated above Th s message may conta n nfo mat on that s p v eged, conf dent a and exempt f om d sc osu e unde app cab e aw and any unautho zed o nadve tent use, ece pt, d sc osu e, d ssem nat on, o d st but on of such nfo mat on sha not wa ve any such p v ege If you a e not an ntended ec p ent of th s message, and/o you have ece ved th s message n e o, then p ease not fy the sende at (8 3) 984-3060 Any unautho zed and/o un ntended ev ew, use, d ssem nat on, d st but on, o ep oduct on of th s message, o any of the nfo mat on conta ned n t, s st ct y p oh b ted

# Ex. 46

| | |
|---|---|
| **From:** | Bratt, Jay (NSD) |
| **Subject:** | Fwd: from counsel for Media Intervenors/search warrant matter |
| **To:** | Coley, Anthony D. (PAO); Rosselo, Luis (PAO) |
| **Cc:** | Olsen, Matthew (NSD); Toscas, George (NSD); Newman, David A. (ODAG) |
| **Sent:** | August 24, 2022 7:30 PM (UTC-04:00) |

FYI


Begin forwarded message:


> **From:** "Gonzalez, Juan Antonio (USAFLS)" <span style="background:black;color:white">(b)(6) per EOUSA</span>@usa.doj.gov>
> **Date:** August 24, 2022 at 7:27:23 PM EDT
> **To:** "Tobin, Charles D." <TobinC@ballardspahr.com>
> **Cc:** "Bratt, Jay (NSD)" <<span style="background:black;color:white">(b)(6),(b)(7)(C) per NSD</span>
> **Subject: RE: from counsel for Media Intervenors/search warrant matter**


Hi Chuck,

Sorry for the delay getting back to you but I have been tied up today.  We are planning to follow the Court's order and file our pleadings under seal.  We do not intend to make a public filing however, the Judge may want to make public specific parts of our pleading.

Regards,

Tony

*Juan Antonio Gonzalez*
United States Attorney
Southern District of Florida
99 NE 4th Street
Miami, Florida 33132
305-961-9100

---

**From:** Tobin, Charles D. <TobinC@ballardspahr.com>
**Sent:** Wednesday, August 24, 2022 8:44 AM
**To:** Gonzalez, Juan Antonio (USAFLS <span style="background:black;color:white">(b)(6) per EOUSA</span> @usa.doj.gov>
**Subject:** [EXTERNAL] from counsel for Media Intervenors/search warrant matter

Good morning, Tony, I hope you remain well.  I wanted to check on the government's plans for tomorrow's noon filing, per the Court's order.

We presume the government will file two versions of the legal memorandum containing its arguments for the continued sealing of portions of the search warrant affidavit   one version sealed, the other a redacted public version.  If you would confirm, we would appreciate it.  Thank you.

Chuck

**Charles D. Tobin**

1909 K Street, NW, 12th F oor
Wash ngton, DC 20006-1157
(b) (6)      d rect
202.661.2299 fax

tob nc@ba ardspahr.com

www.ba ardspahr.com

Document ID: 0.7.500.35726

01715-01506

Ex. 47

**From:** ████ (b)(6) David Newman
**Subject:** Re: Activity in Case 9:22-mj-08332-BER USA v. Sealed Search Warrant Order
**To:** Osen, Matthew (NSD)
**Cc:** Miller, Marsha (ODAG)
**Sent:** August 22, 2022 8:32 AM (UTC-04:00)
**Attached:** Order on Motions to Unseal.pdf

Thanks. (b) (5) ███████

A credit to Jay and the briefing team.

On Aug 22, 2022, at 2:22 PM, Olsen, Matthew (NSD) <(b)(6),(b)(7)(C) per NSD wrote:

Forwarding the court's order (b) (5) ███████.

-Matt

Get Outlook for iOS

**From:** Bratt, Jay (NSD) <(b)(6),(b)(7)(C) per NSD
**Sent:** Monday, August 22, 2022 8:12:30 AM
**To:** Olsen, Matthew (NSD) <(b)(6),(b)(7)(C) per NSD (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD
**Cc:** Toscas, George (NSD) <(b)(6),(b)(7)(C) per NSD (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD
**Subject:** FW: Activity in Case 9:22-mj-08332-BER USA v. Sealed Search Warrant Order

**From:** Bratt, Jay (NSD)
**Sent:** Monday, August 22, 2022 8:12 AM
**To:** Gonzalez, Juan Antonio (USAFLS) (b)(6) per EOUSA @usa.doj.gov>; (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD Toscas, George (NSD) <(b)(6),(b)(7)(C) per NSD Wu, Jason (USAFLS) <JWu@usa.doj.gov>; (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD (b)(6),(b)(7)(C) per NSD (NSD) (b)(6),(b)(7)(C) per NSD>; (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD (NSD) Gilbert, Karen (USAFLS) (b)(6) per EOUSA @usa.doj.gov>; Thakur, Michael (USAFLS) (b)(6) per EOUSA @usa.doj.gov>; Smith, Jeffrey (NSD) <Jeffrey.Smith5@usdoj.gov>
**Subject:** RE: Activity in Case 9:22-mj-08332-BER USA v. Sealed Search Warrant Order

Thanks, Tony. For those without immediate PACER access, I'm attaching a pdf of the order.

**From:** Gonzalez, Juan Antonio (USAFLS) (b)(6) per EOUSA @usa.doj.gov>
**Sent:** Monday, August 22, 2022 8:03 AM
**To:** (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD Toscas, George (NSD) <(b)(6),(b)(7)(C) per NSD Wu, Jason (USAFLS) <JWu@usa.doj.gov>; Bratt, Jay (NSD) <(b)(6),(b)(7)(C) per NSD (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD (b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD (NSD) <(b)(6),(b)(7)(C) per NSD (NSD) Gilbert, Karen (USAFLS) (b)(6) per EOUSA @usa.doj.gov>; Thakur, Michael (USAFLS) (b)(6) per EOUSA usa.doj.gov>
**Subject:** Fwd: Activity in Case 9:22-mj-08332-BER USA v. Sealed Search Warrant Order

This is a very well written order. Clearly written for the media/public and not really for the lawyers. Contains nothing new.

Tony

Juan A. Gonzalez
U.S. Attorney
Southern District of Florida


Begin forwarded message:

> **From:** cmecfautosender@flsd.uscourts.gov
> **Date:** August 22, 2022 at 7:49:38 AM EDT
> **To:** flsd_cmecf_notice@flsd.uscourts.gov
> **Subject: Activity in Case 9:22-mj-08332-BER USA v. Sealed Search Warrant Order**


> **This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
> **\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* There is no charge for viewing opinions.**

> **U.S. District Court**

> **Southern District of Florida**

> **Notice of Electronic Filing**

> The following transaction was entered on 8/22/2022 at 7:48 AM EDT and filed on 8/22/2022
> **Case Name:**        USA v. Sealed Search Warrant
> **Case Number:**      9:22-mj-08332-BER
> **Filer:**
> **Document Number:** 80

> **Docket Text:**
> **ORDER as to Sealed Search Warrant, memorializing and supplementing oral rulings at August 18, 2022, hearing. Signed by Magistrate Judge Bruce E. Reinhart** *See attached document for full details.* **(BER)**


> **9:22-mj-08332-BER-1 Notice has been electronically mailed to:**

> Andrea Flynn Mogensen    andrea@sarasotacriminallawyer.com, records@flcga.org

> Carol Jean LoCicero    clocicero@tlolawfirm.com, nparsons@tlolawfirm.com, tgilley@tlolawfirm.com

> Charles David Tobin    tobinc@ballardspahr.com, baileys@ballardspahr.com, LitDocket_East@ballardspahr.com, relyear@ballardspahr.com, tom.winter@nbcuni.com, tranp@ballardspahr.com

> Dana Jane McElroy    dmcelroy@tlolawfirm.com, bbrennan@tlolawfirm.com,

tgilley@tlolawfirm.com

Deanna Kendall Shullman    dshullman@shullmanfugate.com, abeene@shullmanfugate.com, pleadings@shullmanfugate.com

Elizabeth Seidlin-Bernstein    SeidlinE@ballardspahr.com

Eugene Branch Minchin    mminchin@shullmanfugate.com, abeene@shullmanfugate.com, pleadings@hullmanfugate.com

James Calvin Moon    jmoon@melandbudwick.com, ltannenbaum@ecf.courtdrive.com, ltannenbaum@melandbudwick.com, mrbnefs@yahoo.com, phornia@ecf.courtdrive.com

Juan Antonio Gonzalez , Jr    juan.antonio.gonzalez@usdoj.gov, CaseView.ECF@usdoj.gov, USAFLS-HQDKT@usdoj.gov, wanda.hubbard@usdoj.gov

L. Martin Reeder , Jr    martin@athertonlg.com, e-service@athertonlg.com, tracey@athertonlg.com

Mark Richard Caramanica    mcaramanica@tlolawfirm.com, bbrennan@tlolawfirm.com, dlake@tlolawfirm.com

Michael Bekesha    mbekesha@judicialwatch.org

Nellie Linn King    Nellie@CriminalDefenseFla.com, Anne@CriminalDefenseFla.com

Paul J. Orfanedes    porfanedes@judicialwatch.org

Rachel Elise Fugate    rfugate@shullmanfugate.com, abeene@shullmanfugate.com, pleadings@shullmanfugate.com

**9:22-mj-08332-BER-1 Notice has not been delivered electronically to those listed below and will be provided by other means. For further assistance, please contact our Help Desk at 1-888-318-2260.:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID 1105629215 [Date  8/22/2022] [FileNumber  22486292-0] [871089e550bf8eb1e2cd0a56c1dbe293e7a4e8c2a152333ba4038c98a2a03dc029 0d29a9487297d1a12d777aed57e6465d3bab491d96394fdfa6ea1519956518]]

Ex. 48

**From:** Evers, Austin (ODAG)
**Subject:** Re: time-sensitive (b) (5) questions
**To:** Newman, David A. (ODAG)
**Cc:** Lederman, Martin (OLC); Schroeder, Christopher H. (OLC); Atkinson, Lawrence (ODAG)
**Sent:** August 31, 2022 7:27 AM (UTC-04:00)

A relevant question is (b) (5)

Austin R. Evers
(b) (6)     (m)

On Aug 31, 2022, at 7:11 AM, Newman, David A. (ODAG) < (b) (6)     wrote:

Thank you, Marty. Let me read these and circle back.

