**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

UNITED STATES OF AMERICA,

vs.

DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVEIRA,

          Defendants.

**Case No. 23-80101-CR**
**CANNON/REINHART**

**PRESIDENT TRUMP'S MOTION TO DISMISS COUNTS 1 – 32 BASED ON**
**PRESIDENTIAL IMMUNITY**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

DISCUSSION ....................................................................................................................2

   I.    The Superseding Indictment ................................................................... 2

   II.   Applicable Law: Motions To Dismiss ................................................... 2

   III.   President Trump Is Immune From Prosecution For His Official Acts ......................... 3

      A.   Under The Separation Of Powers, Article III Courts Lack Authority To Sit In Judgment Over A President's Official Acts.................................................... 3

      B.   The Impeachment Judgment Clause Confirms Presidential Immunity ........................ 7

      C.   The President's Unique Role Requires Immunity From Prosecution............................ 8

      D.   "The Presuppositions Of Our Political History" Support Presidential Immunity From Prosecution For Official Acts ................................................... 9

      E.   Analogous Immunity Doctrines Support Presidential Immunity From Prosecution .... 12

      F.   Public Policy Considerations Rooted In The Separation Of Powers Support Presidential Immunity From Prosecution ................................................ 14

      G.   Counts 1-32 Of The Indictment Charge President Trump For Official Acts .............. 16

CONCLUSION....................................................................................................................19

## INTRODUCTION

President Donald J. Trump respectfully submits this motion seeking dismissal of Counts 1 through 32 on the basis of presidential immunity, as these charges stem directly from official acts by President Trump while in office.[1]  Specifically, President Trump is immune from prosecution on Counts 1 through 32 because the charges turn on his alleged decision to designate records as personal under the Presidential Records Act ("PRA") and to cause the records to be moved from the White House to Mar-a-Lago.  As alleged in the Superseding Indictment, President Trump made this decision while he was still in office.  The alleged decision was an official act, and as such is subject to presidential immunity.

The Court should hold a hearing to resolve any factual disputes relating to the official nature of President Trump's PRA designation and the removal of his personal records from the White House.  *See Blassingame v. Trump*, 87 F.4th 1, 29-30 (D.C. Cir. 2023).  Following any necessary hearing, the Court should dismiss Counts 1 through 32.

---

[1] President Trump reserves the right to supplement this motion and file any other motions based on discovery provided as a result of the motions to compel.  *See* ECF No. 314.

1

<u>**DISCUSSION**</u>

**I.    The Superseding Indictment**

The Special Counsel's Office concedes that the "genesis" of this case dates back to at least "the tail end of the Trump Administration itself."  Compel Oppn. at 3.[2]  The Office alleges in the Superseding Indictment that President Trump "*caused* scores of boxes, many of which contained classified documents, to be transported" to Mar-a-Lago.  ECF No. 85 ¶ 4 (emphasis added).  The Superseding Indictment makes clear that this decision and the related transportation of records occurred while President Trump was still in office.  *Id.* ¶ 25 (alleging that President Trump caused boxes of records to be packed and shipped "[i]n January 2021, as he was *preparing* to leave the White House" (emphasis added)).  President Trump departed the White House prior to "12:00 p.m. on January 20, 2021," and as such he is alleged to have made these decisions concerning the documents at issue while he was the Commander-in-Chief.  *Id.* ¶ 4.

**II.    Applicable Law: Motions To Dismiss**

"[A]n indictment may be dismissed where there is an infirmity of law in the prosecution." *United States v. Stokes*, 2023 WL 6462066, at *1 (S.D. Fla. Oct. 4, 2023) (cleaned up); *see also* Fed. R. Crim. P. 12(b)(3)(B).  "[A] district court may dismiss an indictment . . . when immunity, double jeopardy, or jurisdictional issues are implicated."  *United States v. Salman*, 378 F.3d 1266, 1267 n.3 (11th Cir. 2004).  "An indictment that requires speculation on a fundamental part of the charge is insufficient."  *United States v. Bobo*, 344 F.3d 1076, 1084 (11th Cir. 2003).

---

[2] "Compel Oppn." refers to the Special Counsel's Office's response to the Defendants' motion to compel discovery.  ECF No. 277.

