# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN SOLOMON,

               Plaintiff,

    v.

MERRICK GARLAND, *et al.*,

             Defendants.

No. 23-cv-00759-RJL

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND IN
## OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### INTRODUCTION

On January 20, 2021, the Department of Justice (DOJ) received a package of documents from the White House comprising materials related to the Federal Bureau of Investigation (FBI) Crossfire Hurricane investigation.[1]  Accompanying the binder on January 20, 2021, was Mr. Meadows's instruction:  DOJ was to exercise its discretion to apply redactions under the Privacy Act and then to release the redacted materials to the public.  The instructions included no request to return the documents, no reservation of legal control, and no requirement of confidentiality.

As to each of these facts, there is no genuine dispute.  They are established conclusively by the materials submitted alongside Plaintiff's motion for partial summary judgment.  But, far from demonstrating Plaintiff's entitlement to relief, they establish that summary judgment should

---

[1] It is not clear whether the records that Mr. Meadows returned were delivered to DOJ in a binder or simply as a package of documents.  The term "binder" is used herein for ease of reference.

be entered for the Defendants as to both of Plaintiff's claims—to the extent any claim remains after adjudication of Defendants' pending Motion to Dismiss.

Both the replevin and mandamus claims depend on Plaintiff's contention that the binder Mr. Meadows returned to DOJ on January 20, 2021, is a Presidential record. But, while copies of records from the binder were sent to the National Archives and Records Administration (NARA)—albeit in undifferentiated form, with what appear to be copies of documents at multiple stages of declassification review—and are maintained there as Presidential records, there can be no genuine dispute that the version of the binder that Mr. Meadows sent to DOJ fulfills all the elements of the well-established test for determining whether a document is an "agency record." By definition, such materials are excluded from the scope of the definition of "Presidential record" that Congress supplied in the Presidential Records Act. *See* 44 U.S.C. § 2201(2)(B)(i); *Armstrong v. Exec. Office of the President* ("*Armstrong II*"), 1 F.3d 1274, 1292 (D.C. Cir. 1993). In sum, the binder is an agency record because DOJ "obtained" it "in the legitimate conduct of its official duties," *see U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 144 (1989), when Mr. Meadows returned it to DOJ for application of redactions based on its discretion and subsequent release.

The D.C. Circuit uses four factors to assess whether a document meets the second half of the *Tax Analysts* standard: "1) the intent of the document's creator to retain or relinquish control of the records; 2) the ability of the agency to use and dispose of the record as it sees fit; 3) the extent to which agency personnel have read or relied upon the document; and 4) the degree to which the document was integrated into the agency's record system or files." *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 218 (D.C. Cir. 2013). As discussed herein, each of those factors readily supports a finding that the collection at issue is an agency record. First, Mr.

Meadows transmitted the binder to DOJ and evinced no intent to retain control of that record. Indeed, rather than trying to restrict its dissemination, he instructed DOJ to exercise its discretion in redacting the binder's contents, and to release the unredacted portions publicly.  Second, in light of that instruction—and the attendant absence of any requirement that DOJ return the records or keep them confidential—the second factor is easily fulfilled here too.  Third, agency personnel have indisputably read and relied upon the contents of the binder, since they comprise materials related to an FBI investigation that originated with the agency in the first instance. And, finally, the binder plainly is integrated into DOJ's records system or files since it is being processed in response to a Freedom of Information Act (FOIA) request, with a redacted version posted on the FBI's FOIA reading room.

Plaintiff would turn the *Judicial Watch* test on its head.  *See* Mem. of P. & A. in Supp. of Mr. Solomon's Partial Mot. for Summ. J. ("Plaintiff's motion" or "Pl.'s Mot."), ECF No. 16-1. Although the test was devised to determine whether materials were treated as agency records, Plaintiff asks the Court to deploy the test in reverse—to assess whether records that have been treated as agency records *should* have been treated differently, and removed from agency control.  Even if the Court were to apply the test for this novel purpose, it would not support Plaintiff's cause for all the reasons discussed herein; in sum, the precedent equates "control" under this test with *protection* from disclosure; an instruction that DOJ use its discretion to apply redactions and then make the redacted materials public is evidence not of control, but of the relinquishment of control.

Plaintiff also argues that—if the Presidential Records Act and FOIA permit the treatment of the binder as an agency record, and if the binder can consequently be released with redactions in addition to those that, according to Plaintiff, the former President intended—then both statutes

3

are unconstitutional. But there is no basis in the Constitution—or any other law—on which to enforce the former President's instructions or alleged subjective intentions concerning the binder, as Plaintiff evidently seeks to do here. Nor are there compelling equitable grounds supporting the issuance of the writ in this case.

For all the reasons explained herein, the undisputed facts establish that the subject records are agency records and Plaintiff has failed to establish a right—much less a clear and indisputable right—to an order from this Court requiring their transfer from DOJ to NARA. This is especially so given the exacting standard applicable to a request for mandamus relief. Defendants therefore respectfully ask that this Court deny Plaintiff's motion for partial summary judgement on Plaintiff's request for mandamus, and enter summary judgment for Defendants on both Plaintiff's mandamus and replevin claims.[2]

## FACTUAL BACKGROUND

On January 19, 2021, then-President Trump issued a Memorandum concerning a binder of materials related to the FBI's Crossfire Hurricane investigation. These were federal records that DOJ had provided to the White House at the President's request. Mem., Declassification of Certain Materials Related to the FBI's Crossfire Hurricane Investigation, 86 FR 6843 (Jan. 19, 2021), Pl.'s Mot., Ex. 3, ECF No. 16-5. Therein, President Trump noted that he had "requested the documents so that a declassification review could be performed," *id.*, and that—with the exception of the portions that the FBI in consultation with the Intelligence Community had determined "most crucial" to protect—he was ordering declassification of the materials in the

---

[2] Defendants continue to maintain that the Court lacks jurisdiction over Plaintiff's mandamus claim for the reasons explained in their motion to dismiss, *see* Defs.' Mot. to Dismiss, ECF No. 10-1 at 13–17; Defs.' Reply in Supp. of their Mot. to Dismiss, ECF No. 14 at 7–15, and submit the instant motion for summary judgment as an alternative basis on which judgment should be entered for Defendants.

binder.  *Id.*  He clarified, however, that the decision to disclose materials in the binder "[did] not

extend to materials that must be protected from disclosure pursuant to orders of the Foreign

Intelligence Surveillance Court and [did] not require the disclosure of certain personally

identifiable information or any other materials that must be protected from disclosure under

applicable law." *Id.*

The next day, Mr. Meadows returned the "bulk of the binder" to DOJ with instructions

that DOJ conduct a Privacy Act review and then release the remaining material with redactions

applied.  *See* Jan. 20, 2021, Mem., Pl.'s Mot., Ex. 4, ECF No. 16-6 at 1.  Since then, NARA

received and maintains as Presidential records "roughly 2700 undifferentiated pages" that appear

to be multiple copies of the documents from the binder at various stages of declassification

review.  *See* Email from Gary Stern to John Solomon (June 23, 2022), Pl.'s Mot., Ex. 2, ECF No.

16-4, at 13–14.  The records that then-Chief of Staff Meadows transferred back to DOJ—

consistent with "routine practice for agency records that are undergoing declassification or

similar review by other agencies or the White House," Email from Gary Stern to Kash Patel

(Aug. 17, 2022), Pl.'s Mot., Ex. 2, ECF No. 16-4, at 1—have properly remained with DOJ as

agency records subject to the Federal Records Act.  Indeed, at the time of the correspondence

that Plaintiff submits alongside his motion for partial summary judgment, these records were

already "the subject of a FOIA lawsuit with DOJ," *id.*, and most of the materials have now been

released in redacted form on the FBI's FOIA reading room:  https://vault.fbi.gov/crossfire-

hurricane-part-01.

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit," and a dispute is genuine if "the evidence is such that a reasonable [trier of fact] could" rule in favor of the nonmoving party on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). After the moving party has made such a showing, the nonmoving party may avoid summary judgment only by adducing evidence demonstrating "specific facts showing that there is a genuine issue for trial." *See id.*

On a motion for summary judgment, "[t]he evidence presented must be admissible at trial or at least 'capable of being converted into admissible evidence.'" *Allen v. Brown*, 435 F. Supp. 3d 16, 22 (D.D.C. 2020) (quoting *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) and citing Fed. R. Civ. P. 56(c)). To the extent the parties rely on affidavits or declarations, those documents also "must be made on personal knowledge." *Allen*, 435 F. Supp. 3d at 22 (Fed. R. Civ. P. 56(c)(4)).

## ARGUMENT

I. **The Binder that Mr. Meadows Returned to DOJ Meets All the Elements of the Definition of an Agency Record, and therefore Cannot be a Presidential Record.**

"The Presidential Records Act exclu[des] . . . records subject to the FOIA from the class of materials that may be treated as presidential records." *Armstrong II*, 1 F.3d at 1292; 44 U.S.C. § 2201(2)(B)(i) (providing "Presidential records" "does not include any documentary materials that are . . . official records of an agency"). Thus, any materials that fulfill the test for "agency records," by definition, cannot be Presidential records. There can be no genuine dispute that the binder that Mr. Meadows returned to DOJ fulfills each element of that test.

A document is an "agency record" if it fulfills two requirements:  "First, an agency must
either create or obtain the [record]."  *Tax Analysts*, 492 U.S. at 144.  "Second, the agency must
be in control of the requested materials at the time [a Freedom of Information Act request for the
document] is made."  *Id.* at 145.  The Supreme Court clarified:  "[b]y control we mean that the
materials have come into the agency's possession in the legitimate conduct of its official duties."
*Id.*  The latter element is intended to exclude such items as "personal materials in an employee's
possession, even though the materials may be physically located at the agency."  *Id.*  The
baseline presumption is that a document possessed by an agency *is* an agency record.  *See id.* at
142 n.3 ("[t]he burden is on the agency to demonstrate . . . that the materials [at issue] are not
'agency records.'").

## A. DOJ obtained the binder when the then-Chief of Staff transmitted it on January 20, 2021.

The first factor of the *Tax Analysts* test is that "an agency must either create or obtain the
[record]."  *Tax Analysts*, 492 U.S. at 144.  Here, DOJ obtained the existing version of the binder
when Mr. Meadows transmitted it alongside his January 20, 2021, Memorandum.  *See* Pl.'s Mot.,
Ex. 4, ECF No. 16-6; *id.*, Ex. 2, ECF No. 16-4 at 1.  Thus, the first element of the applicable test
plainly is fulfilled in this case.  Moreover, contrary to Plaintiff's treatment of the "binder," the
record received from the White House on January 20, 2021 was not the same as the "binder" that
existed at the White House—the undisputed evidence shows that the then-President's Chief of
Staff altered that collection and transferred a different, diminished set of materials to DOJ.  Mr.
Meadows's January 20, 2021, Memorandum clearly states that he was, on that date, transferring
only "the bulk of the binder," and "includ[e]d all [portions] that appear to have a potential to
raise privacy concerns."  Jan. 20, 2021, Mem., Pl.'s Mot., Ex. 4, ECF No. 16-6 at 1.  Thus,
because of the actions of the then-President's Chief of Staff, what the Plaintiff terms "the

President's Crossfire Hurricane binder" no longer exists as such.  Instead, the "record" at issue

comprises the altered binder that Mr. Meadows transferred to DOJ, and Plaintiff effectively

concedes that this binder was received in the ordinary course of business by DOJ.

### B.  The binder has come into DOJ's possession in the legitimate conduct of its official duties.

As to the second component of the *Tax Analysts* test, four factors can inform the

determination of whether an agency is "in control of the materials" such that they are subject to

FOIA.  *Tax Analysts*, 492 U.S. at 144; *Judicial Watch, Inc.*, 726 F.3d at 218 n.11 (explaining that

the D.C. Circuit has regarded the four-factor test "as a gloss" on the Supreme Court's statement

that "'control' means 'that the materials have come into the agency's possssion in the legitimate

conduct of its official duties'") (quoting *Tax Analysts*, 492 U.S. at 145).  Those four factors are:

"1) the intent of the document's creator to retain or relinquish control of the records; 2) the

ability of the agency to use and dispose of the record as it sees fit; 3) the extent to which agency

personnel have read or relied upon the document; and 4) the degree to which the document was

integrated into the agency's record system or files."  *Judicial Watch, Inc.*, 726 F.3d at 218.

In a setting in which an agency creates or obtains records in the course of its official

duties, the first two factors may be determinative.  *See United We Stand Am. v. IRS*, 359 F.3d

595, 600–603 (D.C. Cir. 2004).  *United We Stand* is instructive on this point.  That case

concerned a plaintiff's request for a document created by the IRS in response to a request from a

Congressional committee.  *See id.* at 597.  Having applied the first two factors, the Court

determined that the agency's response to the Congressional committee's request was not an

"agency record" to the extent—but only to the extent—that the response would disclose the

content of the committee's request, which the committee intended to remain confidential.  *See id.*

at 600–02.  The IRS argued that the remaining factors counseled against finding the entirety of

the response to be an agency record, but the Court held that the first two factors were dispositive—although the agency "created the document only to respond to Congress, used it for no other purpose, and [kept] it in a separate file," *id.* at 602, such considerations could not remove the entirety of the document from the definition of agency records "for doing so would conflict with the Supreme Court's *Tax Analysts* definition of agency control: 'by control we mean that the materials have come into the agency's possession in the legitimate conduct of its official duties.'" *Id.* at 603 (quoting *Tax Analysts*, 492 U.S. at 145). The D.C. Circuit concluded that, where the agency "created and retains the response [to the Congressional request] in the course of its official obligation to communicate with the [Congressional committee]," "absent clear . . . expression of congressional intent to control the entire response" the IRS's handling of the document could not "turn the entire agency-created record into a congressional document." *Id.* (quotation omitted).

The same reasoning applies here. DOJ initially provided the binder to the White House for declassification review, *see supra* at 4, and the White House then returned the binder with no accompanying expression of an intent to control it. On January 20, 2021, DOJ obtained a binder from Mr. Meadows in the course of its "official obligation to communicate with" the White House. Indeed, Mr. Meadows indisputably charged DOJ with additional "official duties" in connection with the binder, *i.e.*, the application of the Department's discretion to redact the binder's contents for Privacy Act concerns. Pl.'s Mot., Ex. 4, ECF No. 16-6, at 1. And, as discussed below, in connection with the first and second factors, Mr. Meadows expressed his intent to relinquish control of the binder when he transferred it, permitting DOJ to use and dispose of the record after using its discretion to apply redactions. *See supra* at 5. Under such circumstances, just as in *United We Stand*, removal of this record from the definition of "agency

9

records" "would conflict with the Supreme Court's *Tax Analysts* definition of agency control."
*United We Stand*, 359 F.3d at 602.

> **1. Mr. Meadows created the current version of the binder, and evinced his intent to relinquish control of it when he transferred it to DOJ for application of DOJ's discretion and subsequent release.**

The first element of the D.C. Circuit test examines "the intent of the document's creator
to retain or relinquish control of the records." *Judicial Watch, Inc.*, 726 F.3d at 218. The focus
is on "stated intent" expressed in writings concerning the subject records, and the conduct of the
agency. *Judicial Watch, Inc. v. U.S. Secret Serv.*, 803 F. Supp. 2d 51, 58 (D.D.C. 2011), *aff'd in
part, rev'd in part on other grounds*, 726 F.3d 208 (D.C. Cir. 2013). Plaintiff relies extensively
on *Judicial Watch*, which involved White House visitor records that were in the physical
possession of the Secret Service (which is an agency subject to FOIA), where the D.C. Circuit
held the subject records were not under agency control. *See* Pl.'s Mot. at 1, 12, 13, 14, 15 (citing
*Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208 (D.C. Cir. 2013)). In so ruling, the Court
focused on a memorandum of understanding (MOU) in which "the White House at all times
assert[ed], and the Secret Service disclaim[ed], all legal control over any and all [those records]."
726 F.3d at 218. That MOU clearly stated that the records remained "at all times Presidential
records . . . under the exclusive legal custody and control of the White House." *Id.* at 231.[3] In
addition, as the D.C. Circuit remarked in *Judicial Watch*, the White House visitor records at
issue in that case reflected White House information, *i.e.*, appointments within the White House
complex. The Court reasoned: "At bottom, we do not believe Congress intended that FOIA
requesters be able to obtain from the gatekeepers of the White House what they are unable to

---

[3] *See also Judicial Watch, Inc.*, 726 F.3d at 231 (noting this provision as evidence of "the way in which both parties historically regarded and treated the documents.").

obtain from its occupants." *Id.* at 233. In this case, by contrast, the information at issue is the

agency's information, obtainable under FOIA directly from the agency. It was provided to the

White House for the sole purpose of conducting a declassification review, and a subset was

returned to DOJ for DOJ to apply redactions in its sole discretion.

Nor does *ACLU v. CIA* support Plaintiff's position. That case addressed a copy of a

Senate Committee report concerning a CIA program that the Committee had transmitted to the

CIA. *See ACLU v. CIA*., 823 F.3d 655, 658–59 (D.C. Cir. 2016). In that case, as in *Judicial*

*Watch*, Congress's statement of intent to exert continued control over the report at issue was

clear:

> These documents remain congressional records in their entirety and disposition and
> control over these records, even after the completion of the Committee's review,
> lies exclusively with the Committee. As such, these records are not CIA records
> under the Freedom of Information Act or any other law.... If the CIA receives any
> request or demand for access to these records from outside the CIA under the
> Freedom of Information Act or any other authority, the CIA will immediately notify
> the Committee and will respond to the request or demand based upon the
> understanding that these are congressional, not CIA, records.

*Id.* at 665 (quoting as "critical evidence" a letter from Senate Committee Chairman and Vice

Chairman to the Director of the CIA concerning Senate Committee Report transmitted to the

CIA).

There is nothing approaching such language in Mr. Meadows's January 20, 2021,

Memorandum. His transmission of the modified binder stands in sharp contrast to the MOU in

*Judicial Watch* and the letter asserting continued Congressional control in *ACLU v. CIA*. He did

not provide that the binder he was transmitting would remain a Presidential record; that it would

be subject to White House control; or that it should be returned to either the White House or

NARA. Rather, Mr. Meadows gave DOJ the discretion to apply its own redactions prior to

making a public release.  This scenario presents the opposite of control; it evidences a relinquishment of control and an intent to pass control to DOJ.[4]

Plaintiff argues that Mr. Meadows's transmission of the binder was "without the President's knowledge or consent," and that the President's intent was to retain the complete binder as a Presidential Record.  Pl.'s Mot. at 16; Pl.'s Stmt. of Undisputed Material Facts, ¶ 17. Defendants are unaware of any case that examined an official's later-expressed subjective intent in assessing a document's status as an agency record.  To the contrary, for expressions of an intent to control, the D.C. Circuit looks to "*specific* instructions . . . to agencies limiting either the use or disclosure of the documents" at issue. *United We Stand Am., Inc.*, 359 F.3d at 602 (quoting *Paisley v. CIA*, 712 F.2d 686, 694 (D.C. Cir. 1983)) (emphasis in original); *see id.* ("post-hoc objections to disclosure cannot manifest the clear assertion of  . . . control that our case law requires"); *see also ACLU*, 823 F.3d at 664 (giving no weight to a letter from a Senate Committee Chairman prepared after the commencement of FOIA action, because it constituted a post-hoc objection to disclosure) (quotation omitted).

But even if such an inquiry into later-expressed subjective intent were consistent with Circuit precedent, Plaintiff's allegation regarding the former President's subjective intent should be given no weight by this Court.  Those allegations rest wholly on hearsay, *see* Pl.'s Mot., Ex. 5, ECF No. 16-7, ¶ 17, and are unsupported by any admissible evidence.  *See Allen*, 435 F. Supp. 3d at 22 (evidence presented at summary judgment "must be admissible at trial or at least 'capable of being converted into admissible evidence'") (quoting *Gleklen*, 199 F.3d at 1369).

---

[4] Mr. Meadows's January 20, 2021, Memorandum makes plain that he returned only "the bulk of the binder" to DOJ, "including all [portions] that appear to have a potential to raise privacy concerns."  *See* Jan. 20, 2021, Mem., Pl.'s Mot., Ex. 4, ECF No. 16-6 at 1.  This retention of control over some portions of the binder supplies further evidence that Mr. Meadows relinquished control over the portion of the binder that he returned.

Plaintiff presents no admissible evidence that the President did not support Mr. Meadows's actions or that Mr. Meadows was acting in rogue fashion, without the President's imprimatur. Mr. Meadows was the former President's Chief of Staff and is presumed to have acted on his behalf in transmitting the subject record to DOJ.

To the extent Plaintiff's underlying complaint is that Mr. Meadows should not have altered the binder or transferred it to the Department; that he should have done so with an instruction that the binder be returned to the White House or NARA; or that he should have retained an exact copy of what was transferred, D.C. Circuit precedent provides that the Court lacks jurisdiction to review such day-to-day White House records management decisions under the Presidential Records Act. *See Citizens for Resp. & Ethics in Washington v. Trump*, 924 F.3d 602, 609 (D.C. Cir. 2019); *see also* Defs' Mot. to Dismiss, ECF No. 14, at 14–16 (discussing case law). Plaintiff's motion is silent as to the Court's jurisdiction, stating only: "[t]his court has found, and the government has acknowledged, that a plaintiff may seek mandamus for Presidential Records Act violations." Pl.'s Mot. at 1 (citing *Citizens for Resp. & Ethics in Washington* (*CREW*) *v. Cheney*, 593 F. Supp. 2d 194, 217 (D.D.C. 2009) (quoting the government's brief)). But the Court's holding in *CREW* was not so broad. Rather, the Court held that a request for mandamus properly could be predicated on an alleged Presidential Records Act violation as to which the Court possessed jurisdiction.[5] *See id.* The Court separately discussed that, while jurisdiction exists for review of certain claims, there is no

_____

[5] Likewise, the government did not concede the Court's jurisdiction over such claims. Rather, the government acknowledged only that "the absence of a private right of action under the [Presidential Records Act] alone does not necessarily foreclose mandamus relief." *CREW*, 593 F. Supp. 2d at 217 (quoting the government's brief in that action) (emphasis added).

jurisdiction to review "'creation, management, and disposal' decisions," *id.* (quoting *Armstrong II*, 1 F.3d at 1278), such as the decision of Mr. Meadows here.

In sum, Mr. Meadows's actions in transmitting the binder to DOJ and relinquishing control—especially when contrasted with his decision to retain control of some portions of the original binder, and transfer only "the bulk" of its content to DOJ—all weigh heavily in favor of finding that the version of the binder Mr. Meadows chose to transmit to DOJ is an agency record.

## 2. Mr. Meadows's transmission imbued DOJ with the discretion to use and dispose of the record as DOJ saw fit.

The second element of the D.C. Circuit test—whether the Department "has discretion to use and dispose of the record as it sees fit"—also weighs heavily in favor of finding that the binder is an agency record. Plaintiff conflates this element with the question of whether any instructions were provided to the agency regarding a document's subsequent use, arguing that the instructions to exercise discretion in applying redactions under the Privacy Act and then to publicly release the binder amount to restrictions of the Department's discretion under this factor. *See* Pl.'s Mot. at 12 ("The Attorney General *never* could use and dispose of the binder as he saw fit.") (emphasis by Plaintiff). Plaintiff is incorrect.

The test for whether a document is an agency record is used to determine whether a document is subject to the disclosure requirements of FOIA. *See, e.g.*, *Judicial Watch*, 726 F.3d at 211; *see also United We Stand Am., Inc. v. I.R.S.*, 359 F.3d 595, 597 (D.C. Cir. 2004) (explaining that, in determining whether an IRS response to a Congressional committee request was an agency record subject to FOIA, the Court was "balancing Congress's authority to maintain the confidentiality of its own materials against the broad mandate of disclosure lying at the heart of FOIA"). The inquiry into whether an agency "has discretion to use and dispose of" materials in this context is thus tantamount to an inquiry into whether an agency may *disclose* the

14

subject record, or whether there are restrictions preventing it from doing so such as a requirement

that the record be kept confidential or returned by the agency to an entity not subject to FOIA.

In *Judicial Watch*, for example, the D.C. Circuit cited a requirement that the agency

"transfer the records to the White House within 60 days of [their creation] and then purge [the

records] from its system," as a restriction on the agency's discretion to use and dispose of the

subject records. *Judicial Watch*, 726 F.3d at 219. Likewise, in *United We Stand America, Inc. v.

IRS*, the D.C. Circuit found that the agency "retain[ed] the 'ability to use and dispose of'" the

records at issue in that case, except to the extent that they would reveal a Congressional

Committee's request, which was accompanied by a "confidentiality directive" from the

Committee. *United We Stand Am., Inc.*, 359 F.3d at 601, 602 (quoting the Committee's

instruction in the request that "[t]his document may not be disclosed without prior approval of

the Joint Committee.").

Here, Plaintiff's contention that the Department did not have "discretion to use and

dispose of the record as it sees fit" based on a White House instruction to DOJ to use its

discretion to apply Privacy Act redactions and then make the document *public* gets this factor

backwards.[6] In *United We Stand*, the D.C. Circuit cautioned against an approach to this analysis

that would result in removing materials from the purview of FOIA, *i.e.*, treating them as non-

---

[6] The Privacy Act, *inter alia*, prohibits disclosure of "any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." 5 U.S.C. § 552a(b). Mr. Meadows's January 20, 2021, Memorandum instructed DOJ to redact the binder "under the standards that the Department of Justice normally would apply," consistent with the White House's intention that materials are not released which would constitute "an unwarranted invasion of personal privacy." *See* Jan. 20, 2021, Mem., Pl.'s Mot., Ex. 4, ECF No. 16-6 at 1. Thus, far from a "ministerial application of very carefully specified redactions" as Plaintiff contends, Pl.'s Mot. at 20, execution of Mr. Meadows's instruction clearly entailed exercise of DOJ officials' judgment and discretion.

agency records, "even if Congress [or, as applied here, the White House] expressed no intent to keep them secret." *United We Stand Am., Inc.*, 359 F.3d at 603. The D.C. Circuit cautioned that this approach would "undermin[e] the spirit of broad disclosure that animates [FOIA]." *Id.*

Mr. Meadows's January 20, 2021, Memorandum expressed no intent to keep secret the records at issue here. There was no limitation on the agency's discretion to *disclose* the materials; to the contrary, he instructed that disclosure should occur once redactions were applied. This instruction, and the accompanying lack of limitation on disclosure, weigh heavily in favor of finding that the subject record is an agency record under the *Tax Analysts* test.

### 3. DOJ's treatment of the binder likewise supports a finding that it is an agency record.

As explained above, where an agency created or obtained a record in the course of its official duties, and there is no "clear" expression of an intent to control that record by the entity not subject to FOIA, *United We Stand*, 359 F.3d at 603, the first two factors are determinative. *See supra* at 8–9. However, if the Court reaches consideration of the third and fourth factors, the Court should conclude that they also favor a determination that the binder is an agency record.

With respect to the third factor, the extent to which agency personnel have read or relied upon the document, *see Judicial Watch*, 726 F.3d at 218: the binder comprises materials related to an FBI investigation. Indeed, the very name of the former President's January 19, 2021, Memorandum reflects as much; the Memorandum is entitled "Declassification of Certain Materials Related to the FBI's Crossfire Hurricane Investigation." *See* 86 FR 6843 (Jan. 19, 2021). Agency personnel, by definition, would have created, and read and relied upon such materials.

And, as to the fourth factor—"the degree to which the document was integrated into the agency's record system or files," *Judicial Watch*, 726 F.3d at 218—this, too, favors treating the

16

binder as an agency record.  Indeed, the very processing of the binder via FOIA is evidence that these materials are part of the Department's official files, and bear no resemblance to materials analogous to "personal documents located within an agency," which this factor is intended to exclude.  *See United We Stand*, 359 F.3d at 603; *see also id.* (noting that "cases that employed the four factor analysis to determine agency control did not involve documents that were created and possessed by the agency "in the legitimate conduct of its official duties").

* * * * *

In sum, application of the well-established test used to determine whether material is an agency record to the undisputed facts of this case demonstrates that the binder at issue here satisfies that test.  Since it meets the requirements for an agency record, the binder, by definition, cannot be a Presidential record.  *See* 44 U.S.C. § 2201(2)(B)(i); *see also Armstrong II*, 1 F.3d at 1292 (recognizing that the Presidential Records Act "exclu[des] . . . records subject to the FOIA from the class of materials that may be treated as presidential records").  For this reason, because both Plaintiff's claim for replevin and his request for mandamus depend entirely on his contention that the binder is a Presidential record, *see* Compl. ¶¶ 34, 37–39, Defendants are entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  The Court should therefore grant the Defendants' motion for summary judgment and deny the Plaintiff's partial motion for summary judgment.

## II.  Plaintiff's Concerns about Changes in the Status of the Record are Misplaced.

Plaintiff complains that Defendants "fail to explain precisely when the binder became an agency record," and criticizes a change in status from Presidential record to agency record as "alchemy unsupported by controlling statutory text or Circuit precedent."  Pl.'s Mot. at 17.  But Plaintiff is mistaken.  There is nothing anomalous about records changing status, depending on

their location—a phenomenon that is reflected in Circuit precedent. Indeed, it is commonplace that records that were, for example, congressional records while in Congress become agency records when received by an agency. Similarly, emails that are Presidential records while in the White House become agency records when shared with an agency, and are processed as federal records when responsive to a FOIA request.

For example, in *United We Stand*, the D.C. Circuit discussed an "exchange of documents" between an agency covered by FOIA and Congress, and concluded that the agency's receipt and control of the documents rendered them agency records. *United We Stand*, 359 F.3d at 599. The Court observed: "In *Holy Spirit*, the FOIA requestor sought disclosure of documents that had been created by the CIA, sent to Congress, and then returned to CIA with no indication that the agency should keep them confidential. Finding the documents to be agency records, we explained that 'even if these [requested] CIA-created records were once congressional documents because [they were] generated in response to Congressional inquiries and transferred to Congress, they subsequently lost their exemption as congressional records when Congress failed to retain control over them.'" *United We Stand*, 359 F.3d at 599–600 (quoting *Holy Spirit Ass'n for the Unification of World Christianity v. CIA*, 636 F.2d 838, 843 (D.C. Cir. 1980), *vacated in part on other grounds*, 455 U.S. 997 (1982)). In other words, in *Holy Spirit*, a document began as an agency record, was transferred to an entity not covered by FOIA, and then regained its status as an agency record when it was transferred back to the agency without any indication that the agency should keep it confidential. Likewise, in this case, when Mr. Meadows sent the bulk of the binder to DOJ without a clear expression of continued White House control, DOJ "obtained" the binder "in the legitimate conduct of its official duties,"

18

*Tax Analysts*, 492 U.S. at 144, rendering it an agency record subject to FOIA under black letter law as discussed above.

### III. The Binder's Status as an Agency Record, and Resultant Processing under FOIA, Raises No Constitutional Issues.

Plaintiff argues that he is entitled to summary judgment on his mandamus claim because, in Plaintiff's view, the treatment of the binder as an agency record "creates constitutional issues." Pl.'s Mot. at 17. Plaintiff is mistaken.

Plaintiff complains that the processing of the subject binder under FOIA raises constitutional issues with respect to the Presidential Records Act and the FOIA based on Presidents' "historical[] exercise [of] complete dominion and control over their papers." Pl.'s Mot. at 18. As a threshold matter, Plaintiff relies on a historical description that predates the Presidential Records Act, "which prospectively abolished private ownership of presidential papers." *Nixon v. United States*, 978 F.2d 1269, 1296–97 (D.C. Cir. 1992) (citing 44 U.S.C. § 2201 *et seq.* (1988)). To the contrary, under the Presidential Records Act of 1978, Congress reserved to the United States "complete ownership, possession, and control of Presidential records." 44 U.S.C. § 2202.[7]

Additionally, the contours of Plaintiff's concern are unclear. Plaintiff asserts that "[n]either the Presidential Records Act nor the Freedom of Information Act could lawfully authorize the Defendants to alter or destroy the Crossfire Hurricane binder," Pl's Mot. at 18, but there is no question of alteration or destruction in this case. The only instance in which the

---

[7] To the extent Plaintiff's objection is to the United States' ownership and control of Presidential papers, the Supreme Court considered and rejected a separation of powers challenge to the Presidential Records Act's predecessor statute in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977), and Congress later relied on the Supreme Court's reasoning in that case when enacting the Presidential Records Act. *See* H.R. Rep. No. 95-1487.

binder is alleged to have been "altered" was when Mr. Meadows himself determined to return only "the bulk of the binder" rather than all of it, to DOJ.

Plaintiff also urges that as "a matter of Constitutional first principles" neither the "Presidential Records Act nor the Freedom of Information Act could lawfully authorize the Defendants . . . to keep the binder from Mr. Solomon," citing a case that addressed the separation of powers. *See* Pl's Mot. at 18 (citing *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923)). Since Mr. Solomon represents the former head of the Executive Branch as his representative under the Presidential Records Act, and the document as to which he seeks mandamus relief is a federal record within an Executive Branch agency, it is difficult to see how separation of powers concerns could arise.