On Aug 31, 2022, at 6:40 AM, Lederman, Martin (OLC) < (b)(6) per OLC     >
wrote:

David: For purposes of your forthcoming call with Gary, note that he has also reached out to



(b)(5) per OLC

(b)(5) per OLC

(b)(5) per OLC

After your call, we should discuss ASAP (i) whether we in OLC should have any follow-up
conversations with Gary concerning (b)(5) per OLC

Thanks very much.

Marty Lederman
Deputy Assistant Attorney General
Office of Legal Counsel

Department of Justice
(b)(6) per OLC (cell)
(office)

**From:** Lederman, Martin (OLC)
**Sent:** Monday, August 29, 2022 3:23 PM
**To:** Newman, David A. (ODAG) <(b) (6) (OLC) (b)(6) per OLC > Schroeder, Christopher H. (OLC)
**Cc:** Evers, Austin (ODAG) <(b) (6) > Atkinson, Lawrence (ODAG) <(b) (6)
**Subject:** Re: time-sensitive (b) (5) questions

Gary pinged me again.  Everyone ok with me conveying our current view?

Sent from my iPhone

Duplicative Records

Ex. 49

**From:**    Lederman, Martin (OLC)
**Subject:**   Re: time-sensitive (b) (5) questions
**To:**      Evers, Austin (ODAG)
**Cc:**      Newman, David A. (ODAG); Schroeder, Christopher H. (OLC); Atkinson, Lawrence (ODAG)
**Sent:**    August 29, 2022 3:38 PM (UTC-04:00)

Ok, but if there's a way to settle on it today, that'd be great.  I suppose that in the meantime I could simply tell Gary that we are considering the question.

Sent from my iPhone

On Aug 29, 2022, at 3:26 PM, Evers, Austin (ODAG) <(b) (6) wrote:

Please hold (b) (5)

From: Lederman, Martin (OLC) (b)(6) per OLC
Sent: Monday, August 29, 2022 3:23 PM
To: Newman, David A. (ODAG) <(b) (6) (b)(6) per OLC Schroeder, Christopher H. (OLC)
Cc: Evers, Austin (ODAG) <(b) (6) Atkinson, Lawrence (ODAG) <(b) (6)
Subject: Re: time-sensitive (b) (5) questions

Gary pinged me again.  Everyone ok with me conveying our current view?

Sent from my iPhone

On Aug 29, 2022, at 9:13 AM, Lederman, Martin (OLC) <(b)(6) per OLC wrote:

I agree, too.  And I'll add this:


(b)(5) per OLC



How does that sound?  Should I ████(b) (5)███████████████████████
████████ ?


Marty Lederman
Deputy Assistant Attorney General
Office of Legal Counsel
Department of Justice
███(b)(6) per OLC███ (cell)
███(b)(6) per OLC███ (office)

**From:** Newman, David A. (ODAG) <██(b) (6)██████████████
**Sent:** Monday, August 29, 2022 8:42 AM
**To:** Schroeder, Christopher H. (OLC) <███(b)(6) per OLC████████; Lederman, Martin (OLC) ███(b)(6) per OLC███████>
**Cc:** Evers, Austin (ODAG) <██(b) (6)██████████ Atkinson, Lawrence (ODAG) <██(b) (6)███
**Subject:** RE: time-sensitive ███(b) (5)██ questions

Thanks, Chris.  That makes sense ████(b) (5)████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████.

**From:** Schroeder, Christopher H. (OLC) <███(b)(6) per OLC████████████
**Sent:** Monday, August 29, 2022 8:15 AM
**To:** Lederman, Martin (OLC) ███(b)(6) per OLC█████████; Newman, David A. (ODAG) <██(b) (6)████████
**Cc:** Evers, Austin (ODAG) <██(b) (6)██████████ Atkinson, Lawrence (ODAG) <██(b) (6)███
**Subject:** RE: time-sensitive ███(b) (5)██ questions

On the question of ████(b)(5) per OLC██████████████, my first instinct is ███(b)(5) per OLC████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████



**From:** Lederman, Martin (OLC) (b)(6) per OLC
**Sent:** Sunday, August 28, 2022 11:23 PM
**To:** Newman, David A. (ODAG) <(b) (6)
**Cc:** Schroeder, Christopher H. (OLC) <(b)(6) per OLC   Evers, Austin (ODAG) <(b) (6) Atkinson, Lawrence (ODAG) <(b) (6)
**Subject:** RE: time-sensitive (b) (5)   questions

(b)(5) per OLC

Marty Lederman
Deputy Assistant Attorney General
Office of Legal Counsel
Department of Justice
(b)(6) per OLC (cell)
(b)(6) per OLC (office)

**From:** Newman, David A. (ODAG) <(b) (6)
**Sent:** Sunday, August 28, 2022 11:19 PM
**To:** Lederman, Martin (OLC) <(b)(6) per OLC
**Cc:** Schroeder, Christopher H. (OLC) <(b)(6) per OLC   Evers, Austin (ODAG) <(b) (6) Atkinson, Lawrence (ODAG) <(b) (6)
**Subject:** Re: time-sensitive (b) (5)   questions

Thank you. I appreciate the update. I will connect tomorrow with this group and others to discuss further. In the meantime, I do not thin (b) (5)



On Aug 28, 2022, at 11:15 PM, Lederman, Martin (OLC) (b)(6) per OLC wrote:

Gary Stern called today to raise a question or two (b)(5) per OLC .

(b)(5) per OLC

Gary is interested to know what DOJ's view is on (b)(5) per OLC

I mentioned these questions briefly to Rush this afternoon. Our first order of business, I believe, is (b)(5) per OLC

One other thing to note: (b)(5) per OLC

**(b)(5) per OLC**

.

I'll be on the road much of tomorrow (Monday), but could talk if necessary.

Thanks.


Marty Lederman
Deputy Assistant Attorney General
Office of Legal Counsel
Department of Justice
(b)(6) per OLC (cell)
(b)(6) per OLC (office)

# Ex. 50

*(Under Seal)*

# Ex. 51

*(Under Seal)*

# Ex. 52

*(Under Seal)*

# Ex. 53

*(Under Seal)*

# Ex. 54

*(Under Seal)*

# Ex. 55

*(Under Seal)*

# Ex. 56

*(Under Seal)*

# Ex. 57

*(Under Seal)*

# Ex. 58

*(Under Seal)*

# Ex. 59

*(Under Seal)*

# Ex. 60

*(Under Seal)*

# Ex. 61

*(Under Seal)*

Ex. 62

# Garland Faces Growing Pressure as Jan. 6 Investigation Widens

The inquiry is a test for President Biden and Attorney General Merrick B. Garland, who both came into office promising to restore the Justice Department's independence.

  

By Katie Benner, Katie Rogers and Michael S. Schmidt

April 2, 2022

WASHINGTON — Immediately after Merrick B. Garland was sworn in as attorney general in March of last year, he summoned top Justice Department officials and the F.B.I. director to his office. He wanted a detailed briefing on the case that will, in all likelihood, come to define his legacy: the Jan. 6 assault on the Capitol.

Even though hundreds of people had already been charged, Mr. Garland asked to go over the indictments in detail, according to two people familiar with the meeting. What were the charges? What evidence did they have? How had they built such a sprawling investigation, involving all 50 states, so fast? What was the plan now?

The attorney general's deliberative approach has come to frustrate Democratic allies of the White House and, at times, President Biden himself. As recently as late last year, Mr. Biden confided to his inner circle that he believed former President Donald J. Trump was a threat to democracy and should be prosecuted, according to two people familiar with his comments. And while the president has never communicated his frustrations directly to Mr. Garland, he has said privately that he wanted Mr. Garland to act less like a ponderous judge and more like a prosecutor who is willing to take decisive action over the events of Jan. 6.

Speaking to reporters on Friday, Mr. Garland said that he and the career prosecutors working on the case felt only the pressure "to do the right thing," which meant that they "follow the facts and the law wherever they may lead."

Still, Democrats' increasingly urgent calls for the Justice Department to take more aggressive action highlight the tension between the frenetic demands of politics and the methodical pace of one of the biggest prosecutions in the department's history.

"The Department of Justice must move swiftly," Representative Elaine Luria, Democrat of Virginia and a member of the House committee investigating the riot, said this past week. She and others on the panel want the department to charge Trump allies with contempt for refusing to comply with the committee's subpoenas.

"Attorney General Garland," Ms. Luria said during a committee hearing, "do your job so that we can do ours."

This article is based on interviews with more than a dozen people, including officials in the Biden administration and people with knowledge of the president's thinking, all of whom asked for anonymity to discuss private conversations.

In a statement, Andrew Bates, a White House spokesman, said the president believed that Mr. Garland had "decisively restored" the independence of the Justice Department.

"President Biden is immensely proud of the attorney general's service in this administration and has no role in investigative priorities or decisions," Mr. Bates said.

A Justice Department spokesman declined to comment.

The Jan. 6 investigation is a test not just for Mr. Garland, but for Mr. Biden as well. Both men came into office promising to restore the independence and reputation of a Justice Department that Mr. Trump had tried to weaponize for political gain.

For Mr. Biden, keeping that promise means inviting the ire of supporters who say they will hold the president to the remarks he made on the anniversary of the assault on the Capitol, when he vowed to make sure "the past isn't buried" and said that the people who planned the siege "held a dagger at the throat of America."