### III.     President Trump Is Immune From Prosecution For His Official Acts

A former president's immunity from criminal prosecution based on official acts presents a "serious and unsettled question of law." *Nixon v. Fitzgerald*, 457 U.S. 731, 743 (1982).  The D.C. Circuit recently erred in finding that President Trump was not entitled to presidential immunity in connection with the set of criminal charges pending in the District of Columbia.  *See United States v. Trump*, 91 F.4th 1173, 2024 WL 436971, at \*17 (D.C. Cir. 2024).  The D.C. Circuit's analysis is not persuasive for many of the reasons discussed below, and President Trump is pursuing further review of that erroneous decision, including en banc review if allowed, and review in the U.S. Supreme Court if necessary.  This Court should not follow the D.C. Circuit's non-binding, poorly reasoned decision.

#### A.   Under The Separation Of Powers, Article III Courts Lack Authority To Sit In Judgment Over A President's Official Acts

"In view of the special nature of the President's constitutional office and functions," a former president has "absolute Presidential immunity from [civil] damages liability for acts within the 'outer perimeter' of his official responsibility." *Fitzgerald*, 457 U.S. at 756 (quoting *Barr v. Matteo*, 360 U.S. 564, 575 (1959)).  This "outer perimeter" includes presidential decisions that "can reasonably be understood as the official actions of an office-holder," where "it reasonable to think he was exercising his official responsibilities as President." *Blassingame*, 87 F.4th at 30.

Under the Executive Vesting Clause of Article II, § 1, and the principles of separation of powers, Article III courts lack authority to sit in judgment over a president's official acts.  The Executive Vesting Clause provides that "[t]he executive Power shall be vested in a President of the United States of America."  U.S. CONST. art. II, § 1, cl. 1.  For another branch to arrogate the "executive Power" to itself, or to purport to dictate how the president must exercise that authority, is a core violation of the separation of powers.  As a direct corollary, the Clause provides that the

Judicial Branch cannot sit in judgment directly over the president's official acts, and that any attempt to do so violates the separation of powers.

In *Marbury v. Madison*, Chief Justice Marshall described this doctrine as foundational and self-evident. "By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165-66 (1803). When it comes to the president's official acts, "whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion." *Id.* at 166. "[N]othing can be more perfectly clear than that" the president's discretionary "acts are only politically examinable." *Id.* "Questions . . . which are, by the constitution and laws, submitted to the executive, can never be made in this court." *Id.* at 170. The president's official acts, therefore, "*can never be examinable by the courts*." *Id.* at 166 (emphasis added).

Consistent with this opinion, an unbroken tradition from *Marbury* to the present holds that Article III courts lack authority to sit in judgment directly over a president's official acts. In 1833, citing *Marbury*, Justice Story wrote that "[i]n the exercise of his political powers [the President] is to use his own discretion, and is accountable only to his country, and to his own conscience. His decision, in relation to these powers, is subject to no control; and his discretion, when exercised, is conclusive." 3 J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES, ch. 37, § 1563 (1833), https://lonang.com/library/reference/story-commentaries-us-constitution/sto-337/.

In *Mississippi v. Johnson*, this Court, citing *Marbury*, held that Article III courts lack jurisdiction to enter an injunction directly against the president in the exercise of his official duties. 71 U.S. 475, 499 (1866). "An attempt on the part of the judicial department of the government to

4

enforce the performance of such duties by the President might be justly characterized, in the language of Chief Justice Marshall, as 'an absurd and excessive extravagance.'" *Id.* (quoting *Marbury*, 5 U.S. at 170). "[T]his court has no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Id.* at 501.

In 1948, this Court wrote that "whatever of this order emanates from the President is not susceptible of review by the Judicial Department." *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948). The Judicial Branch cannot "require [the President] to exercise the 'executive Power' in a judicially prescribed fashion." *Franklin v. Massachusetts*, 505 U.S. 788, 826 (1992) (Scalia, J., concurring in part and concurring in the judgment). "It is incompatible with his constitutional position that [the President] be compelled personally to defend his executive actions before a court." *Id.* at 827.

Thus, Article III courts lack jurisdiction to enter an injunction directly against the president in the exercise of his official responsibility, and no court has ever entered a declaratory judgment against the president in his official acts. The D.C. Circuit observed that "in *Franklin*, . . . [t]he plurality opinion of the Court concluded that 'in general, this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties,' and a majority of the Justices in fact subscribed to this position." *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996) (quoting *Franklin*, 505 U.S. at 802-03). "With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010). This is also the consistent litigation position of the U.S. Department of Justice, which oversees the Special Counsel. *See, e.g.*, DOJ, Reply Brief for Pet'r, *In re Trump*, No. 18-2486 (4th Cir. filed Feb. 21, 2019), at 4-6 (invoking "the separation-of-powers principle that 'courts have no jurisdiction of a bill to enjoin the President in the performance of his

official duties'") (quoting *Mississippi*, 71 U.S. at 501) (cleaned up); DOJ Memorandum, ECF No. 28, *Missouri v. Biden*, No. 21 Civ. 00287 (E.D. Mo. June 4, 2021) (same).