In sum, Plaintiff identifies no constitutional considerations that might justify the Court's intervention in this case.

IV. **The Binder's Status as an Agency Record, and Concomitant Processing under FOIA, Implies No "Absolute Veto" over a Former President's Access to his Records.**

Plaintiff also urges that the Court should grant mandamus relief in this case because declining to intervene "would give the party in power a perverse *de facto* power to ignore the law and an absolute veto over any former President's access to his records." Pl.'s Mot. at 17. But that is not so.

It is undisputed that the former President's own Chief of Staff returned a version of the binder to DOJ, with an affirmative instruction to DOJ to exercise control by applying redactions in its sole discretion. *See* Jan. 20, 2021, Mem., Pl.'s Mot., Ex. 4, ECF No. 16-6 at 1. Not only did the former Chief of Staff not express an intent to retain confidentiality, but he instructed DOJ to apply its own redactions and then make the binder public, with no accompanying instruction that it remain a Presidential record or that it be sent to NARA. *See id.* Had White House staff

made an exact copy of the binder before removing pieces and returning it to DOJ, and had they

left it for NARA to take at the conclusion of the Administration, the former President's

representative, appropriately cleared, would have been able to access the binder at NARA. Just

as the decision to return the binder to the Department—or not—rested with the former President

and his staff, any future President and that President's staff will have the authority to determine

how to manage the records of his or her Administration in accordance with the PRA. Declining

to intervene in this case will not vest a subsequent Administration with any more or less control

over its own records.

## V. Equitable Considerations Do Not Warrant Mandamus Relief.

Even if the threshold requirements for mandamus relief were satisfied, and they are not,

"the plaintiff must additionally show 'compelling equitable grounds' before [the Court] will

grant mandamus relief. *Illinois v. Ferriero*, 60 F.4th 704, 714 (D.C. Cir. 2023) (quoting *In re*

*Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005)). Plaintiff proposes four.

First, Plaintiff asserts "the government has *never* denied a former President access to his

unclassified records." Pl.'s Mot. at 19 (emphasis the Plaintiff's). This argument assumes its

own conclusion, *i.e.*, that the subject records are properly regarded as Presidential records rather

than agency records. For all the reasons discussed above, they are not. Moreover, there are

copies of documents from the binder which were retained at the White House and transferred to

NARA as Presidential records, and Plaintiff has not been categorically denied access to those

materials. Rather, he lacks the requisite security clearance to review those records. *See* Email

from Gary Stern to John Solomon (June 23, 2022), Pl.'s Mot., Ex. 2, ECF No. 16-4, at 13–14.

As NARA's General Counsel explained to Plaintiff: the box in which those records were

retained contains "roughly 2700 undifferentiated pages of documents with varying types of

classification and declassification markings." *Id.* Because NARA "could not be certain of the classification status of any of the information in the box," NARA is "obligated under Executive Order 13526 to treat the contents of the box as classified at the TS/SCI level." *Id.* at 14.[8]

Second, Plaintiff complains that the binder has not yet been made public notwithstanding the former President's declassification. *See* Pl.'s Mot. at 19–20. Plaintiff asserts that release of the binder is "required by law." *Id.* at 20. But the binder is being processed and released consistent with FOIA, which is the applicable law in this setting; once the binder was received by DOJ, it became an agency record and DOJ was required to process it under FOIA upon receipt of a FOIA request seeking its disclosure. *See* 5 U.S.C. § 552. By insisting that the binder should have been released without protecting information exempt from disclosure under FOIA, Plaintiff is asking the Court to disregard FOIA, a federal statute, and to enforce the former President's January 19, 2021, Memorandum. *See* Mem., Declassification of Certain Materials Related to the FBI's Crossfire Hurricane Investigation, 86 FR 6843 (Jan. 19, 2021). But, by its

---

[8] Plaintiff proffers, without citation to any underlying evidence in support, his position that the binder "contained about 2,700 pages" prior to its transfer to DOJ. *See* Pl.'s Stmt. of Undisputed Material Facts, ECF No. 16-2, ¶ 15 (citing Pl.'s Mot., Ex. 5, ¶ 9); *compare* Pl.'s Mot., Ex. 5, ¶ 9 (referring to Plaintiff's estimation of the thickness of the binder, but offering no estimate of page count). Taken with the inadmissible hearsay that Plaintiff offers—conveying purported remarks by Mr. Meadows that the redactions in those materials were finalized on January 19, 2021, Pl.'s Stmt. of Undisputed Material Facts, ECF No. 16-2, ¶ 25, and that Mr. Meadows had "placed a copy of the documents in the binder sent to the [DOJ] in a box for transfer to the Archives as Presidential records," *id.* ¶ 45—Plaintiff appears to be implying that the box that NARA has includes full set of finalized, redacted records, duplicating the complete binder. But Plaintiff is clearly mistaken. The version of the binder that Mr. Meadows transferred, and which is being processed by the FBI, is less than 900 pages in length. *See* Email from Gary Stern to John Solomon (July 12, 2022), Pl.'s Mot., Ex. 2, ECF No. 16-4, at 11. And the box of 2700 pages that NARA received includes "instances of the same document being redacted differently," and some documents without "the required declassification marking." Email from Gary Stern to Kash Patel (July 14, 2022), Pl.'s Mot., Ex. 2, ECF No. 16-4, at 9. The Court should therefore reject Plaintiff's baseless and erroneous suggestion that the box of 2700 pages that NARA has is simply a finalized, redacted set duplicating the complete binder.

own terms, the memorandum forecloses such an argument. In section 2(c), it provides: "This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person." *Id.* at 6843–44.

Third, Plaintiff reprises his contention that NARA has provided a "series of pretextual justifications" for why he could not access the subject records, implying that the answers he has received were internally inconsistent, and have changed over time. Pl.'s Mot. at 20. In response to similar contentions in Plaintiff's prior filing, Defendants explained that Plaintiff is demonstrably wrong, and provided a detailed description of the correspondence to which Plaintiff referred. *See* ECF No. 14 at 13–15. Evidently lacking an answer to that detailed discussion, Plaintiff simply ignores it. *See* Pl.'s Mot. at 20.

Finally, Plaintiff concludes with allegations characterizing the Crossfire Hurricane investigation and his view of what he terms the Defendants' "deeply vested political interest." *See id.* at 20–22. It is difficult to understand how publishing records on a public website in accordance with FOIA demonstrates a "deeply vested political interest."

Moreover, in any event, Plaintiff's contentions concerning what he characterizes as equitable grounds supporting his request for mandamus relief are inapposite; as discussed below, the requirements that there be a "clear and indisputable right to relief" and a "clear duty to act" are jurisdictional. *See Illinois*, 60 F.4th at 714. Where, as here, Plaintiff cannot meet his burden to establish those threshold elements, *see infra* Section VI, there is no jurisdiction to reach the additional question of whether there are equitable grounds that could support the issuance of the writ.

## VI. In Light of the Undisputed Evidence, Plaintiff Cannot Meet the High Threshold Required for Mandamus Relief.

Denial of Plaintiff's motion for partial summary judgment, and entry of judgment for Defendants on Plaintiff's second claim, are warranted because of the extraordinary showing required for a successful mandamus claim. "Few legal standards are more exacting than the requirements for invoking mandamus jurisdiction under § 1361." *Illinois*, 60 F.4th at 710. A plaintiff seeking a writ of mandamus must demonstrate 1) a clear and indisputable right to the particular relief sought against the federal official, 2) that the federal official is violating a clear duty to act, and 3) that the plaintiff has no adequate alternate remedy." *Id.* at 713–14 (citing *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016)). The Court "can" and "often do[es]" "analyze the clear right to relief and clear duty to act requirements for mandamus concurrently." *Id.* at 715. The D.C. Circuit has described both the "clear and indisputable right to relief" and "clear duty to act" standards as "stringent," noting "we will deny mandamus even if a petitioner's argument, though 'pack[ing] substantial force,' is not clearly mandated by statutory authority or case law." *Id.* at 714–15 (quoting *In re Al Baluchi*, 952 F.3d 363, 369 (D.C. Cir. 2020) (internal quotations omitted)).

The D.C. Circuit's high standard is insurmountable in this case. Plaintiff asks this Court to recharacterize an agency record as a Presidential record, and to order its transfer from a federal agency to NARA. Any right to relief or duty by Defendants to act—in this case, for NARA to provide Plaintiff access to the record under the PRA, *see* Compl., ECF No. 1, ¶¶ 38, 39—depends wholly on Plaintiff's assertion that the record at issue is properly regarded as a Presidential record under the Presidential Records Act. Yet the legal theory that Plaintiff advances in support of that argument—inverted application of a test the D.C. Circuit developed to ascertain whether a record is properly subject to FOIA's requirements—has, to Defendants'

knowledge, never been applied by any court in the manner that Plaintiff proposes. *See supra*. That, alone, forecloses mandamus relief. *See Illinois*, 60 F.4th at 710 (quoting *Rep. of Venezuela v. Philip Morris, Inc.,* 287 F.3d 192, 199 (D.C. Cir. 2002), as holding that petitioners did "not come close" to showing clear and indisputable right because they "identif[ied] no precedent of this court or of the Supreme Court" on point).

Moreover, as discussed above, because DOJ obtained the record at issue "in the legitimate conduct of its official duties," *Tax Analysts*, 492 U.S. at 144, that record plainly satisfies all the elements of the definition of an agency record, excluding it from the statutory definition of "Presidential record" under the Presidential Records Act, *see* 44 U.S.C. § 2201(2)(B). *See supra* at 6–16. For this reason, too, Plaintiff cannot demonstrate *any* right to relief or duty to act in this case, much less the "clear" and "indisputable" showing necessary to establish mandamus jurisdiction.

The D.C. Circuit has cautioned that "[t]he grounds on which a district court may grant mandamus relief are narrow, and the demands are austere." *Illinois*, 60 F.4th at 710. For all the reasons explained herein, Plaintiff misses the mark, and by a country mile.

## CONCLUSION

For all the reasons explained herein, the Court should grant Defendants' cross-motion for summary judgment and deny the Plaintiff's motion for partial summary judgment.

Dated:  September 7, 2023        Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO (D.C. Bar No. 418925)
Deputy Director
Federal Programs Branch

/s/ Julia A. Heiman
JULIA A. HEIMAN (D.C. Bar No. 986228)
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, N.W.
Washington, DC 20005
Tel. (202) 616-8480 / Fax (202) 616-8470
julia.heiman@usdoj.gov
*Attorneys for Defendants*

# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDICIAL WATCH, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>NATIONAL ARCHIVES AND )<br>RECORDS ADMINISTRATION, )<br><br>Defendant. ) | Civil Action No: 1:10-cv-01834 (PLF) |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS

# TABLE OF CONTENTS

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.    Statutory Framework. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.    Historical Context. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.    The Presidential Records Act of 1978. . . . . . . . . . . . . . . . . . . . 6

    II.    Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    III.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    I.    PLAINTIFF LACKS STANDING BECAUSE IT HAS NOT ALLEGED
        A REDRESSABLE INJURY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        A.    The Court Cannot Compel NARA to Assume Custody and
            Control of the Audiotapes, Because the PRA Does Not Mandate
            It. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        B.    The Court Cannot Compel NARA to Seize the Audiotapes,
            Because Any Remedies Available Under the PRA Are
            Committed Solely to NARA's Discretion. . . . . . . . . . . . . . . . 15

    II.    THE PRA PRECLUDES JUDICIAL REVIEW OF PLAINTIFF'S
        CLAIM UNDER THE APA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        A.    The D.C. Circuit's *Armstrong* Decisions Have Already
            Determined That Plaintiff's APA Claim is Precluded by the
            PRA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            1.      The *Armstrong* Decisions.. . . . . . . . . . . . . . . . . . . . . . 19

            2.      Plaintiff's Lawsuit Here is Precluded By the *Armstrong* Decisions.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      B.    The PRA Precludes a Private Litigant From Challenging the President's Classification of a Particular Record as Personal.. 25

III.  PLAINTIFF'S LAWSUIT IS PREMATURE BECAUSE NARA HAS NOT UNDERTAKEN A FINAL AGENCY ACTION.. . . . . . . . . . . . 30

IV.   PLAINTIFF HAS FAILED TO STATE A CLAIM BECAUSE EVEN TAKING ALL ALLEGED FACTS AS TRUE, NARA DID NOT ACT ARBITRARILY OR CAPRICIOUSLY IN UPHOLDING PRESIDENT CLINTON'S CLASSIFICATION OF THE AUDIOTAPES AS PERSONAL RECORDS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

# TABLE OF AUTHORITIES

## CASES

*Am. Fed'n of Gov't Employees, AFL-CIO v. O'Connor,*
747 F.2d 748 (D.C. Cir. 1984). ........................................................... 32

*Armstrong v. Bush* [*Armstrong I*],
924 F.2d 282 (1991)......................................... 2, 4, 6, 14, 15, 18, 19, 20, 23, 24

*Armstrong v. Exec. Office of the President* [*Armstrong II*],
1 F.3d 1274 (D.C. Cir. 1993). ............................................... 21, 22, 24

*Armstrong v. Exec. Office of the President* [*Armstrong III*],
90 F.3d 553 (D.C. Cir. 1996). ............................................................. 22

*Armstrong v. Bush,*
721 F. Supp. 343 (D.D.C. 1989). ............................................... 6, 20, 22, 23, 25

*Armstrong v. Bush,*
139 F.R.D. 547 (D.D.C. 1991). ................................................... 20, 21

*Baltimore Gas & Elec. Co. v. FERC,*
252 F.3d 456 (D.C. Cir. 2001). ............................................................. 16

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007). ............................................................. 10, 33, 37

*Bennett v. Spear,*
520 U.S. 154 (1996). ........................................................................ 31

*Block v. Cmty. Nutrition Inst.,*
467 U.S. 340 (1984). ................................................................. 25, 30

*Bowen v. Massachusetts,*
487 U.S. 879 (1988). ........................................................................ 31

*CREW v. Cheney,*
593 F. Supp. 2d 194 (D.D.C. 2009). ........................................... 12, 24

*CREW v. Office of Admin.,*
559 F. Supp. 2d 9 (D.D.C. 2008). ................................................... 17

*CREW v. Dep't of Homeland Sec.*,
    527 F. Supp. 2d 101 (D.D.C. 2007). ........................................................... 3, 24

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971). .................................................................................. 33

*Claybrook v. Slater*,
    111 F.3d 904 (D.C. Cir. 1997). ................................................................ 16

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006). .................................................................................. 10

*EEOC v. St. Francis Xavier Parochial Sch.*,
    117 F.3d 621 (D.C. Cir. 1997). ................................................................ 10

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990). .................................................................................. 11

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992). .................................................................................. 31

*Heckler v. Chaney*,
    470 U.S. 821 (1985). ........................................................................ 15, 16, 17

*Kenney v. Dep't of Justice*,
    603 F. Supp. 2d 184 (D.D.C. 2009). ....................................................... 31

*Kissinger v. Reporters Comm. for Freedom of the Press*,
    445 U.S. 136 (1980). ............................................................................ 14, 32

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1991). .................................................................................. 10

*Massachusetts v. EPA*,
    549 U.S. 497 (2007). .................................................................................. 18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983). .................................................................................... 34

*Newdow v. Roberts*,
    603  F.3d 1002 (D.C. Cir. 2010). .......................................................... 11, 18

*Nixon v. Adm'r of GSA,*
    433 U.S. 425 (1977). ............................................................ 5, 26, 27

*Nixon v. Freeman,*
    670 F.2d 346 (D.C. Cir. 1982). ........................................... 5, 6

*Nixon v. United States,*
    978 F.2d 1269 (D.C. Cir. 1992). ............................................ 5

*Norton v. S. Utah Wilderness Alliance,*
    542 U.S. 55 (2004). ......................................... 12, 13, 14

*Pub. Citizen v. Carlin,*
    2 F. Supp. 2d 1 (D.D.C. 1997). ............................................ 24

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n,*
    324 F.3d 726 (D.C. Cir. 2003). .......................................... 32

*Rempfer v. Sharfstein,*
    583 F.3d 860 (D.C. Cir. 2009). .......................................... 11

*Russello v. United States,*
    464 U.S. 16 (1983). ........................................................ 26

*Sec'y of Labor v. Twentymile Coal Co.,*
    456 F.3d 151 (D.C. Cir. 2006). .......................................... 16

*Swift v. United States,*
    318 F.3d 250 (D.C. Cir. 2003). .......................................... 16

*Switchmen's Union of North America v. Nat'l Mediation Bd.,*
    320 U.S. 297 (1943). ...................................................... 13

*United States v. McElvenny,*
    No. 02-3027, 2003 WL 1741422 (S.D.N.Y. April 1, 2003). ........... 14

*United States v. Mead Corp.,*
    533 U.S. 218 (2001). ...................................................... 37

**STATUTES**

5 U.S.C. § 552. ................................................................ 9

5 U.S.C. § 701. ...................................................................................... 2, 15, 18

5 U.S.C. § 704 ............................................................................................... 31

5 U.S.C. § 706. ............................................................................................. 12

28 U.S.C. § 516. ........................................................................................... 14

44 U.S.C. § 2111. ....................................................................................... 5, 26

44 U.S.C. § 2112. ............................................................... 8, 9, 13, 16, 25, 30

44 U.S.C. §§ 2201-2207. ............................................................................. 1, 6

44 U.S.C. § 2201. ..................................................... 1, 7, 22, 34, 35, 36, 37

44 U.S.C. § 2203 ..................................................................................... 6, 7, 13

44 U.S.C. § 2204. ............................................................................... 25, 27, 28

44 U.S.C. § 2904. ......................................................................................... 4, 17

44 U.S.C. § 2905. ......................................................................................... 4, 13

44 U.S.C. § 3101. ............................................................................................ 4

44 U.S.C. § 3106. ......................................................................................... 4, 13

44 U.S.C. §§ 3315-3324. ................................................................................ 5

## MISCELLANEOUS

H.R. REP. No. 95-1487, *reprinted in* 1978 U.S.C.C.A.N. 5732. ................................. 27

*To Amend the Freedom of Information Act to Insure Public Access to the Official Papers of the President, and for Other Purposes: Hearings Before the Subcomm. on Gov't Information and Individual Rights of the H. Comm. on Gov't Operations*, 95th Cong. (1978)................................................................................................ 28, 29

*To Amend Title 44 to Insure the Preservation and Public Access to the Official Records of the President, and for Other Purposes: Hearing on S. 3494 Before the S. Comm. on Gov't Affairs*, 95th Cong. (1978)................................................................ 29

# INTRODUCTION

Plaintiff Judicial Watch, Inc., purporting to enforce the Presidential Records Act of 1978 (PRA), 44 U.S.C. §§ 2201-2207, requests that this Court order the National Archives and Records Administration (NARA) to physically seize the personal audio diary of former President Clinton. This extraordinary request is unfounded, contrary to the PRA's express terms, and contrary to traditional principles of administrative law. Even taking all factual allegations in the complaint as true, the requested audio diary is a "personal record" as defined by the PRA, 44 U.S.C. § 2201(3)(A), and therefore is not subject to any governmental control. But even assuming for purposes of this motion that the audio diary in question could be considered a presidential and not personal record, NARA has complete discretion as to when to pursue the recovery of presidential records not in its possession. And because NARA has this absolute discretion over when to initiate enforcement proceedings, courts cannot order NARA to seize particular records when NARA has exercised its discretion not to do so.

This Court's inability to issue such an order is fatal to Plaintiff's lawsuit. Plaintiff's *only* alleged injury is a lack of access to President Clinton's audio diary. *See* Compl. at ¶21. To remedy that injury, Plaintiff asks this Court, in part, to "order [NARA] to assume custody and control of" President Clinton's audiotapes. Compl. at 5. But this Court cannot provide such a remedy, and therefore is unable to redress Plaintiff's injury. Plaintiff's complaint, consequently, should be dismissed for lack of standing.

The above analysis assumes, moreover, that Plaintiff even has a cognizable cause of action under the Administrative Procedure Act (APA)—which it does not. The PRA is a statute that "preclude[s] judicial review" under the APA, 5 U.S.C. § 701(a)(1), as the D.C. Circuit's decisions in the *Armstrong* cases confirm. Indeed, the D.C. Circuit already has rejected attempts by private litigants to obtain "judicial review of the President's general compliance with the PRA," which is precisely what Plaintiff seeks to accomplish here. *Armstrong v. Bush*, 924 F.2d 282, 291 (1991) [hereinafter *Armstrong I*]. Moreover, even apart from the *Armstrong* decisions, the PRA's text, structure, purpose, and history all confirm that the PRA precludes judicial review for the particular decision that Plaintiff is challenging here—NARA's determination that President Clinton properly classified particular records as "personal" rather than "presidential."

Yet another threshold issue requires that Plaintiff's lawsuit be dismissed: Plaintiff's purported APA challenge fails to identify any final agency action. Prior to this lawsuit, Plaintiff pursued President Clinton's audiotapes under the Freedom of Information Act (FOIA). NARA rejected Plaintiff's FOIA request on the ground that NARA did not have custody over President Clinton's tapes. NARA then went on to state that, based on the facts provided by Plaintiff, the audiotapes were President Clinton's personal records, and thus would not be subject to FOIA even if they were in NARA's custody. Plaintiff now seizes on this language from NARA's letter and characterizes it as a final agency determination regarding the PRA claim presented here. That argument is untenable; NARA's discussion of the audiotapes was solely in

the context of a FOIA appeal, and did not have any legal consequences under the PRA. Thus, there is no final agency action for this Court to review with respect to Plaintiff's PRA claim.

Finally, even were the Court to conclude that judicial review is available and that NARA made a final determination as to Plaintiff's PRA claim, the Court should still dismiss Plaintiff's complaint for failure to state a claim upon which relief can be granted. Even taking all of Plaintiff's factual allegations as true, NARA correctly upheld President Clinton's classification of the audiotapes as personal records. NARA considered all of the relevant factors and properly explained its decision, which amply demonstrates that NARA did not act arbitrarily or capriciously. NARA's significant institutional expertise with respect to presidential records also entitles its decision to a measure of deference, which Plaintiff's allegations do not overcome. Thus, Plaintiff's complaint should be dismissed.

## BACKGROUND

### I.    Statutory Framework

#### A.    Historical Context

Although Plaintiff's lawsuit is based solely on the Presidential Records Act, two of the PRA's predecessor statutes are also important to this case.

First, the Federal Records Act (FRA) is "a series of statutes that collectively govern the creation, management, and disposal of records by federal agencies." *Citizens for Responsibility & Ethics in Washington (CREW) v. Dep't of Homeland Sec.*, 527 F. Supp. 2d 101, 108 (D.D.C. 2007); *see* 44 U.S.C. §§ 2101-18, 2901-09, 3101-07,

3301-24.  Under the FRA, "[t]he head of each Federal agency shall make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency[.]"  44 U.S.C. § 3101.

The Archivist of the United States—who is the head of NARA—plays an important role in administering the FRA.  Specifically, the Archivist "shall provide guidance and assistance to Federal agencies," *id.* § 2904(a), and "may inspect the records or the records management practices and programs of any Federal agency," *id.* § 2906(a)(1).  Additionally, an agency head may not dispose of any records without the approval of the Archivist.  *See id.* §§ 3303a, 3314.

The FRA also creates an administrative enforcement scheme, by which the Archivist and an agency head must notify each other if one of them learns "of any actual, impending, or threatened unlawful removal, defacing, alteration, or destruction of records in the custody of the agency[.]"  *Id.* §§ 2905(a), 3106.  The agency head, with the assistance of the Archivist, must then "request that the Attorney General initiate an action to prevent the destruction of documents" or to recover unlawfully removed documents.  *Armstrong I*, 924 F.2d at 294.  If the agency head refuses to make that request, then the Archivist must "notify Congress and independently request that the Attorney General initiate an action[.]"  *Id.*

This administrative enforcement scheme is exclusive.  Thus, courts may not order the recovery or retrieval of records that may have been removed or destroyed.  *See id.* ("Because it would clearly contravene this system of administrative enforcement

-4-

to authorize private litigants to invoke federal courts to prevent an agency official from improperly destroying or removing records, we hold that the FRA precludes judicial review of such actions.").

The second predecessor statute to the PRA is the Presidential Recordings and Materials Preservation Act of 1974 (PRMPA), *see* note following 44 U.S.C. § 2111. Prior to the PRMPA, presidential records were "treated as the President's private property." *Nixon v. United States*, 978 F.2d 1269, 1284 (D.C. Cir. 1992). In 1974, however, Congress became concerned that former President Nixon might destroy records relating to the Watergate investigation. *See id.* at 1271. Accordingly, Congress passed the PRMPA, which instructed the General Services Administration (GSA)—at the time the parent agency of the National Archives—to seize President Nixon's records, and to promulgate regulations providing for public access to those records. *See* note following 44 U.S.C. § 2111 at §§ 101, 104. President Nixon challenged the PRMPA's constitutionality, but the Supreme Court upheld the PRMPA's facial validity, and the D.C. Circuit upheld the PRMPA's implementing regulations. *See Nixon v. Adm'r of GSA*, 433 U.S. 425 (1977); *Nixon v. Freeman*, 670 F.2d 346 (D.C. Cir. 1982).

The PRMPA, by its terms, applied only to President Nixon's records. But Title II of the PRMPA created a "National Study Commission on Records and Documents of Federal Officials" to make recommendations to Congress and the President on, among other things, whether or not the records of Presidents should be subject to federal law. *See generally* 44 U.S.C. §§ 3315-3324. Accordingly, "[t]he controversy over the Nixon materials prompted subsequent congressional reconsideration of the traditional

disposition and preservation of Presidential materials. That reconsideration resulted in the passage of the Presidential Records Act of 1978[.]" *Nixon v. Freeman*, 670 F.2d at 349 n.2. When drafting the PRA, therefore, Congress was "acutely aware" of the PRMPA and the litigation surrounding it. *Armstrong v. Bush*, 721 F. Supp. 343, 350 (D.D.C. 1989), *overruled on other grounds by Armstrong I*, 924 F.2d at 282.

### B. The Presidential Records Act of 1978.

The Presidential Records Act of 1978, 44 U.S.C. §§ 2201-2207, commonly known as the PRA, creates a scheme governing the preservation and disclosure of presidential records, which applies to all Presidents starting with President Reagan. During a President's time in office, the PRA directs the President "to take all such steps as may be necessary to assure that" presidential records are created and maintained pursuant to the PRA. *Id.* § 2203(a).

Unlike the FRA, however, the PRA contemplates a limited role for the Archivist during a President's time in office. Indeed, "the PRA accords the President virtually complete control over his records during his term of office. Although the President must notify the Archivist before disposing of records and the Archivist may inform Congress of the President's desire to dispose of the records, neither the Archivist nor the Congress has the authority to veto the President's disposal decision." *Armstrong I*, 924 F.2d at 290.

Once a President's time in office has concluded, the Archivist receives the presidential records, and deposits them in a presidential archival depository, commonly

-6-

referred to as a presidential library.  *See* 44 U.S.C. § 2203(f).  The Library must then

begin processing and organizing the records to provide for public access.  *Id*.

Most presidential records become available to the public beginning five years

after the President leaves office, either through FOIA requests or when the Library has

processed the records.  *See id*. § 2204(b)(2) & (c)(1).  For certain categories of

information, however, the President, prior to leaving office, may "specify durations, not

to exceed 12 years, for which access shall be restricted[.]"  *Id*. § 2204(a).  During that

period, the Archivist, after consulting with the former President, determines whether

a particular presidential record falls within one of the restricted categories.  *Id*.

§ 2204(b)(3).  The Archivist's decision is not subject to judicial review, unless "the

former President assert[s] that a determination made by the Archivist violates the

former President's rights or privileges."  *Id*. § 2204(e).

Importantly to this case, the PRA's preservation and disclosure provisions apply

only to *presidential* records—not personal records.  In its definition of "presidential

records," the PRA specifically excludes the President's "personal records."  *See id*.

§ 2201(2)(B) ("The term 'Presidential records' . . . does not include any documentary

materials that are . . . personal records[.]").  And the term "personal records" is in turn

defined as including, among other things, "diaries, journals, or other personal notes

serving as the functional equivalent of a diary or journal which are not prepared or

utilized for, or circulated or communicated in the course of, transacting Government

business."  *Id*. § 2201(3)(A).  A former President's diary or its functional equivalent,

therefore, is specifically excluded from the definition of a presidential record.

-7-

The PRA requires the President, "to the extent practicable," to "categorize[]" materials as presidential records or personal records "upon their creation or receipt" and to "file[] [them] separately." *Id.* § 2203(b). It then directs the Archivist of the United States to "assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President" upon the conclusion of a President's term in office. *Id.* § 2203(f)(1). The PRA contains no provision compelling the Archivist to assume responsibility for, or to review, the materials that the President "categorized" and "filed separately" as personal records.

Finally, with respect to enforcement, the PRA grants the Archivist the authority to invoke the same enforcement mechanism embodied in the FRA:

> When the Archivist considers it to be in the public interest, he may exercise, with respect to papers, documents, or other historical materials deposited under this section, or otherwise, in a Presidential archival depository, *all the functions and responsibilities otherwise vested in him pertaining to Federal records* or other documentary materials in his custody or under his control.

44 U.S.C. § 2112(c) (emphasis added). Although that language was originally passed as part of the Presidential Libraries Act of 1955—yet another predecessor statute to the PRA—the PRA amended § 2112(c) to specifically apply to presidential records as well. *See id.* (stating that "[o]nly the first two sentences of this subsection," which includes the sentence quoted above, "shall apply to Presidential records").

## II.    Factual Background

Plaintiff Judicial Watch alleges that "[d]uring the course of his presidency, President Clinton enlisted historian Taylor Branch to assist President Clinton in

-8-

creating an oral history of his eight years in office." Compl. at ¶8. That oral history, Plaintiff says, was recorded on a number of audiotapes. *Id.* at ¶9.

On October 7, 2009, Plaintiff sent a request to the Clinton Presidential Library, pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, seeking copies of the Taylor Branch audiotapes. *See* Compl. at ¶12. The Clinton Presidential Library denied that request. *Id.* at ¶13.

On November 2, 2009, Plaintiff appealed that denial to NARA. *Id.* at ¶14. On March 16, 2010, NARA, through Deputy Archivist Adrienne C. Thomas, rejected Plaintiff's FOIA appeal. *Id.* at ¶15. Ms. Thomas explained that the requested audio tapes "are not and have never been physically located at the Clinton Library or at any other NARA facility[.]" *See* Ex. 4 at 2 (Letter from Adrienne C. Thomas to Michael Bekesha). That was the end of Ms. Thomas's FOIA analysis, though she then went on to explain why, based "[o]n the facts made available to me, I do not believe the materials in question fall within the ambit of the PRA." Specifically, Ms. Thomas stated that she was "of the opinion that the audio tapes . . . are personal records of President Clinton[.]" *Id.*

Plaintiff thereafter filed this lawsuit, bringing one claim under the APA, 5 U.S.C. § 701, *et seq.* Plaintiff's claim asserts that NARA arbitrarily and capriciously labeled the audio tapes personal records, Compl. at ¶20, and that classifying the tapes as personal is "irreparably harm[ing]" Plaintiff by "prevent[ing] Plaintiff from gaining access to the audiotapes through FOIA." Compl. at ¶21. Thus, Plaintiff asks this Court for a number of remedies: to declare NARA's classification of the records as

-9-

personal to be arbitrary and capricious; to declare that the tapes are presidential records; to order NARA to assume custody and control of the tapes; to order NARA to deposit the tapes in the Clinton Presidential Library; and to order NARA to process the tapes under FOIA. Compl. at 5.

## III.  Standard of Review

Defendant NARA moves to dismiss the complaint for lack of subject-matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Plaintiff bears the burden of showing subject-matter jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1991). Indeed, it is "presume[d] that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (internal quotation marks omitted).

NARA also moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. In evaluating the sufficiency of the complaint, the Court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although a court must accept all factual allegations as true, the court is "not bound to accept as true a legal conclusion couched as a factual allegation[.]" *Id.* (internal quotation marks omitted).

-10-

## ARGUMENT

### I. PLAINTIFF LACKS STANDING BECAUSE IT HAS NOT ALLEGED A REDRESSABLE INJURY.

For Plaintiff to establish constitutional standing, a jurisdictional requirement, it "must show an injury in fact that is fairly traceable to the challenged conduct and that will likely be redressed by a favorable decision on the merits." *Rempfer v. Sharfstein*, 583 F.3d 860, 868 (D.C. Cir. 2009). A plaintiff's articulation of its injury is limited to the allegations in the complaint. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("[P]etitioners in this case must allege facts essential to show jurisdiction. If they fail to make the necessary allegations, they have no standing." (internal quotations and alterations omitted)).