1/15/24, 9:13 PM    With Biden and Investigation in Different Worlds, Garland Tries to Avoid Being Seen as a Political Actor - The New York Times

Case 9:23-cr-80101-AMC    Document 262-1    Entered on FLSD Docket 01/16/2024    Page 116 of 155



President Biden and Mr. Garland are managing a relationship between the White House and the Justice Department unlike any other in American history.   Doug Mills/The New York Times

Complicating matters for Mr. Biden is the fact that his two children are entangled in federal investigations, making it all the more important that he stay out of the Justice Department's affairs or risk being seen as interfering for his own family's gain.

The department is investigating whether Ashley Biden was the victim of pro-Trump political operatives who obtained her diary at a critical moment in the 2020 presidential campaign, and Hunter Biden is under federal investigation for tax avoidance and his international business dealings. Hunter Biden has not been charged with a crime and has said he handled his affairs appropriately.

Justice Department officials do not keep Mr. Biden abreast of any investigation, including those involving his children, several people familiar with the situation said. The cases involving Hunter Biden and Ashley Biden are worked on by career officials, and people close to the president, including Dana Remus, the White House counsel, have no visibility into them, those people said.

Still, the situation crystallizes the delicate ground that Mr. Biden and Mr. Garland are navigating.

When it comes to Jan. 6, Justice Department officials emphasize that their investigation has produced substantial results already, including more than 775 arrests and a charge of seditious conspiracy against the leader of a far-right militia. More than 280 people have been charged with obstructing Congress's duty to certify the election results.

And federal prosecutors have widened the investigation to include a broad range of figures associated with Mr. Trump's attempts to cling to power. According to people familiar with the inquiry, it now encompasses planning for pro-Trump rallies ahead of the riot and the push by some Trump allies to promote slates of fake electors.



The Justice Department's Jan. 6 inquiry has led to more than 775 arrests. More than 280 people have been charged with obstructing Congress's duty to certify the election results.  Erin Schaff/The New York Times

The Justice Department has given no public indication about its timeline or whether prosecutors might be considering a case against Mr. Trump.

The House committee investigating the Jan. 6 attack can send criminal referrals to the Justice Department, but only the department can bring charges. The panel is working with a sense of urgency to build its case ahead of this year's midterm elections, when Republicans could retake the House and dissolve the committee.

Mr. Biden, a longtime creature of the Senate, is aghast that people close to Mr. Trump have defied congressional subpoenas and has told people close to him that he does not understand how they think they can do so, according to two people familiar with his thinking.

Mr. Garland has not changed his approach to criminal prosecutions in order to placate his critics, according to several Justice Department officials who have discussed the matter with him. He is regularly briefed on the Jan. 6 investigation, but he has remained reticent in public.

"The best way to undermine an investigation is to say things out of court," Mr. Garland said on Friday.

Even in private, he relies on a stock phrase: "Rule of law," he says, "means there not be one rule for friends and another for foes."

He did seem to acknowledge Democrats' frustrations in a speech in January, when he reiterated that the department "remains committed to holding all Jan. 6 perpetrators, at any level, accountable under law."

Quiet and reserved, Mr. Garland is well known for the job he was denied: a seat on the Supreme Court. President Barack Obama nominated him in March 2016 after the death of Justice Antonin Scalia, but Senate Republicans blockaded the nomination.

Mr. Garland's peers regard him as a formidable legal mind and a political centrist. After graduating from Harvard Law School, he clerked for a federal appeals court judge and Justice William J. Brennan Jr. of the Supreme Court before becoming a top official in the Justice Department under Attorney General Janet Reno. There, he prosecuted domestic terrorism cases and supervised the federal investigation into the Oklahoma City bombing.

His critics say that his subsequent years as an appeals court judge made him slow and overly deliberative. But his defenders say that he has always carefully considered legal issues, particularly if the stakes were very high — a trait that most likely helped the Justice Department secure a conviction against Timothy J. McVeigh two years after the Oklahoma City attack.

During the presidential transition after the 2020 election, Mr. Biden took his time mulling over candidates to be attorney general, according to a senior member of the transition team. He had promised the American people that he would reestablish the department as an independent arbiter within the government, not the president's partisan brawler.

In meetings, the incoming president and his aides discussed potential models at length: Did Mr. Biden want a strong personality in the job, like Eric H. Holder Jr., who held the post under Mr. Obama? The relatively quick consensus was no.

Did he want someone who would be seen as a political ally? Some in his circle suggested that might be a good model to follow, which is why former Senator Doug Jones of Alabama, a longtime friend of Mr. Biden's, was once on his shortlist.

But in the end, Mr. Biden went with Mr. Garland, who had a reputation for being evenhanded and independent.

Despite Mr. Biden's private frustrations with the attorney general, several people who speak regularly to the president said he had praised Mr. Garland as among the most thoughtful, moral and intelligent people he had dealt with in his career.

The two men did not know each other well when Mr. Biden selected him for the job. Mr. Garland had a closer relationship with Ron Klain, Mr. Biden's chief of staff, than he did with the incoming president.

Mr. Garland is well known for the job he was denied: a seat on the Supreme Court.  Kenny Holston for The New York Times

Officials inside the White House and the Justice Department acknowledge that the two men have less contact than some previous presidents and attorneys general, particularly Mr. Trump and his last attorney general, William P. Barr.

Some officials see their limited interactions as an overcorrection on the part of Mr. Garland and argue that he does not need to color so scrupulously within the lines. But it may be the only logical position for Mr. Garland to take, particularly given that both of Mr. Biden's children are involved in active investigations by the Justice Department.

The distance between the two men is a sharp departure from the previous administration, when Mr. Trump would often call Mr. Barr to complain about decisions related to his political allies and enemies. Such calls were a clear violation of the longtime norms governing contact between the White House and the Justice Department.

Mr. Biden, a former chairman of the Senate Judiciary Committee, came to his job as president with a classical, post-Watergate view of the department — that it was not there to be a political appendage.

Still, there is unrelenting pressure from Democrats to hold Mr. Trump and his allies accountable for the violence that unfolded at the Capitol on Jan. 6. While there is no indication that federal prosecutors are close to charging the former president, Mr. Biden and those closest to him understand the legal calculations. What Mr. Garland is confronting is anything but a normal problem, with enormous political stakes ahead of the next presidential election.

There is unrelenting pressure from Democrats to hold former President Donald J. Trump and his allies accountable for the violence that unfolded at the Capitol on Jan. 6.
Audra Melton for The New York Times

Federal prosecutors would have no room for error in building a criminal case against Mr. Trump, experts say, given the high burden of proof they must meet and the likelihood of any decision being appealed.

A criminal investigation in Manhattan that examined Mr. Trump's business dealings imploded this year, underscoring the risks and challenges that come with trying to indict the former president. The new district attorney there, Alvin Bragg, would not let his prosecutors present a grand jury with evidence that they felt proved Mr. Trump knowingly falsified the value of his assets for undue financial gain.

One of the outside lawyers who oversaw the case and resigned in protest wrote in a letter to Mr. Bragg that his decision was "a grave failure of justice," even if he feared that the district attorney's office could lose.

At times, Mr. Biden cannot help but get drawn into the discourse over the Justice Department, despite his stated commitment to stay away.

In October, he told reporters that he thought those who defied subpoenas from the House committee investigating the Jan. 6 attack should be prosecuted.

"I hope that the committee goes after them and holds them accountable criminally," Mr. Biden said. When asked whether the Justice Department should prosecute them, he replied, "I do, yes."

The president's words prompted a swift statement from the agency: "The Department of Justice will make its own independent decisions in all prosecutions based solely on the facts and the law. Period. Full stop."

Katie Benner covers the Justice Department. She was part of a team that won a Pulitzer Prize in 2018 for public service for reporting on workplace sexual harassment issues. More about Katie Benner

Katie Rogers is a White House correspondent, covering life in the Biden administration, Washington culture and domestic policy. She joined The Times in 2014. More about Katie Rogers

Michael S. Schmidt is a Washington correspondent covering national security and federal investigations. He was part of two teams that won Pulitzer Prizes in 2018 — one for reporting on workplace sexual harassment and the other for coverage of President Trump and his campaign's ties to Russia. More about Michael S. Schmidt

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Pressure on Garland as Jan. 6 Inquiry Expands

Ex. 63

ONE HUNDRED EIGHTEENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–6906
judiciary.house.gov

January 12, 2024

Mr. Nathan J. Wade, Esq.
Nathan J. Wade, P.C. Attorney at Law
d/b/a Wade & Campbell Firm
1827 Powers Ferry Road
Building 25, Suite 100
Atlanta, GA 30339

Dear Mr. Wade:

The Committee on the Judiciary continues to conduct oversight of politically motivated prosecutions by state and local officials. Based on recent reports, we believe that you possess documents and information about the coordination of the Fulton County District Attorney's Office (FCDAO) with other politically motivated investigations and prosecutions and the potential misuse of federal funds. Accordingly, we ask for your cooperation with our oversight.

On August 14, 2023, with your assistance, Fulton County District Attorney Fani T. Willis indicted a former President of the United States and current declared candidate for that office.[1] According to a recent court filing, you have been paid more than $650,000—at the rate of $250 per hour—to serve as an "Attorney Consultant" and later a "Special Assistant District Attorney" in the unprecedented investigation and prosecution of the former President and other former federal officials.[2] This filing also alleges that while receiving a substantial amount of money from Fulton County, you spent extravagantly on lavish vacations with your boss, Ms. Willis.[3]

Although Ms. Willis has so far refused to cooperate with our oversight of the FCDAO's coordination with other politically motivated prosecutions, invoices that you submitted for payment by the FCDAO, and made public as part of this court filing, highlight this collusion. This new information appears to substantiate our concerns that Ms. Willis's politicized

---

[1] Indictment, *Georgia v. Donald John Trump, et al.*, No. 23SC188947 (Aug. 14, 2023, Fulton Co. Sup. Ct.).
[2] Defendant Michael Roman's Motion to Dismiss Grand Jury Indictment as Fatally Defective and Motion to Disqualify the District Attorney, Her Office and the Special Prosecutor from Further Prosecuting this Matter at 11, *Georgia v. Donald John Trump, et al.*, No. 23SC188947 (Jan. 8, 2024, Fulton Co. Sup. Ct.) ("Roman Motion").
[3] *Id.* at 26-27.