"Since *Mississippi*, the federal courts have continued this practice *without exception* and have not sustained a single injunction against the President in his official capacity." *In re Trump*, 958 F.3d 274, 297-98 (4th Cir. 2020), *cert. granted, judgment vacated sub nom. Trump v. D.C.*, 141 S. Ct. 1262 (2021) (Wilkinson, J., dissenting) (italics in original).

To be sure, Article III courts sometimes review the validity of the official acts of *subordinate* executive officials below the president, *see, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), and such review may reflect *indirectly* on the lawfulness of the president's own acts or directives. But the authority of judicial review of the official acts of subordinate officers has never been held to extend to the official acts of the p*resident himself*. Rather, there is an "'unbroken historical tradition . . . implicit in the separation of powers' that a President may not be ordered by the Judiciary to perform particular Executive acts." *Clinton v. Jones*, 520 U.S. 681, 719 (1997) (Breyer, J., concurring) (quoting *Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment)). These two lines of precedent— that courts may not sit in judgment over a president's official acts, but they may review the validity of the acts of *subordinate* executive officials—have coexisted in harmony for centuries.

Accordingly, the Executive Vesting Clause and the separation of powers prevent Article III courts from sitting in judgment directly over the president's official acts. Under this principle, no Article III court has jurisdiction to enter an injunction against the president, and no court has even ventured to enter a *declaratory judgment* against the president opining on the validity of his official acts. *Newdow*, 603 F.3d at 1013. *A fortiori*, the authority asserted by the Special Counsel here—to put a president on trial, enter a criminal judgment against him, and punish him with

imprisonment or other criminal penalties, all for his *official acts*—constitutes a core violation of the separation of powers. *Cf. Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 32-33 (1827) (Story, J.) (holding that, "[w]hen the President exercises an authority confided to him by law," his official conduct cannot "be passed upon by a jury" or "upon the proofs submitted to a jury").

### B.  The Impeachment Judgment Clause Confirms Presidential Immunity

Presidential immunity from criminal prosecution for official acts draws support directly from the text of the Constitution, as the Impeachment Judgment Clause states that a president cannot be criminally prosecuted unless he is first impeached and convicted by the U.S. Senate.

The Impeachment Judgment Clause provides that "Judgment in Cases of Impeachment shall not extend further than to removal from Office . . . but *the Party convicted* shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law."  U.S. CONST. art. I, § 3, cl. 7 (emphasis added).  Because the Constitution specifies that only "the Party *convicted*" by trial in the Senate may be "liable and subject to Indictment, Trial, Judgment and Punishment," *id.*, it plainly indicates that a president who is *not* convicted may *not* be subject to criminal prosecution.  SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, § 10, at 107 (2012) ("When a car dealer promises a low financing rate to 'purchasers with good credit,' it is entirely clear that the rate is *not* available to purchasers with spotty credit.").

This was the understanding of the Founders.  "James Wilson—who had participated in the Philadelphia Convention at which the document was drafted—explained that . . . the President . . . 'is amenable to [the laws] in his private character as a citizen, and in his public character by impeachment.'"  *Clinton v. Jones*, 520 U.S. 681, 696 (1997) (quoting 2 J. ELLIOT, DEBATES ON THE FEDERAL CONSTITUTION 480 (2d ed. 1863)) (cleaned up).  "With respect to acts taken in his 'public character'—that is, official acts—the President may be disciplined principally by impeachment, not by private lawsuits for damages.  But he is otherwise subject to the laws for his

7

purely private acts." *Id.*; *see also* THE FEDERALIST No. 43 (J. Madison); THE FEDERALIST Nos. 65, 69, 77 (A. Hamilton) (Alexander Hamilton explaining in three essays that criminal prosecution of a president can occur only "afterwards," "after," "subsequent" to, and as a "consequence" of impeachment and conviction by the Senate).