Here, Plaintiff's sole articulation of its injury is that NARA is "prevent[ing] Plaintiff from gaining access to the audiotapes through FOIA." Compl. at ¶21. Plaintiff's own complaint admits, however, that NARA does not currently possess the audiotapes. *See id.* at ¶16 ("On information and belief, President Clinton unlawfully retained the requested audiotapes after leaving office.").

To redress Plaintiff's injury, then, this Court would have to compel NARA to seize the audiotapes from President Clinton—and indeed, that is precisely the relief that Plaintiff seeks. *See id.* at 5 (requesting the Court to "order Defendant to assume custody and control of the requested records"). That relief is unavailable, however, and thus Plaintiff's injury is not redressable by this Court. *See Newdow v. Roberts*, 603

F.3d 1002, 1013 (D.C. Cir. 2010) (denying standing because "[t]he only apparent avenue of redress for plaintiffs' claimed injuries . . . is unavailable").

### A. The Court Cannot Compel NARA to Assume Custody and Control of the Audiotapes, Because the PRA Does Not Mandate It.

Plaintiff's requested relief here is quite remarkable. Plaintiff seeks to compel NARA to seize materials from a former President of the United States, even though the former President presumably considers those materials to be personal records. Plaintiff makes that request, moreover, without identifying any clear basis for it. That lack of specificity is not by accident: No provision in the PRA requires NARA to "assume custody and control" of President Clinton's audiotapes.

Plaintiff's lawsuit is actually one under the APA, purporting to enforce the terms of the PRA. This APA lawsuit was Plaintiff's only option, because the PRA itself does not provide Plaintiff with a private right of action. *See CREW v. Cheney*, 593 F. Supp. 2d 194, 218 (D.D.C. 2009). Plaintiff does not specify which provision of the APA is the basis for its requested relief, but for its injury to be redressed, it would have to proceed under 5 U.S.C. § 706(1), which allows a court "to compel agency action unlawfully withheld."

For Plaintiff to obtain relief under that provision, however, Plaintiff must "assert[] that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) [hereinafter *SUWA*] (emphasis in original). As the Court explained in *SUWA*, prior to the APA judicial review of agency action was achieved mostly through writs of mandamus. The

-12-

APA "carried forward [that] traditional practice[,]" and thus the APA—like mandamus—is "limited to enforcement of a 'specific, unequivocal command[.]" *Id.* at 63. For Plaintiff to succeed on its APA claim, then, it must show that the PRA contains a "specific, unequivocal command" directing NARA to seize all presidential records.

Plaintiff cannot make that showing. The PRA does not require NARA to physically seize presidential records, but instead relies upon a much more limited (and sensible) administrative enforcement scheme. As discussed above, the PRA allows the Archivist of the United States, "[w]hen the Archivist considers it to be in the public interest," to invoke the FRA's enforcement scheme. 44 U.S.C. § 2112(c). And under the FRA's scheme, "the Archivist shall request the Attorney General to initiate" an action for the recovery of missing records, and "shall notify the Congress when such a request has been made." *See id.* §§ 2905(a), 3106.

This administrative enforcement scheme is the exclusive method by which NARA can recover records under the PRA.[1] As the Supreme Court has long held, "it is for Congress to determine how the rights which it creates shall be enforced. . . . [T]he specification of one remedy normally excludes another." *Switchmen's Union of*

---

[1] 44 U.S.C. § 2203(f) does not require NARA to physically seize any records, presidential or personal. That subsection requires the Archivist, when a President leaves office, to "assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President," to deposit them in a federal facility, and to make them available to the public. That subsection presupposes the existence of a departing President's collection of presidential records—"*the* Presidential records of *that* President"—and requires the Archivist to assume responsibility for that specific collection. In drafting this subsection, Congress surely knew that, just a few sentences earlier, it had directed the President to file personal records separately from this collection of presidential records. *Id.* § 2203(b). Tellingly, § 2203(f) does not reference these personal records or require the Archivist to take any action with respect to them.

*North America v. Nat'l Mediation Bd.*, 320 U.S. 297, 301 (1943). Indeed, the D.C. Circuit already has concluded that the FRA's enforcement scheme is exclusive. *See Armstrong I*, 924 F.2d at 294; *see also Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 149 (1980) ("Congress expressly recognized the need for devising adequate statutory safeguards against the unauthorized removal of agency records, and opted in favor of a system of administrative standards and enforcement."). Moreover, NARA—the agency charged with administering this provision—treats this enforcement mechanism as exclusive for both the PRA and the FRA. And, indeed, NARA previously has invoked this scheme to recover missing presidential materials. *See, e.g.*, *United States v. McElvenny*, No. 02-3027, 2003 WL 1741422 (S.D.N.Y. April 1, 2003) (Department of Justice lawsuit in the form of a civil replevin action, seeking recovery of a map of Cuba annotated by President Kennedy during the Cuban Missile Crisis).

Because the PRA relies upon this exclusive enforcement scheme—requesting the Attorney General to institute an action for the recovery of missing records—the PRA cannot also impose a duty on NARA to seize missing records.[2] Without an unequivocal duty for NARA to seize presidential records, this Court cannot order NARA to take such action. *See SUWA*, 542 U.S. at 63 ("[T]he only agency action that can be compelled under the APA is action legally *required*." (emphasis in original)). Plaintiff's

---

[2] Congress's administrative enforcement scheme, moreover, makes good sense. The permanent recovery of a presidential record could involve some sort of judicial proceeding, which would require the Attorney General's authorization. *See* 28 U.S.C. § 516 (stating that all litigation on behalf of the United States and its agencies "is reserved to officers of the Department of Justice, under the direction of the Attorney General").

requested relief is unavailable, and therefore Plaintiff has not alleged a redressable injury.

**B.    The Court Cannot Compel NARA to Seize the Audiotapes, Because Any Remedies Available Under the PRA Are Committed Solely to NARA's Discretion.**

Even assuming that the PRA places a duty on NARA to seize presidential records and that the audiotapes here are presidential records, this Court still cannot order such relief.  Plaintiff is essentially asking the Court to order NARA to "enforce" the PRA against an alleged violator.  Again, this request is rather remarkable.  For one thing, the alleged violator here is a former President of the United States.  When enacting the PRA, Congress was keenly aware of "the stark separation of powers questions implicated by legislation regulating the conduct of the President's daily operations."  *Armstrong I*, 924 F.2d at 292.  It is untenable to think that Congress, mindful of such considerations, would nevertheless authorize a private litigant to compel the seizure and examination of a former President's personal records.  Such relief would, as Congress was well aware, raise serious separation of powers and privacy concerns.

But Plaintiff's requested relief suffers from a more straightforward defect as well.  Under traditional administrative-law principles, this Court cannot review NARA's decision not to enforce the PRA by seeking recovery of specific materials.  Under the APA, courts cannot review "agency action [that] is committed to agency discretion by law[.]"  5 U.S.C. § 701(a)(2).  The Supreme Court interpreted this language in *Heckler v. Chaney*, 470 U.S. 821 (1985), and concluded that "an agency's

-15-

decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Id.* at 831. To overcome that presumption of non-reviewability, a plaintiff must show that "the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 833.

Here, Plaintiff cannot point to any guidelines in the PRA instructing NARA when to seize missing records. As the D.C. Circuit has repeatedly held, this silence is conclusive. *See, e.g.*, *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 157-58 (D.C. Cir. 2006) (holding that judicial review is unavailable because "the statute is 'utterly silent on the manner in which the [agency] is to proceed against a particular transgressor'" (quoting *Baltimore Gas & Elec. Co. v. FERC*, 252 F.3d 456, 461 (D.C. Cir. 2001))); *Swift v. United States*, 318 F.3d 250, 253 (D.C. Cir. 2003) (stating that judicial review is unavailable because the statute "neither sets substantive priorities nor circumscribes the government's power to discriminate among issues or cases it will pursue").

Nor can Plaintiff look outside the PRA for such criteria. The statutory provision authorizing NARA to utilize the FRA enforcement mechanism vests the Archivist with complete discretion for determining when to utilize that mechanism. *See* 44 U.S.C. § 2112(c) ("When the Archivist considers it to be in the public interest, he may . . . ."); *see also Claybrook v. Slater*, 111 F.3d 904, 908 (D.C. Cir. 1997) (holding that nearly identical language—"whenever [the agency representative] determines it to be in the public interest"—precludes review because that determination is "committed to agency

-16-

discretion"). Thus, the text of the statute makes clear that the Archivist's decision whether to initiate enforcement proceedings is unreviewable.

Moreover, the rationale underlying *Chaney* supports application of its presumption here. In *Chaney*, the Court noted that "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise." 470 U.S. at 831. An agency, for example, "must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, . . . whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." *Id.*

Here, NARA is a relatively small agency with limited resources. And yet NARA is tasked with an extremely difficult mission: For every federal agency, NARA must "ensur[e] adequate and proper documentation of the policies and transactions of the Federal Government and ensur[e] proper records disposition." 44 U.S.C. § 2904(a). Needless to say, then, NARA must carefully marshal its resources and prioritize its efforts; private direction of its enforcement activity would create significant disruption.[3] As the Court concluded in *Chaney*, private litigants should not be able to control an agency's budget or its agenda. *See Chaney*, 470 U.S. at 831-32; *see also*

---

[3] Not every presidential record is necessarily worth pursuing through an enforcement proceeding. Although many presidential records are extremely historically significant, some are rather mundane, such as White House parking records maintained by the Office of Administration. *See generally CREW v. Office of Admin.*, 559 F. Supp. 2d 9 (D.D.C. 2008) (concluding that the Office of Administration, which is part of the Executive Office of the President, is not an "agency" subject to FOIA and the Federal Records Act, but is instead subject to the Presidential Records Act), *aff'd*, 566 F.3d 219 (D.C. Cir. 2009).

*Massachusetts v. EPA*, 549 U.S. 497, 527 (2007) ("As we have repeated time and again, an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities. That discretion is at its height when the agency decides not to bring an enforcement action." (internal citations omitted)).

At bottom, the PRA wisely sets no limits on NARA's enforcement discretion. Thus, NARA's view that the requested audio diary is a personal record and its decision not to seek possession of it through an enforcement action is not reviewable. Again, because the Court cannot order NARA to pursue such an action, Plaintiff's only alleged injury—a lack of access to President Clinton's audiotapes—cannot be redressed by this Court. Plaintiff has failed to carry its burden to show that it has standing, and therefore the complaint should be dismissed for lack of subject-matter jurisdiction. *See Newdow*, 603 F.3d at 1013 (denying standing because "[t]he only apparent avenue of redress for plaintiffs' claimed injuries . . . is unavailable").

## II. THE PRA PRECLUDES JUDICIAL REVIEW OF PLAINTIFF'S CLAIM UNDER THE APA.

Even apart from Plaintiff's lack of standing, this lawsuit must be dismissed because the PRA precludes judicial review of Plaintiff's APA claim. *See* 5 U.S.C. § 701(a)(1) (stating that the APA applies "except to the extent that . . . statutes preclude judicial review"). Two independent reasons compel this conclusion.

First, the D.C. Circuit's *Armstrong* decisions have already held that Plaintiff's APA claim is precluded. *See Armstrong I*, 924 F.2d at 291 ("We therefore hold that the

-18-

PRA precludes judicial review of the President's recordkeeping practices and decisions."). Second, the PRA's text, history, structure, and purpose all confirm that private litigants are precluded from challenging the President's classification of a record as personal under the PRA.

### A. The D.C. Circuit's *Armstrong* Decisions Have Already Determined That Plaintiff's APA Claim is Precluded by the PRA.

Binding precedent has already determined that "the PRA is one of the rare statutes that does impliedly preclude judicial review." *Armstrong I*, 924 F.2d at 290. Indeed, the type of review that the D.C. Circuit rejected in that case—"judicial review of the President's general compliance with the PRA at the behest of private litigants"—is precisely the review that Plaintiff requests here. *Id.* at 291; *see* Compl. at ¶16 (alleging that "President Clinton unlawfully retained the requested audio-tapes"). Because such review is precluded, Plaintiff's complaint must be dismissed.

#### 1. The *Armstrong* Decisions.

The D.C. Circuit's *Armstrong* decisions all involve a lawsuit alleging that then Presidents Ronald Reagan and George H.W. Bush, among other defendants, "intend[ed] to delete material from the White House computer systems in violation of the FRA and PRA." *Armstrong I*, 924 F.2d at 286. Specifically, the *Armstrong* plaintiffs sought access to emails that were stored on the National Security Council's (NSC's) computers during the Reagan administration. The defendants moved for summary judgment in the district court, which the court denied after concluding that

"judicial review of the President's compliance with the PRA is permissible under the APA[.]" *Armstrong v. Bush*, 721 F. Supp. 343, 353 (D.D.C. 1989).

On appeal, however, the D.C. Circuit reversed the district court's conclusion. After reviewing the PRA's structure and history, the Court stated: "[I]t is difficult to conclude that Congress intended to allow courts, at the behest of private citizens, to rule on the adequacy of the President's records management practices or overrule his records creation, management, and disposal decisions." *Armstrong I*, 924 F.2d at 290. The Court acknowledged that its decision left open the possibility that the PRA would not be fully enforced, but concluded that was Congress's conscious decision:

> In declining to give outsiders the right to interfere with White House recordkeeping practices, Congress presumably relied on the fact that subsequent Presidents would honor their statutory obligations to keep a complete record of their administrations. We will not second-guess that decision or upset the political compromises it entailed. Allowing judicial review of the President's general compliance with the PRA at the behest of private litigants would substantially upset Congress' carefully crafted balance of presidential control of records creation, management, and disposal during the President's term of office and public ownership and access to the records after the expiration of the President's term. We therefore hold that the PRA precludes judicial review of the President's recordkeeping practices and decisions.

*Id.* at 290-91. The *Armstrong I* Court did, however, permit plaintiffs to pursue their FRA-based claim that NSC's record-keeping guidelines inadequately defined what materials constituted federal records. *See id.* at 291.

On remand, the *Armstrong* plaintiffs amended their complaint to omit all claims based on the PRA. *See Armstrong v. Bush*, 139 F.R.D. 547, 550 (D.D.C. 1991); *see also* Ex. 5, *Armstrong v. Bush*, Civ. No. 89-0142, Mot. for Leave to File Am. Compl. & 2d

-20-

Am. Compl. at 1 ("[P]laintiffs' Second Amended Complaint, in response to the court of appeals' conclusion that judicial review of compliance with the Presidential Records Act is not available, omits plaintiffs' claims for relief under that Act."). Instead, plaintiffs pursued only their FRA- and FOIA-based claims—namely, their claim that NSC's guidelines defining "federal records" were inadequate. *See id.* at ¶20 ("NSC [has] issued guidelines . . . on records identification, management, and disposal. These guidelines . . . fail to provide adequate procedures or guidance to preserve agency records[.]"). During discovery, when plaintiffs sought access to NSC guidelines defining what constituted a "presidential record"—which was necessary to determine how NSC was defining a "federal record"—the district court, relying on *Armstrong I*, rejected plaintiffs' request:

> The Court of Appeals held that the PRA precludes judicial review of the President's recordkeeping practices and decisions. . . . While the plaintiffs' argument has some appeal—that is, a logical way to determine what the agency defines as a record under the FRA is to see what materials are excluded from that definition—it violates the clear mandate from the Court of Appeals. The plaintiffs must focus on the defendants' guidelines relating to "federal records" rather than conducting discovery on the instructions relating to "Presidential records".

*Armstrong v. Bush*, 139 F.R.D. at 551.

Plaintiffs appealed, and again the D.C. Circuit reversed. The Court re-affirmed its opinion in *Armstrong I*, but carved out a "narrow, clearly defined limitation" on the scope of the PRA's preclusion of judicial review. *Armstrong v. Exec. Office of the President*, 1 F.3d 1274, 1292 (D.C. Cir. 1993) [hereinafter *Armstrong II*]. Specifically, the Court held that courts could review "guidelines defining presidential records *under*

-21-

the rubric of substantive FOIA law." *Id.* at 1292 (emphasis added). Congress, when passing the PRA, specifically excluded records subject to FOIA from the definition of "presidential records." *See* 44 U.S.C. § 2201(2)(B)(i). Thus, judicial review under the rubric of substantive FOIA law was necessary to "avert[] a clash in the role of judicial review under the two statutory schemes" of FOIA and the PRA. *Armstrong II*, 1 F.3d at 1292; *see also id.* at 1294 ("Congress expressly intended when it passed the PRA to preserve unchanged the coherent body of law that had been developed under the FOIA, and *it is that body of law* that provides the basis for our limited review of the definition of presidential records provided in the guidelines." (emphasis added)).

The holding of *Armstrong II*, therefore, is that a court, when considering FRA- or FOIA-based claims, may engage in "limited review" of "guidelines defining presidential records" to assure that those guidelines "do not improperly sweep in nonpresidential records" that would otherwise be subject to the FRA or FOIA. *Id.* at 1278. The *Armstrong II* decision did not, however, modify *Armstrong I*'s conclusion that courts cannot directly review a President's compliance with the PRA. *See Armstrong v. Exec. Office of the President*, 90 F.3d 553, 556 (D.C. Cir. 1996) [hereinafter *Armstrong III*] ("[R]ecordkeeping requirements of the FRA are subject to judicial review and enforcement; those of the PRA are not."). The *Armstrong II* panel said nothing about judicial review of stand-alone PRA claims, because that issue was not before the Court—the *Armstrong* plaintiffs, as noted above, had omitted all of their claims based on the PRA.

### 2. Plaintiff's Lawsuit Here is Precluded By the *Armstrong* Decisions.

As the D.C. Circuit made clear throughout the *Armstrong* litigation, the PRA precludes "judicial review of the President's general compliance with the PRA at the behest of private litigants[.]" *Armstrong I*, 924 F.2d at 291. And yet that is precisely the kind of review that Plaintiff seeks here. This Court, in evaluating whether to grant Plaintiff relief, would necessarily have to decide whether "President Clinton *unlawfully* retained the requested audiotapes," as Plaintiff alleges. *See* Compl. at ¶16 (emphasis added). Moreover, the exact same relief that Plaintiff seeks here was already rejected by the D.C. Circuit in *Armstrong I*. *Compare* Compl. at 5 (requesting the court to "declare the requested records to be presidential records"), *with Armstrong I*, 924 F.2d at 286-87 (describing plaintiffs' lawsuit as seeking, in part, a "declaration that many of the documents stored in the PROFS system . . . are presidential records"). Thus, Plaintiff's lawsuit falls within the heart of *Armstrong I*'s preclusion of judicial review.

Nothing, moreover, in *Armstrong II* allows for review of Plaintiff's lawsuit. Specifically, there are two key differences between Plaintiff's lawsuit here and the review allowed by *Armstrong II*.

First, and most fundamentally, *Armstrong II* allows for review of *guidelines* that define what constitutes a presidential record. Here, Plaintiff does not challenge any guideline or general definition of "presidential records." Instead, Plaintiff challenges the *application* of that term to these particular audiotapes. Such lawsuits are clearly outside *Armstrong II*'s provision for limited review of "guidelines defining presidential

records." 1 F.3d at 1292.[4]  Whatever *Armstrong II* might otherwise stand for, it certainly does not open up review for Plaintiff's lawsuit here.

The second reason why *Armstrong II* does not provide for review of Plaintiff's lawsuit is because Plaintiff's suit does not include any FRA- or FOIA-based claims.  As discussed above, *Armstrong II* enables judicial review of guidelines defining presidential records, but only when the plaintiff is proceeding under FRA- or FOIA-based claims.  When a lawsuit contains only PRA claims, as does Plaintiff's suit here, *Armstrong II* precludes review.[5]

---

[4] Even under the FRA, plaintiffs are precluded from challenging how particular documents are classified. *See Armstrong I*, 924 F.2d at 294 (holding that the FRA "preclud[es] private litigants from suing directly to enjoin agency actions in contravention of agency guidelines"); *CREW v. DHS*, 527 F. Supp. 2d at 111-12 ("The FRA . . . precludes a private action, like this one, that seeks to require agency staff to comply with the agency's record-keeping guidelines or the FRA[.]"); *Pub. Citizen v. Carlin*, 2 F. Supp. 2d 1, 9 (D.D.C. 1997) (Friedman, J.) ("While judicial review is precluded to the extent that allegations are made that agency officials are not acting in compliance with their duties under recordkeeping guidelines, the Court has a role to play in reviewing the guidelines themselves under the APA."), *overruled on other grounds by Pub. Citizen v. Carlin*, 184 F.3d 900 (D.C. Cir. 1999).  If a particular record has been mis-classified, the only recourse is the administrative enforcement mechanism provided for by Congress.

[5] To be sure, not every court has agreed with this interpretation of *Armstrong II*. *See, e.g.*, *CREW v. Cheney*, 593 F. Supp. 2d 194 (D.D.C. 2009) (Kollar-Kotelly, J.).  But with all due respect to the Court, *Cheney* has three significant flaws.  First, *Cheney* reads *Armstrong II* as broadly permitting review of PRA claims.  But the *Armstrong II* Court could not have made a broad pronouncement about what type of review is available under the PRA, because that Court did not have any PRA claims before it.

Second, *Cheney* fails to acknowledge that *Armstrong II* permitted judicial review related to the PRA only "to avert[] a clash" with FOIA.  Contrary to the *Cheney* court's holding, then, it *does* matter which statute a plaintiff is proceeding under.  *See Cheney*, 593 F. Supp. 2d at 215.  And third, by narrowly construing *Armstrong I* to preclude review only of "the President's 'creation, management, and disposal decisions,'" 593 F. Supp. 2d at 214-15, the *Cheney* Court ignores the other types of decisions that the *Armstrong I* Court held were not subject to review.  *See Armstrong I*, 924 F.2d at 286-87 (plaintiffs sought "a declaration that many of the documents . . . are presidential records," and an injunction "directing the President and NSC to classify and preserve the documents as required by the FRA and PRA").

-24-

In sum, the D.C. Circuit's *Armstrong* decisions confirm that the PRA precludes judicial review of Plaintiff's lawsuit. A necessary element of Plaintiff's suit here is reviewing whether President Clinton violated the PRA. *Armstrong I* precludes such review, however, and nothing in *Armstrong II* alters that conclusion. Plaintiff's lawsuit should therefore be dismissed.

### B. The PRA Precludes a Private Litigant From Challenging the President's Classification of a Particular Record as Personal.

Even apart from the *Armstrong* decisions, the PRA also evinces a clear intent to preclude private litigants from challenging the President's classification of a particular record as personal. "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). Here, the PRA's text, history, structure, and purpose all confirm that private litigants are unable to challenge the President's designation of a record as personal.

First, the PRA's text supports the view that private litigants may not challenge the designation of a record as personal. When drafting the PRA, Congress clearly knew how to provide for judicial review when it wanted to. It did so expressly with respect to the administrative enforcement mechanism, 44 U.S.C. § 2112(c), and with respect to former Presidents' ability to assert privilege claims. *See* 44 U.S.C. § 2204(e) ("The United States District Court for the District of Columbia shall have jurisdiction over

any action initiated by the former President asserting that a determination made by the Archivist violates the former President's rights or privileges.").[6]  The absence of such express language in other sections of the statute, therefore, implies that Congress intended *not* to allow judicial review of those actions.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotations and alteration omitted)).  The text of the PRA, then, counsels against allowing a private litigant to challenge the President's designation of a particular record as personal.

Second, the PRA's history confirms that Congress intended to minimize intrusions on the President's personal privacy.  As alluded to earlier, the PRA was passed in the wake of the PRMPA and the litigation surrounding that statute.  One of President Nixon's key arguments in challenging the PRMPA was that it unlawfully intruded on his personal privacy because it seized his personal papers and subjected them to review.  Although the Supreme Court upheld the facial validity of the PRMPA, the Justices were highly sensitive to President Nixon's argument.  *See Nixon v. Adm'r*, 433 U.S. at 459 n.22 ("[T]he Government should now promptly disclaim any interest in materials conceded to be appellant's purely private communications and deliver them to him.").  One of the Justices in the majority even wrote separately to stress that

---

[6] Congress also expressly provided for judicial review in the PRMPA. *See* note following 44 U.S.C. § 2111 at § 105.

"return of these [personal] materials should proceed without delay." *Id.* at 484 (White, J., concurring in part and concurring in the judgment). And although the Supreme Court upheld the facial validity of the PRMPA, at the time of the PRA's passage President Nixon was still litigating the validity of the regulations promulgated to implement the PRMPA. Thus, the precise scope of a President's privacy right—specifically his right not to have his personal papers reviewed by others—was still undefined.

Congress was well aware of this uncertainty, and sought to ensure that the PRA would not intrude on future Presidents' privacy rights. *See, e.g.*, H.R. REP. NO. 95-1487, pt. 1, at 5-7 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5732, 5737-38 [hereinafter HOUSE REPORT] (discussing the history of the Nixon materials and the Supreme Court's decision); *id.* at 11 (noting the need "to properly protect a President's privacy interests and his first amendment associational rights"). In light of this history, Congress would not have authorized private litigants to obtain judicial review of a President's determination that certain records are personal. Congress instead left decisions about whether to recover materials in the possession of a former President (or any other individual) in the hands of the Archivist and the Attorney General.

Third, the PRA's overall structure also supports preclusion of judicial review. Yet another way the PRA protects the President's privacy is by allowing the President to restrict access to certain categories of presidential records for up to twelve years. *See* 44 U.S.C. § 2204(a). During that restricted period, a person denied access to a record has no right to judicial review of that denial. *Id.* § 2204(b)(3). The President's

-27-

personal papers, by contrast, are not subject to any restricted period, because those papers are not government records and are excluded from the public disclosure requirements of the PRA. Were this Court to permit judicial review, however, it would lead to the anomalous consequence that the President's *most* sensitive papers would be *immediately* subject to judicial review. At 12:01p.m. on January 20th, as soon as the President has left office, a plaintiff would be able to file a lawsuit seeking access to the former President's diary, which may include reflections from mere moments ago. It is highly improbable that Congress, obviously concerned about the President's personal privacy, intended such a system.

That conclusion is re-enforced by the fourth relevant consideration—the purpose of the provision excluding a President's personal papers from government control. By giving each President complete control over his personal papers, Congress hoped that it would encourage Presidents to create and preserve such papers, and that Presidents would later voluntarily donate those papers to the National Archives. As Representative Brademas, one of the PRA's co-sponsors, explained: "We also hope that, in protecting materials such as purely personal diaries from mandatory disclosure, we will encourage their creation in the first instance and keep alive the possibility of a voluntary gift of these materials." *To Amend the Freedom of Information Act to Insure Public Access to the Official Papers of the President, and for Other Purposes: Hearings Before the Subcomm. on Gov't Information and Individual Rights of the H. Comm. on Gov't Operations*, 95th Cong. 72 (1978) [hereinafter *House Hearings*].

Senator Nelson, one of the Act's co-sponsors in the Senate, shared this view: "It is hoped that allowing former Presidents considerable leeway in the definition of 'personal records' will encourage those Presidents to make available those records after a reasonable length of time." *To Amend Title 44 to Insure the Preservation and Public Access to the Official Records of the President, and for Other Purposes: Hearing on S. 3494 Before the S. Comm. on Gov't Affairs*, 95th Cong. 2 (1978) [hereinafter *Senate Hearings*]. Moreover, this philosophy was espoused by many prominent witnesses during the hearings on the PRA.[7] And indeed this approach has been vindicated, as shown by the donation of President Reagan's personal diary to NARA's Reagan Library.

In light of this philosophy, it is implausible to think that Congress would have permitted judicial review over a President's personal papers. Knowing that private litigants could challenge the designation of personal records would almost certainly deter a President from creating those records in the first place. And understandably so—most people, let alone public figures, would balk at the prospect of having to defend their diary in court. Judicial review, therefore, is inconsistent with the purpose underlying the PRA's personal papers provision.

---

[7] *See, e.g.*, *House Hearings* at 389-90 (statement of Daniel J. Boorstin, Librarian of Congress); *id.* at 210-11 (statement of Arthur Schlesinger, Jr., Professor of Humanities, City University of New York). This view was also embraced by the influential report written by the National Study Commission on Records and Documents of Federal Officials, produced in the wake of the dispute over the Nixon materials. *See House Hearings* at 445-46 ("Because of their great historical value, every encouragement should be offered to the President to preserve [personal] materials, and to make them publicly available.").

At bottom, the Congress of 1978 did not intend for private litigants to be able to pursue judicial review over a President's decision that certain records are personal. The PRA's text implicitly precludes judicial review, and the history preceding the PRA shows that Congress was extremely concerned about future Presidents' privacy rights. Moreover, judicial review would be extremely intrusive, particularly because it could occur immediately after a President's term ended. Such review would undoubtedly discourage Presidents from creating or preserving personal records in the first place, which is the very opposite of Congress's desired goal. For all of these reasons, this Court should dismiss Plaintiff's lawsuit, because the PRA precludes private litigants from challenging a President's classification of certain records as personal.[8]

## III.   PLAINTIFF'S LAWSUIT IS PREMATURE BECAUSE NARA HAS NOT UNDERTAKEN A FINAL AGENCY ACTION.

Even assuming that some measure of judicial review were available under the PRA, the particular facts of this case make review inappropriate. Specifically, NARA has not yet undertaken a final agency action. The letters that form the basis of this suit were responses to Plaintiff's FOIA request, and do not represent a final agency

---

[8] To be clear, the above preclusion arguments would not affect a court's ability to decide a lawsuit instituted by the Attorney General for the recovery of a presidential record. That lawsuit, as discussed above, is expressly provided for in the PRA. *See* 44 U.S.C. § 2112(c); *see also supra* Part I.A. Obviously, Congress cannot impliedly preclude something that it provided for expressly. Moreover, it is not uncommon for Congress to preclude some people from bringing an action, but not others. *See, e.g.*, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984) ("[W]e must examine this statutory scheme to determine whether Congress precluded all judicial review, and, if not, whether Congress nevertheless foreclosed review to the class to which the respondents belong." (internal alterations and quotations omitted)).

determination regarding the PRA claim at issue here. Judicial review, therefore, would be premature.

Under the APA, a plaintiff may obtain judicial review only of "final agency action[.]" 5 U.S.C. § 704. To constitute "final agency action," an agency's action must have two characteristics: the action "must mark the consummation of the agency's decisionmaking process;" and the action "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1996) (internal quotation marks omitted). Agency action "is not final if it is only the ruling of a subordinate official, or tentative." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).

Here, Plaintiff alleges that "Defendant's March 16, 2010 determination was a final agency action for which there is no other adequate remedy in a court of law." Compl. at ¶19. The March 16th determination was the letter that NARA sent to Plaintiff, stating that NARA was denying Plaintiff's FOIA appeal. *See* Ex. 4 (Letter from Deputy Archivist Adrienne C. Thomas to Michael Bekesha).

To be sure, that letter constituted final agency action with respect to Plaintiff's FOIA request. But Plaintiff is obviously not pursuing a FOIA claim here.[9] Plaintiff is instead pursuing this APA claim, which requires Plaintiff to characterize the letter

---

[9] In Plaintiff's prayer for relief, Plaintiff does ask for an order requiring NARA "to process the records pursuant to FOIA," and for "attorney's fees and other litigation costs pursuant to" the FOIA statute. Compl. at 5. Such relief is unavailable in this lawsuit, however, because those forms of relief are available under FOIA itself. Thus, they cannot be pursued under the APA. *See Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988); *Kenney v. Dep't of Justice*, 603 F. Supp. 2d 184, 190 (D.D.C. 2009) (Friedman, J.).

-31-

as a different type of final agency action—a final determination regarding the PRA issues raised in this lawsuit.

A close reading of the letter, however, reveals that it does not meet either test for finality. As an initial matter, the letter did not alter any rights or obligations or create any legal consequences—at least not with respect to the PRA claim. The letter was sent as a response to a FOIA appeal, and as soon as NARA stated that it did not possess the records, that was sufficient to end the FOIA matter. *See Kissinger*, 445 U.S. at 152 (holding that "possession or control [of records] is a prerequisite to FOIA disclosure duties"). Whatever language came afterwards could not, by definition, affect any legal rights or consequences, because the only legal question presented by the letters had already been resolved. Thus, NARA's opining about the status of the audiotapes did not have any legal consequences, which means it was not final agency action. *See Am. Fed'n of Gov't Employees, AFL-CIO v. O'Connor*, 747 F.2d 748, 753 (D.C. Cir. 1984) (Ginsburg, R.B., J.) ("No precedent known to us sanctions court review of such nonbinding advisory expositions.").

Moreover, NARA's letter does not represent the consummation of its decision-making process with respect to Plaintiff's PRA claim here. Plaintiff's letters to NARA were written solely within the context of a FOIA claim, and that is what NARA responded to. Plaintiff did not argue, nor did NARA consider, the precise PRA claim presented here—namely, that the PRA requires NARA to assume custody and examine President Clinton's audiotapes, because those tapes are potential presidential records. Plaintiff is still free to raise that argument to NARA, and thus judicial review at this

stage would be premature.  *See Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732-33 (D.C. Cir. 2003) ("So long as [Plaintiff] retains the opportunity to convince the agency that [the agency should take a certain action], it makes no sense for a court to intervene.").