Mr. Nathan J. Wade, Esq.
January 12, 2024
Page 2

prosecution, including the decision to convene a special purpose grand jury, was aided by partisan Democrats in Washington, D.C.[4] For example:

- In April 2022, you billed $6,000 for 24 hours of "[t]eam meeting; Conf w/Jan 6; Research legal issues to prep intev" from April 18 to 22.[5]

- In May 2022, you billed $2,000 for eight hours of "travel to Athens; conf. with White House Counsel" on May 23, 2022.[6]

- In that same invoice, you billed another $2,000 for eight hours of "team meeting; Conf w/Jan 6; SPGJ witness prep" on May 31, 2022.[7]

- In September 2022, you billed $6,000 for 24 hours of "[w]itness [i]nterviews; conf call DC; team meeting" from September 7 to 9.[8]

- In November 2022, you billed $2,000 for eight hours of "Jan 6 meeting and Atty conf." on November 16.[9]

- In that same invoice, you billed another $2,000 for eight hours of "[i]nterview with DC/White House" on November 18.[10]

The FCDAO reportedly compensated you using a concoction of comingled funds, including monies confiscated or seized by the FCDAO and monies directed from Fulton County's "general" fund.[11] The Committee has information that the FCDAO received approximately $14.6 million in grant funds from the Department of Justice between 2020 and 2023[12] and, given the enormous legal fees you have billed to the FCDAO, there are open questions about whether federal funds were used by the FCDAO to finance your prosecution. In fact, on one day—November 5, 2021—you billed taxpayers for 24 hours of legal work, attesting that you worked all day and night without break on a politically motivated prosecution.

A recent news report corroborates your coordination with partisan Democrats, explaining that you and FCDAO staff "quietly met" with the partisan January 6 Committee, which allowed

---

[4] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Dist. Att'y Fani T. Willis, Fulton Co. Dist. Att'y's Off. (Dec. 5, 2023) ("December Letter").
[5] *Id.* at Ex. F (invoice #6).
[6] *See id.* at Ex. F (invoice #8); Josh Boswell, *Invoices from lawyer 'lover' hired by Fani Willis to prosecute Donald Trump in election interference case show he had TWO 8-hour meetings with the Biden White House counsel*, DAILYMAIL.COM (Jan. 9, 2024).
[7] Roman Motion, *supra* note 2, Ex. F (invoice #8).
[8] *Id.* at Ex. F (invoice #12).
[9] *Id.* at Ex. H (invoice #14).
[10] *See* Roman Motion at Ex. F, Boswell, *supra* note 6.
[11] Roman Motion at 13-16.
[12] Letter from Fani T. Willis to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary at Ex. E (Sept. 7, 2023).

Mr. Nathan J. Wade, Esq.
January 12, 2024
Page 3

you to review information they had gathered.[13] *Politico* reported that the partisan January 6 Committee provided Ms. Willis's prosecution a "boost" as she prepared to convene a special grand jury and even "helped prosecutors prepare for interviews with key witnesses."[14] The same article suggests that the partisan January 6 Committee provided you access to records it withheld from other law-enforcement entities and even other Members of Congress.[15]



The Committee has serious concerns about the degree of improper coordination among politicized actors—including the Biden White House—to investigate and prosecute President Biden's chief political opponent. This new information released recently only reinforces the Committee's concerns about politically motivated prosecutions by state and local officials. To advance our oversight, we ask that you please produce the following documents and information for the period of November 1, 2021, to the present:

---

[13] Betsy Woodruff, et al., *Jan. 6 committee helped guide early days of Georgia Trump probe*, POLITICO (Jan. 10, 2024).
[14] *Id.*
[15] *Id.*

Mr. Nathan J. Wade, Esq.
January 12, 2024
Page 4

1. All documents and communications in your possession between or among the Fulton County District Attorney's Office, including yourself, and the U.S. Department of Justice and its components, including but not limited to Special Counsel Jack Smith, referring or relating to the Fulton County District Attorney's Office's investigation of President Trump;

2. All documents and communications in your possession between or among the Fulton County District Attorney's Office, including yourself, and the Executive Office of the President, including but not limited to the White House Counsel's Office, referring or relating to the Fulton County District Attorney's Office's investigation of President Trump;

3. All documents and communications in your possession between or among the Fulton County District Attorney's Office, including yourself, and the partisan January 6 Select Committee referring or relating to the Fulton County District Attorney's Office's investigation of President Trump;

4. All notes, memoranda, documents, or other material in your possession referring or relating to your meetings, conferences, phone calls, or other interactions with the U.S. Department of Justice, the Executive Office of the President, or the partisan January 6 Select Committee;

5. All invoices, including credit card statements and individualized reimbursement requests, submitted by you or your law partners to the Fulton County District Attorney's Office relating to its investigation of President Trump; and

6. All contracts and financial arrangements between you and the Fulton County District Attorney's Office relating to its investigation of President Trump.

Please provide this information as soon as possible but not later than 10:00 a.m. on January 26, 2024.

Pursuant to Rule X of the Rules of the House of Representatives, the Committee has jurisdiction over criminal justice matters in the United States.[16] If you have any questions about this request, please contact Committee staff at (202) 225-6906. Thank you for your prompt attention to this matter.

Sincerely,

Jim Jordan
Chairman

---

[16] Rules of the House of Representatives, R. X, 118th Cong. (2023).

Mr. Nathan J. Wade, Esq.
January 12, 2024
Page 5


cc:     The Honorable Jerrold L. Nadler, Ranking Member

Ex. 64

January 6, 2021

United States Senate
Select Committee on Intelligence
Washington, DC 20510-6475

RE: SSCI #2020-3029

Dear Acting Chairman Rubio and Vice Chairman Warner,

(U) This letter responds to your letter to me of October 29, 2020, asking for an independent review of possible instances of politicization of intelligence. The letter transmits my findings, which are laid out more fully in the attached report. I am prepared to provide a classified briefing to discuss the findings in more detail.

(U) The United States is in a hyperpartisan state, unlike any in recent memory. The country is divided along political, ideological, and racial lines to the point where civil discourse has become difficult if not impossible. The polarized atmosphere has threatened to undermine the foundations of our Republic, penetrating even into the Intelligence Community. Though, as intelligence professionals, we have the ethical responsibility to remain unbiased and objective in our work, we are human beings and can still feel the pressures from society and our political leaders. Pressures from our political leaders have sometimes placed demands on us that have translated into what might seem like bias or a loss of objectivity. In most cases, what we see is the entire system responding to and resisting pressures from outside, rather than attempts to politicize intelligence by our leaders or analysts.

(U) In this environment, characterized by unintentional loss of objectivity, there have been a few incidents where we documented where individuals, or groups of individuals, taking willful actions that – whatever their motivations – had the effect of politicizing intelligence, hindering objective analysis, or injecting bias into the intelligence process. This report lays out the evidence for these instances.

(U) The bottom-line-up-front answers to your questions are:

(U) **Have ODNI-published products adhered to Analytic Standards?** YES, within the scope of the tradecraft review explained below.

(U) **Have ODNI officials politicized or attempted to politicize intelligence, exercised or attempted to exercise undue influence on the analysis, production, or dissemination process of ODNI-published intelligence products related to election security?** YES, in some cases as documented below.

(U) **Have definitions or analytic tradecraft been altered, misapplied, or applied inconsistently on these products?** YES, in some cases as documented below.

(U) **Has ODNI followed standard procedure for the drafting, editing, approval, and dissemination of analytic products related to election interference?** NO, not in all cases, as documented below.

UNCLASSIFIED

(U) By taking on board this report, the Intelligence Community recognizes where we have not met our responsibilities for objective intelligence. By taking up the recommendations detailed in Appendix I, the Intelligence Community shows that it is already taking steps to correct where we lost our focus on objectivity in the past and will work to ensure that it does not happen again.

Sincerely,

Dr. Barry A. Zulauf,

IC Analytic Ombudsman,

Office of the Director of National Intelligence

## (U) Independent IC Analytic Ombudsman's on Politicization of Intelligence

### (U) Authorities

(U) As the Intelligence Community (IC) Analytic Ombudsman, IRTPA Section 1020 grants me the authority to counsel, conduct arbitration, offer recommendations, and, as appropriate, initiate inquiries into real or perceived problems of analytic tradecraft or politicization, biased reporting, or lack of objectivity in intelligence analysis. For definitions of these standards, see Annex II. In his appointment letter to me, DNI Ratcliffe conveyed his personal commitment to the Ombudsman's obligation to provide an independent avenue for analysts to pursue unbiased analysis. Even the perception that intelligence is being politicized can undermine the trust that the American people have placed in the work of the Intelligence Community. Accordingly, what follows is my independent review and recommendations as the IC Analytic Ombudsman.

### (U) Altered, Misapplied or Inconsistent Analytic Tradecraft or Definitions

(U) My review, conducted in response to IC complaints regarding the election threat issue, surfaced a number of examples of altered tradecraft and misapplied or inconsistent definitions. Due to varying collection and insight into hostile state actors' leadership intentions and domestic election influence campaigns, the definitional use of the terms "influence" and "interference" and associated confidence levels are applied differently by the China and Russia analytic communities. A formal definition document, *Lexicon for Russian Influence Efforts (U//FOUO)*, was published by the NIC in June 2017, however there is no parallel document for China, and it seems that the Russia document is not widely known across IC agencies, at least not outside the election threat community. The terms were applied inconsistently across the analytic community. Failing to explain properly these definitions is inconsistent with Tradecraft Standards 1, 2, and 6.