As Justice Alito recently noted, "[t]he plain implication" of this Clause "is that criminal prosecution, like removal from the Presidency and disqualification from other offices, is a consequence that can come about only after the Senate's judgment, not during or prior to the Senate trial." *Trump v. Vance*, 140 S. Ct. 2412, 2444 (2020) (Alito, J., dissenting). "This was how Hamilton explained the impeachment provisions in the Federalist Papers. He wrote that a President may 'be impeached, tried, and, upon conviction . . . would afterwards be liable to prosecution and punishment in the ordinary course of law.'" *Id.* (quoting THE FEDERALIST No. 69, p. 416); *see also* THE FEDERALIST No. 77, p. 464 (A. Hamilton) (arguing that a President is "at all times liable to impeachment, trial, [and] dismission from office," but any other punishment must come only "by subsequent prosecution in the common course of law"); THE FEDERALIST NO. 65.

### C.  The President's Unique Role Requires Immunity From Prosecution

*Fitzgerald* recognized that presidential immunity is also rooted in the common law and "separation of powers under the Constitution." 457 U.S. at 753 (cleaned up).

"The President occupies a unique position in the constitutional scheme." *Fitzgerald*, 457 U.S. at 749. Under Article II, § 1 of the Constitution, the president is "the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity." *Id.* at 749-50. "Nor can the sheer prominence of the President's office be ignored." *Id.* at 752-53. "In view of the visibility of his office and the effect of his actions on countless people, the President would be an easily identifiable target for" criminal prosecution in

countless federal, state, and local jurisdictions across the country. *Id.* at 753. "Cognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Id.* This "unique status under the Constitution distinguishes him from other executive officials." *Id.* at 750. As a result of "the singular importance of the President's duties," "diversion of his energies by concern with" criminal prosecution administered by the judicial branch "would raise unique risks to the effective functioning of government." *Id.* at 751; *see also* Brett Kavanaugh, Separation of Powers During the Forty-Fourth Presidency and Beyond, 93 Minn L. Re*v.* 1454, 1461 (2009) ("[A] President who is concerned about an ongoing criminal investigation is almost inevitably going to do a worse job as President"). Without immunity from criminal prosecution, the President's political opponents will seek to influence and control his or her decisions via *de facto* extortion or blackmail with the threat, explicit or implicit, of indictment by a future, hostile Administration, for acts that do not warrant any such prosecution. This threat will hang like a millstone around every future President's neck, distorting Presidential decisionmaking, undermining the President's independence, and clouding the President's ability "to deal fearlessly and impartially with' the duties of his office." *Fitzgerald*, 457 U.S. at 752.

### D. "The Presuppositions Of Our Political History" Support Presidential Immunity From Prosecution For Official Acts

"[T]he presuppositions of our political history," including "tradition[s] well grounded in history and reason," help to define the scope of presidential immunity. *Fitzgerald*, 457 U.S. at 745. This history dates back to the founding and was upheld in *Marbury v. Madison*, as discussed above. There, Charles Lee, who served as Attorney General under Presidents Washington and Adams, "declare[d] it to be [his] opinion, grounded on a comprehensive view of the subject, that the President is not amenable to *any court of judicature for the exercise of his high functions*, but

is responsible only in the mode pointed out in the constitution," *i.e.*, by impeachment.  *Marbury*, 5 U.S. at 149 (emphasis added).

Indeed, in 234 years from 1789 to 2023, no president was ever prosecuted for his official acts.  "Perhaps the most telling indication of a severe constitutional problem" with this "wholly unprecedented" prosecution "is a lack of historical precedent to support it."  *Seila Law, LLC v. CFPB*, 140 S. Ct. 2183, 2201 (2020).  The unbroken tradition of not exercising the supposed formidable power of criminally prosecuting a president for official acts—despite ample motive and opportunity to do so, over centuries—implies that the power does not exist.  *See id.*; *see also, e.g.*, *NFIB v. OSHA*, 595 U.S. 109, 119 (2022) (per curiam); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010)).  "[T]he longstanding 'practice of the government,' can inform our determination of 'what the law is.'"  *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 525 (2014) (quoting *McCulloch v. Maryland*, 17 U.S. 316, 401 (1819), and *Marbury*, 5 U.S. at 177).  "That principle is neither new nor controversial," and this Court's "cases have continually confirmed [this] view."  *Id.* (citing *Mistretta v. United States*, 488 U.S. 361, 401 (1989), and eight other cases from 1803 to 1981).