NARA's letter from March 16, 2010 represents a final agency action for only one type of claim—a FOIA claim.  NARA's additional comments about the status of the audiotapes did not directly affect any legal obligations, and did not represent the consummation of NARA's decisionmaking process.  Thus, Plaintiff's lawsuit is premature because there is no final agency action for this Court to review.

## IV. PLAINTIFF HAS FAILED TO STATE A CLAIM BECAUSE EVEN TAKING ALL ALLEGED FACTS AS TRUE, NARA DID NOT ACT ARBITRARILY OR CAPRICIOUSLY IN UPHOLDING PRESIDENT CLINTON'S CLASSIFICATION OF THE AUDIOTAPES AS PERSONAL RECORDS.

Even if the Court decides that Plaintiff has overcome all of the threshold barriers to review, Plaintiff's complaint should still be dismissed on the merits for failure to state a claim.  Nothing in the complaint takes Plaintiff's right to relief beyond the "speculative level." *Twombly*, 550 U.S. at 555.  Even assuming that all of Plaintiff's factual allegations are true, NARA correctly upheld President Clinton's classification of the audiotapes as personal records.  Thus, NARA could not have acted arbitrarily or capriciously.

Under the APA, the "arbitrary and capricious" standard of review is a narrow one.  A court may not "substitute its judgment for that of the agency," and ultimately may reverse only if the agency has committed "a clear error of judgment." *Citizens to*

*Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). As long as the agency "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action," the agency has not acted arbitrarily or capriciously. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

As Plaintiff's complaint states, the definition of "presidential records" includes "documentary materials created by the President 'in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." Compl. at ¶5 (quoting 44 U.S.C. § 2201(2)). Specifically exempted from that definition, however, are a President's personal records. *See* 44 U.S.C. § 2201(2)(B) ("Such term [presidential records] does not include . . . personal records[.]"). Thus, even if the contents of a personal record relate to the President's official duties, that record remains a personal one. As relevant here, the PRA defines "personal records" to expressly include "diaries, journals, or other personal notes serving as the functional equivalent of a diary or journal which are not prepared or utilized for, or circulated or communicated in the course of, transacting Government business[.]" *Id.* § 2201(3)(A).

The relevant question here, therefore, is not whether the requested audiotapes relate to President Clinton's official duties as President. That inquiry is irrelevant if the audiotapes are validly classified as personal records. Instead, the relevant questions are whether the audiotapes are "the functional equivalent of a diary" and whether the tapes were "prepared or utilized for, or circulated or communicated in the course of, transacting Government business."

-34-

As for the first question, NARA properly concluded that the audiotapes are the functional equivalent of a diary. As Plaintiff's own complaint alleges, President Clinton's goal was to "creat[e] an oral history of his eight years in office." Compl. at ¶8. Accordingly, President Clinton recorded his "thoughts and commentary on contemporaneous events and issues he was facing as president[.]" *Id.* at ¶9. The audiotapes, according to Plaintiff, include things like "President Clinton contemplating potential changes to his cabinet" and "President Clinton's thoughts and reasoning behind foreign-policy decisions[.]" *Id.* at ¶¶11(a), 11(b).

A person's thoughts, commentary, contemplations, and reasoning are precisely the kinds of things that one would expect to find in a diary. And indeed that is what NARA's letter concluded:

> It seems self-evident that the President was interested in compiling information for use, at his discretion, in personal endeavors following his presidency. Indeed, you assert, by citing to Mr. Branch's book, that the audio tapes were a way for President Clinton to explain, during his "post-presidency," his reasoning behind much of his policy-making and decision making. This seems to suggest that President Clinton's intent was to use the audio tapes as memory joggers about major initiatives and historical events that occurred while he was in office, akin to "diaries, journals or other personal notes."

Ex. 4 at 2 (Letter from Deputy Archivist Adrienne C. Thomas to Michael Bekesha). This passage satisfactorily explains NARA's reasoning for why the tapes are the functional equivalent of a diary.

The fact that the audiotapes may occasionally include President Clinton's side of telephone conversations does not change this conclusion. NARA acknowledged that issue, too, and likewise addressed it directly: "[W]hile the audio tapes sometimes

record President Clinton's statements and actions in response to telephone calls with local and national leaders, there is no evidence to suggest that the tapes were circulated to anyone or relied on for policy determinations of the Clinton administration." Ex. 4 at 2. Because the tapes themselves were never used as part of President Clinton's official duties, NARA properly concluded that the tapes retained their personal character. A contrary interpretation—that any diary recording official events suddenly becomes a presidential record—would transform a sanctuary that Congress carefully constructed into an empty sieve. NARA's conclusion makes good sense, and cannot be described as a clear error in judgment.

As for the second question—whether the tapes were "prepared or utilized for, or circulated or communicated in the course of, transacting Government business," 44 U.S.C. § 2201(3)(A)—nowhere does Plaintiff allege that the tapes were, in fact, prepared for transacting government business, utilized for conducting government business, circulated in the course of transacting government business, or communicated in the course of transacting government business. Plaintiffs do allege that the tapes contain content relating to government business—but that is not enough to take them outside of the carefully crafted exception for diaries. NARA addressed this issue and explained the basis for its decision. *See* Ex. 4 at 2 (considering whether the audiotapes "were created with the intent of their use as government materials, and whether or not they were circulated within the Administration or relied on as policy documents," and concluding that "there is no suggestion that [the tapes] were circulated or relied on for final decisions, or ever intended to be maintained by the

-36-

White House Office of Records Management"). Again, this explanation goes far beyond satisfactory, and is hardly a clear error in judgment.

Finally, any doubt on these questions must be resolved in NARA's favor based on the deference owed to NARA—the agency charged with administering the PRA. Indeed, NARA has significant institutional expertise with respect to presidential records and personal records of Presidents; NARA and its predecessor agencies have been operating presidential libraries since the 1940s. Thus, NARA's interpretation of the term "diaries, journals, or other personal notes serving as the functional equivalent of a diary or journal," 44 U.S.C. § 2201(3)(A), is entitled to significant deference. *See generally United States v. Mead Corp.*, 533 U.S. 218 (2001). Plaintiff's allegations cannot overcome the deferential review that this Court must give to NARA's conclusion about the status of the audiotapes.

Even assuming that all of the facts in Plaintiff's complaint are true, and that NARA's letter constituted a final agency decision, Plaintiff's right to relief does not rise above the "speculative level[.]" *Twombly*, 550 U.S. at 555. In upholding President Clinton's classification of the tapes as personal records, NARA properly considered all of the relevant factors, adequately explained its decision, and did not commit a clear error in judgment. NARA did not, therefore, act arbitrarily or capriciously, and Plaintiff's complaint should be dismissed for failure to state a claim.

# CONCLUSION

For all the foregoing reasons, Plaintiff's complaint should be dismissed for lack of subject-matter jurisdiction, or, in the alternative, for failure to state a claim upon which relief can be granted.

Dated: January 3, 2011

Respectfully submitted,

TONY WEST
Assistant Attorney General

RONALD C. MACHEN JR.
United States Attorney

*/s/ Elizabeth J. Shapiro*
ELIZABETH J. SHAPIRO
D.C. Bar Number 418925
Deputy Branch Director
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
Tel.    (202) 514-5302
Fax    (202) 616-8470
Elizabeth.Shapiro@usdoj.gov

*Attorneys for Defendant*

# EXHIBIT 3

—1—

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | Civil Action No. |
| Plaintiff. | ) | 10-cv-1834 |
| v. | ) | |
| NATIONAL ARCHIVES AND | ) | October 14, 2011 |
| RECORDS ADMINISTRATION, | ) | 10:03 a.m. |
| | ) | |
| Defendant. | ) | Washington, D.C. |