(U) Given analytic differences in the way Russia and China analysts examined their targets, China analysts appeared hesitant to assess Chinese actions as undue influence or interference. These analysts appeared reluctant to have their analysis on China brought forward because they tended to disagree with the Administration's policies, saying in effect, I don't want our intelligence used to support those policies. This behavior would constitute a violation of Analytic Standard B: Independent of Political Considerations (IRTPA Section 1019). On the other hand, Russia analysts assessed that there was clear and credible evidence of Russian election influence activities. They said IC management slowing down or not wanting to take their analysis to customers, claiming that it was not well received, frustrated them. Analysts saw this as suppression of intelligence, bordering on politicization of intelligence from above. At a minimum, it is a violation of the Analytic Standard for Timeliness. ODNI leaders were focusing on presenting intelligence as part of a story arc, highlighting significant trends in a way the customers could consume, rather than reporting each individual item. The incongruity between leaders' and analysts' perceptions might not have occurred if there had been more consistent and transparent communication about analytic differences.

(U) ODNI officials engaging with policymakers said that these customers did notice the result, particularly differences in the volume, frequency, and confidence levels of the intelligence coming from the China and Russia analytic communities on activities that, from their perspective, were very similar in their potential effects. These differences were not intentional, but a result of different collection and analysis rhythms and interpretations by analysts that do not cross-pollinate between regional issues. Subtle differences in analytic concepts, and their inconsistent application did, therefore, make a difference in how customers consumed the intelligence. Some customers were able to perceive differences in tradecraft and definitions: they asked hard questions, leading to greater scrutiny within the IC as leaders suggested changes in an attempt to make the intelligence more consistent and, in some cases, more palatable to customers. IC leaders were not consistently transparent with the workforce about some of these probably justified changes.

(U) According to interviews with NIC officials, policymakers were probably not aware of the behind-the-scenes machinations of the production and dissemination processes. These foundational analytic shortcomings contributed to instances of, and led to other instances of, at least the perceived politicization of intelligence, needlessly long review times, and differences between analytic conclusions in public statements on the one hand and established IC positions on the other. None of this happened in a vacuum, but the dispute appears to have largely begun with misapplied or inconsistent analytic definitions.

(U) [*Ombudsman Comment: Classified details on this issue can be provided at the request of the committee.*]

## (U) Dissonance between Public Statements and IC Coordinated Assessments

(U) After conducting a thorough review I found several incidents where there were attempts to politicize intelligence. The most egregious example is the talking points provided alongside the written introductory statement delivered by, but not written by, National Counterintelligence and Security Center (NCSC) Director Bill Evanina on 10 March 2020. Evanina also issued a 24 July ODNI public statement on foreign election interference/influence, and a 7 August press release [for both of which, the intelligence information came from the NIC]. Analysts also referred to statements by the DNI in an 8 October article published in The Hill. These statements left the impression that "the IC thinks..." when, in fact what was stated was actually, according to analysts, a "gross misrepresentation" of established IC views. According to the Director of NCSC, when asked about the IC assessments shared in his March statement and August press release, he said that he assumed they represented coordinated IC views, because NIC and other ODNI officials gave them to him and portrayed them as such. They in fact did not represent fully coordinated IC views, as discussed below.

(U) The March 10 Talking Points were drafted presumably by ODNI staff, however I was not able to find one individual who admitted to writing them. Most officials say (in the passive voice) "they were drawn from" existing reporting, albeit selectively, and were "shaped by other ODNI officials and the Ambassador [meaning A/DNI Grenell]." The main drafters were not analysts, which was probably a major contributing factor to the perceived difference between the

talking points and the established IC view. Analysts point out that there were substantive differences between the Talking Points and what the IC actually thought. Emails show that those who drew up the talking points did partially coordinate them and were informed of analysts' concerns with them, but did not completely consider the concerns in the final version. There was widespread reluctance among intelligence professionals to deliver them. This reluctance on the part of seasoned IC officers should have been a red flag, but did not stop the statement from being issued.

(U) [*Ombudsman Comment: Classified details on this issue can be provided at the request of the committee.*]

## (U) Not Following Standard Procedure for Drafting, Editing, Approval, and Dissemination

(U) Following the March Talking Points, I have identified a long story arc of – at the very least – perceived politicization of intelligence. Guidelines on special review procedures relating to election security products were promulgated by ODNI and CIA leadership, but according to interviews it appears not all analysts and managers were aware of them. Interviewees commented, if there are such guidelines they are not well promulgated. They may be known to other analysts. Three different NIC products demonstrate the overall pattern of perceived politicization stemming from the inconsistent application of definitions as outlined above. There was a neglect or refusal to re-coordinate changes, adopt alternative analyses, and include dissent language, as well as leadership's failure to communicate clearly and directly to analysts the reasoning for those changes on a consistent basis.

(U) A NIC Memo (NICM) published in May 2020 suffered from a severe slowdown and major changes to coordinated assessments in the drafting, review, and approval process. CIA analysts noted that they and a wide range of IC analysts participated fully in the early analytic work leading up to this NICM, including in the analytic line review. They feel that the first drafts of the NICM followed the general agreement of the community. Then a revised draft came back from NIC review as substantially changed, leading with intelligence gaps that seemed to undermine the threat assessment. The draft led with intelligence gaps and "buried the lead" regarding what the IC does know about election security threats. The then-NIC Chair, immediately before becoming the Principal Executive, crafted this language. In a follow-up interview, the PE stated that he did this because it was good tradecraft to lay out the analytic environment, including what is not known.

(U) Subsequently, the draft was held up by A/DNI Grenell for weeks before publication, and underwent what appears to be politically motivated editing. Analysts recounted that the NIC and DNI's changes were not fully re-coordinated with the community. The result was a final product whose delayed publication meant it diverged sharply from the up-to-date IC view communicated in other product lines. I have e-mail exchanges to document this delay, allusions to political repercussions, and frustration from intelligence professionals with the delay. These actions constitute a violation of the Analytic Standard for Timeliness, and Tradecraft Standard 7.

(U) According to interviews, the established practice does not include the DNI actively participating in the review chain for NIC Memos or Assessments. As a political appointee, there

is a potential conflict of interest. As DNI Ratcliffe has stated, on the other hand, just because it is unusual to have DNI involvement in the review of these products does not mean it is necessarily wrong to do so. According to tradecraft standards, the DNI like any IC employee, has the right to an analytic conclusion, and provided it is supported by the intelligence. The DNI should also, when speaking publicly, adhere to good tradecraft and clearly delineate when they are sharing their own personal views versus when they are communicating a coordinated intelligence community assessment. To do otherwise would be a violation of Tradecraft Standard 3.

(U) [*Ombudsman Comment: I have not interviewed A/DNI Grenell or his staff who have departed ODNI. They are no longer under my purview as Analytic Ombudsman.*]

(U) In the August NICA, there were analytic lines from the Annual Threat Assessment (ATA – originally drafted in early 2020) which were technically accurate but not as current as what the IC had published over the previous six months in other product lines. Instead of allowing the most current IC-coordinated NICA language to drive this alignment, previously IC-coordinated ATA language was used without a re-coordination, at the instruction of the A/NIC Chair. Analysts claim that NIC leadership consistently watered down conclusions during a drawn-out review process, boosting the threat from China and making the threat from Russia sound "not too controversial."

(U) NIC officials pointed to ODNI senior officials as intervening in the changes to conclusions, saying that they were overly sensitive to political customers who saw the dissonance between China and Russia reporting and the inconsistent application of definitions. DNI Ratcliffe just disagreed with the established analytic line on China, insisting 'we are missing China's influence in the US and that Chinese actions ARE intended to affect the election. DNI Ratcliffe wrote as much in his Wall Street Journal op-ed. Ultimately the DNI insisted in putting material on China in, and was aware analysts disagreed and probably still disagree. As a result, the final published NICA, analysts felt, was an outrageous misrepresentation of their analysis. DNI Ratcliffe states, "I know my conclusions are right, based on the intelligence that I see." As the DNI states, "Many analysts think I am going off the script. They don't realize that I did it based on the intelligence."

(U) Two NIOs wrote a NIC Alternative Analysis Memo (NIC AOA Memo) in October 2020, which expressed alternative views on potential Chinese election influence activities. These alternative views met with considerable organizational counter pressure, which we will address later in this report. ODNI has to ensure that alternative views are expressed, even when they differ from the majority. A healthy challenge culture in the IC can foster differences of analytic views and ensure that they are shared in intelligence products, consistent with IRTPA Section 1017. In my discussions with him, DNI Ratcliffe agreed with the concerns expressed in the Alternative Analysis Memo, and was aware that most analysts did not hold that view. Not to include all intelligence would also be a violation of the IRTPA Analytic Standard D, to be "Based on All Available Sources of Intelligence."

(U) Ombudsmen from CIA, NSA, and ODNI report the widely shared perspective among IC analysts that analysis on foreign election interference was delayed, distorted, or obstructed out of concern over policymaker reactions or for political reasons, which in their view constitutes

politicization. These Ombudsmen agree, whether through application of highly stringent
coordination and review practices or deliberate temporizing, there is a discernible pattern of
delay on IC analytic production on election threat reporting. There is an inherent danger in even
the perception that intelligence products were changed for political purposes. The perception of
politicization undermined analysts' willingness to come forward with alternatives. This is a
violation of Tradecraft Standard 4 and IRTPA Section 1017.

(U) [*Ombudsman Comment: Classified details on this issue can be provided at the request of the
committee.*]

## (U) Undue Influence on Analysis, Production, and Dissemination

(U) There were strong efforts to suppress analysis of alternatives (AOA) in the August NICA,
and associated IC products, which is a violation of Tradecraft Standard 4 and IRTPA Section
1017. NIC officials reported that CIA officials rejected NIC coordination comments and tried to
downplay analysis of alternatives in their own production during the drafting of the NICA.
According to NIOs and Directors, CIA management contacted the A/NIC Chair and NIOs to
suppress the NIC from caveating analytic judgments that were downplayed due to concerns
about policy. As a result, these NIC officials felt the only avenue to express alternative views
was via the NIC AOA Memo they authored in October 2020. During the drafting of the NIC
AOA Memo, CIA management again contacted the A/NIC Chair and other NIOs on joint duty
assignment from CIA (who would eventually have to return to their home agency), pressuring
them to withdraw their support of the NIC AOA Memo in an attempt to suppress it. This was
seen by NIOs as politicization from below, just as the A/DNI's push to bring forward evidence
of what the Chinese are or were doing without apparently being supported by intelligence
available to all analysts "must be politicization from above," according to an ODNI official.
Politicization may be in the eye of the beholder, but my objective and independent view is that
there was politicization from above and below.