American history abounds with examples of presidents who were accused by political opponents of committing crimes through their official acts—yet none was ever prosecuted, until last year.  These include, among many others, John Quincy Adams' alleged "corrupt bargain" in appointing Henry Clay as Secretary of State;[3] President George W. Bush's allegedly false claim to Congress that Saddam Hussein possessed stockpiles of "weapons of mass destruction," which

---

[3] *See, e.g.*, Jessie Kratz, *The 1824 Presidential Election and the "Corrupt Bargain"*, NAT'L ARCHIVES (Oct. 22, 2020), https://prologue.blogs.archives.gov/2020/10/22/the-1824-presidential-election-and-the-corrupt-bargain/.

led to war in which thousands of Americans were killed;[4] and President Obama's alleged authorization of a drone strike that targeted and killed a U.S. citizen abroad (and his teenage son, also a U.S. citizen).[5]  They also include, among many other examples, President Clinton's last-minute pardon of fugitive financier Marc Rich,[6] President Clinton's repeated use of airstrikes in the Middle East in August and November 1998 in an alleged attempt to distract attention from the Monica Lewinsky scandal,[7] President Biden's egregious mismanagement of the United States' border security, and President Biden's alleged "material support for terrorism" through both the funding of the UNRWA despite its documented history of direct support for terrorism, and release of billions of dollars to Iran's terror-sponsoring regime.[8]  Despite numerous examples of presidents

---

[4] *See, e.g.*, Gary L. Gregg II, *George W. Bush: Foreign Affairs*, UVA MILLER CENTER, https://millercenter.org/president/gwbush/foreign-affairs; Tim Arango, *Ex-Prosecutor's Book Accuses Bush of Murder*, N.Y. TIMES (July 7, 2008), https://www.nytimes.com/2008/07/07/business/media/07bugliosi.html.

[5] *See, e.g.*, Spencer Ackerman, *US Cited Controversial Law in Decision to Kill American Citizen by Drone*, THE GUARDIAN (June 23, 2014), https://www.theguardian.com/world/2014/jun/23/us-justification-drone-killing-american-citizen-awlaki.

[6] Andrew C. McCarthy, *The Wages of Prosecuting Presidents for their Official Acts*, NAT'L REV. (Dec. 9, 2023, 6:30 AM), https://www.nationalreview.com/2023/12/the-wages-of-prosecuting-presidents-over-their-official-acts/.

[7] *See, e.g.*, *World Media Troubled by Clinton's Timing in Airstrikes*, CNN (Dec. 18, 1998), http://edition.cnn.com/WORLD/meast/9812/18/iraq.press/; Francis X. Clines and Steven Lee Myers, *Attack on Iraq; The Overview; Impeachment Vote in House Delayed As Clinton Launches Iraq Air Strike, Citing Military Need to Move Swiftly*, N.Y. TIMES (Dec. 17, 1998), https://www.nytimes.com/1998/12/17/world/attack-iraq-overview-impeachment-vote-house-delayed-clinton-launches-iraq-air.html.

[8] *See, e.g.*, Jason Willick, *The Eyebrow-Raising Line in the Trump Immunity Opinion*, WASH. POST (Feb. 7, 2024), https://www.washingtonpost.com/opinions/2024/02/07/trump-immunity-decision-disclaimer/; Andrew C. McCarthy, *Thoughts on Biden's Funding of Terror-Sponsoring UNRWA and D.C. Circuit's Delay on Trump Immunity*, NAT'L REVIEW (Jan. 31, 2024), https://www.nationalreview.com/corner/thoughts-on-bidens-funding-of-terror-sponsoring-unrwa-and-d-c-circuits-delay-on-trump-immunity/ ("When President Biden insisted on restarting funding for UNRWA, to the tune of over $1 billion since 2021, there was abundant, well-known evidence, going back decades, that UNRWA provides material support to terrorism.  It was not just a

committing supposedly "criminal" behavior in their official acts throughout American history, none was ever prosecuted in 234 years before 2023.  The "presuppositions of our political history," *Fitzgerald*, 457 U.S. at 745, thus confirm that prosecutors and courts lack authority to prosecute and place a president on trial for official acts.

### E.  Analogous Immunity Doctrines Support Presidential Immunity From Prosecution

Analogous immunity doctrines strongly favor the conclusion that absolute presidential immunity extends to immunity from criminal prosecution for official acts.

In their common-law origins, immunity doctrines extended to both civil and criminal liability: "The immunity of federal executive officials began as a means of protecting them in the execution of their federal statutory duties from criminal or civil actions based on state law." *Butz v. Economou*, 438 U.S. 478, 489 (1978).  Common-law immunity doctrines encompass the "privilege . . . to be free from arrest or civil process," *i.e.*, criminal and civil proceedings alike. *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951).