------------------------

TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE

COURT REPORTER:    PATRICIA A. KANESHIRO-MILLER, RMR
                   Certified Realtime Reporter
                   Official Court Reporter
                   Room 4704B, U.S. Courthouse
                   Washington, D.C. 20001
                   202-354-3243

```
1                              APPEARANCES

2       FOR THE PLAINTIFF:
        MICHAEL BEKESHA, ESQ.
3       Judicial Watch
        425 Third Street, S.W.
4       Suite 800
        Washington, D.C. 20024
5
        FOR THE DEFENDANT:
6       DANIEL SCHWEI, ESQ.
        ELIZABETH SHAPIRO, ESQ.
7       U.S. Department of Justice
        Civil Division
8       20 Massachusetts Avenue, N.W.
        Washington, D.C. 20001
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

———3———

1              PROCEEDINGS

2         THE CLERK:  Your Honor, calling Civil Action 10-1834,

3    Judicial Watch, Incorporated v. National Archives and Records

4    Administration.

5         Will all counsel please approach the podium and

6    identify yourselves for the record and the parties you

7    represent.

8         MR. BEKESHA:  Good morning, Your Honor.  Michael

9    Bekesha on behalf of the plaintiff, Judicial Watch.

10        THE COURT:  Good morning.

11        MR. SCHWEI:  Good morning, Your Honor.  Daniel Schwei

12   on behalf of the defendant, the National Archives and Records

13   Administration.

14        THE COURT:  Good morning.

15        MS. SHAPIRO:  Good morning, Your Honor.  Elizabeth

16   Shapiro on behalf of the Archives.

17        THE COURT:  Good morning.

18        This is the defendant's motion, so I think we ought to

19   start with the defendant.

20        MR. SCHWEI:  Good morning, Your Honor, and may it

21   please the Court, plaintiff's requested relief is both

22   extraordinary and unprecedented.  Plaintiff is attempting to

23   compel the National Archives to physically seize and then

24   publicly scrutinize the personal audio diary of a former

25   president of the United States.  This Court lacks the

1    authority to provide such relief.  Neither the Presidential

2    Records Act nor the Administrative Procedure Act authorizes

3    such an order.  Under those statutes, a private litigant

4    cannot compel the seizure and scrutiny of a potential

5    presidential record.  This fundamental defect underlies each

6    of the threshold reasons why plaintiff's complaint must be

7    dismissed.

8          First, plaintiff's alleged injury is not redressable.

9    Plaintiff's only alleged injury here is a lack of access to

10   the audiotapes, but the Court cannot require NARA to go seize

11   those audiotapes, and NARA does not currently possess the

12   audiotapes; therefore, the injury cannot be redressed under

13   the PRA.  Moreover, NARA's decision about how to enforce the

14   PRA cannot be overruled by this Court.

15         THE COURT:  Can I determine from the face of the

16   pleadings from the point where we are at the moment that you

17   don't actually have them?

18         MR. SCHWEI:  According to the allegations in

19   plaintiff's complaint, NARA does not currently possess the

20   tapes.

21         THE COURT:  I think he says, upon information and

22   belief, the president took them with him.  And I think it's in

23   one of your -- the second letter, the appeal letter,

24   Exhibit 4, that the archivist says, we don't have them.  You

25   would have thought that would have been the response to the

— 5 —

1       first -- in the first letter, but at that point they say, we

2       don't have them.  Is that a given for purposes of this

3       hearing?  I'm going to ask the plaintiff the same thing.  Does

4       everybody agree that they're not there?

5               MR. SCHWEI:  Yes, Your Honor --

6               THE COURT:  All right.

7               MR. SCHWEI:  -- I think everybody does agree that

8       they're not there.  That's based both on the complaint and the

9       letter that you referenced --

10              THE COURT:  Okay.

11              MR. SCHWEI:  -- which is incorporated into the

12      complaint.

13              THE COURT:  Okay.

14              MR. SCHWEI:  With those allegations, because NARA does

15      not possess the tapes and because the Court can't order NARA

16      to go out and seize the tapes, there is simply no way to

17      redress the only injury alleged in plaintiff's complaint,

18      which is a lack of access to the audiotapes.

19              The second threshold reason which is tied to that same

20      fundamental defect is that the PRA is the statute that

21      precludes judicial review under the PRA.  That's true both

22      because of the D.C. Circuit's *Armstrong* line of decisions and

23      because the particular action here, namely the classification

24      of particular records as personal, is precluded by the PRA.

25              The third threshold reason is the lack of final agency

1     action.  The letters that Your Honor referenced earlier were a

2     response to a FOIA appeal, not to anything related to the PRA.

3          And the final reason, which is not a threshold reason

4     why this Court must dismiss the complaint, is that it fails to

5     state a claim upon which relief can be granted.  Even assuming

6     all of the factual allegations, the particular records here

7     were not -- NARA's action in responding to those letters was

8     not an arbitrary and capricious action.

9          THE COURT:  Let me start with kind of the fundamentals

10    here.  Basically, you are beyond the redressability issue,

11    which goes to the scope of the archivist's authority.  I guess

12    your third position is that -- the second issue that you

13    raised is that the classification decision is not reviewable

14    by the Court.

15         Who made the classification decision here?

16         MR. SCHWEI:  I think there are two classification

17    decisions, only one of which the plaintiff is challenging.

18    President Clinton initially classified the audiotapes as --

19    presumably classified the tapes as personal records by not

20    transferring them to the archives at the conclusion of his

21    administration.

22         There's then the second classification determination,

23    setting aside the final agency action problem, of course, but

24    assuming that there is a final determination on that issue,

25    NARA then would be presented with the issue:  Do we agree with

1    the president's classification?  If NARA does not agree, then

2    they can invoke their enforcement mechanism, which we discuss;

3    or if they do agree, then they are not required to do anything

4    further.  And so there's really -- there are two

5    classification decisions, but the issue in front of this Court

6    is did NARA act arbitrarily or capriciously in making their

7    own decision or responding to the plaintiff's own letter.

8           THE COURT:  Well, I don't understand -- the judicial

9    review issue seems to be based on the president's

10   classification decision.  Once archives takes it upon itself

11   to make its own classification decision, why isn't that

12   reviewable?  What was it even doing at that point?

13          MR. SCHWEI:  Because the issues are exactly the same,

14   are these presidential records or are these personal records,

15   and so for this Court to review the archivist decision, it

16   would necessarily have to decide did the president correctly

17   classify these materials.  And plaintiff's own complaint bears

18   that out when they allege that President Clinton unlawfully

19   retained these materials.  So the rationale for why judicial

20   review is precluded, namely a sensitivity for the president's

21   personal papers, applies both to the president's own

22   classification decision as well as the archivist decision

23   because that issue, the examination of are these presidential

24   or personal, that is the rationale for precluding judicial

25   review, and the Court would have to answer that question

1    regardless of whether it is the archivist or the president.

2            THE COURT:  Well, all the arguments for why I can't

3    review a decision of the president don't apply to the

4    archivist, so my first question:  What was -- under what

5    authority was the archivist even purporting to reclassify or

6    to classify at all the tapes?  I mean the -- the letter says I

7    have to consider the nature of the audiotapes, the purpose for

8    which they were created, how they were utilized.  Based on the

9    record before me, I am of the opinion that the tapes are

10   personal.

11           Now, under the statute, differentiation between

12   presidential records and personal records is made by the

13   president.  At the close of the presidency, the presidential

14   records become -- fall within the custody of the archivist.

15   What was the archivist doing when it purported to make a

16   classification decision?  What portion of the statute even

17   permitted that exercise to go on?

18           MR. SCHWEI:  Right, I think the statute would be

19   Section 2112(c), which is the enforcement mechanism, which

20   allows the archivist to go after records that it believes are

21   improperly classified or that are outside of its control and

22   that it believes should be within its custody and control, and

23   so that is exactly what happened in the *McIlveney* decision,

24   the *United States v. McIlveney* lawsuit in which the archivist

25   and the Department of Justice jointly brought a lawsuit to

— 9 —

1    recover a map of Cuba that was annotated by President Kennedy

2    because they believed it belonged in the Kennedy Presidential

3    Library.

4         THE COURT:  So the decision before this Court to

5    review, in your view, is the archivist's refusal to invoke the

6    enforcement mechanism under 2112?  Is that even alleged in the

7    complaint?

8         MR. SCHWEI:  No, the action as alleged in the

9    complaint is an arbitrary and capricious challenge to the

10   merits decision, are these presidential or personal; but

11   there's a separate question of redressability.  And a

12   necessary action to redress plaintiff's injury would be to

13   order the archivist to initiate this enforcement action.  So

14   even before we deal with the complaint, the actual claim in

15   the complaint, the Court needs to examine the threshold

16   inquiry of redressability.  Under that inquiry, the relevant

17   decision is did the archivist fail to invoke the enforcement

18   mechanism or is that something the Court can review.  And the

19   answer is no.  And so it's not necessarily what is alleged in

20   the complaint, but it is a separate inquiry under the

21   redressability.  And so because this Court cannot review the

22   archivist's failure to enforce the discretionary -- or the

23   failure to bring the discretionary enforcement action, that's

24   why redressability fails here.

25         THE COURT:  What's your basis -- I understand the

─10─

1   basis for saying I can't review what the president did.  What

2   is your basis for your claim that I can't review the

3   archivist's decision of whether or not to invoke the

4   enforcement mechanism?

5          MR. SCHWEI:  I think it starts with heck *Heckler v.*

6   *Chaney*, the Supreme Court's decision stating that

7   presumptively, a failure to bring an enforcement action is not

8   reviewable by this Court.  And then the second thing is when

9   one looks at the actual statutory text of the enforcement

10  mechanism, it says that when the archivist considers it to be

11  in the public interest, he may initiate an enforcement action.

12  And that type of language, when an agency, individual, or

13  representative considers it to be in the public interest, has

14  already been construed by the D.C. Circuit to constitute

15  unreviewable discretion by the agencies because there is no

16  law to apply for this Court in determining whether the agency

17  had properly determined whether something is or is not in the

18  public interest.

19         THE COURT:  Can I review it under the APA as arbitrary

20  and capricious exercise of the discretion?  The discretion is

21  so unfettered that I can't even review it under that standard?

22         MR. SCHWEI:  Correct, Your Honor, which is what both

23  *Heckler v. Chaney* and the line of D.C. Circuit decisions hold,

24  which is that APA review has a carve-out stating that this

25  statute of the APA does not apply to agency action committed

—11—

1      to agency discretion by law, and that is exactly what the

2      Supreme Court held in *Heckler v. Chaney*; that an agency's

3      failure to initiate an enforcement action is unreviewable

4      because that decision is committed to agency discretion by

5      law.  And the particular statutory text we have here, the D.C.

6      Circuit already construed nearly identical statutory text and

7      also agreed that that language constitutes unreviewable

8      discretion, so no APA review is available.

9           THE COURT:  What you're saying makes it -- when you

10     read the letter, it doesn't give you any indication that what

11     the archivist is talking about is whether or not it's going to

12     invoke the enforcement mechanism.  It sounds like the

13     archivist is making a classification decision, which is not

14     committed to the archivist in the first place.

15          MR. SCHWEI:  According to the D.C. Circuit's case

16     laws, I think it is, and the reason why is because part of the

17     decision whether to enforce is the antecedent judgment whether

18     a violation has even occurred, and those are the cases that we

19     cite in our reply brief, such as *Block v. SEC*, that even if

20     the Court -- even if the agency declines not to enforce on the

21     basis of there being no violation, that antecedent

22     determination whether there is or is not a violation is part

23     of the decision to enforce and thus cannot be reviewed.  And

24     that's true both under the D.C. Circuit's law and it was the

25     case in *Heckler v. Chaney*.

—12—

1          THE COURT:  Well, doesn't *Armstrong II* specifically

2    contemplate that the one thing that is reviewable is the

3    classification decision of what's presidential and what's not.

4          MR. SCHWEI:  Only in very narrow circumstances, which

5    are not present here.  The *Armstrong II* decision creates -- it

6    allows for review of guidelines defining what constitutes a

7    presidential record but only if there is a Federal Records Act

8    or a Freedom of Information Act claim at issue.  And here

9    plaintiff, in their brief, concedes both of those points.

10   Number one, plaintiff concedes that it is not challenging any

11   guidelines; and number two, plaintiff concedes that it is not

12   bringing an FAR or a FOIA-based claim.  And so for those

13   reasons, it fails under both preconditions for an *Armstrong II*

14   type of claim.  The *Armstrong II* type of claim would allow

15   someone under the APA to argue that bringing an FAR claim

16   only, not a PRA claim, which is the only statute at issue

17   here, it would allow someone bringing an FAR claim to argue

18   that the guidelines defining what is a federal record are at

19   issue, and in order to determine whether those guidelines are

20   accurate, the Court would also be able to determine whether

21   guidelines defining presidential record are accurate and

22   conform to the statute.

23          THE COURT:  Right.  I mean, *Armstrong II*, the holding

24   is much narrower than some of the language in it.

25   *Armstrong II* was dealing with a situation where presidential

— 13 —

1    agencies were trying to sweep what are agency records

2    otherwise covered by FOIA and the FAR into the Presidential

3    Records Act and, therefore, narrow access to them; and

4    *Armstrong II* said, no, you can't do that.  But there are

5    snippets in there that this Court has read subsequently as

6    saying, well, the Court was concerned about over classifying

7    in general, and there's a concern that a president could

8    shield all sorts of things that should be open to the public

9    by simply designating them as private.

10          What is the -- what is to prevent a president from

11   frustrating the balance that the statute was trying to strike

12   between his privacy and public access and given the fact that

13   the Court recognizes that just about nothing that a president

14   does is private?  Let's say a president kind of maliciously

15   over classifies, what is the remedy?

16          MR. SCHWEI:  I think there are three answers to that,

17   Your Honor.  The first one and the primary remedy is that it

18   always lies with the archivist and the attorney general, who

19   have the authority if they believe that the president has

20   misclassified something that they can invoke the discretionary

21   enforcement mechanism and pursue recovery of those records.

22   So there's always the possibility for the archivist to act as

23   the check, and that's what Congress chose, and that's the

24   remedy that this Court is bound by.  The Congress did not

25   choose to allow private litigants to try to compel the

—14—

1    archivist to pursue those records.  Congress left the decision

2    in the archivist's and the attorney general's hands.

3         The second answer --

4         THE COURT:  Is that a remedy that the archivist even

5    has available once the president is no longer the president?

6    And what it says in the Presidential Records Act is you have

7    the remedies available to you under the records act.  So you

8    go to the records act, and it says you can ask the attorney

9    general to go after an agency.  But we're now talking about a

10   former president.  Can he go after a former president?

11        MR. SCHWEI:  Yes, and that would be a very serious

12   consideration for the archivist to make, but that is exactly

13   what Congress intended, is leaving it to the archivist and the

14   attorney general to decide when it is appropriate under

15   serious considerations in situations like that to seek

16   recovery of those records.  It is a very different situation

17   what plaintiff is attempting here, which is a private litigant

18   trying to compel the archivist to sue a former president, and

19   there are good reasons why Congress would leave the decision

20   to experts like the archivist and the attorney general.

21        And the second answer, I think, going back to Your

22   Honor's earlier question about the checks on the president, is

23   that *Armstrong I* already addressed this issue and said, quote,

24   "Congress presumably relied on the fact that subsequent

25   presidents would honor their statutory obligations to keep a

—15—

1    complete record of their administration."  And that's on page

2    20 of our initial brief, that the D.C. Circuit in *Armstrong* --

3         THE COURT:  Given some of the litigation that's

4    occurred subsequently, that may or may not have been a good

5    thing to do.

6         MR. SCHWEI:  Well, that was Congress's judgment, which

7    the D.C. Circuit upheld in *Armstrong I*.

8         And the third check on a president is always Congress,

9    because if Congress believes that a president is wildly

10   misclassifying information, it can pass a law to change the

11   statutory structure or to seize some of those records, which

12   it has done in the past.  That's exactly what happened with

13   President Nixon and the Presidential Recordings and Materials

14   Preservation Act, or the PRMPA, which was the predecessor to

15   the Presidential Records Act.  Congress felt that there was a

16   real danger of losing some of these documents, and so they

17   passed a new statute seizing those documents.

18        THE COURT:  Well, and the statute we're dealing with

19   came after that, so the whole point is to have to avoid that,

20   that's why we have this statute.

21        MR. SCHWEI:  Correct.  Hopefully, this statute will

22   avoid that through enforcement mechanisms like the archivist,

23   but in the event that it does not, then it is always up to

24   Congress.

25        And a second historical instance of Congress acting is

1     with records relating to President Kennedy's assassination,

2     which Congress passed a law in 1992 to preserve all of those

3     records and make them publicly available.

4          So even aside from the archivist's own enforcement

5     discretion and the presumed good faith of the president to

6     honor the PRA, there is always the possibility that Congress

7     could act to correct an instance where a president is not

8     following the PRA.

9          THE COURT:  Well, what's -- how do you distinguish the

10    American Historical Association case?

11         MR. SCHWEI:  Right.  That case was really about

12    whether after a president's term ends the president still

13    retains legal authority to make certain classification

14    decisions, and there the archivist had essentially delegated

15    the authority to the former president.  And so before the

16    Court in that case was the legality of that agreement.  So

17    it's not really a case like this one, where a private litigant

18    is trying to compel the archivist to seize and reclassify

19    certain records.  Peterson was simply a case about who the

20    relevant decision maker was, and that issue is not present

21    here because the archivist clearly is the relevant decision

22    maker here and plaintiff is not alleging otherwise.

23         THE COURT:  Well, but the Court said it had the

24    authority to look at what the archivist was doing, whether the

25    archivist was doing what it was doing because it was bound by

1    a contract with the former president or because it was just

2    simply acceding to the judgment of a former president.  The

3    Court determined after reading *Armstrong I* and *Armstrong II*

4    that there was a little window open for it to look at the

5    classification process and to review what the archivist was up

6    to.

7           MR. SCHWEI:  Right.

8           THE COURT:  So do you think that that part of the

9    decision was wrong?

10           MR. SCHWEI:  The part that read *Armstrong I and II* and

11    concluded that the Court could enforce a freestanding PRA

12    claim under the APA, yes, we believe that part of the decision

13    was wrong; but I will also note that the Peterson decision

14    involved guidelines.  And so still whatever *Armstrong I and II*

15    might mean or whatever other courts have construed them to

16    mean, it is always in the context of reviewing guidelines

17    defining presidential records, and here that is not what

18    plaintiff is attempting to do, as they concede in their brief.

19    They are attempting to reclassify particular records as

20    presidential records; and even under the Federal Records Act,

21    which by all accounts permits more judicial review, litigants

22    are precluded from challenging a particular classification

23    decision, and the reason why is because that is the

24    administrative enforcement mechanism that Congress chose.

25    They chose to give it to the archivist to choose whether to

1    reclassify or pursue the recovery of missing records.  They

2    did not want private litigants in control of that, which is

3    consistent with the rationale of *Heckler v. Chaney*, which is

4    that agencies are in the best position to determine how to

5    spend their resources and to chose how to enforce their

6    statutes.

7         THE COURT:  Well, if, in fact, the president was not

8    just chatting up Taylor Branch and musing about why he did

9    what he did but they literally kept the tapes running while he

10   went about conducting his business and he is talking on the

11   phone to foreign leaders and he's making appointments, doesn't

12   that sort of take it out of the realm of what you started

13   with, which is this is a personal audio diary?  Aren't we

14   really talking about records, or at least in part, that track

15   his official presidency?

16        MR. SCHWEI:  Right, so just to be clear, our position

17   is that Your Honor could only reach that issue if Your Honor

18   disagrees with all of our threshold arguments but --

19        THE COURT:  I understand that, but it's an interesting

20   issue.

21        MR. SCHWEI:  Right.  But here those tapes that

22   President Clinton allegedly recorded are the functional -- or

23   NARA rationally responded to the plaintiff and said those

24   tapes are the functional equivalent of a diary or other

25   personal notes because those tapes were not prepared for use

1    in official business, they were not communicated throughout

2    the government.  They were simply President Clinton's personal

3    record --

4         THE COURT:  How does the archivist know what they were

5    without asking President Clinton?

6         MR. SCHWEI:  Because based on the facts provided by

7    the plaintiff in the letter, and which are again alleged here

8    in the complaint, NARA responded rationally to the letter by

9    saying, based on the facts that you have provided in your

10   letter, those sound more like personal records rather than

11   presidential records.

12        THE COURT:  Even the ones where it is literally a tape

13   recording of him on the phone talking to someone else as

14   opposed to a recording of his expounding on his presidency to

15   a historian?

16        MR. SCHWEI:  But that would be no different than if

17   the president sat down and simply wrote in their diary, this

18   is what I said on a telephone conversation earlier --

19        THE COURT:  Well, no, one is filtered through

20   someone's memory and perception and the other is a raw tape.

21        MR. SCHWEI:  It would be the equivalent of either the

22   post hoc recollection or personal notes, which are also

23   included in the statute, which is the mere fact of

24   contemporaneousness would not take it outside the realm of

25   personal records because, again, the statute recognizes that

1    its diaries and papers and personal notes, or the functional

2    equivalent thereof, and so personal notes would likely be

3    created contemporaneously but --

4            THE COURT:  I'm not focusing on the timing; I'm

5    focusing on the exact duplication, the capturing of the

6    conduct of official business, it is different.  The transcript

7    that is being created at this moment is different than the

8    notes he is sitting there taking.

9            MR. SCHWEI:  Because the transcript is a public record

10    that will be communicated, you know -- it might be posted on

11    the docket and it is available to everyone, but here the

12    audiotapes were allegedly created solely by President Clinton

13    solely for his use after the presidency, solely to act as

14    memory joggers about what happened during his presidency.

15            THE COURT:  How can you say that?  How do you know it

16    was prepared solely to be a memory jogger?  Aren't you making

17    factual findings about what was in President Clinton's mind?

18            MR. SCHWEI:  No.  It's based on the facts provided by

19    the plaintiff in their letter.  NARA rationally concluded that

20    President Clinton created these solely as memory joggers for

21    his post-presidency.

22            THE COURT:  The definition of personal records

23    includes diaries, journals, or other personal notes serving as

24    the functional equivalent of a diary or a journal -- yes --

25    which are not prepared or utilized for transacting government

—21—

1    business -- correct -- but it also says not communicated in

2    the course of transacting government business.

3         Now, isn't pressing the "on" button on a tape recorder

4    while you pick up the phone and talk to a foreign leader

5    communicated in the course of transacting government business?

6         MR. SCHWEI:  That was not plaintiff's argument in

7    their letter, and NARA could rationally conclude that it was

8    not communicated in the course of transacting government

9    business, because the focus is not on the -- perhaps the audio

10   of President Clinton's voice, it would be on the records

11   themselves, so the records were not communicated in the course

12   of transacting government business.

13        THE COURT:  I think his letter clearly cites those

14   instances where Taylor Branch pointed out that the president

15   kept the tape running while he conducted business, and they

16   specifically asked the archivist to segregate those portions.

17   So I don't see how you can't say that's not in the letter.

18        MR. SCHWEI:  But there is no allegation in the letter

19   or the complaint that the records were communicated in the

20   course of transacting government business, because the

21   relevant record is the audiotapes, not the sound of President

22   Clinton's voice as he's speaking.

23        THE COURT:  Okay.  So the way you parse the statute is

24   he had to take the tape out of the tape recorder after Branch

25   made it and hand it to someone in the course of official

—22—

1    business to make it a presidential record.  The fact that it

2    captured the conduct of official business doesn't bring it

3    under the statute.

4         MR. SCHWEI:  Right, and there are a couple of further

5    points to add to that, which is that is certainly a reasonable

6    reading of the statute, and NARA would be entitled to

7    deference on that reading, which is something that the

8    plaintiff does not contest here.  And the second point is that

9    presidential diaries have historically, and almost certainly

10   will in the future, contain information relating to official

11   business.  The president is so busy that it's almost certain

12   that every presidential diary will contain information about

13   what the president did, and that's borne out by President

14   Reagan's diary, which is almost exclusively about official

15   business, and also by the Supreme Court's decision in the

16   Nixon case and in the D.C. Circuit's subsequent decision where

17   they say, simply because a record has official business or

18   historical interest does not take it outside the realm of a

19   personal record.

20        And Congress was very cautious in drafting this

21   protection for personal records.  I think that goes to one of

22   our other preclusion arguments about how Congress would not

23   have intended to allow a private litigant to challenge the

24   classification of a particular record as presidential or

25   personal, and one of the reasons why is the history of the

1    president -- that led up to the passage of the Presidential

2    Records Act.  At the time when Congress passed this act, the

3    scope of a president's personal privacy right was still

4    undefined and was still being litigated by President Nixon,

5    and so Congress, when drafting this statute, was very cautious

6    to avoid a potential challenge on personal privacy grounds,

7    which was one of the main arguments that President Nixon made

8    to the Supreme Court and then later to the D.C. Circuit.

9    That's borne out both by this expressed exemption for personal

10   records, as well as the legislative history which talks about

11   why it's important to avoid some of the challenges presented

12   by the Nixon litigation.

13           THE COURT:  Well, but all of that goes back to where

14   we started, which is Congress and the Courts recognizing a

15   strong presumption that it should -- it is committed to the

16   discretion of the president to say, this is mine and this is

17   public, and that's why I don't quite understand the way the

18   archivist went about answering the letter.  Instead of saying

19   the president designated these as personal, it said, I think

20   they're personal.  And once the archivist purports to be

21   acting, making this classification decision, then it seems to

22   be it's making a decision that might be a reviewable agency

23   action.

24           MR. SCHWEI:  But it is not reviewable because it is

25   inherently part of the enforcement decision, which is

-24-

1    delegated to the archivist's complete discretion.  And so

2    that's why the archivist responded making -- responding with

3    its own independent evaluation and characterization, because

4    the archivist could -- could, theoretically, go after records

5    that it believes are presidential records but not within its

6    custody and control.  And so there is a role for the archivist

7    in this statutory scheme, which is what Congress intended, but

8    there is not a role for the Court to evaluate the archivist's

9    decisions within that statutory scheme.

10        THE COURT:  It certainly didn't make it clear at any

11   point in its letter that that's what it was doing.  There

12   might have been a more helpful way to get this teed up the way

13   you now read it.

14        MR. SCHWEI:  But it is not the way I'm reading it, and

15   I think a lot of the confusion is because this entire case was

16   initially teed up as a FOIA case, which is that the letters

17   all were FOIA requests pursuant to the PRA, and so the genesis

18   of those letters led the archivist to respond in the way it

19   did, and then only when this complaint was filed does the

20   plaintiff add these additional dimensions of, oh, the

21   archivist is required to go seize these tapes and provide me

22   access to them.  And so the reason why the issues that we're

23   discussing now are perhaps not completely borne out in this

24   letter is because they were never raised in the appeal by

25   plaintiff and, therefore, the archivist had no occasion to

1    respond to them, and I think that goes to the core of our

2    final agency action argument, which is that the letter that

3    plaintiff is focusing on here was certainly a final agency

4    action with respect to the FOIA appeal but it did not present

5    the PRA type issues that we are now discussing and, therefore,

6    it did not create binding legal consequences under the PRA,

7    and it did not represent the consummation of the agency's

8    decision-making process under the PRA.

9         THE COURT:  Well, it certainly seems final when you

10    look at it.  The archivist says, I'm done, go to District

11    Court now.  And since now you've just explained that the whole

12    point of making the classification decision in the letter was

13    as a predicate to whether it was going to invoke the

14    enforcement mechanism or not, why isn't the letter a final

15    decision that is not going to invoke the enforcement

16    mechanism?  I understand you're saying that even if it is that

17    is not a reviewable decision --

18         MR. SCHWEI:  Right.

19         THE COURT:  -- but why doesn't the letter clearly say,

20    we're done with this from the archive's perspective?

21         MR. SCHWEI:  Because it only says we are done with

22    this with respect to the FOIA claim that was actually

23    presented in the letter.  It says, first and most

24    fundamentally, we don't have these audiotapes, so your FOIA

25    claim is over; but oh by the way, here's an additional

1    explanation about why we do not think -- or we do not think

2    that these -- we probably view these records as personal

3    records rather than presidential.

4         THE COURT:  Well, "probably" is a little softer than

5    what they said.  It said, "I decide."

6         MR. SCHWEI:  They say, based on the facts made

7    available to me, I believe that these are personal records,

8    which is -- which has nothing to do with the actual FOIA claim

9    that was presented.

10        THE COURT:  So to tee up the claim that you would

11   ultimately be standing here and telling me is unreviewable,

12   they would have had to write a letter to the archivist and

13   say, please exercise your authority under 2112 to ask the

14   attorney general to go after the records, and the archivist

15   write back and say no, and then they were supposed to sue

16   under the APA and say that was arbitrary and capricious so

17   that you could come back and say it's within its unfettered

18   discretion so you have to dismiss this.

19        MR. SCHWEI:  Which is the point of requirements like

20   final agency action, to give the agency the opportunity to

21   actually consider the issues that are going to then be

22   litigated.  So it makes sense to give the agency the first

23   opportunity to consider those issues and resolve them before a

24   lawsuit is filed against that agency.

25        THE COURT:  So you're telling him that if he thinks he

1    can make a better case than he's made already for the fact

2    that these might be presidential records and not personal

3    records, he can write another letter asking the archivist to

4    consider invoking the enforcement mechanism and the archivist

5    hasn't already decided whether it would or it wouldn't?

6         MR. SCHWEI:  I think that lawsuit would present all of

7    the same --

8         THE COURT:  I'm not talking about the lawsuit.  Is

9    that letter dead on arrival, or is that a letter he could

10   write?

11        MR. SCHWEI:  I can't speak to whether that would be

12   dead on arrival.  It's the agency's decision.

13        THE COURT:  But your position on final agency action

14   is that that decision has not yet been made?

15        MR. SCHWEI:  That the letter at issue here does not

16   represent a final agency action with respect to that decision.

17        THE COURT:  Okay.  All right.  Well, that's

18   interesting.

19        MR. SCHWEI:  But that lawsuit, the eventual lawsuit

20   would present all of the same other threshold --

21        THE COURT:  That would be dead on arrival, in your

22   view?

23        MR. SCHWEI:  Yes, Your Honor.

24        THE COURT:  All right.  I think you've covered all of

25   your points, but if I interrupted you too early and there is

—28—

1       something else you want to cover, you can do so.

2              MR. SCHWEI:  No, Your Honor, I think we've covered all

3       of the issues.

4              THE COURT:  Okay.  Thank you very much.

5              MR. BEKESHA:  Good morning, Your Honor.

6              Since you guys just -- since you just concluded with

7       talking about the agency action, the first letter in response

8       to our FOIA request did not say anything about we don't have

9       the records.  It just said these are not presidential records.

10      So we wrote another letter, and in response we received the

11      same response.  So we believe it is a final agency action

12      because you had a first letter.  We asked for -- you know, we

13      provided more evidence, more guidance on why we believed the

14      tapes were presidential records, and archives came back and

15      still said, once again, in a final agency action, these are

16      not presidential records.

17            THE COURT:  But your suit is certainly premised on the

18      assumption that they do not have them; is that correct?

19            MR. BEKESHA:  We don't know whether or not they have

20      them.  We assume that they don't have them on information and

21      belief because archives has told us they don't have them.

22            THE COURT:  And if I'm assuming the complaint to be

23      true for purposes --

24            MR. BEKESHA:  Then --

25            THE COURT:  -- it's not your allegation that they do

1    have them and they're hiding them from you --

2         MR. BEKESHA:  Correct.

3         THE COURT:  -- because you've asked me to order them

4    to go get them?

5         MR. BEKESHA:  We've asked you to determine that the

6    records are presidential records; and once --

7         THE COURT:  Well, you've asked me to order them to go

8    get them.

9         MR. BEKESHA:  To an extent.  We asked the Court to

10   require them to assume custody and control of them.  We're not

11   asking for seizure.  I mean it sounds awful that they think

12   we're asking for this Court to bang down President Clinton's

13   door and seize these audiotapes.  I mean archives could make a

14   phone call, they could write a letter.  There is nothing in

15   the record stating that President Clinton wouldn't just give

16   them the records.  So we're asking that they assume custody

17   and control of them.  We're not specifically saying they have

18   to go seize.

19        THE COURT:  They can call and ask, but ultimately

20   you're asking them to assume control to get something they

21   don't have.

22        MR. BEKESHA:  That's correct, Your Honor.

23        THE COURT:  All right.  What authority under the

24   statute do they have to do that?

25        MR. BEKESHA:  Under the Presidential Records Act, they

1  are required to assume custody and control of the records and

2  then make them immediately available.

3      THE COURT:  They're required to assume custody and

4  control of the presidential records after the president

5  designates which are which?

6      MR. BEKESHA:  Possibly.

7      THE COURT:  Where do they have the authority to go

8  behind that and demand something else?

9      MR. BAKESHA:  Well, first, it is not in the record and

10  no one knows how President Clinton classified these records,

11  nor is that an issue here today.  But the second --

12      THE COURT:  Why not?

13      MR. BEKESHA:  Why isn't it an issue?

14      THE COURT:  Right.  Aren't we missing an indispensable

15  party here?

16      MR. BEKESHA:  We're not because the definition of

17  presidential records doesn't talk about how the president

18  classifies the records; it talks about the substance of the

19  records.  So regardless of how the president classifies the

20  records, if it is a presidential record based on substance,

21  they're still presidential records.

22      THE COURT:  No, the president is given the specific

23  authority to categorize the records as presidential or

24  personal, and the ones that are personal are filed separately.

25  Then when the presidency ends under the statute, the

—31—

1     presidential records go within the custody and the control of

2     the archivist.  So where under that statutory scheme does the

3     archivist have any control over something that has already

4     been separated as personal?

5          MR. BEKESHA:  Well, the plaintiff -- we would argue

6     that there is that classification that goes on initially, but

7     that's not -- that's just to help the White House and the

8     president sort out which records is going to be turned over to

9     archives.  It's not the final decision.  It's not absolute.

10    The definition of a presidential record doesn't include a

11    presidential record is what the president says it is.  A

12    presidential record --

13         THE COURT:  Well, actually, I think that's exactly

14    what the statute says.  Where does the statute give the

15    archivist the authority to decide what a presidential record

16    is?

17         MR. BEKESHA:  The archivist -- all the statute says is

18    that the archivist of the United States shall assume

19    responsibility for the custody, control, and preservation of

20    and access to presidential records of that president.

21         Our argument is that these records, as we've alleged,

22    are presidential records and, therefore, archives is to assume

23    custody and control of the records --

24         THE COURT:  That's upon conclusion of the president's

25    term of office.

—32—

1          MR. BEKESHA:  Correct, and he has been out of office.

2          THE COURT:  Right.  And that's Section (f).

3          MR. BEKESHA:  Correct.

4          THE COURT:  But if you go up to Section (b),

5     documentary materials produced or received by the president

6     and his staff or units or individuals in the executive office

7     of the president shall -- shall -- to the extent possible, be

8     categorized as presidential records or personal records upon

9     their creation or receipt and be filed separately.  That's

10    (b).  That's during the presidency.  It's only after the

11    presidency is over and there is a category -- you know, let's

12    say he had two boxes, he's leaving the White House; personal,

13    presidential, personal, presidential.  They get this box, they

14    don't get the other box.  This is what they assume custody and

15    control over.  So where do they get to classify anything?

16         MR. BEKESHA:  Your Honor, if you go to section or