(U) The NIOs and Directors faced opposition getting their views on election interference across.
It is difficult to have a healthy analytic conversation in a confrontational environment. ODNI and
the IC agencies involved in analysis of election interference at first failed in allowing for a
challenge culture where analysis of alternatives is required and dissents are encouraged as
healthy analytic tradecraft. Such actions amount to exercise, or at least the attempt to exercise,
undue influence on intelligence, which is a violation of Tradecraft Standard 4. ODNI and the
NIC did, to their credit, ensure that the analysis of alternatives piece and other related
intelligence was published.

(U) [*Ombudsman Comment: Classified details on this issue can be provided at the request of the
committee.*]

## (U) Tradecraft Review

(U) Pursuant to your letter, I asked for products produced between January and October 2020 to
be evaluated for compliance with Analytic Tradecraft Standards by the ODNI's Analytic
Integrity and Standards Division (AIS) in exactly the same manner as any other product would

be evaluated pursuant to IRTPA Section 1019. We found no evidence of lack of objectivity or politicization of intelligence. Indications of politicization would come out in the inquiry focused on the editing, review, and coordination behind the scenes of the final products.

## (U) Historical Context

(U) Recent history gives an example of how politicization of intelligence can undermine the intelligence analysis process. Politicization of election security intelligence this year echoes the events surrounding the writing of Secretary of State Colin Powell's UN Speech to make the case to go to war with Iraq in 2003. In this historic example, politicians and political appointees had also made up their mind about an issue and spent considerable time pressuring analysts and managers to prove their thesis to the American public, with little regard for analytic tradecraft.

(U) The difference this time – with the accusations of politicization of intelligence in 2020 -- is that analysts remember what happened in 2003. Intelligence based on bias and subjected to undue influence led to a war. In this case, analysts have reacted strongly to what they see as history repeating itself. Analysts may have lost their own objectivity because they felt they had to fight to ensure the intelligence information they provided was not misconstrued, misused, or ignored. Analysts should not be put in this position. The DNI and other ODNI senior officials must stay above the fray and protect the integrity, timeliness and objectivity of intelligence by fostering a challenge culture in which differences of analytic opinion are shared without organizational suppression or fear of retribution. The IC must produce objective intelligence and communicate it clearly to customers; however customers might use or mis-use it for policy purposes with which analysts or IC leaders may or may not agree.

## (U) Conclusion

(U) Looking back over the past year, it is evident that what began as mischaracterization of IC analytic assessments by ODNI officials escalated into an ongoing widespread perception in the workforce about politicization and loss of analytic objectivity throughout the community on the topics of Russian and Chinese election influence and interference. Politicization need not be overt to be felt. This report documents the reality of both attempts to politicize and perception of politicization of intelligence.

(U) No ODNI official has stated that reviews or edits of election threat intelligence were phrased in a way that was explicitly political in nature. Rather, from the ODNI leadership perspective, officials were seeking a way to deliver intelligence in a way that the Trump Administration would consume it. Top ODNI officials faced enormous pressure to balance between IC assessments and customers' demands. This pressure filtered back down the chain and analysts perceived their work as being politicized, in contravention to the Analytic Standards for Objectivity and avoiding political considerations, in order to make intelligence more palatable to senior customers. Their response to the perceived – and sometimes real – attempts at politicization reflected a loss of analytic objectivity. When analysts face perceived politicization, they have recourse to report their concerns to the Ombudsman just as they have the obligation to continue to produce timely, accurate, objective intelligence with no regard for political considerations.

(U) If our political leaders in the White House and Congress believe we are withholding intelligence because of organizational turf wars or political considerations, the legitimacy of the Intelligence Community's work is lost. Intelligence officers, even those at the highest levels, cannot allow political considerations to influence analysis, and must stand as a bulwark against all political pressures, even if the cost is that senior customers do not like what the intelligence community assesses. As PE Neil Wiley has stated (and I paraphrase), *intelligence is the only great function of state that does not come to top decision makers with an agenda, wanting something. The purpose of intelligence is to provide objective, unbiased, and policy-neutral assessments. We are, perhaps, most important to decision makers when we bring to them the bad news, or what they don't want to hear. This is an ethical challenge to intelligence professionals, and sometimes demands moral courage to carry out. Other institutions are inherently political and are much less likely to bring bad news. If we lose that objectivity, or even are perceived to have lost it, we have endangered the entire reason for us to exist.*

(U) Finally, IC officials, whether politically appointed or not, must not make statements that, implied or directly attributed, communicate the IC's analytic views when they are in fact not representative of the IC's analytic line of argument. There must be a clear distinction between the actual intelligence, the IC's analytic assessments and judgments, and personal or political opinions. DNI Ratcliffe pointed out that "objectivity needs to be on both sides of the debate. When senior leaders ask questions about analytic products that does not mean that is politicization." The IC needs to foster a stronger challenge culture to allow for alternative views and "make the IC better at what it does."

(U) This report has presented the findings of my independent Ombudsman review, in response to your letter. I have appended a set of recommendations at Annex I, based on those findings, pursuant to my authority under IRTPA Section 1020, which I have given to ODNI management to take for action. I have provided definitions in Annex II and a scope note in Annex III.

## ANNEX I

### (U) Recommendations

(U) ODNI recognizes the analytic tradecraft deficiencies related to intelligence products on election interference. These recommendations have been accepted by the DNI, and ODNI is already taking steps and is prepared to take further steps to remedy the process, communication, and education failures that led to this ombudsman complaint.

- (U) Reinforce through direct leadership communications from ODNI to the workforce as a whole, and from agency heads to all IC agencie,s the importance of protecting analytic integrity and a renewed commitment to analytic objectivity and avoiding politicization in both policy and practice. Reinforce adherence to analytic tradecraft as spelled out in IRTPA Section 1019.

- (U) This issue has created across the workforce, in several agencies, skepticism and mistrust among analysts and line managers directed at agency and IC leaders. Take steps to rebuild trust through more direct leadership communication and transparency. When departing from established practices, ensure consistency in decision making that adheres to established analytic tradecraft standards, best practices, and guidelines for production and dissemination on this topic. Avoid verbal instructions, such as, "ODNI says to do it this way." Adhere to clear and defensible written instructions, and provide timely, direct, and specific feedback. Help the analytic workforce understand the balance between discretion required for this topic and the need to warn. Ensure that these guidelines and practices are written, widely disseminated, and understood. Analysts may assume that changes must be politically motivated. Better leadership communications will clarify when changes are being made NOT for political or policy reasons.

- (U) Foster a collaboration culture across the IC analytic community that expressly supports analyses of alternatives and encourages dissent when appropriate as required in IRTPA, Section 1017. Publish a memo to IC and ODNI senior leaders, managers, and analysts reminding them that when fundamental disagreements to analytic judgments exist across agencies or analytic units, the solution is to write a product that clearly articulates those disagreements, to include dissenting language and analysis of alternatives. Backchannel intimidation tactics between analysts, managers, and/or senior leadership to suppress dissenting views must be expressly forbidden.

- (U) Use the Analytic Ombudsman to sponsor dialogues between analytic elements and leadership where needed to facilitate direct communication and transparency. The Ombudsman's statutory role in IRTPA Section 1020 is to help resolve differences before they become problems.

- (U) Mandate analyst exchanges between regional election security units within agencies (e.g., Russian election security analysts spend time working with China election security analysts and vice versa) in order to facilitate the exchange of methodologies and analytic practice with the aim of providing more consistent analytic definitions across topics at the strategic level. These analytic exchanges can clarify what has been seen as inconsistent application of definitions and analytic models.

- (U) Redouble analytic objectivity and tradecraft standards training efforts for three customer categories: new analyst training, refresher training for managers and analysts, and executive-level training. 1) Analysis 101 was once mandatory, but agencies resisted in favor of their own training. Clearly, the training going on now has been insufficient to inculcate good tradecraft – leading to this issue. This course already exists, and is overseen by the Analytic Ombudsman; 2) require an analytic standards and objectivity course prerequisite as part of completing the IC Advanced Analyst Program (ICAAP). Such a requirement will provide in-service training on analytic standards for senior analyst and managers of analysts, to better enable them to recognize and mitigate problems with objectivity and politicization. Courses already exist, that just have to be recognized within and overseen by ICAAP; 3) Provide for one expert on analytic tradecraft and objectivity to create and oversee an executive training course on analytic objectivity and tradecraft standards.

- (U) Hold IC agencies to account for improving tradecraft issues found by ODNI's assessments of analytic tradecraft conducted by AIS – and where possible by agencies own tradecraft evaluation efforts. ODNI will work through the National Intelligence Analysis Board (NIAB) to improve analytic tradecraft across the IC.