Members of Congress are immune from criminal prosecution for acts within the scope of their legislative duties.  *See United States v. Johnson*, 383 U.S. 169, 179 (1966) ("The legislative privilege, protecting against possible prosecution by an unfriendly executive and conviction by a hostile judiciary, is one manifestation of the 'practical security' for ensuring the independence of the legislature.").  Speech and debate immunity resembles presidential immunity because it serves a unique role in preserving the separation of powers in our constitutional structure.  *See Tenney*,

---

hypothetical possibility that Biden's funding might end up facilitating Hamas's operations.  There were notorious cases over the years of UNRWA terror support."); The Editors, *Hamas Was Right Under Unrwa's Nose*, WALL ST. J. (Feb. 11, 2024), https://www.wsj.com/articles/hamas-was-right-under-unrwas-nose-tunnels-gaza-israel-war-f715d219?mod=opinion_lead_pos2 ("Israel has provided evidence that 12 Unrwa employees took part in the Oct. 7 massacre, and that 1,200 are affiliated with or members of Hamas and Islamic Jihad.").

341 U.S. at 376.  "[I]t is apparent from the history of the [Speech and Debate] clause that the privilege was not born primarily of a desire to avoid private suits . . . , but rather to *prevent intimidation by the executive and accountability before a possibly hostile judiciary*."  *Johnson*, 383 U.S. at 180-81 (emphasis added).  Thus, *Johnson* held that criminal prosecution for official acts—not civil liability—was the "chief fear" that led to the adoption of legislative immunity.  *Id.* at 182; *see also Gravel v. United States*, 408 U.S. 606, 624 (1972) (reasoning that acts "within the sphere of legitimate legislative activity" "may not be made the basis for a civil or criminal judgment against a Member").  Presidential immunity serves no less important a role in "our scheme of government," *Tenney*, 341 U.S. at 377, than legislative immunity.

Likewise, absolute judicial immunity protects state and federal judges from criminal prosecution, as well as civil suits, based on their official judicial acts—excepting cases involving judicial bribery and extortion, which have long been held not to constitute judicial acts.  *See Spalding v. Vilas*, 161 U.S. 483, 494 (1896) ("The doctrine which holds a judge exempt from a civil suit or indictment for any act done or omitted to be done by him, sitting as judge, has a deep root in the common law." (cleaned up)).  "This immunity applies even when the judge is accused of acting maliciously and corruptly."  *Pierson v. Ray*, 386 U.S. 547, 554 (1967); *see also Fitzgerald*, 457 U.S. at 745-46.  In the few cases where prosecutors have brought criminal charges against judges for their judicial acts, courts have rejected them.  *See, e.g.*, *United States v. Chaplin*, 54 F. Supp. 926, 928 (S.D. Cal. 1944) (holding that judicial immunity barred the criminal prosecution of a judge who was "acting in his judicial capacity and within his jurisdiction in imposing sentence and probation upon a person charged with an offense in his court to which the defendant has pleaded guilty").  Reviewing many authorities, *Chaplin* concluded that absolute immunity shielded the judge from criminal prosecution as well as civil suit.  *Id.* at 934 (holding

that criminal prosecution of judges for judicial acts "would . . . destroy the independence of the judiciary and mark the beginning of the end of an independent and fearless judiciary"). The exact same reasoning applies to President Trump and all Presidents.

**F. Public Policy Considerations Rooted In The Separation Of Powers Support Presidential Immunity From Prosecution**

In considering presidential immunity, the Supreme Court "has weighed concerns of public policy, especially as illuminated by our history and the structure of our government." *Fitzgerald*, 457 U.S. at 747-48. Here, public policy overwhelmingly supports a finding of immunity.

First, robust immunity is appropriate for officials who have "especially sensitive duties." *Fitzgerald*, 457 U.S. at 746. The president's duties are "highly sensitive." *Id.* at 756.