17    subsection (b), it says, shall to the extent practical be

18    categorized.  It does not say that if it is not categorized by

19    the president as a presidential record that it is not a

20    presidential record.

21         For example, if you go to the archive's website about

22    the Clinton Library --

23         THE COURT:  It says it shall be classified as

24    presidential or personal and filed separately.

25         MR. BEKESHA:  Correct.  The president is supposed to

—33—

1    categorize his records but that doesn't make it a presidential

2    record; that is just how the president categorizes the record.

3             THE COURT:  Well, who exercises the authority to

4    classify?

5             MR. BEKESHA:  Archives, in response to two of our

6    letters, states that it has the authority to make that

7    determination.

8             THE COURT:  Well, and I'm not sure that it does, and

9    I'm asking you where is that authority found in the statute.

10   There is no reference to presidential versus personal anywhere

11   in the statute except in subsection (b).

12            MR. BEKESHA:  No, Your Honor, but the other parts of

13   the statute talk about presidential records --

14            THE COURT:  Right.

15            MR. BEKESHA:  -- and once -- a presidential record is

16   not because somebody classified it as so but because it fits

17   the criteria.  We have alleged that these records are

18   presidential records based on the information and belief

19   listing, as you were speaking about before, you know,

20   conversations with foreign dignitaries, conversations with

21   congressmen, and the recording kept going.

22            So our position is these records are clearly

23   presidential records and they should be made available to the

24   public as quickly as possible.

25            THE COURT:  Well, let's say you're right.  What

—34—

1    authority do I have to tell the archivist to do anything about

2    it?  And what authority do you have to sue, to ask them to do

3    anything about it?

4         MR. BEKESHA:  Well, first off, if you look at the

5    enforcement mechanisms that the archives keeps talking about,

6    section 2112(c), as well as the separate provision about the

7    attorney general.

8         THE COURT:  Right.  And 2112(c) states the archivist

9    may.

10         MR. BEKESHA:  Correct, but it also talks about records

11    being deposited with them.  It doesn't talk about necessarily

12    enforcement actions to go get records they don't have.  I

13    think what 2112(c) talks about is, once archives is provided

14    with personal records, other records, they may treat them as

15    though they were received as presidential records, which is

16    important when they're prior presidents, not as much the case

17    anymore, but I mean prior to the Presidential Records Act, if

18    they received these materials from a former president, what do

19    they do with them.  And all 2112(c) talks about is, once they

20    receive them, they can treat them as presidential records.

21         And then with regard to the attorney general

22    provision, that only applies to the Federal Records Act.  I

23    mean there is no statutory authority or any case authority

24    talking about --

25         THE COURT:  Well, the Presidential Records Act says,

1    if they think it is in the public interest, they can invoke

2    the remedies available in the Federal Records Act, and then

3    you have to go and read the Federal Records Act to see what

4    they're talking about.  But if you're saying neither one of

5    those applies here, where is the statutory authority -- let's

6    put aside the question of whether I can even order them to do

7    it -- where is the statutory authority that they get to call

8    up -- we're not going to go knock on the door now -- and say,

9    President Clinton you've got something that you shouldn't

10   have?

11        MR. BEKESHA:  The authority would be under the

12   Presidential Records Act and the idea that the records -- that

13   archives is required to assume custody and control of the

14   records and make them available.  If they don't have the

15   records, they cannot make them available to the public under

16   FOIA or under any other provision or in any other way.  So the

17   authority rests with what the statute says; that they are

18   required to assume custody and control and then required to

19   make those available to the public.

20        In this instance, if they don't have the records, they

21   will then have an obligation to try to obtain and try to get

22   the records, and that's what we're asking.  We're asking for a

23   determination that the records are presidential records and

24   that archives assumes custody and control of the records.

25        THE COURT:  But you can only read that section the way

1    you're reading that section if you read that section without

2    reading the rest of the statute, that something happens before

3    the end of the presidency, and what happens before the end of

4    the presidency is the president classifies his records.

5          MR. BEKESHA:  Well, we don't know -- that's the other

6    problem.  We don't know what the president did.  We do not

7    know if President Clinton classified these records as personal

8    records or as presidential records.  Archives doesn't know.

9    Archives, in the letter, assumed that these records were

10   classified one way, but they don't know.  I mean there's --

11         THE COURT:  So why aren't -- are we missing a party

12   here?  American Historical Association sued George Bush.

13         MR. BEKESHA:  We're challenging -- we don't think

14   President Clinton is a necessary party because we're

15   challenging the determination by archives; and archives, at

16   that time, didn't reference President Clinton.  They said, as

17   this Court has already stated, they said based on information,

18   I determine.

19         Now, there may be information that President Clinton

20   has that he may be able to provide to the Court to clarify how

21   he classified the records, what happened to the records, maybe

22   even where the records are; but in the motion to dismiss, that

23   is not an issue.  Maybe we need to take the next step and

24   see -- have very limited discovery on that issue if the idea

25   of the classification is important, let the case go forward at

—37—

1      this point, and then figure out what the next step is.

2      Limited discovery of some sort may resolve those issues.

3              THE COURT:  Well, what do you do with the holding in

4      *CREW vs. Chaney* that there is no cause of action against the

5      archivist under this statute?

6              MR. BEKESHA:  We would turn the Court's attention to

7      the *Judicial Watch v. Commerce Department* case about -- which

8      was FACA, so slightly different -- but how -- you know, the

9      prevention of making this determination prevents any possible

10     remedy, any action.  I mean this relies solely on the

11     determination that these were not presidential records.

12     Because they're not presidential records, archives argues, you

13     know, it's outside the scope of FOIA.  There would be

14     no -- because it is outside the scope of FOIA, we couldn't

15     bring a FOIA lawsuit against the Court -- I'm sorry -- against

16     archives.  So we're stuck.  We have no way to challenge their

17     determination.  And so we believe in this instance, which is

18     different circumstances, that APA allows, and this Court has

19     authority, to make a determination under the APA about the

20     decision that archives made in this instance.

21             THE COURT:  What is the decision that you're asking me

22     to review?  The failure to invoke the enforcement mechanisms

23     or the classification?

24             MR. BEKESHA:  Well, the determination that these

25     records are not presidential records.

—38—

1      THE COURT:  And again, why -- why is there a cause of

2  action against them?  How do you distinguish *CREW v. Chaney*?

3  What the Court found in that situation is she could mandamus

4  the vice president, but there wasn't really anything she could

5  do about the archivist.  Why isn't that the answer here?

6      MR. BEKESHA:  If I recall correctly, *CREW* was -- *CREW*,

7  very similar to *Armstrong*, was during the presidency.

8      THE COURT:  Right.

9      MR. BEKESHA:  President Clinton is no longer in

10  office.  These are different circumstances.  There is -- a lot

11  of those issues talk about separation of powers and courts and

12  even Congress interfering with the president's day-to-day

13  activities while the president or vice president is in office.

14  We don't have that issue here.

15      THE COURT:  Right.  What she said in *CREW* is, at this

16  point before the presidency is over, they don't have any

17  authority.  They don't get to classify, the vice president is

18  doing all the classifying.  So there is nothing in the

19  statute, there is no statutory hook for me to hold them

20  responsible.  So she lets them out of the lawsuit.

21      Here you're saying the presidency is over, but I see

22  even less of a statutory hook at this point because they get

23  what's given to them at the end of the presidency.  They don't

24  get anything else under the statute, and you're saying there's

25  something they didn't get that was misclassified and I want

1    it.

2            MR. BEKESHA:  Well, we don't know if they're

3    misclassified.  All we know is that archives does not have

4    these audiotapes at this moment.  And based on their letters,

5    they made a determination that they don't have the audiotapes

6    because they're not presidential records.  That's all that's

7    before the Court right now.  You know, we don't know if they

8    may have received the audiotapes at one point.  We don't know

9    that.  They haven't alleged that they never received them;

10   just that they don't have them right now.  They may have been

11   reviewed by archives.  We don't know.  We've alleged that

12   these are presidential records, that they have a requirement

13   to assume custody and control of these records, that they have

14   a responsibility and obligation to make these records

15   available to the public.  Their response, archives' response

16   was they're not presidential records, you don't get them, and

17   that's what we're stuck with, that's what we're faced with.

18           THE COURT:  Well, the Presidential Records Act,

19   according to *Armstrong I*, accords the president virtually

20   complete control over his records during the term of his

21   office.  And the archivist and Congress can't even veto him if

22   he actually starts disposing of records, much less saying, you

23   know, this is private.

24           How do you square that language with your claim that

25   the decision to classify these records is subject to judicial

1    review?

2          MR. BEKESHA:  Well, both the *Armstrong* cases were

3    extremely focused and they were during the presidency and now

4    we're after the presidency; but how we view *Armstrong* was the

5    creation, the management, and disposal decisions; and we're

6    not addressing any of the creation, management, or disposal

7    decisions made by President Clinton.

8          THE COURT:  But the only classification --

9          MR. BEKESHA:  He created --

10         THE COURT:  -- decision in *Armstrong II* said the Court

11   had to be able to review was the decision essentially to bring

12   things under the Presidential Records Act that don't belong

13   there as opposed to excluding something from the Presidential

14   Records Act that you think belongs there.  What right do you

15   have as a private party to say, I am not particularly happy

16   with the balance that has been struck under the Presidential

17   Records Act here?

18         MR. BEKESHA:  Well, the *Armstrong* cases were during

19   the presidency; and although I won't concede that point, I

20   would say that under *Armstrong*, if President Clinton was still

21   in office and making these audiotapes, at this point, under

22   *Armstrong*, we may not be able to go in and ask the Court to

23   deal with the creation, the management, and the disposal of

24   the records.  But these are different times.  We know these

25   records exist.  We know they've been created.  We don't know

1    how they were necessarily managed during the presidency.  We

2    don't know what happened to them when President Clinton's term

3    ended.  All we know is that archives does not have the records

4    and they don't believe they are presidential records, and

5    we're trying to figure that out.  We're asking the Court to

6    make a determination based on the evidence provided that these

7    records are presidential records, and once they're

8    presidential records, other obligations take effect.

9         THE COURT:  How can I make that decision without the

10   information that would really only be in the president's head,

11   what they were created and utilized for?

12        MR. BEKESHA:  Well, that's the problem.  Archives

13   thinks they can still make that determination.  They, in fact,

14   make that determination, so we're challenging their

15   determination.  We're challenging that their decision was

16   arbitrary and capricious because they never reviewed the

17   records, they never asked President Clinton about the records.

18   They looked at our letter and said, no, we don't think these

19   are presidential records, they're not subject to FOIA, so

20   we're challenging that decision.

21        THE COURT:  Well, if a Court could review the decision

22   of presidential versus personal, how would it go about doing

23   that?  What is the standard of review?

24        MR. BEKESHA:  Well, first, the standard of

25   review -- the Court would be reviewing the determination.  It

—42—

1    wouldn't -- and once you get to that point --

2            THE COURT:  Right.  But am I supposed to defer?  Do I

3    get to do it de novo?  It depends on what it was prepared or

4    utilized for.  How would I make that determination without

5    input from the president?  And doesn't the lack of any mention

6    of any of this in the statute sort of point to the notion that

7    once it's done, it's done?

8            MR. BEKESHA:  I don't think so.  If once it's done,

9    it's done, the president could classify or not classify, do

10   nothing, and then take all his papers and records with him on

11   the last day.  And archives would say, oh, well, we can't do

12   anything about that.  We don't believe that was the intent

13   that Congress had in mind.

14           THE COURT:  All right.  Well, let's say President

15   Clinton took everything with him, and not just these tapes --

16           MR. BEKESHA:  Uh-huh.

17           THE COURT:  -- and there was essentially an abuse of

18   the Presidential Records Act, and it was a matter of history,

19   he held a press conference and he said, I am taking every

20   single piece of paper in the White House with me, so there,

21   and he leaves.  What can the archivist do under the statute?

22           MR. BEKESHA:  Under the statute, the archives is

23   required to assume custody and control.  Exactly how the

24   archives goes about doing that is part of the discretion that

25   archives has.  But we're not challenging the enforcement

—43—

1    mechanism of how they get somewhere.  If they're trying to get

2    C -- if we're at point A and they're trying to get to point D

3    and B and C is in the middle, we're not challenging whether

4    they choose point B or whether they choose point C, whether or

5    not they file a court action, have the attorney general file a

6    court action, whether they try to physically seize the

7    records, make a phone call.  All we're saying is they have a

8    requirement to do so.  How they go about doing it is for the

9    archives to choose, but they're required to do so.

10             THE COURT:  And you get all of that out of the

11   sentence in Section (f)?

12             I mean doesn't the fact that the Presidential Records

13   Act itself specifies the administrative enforcement remedy

14   available under the Federal Records Act indicate that that is

15   the enforcement mechanism and the only enforcement mechanism?

16             MR. BEKESHA:  We don't believe so, Your Honor.  I mean

17   also --

18             THE COURT:  What does "assume custody and control"

19   mean in your view?  What do you want them to do?

20             MR. BEKESHA:  Because they are also required to make

21   them available to the public, "assume custody and control"

22   would be to take control of the records or have somebody else

23   take control of the records, review the records, because if

24   there is personal information --

25             THE COURT:  How do they take control?  He's got them.

—44—

1    I have them.  He issues a press release, I've got them.  I'm

2    taking them to New York with Buddy.  Then what?  What are they

3    supposed to do?

4        MR. BEKESHA:  As I said, there are many options.

5    They --

6        THE COURT:  Tell me one.

7        MR. BEKESHA:  One option is they can call President

8    Clinton and ask.  There is nothing in the records --

9        THE COURT:  Okay.  He says no.  Now what?

10       MR. BEKESHA:  They write a nice letter.  They maybe

11   use one of these enforcement mechanisms.  Maybe they try

12   something else.  I mean the idea is, also, you know, Section

13   2202 says, the United States shall reserve and retain complete

14   ownership, possession, and control of presidential records.

15   Under the Presidential Record Act, these records are United

16   States property.  They are supposed to stay within the United

17   States government.  So if you take everything combined and you

18   take the Public Records Act and you look at all those sections

19   as a whole, archives is required to have custody and control

20   of presidential records because they're United States

21   government property and they're supposed to make them

22   available to the public, you know, 5 years, 10 years,

23   12 years, 20 years, if its designated as such, and they're

24   supposed to process them through FOIA, and if they process

25   them through FOIA, they can segregate.  We don't dispute that

45

1          some of these records could be more of an audio diary; but as

2          a whole, they're presidential records and archives is required

3          to process them as such.

4               THE COURT:  Well, what is your response to the Court's

5          holding in the CREW opinion that there is no private right of

6          action under the PRA?

7               MR. BEKESHA:  We have brought this claim under the

8          APA.

9               THE COURT:  Well, you've brought it under both.  Are

10         we only talking about APA?

11              MR. BEKESHA:  The decision whether or not these are

12         presidential records is our focus.

13              THE COURT:  Okay.

14              MR. BEKESHA:  So our focus is the APA and the

15         determination that archives made.  Where Presidential Records

16         Act and where FOIA comes into play is that the decision was

17         based on the Presidential Records Act; but the focus -- our

18         claim, our argument is solely on the APA, that it was -- that

19         the determination was arbitrary and capricious and that these

20         records are presidential records.

21              THE COURT:  Well, why is it arbitrary and capricious?

22         If you say the final agency action is the letter saying, in my

23         opinion, based on the record before me, these are private, and

24         you say that that is a final decision, and you say that that

25         is a reviewable decision, and that's a decision that the

1    archivist was entitled to make under the statute -- which I'm

2    not sure about, but let's assume you're right about all those

3    things and they made it, and I agree with you that it is

4    final -- what am I measuring it against to find it to be

5    arbitrary and capricious?  If I'm using the APA, doesn't that

6    mean that I have to give them deference?

7              MR. BEKESHA:  There is deference involved but -- and I

8    don't want to go ahead and read our five-page letter -- but if

9    the Court looks through the five-page letter that we wrote on

10   appeal --

11             THE COURT:  No, I read it.

12             MR. BEKESHA:  -- we pretty clearly establish that

13   these were presidential records.  We talk about all the

14   instances that these are presidential records, about

15   conversations President Clinton had with foreign dignitaries,

16   with congressmen, with senators, talking about policies,

17   trying to determine who is going to be his next secretary of

18   state, I believe.  These are all conversations about policy,

19   even in some instances where Taylor Branch went off to a

20   foreign country and came back and reported to the president

21   about what he saw there.  These are all discussions that

22   aren't like a diary.  A diary is something you usually write

23   at the end of the day, at the end of the week in your point of

24   view of what is -- of what occurred.  This is actually what

25   occurred as it was occurring.  It's no different than, you

1    know -- this is very similar -- counsel was talking about this

2    idea --

3           THE COURT:  Let's say you're right because I think

4    there is something to at least the portions of the tapes where

5    he's doing something else other than just chatting with Taylor

6    Branch.  Taylor Branch is watching him do his job.  It's a

7    record of his doing his job.  That still doesn't necessarily

8    fall within the definition because personal talks about what

9    you do with the record and whether you use the record in the

10   course of your government business.  And I don't believe there

11   is anything in your letter that suggests he used the

12   recordings for anything other than personal purposes.  But

13   let's say you are right and he -- after he got off the

14   phone -- took his tape with Taylor Branch and sent it to his

15   chief of staff and said, listen to this great conversation I

16   just had with the foreign leader, wasn't I brilliant, and do

17   you think I made the right decision or should I call them

18   back?  So let's say some portion of them fall within

19   presidential records.  Why is your injury redressable?  Why

20   doesn't that just sort of end the lawsuit?

21           MR. BEKESHA:  Well, under -- going back to the

22   *Judicial Watch vs. Commerce* case, the FACA case where it

23   talked about standing in the FACA context, in there -- I mean

24   I think we fall within there.  Because the records were

25   determined not to be presidential records, we fail

—48—

1    to -- archives doesn't have an obligation to process the

2    records; and because of that, we don't have access to the

3    records.  I think -- if the system worked and you went through

4    the checklist, once they're determined presidential records,

5    archives assumed custody and control of the records, and then

6    they make them available.  Because the determination was these

7    were not presidential records, therefore they fall outside the

8    context of FOIA, we don't get the records, and that's our

9    injury.  Our injury is that Judicial Watch as well as --

10           THE COURT:  But Judicial Watch said that the defendant

11   in that case was subject to statutory obligations under the

12   particular statute that were within the agency's power to

13   discharge.

14           MR. BEKESHA:  Yes.

15           THE COURT:  And what they're saying is it is just

16   simply not within our power to do what it is you want us to

17   do, to assume custody and control of the records, and you keep

18   repeating that phrase, and I keep asking you what does that

19   mean, what do they have the statutory authority to do other

20   than exercise their unfettered discretion to ask the attorney

21   general to try to go get them, and you haven't pointed to

22   anything in the statute that they have the authority to do,

23   and I think that's kind of where this sits at the moment.

24           What enforcement mechanism, what thing, what power can

25   they exercise under the statute that I can order them to do

1    that makes your injury redressable?

2          MR. BEKESHA:  Once the records are determined to be

3    presidential records, there is an obligation to assume custody

4    and control of them.  How -- and I will just say, once again,

5    how they go about doing that -- Judicial Watch is not

6    challenging how.  We're not challenging whether they use one

7    enforcement mechanism or another.  The statute --

8          THE COURT:  I just want you to tell me what they have

9    other than the one that they have that they don't have to do.

10          Under the APA, for instance, I can only order an

11    agency to do what it has to do.

12          MR. BEKESHA:  Yes.

13          THE COURT:  And under the statute, they don't have to

14    go after misclassified records.  They can choose to go after

15    misclassified records.  And so that's why I want to know what

16    is it that you see that they have the statutory power to do

17    that they also have the statutory obligation to do.

18          MR. BEKESHA:  We believe they have -- I keep repeating

19    myself.

20          THE COURT:  To assume custody and control of their

21    records?

22          MR. BEKESHA:  Yes, I sound like a broken record, but

23    this obligation will exist.  You know, once a determination is

24    that they are presidential records, this obligation is

25    created; and once that obligation is created, it sets

1    up -- there may be other options -- Judicial Watch is harmed

2    by that determination because it ends everything.  It's final,

3    it's determinative, and there is no redressability -- I mean

4    there is no other way to challenge this determination.  And

5    once the determination is made that's presidential records, it

6    opens the door.  It leaves for the possibility that archives

7    will go out and get the records.  It leaves the possibility

8    that they'll use one of their enforcement mechanisms or they

9    may use other avenues to get them.

10         We're challenging the determination.  We're not

11   challenging archives' failure to bring an enforcement action.

12   We didn't get there.  That's not before the Court.  What's

13   before the Court is --

14         THE COURT:  Why isn't that what should happen next?

15         MR. BEKESHA:  If this Court agreed and found that the

16   records were presidential records and ordered archives to, to

17   the best of it abilities, seek to assume custody and control

18   of the records, it would bring us to a next step.  If archives

19   didn't use their -- you know, all their powers to the best of

20   their ability, there would be --

21         THE COURT:  We're talking about very mushy

22   unenforceable orders at this point.  I mean I just don't think

23   I could issue an order that says try your best.  Then how

24   would anybody be able to ascertain whether they've complied.

25         MR. BEKESHA:  If archives did nothing, they wouldn't

—51—

1    be complying.  If they asked President Clinton to turn over

2    the records and he did, they would be complying.  It opens up

3    the door for Judicial Watch to be redressed, to have the

4    records determined to be presidential records and then

5    properly processed as presidential records are supposed to be.

6    Once again, you know, archives can pick and choose how they

7    can go about assuming custody and control, but they have to do

8    so under the statute.

9         THE COURT:  But to me the statute only has them assume

10   custody and control of what has been designated by the

11   president as presidential records.  Earlier in the statute

12   it's the president who exercises the authority to classify

13   them one way or the other and then they get what is

14   presidential, they don't get what's personal.  And so you're

15   basically asking me to enforce the definition section as

16   opposed to asking me to enforce the section that tells under

17   which the archivist has authority one way or the other.

18        MR. BEKESHA:  But once the definition section is

19   enforced, then the other sections fall into place.  If a

20   record is determined to be a presidential record, archives

21   can't sit back and do nothing.  I mean these are United States

22   government property.  They are supposed to be made available

23   to the public.  So the definition is important.  The

24   determination of what is a presidential record is important

25   because it leads to everything else.

1            THE COURT:  But the statute doesn't include a private

2      right of action.  The statute doesn't include a judicial

3      review provision.  Doesn't all of that suggest that

4      misclassified records are only subject to the

5      enforcement -- the one mechanism that is set forth in the

6      statute, which is that they can exercise their discretion to

7      go ask the attorney general and Congress to do something about

8      this?

9            MR. BEKESHA:  No, but it also leaves open the

10     opportunity to bring an APA claim for that because there is no

11     remedy, there is no avenue or vehicle to bring such a

12     challenge specifically under the PRA, and that's why we're

13     focusing on the determination made by archives in its two

14     letters.

15            THE COURT:  Well, they say that the determination they

16     make is essentially do we invoke the enforcement mechanism or

17     not and that that discretion is so broad that it is

18     unreviewable.  What is your response to that?

19            MR. BEKESHA:  That they didn't make a determination

20     about the failure to bring an enforcement action; they made

21     solely a determination about whether or not these records are

22     presidential records, and their determination was that it was

23     not.  There is nothing in their determination saying -- under

24     their theory, they could have said, these are presidential

25     records but we don't invoke the enforcement mechanism.  That

— 53 —

1    would have been a different determination and something else

2    we may have a possibility -- I don't know -- to challenge, but

3    that wasn't their determination.  Their determination was only

4    is this -- are these records presidential records.

5           THE COURT:  And what was the source of their authority

6    to make that determination at all?

7           MR. BEKESHA:  Their source would be the PRA and

8    their -- the overall objective to make presidential records

9    available to the public.

10          THE COURT:  What part of the PRA accords the archivist

11   as opposed to the president any authority whatsoever to

12   classify things as presidential versus personal?  Isn't that a

13   decision committed to the president under the act?

14          And I agree with you, the letter purports to make a

15   decision --

16          MR. BEKESHA:  Uh-huh.

17          THE COURT:  -- and I find that troubling, and I see

18   why you took the approach you took in light of receiving the

19   letter you received.  But where do they have the authority to

20   do any classifying or reclassifying?

21          I mean initially I thought this lawsuit was about your

22   asking them to sort of reclassify.  Now you're saying they

23   went ahead and classified and I think they're wrong and that

24   is a reviewable agency action --

25          MR. BEKESHA:  Uh-huh.

-54-

1        THE COURT:  -- and that has some force to it.  But I
2   don't know that they had the power to do that at all anywhere
3   under this statute.  I don't see anywhere where Congress gave
4   the archivist the opportunity to decide what of the
5   president's is personal or not.
6        MR. BEKESHA:  During his term there is no -- I mean
7   they have no -- archivist has no authority during the
8   president's term to make a classification.  That is solely up
9   to the president.
10       THE COURT:  Well, after his term, how does that
11  change?  What's personal is personal.  What he used it for,
12  what he thought it was for, what he created it for, and that's
13  why it says, under Section (b), they should be categorized as
14  presidential or personal upon their creation or receipt.
15       MR. BEKESHA:  Yes.  The president is required to
16  classify the records, if possible.  But it does not -- it does
17  not say that only those records classified by the president
18  are presidential records.  They're just saying he's supposed
19  to classify.  He holds one sheet of paper up, he puts one in
20  one box, one in the other.  That's what his requirement is.
21  If he takes, for example, his daily calendars or maybe his
22  notes on his speeches, a speech that he just -- one of his
23  speeches and puts that in the personal records box, that
24  doesn't make it a personal record, that just means that
25  President Clinton classified it as a personal record.

— 55 —

1       THE COURT:  Right.  And *Armstrong I* says, while he's

2    doing that, there is no judicial review whatsoever.  What he

3    does he has unfettered discretion to.  We're going to trust

4    him to do it right.  Congress trusted him to do it right.  He

5    has unfettered discretion to do it, though the archivist is

6    allowed to raise his hand and say, Mr. President, how about

7    this, how about that, but very, very limited authority to veto

8    what he is doing.  Even literally shredding presidential

9    records, he may dispose of presidential records, and there is

10   nothing we can do about it.

11       MR. BEKESHA:  Correct.

12       THE COURT:  And that, it seems to me, is even more

13   troubling than what you're talking about.  If he can do that,

14   why can't he do this?

15       MR. BEKESHA:  He could classify them as such and maybe

16   he did and maybe he didn't.  We don't know.  But it is still

17   under the obligation -- but archives is still under the

18   obligation to take possession of presidential records.

19       Now, they could -- Congress could have easily in the

20   definition of presidential records said a presidential record

21   is this and list what makes it a presidential record and then

22   said, and as classified by the president.  But they didn't.

23   They didn't focus on the president's classification in the

24   definition of a presidential record.  They focused on the

25   substance.

-56-

1      THE COURT:  Well, but they do in Section 2203
2  specifically talk about the classification process taking
3  place.
4      MR. BEKESHA:  Well, that talks about the management
5  and custody of the records.  I mean that's the section it is
6  in, section on how to manage these.  Congress was
7  concerned that --
8      THE COURT:  Well, as I said, Section (b) is the only
9  section I could find that talks about personal at all other
10  than the definition section, and so they have the
11  categorization of presidential versus personal taking place
12  during the presidency, which makes perfect sense.
13      MR. BEKESHA:  Right, but they didn't need to say
14  personal records there.  They could have just said, if it
15  falls in the presidential.  I mean if it is not a presidential
16  record --
17      THE COURT:  Right.
18      MR. BEKESHA:  -- then it is a personal record.
19      THE COURT:  Right.  And so that seems to vest
20  exclusive authority for saying this is personal on the person
21  who would know.
22      MR. BEKESHA:  It gives him that ability to classify at
23  that time, but it doesn't mean that something he classifies at
24  that time is, in fact, a personal or a presidential.  It just
25  means he needs to classify it to make it easier for management

1    during his term and then after his term for archives.  If the

2    president didn't classify and didn't manage his records, if he

3    didn't think about it, if there was no system set up, then

4    you'd have a problem.  At the end of the term, you'd have a

5    big stack of papers, one page personal, one page presidential,

6    and archives would have to sort it out and figure it out.  So

7    Congress here was trying to make it easy for archives.  They

8    were trying to say the president needs to classify records.

9    Just because he classifies it doesn't mean it's a presidential

10   record.  We're also not asking for archives to go on a fishing

11   expedition and try to find records that may or may not exist.

12   We informed archives that these records exist.  Based on the

13   letters, it almost seems to suggest that archives -- I'm

14   sorry -- not letters, audiotapes -- that these audiotapes

15   exist.  So we're not asking for a fishing expedition.

16          THE COURT:  Well, I feel like your entire theory works

17   if I ignore *Armstrong I* completely, and you say I can ignore

18   *Armstrong I* completely because that was during the presidency,

19   and *Armstrong II* is during the presidency, and CREW is during

20   the presidency, and American Historical Association is

21   different.  Are you hanging your hat on anything other than

22   *Judicial Watch v. Commerce*, or am I writing on a blank slate

23   here?

24          MR. BEKESHA:  None of these issues were before the

25   Court.  And that happens.  In Armstrong it was the first time

—58—

1    that it was before the Courts.

2          THE COURT:  I just want to know if I'm right that

3    you're saying I'm writing on a blank slate?

4          MR. BEKESHA:  Yes.

5          THE COURT:  Okay.

6          MR. BEKESHA:  Yes.  We don't think the current case

7    law discusses this issue at all, and that happens.  And so

8    yes, it's a blank slate with in mind what the PRA says and the

9    obligations that archives has.

10         THE COURT:  Okay.  So let's go back to my original

11   question:  What is the standard of review to be applied to a

12   classification decision?  Are you saying arbitrary and

13   capricious because I'm getting at it through the APA?

14         MR. BEKESHA:  Yes.  I mean that's our argument; that

15   the determination was arbitrary and capricious.  How to review

16   the audiotapes -- I mean it would be a -- I mean it's

17   difficult to answer.

18         THE COURT:  It's an important question --

19         MR. BEKESHA:  It is, and I appreciate that.  I just --

20   thinking, you know --

21         THE COURT:  You're telling me, Judge, you absolutely

22   get to review it.  And I'm saying, okay, what's the --

23         MR. BEKESHA:  Right.  I mean, it would be arbitrary

24   and capricious because it is under the APA.  Our claim is that

25   they acted arbitrarily and capriciously, and then you would

1    take into account the facts alleged and whether or not their

2    decision was merited based on the facts presented to them in

3    the letters and also in the complaint.

4         THE COURT:  Well, and am I giving them Chevron

5    deference because they're the agency given the authority to

6    implement this statute under the Presidential Records Act?

7         MR. BEKESHA:  I think because the decision was so

8    arbitrary it doesn't matter what standard you review it under.

9    The letters clearly establish that these records are

10   presidential records; that even with some deference, which the

11   agency doesn't even -- I mean they don't even discuss the

12   facts.  They just say these sound like personal diaries.  They

13   don't even -- it seems based on the letters that they didn't

14   even think about, well, if this is one end of the

15   conversation, you know, is that recordings made in the Oval

16   Office?  Those would be presidential records but why not

17   these.  Oval Office operations helped set up the meetings.

18   They were intimately involved in the recordings.  They set up

19   the appointments with Taylor Branch.  They escorted him

20   sometimes into the Oval Office, sometimes into other rooms in

21   the White House.

22        THE COURT:  Well, let's say you're right about every

23   single step of this:  They were wrong.  I have the authority

24   to tell them that they were wrong.  I have the authority to

25   say assume custody and control.  And they make a phone call,

1   write a nice letter.  They even head up to Observatory Circle

2   and knock on the door.  And he says, they're my records, and

3   he closes the door.  How is your injury something we can

4   redress?

5          MR. BEKESHA:  The injury there would be redressable

6   because by making a determination that the records are

7   presidential records, it falls under FOIA, and there would

8   be -- the FOIA statute would kick in.

9          THE COURT:  FOIA only has to give you what they have.

10         MR. BEKESHA:  Yes, unless it's in the possession of

11   another agency or --

12         THE COURT:  He's not an agency.

13         MR. BEKESHA:  It could be -- and I haven't --

14         THE COURT:  He is a private citizen.

15         MR. BEKESHA:  He is a private citizen, but he also

16   holds -- the former president has some type of office.

17         THE COURT:  Are you saying that my order to them, go

18   get them, binds him to give them to them when they knock on

19   the door --

20         MR. BEKESHA:  No, your order would not bind them.

21   However, they are --

22         THE COURT:  So even if you win, what do you get?

23         MR. BEKESHA:  We get the possibility to discuss that

24   when the time comes.  I mean we've been redressed -- I mean

25   the injury of the determination stops the proceedings.  I mean

61

1    it stops.  We win by now -- we now have --

2           THE COURT:  The opportunity to sue President Clinton,

3    which you haven't elected to do so far?

4           MR. BEKESHA:  We haven't elected to do so, so far, but

5    that could be a possibility, or the possibility could be that

6    he turns over the records.  It just opens the door to having

7    many -- redressability could be by simply having them declared

8    presidential records and then the ability to have the further

9    process under FOIA.  You know, there are many different

10   instances where an agency could go out and get records under

11   FOIA.

12          THE COURT:  This is not one of those.  This just does

13   not fall within -- if they don't have them, FOIA doesn't help

14   you.

15          MR. BEKESHA:  Most likely, yes.

16          THE COURT:  Okay.  All right.  Is there anything else

17   that you wanted to say that I took you off your outline and

18   you didn't get to say?

19          You can take a minute.

20          MR. BEKESHA:  Thank you.

21          I think we covered everything.

22          THE COURT:  All right.  Thank you very much.

23          MR. BEKESHA:  Thank you very much.

24          THE COURT:  All right.  Briefly, I think I understand

25   all the arguments you made initially, and I don't think we

1    need to repeat them.  The one thing that we haven't really

2    talked about is the only thing he talked about, which is the

3    mandatory nature of Section (f), where it says the archivist

4    shall assume responsibility for access to presidential

5    records, and he says presidential records is defined in the

6    definition section, these meet the definition, therefore you

7    do have a duty that is enforceable by this Court, reviewable

8    by this Court.  What do you say to that?

9            MR. SCHWEI:  We have two responses to that:  The first

10   is that, as Your Honor alluded to, we argue that whatever that

11   duty within Section 2203(f) is, it only applies to the

12   specific collection of presidential records designated by the

13   president as Section 2203(b) contemplates, which there are two

14   pre-existing collections that get -- one gets transferred at

15   the end of the term; personal records do not.

16            The second argument is that even the language of

17   2203(f) does not actually impose a duty to, quote, assume

18   custody and control.  What 2203(f) actually says is, quote,

19   to assume responsibility for assume custody and control, which

20   is very different, because as the D.C. Circuit stated in the

21   *American Friends Service Committee v. Webster case*, when a

22   statute says -- a statute there said NARA shall have

23   responsibility to conduct inspections of records; and the

24   D.C. Circuit, in that case, stated NARA does not have a

25   mandatory duty to conduct inspections.  NARA has the

—63—