## **ANNEX II:**

### **(U) Definitions: What we mean when we say**

(U) Mandated by Section 1019 of the Intelligence Reform and Terrorism Prevention Act (IRTPA), the IC Analytic Standards guide analytic production, speak directly to the integrity of the analytic *process* that lies behind the disseminated analytic product, and to the *value* of that product to the consumer. Below are Intelligence Community Directive 203 definitions of these terms; my comments add context for this case.

a) **(U) Objective**: Analysts must perform their functions with objectivity and with awareness of their own assumptions and reasoning. They must employ reasoning techniques and practical mechanisms that reveal and mitigate bias. Analysts should be alert to influence by existing analytic positions or judgments and must consider alternative perspectives and contrary information. Analysis should not be unduly constrained by previous judgments when new developments indicate a modification is necessary. *Ombudsman Comment: In this letter I refer to this standard and violations thereof in terms of analytic objectivity and bias.*

   • **(U) Bias:** According to the late Dick Heuer in Psychology of Intelligence Analysis, bias in intelligence is a fundamental limitation of human mental processes. These limitations cause people to employ various simplifying strategies and rules of thumb to ease the burden of mentally processing information to make judgments and decisions. In ordinary life, these simple rules of thumb are often useful in helping us deal with complexity and ambiguity. In intelligence analysis, however, bias lead to predictably faulty analytic judgments and the inability to provide objective analysis to consumers of intelligence.

b) **(U) Independent of political consideration**: Analytic assessments must not be distorted by, nor shaped for, advocacy of a particular audience, agenda, or policy viewpoint. Analytic judgments must not be influenced by the force of preference for a particular policy. *Ombudsman Comment: In this letter I refer to this standard and violations thereof in terms of politicization and distortion.*

c) **(U) Timely**: Analysis must be disseminated in time for it to be actionable by customers. Analytic elements have the responsibility to be continually aware of events of intelligence interest, of customer activities and schedules, and of intelligence requirements and priorities, in order to provide useful analysis at the right time. *Ombudsman Comment: In this letter I refer to this standard and violations thereof in terms of excessively delayed review times.*

d) **(U) Based on all available sources of intelligence information**: Analysis should be informed by all relevant information available. Analytic elements should identify and address critical information gaps and work with collection activities and data providers to develop access and collection strategies. *Ombudsman Comment: In this letter I refer to this standard and violations thereof in terms of analytic tradecraft.*

e) **(U) Implements and Exhibits Analytic Tradecraft Standards:** The nine standards as further spelled out in ICD 203, are -

1. Properly Describes the Quality and Credibility of Underlying Sources, Data, and Methodologies
2. Properly Expresses and Explains Uncertainties Associated With Major Analytic Judgments
3. Properly Distinguishes Between Underlying Intelligence Information and Analysts' Assumptions and Judgments
4. Incorporates Analysis of Alternatives
5. Demonstrates Customer Relevance and Addresses Implications
6. Uses Clear and Logical Argumentation
7. Explains Change to or Consistency of Analytic Judgments
8. Makes Accurate Judgments and Assessments
9. Incorporates Effective Visual Information Where Appropriate

## ANNEX III

### (U) Scope Note

(U) I completed a comprehensive review and ascertained accusations and documentation of attempts to alter a range of analytic products for reasons that do not follow good tradecraft. Prior to receipt of the letter, I already had begun a review based on perceived problems with politicization and violations of analytic tradecraft that were brought to my attention by Ombudsmen in three IC agencies.

(U) While Ombudsmen from other agencies do not report to me in my statutory role as ODNI Ombudsman, several of us met and conferred on these complaints and agree that aspects of these concerns fall within the IC definition of politicization. The concerns conveyed to us represent widely held views among IC officers engaged on the election threat issue and point to broadly perceived, and probably some actual instances of, politicized intelligence relating to foreign interference in US elections.

(U) I conducted listening sessions with the analysts and managers from CIA, NSA, other agencies, NIC, PDB, and ODNI leadership to obtain information surrounding the complaints filed. Some interview subjects requested anonymity, which I granted, as a condition for their sharing documentation or comments. Others asked to be identified. I also conducted confidential interviews with a number of senior IC leaders connected with this issue. I have not interviewed individuals outside the IC.

UNCLASSIFIED

## DIRECTOR OF NATIONAL INTELLIGENCE
WASHINGTON, DC

SUBJECT:          Views on Intelligence Community Election Security Analysis

REFERENCE:        Intelligence Community Assessment: Foreign Threats to the 2020 U.S.
                  Elections

From my unique vantage point as the individual who consumes all of the U.S. government's most sensitive intelligence on the People's Republic of China, I do not believe the majority view expressed by Intelligence Community (IC) analysts fully and accurately reflects the scope of the Chinese government's efforts to influence the 2020 U.S. federal elections.

The IC's Analytic Ombudsman issued a report, which I will reference several times below, that includes concerning revelations about the politicization of China election influence reporting and of undue pressure being brought to bear on analysts who offered an alternative view based on the intelligence. The Ombudsman's report, which is being transmitted to Congress concurrently with this Intelligence Community Assessment (ICA), also delves into a wider range of election security intelligence issues that I will not focus on here. However, the specific issues outlined below with regard to China reporting are illustrative of broader concerns. It is important for all IC leaders to foster a culture within the Community that encourages dissenting views that are supported by the intelligence. Therefore, I believe it is incumbent upon me in my role as the Director of National Intelligence to lead by example and offer my analytic assessment, alongside the majority and minority views. This letter was prepared in consultation with the Ombudsman to ensure that I am accurately articulating his findings and presenting them in their proper context.

The majority view expressed in this ICA with regard to China's actions to influence the election fall short of the mark for several specific reasons.

Analytic Standard B requires the IC to maintain "independence of political considerations." This is particularly important during times when the country is, as the Ombudsman wrote, "in a hyper partisan state." However, the Ombudsman found that:

"China analysts were hesitant to assess Chinese actions as undue influence or interference. These analysts appeared reluctant to have their analysis on China brought forward because they tend to disagree with the administration's policies, saying in effect, I don't want our intelligence used to support those policies. This behavior would constitute a violation of Analytic Standard B: Independence of Political Considerations (IRTPA Section 1019)."

Furthermore, alternative viewpoints on China's election influence efforts have not been appropriately tolerated, much less encouraged. In fact, the Ombudsman found that:

UNCLASSIFIED

UNCLASSIFIED

SUBJECT:     Views on Intelligence Community Election Security Analysis

"There were strong efforts to suppress analysis of alternatives (AOA) in the August [National intelligence Council Assessment on foreign election influence], and associated IC products, which is a violation of Tradecraft Standard 4 and IRTPA Section 1017. National Intelligence Council (NIC) officials reported that Central Intelligence Agency (CIA) officials rejected NIC coordination comments and tried to downplay alternative analyses in their own production during the drafting of the NICA."

Additionally, the Ombudsman found that CIA Management took actions "pressuring [analysts] to withdraw their support" from the alternative viewpoint on China "in an attempt to suppress it. This was seen by National Intelligence Officers (NIO) as politicization," and I agree. For example, this ICA gives the false impression that the NIO Cyber is the only analyst who holds the minority view on China. He is not, a fact that the Ombudsman found during his research and interviews with stakeholders. Placing the NIO Cyber on a metaphorical island by attaching his name alone to the minority view is a testament to both his courage and to the effectiveness of the institutional pressures that have been brought to bear on others who agree with him.

Intelligence Reform and Terrorism Prevention Act (IRTPA) Analytic Standard D requires that coordinated analytic products be "based on all available sources of intelligence." However, because of the highly compartmented nature of some of the relevant intelligence, some analysts' judgements reflected in the majority view are not based on the full body of reporting. Therefore the majority view falls short of IRTPA Analytic Standard D.

Tradecraft Standard 1 requires the analytic community to be consistent in the definitions applied to certain terminology, and to ensure that the definitions are properly explained. Having consumed election influence intelligence across various analytic communities, it is clear to me that different groups of analysts who focus on election threats from different countries are using different terminology to communicate the same malign actions. Specifically, definitional use of the terms "influence" and "interference" are different between the China and Russia analytic communities. The Analytic Ombudsman found that:

"Terms were applied inconsistently across the analytic community… Given analytic differences in the way Russia and China analysts examined their targets, China analysts appeared hesitant to assess Chinese actions as undue influence or interference."

As a result, similar actions by Russia and China are assessed and communicated to policymakers differently, potentially leading to the false impression that Russia sought to influence the election but China did not. This is inconsistent with Tradecraft Standard 1.

In the Ombudsman's report, he accurately acknowledged my commitment "to provide an independent avenue for analysts to pursue unbiased analysis." My approach here is not without precedent. In 1962, a National Intelligence Estimate stated that the Soviet Union was unlikely to place missiles in Cuba. Then-CIA Director John McCone forcefully disagreed with the analysts,

UNCLASSIFIED

UNCLASSIFIED

SUBJECT:    Views on Intelligence Community Election Security Analysis

and later ordered the U-2 reconnaissance flights that discovered that missiles had in fact been deployed.

In that same spirit, I am adding my voice in support of the stated minority view – based on all available sources of intelligence, with definitions consistently applied, and reached independent of political considerations or undue pressure -- that the People's Republic of China sought to influence the 2020 U.S. federal elections, and raising the need for the Intelligence Community to address the underlying issues with China reporting outlined above.

_____          _____
John Ratcliffe                                            January 7, 2021
                                                                   Date                                   .

3

UNCLASSIFIED

OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE
DIRECTOR OF THE NATIONAL COUNTERINTELLIGENCE AND SECURITY CENTER
WASHINGTON, DC

NCSC-21-007
January 7, 2021

The Honorable Marco Rubio
Acting Chairman
Select Committee on Intelligence
United States Senate
Washington, DC 20510

The Honorable Mark Warner
Vice Chairman
Select Committee on Intelligence
United States Senate
Washington, DC 20510

Dear Acting Chairman Rubio and Vice Chairman Warner:

I am writing to inform you that I am appalled by the findings contained in the January 6, 2021 letter to you from Intelligence Community (IC) Analytic Ombudsman Dr. Barry Zulauf regarding possible politicization of intelligence in connection with the 2020 U.S. elections.

I was appointed to my current role in June 2014 by Director of National Intelligence (DNI) James Clapper under the Obama Administration. In 2017, I was asked to remain in this position by DNI Dan Coats under the Trump Administration. I was later nominated and became the first Senate-confirmed Director of the National Counterintelligence and Security Center (NCSC). I am humbled by and proud of the bipartisan support I received during my confirmation process.