Second, immunity is most appropriate for officials from whom "bold and unhesitating action" is required. *Fitzgerald*, 457 U.S. at 745.[9] "[T]o submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties," and subject them "to the constant dread of retaliation." *Barr*, 360 U.S. at 571-72 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Hand, J.)); *see also id.* at 571 (expressing

---

[9] Similarly, in the context of immunity under the Speech and Debate Clause, which includes criminal immunity, "[t]here is little doubt that the instigation of criminal charges against critical or disfavored legislators by the executive in a judicial forum was the chief fear prompting the long struggle for parliamentary privilege in England and, in the context of the American system of separation of powers, is the predominate thrust of the Speech or Debate Clause. In scrutinizing this criminal prosecution, then, we look particularly to the prophylactic purposes of the clause." *United States v. Johnson*, 383 U.S. 169, 182 (1966). The Supreme Court has thus emphasized that criminal as well as civil immunity is essential for a legislator to have the freedom to exercise bold and unhesitating action in his or her legislative acts, which is itself essential to preserving the legislative "independence" required by the separation of powers: "The legislative privilege, protecting against possible prosecution by an unfriendly executive and conviction by a hostile judiciary, is one manifestation of the 'practical security' for ensuring the independence of the legislature." *Id.* at 179.

concern that suits would "inhibit the fearless, vigorous, and effective administration of policies of government"). In *Vance*, the Supreme Court noted this concern was central to its adoption of absolute immunity for the president, holding that *Fitzgerald* "conclud[ed] that a President . . . must deal fearlessly and impartially with the duties of his office"—not be made "unduly cautious in the discharge of [those] duties by the prospect of civil liability for official acts." 140 S. Ct. at 2426. The threat of criminal prosecution poses a greater risk of deterring bold and unhesitating action than the threat of civil suit.

Third, "[f]requently acting under serious constraints of time and even information," a president inevitably makes many important decisions, and "[d]efending these decisions, often years after they were made, could impose unique and intolerable burdens . . . ." *Imbler*, 424 U.S. at 425-26. The president's "focus should not be blurred by even the subconscious knowledge" of the risk of future prosecution. *Id.* at 427. And "[t]here is no question that a criminal prosecution holds far greater potential for distracting a President and diminishing his ability to carry out his responsibilities than does the average civil suit." *Vance*, 140 S. Ct. at 2452 (Alito, J., dissenting). Far more than civil liability, the threat of criminal prosecution undermines the president's "maximum ability to deal fearlessly and impartially with the duties of his office." *Fitzgerald*, 457 U.S. at 751 (citation and quotation marks omitted).

Fourth, another key purpose of immunity for senior officials is to "prevent them being harassed by vexatious actions." *Spalding*, 161 U.S. at 495 (quotation omitted). The president, as the most high-profile government official in the country, is most likely to draw politically motivated ire, and most likely to be targeted for harassment by vexatious actions. *See Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 369 (2004) (recognizing "the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic

15

performance of its constitutional duties.").  While *Vance* held that this principle was not alone sufficient to shield the president from a criminal subpoena for private records, 140 S. Ct. at 2426, the rationale provides additional support for a finding of official immunity—as *Fitzgerald*, *Spalding*, *Butz*, *Imbler*, and similar cases held.  Without immunity from criminal prosecution for official acts, the presidency will cease to function and that will erode the bedrock of our republic.

### G.  Counts 1 – 32 Charge President Trump For Official Acts

Under these standards, President Trump's alleged decision to designate records as personal under the PRA and cause them to be removed from the White House—which underlies Counts 1 through 32 of the Superseding Indictment—was an official act by the incumbent president.  As the Supreme Court held in *Fitzgerald*, absolute presidential immunity from civil liability includes all actions taken within the "'outer perimeter' of [the President's] official responsibilities."  457 U.S. at 756.  The same scope of immunity should extend to criminal prosecution.

President Trump's decision to designate records as personal and cause them to be removed from the White House plainly constitutes an official act within the "outer perimeter" of the president's official duties.  As discussed in more detail in President Trump's separate motion to dismiss based on the PRA, the PRA specifically provides that "[d]uring a President's term of office, . . . [t]he President shall remain exclusively responsible for the custody, control, and access to . . . Presidential records." 44 U.S.C. § 2203(f).  The statute recognizes that the president "shall . . . categorize[]" documents produced or received during his presidency "as Presidential records or personal records."  *Id.* § 2203(b); *see also Armstrong v. Bush*, 924 F.2d 282, 291 (D.C. Cir. 1991) (reasoning that the PRA "precludes judicial review of the President's recordkeeping practices and decisions").

DOJ previously took the same position on behalf of NARA: "President Clinton . . . *presumably* classified the tapes as personal records *by not transferring them* to the [A]rchives at

the conclusion of his administration."  ECF No. 14 at 6, *Judicial Watch, Inc. v. NARA*, No. 10 Civ.