```
 1    responsibility and the prerogative, but it is not the type of
 2    mandatory duty and certainly not the type of specific
 3    unequivocal command that is required under the APA for this
 4    Court to order NARA to actually comply with that section.
 5          THE COURT:  Is that cited in your reply, the case you
 6    just cited to me?
 7          MR. SCHWEI:  Yes, Your Honor.
 8          THE COURT:  Okay.  All right.  I think you said you
 9    had two answers.  That was the second answer.  The first
10    answer was Section (b) --
11          MR. SCHWEI:  Correct.
12          THE COURT:  -- that he puts them in the two boxes.
13          All right.  Is there anything else you want to say in
14    response to what he said?
15          MR. SCHWEI:  I think we're content to rest on our
16    briefs, Your Honor.
17          THE COURT:  Okay.  Thank you very much.
18          I very much appreciate the quality of the arguments
19    this morning.  It is a very interesting case.  I think, based
20    upon everything I've read, that we are writing on a relatively
21    blank slate, which makes it interesting, but it also means I
22    need to think about it, and I'm going to take it under
23    advisement.  And thank you very much.
24          (Proceedings adjourned at 11:31 a.m.)
25
```

64

                    CERTIFICATE OF OFFICIAL COURT REPORTER


          I, Patricia A. Kaneshiro-Miller, certify that the

    foregoing is a correct transcript from the record of

    proceedings in the above-entitled matter.




    ----------------------------------      -----------------------

    PATRICIA A. KANESHIRO-MILLER                       DATE

65

## 1

**10** [1] - 44:22
**11:31** [1] - 63:24
**12** [1] - 44:23
**1992** [1] - 16:2

## 2

**20** [2] - 15:2, 44:23
**2112** [2] - 9:6, 26:13
**2112(c** [5] - 8:19, 34:6, 34:8, 34:13, 34:19
**2202** [1] - 44:13
**2203** [1] - 56:1
**2203(b** [1] - 62:13
**2203(f** [2] - 62:11, 62:17, 62:18

## 4

**4** [1] - 4:24

## 5

**5** [1] - 44:22

## A

**a.m** [1] - 63:24
**abilities** [1] - 50:17
**ability** [3] - 50:20, 56:22, 61:8
**able** [5] - 12:20, 36:20, 40:11, 40:22, 50:24
**above-entitled** [1] - 64:5
**absolute** [1] - 31:9
**absolutely** [1] - 58:21
**abuse** [1] - 42:17
**acceding** [1] - 17:2
**access** [8] - 4:9, 5:18, 13:3, 13:12, 24:22, 31:20, 48:2, 62:4
**according** [3] - 4:18, 11:15, 39:19
**accords** [2] - 39:19, 53:10
**account** [1] - 59:1
**accounts** [1] - 17:21
**accurate** [2] - 12:20, 12:21
**Act** [29] - 4:2, 12:7, 12:8, 13:3, 14:6, 15:14, 15:15, 17:20, 23:2, 29:25, 34:17,

34:22, 34:25, 35:2, 35:3, 35:12, 39:18, 40:12, 40:14, 40:17, 42:18, 43:13, 43:14, 44:15, 44:18, 45:16, 45:17, 59:6
**act** [8] - 7:6, 13:22, 14:7, 14:8, 16:7, 20:13, 23:2, 53:13
**acted** [1] - 58:25
**acting** [2] - 15:25, 23:21
**action** [33] - 5:23, 6:1, 6:7, 6:8, 6:23, 9:8, 9:12, 9:13, 9:23, 10:7, 10:11, 10:25, 11:3, 23:23, 25:2, 25:4, 26:20, 27:13, 27:16, 28:7, 28:11, 28:15, 37:4, 37:10, 38:2, 43:5, 43:6, 45:6, 45:22, 50:11, 52:2, 52:20, 53:24
**actions** [1] - 34:12
**activities** [1] - 38:13
**actual** [3] - 9:14, 10:9, 26:8
**add** [2] - 22:5, 24:20
**additional** [2] - 24:20, 25:25
**addressed** [1] - 14:23
**addressing** [1] - 40:6
**adjourned** [1] - 63:24
**administration** [2] - 6:21, 15:1
**administrative** [2] - 17:24, 43:13
**Administrative** [1] - 4:2
**advisement** [1] - 63:23
**agencies** [3] - 10:15, 13:1, 18:4
**agency** [30] - 5:25, 6:23, 10:12, 10:16, 10:25, 11:1, 11:4, 11:20, 13:1, 14:9, 23:22, 25:2, 25:3, 26:20, 26:22, 26:24, 27:13, 27:16, 28:7, 28:11, 28:15, 45:22, 49:11, 53:24, 59:5, 59:11, 60:11, 60:12, 61:10
**agency's** [4] - 11:2, 25:7, 27:12, 48:12
**agree** [7] - 5:4, 5:7, 6:25, 7:1, 7:3, 46:3, 53:14
**agreed** [1] - 11:7,

50:15
**agreement** [1] - 16:16
**ahead** [2] - 46:8, 53:23
**allegation** [2] - 21:18, 28:25
**allegations** [2] - 4:18, 5:14, 6:6
**allege** [1] - 7:18
**alleged** [12] - 4:8, 4:9, 5:17, 9:6, 9:8, 9:19, 19:7, 31:21, 33:17, 39:9, 39:11, 59:1
**allegedly** [2] - 18:22, 20:12
**alleging** [1] - 16:22
**allow** [4] - 12:14, 12:17, 13:25, 22:23
**allowed** [1] - 55:6
**allows** [3] - 8:20, 12:6, 37:18
**alluded** [1] - 62:10
**almost** [4] - 22:9, 22:11, 22:14, 57:13
**American** [4] - 16:10, 36:12, 57:20, 62:21
**annotated** [1] - 9:1
**answer** [8] - 7:25, 9:19, 14:3, 14:21, 38:5, 58:17, 63:9, 63:10
**answering** [1] - 23:18
**answers** [2] - 13:16, 63:9
**antecedent** [2] - 11:17, 11:21
**APA** [19] - 10:19, 10:24, 10:25, 11:8, 12:15, 17:12, 26:16, 37:18, 37:19, 45:8, 45:10, 45:14, 45:18, 46:5, 49:10, 52:10, 58:13, 58:24, 63:3
**appeal** [5] - 4:23, 6:2, 24:24, 25:4, 46:10
**applied** [1] - 58:11
**applies** [4] - 7:21, 34:22, 35:5, 62:11
**apply** [3] - 8:3, 10:16, 10:25
**appointments** [2] - 18:11, 59:19
**appreciate** [2] - 58:19, 63:18
**approach** [1] - 53:18
**appropriate** [1] - 14:14
**arbitrarily** [2] - 7:6, 58:25
**arbitrary** [12] - 6:8, 9:9, 10:19, 26:16,

41:16, 45:19, 45:21, 46:5, 58:12, 58:15, 58:23, 59:8
**archive's** [2] - 25:20, 32:21
**archives** [48] - 6:20, 7:10, 28:14, 28:21, 29:13, 31:9, 31:22, 33:5, 34:5, 34:13, 35:13, 35:24, 36:8, 36:9, 36:15, 37:12, 37:16, 37:20, 39:3, 39:11, 41:3, 41:12, 42:11, 42:22, 42:24, 42:25, 43:9, 44:19, 45:2, 45:15, 48:1, 48:5, 50:6, 50:16, 50:18, 50:25, 51:6, 51:20, 52:13, 55:17, 57:1, 57:6, 57:7, 57:10, 57:12, 57:13, 58:9
**archives'** [2] - 39:15, 50:11
**archivist** [65] - 4:24, 7:15, 7:22, 8:1, 8:4, 8:5, 8:14, 8:15, 8:20, 8:24, 9:13, 9:17, 10:10, 11:11, 11:13, 11:14, 13:18, 13:22, 14:1, 14:4, 14:12, 14:13, 14:18, 14:20, 15:22, 16:14, 16:18, 16:21, 16:24, 16:25, 17:5, 17:25, 19:4, 21:16, 23:18, 23:20, 24:2, 24:4, 24:6, 24:18, 24:21, 24:25, 25:10, 26:12, 26:14, 27:3, 27:4, 31:2, 31:3, 31:15, 31:17, 31:18, 34:1, 34:8, 37:5, 38:5, 39:21, 42:21, 46:1, 51:17, 53:10, 54:4, 54:7, 55:5, 62:3
**archivist's** [8] - 6:11, 9:5, 9:22, 10:3, 14:2, 16:4, 24:1, 24:8
**argue** [4] - 12:15, 12:17, 31:5, 62:10
**argues** [1] - 37:12
**argument** [6] - 21:6, 25:2, 31:21, 45:18, 58:14, 62:16
**arguments** [6] - 8:2, 18:18, 22:22, 23:7, 61:25, 63:18
**Armstrong** [28] - 5:22, 12:1, 12:5, 12:13,

12:14, 12:23, 12:25, 13:4, 14:23, 15:2, 15:7, 17:3, 17:10, 17:14, 38:7, 39:19, 40:2, 40:4, 40:10, 40:18, 40:20, 40:22, 55:1, 57:17, 57:18, 57:19, 57:25
**arrival** [1] - 27:9, 27:12, 27:21
**ascertain** [1] - 50:24
**aside** [3] - 6:23, 16:4, 35:6
**assassination** [1] - 16:1
**Association** [3] - 16:10, 36:12, 57:20
**assume** [26] - 28:20, 29:10, 29:16, 29:20, 30:1, 30:3, 31:18, 31:22, 32:14, 35:13, 35:18, 39:13, 42:23, 43:18, 43:21, 46:2, 48:17, 49:3, 49:20, 50:17, 51:9, 59:25, 62:4, 62:17, 62:19
**assumed** [2] - 36:9, 48:5
**assumes** [1] - 35:24
**assuming** [4] - 6:5, 6:24, 28:22, 51:7
**assumption** [2] - 28:18
**attempting** [3] - 14:17, 17:18, 17:19
**attention** [1] - 37:6
**attorney** [11] - 13:18, 14:2, 14:8, 14:14, 14:20, 26:14, 34:7, 34:21, 43:5, 48:20, 52:7
**audio** [3] - 18:13, 21:9, 45:15
**audiotapes** [17] - 4:10, 4:11, 4:12, 5:18, 6:18, 8:7, 20:12, 21:21, 25:24, 29:13, 39:4, 39:5, 39:8, 40:21, 57:14, 58:16
**authority** [38] - 4:1, 6:11, 8:5, 13:19, 16:13, 16:15, 16:24, 26:13, 29:23, 30:7, 30:23, 31:15, 33:3, 33:6, 33:9, 34:1, 34:2, 34:23, 35:5, 35:7, 35:11, 35:17, 37:19, 38:17, 48:19, 48:22, 51:12, 51:17, 53:5, 53:11, 53:19,

54:7, 55:7, 56:20, 59:5, 59:23, 59:24
**authorizes** [1] - 4:2
**available** [19] - 11:8, 14:5, 14:7, 16:3, 20:11, 26:7, 30:2, 33:23, 35:2, 35:14, 35:15, 35:19, 39:15, 43:14, 43:21, 44:22, 48:6, 51:22, 53:9
**avenue** [1] - 52:11
**avenues** [1] - 50:9
**avoid** [4] - 15:19, 15:22, 23:6, 23:11
**awful** [1] - 29:11

## B

**b)** [2] - 32:10, 33:11
**BAKESHA** [1] - 30:9
**balance** [2] - 13:11, 40:16
**bang** [1] - 29:12
**based** [19] - 5:8, 7:9, 8:8, 12:12, 19:6, 19:9, 20:18, 26:6, 30:20, 33:18, 36:17, 39:4, 41:6, 45:17, 45:23, 57:12, 59:2, 59:13, 63:19
**basis** [4] - 9:25, 10:1, 10:2, 11:21
**bears** [1] - 7:17
**become** [1] - 8:14
**behind** [1] - 30:8
**BEKESHA** [87] - 28:5, 28:19, 28:24, 29:2, 29:5, 29:9, 29:22, 29:25, 30:6, 30:13, 30:16, 31:5, 31:17, 32:1, 32:3, 32:16, 32:25, 33:5, 33:12, 33:15, 34:4, 34:10, 35:11, 36:5, 36:13, 37:6, 37:24, 38:6, 38:9, 39:2, 40:2, 40:9, 40:18, 41:12, 41:24, 42:8, 42:16, 42:22, 43:16, 43:20, 44:4, 44:7, 44:10, 45:7, 45:11, 45:14, 46:7, 46:12, 47:21, 48:14, 49:2, 49:12, 49:18, 49:22, 50:15, 50:25, 51:18, 52:9, 52:19, 53:7, 53:16, 53:25, 54:6, 54:15, 55:11, 55:15, 56:4, 56:13, 56:18, 56:22, 57:24, 58:4, 58:6,

58:14, 58:19, 58:23, 59:7, 60:5, 60:10, 60:13, 60:15, 60:20, 60:23, 61:4, 61:15, 61:20, 61:23
**belief** [3] - 4:22, 28:21, 33:18
**believes** [4] - 8:20, 8:22, 15:9, 24:5
**belong** [1] - 40:12
**belonged** [1] - 9:2
**belongs** [1] - 40:14
**best** [4] - 18:4, 50:17, 50:19, 50:23
**better** [1] - 27:1
**between** [2] - 8:11, 13:12
**beyond** [1] - 6:10
**big** [1] - 57:5
**bind** [1] - 60:20
**binding** [1] - 25:6
**binds** [1] - 60:18
**blank** [4] - 57:22, 58:3, 58:8, 63:21
**Block** [1] - 11:19
**borne** [3] - 22:13, 23:9, 24:23
**bound** [2] - 13:24, 16:25
**box** [4] - 32:13, 32:14, 54:20, 54:23
**boxes** [2] - 32:12, 63:12
**Branch** [8] - 18:8, 21:14, 21:24, 46:19, 47:6, 47:14, 59:19
**brief** [4] - 11:19, 12:9, 15:2, 17:18
**briefly** [1] - 61:24
**briefs** [1] - 63:16
**brilliant** [1] - 47:16
**bring** [10] - 9:23, 10:7, 22:2, 37:15, 40:11, 50:11, 50:18, 52:10, 52:11, 52:20
**bringing** [3] - 12:12, 12:15, 12:17
**broad** [1] - 52:17
**broken** [1] - 49:22
**brought** [3] - 8:25, 45:7, 45:9
**Buddy** [1] - 44:2
**Bush** [1] - 36:12
**business** [16] - 18:10, 19:1, 20:6, 21:1, 21:2, 21:5, 21:9, 21:12, 21:15, 21:20, 22:1, 22:2, 22:11, 22:15, 22:17, 47:10
**busy** [1] - 22:11

**button** [1] - 21:3

## C

**calendars** [1] - 54:21
**cannot** [7] - 4:4, 4:10, 4:12, 4:14, 9:21, 11:23, 35:15
**capricious** [11] - 6:8, 9:9, 10:20, 26:16, 41:16, 45:19, 45:21, 46:5, 58:13, 58:15, 58:24
**capriciously** [2] - 7:6, 58:25
**captured** [1] - 22:2
**capturing** [1] - 20:5
**carve** [1] - 10:24
**carve-out** [1] - 10:24
**case** [23] - 11:15, 11:25, 16:10, 16:11, 16:16, 16:17, 16:19, 22:16, 24:15, 24:16, 27:1, 34:16, 34:23, 36:25, 37:7, 47:22, 48:11, 58:6, 62:21, 62:24, 63:5, 63:19
**cases** [3] - 11:18, 40:2, 40:18
**categorization** [1] - 56:11
**categorize** [2] - 30:23, 33:1
**categorized** [4] - 32:8, 32:18, 54:13
**categorizes** [1] - 33:2
**category** [2] - 22:20, 23:5
**cautious** [2] - 22:20, 23:5
**certain** [3] - 16:13, 16:19, 22:11
**certainly** [7] - 22:5, 22:9, 24:10, 25:3, 25:9, 28:17, 63:2
**CERTIFICATE** [1] - 64:1
**certify** [1] - 64:3
**challenge** [7] - 9:9, 22:23, 23:6, 37:16, 50:4, 52:12, 53:2
**challenges** [1] - 23:11
**challenging** [14] - 6:17, 12:10, 17:22, 36:13, 36:15, 41:14, 41:15, 41:20, 42:25, 43:3, 49:6, 50:10, 50:11
**Chaney** [7] - 10:6, 10:23, 11:2, 11:25,

18:3, 37:4, 38:2
**change** [2] - 15:10, 54:11
**characterization** [1] - 24:3
**characterized** [2] - 18:8, 47:5
**check** [2] - 13:23, 15:8
**checklist** [1] - 48:4
**checks** [1] - 14:22
**Chevron** [1] - 59:4
**chief** [1] - 47:15
**choose** [7] - 13:25, 17:25, 43:4, 43:9, 49:14, 51:6
**chose** [4] - 13:23, 17:24, 17:25, 18:5
**Circle** [1] - 60:1
**Circuit** [8] - 10:14, 10:23, 11:6, 15:2, 15:7, 23:8, 62:20, 62:24
**Circuit's** [4] - 5:22, 11:15, 11:24, 22:16
**circumstances** [3] - 12:4, 37:18, 38:10
**cite** [1] - 11:19
**cited** [2] - 63:5, 63:6
**cites** [1] - 21:13
**citizen** [2] - 60:14, 60:15
**claim** [20] - 6:5, 9:14, 10:2, 12:8, 12:12, 12:14, 12:15, 12:16, 12:17, 17:12, 25:22, 25:25, 26:8, 26:10, 39:24, 45:7, 45:18, 52:10, 58:24
**clarify** [1] - 36:20
**classification** [27] - 5:23, 6:13, 6:15, 6:16, 6:22, 7:1, 7:5, 7:10, 7:11, 7:22, 8:16, 11:13, 12:3, 16:13, 17:5, 17:22, 22:24, 23:21, 25:12, 31:6, 36:25, 37:23, 40:8, 54:8, 55:23, 56:2, 58:12
**classified** [13] - 6:18, 6:19, 8:21, 30:10, 32:23, 33:16, 36:7, 36:10, 36:21, 53:23, 54:17, 54:25, 55:22
**classifies** [6] - 13:15, 30:18, 30:19, 36:4, 56:23, 57:9
**classify** [17] - 7:17, 8:6, 32:15, 33:4, 38:17, 39:25, 42:9,

51:12, 53:12, 54:16, 54:19, 55:15, 56:22, 56:25, 57:2, 57:8
**classifying** [3] - 13:6, 38:18, 53:20
**clear** [2] - 18:16, 24:10
**clearly** [6] - 16:21, 21:13, 25:19, 33:22, 46:12, 59:9
**Clinton** [24] - 6:18, 7:18, 18:22, 19:5, 20:12, 20:20, 29:15, 30:10, 32:22, 35:9, 36:7, 36:14, 36:16, 36:19, 38:9, 40:7, 40:20, 41:17, 42:15, 44:8, 46:15, 51:1, 54:25, 61:2
**Clinton's** [6] - 19:2, 20:17, 21:10, 21:22, 29:12, 41:2
**close** [1] - 8:13
**closes** [1] - 60:3
**collection** [1] - 62:12
**collections** [1] - 62:14
**combined** [1] - 44:17
**command** [1] - 63:3
**Commerce** [2] - 37:7, 57:22
**commerce** [1] - 47:22
**committed** [5] - 10:25, 11:4, 11:14, 23:15, 53:13
**Committee** [1] - 62:21
**communicated** [7] - 19:1, 20:10, 21:1, 21:5, 21:8, 21:11, 21:19
**compel** [4] - 4:4, 13:25, 14:18, 16:18
**complaint** [17] - 4:6, 4:19, 5:8, 5:12, 5:17, 6:4, 7:17, 9:7, 9:9, 9:14, 9:15, 9:20, 19:8, 21:19, 24:19, 28:22, 59:3
**complete** [4] - 15:1, 24:1, 39:20, 44:13
**completely** [3] - 24:23, 57:17, 57:18
**complied** [1] - 50:24
**comply** [1] - 63:4
**complying** [2] - 51:1, 51:2
**concede** [2] - 17:18, 40:19
**concedes** [3] - 12:9, 12:10, 12:11
**concern** [1] - 13:7
**concerned** [2] - 13:6,

67

56:7
**conclude** [1] - 21:7
**concluded** [3] - 17:11, 20:19, 28:6
**conclusion** [2] - 6:20, 31:24
**conduct** [4] - 20:6, 22:2, 62:23, 62:25
**conducted** [1] - 21:15
**conducting** [1] - 18:10
**conference** [1] - 42:19
**conform** [1] - 12:22
**confusion** [1] - 24:15
**Congress** [29] - 13:23, 13:24, 14:1, 14:13, 14:19, 14:24, 15:8, 15:9, 15:15, 15:24, 15:25, 16:2, 16:6, 17:24, 22:20, 22:22, 23:2, 23:5, 23:14, 24:7, 38:12, 39:21, 42:13, 52:7, 54:3, 55:4, 55:19, 56:6, 57:7
**Congress's** [1] - 15:6
**congressmen** [2] - 33:21, 46:16
**consequences** [1] - 25:6
**consider** [4] - 8:7, 26:21, 26:23, 27:4
**consideration** [1] - 14:12
**considerations** [1] - 14:15
**considers** [2] - 10:10, 10:13
**consistent** [1] - 18:3
**constitute** [1] - 10:14
**constitutes** [2] - 11:7, 12:6
**construed** [3] - 10:14, 11:6, 17:15
**consummation** [1] - 25:7
**contain** [2] - 22:10, 22:12
**contemplate** [1] - 12:2
**contemplates** [1] - 62:13
**contemporaneously** [1] - 20:3
**contemporaneousss** [1] - 19:24
**content** [1] - 63:15
**contest** [1] - 22:8
**context** [3] - 17:16, 47:23, 48:8
**contract** [1] - 17:1
**control** [37] - 8:21,

8:22, 18:2, 24:6, 29:10, 29:17, 29:20, 30:1, 30:4, 31:1, 31:3, 31:19, 31:23, 32:15, 35:13, 35:18, 35:24, 39:13, 39:20, 42:23, 43:18, 43:21, 43:22, 43:23, 43:25, 44:14, 44:19, 48:5, 48:17, 49:4, 49:20, 50:17, 51:7, 51:10, 59:25, 62:18, 62:19
**conversation** [3] - 19:18, 47:15, 59:15
**conversations** [4] - 33:20, 46:15, 46:18
**core** [1] - 25:1
**correct** [14] - 10:22, 15:21, 16:7, 21:1, 28:18, 29:2, 29:22, 32:1, 32:3, 32:25, 34:10, 55:11, 63:11, 64:4
**correctly** [2] - 7:16, 38:6
**counsel** [1] - 47:1
**country** [1] - 46:20
**couple** [1] - 22:4
**course** [8] - 6:23, 21:2, 21:5, 21:8, 21:11, 21:20, 21:25, 47:10
**Court** [49] - 4:10, 4:14, 5:15, 6:4, 6:14, 7:5, 7:15, 7:25, 9:4, 9:15, 9:18, 9:21, 10:8, 10:16, 11:2, 11:20, 12:20, 13:5, 13:6, 13:13, 13:24, 16:16, 16:23, 17:3, 17:11, 23:8, 24:8, 25:11, 29:9, 29:12, 36:17, 36:20, 37:15, 37:18, 38:3, 39:7, 40:10, 40:22, 41:5, 41:21, 41:25, 46:9, 50:12, 50:13, 50:15, 57:25, 62:7, 62:8, 63:4
**court** [2] - 43:5, 43:6
**COURT** [136] - 4:15, 4:21, 5:6, 5:10, 5:13, 6:9, 7:8, 8:2, 9:4, 9:25, 10:19, 11:9, 12:1, 12:23, 14:4, 15:3, 15:18, 16:9, 16:23, 17:8, 18:7, 18:19, 19:4, 19:12, 19:19, 20:4, 20:15, 20:22, 21:13, 21:23, 23:13, 24:10, 25:9,

25:19, 26:4, 26:10, 26:25, 27:8, 27:13, 27:17, 27:21, 27:24, 28:4, 28:17, 28:22, 28:25, 29:3, 29:7, 29:19, 29:23, 30:3, 30:7, 30:12, 30:14, 30:22, 31:13, 31:24, 32:2, 32:4, 32:23, 33:3, 33:8, 33:14, 33:25, 34:8, 34:25, 35:25, 36:11, 37:3, 37:21, 38:1, 38:8, 38:15, 39:18, 40:8, 40:10, 41:9, 41:21, 42:2, 42:14, 42:17, 43:10, 43:18, 43:25, 44:6, 44:9, 45:4, 45:9, 45:13, 45:21, 46:11, 47:3, 48:10, 48:15, 49:8, 49:13, 49:20, 50:14, 50:21, 51:9, 52:1, 52:15, 53:5, 53:10, 53:17, 54:1, 54:10, 55:1, 55:12, 56:1, 56:8, 56:17, 56:19, 57:16, 58:2, 58:5, 58:10, 58:18, 58:21, 59:4, 59:22, 60:9, 60:12, 60:14, 60:17, 60:22, 61:2, 61:12, 61:16, 61:22, 61:24, 63:5, 63:8, 63:12, 63:17, 64:1
**Court's** [4] - 10:6, 22:15, 37:6, 45:4
**courts** [2] - 17:15, 38:11
**Courts** [2] - 23:14, 58:1
**cover** [1] - 28:1
**covered** [4] - 13:2, 27:24, 28:2, 61:21
**create** [1] - 25:6
**created** [11] - 8:8, 20:3, 20:7, 20:12, 20:20, 40:9, 40:25, 41:11, 49:25, 54:12
**creates** [1] - 12:5
**creation** [5] - 32:9, 40:5, 40:6, 40:23, 54:14
**CREW** [7] - 37:4, 38:2, 38:6, 38:15, 45:5, 57:19
**criteria** [1] - 33:17
**Cuba** [1] - 9:1
**current** [1] - 58:6
**custody** [30] - 8:14,

8:22, 24:6, 29:10, 29:16, 30:1, 30:3, 31:1, 31:19, 31:23, 32:14, 35:13, 35:18, 35:24, 39:13, 42:23, 43:18, 43:21, 44:19, 48:5, 48:17, 49:3, 49:20, 50:17, 51:7, 51:10, 56:5, 59:25, 62:18, 62:19

## D

**D.C** [12] - 5:22, 10:14, 10:23, 11:5, 11:15, 11:24, 15:2, 15:7, 22:16, 23:8, 62:20, 62:24
**daily** [1] - 54:21
**danger** [1] - 15:16
**DATE** [1] - 64:9
**day-to-day** [1] - 38:12
**de** [1] - 42:3
**dead** [3] - 27:9, 27:12, 27:21
**deal** [2] - 9:14, 40:23
**dealing** [2] - 12:25, 15:18
**decide** [5] - 7:16, 14:14, 26:5, 31:15, 54:4
**decided** [1] - 27:5
**decision** [64] - 4:13, 6:13, 6:15, 7:7, 7:10, 7:11, 7:15, 7:22, 8:3, 8:16, 8:23, 9:4, 9:10, 9:17, 10:3, 10:6, 11:4, 11:13, 11:17, 11:23, 12:3, 12:5, 14:1, 14:19, 16:20, 16:21, 17:9, 17:12, 17:13, 17:23, 22:15, 22:16, 23:21, 23:22, 23:25, 25:8, 25:12, 25:15, 25:17, 27:12, 27:14, 27:16, 31:9, 37:20, 37:21, 39:25, 40:10, 40:11, 41:9, 41:15, 41:20, 41:21, 45:11, 45:16, 45:24, 45:25, 47:17, 53:13, 53:15, 58:12, 59:2, 59:7
**decision-making** [1] - 25:8
**decisions** [8] - 5:22, 6:17, 7:5, 10:23, 16:14, 24:9, 40:5, 40:7
**declared** [1] - 61:7

**declines** [1] - 11:20
**defect** [2] - 4:5, 5:20
**defendant** [1] - 48:10
**defer** [1] - 42:2
**deference** [5] - 22:7, 46:6, 46:7, 59:5, 59:10
**defined** [1] - 62:5
**defining** [4] - 12:6, 12:18, 12:21, 17:17
**definition** [10] - 20:22, 30:16, 31:10, 47:8, 51:15, 51:18, 51:23, 55:20, 55:24, 56:10, 62:6
**delegated** [2] - 16:14, 24:1
**demand** [1] - 30:8
**Department** [2] - 8:25, 37:7
**deposited** [1] - 34:11
**designated** [4] - 23:19, 44:23, 51:10, 62:12
**designates** [1] - 30:5
**designating** [1] - 13:9
**determination** [40] - 6:22, 6:24, 11:22, 33:7, 35:23, 36:15, 37:9, 37:11, 37:17, 37:19, 37:24, 39:5, 41:6, 41:13, 41:14, 41:15, 41:25, 42:4, 45:15, 45:19, 48:6, 49:23, 50:2, 50:4, 50:5, 50:10, 51:24, 52:13, 52:15, 52:19, 52:21, 52:22, 52:23, 53:1, 53:3, 53:6, 58:15, 60:6, 60:25
**determinative** [1] - 50:3
**determine** [7] - 4:15, 12:19, 12:20, 18:4, 29:5, 36:18, 46:17
**determined** [7] - 10:17, 17:3, 47:25, 48:4, 49:2, 51:4, 51:20
**determining** [1] - 10:16
**diaries** [4] - 20:1, 20:23, 22:9, 59:12
**diary** [9] - 18:13, 18:24, 19:17, 20:24, 22:12, 22:14, 45:1, 46:22
**different** [13] - 14:16, 19:16, 20:6, 20:7, 37:8, 37:18, 38:10,

40:24, 46:25, 53:1, 57:21, 61:9, 62:20
**differentiation** [1] - 8:11
**difficult** [1] - 58:17
**dignitaries** [2] - 33:20, 46:15
**dimensions** [1] - 24:20
**disagrees** [1] - 18:18
**discharge** [1] - 48:13
**discovery** [2] - 36:24, 37:2
**discretion** [16] - 10:15, 10:20, 11:1, 11:4, 11:8, 16:5, 23:16, 24:1, 26:18, 42:24, 48:20, 52:6, 52:17, 55:3, 55:5
**discretionary** [3] - 9:22, 9:23, 13:20
**discuss** [3] - 7:2, 59:11, 60:23
**discusses** [1] - 58:7
**discussing** [2] - 24:23, 25:5
**discussions** [1] - 46:21
**dismiss** [3] - 6:4, 26:18, 36:22
**dismissed** [1] - 4:7
**disposal** [3] - 40:5, 40:6, 40:23
**dispose** [1] - 55:9
**disposing** [1] - 39:22
**dispute** [1] - 44:25
**distinguish** [2] - 16:9, 38:2
**District** [1] - 25:10
**docket** [1] - 20:11
**documentary** [1] - 32:5
**documents** [2] - 15:16, 15:17
**done** [8] - 15:12, 25:10, 25:20, 25:21, 42:7, 42:8, 42:9
**door** [8] - 29:13, 35:8, 50:6, 51:3, 60:2, 60:3, 60:19, 61:6
**down** [2] - 19:17, 29:12
**drafting** [2] - 22:20, 23:5
**duplication** [1] - 20:5
**during** [14] - 20:14, 32:10, 38:7, 39:20, 40:3, 40:18, 41:1, 54:6, 54:7, 56:12, 57:1, 57:18, 57:19

**duty** [5] - 62:7, 62:11, 62:17, 62:25, 63:2

## E

**early** [1] - 27:25
**easier** [1] - 56:25
**easily** [1] - 55:19
**easy** [1] - 57:7
**effect** [1] - 41:8
**either** [1] - 19:21
**elected** [2] - 61:3, 61:4
**end** [9] - 36:3, 38:23, 46:23, 47:20, 57:4, 59:14, 62:15
**ended** [1] - 41:3
**ends** [3] - 16:12, 30:25, 50:2
**enforce** [4] - 4:13, 9:22, 11:17, 11:20, 11:23, 17:11, 18:5, 51:15, 51:16
**enforceable** [1] - 62:7
**enforced** [1] - 51:19
**enforcement** [36] - 7:2, 8:19, 9:6, 9:13, 9:17, 9:23, 10:4, 10:7, 10:9, 10:11, 11:3, 11:12, 13:21, 15:22, 16:4, 17:24, 23:25, 25:14, 25:15, 27:4, 34:5, 34:12, 37:22, 42:25, 43:13, 43:15, 44:11, 48:24, 49:7, 50:8, 50:11, 52:5, 52:16, 52:20, 52:25
**entire** [2] - 24:15, 57:16
**entitled** [3] - 22:6, 46:1, 64:5
**equivalent** [4] - 18:24, 19:21, 20:2, 20:24
**escorted** [1] - 59:19
**essentially** [4] - 16:14, 40:11, 42:17, 52:16
**establish** [2] - 46:12, 59:9
**evaluate** [1] - 24:8
**evaluation** [1] - 24:3
**event** [1] - 15:23
**eventual** [1] - 27:19
**evidence** [2] - 28:13, 41:6
**exact** [1] - 20:5
**exactly** [7] - 7:13, 8:23, 11:1, 14:12, 15:12, 31:13, 42:23
**examination** [1] - 7:23

**examine** [1] - 9:15
**example** [2] - 32:21, 54:21
**except** [1] - 33:11
**excluding** [1] - 40:13
**exclusive** [1] - 56:20
**exclusively** [1] - 22:14
**executive** [1] - 32:6
**exemption** [1] - 23:9
**exercise** [6] - 8:17, 10:20, 26:13, 48:20, 48:25, 52:6
**exercises** [2] - 33:3, 51:12
**Exhibit** [1] - 4:24
**exist** [5] - 40:25, 49:23, 57:11, 57:12, 57:15
**existing** [1] - 62:14
**expedition** [2] - 57:11, 57:15
**experts** [1] - 14:20
**explained** [1] - 25:11
**explanation** [1] - 26:1
**expounding** [1] - 19:14
**expressed** [1] - 23:9
**extent** [3] - 29:9, 32:7, 32:17
**extremely** [1] - 40:3

## F

**f)** [1] - 32:2
**FACA** [3] - 37:8, 47:22, 47:23
**face** [1] - 4:15
**faced** [1] - 39:17
**fact** [9] - 13:12, 14:24, 18:7, 19:23, 22:1, 27:1, 41:13, 43:12, 56:24
**facts** [7] - 19:6, 19:9, 20:18, 26:6, 59:1, 59:2, 59:12
**factual** [2] - 6:6, 20:17
**fail** [2] - 9:17, 47:25
**fails** [3] - 6:4, 9:24, 12:13
**failure** [7] - 9:22, 9:23, 10:7, 11:3, 37:22, 50:11, 52:20
**faith** [1] - 16:5
**fall** [7] - 16:14, 47:8, 47:18, 47:24, 48:7, 51:19, 61:13
**falls** [2] - 56:15, 60:7
**far** [2] - 61:3, 61:4
**FAR** [4] - 12:12, 12:15,

12:17, 13:2
**Federal** [6] - 12:7, 17:20, 34:22, 35:2, 35:3, 43:14
**federal** [1] - 12:18
**felt** [1] - 15:15
**figure** [2] - 37:1, 41:5, 57:6
**file** [2] - 43:5
**filed** [5] - 24:19, 26:24, 30:24, 32:9, 32:24
**filtered** [1] - 19:19
**final** [18] - 5:25, 6:3, 6:23, 6:24, 25:2, 25:3, 25:9, 25:14, 26:20, 27:13, 27:16, 28:11, 28:15, 31:9, 45:22, 45:24, 46:4, 50:2
**findings** [1] - 20:17
**first** [16] - 4:8, 5:1, 8:4, 11:14, 13:17, 25:23, 26:22, 28:7, 28:12, 30:9, 34:4, 41:24, 47:25, 62:9, 63:9
**fishing** [2] - 57:10, 57:15
**fits** [1] - 33:16
**five** [2] - 46:8, 46:9
**five-page** [2] - 46:8, 46:9
**focus** [5] - 21:9, 45:12, 45:14, 45:17, 55:23
**focused** [2] - 40:3, 55:24
**focusing** [4] - 20:4, 20:5, 25:3, 52:13
**FOIA** [25] - 6:2, 12:12, 13:2, 24:16, 24:17, 25:4, 25:22, 25:24, 26:8, 28:8, 35:16, 37:13, 37:14, 37:15, 41:19, 44:24, 44:25, 45:16, 48:8, 60:7, 60:8, 60:9, 61:9, 61:11, 61:13
**FOIA-based** [1] - 12:12
**following** [1] - 16:8
**force** [1] - 54:1
**foregoing** [1] - 64:4
**foreign** [6] - 18:11, 21:4, 33:20, 46:15, 46:20, 47:16
**former** [8] - 14:10, 14:18, 16:15, 17:1, 17:2, 34:18, 60:16
**forth** [1] - 52:5
**forward** [1] - 36:25

**Freedom** [1] - 12:8
**freestanding** [1] - 17:11
**Friends** [1] - 62:21
**front** [1] - 7:5
**frustrating** [1] - 13:11
**functional** [4] - 18:22, 18:24, 20:1, 20:24
**fundamental** [2] - 4:5, 5:20
**fundamentally** [1] - 25:24
**fundamentals** [1] - 6:9
**future** [1] - 22:10

## G

**general** [11] - 13:7, 13:18, 14:9, 14:14, 14:20, 26:14, 34:7, 34:21, 43:5, 48:21, 52:7
**general's** [1] - 14:2
**genesis** [1] - 24:17
**George** [1] - 36:12
**given** [6] - 5:2, 13:12, 15:3, 30:22, 38:23, 59:5
**government** [11] - 19:2, 20:25, 21:2, 21:5, 21:8, 21:12, 21:20, 44:17, 44:21, 47:10, 51:22
**granted** [1] - 6:5
**great** [1] - 47:15
**grounds** [1] - 23:6
**guess** [1] - 6:11
**guidance** [1] - 28:13
**guidelines** [7] - 12:6, 12:11, 12:18, 12:19, 12:21, 17:14, 17:16
**guys** [1] - 28:6

## H

**hand** [2] - 21:25, 55:6
**hands** [1] - 14:2
**hanging** [1] - 57:21
**happy** [1] - 40:15
**harmed** [1] - 50:1
**hat** [1] - 57:21
**head** [2] - 41:10, 60:1
**hearing** [1] - 5:3
**heck** [1] - 10:5
**Heckler** [5] - 10:5, 10:23, 11:2, 11:25, 18:3
**held** [2] - 11:2, 42:19

69

**help** [2] - 31:7, 61:13
**helped** [1] - 59:17
**helpful** [1] - 24:12
**hiding** [1] - 29:1
**historian** [1] - 19:15
**historical** [2] - 15:25, 22:18
**Historical** [3] - 16:10, 36:12, 57:20
**historically** [1] - 22:9
**history** [3] - 22:25, 23:10, 42:18
**hoc** [1] - 19:22
**hold** [2] - 10:23, 38:19
**holding** [3] - 12:23, 37:3, 45:5
**holds** [2] - 54:19, 60:16
**Honor** [16] - 5:5, 6:1, 10:22, 13:17, 18:17, 27:23, 28:2, 28:5, 29:22, 32:16, 33:12, 43:16, 62:10, 63:7, 63:16
**honor** [2] - 14:25, 16:6
**Honor's** [1] - 14:22
**hook** [2] - 38:19, 38:22
**hopefully** [1] - 15:21
**House** [4] - 31:7, 32:12, 42:20, 59:21

**I**

**idea** [4] - 35:12, 36:24, 44:12, 47:2
**identical** [1] - 11:6
**ignore** [1] - 57:17
**II** [12] - 12:1, 12:5, 12:13, 12:14, 12:23, 12:25, 13:4, 17:3, 17:10, 17:14, 40:10, 57:19
**immediately** [1] - 30:2
**implement** [1] - 59:6
**important** [6] - 23:11, 34:16, 36:25, 51:23, 51:24, 58:18
**impose** [1] - 62:17
**improperly** [1] - 8:21
**include** [3] - 31:10, 52:1, 52:2
**included** [1] - 19:23
**includes** [1] - 20:23
**incorporated** [1] - 5:11
**independent** [1] - 24:3
**indicate** [1] - 43:14
**indication** [1] - 11:10

**indispensable** [1] - 30:14
**individual** [1] - 10:12
**individuals** [1] - 32:6
**information** [10] - 4:21, 15:10, 22:10, 22:12, 28:20, 33:18, 36:17, 36:19, 41:10, 43:24
**Information** [1] - 12:8
**informed** [1] - 57:12
**inherently** [1] - 23:25
**initial** [1] - 15:2
**initiate** [3] - 9:13, 10:11, 11:3
**injury** [12] - 4:8, 4:9, 4:12, 5:17, 9:12, 47:19, 48:9, 49:1, 60:3, 60:5, 60:25
**input** [1] - 42:5
**inquiry** [3] - 9:16, 9:20
**inspections** [2] - 62:23, 62:25
**instance** [6] - 15:25, 16:7, 35:20, 37:17, 37:20, 49:10
**instances** [4] - 21:14, 46:14, 46:19, 61:10
**instead** [1] - 23:18
**intended** [3] - 14:13, 22:23, 24:7
**intent** [1] - 42:12
**interest** [5] - 10:11, 10:13, 10:18, 22:18, 35:1
**interesting** [4] - 18:19, 27:18, 63:19, 63:21
**interfering** [1] - 38:12
**interrupted** [1] - 27:25
**intimately** [1] - 59:18
**invoke** [12] - 7:2, 9:5, 9:17, 10:3, 11:12, 13:20, 25:13, 25:15, 35:1, 37:22, 52:16, 52:25
**invoking** [1] - 27:4
**involved** [3] - 17:14, 46:7, 59:18
**issue** [22] - 6:10, 6:12, 6:24, 6:25, 7:5, 7:9, 7:23, 12:8, 12:16, 12:19, 14:23, 16:20, 18:17, 18:20, 27:15, 30:11, 30:13, 36:23, 36:24, 38:14, 50:23, 58:7
**issues** [10] - 7:13, 24:22, 25:5, 26:21, 26:23, 28:3, 37:2, 38:11, 44:1, 57:24

**itself** [2] - 7:10, 43:13

**J**

**job** [2] - 47:6, 47:7
**jogger** [1] - 20:16
**joggers** [2] - 20:14, 20:20
**jointly** [1] - 8:25
**journal** [1] - 20:24
**journals** [1] - 20:23
**Judge** [1] - 58:21
**judgment** [3] - 11:17, 15:6, 17:2
**judicial** [8] - 5:21, 7:8, 7:19, 7:24, 17:21, 39:25, 52:22, 57:22
**Judicial** [8] - 37:7, 47:22, 48:9, 48:10, 49:5, 50:1, 51:3, 57:22
**Justice** [1] - 8:25

**K**

**Kaneshiro** [1] - 64:3
**KANESHIRO** [1] - 64:9
**Kaneshiro-Miller** [1] - 64:3
**KANESHIRO-MILLER** [1] - 64:9
**keep** [4] - 14:25, 48:17, 48:18, 49:18
**keeps** [1] - 34:5
**Kennedy** [2] - 9:1, 9:2
**Kennedy's** [1] - 16:1
**kept** [3] - 18:9, 21:15, 33:21
**kick** [1] - 60:8
**kind** [3] - 6:9, 13:14, 48:23
**knock** [3] - 35:8, 60:2, 60:18
**knows** [1] - 30:10

**L**

**lack** [4] - 4:9, 5:18, 5:25, 42:5
**language** [5] - 10:12, 11:7, 12:24, 39:24, 62:16
**last** [1] - 42:11
**law** [7] - 10:16, 11:1, 11:5, 11:24, 15:10, 16:2, 58:7
**laws** [1] - 11:16
**lawsuit** [11] - 8:24,

8:25, 26:24, 27:6, 27:8, 27:19, 37:15, 38:20, 47:20, 53:21