As a 24-year career law enforcement and intelligence officer who was assigned to oversee the IC's election security threat briefings in May 2020, it was vital for myself and other IC leaders to have complete trust and confidence in the intelligence we received so we could convey it objectively and without fear or favor to policymakers and the public. It is disheartening to hear that I may have been provided intelligence that was disputed by some when I was communicating with Congress and the American public about threats to the 2020 elections.

Going forward, we must ensure without fail that IC leaders can have complete faith in the intelligence they deliver to policymakers. We must also ensure that analysts are afforded the space and independence necessary to provide unbiased and objective assessments to IC leaders. I will yield to the incoming IC leadership and analytical leaders in the community to make the necessary modifications and cultural changes required to achieve this state.

For context, I feel obligated to set forth the facts surrounding some of the assertions in Dr. Zulauf's January 6, 2021 letter to you. Specifically, Dr. Zulauf alleged: "After conducting a thorough review, I found several incidents where there were attempts to politicize intelligence. The most egregious example is the talking points provided alongside the written introductory statement delivered by, but not written by, National Counterintelligence and Security Center (NCSC) Director Bill Evanina on 10 March 2020."

SUBJECT: Acting Chairman Rubio and Vice Chairman Warner

The facts of this matter are as follows:

- On Tuesday, March 10, 2020, Acting DNI Richard Grenell was scheduled to testify on election security at classified all-Senate and all-House briefings. Senior ODNI officials had been preparing testimony, Q&A and related talking points for Acting DNI Grenell for several days before the hearing.

- Less than 24 hours before the scheduled hearings, I was informed by Deputy DNI Beth Sanner that I would be testifying at the briefings, not Acting DNI Grenell. This came as a surprise to me because IC election security issues, at the time, were primarily the purview of the ODNI Election Threats Executive, not the NCSC. Nevertheless, I agreed to testify and was provided a written script to read for the classified briefings.

- The script was provided to me by the ODNI Election Threats Executive and other senior ODNI officials. I used these materials in the classified Senate and House briefings, trusting and believing they reflected the coordinated views of the IC because they had been provided to me by the DNI's top intelligence advisor, ODNI's top election threat executive and senior career intelligence officials.

- After the hearing, the ODNI posted on its public website a "Handout on Foreign Threats to U.S. Elections for Congressional Members" on March 10, 2020. I had absolutely no role in crafting these public talking points, nor were they issued under my name.

The IC Analytic Ombudsman further asserted in his letter that public statements on election security I issued on July 24, 2020 and August 7, 2020, were, according to some analysts, a "gross misrepresentation" of established IC views. The facts of this matter are as follows:

- After I was assigned in May 2020 to oversee the IC's election security threat briefings, I issued two formal, written statements to the public. In both my July 24, 2020 and August 7, 2020 public statements, I described foreign threats to the U.S. election based exclusively on language and threat information provided to me by Deputy DNI Sanner, the ODNI Election Threat Executive, the Chair of the National Intelligence Council, and other career intelligence officials representing the spectrum of IC agencies.

- Furthermore, the underlying threat language of both statements was drawn directly from the draft IC Annual Threat Assessment, which represented the coordinated views of the IC. In addition, the threat language was coordinated with and agreed to by senior officials at CIA and other IC agencies before its public release.

Throughout the election security briefing process, which included more than 20 briefings to members of Congress, the Trump and Biden campaigns, as well as the RNC and DNC, I

SUBJECT: Acting Chairman Rubio and Vice Chairman Warner

trusted and relied on upon the foreign threat language provided to me by senior intelligence experts from across the IC. I ensured these briefings were consistent and uniform regardless of the audience, and I accurately conveyed what I believed to be the established IC analytic lines at the time my statements were issued.

Throughout my career at FBI, CIA and NCSC, I have spoken truth to power, no matter the consequences and without regard to politics. I have never politicized intelligence during my career and any suggestion I would is a personal affront to me. Despite the Congressional and public criticism that came with the job of leading the IC's election security threat briefings and informing Americans of threats to their elections in a hyper-partisan environment, I have proudly maintained my integrity throughout the entire process.

Notwithstanding the findings of the IC Analytic Ombudsman, I am proud of the work of the IC and all our federal, state and local partners in keeping foreign adversaries from interfering in the 2020 U.S. elections. It is critical that the IC maintain a significant role in future efforts to secure U.S. elections against foreign threats. The integrity of the analytic process and product must be the bedrock of these efforts.

Sincerely,

William R. Evanina

Ex. 65

UNCLASSIFIED

## DIRECTOR OF NATIONAL INTELLIGENCE
### WASHINGTON, DC

SUBJECT:           Views on Intelligence Community Election Security Analysis

REFERENCE:      Intelligence Community Assessment: Foreign Threats to the 2020 U.S. Elections

From my unique vantage point as the individual who consumes all of the U.S. government's most sensitive intelligence on the People's Republic of China, I do not believe the majority view expressed by Intelligence Community (IC) analysts fully and accurately reflects the scope of the Chinese government's efforts to influence the 2020 U.S. federal elections.

The IC's Analytic Ombudsman issued a report, which I will reference several times below, that includes concerning revelations about the politicization of China election influence reporting and of undue pressure being brought to bear on analysts who offered an alternative view based on the intelligence. The Ombudsman's report, which is being transmitted to Congress concurrently with this Intelligence Community Assessment (ICA), also delves into a wider range of election security intelligence issues that I will not focus on here. However, the specific issues outlined below with regard to China reporting are illustrative of broader concerns. It is important for all IC leaders to foster a culture within the Community that encourages dissenting views that are supported by the intelligence. Therefore, I believe it is incumbent upon me in my role as the Director of National Intelligence to lead by example and offer my analytic assessment, alongside the majority and minority views. This letter was prepared in consultation with the Ombudsman to ensure that I am accurately articulating his findings and presenting them in their proper context.

The majority view expressed in this ICA with regard to China's actions to influence the election fall short of the mark for several specific reasons.

Analytic Standard B requires the IC to maintain "independence of political considerations." This is particularly important during times when the country is, as the Ombudsman wrote, "in a hyper partisan state." However, the Ombudsman found that:

> "China analysts were hesitant to assess Chinese actions as undue influence or interference. These analysts appeared reluctant to have their analysis on China brought forward because they tend to disagree with the administration's policies, saying in effect, I don't want our intelligence used to support those policies. This behavior would constitute a violation of Analytic Standard B: Independence of Political Considerations (IRTPA Section 1019)."

Furthermore, alternative viewpoints on China's election influence efforts have not been appropriately tolerated, much less encouraged. In fact, the Ombudsman found that:

UNCLASSIFIED

SUBJECT:    Views on Intelligence Community Election Security Analysis

"There were strong efforts to suppress analysis of alternatives (AOA) in the August
[National intelligence Council Assessment on foreign election influence], and associated
IC products, which is a violation of Tradecraft Standard 4 and IRTPA Section 1017.
National Intelligence Council (NIC) officials reported that Central Intelligence Agency
(CIA) officials rejected NIC coordination comments and tried to downplay alternative
analyses in their own production during the drafting of the NICA."

Additionally, the Ombudsman found that CIA Management took actions "pressuring
[analysts] to withdraw their support" from the alternative viewpoint on China "in an attempt to
suppress it. This was seen by National Intelligence Officers (NIO) as politicization," and I agree.
For example, this ICA gives the false impression that the NIO Cyber is the only analyst who
holds the minority view on China. He is not, a fact that the Ombudsman found during his
research and interviews with stakeholders. Placing the NIO Cyber on a metaphorical island by
attaching his name alone to the minority view is a testament to both his courage and to the
effectiveness of the institutional pressures that have been brought to bear on others who agree
with him.

Intelligence Reform and Terrorism Prevention Act (IRTPA) Analytic Standard D requires
that coordinated analytic products be "based on all available sources of intelligence." However,
because of the highly compartmented nature of some of the relevant intelligence, some analysts'
judgements reflected in the majority view are not based on the full body of reporting. Therefore
the majority view falls short of IRTPA Analytic Standard D.

Tradecraft Standard 1 requires the analytic community to be consistent in the definitions
applied to certain terminology, and to ensure that the definitions are properly explained. Having
consumed election influence intelligence across various analytic communities, it is clear to me
that different groups of analysts who focus on election threats from different countries are using
different terminology to communicate the same malign actions. Specifically, definitional use of
the terms "influence" and "interference" are different between the China and Russia analytic
communities. The Analytic Ombudsman found that:

"Terms were applied inconsistently across the analytic community… Given analytic
differences in the way Russia and China analysts examined their targets, China analysts
appeared hesitant to assess Chinese actions as undue influence or interference."

As a result, similar actions by Russia and China are assessed and communicated to
policymakers differently, potentially leading to the false impression that Russia sought to
influence the election but China did not. This is inconsistent with Tradecraft Standard 1.

In the Ombudsman's report, he accurately acknowledged my commitment "to provide an
independent avenue for analysts to pursue unbiased analysis." My approach here is not without
precedent. In 1962, a National Intelligence Estimate stated that the Soviet Union was unlikely to
place missiles in Cuba. Then-CIA Director John McCone forcefully disagreed with the analysts,

2

UNCLASSIFIED

SUBJECT:   Views on Intelligence Community Election Security Analysis

and later ordered the U-2 reconnaissance flights that discovered that missiles had in fact been deployed.

In that same spirit, I am adding my voice in support of the stated minority view -- based on all available sources of intelligence, with definitions consistently applied, and reached independent of political considerations or undue pressure -- that the People's Republic of China sought to influence the 2020 U.S. federal elections, and raising the need for the Intelligence Community to address the underlying issues with China reporting outlined above.

_____                    _____
John Ratcliffe                                                          Date   January 7, 2021

3

UNCLASSIFIED

# Ex. 66

*(Under Seal)*

# Ex. 67

*(Under Seal)*

# Ex. 68

*(Under Seal)*

# Ex. 69

*(Under Seal)*

# Ex. 70

*(Under Seal)*