1834 (D.D.C. Mar. 5, 2012) (emphasis added).  The Special Counsel's Office should not be

permitted to take a contrary position now.  *See, e.g.*, *Slater v. U.S. Steel Corp.*, 871 F.3d 1174,

1176 (11th Cir. 2017) (en banc) (discussing doctrine of judicial estoppel).  However, to the extent

the Special Counsel's Office disputes the official nature of President Trump's PRA decision and

the removal of the records from the White House, a hearing is necessary.  *See Blassingame*, 87

F.4th at 29 ("The Supreme Court has recognized that discovery tailored specifically to the question

of immunity may be merited when there is a need to develop facts or resolve factual disputes to

facilitate deciding a threshold question of immunity.").

"The decisions from which [*Fitzgerald*] drew the outer-perimeter test make evident that a

President's official responsibilities encompass more than just those acts falling within the office's

express constitutional and statutory authority," and also include even "discretionary acts" within

the "concept of duty" associated with the presidency.  *Blassingame*, 87 F.4th at 13.  Where, as

here, the President exercised his inherent Executive authority to organize and dispose of his own

records, and acted pursuant to an explicit statutory grant of authority under the PRA, the official

nature of his conduct is at its zenith.  *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S.

579, 635 (1952) (Jackson, J., concurring) ("When the President acts pursuant to an express or

implied authorization of Congress, his authority is at its maximum, for it includes all that he

possesses in his own right plus all that Congress can delegate.").

Even if the Special Counsel's Office could establish that President Trump's designation

decision under the PRA was illegal or otherwise improper—and they cannot—"the President's

actions do not fall beyond the outer perimeter of official responsibility merely because they are

unlawful or taken for a forbidden purpose."  *Blassingame*, 87 F.4th at 14.  The Supreme Court has

so held, repeatedly.  After all, every claim of immunity is raised against charges of allegedly improper motive or purpose.  *See, e.g.*, *Fitzgerald*, 457 U.S. at 756 (rejecting a rule that would permit "an inquiry into the President's motives" as "highly intrusive"); *Pierson v. Ray*, 386 U.S. 547, 554 (1967); *Barr v. Matteo*, 360 U.S. 564, 575 (1959) ("The claim of an unworthy purpose does not destroy the privilege." (citation omitted)); *Spalding v. Vilas*, 161 U.S. 483, 498 (1896) (holding that immunity does not turn on "any personal motive that might be alleged to have prompted his action"); *Bradley v. Fisher*, 80 U.S. 335, 354 (1871) (holding that immunity "cannot be affected by any consideration of the motives with which the acts are done"); *see also, e.g.*, *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Hand, J.).  In short, in assessing whether immunity applies, courts must look to the "nature of the act itself."  *Stump v. Sparkman*, 435 U.S. 349, 362 (1978).  The allegedly improper manner or purpose of the alleged acts is not relevant.  *Fitzgerald*, 457 U.S. at 756.  Therefore, President Trump is entitled to immunity for this official act and that must include immunity from criminal prosecution.

## **CONCLUSION**

The charges in Counts 1 through 32 cannot be adjudicated without sitting in judgment over President Trump's official acts, which Chief Justice Marshall held "can never be examinable by the courts." *Marbury*, 5 U.S. at 166. Accordingly, and for the foregoing reasons, the Court should hold a hearing, if necessary, to resolve any factual disputes relating to President Trump's official acts, and dismiss Counts 1 through 32.

Dated: February 22, 2024

Respectfully submitted,

*/s/ Todd Blanche*
Todd Blanche (PHV)
toddblanche@blanchelaw.com
Emil Bove (PHV)
emil.bove@blanchelaw.com
BLANCHE LAW PLLC
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*/s/ Christopher M. Kise*
Christopher M. Kise
Florida Bar No. 855545
ckise@continentalpllc.com
CONTINENTAL PLLC
255 Alhambra Circle, Suite 640
Coral Gables, Florida 33134
(305) 677-2707

*Counsel for President Donald J. Trump*

**<u>CERTIFICATE OF SERVICE</u>**

I, Christopher M. Kise, certify that on February 22, 2024, I filed the foregoing document and served it on the Special Counsel's Office via email, or CM/ECF to the extent possible, as required by the Court's February 20, 2024 Order.  ECF No. 320.

*<u>/s/ Christopher M. Kise</u>*
Christopher M. Kise