**leader** [2] - 21:4, 47:16
**leaders** [1] - 18:11
**leads** [1] - 51:25
**least** [2] - 18:14, 47:4
**leave** [1] - 14:19
**leaves** [4] - 42:21, 50:6, 50:7, 52:9
**leaving** [2] - 14:13, 32:12
**led** [2] - 23:1, 24:18
**left** [1] - 14:1
**legal** [2] - 16:13, 25:6
**legality** [1] - 16:16
**legislative** [1] - 23:10
**less** [2] - 38:22, 39:22
**letter** [42] - 4:23, 5:1, 5:9, 7:7, 8:6, 11:10, 19:7, 19:8, 19:10, 20:19, 21:7, 21:13, 21:17, 21:18, 23:18, 24:11, 24:24, 25:2, 25:12, 25:14, 25:19, 25:23, 26:12, 27:3, 27:9, 27:15, 28:7, 28:10, 28:12, 29:14, 36:9, 41:18, 44:10, 45:22, 46:8, 46:9, 47:11, 53:14, 53:19, 60:1
**letters** [12] - 6:1, 6:7, 24:16, 24:18, 33:6, 39:4, 52:14, 57:13, 57:14, 59:3, 59:9, 59:13
**Library** [2] - 9:3, 32:22
**lies** [1] - 13:18
**light** [1] - 53:18
**likely** [2] - 20:2, 61:15
**limited** [3] - 36:24, 37:2, 55:7
**line** [2] - 5:22, 10:23
**list** [1] - 55:21
**listen** [1] - 47:15
**listing** [1] - 33:19
**literally** [3] - 18:9, 19:12, 55:8
**litigant** [4] - 4:3, 14:17, 16:17, 22:23
**litigants** [3] - 13:25, 17:21, 18:2
**litigated** [2] - 23:4, 26:22
**litigation** [2] - 15:3, 23:12
**look** [5] - 16:24, 17:4, 25:10, 34:4, 44:18

**looked** [1] - 41:18
**looks** [2] - 10:9, 46:9
**losing** [1] - 15:16

**M**

**main** [1] - 23:7
**maker** [2] - 16:20, 16:22
**maliciously** [1] - 13:14
**manage** [2] - 56:6, 57:2
**managed** [1] - 41:1
**management** [5] - 40:5, 40:6, 40:23, 56:4, 56:25
**mandamus** [1] - 38:3
**mandatory** [3] - 62:3, 62:25, 63:2
**map** [1] - 9:1
**Materials** [1] - 15:13
**materials** [4] - 7:17, 7:19, 32:5, 34:18
**matter** [3] - 42:18, 59:8, 64:5
**McIlveney** [2] - 8:23, 8:24
**mean** [34] - 8:6, 12:23, 17:15, 17:16, 29:11, 29:13, 34:17, 34:23, 36:10, 37:10, 43:12, 43:16, 43:19, 44:12, 46:6, 47:23, 48:19, 50:3, 50:22, 51:21, 53:21, 54:6, 56:5, 56:15, 56:23, 57:9, 58:14, 58:16, 58:23, 59:11, 60:24, 60:25
**means** [3] - 54:24, 56:25, 63:21
**measuring** [1] - 46:4
**mechanism** [20] - 7:2, 8:19, 9:6, 9:18, 10:4, 10:10, 11:12, 13:21, 17:24, 25:14, 25:16, 27:4, 43:1, 43:15, 48:24, 49:7, 52:5, 52:16, 52:25
**mechanisms** [5] - 15:22, 34:5, 37:22, 44:11, 50:8
**meet** [1] - 62:6
**meetings** [1] - 59:17
**memory** [4] - 19:20, 20:14, 20:16, 20:20
**mention** [1] - 42:5
**mere** [1] - 19:23
**merited** [1] - 59:2
**merits** [1] - 9:10

70

**middle** [1] - 43:3
**might** [5] - 17:15, 20:10, 23:22, 24:12, 27:2
**Miller** [1] - 64:3
**MILLER** [1] - 64:9
**mind** [3] - 20:17, 42:13, 58:8
**mine** [1] - 23:16
**minute** [1] - 61:19
**misclassified** [6] - 13:20, 38:25, 39:3, 49:14, 49:15, 52:4
**misclassifying** [1] - 15:10
**missing** [3] - 18:1, 30:14, 36:11
**moment** [4] - 4:16, 20:7, 39:4, 48:23
**moreover** [1] - 4:13
**morning** [2] - 28:5, 63:19
**most** [2] - 25:23, 61:15
**motion** [1] - 36:22
**MR** [134] - 4:18, 5:5, 5:7, 5:11, 5:14, 6:16, 7:13, 8:18, 9:8, 10:5, 10:22, 11:15, 12:4, 13:16, 14:11, 15:6, 15:21, 16:11, 17:7, 17:10, 18:16, 18:21, 19:6, 19:16, 19:21, 20:9, 20:18, 21:6, 21:18, 22:4, 23:24, 24:14, 25:18, 25:21, 26:6, 26:19, 27:6, 27:11, 27:15, 27:19, 27:23, 28:2, 28:5, 28:19, 28:24, 29:2, 29:5, 29:9, 29:22, 29:25, 30:6, 30:9, 30:13, 30:16, 31:5, 31:17, 32:1, 32:3, 32:16, 32:25, 33:5, 33:12, 33:15, 34:4, 34:10, 35:11, 36:5, 36:13, 37:6, 37:24, 38:6, 38:9, 39:2, 40:2, 40:9, 40:18, 41:12, 41:24, 42:8, 42:16, 42:22, 43:16, 43:20, 44:4, 44:7, 44:10, 45:7, 45:11, 45:14, 46:7, 46:12, 47:21, 48:14, 49:2, 49:12, 49:18, 49:22, 50:15, 50:25, 51:18, 52:9, 52:19, 53:7, 53:16, 53:25, 54:6,

54:15, 55:11, 55:15, 56:4, 56:13, 56:18, 56:22, 57:24, 58:4, 58:6, 58:14, 58:19, 58:23, 59:7, 60:5, 60:10, 60:13, 60:15, 60:20, 60:23, 61:4, 61:15, 61:20, 61:23, 62:9, 63:7, 63:11, 63:15
**mushy** [1] - 50:21
**musing** [1] - 18:8
**must** [2] - 4:6, 6:4

# N

**namely** [2] - 5:23, 7:20
**NARA** [17] - 4:10, 4:11, 4:19, 5:14, 5:15, 6:25, 7:1, 7:6, 18:23, 19:8, 20:19, 21:7, 22:6, 62:22, 62:24, 62:25, 63:4
**NARA's** [2] - 4:13, 6:7
**narrow** [2] - 12:4, 13:3
**narrower** [1] - 12:24
**nature** [2] - 8:7, 62:3
**nearly** [1] - 11:6
**necessarily** [5] - 7:16, 9:19, 34:11, 41:1, 47:7
**necessary** [2] - 9:12, 36:14
**need** [4] - 36:23, 56:13, 62:1, 63:22
**needs** [3] - 9:15, 56:25, 57:8
**never** [4] - 24:24, 39:9, 41:16, 41:17
**New** [1] - 44:2
**new** [1] - 15:17
**next** [5] - 36:23, 37:1, 46:17, 50:14, 50:18
**nice** [2] - 44:10, 60:1
**Nixon** [5] - 15:13, 22:16, 23:4, 23:7, 23:12
**none** [1] - 57:24
**note** [1] - 17:13
**notes** [7] - 18:25, 19:22, 20:1, 20:2, 20:8, 20:23, 54:22
**nothing** [10] - 13:13, 26:8, 29:14, 38:18, 42:10, 44:8, 50:25, 51:21, 52:23, 55:10
**notion** [1] - 42:6
**novo** [1] - 42:3
**number** [2] - 12:10,

12:11

# O

**objective** [1] - 53:8
**obligation** [10] - 35:21, 39:14, 44:1, 49:3, 49:17, 49:23, 49:24, 49:25, 55:17, 55:18
**obligations** [4] - 14:25, 41:8, 48:11, 58:9
**Observatory** [1] - 60:1
**obtain** [1] - 35:21
**occasion** [1] - 24:25
**occurred** [4] - 11:18, 15:4, 46:24, 46:25
**occurring** [1] - 46:25
**OF** [1] - 64:1
**office** [8] - 31:25, 32:1, 32:6, 38:10, 38:13, 39:21, 40:21, 60:16
**Office** [3] - 59:16, 59:17, 59:20
**OFFICIAL** [1] - 64:1
**official** [8] - 18:15, 19:1, 20:6, 21:25, 22:2, 22:10, 22:14, 22:17
**once** [20] - 7:10, 14:5, 23:20, 28:15, 29:6, 33:15, 34:13, 34:19, 41:7, 42:1, 42:7, 42:8, 48:4, 49:2, 49:4, 49:23, 49:25, 50:5, 51:6, 51:18
**one** [35] - 4:23, 6:17, 10:9, 12:2, 12:10, 13:17, 16:17, 19:19, 22:21, 22:25, 23:7, 30:10, 35:4, 36:10, 39:8, 44:6, 44:7, 44:11, 49:6, 49:9, 50:8, 51:13, 51:17, 52:5, 54:19, 54:20, 54:22, 57:5, 59:14, 61:12, 62:1, 62:14
**ones** [2] - 19:12, 30:24
**open** [3] - 13:8, 17:4, 52:9
**opens** [3] - 50:6, 51:2, 61:6
**operations** [1] - 59:17
**opinion** [3] - 8:9, 45:5, 45:23
**opportunity** [5] - 26:20, 26:23, 52:10,

54:4, 61:2
**opposed** [4] - 19:14, 40:13, 51:16, 53:11
**option** [1] - 44:7
**options** [2] - 44:4, 50:1
**order** [13] - 4:3, 5:15, 9:13, 12:19, 29:3, 29:7, 35:6, 48:25, 49:10, 50:23, 60:17, 60:20, 63:4
**ordered** [1] - 50:16
**orders** [1] - 50:16
**original** [1] - 58:10
**otherwise** [2] - 13:2, 16:22
**outline** [1] - 61:17
**outside** [6] - 8:21, 19:24, 22:18, 37:13, 37:14, 48:7
**Oval** [3] - 59:15, 59:17, 59:20
**overall** [1] - 53:8
**overruled** [1] - 4:14
**own** [7] - 7:7, 7:11, 7:17, 7:21, 16:4, 24:3
**ownership** [1] - 44:14

# P

**page** [5] - 15:1, 46:8, 46:9, 57:5
**paper** [2] - 42:20, 54:19
**papers** [4] - 7:21, 20:1, 42:10, 57:5
**parse** [1] - 21:23
**part** [9] - 11:16, 11:22, 17:8, 17:10, 17:12, 18:14, 23:25, 42:24, 53:10
**particular** [8] - 5:23, 5:24, 6:6, 11:5, 17:19, 17:22, 22:24, 48:12
**particularly** [1] - 40:15
**parts** [1] - 33:12
**party** [4] - 30:15, 36:11, 36:14, 40:15
**pass** [1] - 15:10
**passage** [1] - 23:1
**passed** [3] - 15:17, 16:2, 23:2
**past** [1] - 15:12
**Patricia** [1] - 64:3
**PATRICIA** [1] - 64:9
**perception** [1] - 19:20
**perfect** [1] - 56:12

**perhaps** [2] - 21:9, 24:23
**permits** [1] - 17:21
**permitted** [1] - 8:17
**person** [1] - 56:20
**personal** [61] - 5:24, 6:19, 7:14, 7:21, 7:24, 8:10, 8:12, 9:10, 18:13, 18:25, 19:2, 19:10, 19:22, 19:25, 20:1, 20:2, 20:22, 20:23, 22:19, 22:21, 22:25, 23:3, 23:6, 23:9, 23:19, 23:20, 26:2, 26:7, 27:2, 30:24, 31:4, 32:8, 32:12, 32:13, 32:24, 33:10, 34:14, 36:7, 41:22, 43:24, 47:8, 47:12, 51:14, 53:12, 54:5, 54:11, 54:14, 54:23, 54:24, 54:25, 56:9, 56:11, 56:14, 56:18, 56:20, 56:24, 57:5, 59:12, 62:15
**perspective** [1] - 55:20
**Peterson** [2] - 16:19, 17:13
**phone** [7] - 18:11, 19:13, 21:4, 29:14, 43:7, 47:14, 59:25
**phrase** [1] - 48:18
**physically** [1] - 43:6
**pick** [2] - 21:4, 51:6
**piece** [1] - 42:20
**place** [4] - 11:14, 51:19, 56:3, 56:11
**plaintiff** [16] - 5:3, 6:17, 12:9, 12:10, 12:11, 14:17, 16:22, 17:18, 18:23, 19:7, 20:19, 22:8, 24:20, 24:25, 25:3, 31:5
**plaintiff's** [9] - 4:6, 4:8, 4:9, 4:19, 5:17, 7:7, 7:17, 9:12, 21:6
**play** [1] - 45:16
**pleadings** [1] - 4:16
**point** [22] - 4:16, 5:1, 7:12, 15:19, 22:8, 24:11, 25:12, 26:19, 37:1, 38:16, 38:22, 39:8, 40:19, 40:21, 42:1, 42:6, 43:2, 43:4, 46:23, 50:22
**pointed** [2] - 21:14, 48:21
**points** [3] - 12:9, 22:5,

27:25

**policies** [1] - 46:16
**policy** [1] - 46:18
**portion** [2] - 8:16, 47:18
**portions** [2] - 21:16, 47:4
**position** [5] - 6:12, 18:4, 18:16, 27:13, 33:22
**possess** [3] - 4:11, 4:19, 5:15
**possession** [3] - 44:14, 55:18, 60:17
**possibility** [8] - 13:22, 16:6, 50:6, 50:7, 53:2, 60:23, 61:5
**possible** [4] - 32:7, 33:24, 37:9, 54:16
**possibly** [1] - 30:6
**post** [2] - 19:22, 20:21
**post-presidency** [1] - 20:21
**posted** [1] - 20:10
**potential** [2] - 4:4, 23:6
**power** [5] - 48:12, 48:16, 48:24, 49:16, 54:2
**powers** [2] - 38:11, 50:19
**PRA** [19] - 4:13, 4:14, 5:20, 5:21, 5:24, 6:2, 12:16, 16:6, 16:8, 17:11, 24:17, 25:5, 25:6, 25:8, 45:6, 52:12, 53:7, 53:10, 58:8
**practical** [1] - 32:17
**pre** [1] - 62:14
**pre-existing** [1] - 62:14
**precluded** [1] - 5:24, 7:20, 17:22
**precludes** [1] - 5:21
**precluding** [1] - 7:24
**preclusion** [1] - 22:22
**preconditions** [1] - 12:13
**predecessor** [1] - 15:14
**predicate** [1] - 25:13
**premised** [1] - 28:17
**prepared** [4] - 18:25, 20:16, 20:25, 42:3
**prerogative** [1] - 63:1
**present** [5] - 12:5, 16:20, 25:4, 27:6, 27:20
**presented** [5] - 6:25,

23:11, 25:23, 26:9, 59:2
**preservation** [1] - 31:19
**Preservation** [1] - 15:14
**preserve** [1] - 16:2
**presidency** [23] - 8:13, 18:15, 19:14, 20:13, 20:14, 20:21, 30:25, 32:10, 32:11, 36:3, 36:4, 38:7, 38:16, 38:21, 38:23, 40:3, 40:4, 40:19, 41:1, 56:12, 57:18, 57:19, 57:20
**President** [35] - 6:18, 7:18, 9:1, 15:13, 16:1, 18:22, 19:2, 19:5, 20:12, 20:17, 20:20, 21:10, 21:21, 22:13, 23:4, 23:7, 29:12, 29:15, 30:10, 35:9, 36:7, 36:14, 36:16, 36:19, 38:9, 40:7, 40:20, 41:2, 41:17, 42:14, 44:7, 46:15, 51:1, 54:25, 61:2
**president** [69] - 4:22, 7:16, 8:1, 8:3, 8:13, 10:1, 13:7, 13:10, 13:13, 13:14, 13:19, 14:5, 14:10, 14:18, 14:22, 15:8, 15:9, 16:5, 16:7, 16:12, 16:15, 17:1, 17:2, 18:7, 19:17, 21:14, 22:11, 22:13, 23:1, 23:16, 23:19, 30:4, 30:17, 30:19, 30:22, 31:8, 31:11, 31:20, 32:5, 32:7, 32:19, 32:25, 33:2, 34:18, 36:4, 36:6, 38:4, 38:13, 38:17, 39:19, 42:5, 42:9, 46:20, 51:11, 51:12, 53:11, 53:13, 54:9, 54:15, 54:17, 55:6, 55:22, 57:2, 57:8, 60:16, 62:13
**president's** [12] - 7:1, 7:9, 7:20, 7:21, 16:12, 23:3, 31:24, 38:12, 41:10, 54:5, 54:8, 55:23
**Presidential** [21] - 4:1, 9:2, 13:2, 14:6, 15:13, 15:15, 23:1,

29:25, 34:17, 34:25, 35:12, 39:18, 40:12, 40:13, 40:16, 42:18, 43:12, 44:15, 45:15, 45:17, 59:6
**presidential** [111] - 4:5, 7:14, 7:23, 8:12, 8:13, 9:10, 12:3, 12:7, 12:21, 12:25, 17:17, 17:20, 19:11, 22:1, 22:9, 22:12, 22:24, 24:5, 26:3, 27:2, 28:9, 28:14, 28:16, 29:6, 30:4, 30:17, 30:20, 30:21, 30:23, 31:1, 31:10, 31:11, 31:12, 31:15, 31:20, 31:22, 32:8, 32:13, 32:19, 32:20, 32:24, 33:1, 33:10, 33:13, 33:15, 33:18, 33:23, 34:15, 34:20, 35:23, 36:8, 37:11, 37:12, 37:25, 39:6, 39:12, 39:16, 41:4, 41:7, 41:8, 41:19, 41:22, 44:14, 44:20, 45:2, 45:12, 45:20, 46:13, 46:14, 47:19, 47:25, 48:4, 48:7, 49:3, 49:24, 50:5, 50:16, 51:4, 51:5, 51:11, 51:14, 51:20, 51:24, 52:22, 52:24, 53:4, 53:8, 53:12, 54:14, 54:18, 55:8, 55:9, 55:18, 55:20, 55:21, 56:24, 56:11, 56:15, 56:24, 57:5, 57:9, 59:10, 59:16, 60:7, 61:8, 62:4, 62:5, 62:12
**presidents** [2] - 14:25, 34:16
**press** [2] - 42:19, 44:1
**pressing** [1] - 21:3
**presumably** [2] - 6:19, 14:24
**presumed** [1] - 16:5
**presumption** [1] - 23:15
**presumptively** [1] - 10:7
**pretty** [1] - 46:12
**prevent** [1] - 13:10
**prevention** [1] - 37:9
**prevents** [1] - 37:9
**primary** [1] - 13:17
**privacy** [3] - 13:12, 23:3, 23:6

**private** [15] - 4:3, 13:9, 13:14, 13:25, 14:17, 16:17, 18:2, 22:23, 39:23, 40:15, 45:5, 45:23, 52:1, 60:14, 60:15
**PRMPA** [1] - 15:14
**problem** [4] - 6:23, 36:6, 41:12, 57:4
**Procedure** [1] - 4:2
**Proceedings** [1] - 63:24
**proceedings** [2] - 60:25, 64:5
**process** [8] - 17:5, 25:8, 44:24, 45:3, 48:1, 56:2, 61:9
**processed** [1] - 51:5
**produced** [1] - 32:5
**properly** [2] - 10:17, 51:5
**property** [3] - 44:16, 44:21, 51:22
**protection** [1] - 22:21
**provide** [3] - 4:1, 24:21, 36:20
**provided** [6] - 19:6, 19:9, 20:18, 28:13, 34:13, 41:6
**provision** [4] - 34:6, 34:22, 35:16, 52:3
**public** [16] - 10:11, 10:13, 10:18, 13:8, 13:12, 20:9, 23:17, 33:24, 35:1, 35:15, 35:19, 39:15, 43:21, 44:22, 51:23, 53:9
**Public** [1] - 44:18
**publicly** [1] - 16:3
**purported** [1] - 8:15
**purporting** [1] - 8:5
**purports** [2] - 23:20, 53:14
**purpose** [1] - 8:7
**purposes** [3] - 5:2, 28:23, 47:12
**pursuant** [1] - 24:17
**pursue** [3] - 13:21, 14:1, 18:1
**put** [1] - 35:6
**puts** [3] - 54:19, 54:23, 63:12

## Q

**quality** [1] - 63:18
**quickly** [1] - 33:24
**quite** [1] - 23:17
**quote** [3] - 14:23,

62:17, 62:18

## R

**raise** [1] - 55:6
**raised** [2] - 6:13, 24:24
**rather** [2] - 19:10, 26:3
**rationale** [3] - 7:19, 7:24, 18:3
**rationally** [4] - 18:23, 19:8, 20:19, 21:7
**raw** [1] - 19:20
**reach** [1] - 18:17
**read** [10] - 11:10, 13:5, 17:10, 24:13, 35:3, 35:25, 36:1, 46:8, 46:11, 63:20
**reading** [6] - 17:3, 22:6, 22:7, 24:14, 36:1, 36:2
**Reagan's** [1] - 22:14
**real** [1] - 15:16
**really** [7] - 7:4, 16:11, 16:17, 18:14, 38:4, 41:10, 62:1
**realm** [3] - 18:12, 19:24, 22:18
**reason** [7] - 5:19, 5:25, 6:3, 11:16, 17:23, 24:22
**reasonable** [1] - 22:5
**reasons** [4] - 4:6, 12:13, 14:19, 22:25
**receipt** [2] - 32:9, 54:14
**receive** [1] - 34:20
**received** [7] - 28:10, 32:5, 34:15, 34:18, 39:8, 39:9, 53:19
**receiving** [1] - 53:18
**reclassify** [5] - 8:5, 16:18, 17:19, 18:1, 53:22
**reclassifying** [1] - 53:20
**recognizes** [2] - 13:13, 19:25
**recognizing** [1] - 23:14
**recollection** [1] - 19:22
**Record** [1] - 44:15
**record** [42] - 4:5, 8:9, 12:7, 12:18, 12:21, 15:1, 19:3, 20:9, 21:21, 22:1, 22:17, 22:19, 22:24, 29:15, 30:9, 30:20, 31:10,

31:11, 31:12, 31:15, 32:19, 32:20, 33:2, 33:15, 45:23, 47:7, 47:9, 49:22, 51:20, 51:24, 54:24, 54:25, 55:20, 55:21, 55:24, 56:16, 56:18, 57:10, 64:4

**recorded** [1] - 18:22
**recorder** [2] - 21:3, 21:24
**recording** [3] - 19:13, 19:14, 33:21
**recordings** [3] - 47:12, 59:15, 59:18
**Recordings** [1] - 15:13
**records** [192] - 5:24, 6:6, 6:19, 7:14, 8:12, 8:14, 8:20, 13:1, 13:21, 14:1, 14:7, 14:8, 14:16, 15:11, 16:1, 16:3, 16:19, 17:17, 17:19, 17:20, 18:1, 18:14, 19:10, 19:11, 19:25, 20:22, 21:10, 21:11, 21:19, 22:21, 23:10, 24:4, 24:5, 26:2, 26:3, 26:7, 26:14, 27:2, 27:3, 28:9, 28:14, 28:16, 29:6, 29:16, 30:1, 30:4, 30:10, 30:17, 30:18, 30:19, 30:20, 30:21, 30:23, 31:1, 31:8, 31:20, 31:21, 31:22, 31:23, 32:8, 33:1, 33:13, 33:17, 33:18, 33:22, 33:23, 34:10, 34:12, 34:14, 34:15, 34:20, 35:12, 35:14, 35:15, 35:20, 35:22, 35:23, 35:24, 36:4, 36:7, 36:8, 36:9, 36:21, 36:22, 37:11, 37:12, 37:25, 39:6, 39:12, 39:13, 39:14, 39:16, 39:20, 39:22, 39:25, 40:24, 40:25, 41:3, 41:4, 41:7, 41:8, 41:17, 41:19, 42:10, 43:7, 43:22, 43:23, 44:8, 44:14, 44:15, 44:20, 45:1, 45:2, 45:12, 45:20, 46:13, 46:14, 47:19, 47:24, 47:25, 48:2, 48:3, 48:4, 48:5, 48:7, 48:8, 48:17, 49:2,

49:3, 49:14, 49:15, 49:21, 49:24, 50:5, 50:7, 50:16, 50:18, 51:2, 51:4, 51:5, 51:11, 52:4, 52:21, 52:22, 52:25, 53:4, 53:8, 54:16, 54:17, 54:18, 54:23, 55:9, 55:18, 55:20, 56:5, 56:14, 57:2, 57:8, 57:11, 57:12, 59:9, 59:10, 59:16, 60:2, 60:6, 60:7, 61:6, 61:8, 61:10, 62:5, 62:12, 62:15, 62:23
**Records** [25] - 4:2, 12:7, 13:3, 14:6, 15:15, 17:20, 23:2, 29:25, 34:17, 34:22, 34:25, 35:2, 35:3, 35:12, 39:18, 40:12, 40:14, 40:17, 42:18, 43:12, 43:14, 44:18, 45:15, 45:17, 59:6
**recover** [1] - 9:1
**recovery** [3] - 13:21, 14:16, 18:1
**redress** [3] - 5:17, 9:12, 60:4
**redressability** [7] - 6:10, 9:11, 9:16, 9:21, 9:24, 50:3, 61:7
**redressable** [4] - 4:8, 47:19, 49:1, 60:5
**redressed** [2] - 4:12, 51:3, 60:24
**reference** [2] - 33:10, 36:16
**referenced** [2] - 5:9, 6:1
**refusal** [1] - 9:5
**regard** [1] - 34:21
**regardless** [2] - 8:1, 30:19
**related** [1] - 6:2
**relating** [2] - 16:1, 22:10
**relatively** [1] - 63:20
**release** [1] - 44:1
**relevant** [4] - 9:16, 16:20, 16:21, 21:21
**relied** [1] - 14:24
**relief** [2] - 4:1, 6:5
**relies** [1] - 37:10
**remedies** [2] - 14:7, 35:2
**remedy** [7] - 13:15, 13:17, 13:24, 14:4, 37:10, 43:13, 52:11

**repeat** [1] - 62:1
**repeating** [2] - 48:18, 49:18
**reply** [2] - 11:19, 63:5
**reported** [1] - 46:20
**REPORTER** [1] - 64:1
**represent** [2] - 25:7, 27:16
**representative** [1] - 10:13
**request** [1] - 28:8
**requests** [1] - 24:17
**require** [2] - 4:10, 29:10
**required** [14] - 7:3, 24:21, 30:1, 30:3, 35:13, 35:18, 42:23, 43:9, 43:20, 44:19, 45:2, 54:15, 63:3
**requirement** [3] - 39:12, 43:8, 54:20
**requirements** [1] - 26:19
**reserve** [1] - 44:13
**resolve** [2] - 26:23, 37:2
**resources** [1] - 18:5
**respect** [5] - 25:4, 25:22, 27:16
**respond** [2] - 24:18, 25:1
**responded** [3] - 18:23, 19:8, 24:2
**responding** [3] - 6:7, 7:7, 24:2
**response** [11] - 4:25, 6:2, 28:7, 28:10, 28:11, 33:5, 39:15, 45:4, 52:18, 63:14
**responses** [1] - 62:9
**responsibility** [6] - 31:19, 39:14, 62:4, 62:19, 62:23, 63:1
**responsible** [1] - 38:20
**rest** [2] - 36:2, 63:15
**rests** [1] - 35:17
**retain** [1] - 44:13
**retained** [1] - 7:19
**retains** [1] - 16:13
**review** [31] - 5:21, 7:9, 7:15, 7:20, 7:25, 8:3, 9:5, 9:18, 9:21, 10:1, 10:2, 10:19, 10:21, 10:24, 11:8, 12:6, 17:5, 17:21, 37:22, 40:1, 40:11, 41:21, 41:23, 41:25, 43:23, 52:3, 55:2, 58:11, 58:15, 58:22, 59:8

**reviewable** [10] - 6:13, 7:12, 10:8, 12:2, 23:22, 23:24, 25:17, 45:25, 53:24, 62:7
**reviewed** [3] - 11:23, 39:11, 41:16
**reviewing** [2] - 17:16, 41:25
**role** [2] - 24:6, 24:8
**rooms** [1] - 59:20
**running** [2] - 18:9, 21:15

## S

**sat** [1] - 19:17
**saw** [1] - 46:21
**scheme** [3] - 24:7, 24:9, 31:2
**SCHWEI** [46] - 4:18, 5:5, 5:7, 5:11, 5:14, 6:16, 7:13, 8:18, 9:8, 10:5, 10:22, 11:15, 12:4, 13:16, 14:11, 15:6, 15:21, 16:11, 17:7, 17:10, 18:16, 18:21, 19:6, 19:16, 19:21, 20:9, 20:18, 21:6, 21:18, 22:4, 23:24, 24:14, 25:18, 25:21, 26:6, 26:19, 27:6, 27:11, 27:15, 27:19, 27:23, 28:2, 62:9, 63:7, 63:11, 63:15
**scope** [6] - 6:11, 23:3, 37:13, 37:14
**scrutiny** [1] - 4:4
**SEC** [1] - 11:19
**second** [12] - 4:23, 5:19, 6:12, 6:22, 10:8, 14:3, 14:21, 15:25, 22:8, 30:11, 62:16, 63:9
**secretary** [1] - 46:17
**section** [14] - 32:16, 34:6, 35:25, 36:1, 51:15, 51:16, 51:18, 56:5, 56:6, 56:9, 56:10, 62:6, 63:4
**Section** [12] - 8:19, 32:2, 32:4, 43:11, 44:12, 54:13, 56:1, 56:8, 62:3, 62:11, 62:13, 63:10
**sections** [2] - 44:18, 51:19
**see** [7] - 21:17, 35:3, 36:24, 38:21, 49:16,

53:17, 54:3
**seek** [2] - 14:15, 50:17
**segregate** [2] - 21:16, 44:25
**seize** [8] - 4:10, 5:16, 15:11, 16:18, 24:21, 29:13, 29:18, 43:6
**seizing** [1] - 15:17
**seizure** [2] - 4:4, 29:11
**senators** [1] - 46:16
**sense** [2] - 26:22, 56:12
**sensitivity** [1] - 7:20
**sent** [1] - 47:14
**sentence** [1] - 43:11
**separate** [3] - 9:11, 9:20, 34:6
**separated** [1] - 31:4
**separately** [3] - 30:24, 32:9, 32:24
**separation** [1] - 38:11
**serious** [2] - 14:11, 14:15
**Service** [1] - 62:21
**serving** [1] - 20:23
**set** [4] - 52:5, 57:3, 59:17, 59:18
**sets** [1] - 49:25
**setting** [1] - 6:23
**shall** [8] - 31:18, 32:7, 32:17, 32:23, 44:13, 62:4, 62:22
**sheet** [1] - 54:19
**shield** [1] - 13:8
**shredding** [1] - 55:8
**similar** [2] - 38:7, 47:1
**simply** [9] - 5:16, 13:9, 16:19, 17:2, 19:2, 19:17, 22:17, 48:16, 61:7
**single** [2] - 42:20, 59:23
**sit** [1] - 51:21
**sits** [1] - 48:23
**sitting** [1] - 20:8
**situation** [3] - 12:25, 14:16, 38:3
**situations** [1] - 14:15
**slate** [4] - 57:22, 58:3, 58:8, 63:21
**slightly** [1] - 37:8
**snippets** [1] - 13:5
**softer** [1] - 26:4
**solely** [9] - 20:12, 20:13, 20:16, 20:20, 37:10, 45:18, 52:21, 54:8
**someone** [4] - 12:15, 12:17, 19:13, 21:25
**sometimes** [2] - 59:20

**somewhere** [1] - 43:1
**sorry** [2] - 37:15, 57:14
**sort** [7] - 18:12, 31:8, 37:2, 42:6, 47:20, 53:22, 57:6
**sorts** [1] - 13:8
**sound** [4] - 19:10, 21:21, 49:22, 59:12
**sounds** [2] - 11:12, 29:11
**source** [2] - 53:5, 53:7
**speaking** [2] - 21:22, 33:19
**specific** [3] - 30:22, 62:12, 63:2
**specifically** [5] - 12:1, 21:16, 29:17, 52:12, 56:2
**specifies** [1] - 43:13
**speech** [1] - 54:22
**speeches** [2] - 54:22, 54:23
**spend** [1] - 18:5
**square** [1] - 39:24
**stack** [1] - 57:5
**staff** [2] - 32:6, 47:15
**standard** [5] - 10:21, 41:23, 41:24, 58:11, 59:8
**standing** [2] - 26:11, 47:23
**start** [1] - 6:9
**started** [2] - 18:12, 23:14
**starts** [2] - 10:5, 39:22
**state** [2] - 6:5, 46:18
**states** [2] - 33:6, 34:8
**States** [7] - 8:24, 31:18, 44:13, 44:16, 44:17, 44:20, 51:21
**stating** [3] - 10:6, 10:24, 29:15
**statute** [51] - 5:20, 8:11, 8:16, 8:18, 10:25, 12:16, 12:22, 13:11, 15:17, 15:18, 15:20, 15:21, 19:23, 19:25, 21:23, 22:3, 22:6, 23:5, 29:24, 30:25, 31:14, 31:17, 33:9, 33:11, 33:13, 35:17, 36:2, 37:5, 38:19, 38:24, 42:6, 42:21, 42:22, 45:22, 48:25, 49:7, 49:13, 51:8, 51:9, 51:11, 52:1, 52:2, 52:6, 54:3, 59:6, 60:8, 62:22

**statutes** [2] - 4:3, 18:6
**statutory** [17] - 10:9, 11:5, 11:6, 14:25, 15:11, 24:7, 24:9, 31:2, 34:23, 35:5, 35:7, 38:19, 38:22, 48:11, 48:19, 49:16, 49:17
**stay** [1] - 44:16
**step** [4] - 36:23, 37:1, 50:18, 59:23
**still** [11] - 16:12, 17:14, 23:3, 23:4, 28:15, 30:21, 40:20, 41:13, 47:7, 55:16, 55:17
**stops** [2] - 60:25, 61:1
**strike** [1] - 13:11
**strong** [1] - 23:15
**struck** [1] - 40:16
**structure** [1] - 15:11
**stuck** [2] - 37:16, 39:17
**subject** [4] - 39:25, 41:19, 48:11, 52:4
**subsection** [2] - 32:17, 33:11
**subsequent** [2] - 14:24, 22:16
**subsequently** [2] - 13:5, 15:14
**substance** [3] - 30:18, 30:20, 55:25
**sue** [4] - 14:18, 26:15, 34:2, 61:2
**sued** [1] - 36:12
**suggest** [2] - 52:3, 57:13
**suggests** [1] - 47:11
**suit** [1] - 28:17
**supposed** [10] - 26:15, 32:25, 42:2, 44:3, 44:16, 44:21, 44:24, 51:5, 51:22, 54:18
**Supreme** [4] - 10:6, 11:2, 22:15, 23:8
**sweep** [1] - 13:1
**system** [2] - 48:3, 57:3

**T**

**talks** [8] - 23:10, 30:18, 34:10, 34:13, 34:19, 47:8, 56:4, 56:9
**tape** [7] - 19:12, 19:20, 21:3, 21:15, 21:24, 47:14
**tapes** [14] - 4:20, 5:15,

5:16, 6:19, 8:6, 8:9, 18:9, 18:21, 18:24, 18:25, 24:21, 28:14, 42:15, 47:4
**Taylor** [7] - 18:8, 21:14, 46:19, 47:5, 47:6, 47:14, 59:19
**tee** [1] - 26:10
**teed** [2] - 24:12, 24:16
**telephone** [1] - 19:18
**term** [11] - 16:12, 31:25, 39:20, 41:2, 54:6, 54:8, 54:10, 57:1, 57:4, 62:15
**text** [3] - 10:9, 11:5, 11:6
**THE** [135] - 4:15, 4:21, 5:6, 5:10, 5:13, 6:9, 7:8, 8:2, 9:4, 9:25, 10:19, 11:9, 12:1, 12:23, 14:4, 15:3, 15:18, 16:9, 16:23, 17:8, 18:7, 18:19, 19:4, 19:12, 19:19, 20:4, 20:15, 20:22, 21:13, 21:23, 23:13, 24:10, 25:9, 25:19, 26:4, 26:10, 26:25, 27:8, 27:13, 27:17, 27:21, 27:24, 28:4, 28:17, 28:22, 28:25, 29:3, 29:7, 29:19, 29:23, 30:3, 30:7, 30:12, 30:14, 30:22, 31:13, 31:24, 32:2, 32:4, 32:23, 33:3, 33:8, 33:14, 33:25, 34:8, 34:25, 35:25, 36:11, 37:3, 37:21, 38:1, 38:8, 38:15, 39:18, 40:8, 40:10, 41:9, 41:21, 42:2, 42:14, 42:17, 43:10, 43:18, 43:25, 44:6, 44:9, 45:4, 45:9, 45:13, 45:21, 46:11, 47:3, 48:10, 48:15, 49:8, 49:13, 49:20, 50:14, 50:21, 51:9, 52:1, 52:15, 53:5, 53:10, 53:17, 54:1, 54:10, 55:1, 55:12, 56:1, 56:8, 56:17, 56:19, 57:16, 58:2, 58:5, 58:10, 58:18, 58:21, 59:4, 59:22, 60:9, 60:12, 60:14, 60:17, 60:22, 61:2, 61:12, 61:16, 61:22, 61:24, 63:5, 63:8,

63:12, 63:17
**themselves** [1] - 21:11
**theoretically** [1] - 24:4
**theory** [2] - 52:24, 57:16
**therefore** [7] - 4:12, 13:3, 24:25, 25:5, 31:22, 48:7, 62:6
**thereof** [1] - 20:2
**they've** [2] - 40:25, 50:24
**thinking** [1] - 58:20
**thinks** [2] - 26:25, 41:13
**third** [3] - 5:25, 6:12, 15:8
**three** [1] - 13:16
**threshold** [7] - 4:6, 5:19, 5:25, 6:3, 9:15, 18:18, 27:20
**throughout** [1] - 19:1
**tied** [1] - 5:19
**timing** [1] - 20:4
**today** [1] - 30:11
**took** [6] - 4:22, 42:15, 47:14, 53:18, 61:17
**track** [1] - 18:14
**transacting** [6] - 20:25, 21:2, 21:5, 21:8, 21:12, 21:20
**transcript** [3] - 20:6, 20:9, 64:4
**transferred** [1] - 62:14
**transferring** [1] - 6:20
**treat** [2] - 34:14, 34:20
**troubling** [2] - 53:17, 55:13
**true** [3] - 5:21, 11:24, 28:23
**trust** [1] - 55:3
**trusted** [1] - 55:4
**try** [8] - 13:25, 35:21, 43:6, 44:11, 48:21, 50:23, 57:11
**trying** [10] - 13:1, 13:11, 14:18, 16:18, 41:5, 43:1, 43:2, 46:17, 57:7, 57:8
**turn** [2] - 37:6, 51:1
**turned** [1] - 31:8
**turns** [1] - 61:6
**two** [10] - 6:16, 7:4, 12:11, 32:12, 33:5, 52:13, 62:9, 62:13, 63:9, 63:12
**type** [7] - 10:12, 12:14, 25:5, 60:16, 63:1, 63:2

**U**

**ultimately** [2] - 26:11, 29:19
**undefined** [1] - 23:4
**under** [66] - 4:3, 4:12, 5:21, 8:4, 8:11, 9:6, 9:16, 9:20, 10:19, 10:21, 11:24, 12:13, 12:15, 14:7, 14:14, 17:12, 17:20, 22:3, 25:6, 25:8, 26:13, 26:16, 29:23, 29:25, 30:25, 31:2, 35:11, 35:15, 35:16, 37:5, 37:19, 38:24, 40:12, 40:16, 40:20, 40:21, 42:21, 42:22, 43:14, 44:15, 45:6, 45:7, 45:9, 46:1, 47:21, 48:11, 48:25, 49:10, 49:13, 51:8, 51:16, 52:12, 52:23, 53:13, 54:3, 54:13, 55:17, 58:24, 59:6, 59:8, 60:7, 61:9, 61:10, 63:3, 63:22
**underlies** [1] - 4:5
**unenforceable** [1] - 50:22
**unequivocal** [1] - 63:3
**unfettered** [5] - 10:21, 26:17, 48:20, 55:3, 55:5
**United** [7] - 8:24, 31:18, 44:13, 44:15, 44:16, 44:20, 51:21
**units** [1] - 32:6
**unlawfully** [1] - 7:18
**unless** [1] - 60:10
**unreviewable** [5] - 10:15, 11:3, 11:7, 26:11, 52:18
**up** [18] - 15:23, 17:5, 18:8, 21:4, 23:1, 24:12, 24:16, 26:10, 32:4, 35:8, 50:1, 51:2, 54:8, 54:19, 57:3, 59:17, 59:18, 60:1
**upheld** [1] - 15:7
**utilized** [4] - 8:8, 20:25, 41:11, 42:4

**V**

**vehicle** [1] - 52:11
**versus** [4] - 33:10, 41:22, 53:12, 56:11

**vest** [1] - 56:19
**veto** [2] - 39:21, 55:7
**vice** [3] - 38:4, 38:13, 38:17
**view** [6] - 9:5, 26:2, 27:22, 40:4, 43:19, 46:24
**violation** [3] - 11:18, 11:21, 11:22
**virtually** [1] - 39:19
**voice** [2] - 21:10, 21:22
**vs** [2] - 37:4, 47:22

# W

**Watch** [8] - 37:7, 47:22, 48:9, 48:10, 49:5, 50:1, 51:3, 57:22
**watching** [1] - 47:6
**website** [1] - 32:21
**Webster** [1] - 62:21
**week** [1] - 46:23
**whatsoever** [2] - 53:11, 55:2
**White** [4] - 31:7, 32:12, 42:20, 59:21
**whole** [4] - 15:19, 25:11, 44:19, 45:2
**wildly** [1] - 15:9
**win** [2] - 60:22, 61:1
**window** [1] - 17:4
**works** [1] - 57:16
**write** [8] - 26:12, 26:15, 27:3, 27:10, 29:14, 44:10, 46:22, 60:1
**writing** [3] - 57:22, 58:3, 63:20
**wrote** [3] - 19:17, 28:10, 46:9

# Y

**years** [4] - 44:22, 44:23
**York** [1] - 44:2