UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
CASE NO. 23-cr-80101-AMC

UNITED STATES OF AMERICA, Fort Pierce, Florida

Plaintiff, March 14, 2024

vs.

10:04 a.m. - 2:42 p.m.

DONALD J. TRUMP, WALTINE NAUTA, CARLOS DE OLIVEIRA,

Defendants. Pages 1 to 173

______________________________________________________________.

TRANSCRIPT OF MOTIONS TO DISMISS
BEFORE THE HONORABLE AILEEN M. CANNON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

U. S. DEPARTMENT OF JUSTICE
JAY I. BRATT, ESQ.
DAVID HARBACH, ESQ.
National Security Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

FOR THE DEFENDANTS:
Donald J. Trump

BLANCHE LAW
EMIL BOVE, ESQ.
TODD BLANCHE, ESQ.
99 Wall Street
Suite 4460
New York, New York 10005

CHRIS KISE & ASSOCIATES, P.A.
CHRISTOPHER M. KISE, ESQ.
201 East Park Avenue
5th Floor
Tallahassee, Florida 32301

FOR THE DEFENDANTS:
Waltine Nauta

DADAN LAW FIRM
SASHA DADAN, ESQ.
201 S. 2nd Street
Suite 202
Fort Pierce, Florida 34950

BRAND WOODWARD LAW, LP
STANLEY WOODWARD, ESQ.
400 Fifth Street
Northwest Suite 300
Washington, DC 20001

Carlos De Oliveira

E&W LAW
JOHN S. IRVING, ESQ.
1455 Pennsylvania Avenue, NW
Suite 1400
Washington, DC 20004

L.D. MURRELL, PA
LARRY DONALD MURRELL JR., ESQ.
400 Executive Center Drive
Suite 201
West Palm Beach, Florida 33401

STENOGRAPHICALLY REPORTED BY:

LAURA E. MELTON, RMR, CRR, FPR
Official Court Reporter to the
Honorable Aileen M. Cannon
United States District Court
Fort Pierce, Florida

(Call to the Order of the Court.)

THE COURT: All right. Good morning. You may be seated unless you are addressing the Court.

Please call the case.

COURTROOM DEPUTY: United States of America vs. Donald J. Trump, Waltine Nauta, and Carlos De Oliveira.

Will the parties please make your appearance, starting with Special Counsel.

MR. BRATT: Good morning, Your Honor. Jay Bratt and David Harbach on behalf of the United States.

THE COURT: Good morning.

MR. BLANCHE: Good morning, Your Honor. Todd Blanche, and I'm joined at counsel table with my -- the client, President Trump, Emil Bove, and Chris Kise. Good morning.

THE COURT: Good morning.

MR. WOODWARD: Good morning, Your Honor. Stanley Woodward and Sasha Dadan on behalf of Mr. Nauta, who is also present.

THE COURT: Good morning.

MR. IRVING: Good morning, Your Honor. John Irving and Donnie Murrell on behalf of Mr. De Oliveira. Thank you.

THE COURT: Good morning.

Good morning to all of you. And welcome back to Fort Pierce. The same ground rules apply as I have indicated in the past: No use or possession of electronic devices.

Please stay seated in the courtroom until the court recesses, until there -- unless there is an emergency.

For counsel presenting argument, please do so from the lectern. And if at any point anybody in the gallery or at counsel table has trouble hearing, please also let me know.

As usual, we have set up our overflow room, which is transmitting contemporaneously for the benefit of any additional persons who wish to observe.

We have two motions on deck for today's hearing. The first is docket entry 325. That is a motion to dismiss the indictment based on unconstitutional vagueness, and it is filed by Former President Trump. And the second motion is docket entry 327, which is a motion to dismiss based on the Presidential Records Act, filed by Former President Trump. And that motion, I understand, is joined by Mr. De Oliveira.

Mr. Irving; is that correct?

MR. IRVING: Your Honor, insofar as...

THE COURT: I'm referring to docket entry 331, which I believe is a notice of adoption. I just want to be clear if you -- if -- if you have also signed on to 327.

MR. IRVING: Your Honor, I will have to look. I apologize, but I don't believe that we signed on to either one of these.

THE COURT: All right. Well, you should check that and let me know soon.

All right. Mr. Woodward, on behalf of Mr. Nauta, have you joined in either of the two motions?

MR. WOODWARD: Yes, Your Honor. We would -- we will file a notice joining 327, but only insofar as should the Court grant the relief that is sought by President Trump and conclude that the official proceeding was, in fact, not an official proceeding, then we would join in the relief sought in the latter half of 327.

THE COURT: All right. Any notice of adoption must be filed no later than tomorrow close of business.

MR. WOODWARD: We -- yes, Your Honor. We are waiting to see the replies. Of course we don't want to join in a motion that does not apply to our client. Now that this motion has been fully briefed, we will put a notice in today.

THE COURT: Okay. All right.

So, Mr. Irving, in light of docket entry 331, which I do believe generally purports to adopt the pretrial motions, including 327, did you intend to present argument today on 327?

MR. IRVING: No, Your Honor.

THE COURT: No. Okay. All right then.

Well, I have reviewed both of the motions, the respective oppositions filed by the office of the Special Counsel, and the replies. Those replies were ordered on an accelerated basis to accommodate this hearing. There was also an amicus brief filed at docket entry 360-1, to which the

Special Counsel filed an opposition at docket entry 400, and I reviewed those as well.

Some of the concepts in the motions overlap, so I will understand if there is some crossover in the presentation, but for purposes of organization and clarity, I would like to take up the motions individually, starting with the vagueness challenge at docket entry 327.

Because these are defense motions, I will hear from defense counsel first as to both.

So with that, let me turn first to defense counsel with respect to 327, which is -- excuse me -- the vagueness challenge, which is 325 is the motion I would like to hear first.

Who will be presenting argument on that motion?

MR. BOVE: I will, Judge. Thank you.

THE COURT: Okay.

MR. BOVE: Thank you, Judge.

So this is a motion to dismiss each of the 793 counts on the basis of unconstitutional vagueness. And it is a motion that challenges three aspects of Section 793; the Authorization Clause, the NDI Clause, and the Entitlement Clause.

This case stands alone with respect to each of those three issues as applied to President Trump. And when they're considered collectively, these charges must be struck and dismissed. There are four aspects of this case, and the way

the statute is being applied or attempted to being applied to President Trump, that require that result.

First is President Trump's exercise of the original classification authority with respect to the documents at issue. Second, and this speaks to the overlap that Your Honor mentioned, is that President Trump designated these records as personal, pursuant to the Presidential Records Act. Third is President Trump's access to executive privilege. And fourth is the presidential immunity document.

THE COURT: Let me ask you this. Does your motion depend on resolution of any facts that are not alleged in the superseding indictment?

MR. BOVE: It -- I don't believe so, Your Honor, because -- the four distinct --

THE COURT: Well, because one of the things you mentioned right now was -- was the designation as personal. That's, of course, an assertion that you have made in the papers. That's not an alleged fact in the superseding indictment.

And so my question is: Is this motion premature? Because it would require the Court, essentially, to pass on a motion in light of contested facts. So should we be having this discussion really in the context, perhaps, of a motion for judgment of acquittal or in some other posture, perhaps also maybe in crafting jury instructions? But why are we having

this as-applied discussion now, given the potential for disputed facts?

MR. BOVE: For two reasons, Judge. First of all, the indictment alleges that President Trump caused these records to be removed from the White House. That's paragraph 4 of the superseding indictment. That allegation relates to a time period when President Trump was the President of the United States.

The inference from that allegation, from the language that the Special Counsel chose, is that that removal of the records constituted the designation as personal. That is an inference that was granted in Judicial Watch, and it's appropriate here. In addition --

THE COURT: Okay. So that's an inference that you wish to draw based on paragraph 4 of the superseding indictment; is that correct?

MR. BOVE: Yes. As well as concessions as to the timing of the removal made in the Special Counsel's papers that we've cited in our briefs.

THE COURT: Okay. But either way, the superseding indictment at this point certainly doesn't take the position that the documents are personal. And so I take your point that that's what you're asserting, but I'm still left with a contested factual point, and that leads me to the same question, which is, isn't this motion premature?

MR. BOVE: I don't think so. And I want to stay on this point first. What we're doing here is attributing legal significance to a factual allegation. The legal significance is the designation as personal under the PRA. The factual allegation is causation while President Trump was in office during his presidency. So I don't think that there is a factual dispute. There is a legal argument about the significance of when the Commander in Chief chooses to remove his own records from the White House and transport them to the residence.

We take those facts as true, that that happened, that that transportation happened, and we attribute the same legal significance to that fact that President Clinton got the benefit of in Judicial Watch.

THE COURT: All right. Please continue.

MR. BOVE: There is a second point here, Judge, which is that in as-applied challenges, I don't think the Court is restricted to the allegations in the indictment. You're allowed to consider, in this constitutional challenge to the statute, the factual circumstances surrounding the case. And I think -- obviously, and I think --

THE COURT: I'm not sure that's correct. If there are disputes of fact, how am I to do that? Receive proffers which aren't evidence from attorneys? That's the thing. It's -- it's tricky in this posture to try to really adjudicate

contested facts.

MR. BOVE: It is tricky. I don't think they're contested. I think the legal significance is contested. But I think -- there is obviously a number of opinions considering vagueness challenges that I think we're probably going to talk about this morning, and in each of those opinions, the Court resorts to facts that are outside the indictment.

THE COURT: Would that have been postconviction mostly?

MR. BOVE: No, Judge. The Schulte opinion that the Special Counsel's office relies on speaks to experience as a -- that that defendant's experience as a former CIA officer, Hitselberger in the District of Columbia speaks to the training that that person had in their job.

So I think that courts do, in as-applied constitutional challenges, look to facts outside the indictment that bear on the fair notice issue. But, again, our fundamental point, and this is significant to both this motion and the PRA motion, is that this causation allegation is the fact, and we are attributing legal significance to that fact and that's permissible.

THE COURT: All right. Let's get to the statutory text of 793 as charged.

Am I correct that this is how it would read? And I've, of course, stricken the text that's not applicable to the charge.

It would just say like this: Whoever having unauthorized possession of any document willfully retains the same and fails to deliver it to the office or employee of the United States entitled to receive it.

We have basic -- in other words, what is charged in this count is a -- is a document-only retention count without transmittal. And so we -- we skip over the intermediate language of the statute; is that correct?

MR. BOVE: As a textual matter, yes. And I think the Court -- when you described documents, you left off, for the sake of brevity, the NDI Clause. But I understand that that NDI Clause attaches to the type of document that's at issue in these counts. So it's unauthorized possession; that's the Authorization Clause. Document relating to the National Defense; the NDI Clause. And, you know, retained and not returned to a person entitled to receive it. When I say "Entitlement Clause," that's the language I'm referring to.

THE COURT: Right. Okay. So whoever having unauthorized possession of any document relating to the National Defense willfully retains the same and fails to deliver it to the officer or employee of the U.S. entitled to receive it. That would be how Counts 1 through 32 are charged.

MR. BOVE: Yes, Judge.

THE COURT: Okay. In your understanding, who, as charged, is the officer or employee of the United States

entitled to receive it in this case? In other words, who is the individual that allegedly the defendant did not deliver the documents to?

MR. BOVE: I don't think that's alleged specifically in the indictment. And I think that that's one of the issues, not the -- not necessarily the failure in the indictment to identify a specific individual, but the concept more generally, that, at minimum, it is ambiguous, provides no fair notice, and allows for arbitrary enforcement in a situation where we have a former president with his personal records at his residence, who, in the United States Government, is entitled to retrieve those records. And our position is that at -- in this motion, is that that language, "entitled to," is unconstitutionally ambiguous.

THE COURT: Why?

MR. BOVE: Because the concept of entitlement -- and I think even the courts that have addressed this issue -- Rosen, for one, addresses it -- acknowledges that there is no definition of who would be entitled under any circumstance. There is -- there is nothing in the statute setting that -- setting forth that concept.

And so what Rosen did was look to Executive Order 13526. And there, the issue, Judge, is that that Executive Order, to the extent it applies to records, does not apply to the personal records of the President. And that is explicit in

the definition of records in Section 6(hh).

And so to the -- to the extent that the Rosen court looked at this, it obviously was not -- the Court was not considering the circumstances we have here. This is an as-applied challenge, and in this setting where we're talking about personally designated records under the PRA, no one is entitled to receive those records from the President. NARA can ask --

THE COURT: All right. Again, that calls for a factual designation and classification of the records as personal, which is outside the superseding indictment.

MR. BOVE: We respectfully disagree with that point because the -- it's a legal concept applying the definitions of personal and presidential under the PRA. We further, on this issue, believe that the DOJ should be estopped from arguing anything different than they did in Judicial Watch with respect to President Clinton. We discussed that case at length in our papers, but it bears mention here, Judge. Nobody in that proceeding contemplated, could conceive of, even thought about taking President Clinton's tapes back from him. And DOJ was completely complicit and supportive of that outcome, as was NARA, the agency administering the PRA, the agency who is looking to these definitions that I'm talking about.

So how then --

THE COURT: One question. Is it uncontested that those

tapes contained classified information?

MR. BOVE: I believe so. And if it's not, it could not be reasonably disputed based on the -- especially based on the way the Special Counsel has spoken about classified information and National Defense information in this case. Those tapes contained disclosures that are written up in Taylor Branch's book about discussions with foreign dignitaries, discussions about military operations, things that parallel in a very direct way the documents in this case.

So to the extent that it is contested -- and maybe that's a question for the folks behind me -- it could not be done in a reasonable way, based on the text of that book in the way that it summarizes those tapes. They contain classified information. And no one in that courtroom, at the argument of Judicial Watch, was saying, well, there is an Executive Order here governing classified information, so we've really got to go back to President Clinton's home and retrieve those.

It was unspeakable. And it should have been here. And that's one of the reasons that this phrase, "entitled to receive it," has no content as applied to President Trump. And to the extent that it has content, it's equally problematic in the sense that it permits arbitrary enforcement. And there is some overlap here with our selective prosecution motion on that concept. But the 11th Circuit has said that the arbitrary enforcement prong of the vagueness doctrine is the more

important consideration, the more salient concern.

And so when you have a situation here -- and we're just talking about the -- one of the three clauses that collectively make this statute unconstitutionally infirm with respect to President Trump on this issue, pointing to an Executive Order where there is no rulemaking authority, that's vague in its own right, doesn't add any meaningful content to prevent arbitrary enforcement. And, in fact, that's exactly what happened here.

THE COURT: So your concern is that the "entitled to receive" clause doesn't explicitly incorporate or reference the Executive Order or authorize regulations on the subject of classification?

MR. BOVE: That's one of the concerns, is that there is -- and I think there is some confusion in the papers from the Special Counsel's office about what our argument is here. There is no delegation from Congress in 793(e) to promulgate regulations or Executive Orders to add content to phrases that Congress declined to define.

THE COURT: And so the courts that have faced challenges on the "entitled to receive" have -- have relied on the Executive Order to provide that judicial gloss; is that correct?

MR. BOVE: Yes. And I think, Judge, that that is principally Rosen, and then circular cites to Rosen. I think, respectfully, that Rosen is incorrect on this point, and that

this point that we are pressing, which is a nondelegation argument, was certainly not discussed and, I don't believe, made in Rosen.

And there -- we have cited other statutes. Congress knows how to be explicit when they want to look to the Executive Branch to -- to add content to their word choices. But that's not what happened here. And I think that is why it's important and significant that the Special Counsel's office didn't bother to address any of the legislative history that we laid out in our motions. Because in 1911, 1917, and in 1950, Congress thought about these issues, they had an opportunity to define them with the necessary clarity, and they did not do so.

And there is two points I want to make about Congressional failures in this regard. The first is that in 1917, President Wilson and his administration proposed, as part of the Senate bill that was under consideration, a delegation of rulemaking authority. It's discussed in the Law Review article that we cited; it's Section 6 of that bill. And Congress declined to put it into the law. They explicitly declined to provide that authority. And they said, we will do our work as elected officials here. And it was insufficient.

And then in 1950, the Espionage Act that gives rise to the 793 that we're talking about, that -- that Congressional body has the benefit of the Supreme Court's analysis in Gorin,

and of the Heine case by Judge Hand in the 2nd Circuit. They are on notice of these issues. And, again, there is no rulemaking delegation. They left the language as is.

And under the residual clause cases that we have cited -- Davis most recently -- when Congress chooses to do something like that, in an Article III court with a criminal defendant facing the kind of consequences that President Trump faces here, the Court's obligation is not to rewrite the statute, not to follow nonbinding judicial gloss from other circuits. The Court's obligation is to strike the statute and say, Congress, get it right.

And Congress is trying to get it right in part.

THE COURT: So the 11th Circuit hasn't really addressed the arguments you've made thus far, except for, perhaps, on the NDI Clause; is that correct?

MR. BOVE: With heavy emphasis on "perhaps," Judge, because the Campa case is not a vagueness challenge; it's a sufficiency of the evidence challenge. And in that setting, Campa refers -- the 11th Circuit in Campa refers to Gorin. But that's not affirming a vagueness challenge to this statute.

THE COURT: All right. Well, let's say you get to the Executive Order and the Subsection (dd), would that language not narrow the scope of the statute as opposed to broaden it?

MR. BOVE: Subsection (dd)? I'm sorry, Judge.

THE COURT: Which defines the need to know, I think it

is, of the Executive Order.

MR. BOVE: No, Judge, not at all. And I think that that is really -- that's the -- one of the nubs to our argument that is different and has not been analyzed, I don't think, by any court, which is the complete lack of standards governing what is need to know. And I am confident that that is apparent to Your Honor, based on the way that that phrase has been bandied about in the CIPA litigation.

If we say they need to know, they need to know; if we say they don't need to know, they don't need to know. No court has interpreted that. The definition is -- there are some words there, but they are of limited content. And what's really happening is the Executive Order is saying the Executive Branch can make a decision about what that means in every case. And that is extremely problematic under the Supreme Court's holding in City of Chicago vs. Morales. Morales considered a situation where, quote, "The police have adopted internal rules limiting their enforcement to certain designated areas in the city."

And the Court said those internal rules by the police were not adequate to address the vagueness issue that the statute presented. And I think it's a very similar issue here. There is no delegation to the President to make this Executive Order.

The National Security Act cited by the Special

Counsel's office at 3161(a) expressly does not include the authority to promulgate regulations and Executive Orders relating to presidents. And even if you get to the Executive Order, it excludes personal records under the PRA.

And finally, where we are here, if you ignored all of that -- and each of those is dispositive. If you ignored all of them and just got right to the "need to know" point, it adds no content to the phrase "entitled to receive it" or "unauthorized access."

So this -- this "need to know" concept, to the extent it's being invoked here as something that adds clarity or governs a statute that never asked to be governed, the "need to know" phrase is problematic for both the Authorization Clause and the Entitlement Clause.

THE COURT: So let's shift to the Authorization Clause for a moment, and just looking at the superseding indictment. The date of the offense begins January 20th of 2021. So I guess my question is: Hypothetically, on January 21 of 2021, is the alleged crime of unlawful retention complete, according to the theory as charged in the indictment?

So one day later, at that point, you would have all three elements, allegedly. You would have the willful removal; that decision allegedly would be purposeful. The documents have the markings, so allegedly they would relate to the National Defense. And there would be no authorization because

the presidency ended.

Is that how you read it? Because if the crime is complete, let's say, one day later, then my question is: Any other former official who would have in his or her possession classified materials that they willfully removed, at that point, they would be running afoul of this criminal prohibition; is that correct?

MR. BOVE: So in Your Honor's description, there was -- there was some -- some facts about classification markings, another thing that I think -- the way I understood it was that they were offered to support some legal allegations --

THE COURT: Let's assume the documents have classification markings, and let's assume the documents relate to the National Defense. Then anybody, a former official who had authority prior to the expiration of the position, would then -- would then lose that authority and, therefore, one day later the crime of unlawful retention is arguably complete; correct? One day later, day one of the crime -- or day two of the crime.

MR. BOVE: So if you assume as -- in that -- I just want to emphasize one part of the hypothetical -- that the possession and retention was unauthorized -- because we dispute that legally.

THE COURT: Well, I think the theory that is in the indictment is that --

MR. BOVE: Right.

THE COURT: -- it was authorized prior to the changeover. It became unauthorized the moment the presidency ended. The documents were willfully taken, hence, crime complete.

MR. BOVE: I -- I agree that that appears to be the theory of the indictment. I do not -- that's not our theory, but I agree that's the --

THE COURT: Okay. So if that's the theory of the indictment, then -- then there would be other officials who clearly would have run afoul of this prohibition as charged.

MR. BOVE: Unquestionably. And we don't -- and in some respects, we don't want to make this a day about selective prosecution, because we think that's an independent basis. But the point that Your Honor just made, backed by history, backed by Judicial Watch, The Clinton Tapes, backed by The Reagan Diaries, and it has to be said, backed by the Hur report, completely supports that theory.

And that is why the statute permits arbitrary enforcement as written because they -- the government gets to make decisions based on subjective criteria, here political bias, that permit them to go out and bring charges like this.

THE COURT: Well, I guess my question is -- is in terms of when does it become unauthorized? I think, according to the theory of the indictment, it becomes unauthorized the moment

the presidency ends. And it really has nothing to do with any demand for the documents that would have been triggered following the issuance of the grand jury subpoena, given the timing of the date of the offense in the superseding indictment.

MR. BOVE: Again, I do -- I think that that's the Special Counsel's theory of the case. I think that that is wrong because President Trump designated the records as personal when he took them out of the White House. And so in terms of the authorization that we're talking about, our position is that the reason -- this is more the PRA argument. The reason that the 793 counts should be dismissed, based on the clash between the PRA and 793, is that the government, as a matter of law, cannot establish lack of authorization because President Trump, like President Clinton, like President Reagan, like President Biden as vice president, removed records from the White House that were -- that constituted a personal designation, and that was a completely viable and credited legal theory in a completely credited manner doing business with NARA.

To such an extent that in early 2023, as publicity around this case and the situation with President Biden and Vice President Pence started to get more scrutiny, NARA reached out to past presidents and vice presidents. And then this is written up in the New York Times article that we cited in our

reply.

And they said, hey, could you please take another look to see if you have anything that might constitute a presidential record?

And President Bush's team's response is quoted in the article, and the response is basically, yeah, we're done here, you have nothing to say to us.

THE COURT: So, okay, what is your definition of "unauthorized"?

MR. BOVE: Judge, I don't have one, and that's why the statute is unconstitutionally vague as applied to President Trump.

THE COURT: So we would just -- it's not defined in the statute, so we can resort to ordinary meaning, which then permits use of dictionaries. So why wouldn't it just be the standard meaning that the Special Counsel has offered, which is without permission?

MR. BOVE: Well, respectfully, I don't think that's the definition they offered. The definition they offered was without official permission. And that word "official" is critical to allow them to then argue that to -- invoke the National Security Act.

But even the dictionaries they cite don't include the requirement that the permission be official. And the 9th Circuit case that they cite, Nosal, speaks to private

authorization, which is a basic concept of property rights.

So what the government is trying to do here, to add content that does not exist to that phrase, is to impute some official requirement in order to allow the Court or themselves to go look at another statute, not 793, as a hook back to the Executive Order.

THE COURT: But the way -- the way it would be built would be without official permission, and then the official permission comes from the Executive Order if there is a waiver provided by the sitting president?

MR. BOVE: Well, that's -- I mean, it would -- and, again, we're just talking about my understanding of the government's theory of -- of this piece. My understanding is that, from their opposition brief, they cobbled together some dictionary definitions that spoke --

THE COURT: Well, that's not inappropriate. I mean, it's -- dictionary definitions can be used.

MR. BOVE: I agree with that. And I think that's important because the dictionary definitions that they used did not include the word "official" in terms of the permissions. They -- the dictionary definitions, quite appropriately, and consistent with the plain meaning of the term, include private permissions.

And that is -- because that is the case, there is no reasonable basis to then have the Court look from the

dictionary definition to the National Security Act to the Executive Order. They need that word in their made-up definition to allow those steps.

Without that word, where private permissions are part of what is authorized or not, we're back to a contentless phrase in a statute, words chosen by Congress, that Article III courts are not in a position to remedy or correct.

THE COURT: All right. Well, in terms of precedent on the authorized portion, you would agree that no court has deemed that phrase unconstitutionally vague; correct?

MR. BOVE: Yes. That's correct; no court has deemed it unconstitutionally vague. Multiple courts have deemed it problematic, and multiple courts have then looked to the mens rea element of the statute, and I would like to talk about that, if I could.

THE COURT: Yes, please.

MR. BOVE: The -- the string of authorities that are 793 specific -- well, that are relied on for 793 vagueness challenges start with the Supreme Court's ruling in Gorin. And then there are four -- four circuit rulings. Dedeyan, Hung, Morison, and Ford.

And if you trace the reasoning in those decisions, what emerges is that what was significant to the Supreme Court in Gorin, and significant to the earlier 4th Circuit cases, was not just a willfulness requirement. They considered the

additional requirement, at issue in those cases or not, and in Morison that is a debate, but the additional requirement that the government established injury to the United States, or -- or potential benefit to a foreign adversary.

THE COURT: That is not required here in terms of the elements?

MR. BOVE: Well, yes, the -- the reason I'm pausing, Judge, is because there is contrary case law, Morison, the Kiriakou case that we cite, which I think is EDVA. There -- some courts have read the statute in a way that requires that additional -- I'm going to refer to it as the injury element -- that require that additional injury piece, plus willfulness.

THE COURT: But for a 793(e) documents-only charge without transmittal, it appears the statutory text would not require that, in contrast to the text addressed by the Supreme Court in Gorin.

MR. BOVE: I agree.

THE COURT: Okay.

MR. BOVE: And so my -- but my point is, Gorin should not have been persuasive to any court considering this type of vagueness challenge and the willfulness element because Gorin had both pieces, willfulness plus injury. The 4th Circuit in Dedeyan, both pieces, willfulness plus injury. Hung, two. Same. Morison, both. Same.

And so then you have a series of string cites, maybe the most recent is Schulte, relying on those cases. But without meaningful discussion, I mean -- like, none of the fact that Gorin was looking at a different statute. And when you're talking about can a mens rea element sufficiently clarify and narrow something, the fact that those earlier decisions are looking at both parts is extremely significant.

THE COURT: I have a question on the willfulness. So, of course, we have our pattern instructions in the 11th Circuit, and there are two that define the word "willfully."

There is one that says: "The word willfully means that the act was done voluntarily and purposefully" -- excuse me -- "purposely with the specific intent to violate a known legal duty, that is, with the intent to do something the law forbids. That is Pattern B9."

So in terms of the "doing something the law forbids," what is your understanding of what law is being breached there?

MR. BOVE: I think that's exactly the problem, Judge, and that is why a willfulness on that B9 instruction does not resolve the vagueness challenge is because, at most, that instruction refers the jury back to the ambiguous terms and says do your best. And that can't be enough on the facts that we've described here, and it can't be enough when compared to authorities that require both willfulness plus the injury

element.

I don't think it's sufficient when there are -- even the courts that have rejected the vagueness challenges have said -- these are -- these are serious issues, this is problematic. The -- meaning the language chosen --

THE COURT: So has -- has there been a judicial gloss, perhaps, in those contexts where a bad-faith component has been injected to add a little more strictness to the willfulness, otherwise, it's the simple willfulness?

MR. BOVE: It's possible. I can't -- I'm not going to pretend that I have surveyed every set of jury instructions in a 793(e) trial. But even -- even a general bad-faith instruction would not address the vagueness problems. And I think it's important here to -- to keep in mind the two prongs of the vagueness doctrine. There is the fair notice piece -- and when we're talking about mens rea, that is really what -- what we're focused on.

THE COURT: On the fair notice, just explain to me something. In the case of a former president, is -- there is -- the clearance status is inherent in the position itself; is that correct?

MR. BOVE: As I understand it, yes. I think -- as president --

THE COURT: After the presidency ends, is there any sort of transaction or mechanism by which the clearance is

removed, suspended, or terminated?

MR. BOVE: I think -- I think that that has -- the record reflects that that -- to the extent there is a process, it is inconsistent and not -- not applied in a formal way, and I'm referring to the Q clearance issue.

THE COURT: So in this case, setting aside Count 19, was there a suspension of a clearance in a formal sense?

MR. BOVE: I think that it's -- it's -- there is a statute that governs a president's clearance, and it's possible that there is an argument from the government that, by operation of law, that that no longer -- that the formal clearance authorized by that statute doesn't --

THE COURT: What statute is that, do you know?

MR. BOVE: I don't have it at the ready, but I'm sure Mr. Bratt will.

THE COURT: Okay.

MR. BOVE: But, Judge, I want to point out that the superseding indictment, once -- one of the passages that the government relies on as part of its argument that President Trump had actual notice, is President Trump's statement regarding the revocation of John Brennan's security clearance.

And in that statement, he -- President Trump -- and this is in the indictment. So we're talking about what we're stuck with on the four corners of the document -- refers to "the practice of former officials maintaining access to our

nation's most sensitive secrets long after their time in government has ended." That's their -- they chose to put that in the indictment. They think that it has significance. I do, too, probably for different reasons.

Here, what that reflects is that the authorization concept, as understood, doesn't provide fair notice to President Trump. And as applied here, reflects the type of arbitrary enforcement that the Davis court was concerned about.

THE COURT: All right. I have another factual question. In terms of the criminal referral referenced in the indictment, was that criminal referral transmitted to the former president? In other words, was he aware of the criminal referral when it was made?

MR. BOVE: I would need -- I would need a moment to answer that.

THE COURT: Okay. Okay. I think this is uncontested, but I will ask the Special Counsel. Has NARA ever issued a criminal referral outside of the context of -- of these documents?

MR. BOVE: To my understanding, based on NARA OIG's website, there may have been criminal referrals in other settings, but I think that this is the first of its kind in terms of -- you know, there is really three referrals in that document that -- those referrals relating to -- I will just speak to the ones that apply to my client -- efforts to recover

records from a former president are one of a kind.

And the reason that that's important -- and Mr. Blanche will speak to that when we get to the PRA, but I want to preview it -- is that in order to make the referral, NARA OIG is acting pursuant to the OIG Act, which requires a reasonable basis to believe that there is a criminal violation.

And in light of NARA's history and customs and practice, reflected in Judicial Watch with President Clinton, The Reagan Diaries, President Biden, all of the examples we have cited, they had no reasonable basis to believe that there was -- that there needed to be a referral or could be.

So our position is that that referral was unlawful agency action because it violated the language of the statute.

THE COURT: Okay. Well, okay. Anything further on the three clauses that you have taken issue with in 793(e)?

MR. BOVE: There is two points that I would like to make, Judge.

One relates to the relevance of the executive privilege and what it means to -- to or not to -- to be or not to be unauthorized in this setting. These documents allegedly relate to briefings that were provided to the President. They relate to the types of sensitive, confidential communications over which typically there would be a -- it's qualified, we understand -- but a basis to invoke the executive privilege.

Courts in the D.C. Circuit, when they've looked at that

privilege, have spoken to, in the first instance, an obligation for the Executive Branch and Congress to put their heads together in the political sphere to resolve disputes over the executive privilege.

One example of that is United States vs. AT&T, which is a D.C. Circuit case from 1977, 567 F.2d 121. And in that case, the D.C. Circuit rejected the idea that the Constitution confers on the executive absolute discretion in the area of national security. And so the significance of that is: AT&T limits, and AT&T speaks to why the government's Egan case can't support what they're trying to do here. Egan is about appellate review of security clearances. AT&T goes through, in a persuasive way, the limits on the executive's discretion in a way that the Congress also has national security authority.

The examples in AT&T include: The power to declare war. The power to fund the Army. The power to consent to treaties. The power to appoint ambassadors.

So Congress has the authority under the Constitution to speak in the area of national security. They spoke in the Espionage Act of 1950. We are stuck with the words that they chose. So it's no answer, I submit, to rely on Egan and say, well, the President has the ability to promulgate an Executive Order that can be applied in any situation where we feel there is national security issue in a criminal prosecution to define a statute in the way we want.

THE COURT: Okay. Let me ask you. Let's say I deny your motion. Then how would you put forward jury instructions on the definition of "unauthorized"? What would be the definition?

MR. BOVE: Well, it will -- it would -- assuming we were to get there, it would absolutely include language about the significance of the Presidential Records Act, the definition of personal records, and the impact of a designation by a former president of those records as personal. It would be -- it would have additional legal content based on the PRA which we're -- we would be entitled to to support our defense theory. We would be -- but what we would be doing there --

THE COURT: The Special Counsel would say all it needs to say is that you lacked a security clearance and you lacked a need to know because you were no longer president.

MR. BOVE: And so what is that, other than to say: We, the Executive Branch, we, the Special Counsel, feel that you didn't have a need to know. We're going to say that to the jury. There is no standard to govern "need to know," and so you're guilty.

THE COURT: Well, it's in the Executive Order. It's in the Executive Order, and that would be applicable to former presidents unless withdrawn.

MR. BOVE: It's -- the phrase "need to know" is in the Executive Order. But the Court can't save an

unconstitutionally vague statute by looking to an impermissibly vague and standardless term like "need to know." And there is no authority defining that term in a meaningful way that prevents arbitrary enforcement.

I know I have hit that a few times this morning, but I think it's really important, and I don't think it's discussed in any of the -- the decisions that we're talking about, is that when a court -- when a court sort of drags into the analysis Executive Order 13526, you are incorporating that "need to know" concept. And if it had standards, if there was a mechanism to truly define it, then that is -- it's possible it could help. You would still have the nondelegation issue that we have raised, but it's possible it could help. But the definition is not sufficiently specific to ward off arbitrary enforcement or to allow somebody in President Trump's position to understand which way, for example, the CIA is going to come out on "need to know" on a particular document.

THE COURT: Do you know if the Executive Order speaks to termination of clearances and suspensions of existing clearances?

MR. BOVE: Not off the top of my head.

THE COURT: Okay. All right. Well, then, unless you have anything further -- and I may come back to you -- I would like to hear from the Special Counsel.

MR. BOVE: The only other point that I want to raise is

on the NDI element. The point here, Judge, is that the classified discovery discussed in our -- the -- our filings, the classified filing, reflects that there is confusion within the agencies about what constitutes NDI and whether a particular document contains NDI. It's more than confusion. There is dissent. And that further supports our argument when you have -- the government authorities responsible for applying these concepts can't agree on it.

THE COURT: But there has been a fair amount of litigation, I think, on the defense information prong. And that one of the three really has, I think, the most case law support. So it would be hard to say, based on the current state of decisional authority, that that prong, in and of itself, is unconstitutionally vague.

MR. BOVE: I can't fight with the way that Your Honor phrased that. I think that that's right for whatever that is worth. I think it's right. But all of that case law turns on this invented concept of closely held. And in this case --

THE COURT: Well, that comes from Gorin, which really rests on secrecy. So it's not really invented.

MR. BOVE: What I'm saying is that -- I should have said it better, Judge, thank you. There is no basis for that in the statutory text. There is -- that is completely invented, relative to what the statute says.

And our argument here on vagueness grounds with respect

to the NDI element is not limited to the fact that some of these materials appear to have been sourced from public information. That's more of a factual issue that's tied up in the motions to compel, and if we made it to a trial, that would be a part of our presentation.

But on the NDI element, I don't think that the "closely held" component mitigates the concern that we have. This is our concern on -- on the NDI element. Courts have taken this phrase "National Defense" -- and this is foreshadowed in Gorin and by Judge Hand in Heine -- and broadened it out into basically anything. And that's evident from the government's papers, where I -- I think the position is, essentially, if it was presented to the President at some point, then it's National Defense information. I -- I think --

THE COURT: Well, I think -- I think they're relying on multiple categories, specified in the Section 10, not just the presentation of the documents to the President.

But let me ask you: On the Count 19 issue, you sought discovery specifically on what? And have you obtained any of it?

MR. BOVE: We -- we sought discovery on the communications that led to the memoranda that is -- memorandum that is discussed in our papers, the process that led the Energy Department to suddenly, post-indictment, write up this document that says we retroactively terminate the clearance.

We sought those communications. We have sought any records of data --

THE COURT: I guess that's my question. Why in the case of the Q clearance is there official documentation retroactively suspending it post-indictment? But just gets to my earlier question: With the other counts, does the clearance, just by operation of law, disappear?

MR. BOVE: The answer is they have not disclosed these things in discovery, so I don't know.

The Q clearance, the reason that it is discoverable and favorable to the defense is that, to Your Honor's point, relative to the other documents and the other clearances at issue, this type of thing didn't happen. And it's also to the -- to the extent that count is going to survive our motion, and we -- to the extent we were going to have a trial that involved the document in Count 19, we would be permitted to cross-examine people about the -- the decision that was made to retroactively delete this clearance off the books, especially relative to the John Brennan statement that I talked about from the indictment, where former government officials are permitted to retain clearances. And that's why part of our discovery request is for the Energy Department's treatment of other presidents and officials with Q clearances. And so I think, first --

THE COURT: So, so far you have made that request. And

the answer was: You're not entitled -- it's not discoverable because?

MR. BOVE: I'm not sure that sentence was completed. I think that there was also --

THE COURT: Well, I'm sure that it was. But I will ask the Special Counsel exactly what the position is on discovery with respect to the Q -- to the Q clearance.

MR. BOVE: Part of it, part of the response in the motion papers was an indication of privilege without providing --

THE COURT: Deliberative process on the internal communications.

MR. BOVE: Without providing a privilege log. And it's a privilege that cannot stand when it's up against Brady and Giglio.

THE COURT: Assuming those internal communications contained such information. And the Special Counsel has indicated, I think, multiple times that it's in compliance with Brady and Giglio obligations. But I will cover that with the Special Counsel in my discussion with him.

MR. BOVE: Judge --

THE COURT: What about the facilities? Because I understand the Executive Order also speaks to protected facilities, and that there has been a -- there is an outstanding request for discovery on that topic.

Can you bring me back to the request that is on the table, and what is the status of -- of your -- of your request?

MR. BOVE: So the request touches, I think, on two issues -- one is secure facilities at President Trump's residences, and the other is facilities used to provide briefings to President Trump as candidate, as President-elect, and then as President post-inauguration.

So there is two related requests, and what we're asking for there is information about the -- the documented details that made people comfortable that these briefings could be provided under the conditions that they were provided, because we are permitted, if this case goes forward, at trial, to argue that all -- President Trump's training with respect to classified information handling happened on the job. And if what happened in front of him was that he was repeatedly shown documents in these -- in, for example, at Mar-a-Lago, or at Bedminster under circumstances that the government approved, then that is evidence that is admissible to show that President Trump did not have -- willfully violate anything, because he was handling --

THE COURT: Do you know who would have custody of any documentary evidence related to the secure facilities at residences or in secure locations?

MR. BOVE: There is a White House component that is discussed in our motion to compel papers. And then there is a

witness who is also discussed in our motion to compel papers who provided -- there is two, really, who provided these briefings. And both that agency and those witnesses can speak to, and I submit, have emails relating to: Is it permissible to give these briefings under these circumstances?

THE COURT: Would that be relevant, the secure nature of the facilities? Would that be relevant to the three elements under -- for Counts 1 through 32?

There are references in the indictment to the -- to the lack of secure facility where the boxes were allegedly kept. But is it strictly relevant to the three elements that are necessary for proof of Counts 1 through 32?

MR. BOVE: I think that this evidence could potentially bear on the Authorization Clause. But our theory in the motion to compel papers is that it would be most directly relevant to President Trump's state of mind, because the circumstances under which briefings were conducted prior to him leaving office informed his view about how the appropriateness and the -- of how to handle classified information after his presidency.

THE COURT: But you're not sure whether the Executive Order itself speaks to protected or secure facilities?

MR. BOVE: I think that there is language right around Section 4 that touches on that issue, Judge.

THE COURT: And your understanding of the superseding

indictment is that it does require resort to the Executive Order in order to fill in content for the "entitled to receive" clause and the "unauthorized" clause.

MR. BOVE: And the NDI Clause, because I think a big part of their argument is that the classification status of the documents, the alleged sensitivity of the documents -- this is them talking, not me -- makes it more likely that the defendant understood that these things constituted NDI. And I think, on that issue, in the -- the use of the Executive Order to define the NDI element, you have to look at Section 1.4 of the Executive Order, which defines the categories of classified information that are subject to the order. And it's much broader than the concept of National Defense.

THE COURT: Okay. All right. Thank you. It's been some time now that we have been discussing. So let me turn to hear argument from either Mr. Harbach or Mr. Bratt, whoever will be taking the lead on this particular opposition.

MR. BRATT: Thank you, Your Honor. Good morning.

THE COURT: Good morning.

MR. BRATT: So I will just start with an overview of our position, and then I will turn to some of the specific issues, both that Mr. Bove raised, and answer some of the Court's questions.

The former president's as-applied challenge to 793 here is really no different from the many others that have come

before other courts, that have been unsuccessful, and this challenge should fail for the same reasons.

THE COURT: Do you believe it's premature because it relies on facts outside of the indictment?

MR. BRATT: So with respect to their PRA argument -- and I can address that right now -- I would say as to that, not only is it premature as to that aspect, I do think that the Court can rule as a legal matter with respect to the three prongs or the three statements that are -- elements that are in 793 that they allege are -- that they allege are vague, that the Court can, as a legal matter, rule on those.

But with respect to their PRA claim, and their claim that the former president designated these records as personal, not only is it premature, but for Rule 12 purposes, it never happened. And, actually, what is in the indictment as to how the former president viewed these documents is to the contrary.

And I would direct the Court's attention to paragraph 35 of the superseding indictment, ECF Number 85, particularly on page 16. And just toward, sort of, the middle of that page, the former president -- and this is at Bedminster, in the summer of 2021, July of 2021. And he is speaking to a publisher of his former chief of staff's memoir and the ghost writer, and he has a couple of aides present.

And just starting where it says:

"TRUMP: This was done by the military and given to me.

I think we probably -- we can probably, right?

"STAFFER: I don't know. Well, we will have to see. Yeah, we will have to try.

"TRUMP: Declassify it:

"STAFFER: Figure out -- figure out a -- yeah.

"TRUMP: See, as president, I could have declassified it.

"THE STAFFER: Yeah.

"Now I can't, you know, but this is still secret."

He doesn't say there, I can show you this because I designated it as personal. In fact, he is saying the exact opposite, that these are presidential records, core presidential records that he has custody of, and that they remain classified.

Mr. Harbach will be handling most of the PRA argument, but I will touch on a couple of things as it relates to the vagueness claim. It is our position -- and I think actually if you look at the PRA, the PRA reinforces the notice to the former president that what he was doing is illegal.

The clarity of the definitions in the PRA of what is personal and what is presidential, they undermine the claim he is making that he was not on notice, that he could keep these documents.

They have some very black-and-white definition of what is a presidential record and a personal record. And I would

just like to take a moment, Your Honor, to read to you what is in 44 U.S.C. Section 2201(2), which is the definition of a presidential record.

The term "presidential record" means any document -- all documentary materials or any reasonably segregable portion thereof, created or received by the president, the president's immediate staff, or a unit or individual of the Executive Office of the president, whose function is to advise or assist the president in the course in conducting activities which relate to or have a -- or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the president.

And then by contrast, personal records, in 2201(3), the term "personal records" means all documentary materials or any reasonably segregable portion thereof, of a purely private or nonpublic character which do not relate to or have an effect upon the carrying out of the constitutional statutory or other official ceremonial duties of the president.

It would do violence to the text of these provisions to say that a president can simply, by fiat, make what the law requires to be a presidential record a personal record.

These are all documents that he did not create, they -- as we say and as they admit, they were provided to him in the course of sensitive briefings. I would -- there is nothing in the PRA that says a personal record by definition cannot

contain classified information or cannot be subject to 18 U.S.C. 793.

And, in fact, the PRA does anticipate that even a personal record can contain information in it that is presidential or even classified. That's the importance of the use of the term "segregable."

THE COURT: And I very much appreciate these arguments. I do want to consider them, certainly, but -- in the context of the vagueness challenge, and then we can turn to the PRA. I just -- I'm trying to keep the analysis a little more organized here with respect to the challenge clauses.

So if you could just root your argument in the vagueness challenge, that would be helpful.

MR. BRATT: Yes. And the way I'm trying to root it, Your Honor, and probably maybe not as well as I could, is that on the whole issue of fair notice, that you have to look at everything that is alleged in the indictment, everything that is on the books and the law, and that the PRA, rather than undermine -- or supporting his claim, that he could take these documents without any consequences, actually reinforces the notice to him that he could not do so.

THE COURT: Okay. But it is uncontested, of course, that no former executive or former vice president had ever been -- had ever been -- been faced with or exposed to criminal liability for retaining personal or presidential records.

MR. BRATT: None has been charged.

Just in answer to the Court's question about criminal referrals, there was a criminal referral from NARA with respect to President Biden. There also was a criminal referral from NARA to the Department of Justice with respect to Former Vice President Pence. So there were other referrals.

THE COURT: Those postdated --

MR. BRATT: Postdated this; right.

THE COURT: Okay. So there wouldn't have been, I guess, a historical example for the former president, at least to say, well, there is a -- there is a realistic likelihood here that I could be looking at a 793(e) indictment?

MR. BRATT: There hasn't. But I would add that there was never -- even with other former presidents, there was never a situation remotely similar to this one.

THE COURT: So then I guess that gets me to the whole "when was the crime complete?" Because the way the time period is alleged in the indictment is, starts on January 20th of 2021 -- correct me if I'm wrong -- and it runs through the date of the search; is that correct?

MR. BRATT: Well, it -- there -- so there are three different stop points. And one, I think as a legal matter, retention is an ongoing offense, it continues -- it's a continuing offense until it stops.

THE COURT: But, conceivably, you could have charged it

on January 30th, and you would have had a week of unlawful retention under the theory charged in the indictment; correct?

MR. BRATT: That's correct.

THE COURT: Okay. So then that's my question, is that, if that's the theory and you -- and the crime is complete, then wouldn't that have been applicable to other officials who, I think, it's undisputed have possessed classified information post-presidency, and done so through willful actions?

MR. BRATT: So I think it's the willful part that becomes harder. And that really goes to, what is the proof that the government would have to prosecute a former president or former official who retained documents?

And the Court may have read the Hur report, but that certainly is a big part of the Hur report's discussion as to whether or not President Biden's conduct was willful or whether they could prove beyond a reasonable doubt that it was willful.

I don't have insights into what my former colleagues decided with respect to Former Vice President Pence. But those are all, certainly, facts that bear upon whether or not there was a charge -- there would be a charge.

THE COURT: But based on the simple willfulness that -- that is permitted, you could have willfulness on January 21 of 2021; correct? Because at that point, your position has ceased. You -- a lack of clearance and -- you lack a clearance, and you lack a need to know, correct, and,

therefore, it's unauthorized, and you took them willfully, and they contain National Defense information?

So all of the elements are satisfied and the crime is complete as of January 21, 2021?

MR. BRATT: That as a -- as the Court states it, correct, that is correct.

THE COURT: And then there is no tension with that position and the absence of any criminal prosecutions for possession of classified information post- -- postposition?

MR. BRATT: So I think the Court -- the Court's question would be an important one if the indictment was returned on January 30th, 2021, but it wasn't. It was returned -- with the history of everything that happened beginning in May of 2021, the return of only 15 boxes, the failure to comply with -- fully comply with the grand jury subpoena, the false declaration that was submitted, the evidence of obstruction, all of that is what brings --

THE COURT: And I think all of that is -- is -- is adequately pled in the obstruction counts, but for the retention counts, it just struck me as interesting that the period of time starts when it does. Because at that point, there is -- there is no demand for the documents.

MR. BRATT: And, again, that's partly why the -- the -- there is no charge as of January 21st, January 30th, 2021.

You have to look at the entire conduct. And, yes, what you're saying is what we are alleging relates to the obstruction charges, but that's also key proof of willfulness.

And to return to the Court's question, the Court's comment, the -- B9 is the -- what appears to be the 11th Circuit's distillation of the Bryan standard, which is what the courts have routinely used in 793 prosecutions.

And I would say the Bryan standard is -- I know sometimes the term "simple willfulness" is -- is applied to it, and I think that's to differentiate it from the Ratzlafv/Cheek, sort of --

THE COURT: Correct.

MR. BRATT: -- sort of willfulness. But there is also another, sometimes, definition of willfulness, which is just doing something advertently, or not by mistake.

And the Bryan standard does require us to prove that when the former president took the documents, he did so with the knowledge that it was illegal to do that.

THE COURT: Illegal. So -- just so we get to that definition, where it says "with the intent to do something, the law forbids..."

And my question is: Which law is captured there?

MR. BRATT: So under Bryan -- and, again, we're not -- obviously, we're very far from the charging stage, and so we would certainly give the Court language that would be more

refined than what I'm about to say now. But what we usually have in our instructions to flesh out the meaning of Bryan is that a defendant does not need to know the specific law that he is charged with violating, but he has to know in a general sense, general knowledge that what he is doing is illegal. He doesn't have to --

THE COURT: But illegal because it's -- because it's a violation of 793(e) or it's illegal because it's in violation of the Executive Order?

MR. BRATT: 793(e), the prohibitions in 793(e), which aren't formed, though, by the Executive Order.

THE COURT: Okay. So then do you see any issue with the fact that 793(e) does not incorporate or otherwise reference the Executive Order; it just says "entitled to receive it"?

MR. BRATT: So let me spend a moment on the "entitled to receive" prong, because -- and I think the Court was getting to some of the issues with that. But the cases that we go back and forth on, and particularly the Rosen case, those all dealt with the transmission prong of 793(e).

So there, it's really -- it is part of the actus reus that the person to whom you transmit the information, be it a reporter, be it a friend -- we have a subset of cases where people are giving it to boyfriends or girlfriends to advance their careers. Part of the actus reus is that the person to

whom you give it is not entitled to receive it.

The point that we were making in footnote 6 of our brief, and which I can amplify upon, is that in this case, the entitled-to-receive language is not part of the actus reus. The offense here is that he failed to return it.

So in many ways, you don't even have to focus anymore on the "entitled to receive."

THE COURT: Failed to return it to who?

MR. BRATT: To the official entitled to receive it.

THE COURT: Which would have been?

MR. BRATT: NARA would have been one.

THE COURT: But that's -- so as of January 21, the crime at that point is, you would have returned it to NARA at that point, day -- day after presidency ends?

MR. BRATT: As the PRA is written by -- as a matter of law, the ownership of those documents transfer to NARA.

THE COURT: Okay. So NARA is the official contemplated to whom the former president would have returned the documents?

MR. BRATT: Under the facts of this case. There is also returning them to the FBI via the grand jury.

THE COURT: Post grand jury.

MR. BRATT: Correct.

THE COURT: Okay.

MR. BRATT: But, you know, where -- that's not this case, and it would be almost an absurd situation.

But let's say that things had turned out differently, that the former president realized that he had these documents in a storage room and decided, oh, I've got to give these back, and rather than calling NARA or calling the Department of Justice, he called, say, the then leader of the Republicans in the House and say, hey, I've got these documents. I want to return them to you. And somebody is arguing that was not the official entitled to receive them.

Again, that's not a case I think anybody would charge, but that's how the "entitled to receive" language would play out in a prosecution if there were an incorrect return. But in our case, the element really gets satisfied through the proof of the failure.

THE COURT: But it does -- it does require or resort to the Executive Order, you would agree?

MR. BRATT: Yes. And in -- to just address a couple of questions that the Court had for Mr. Bove. First of all, a president never receives a clearance, just as Your Honor does not receive a clearance. So there is not a situation where a clearance is suspended. The DOE situation, which I can talk about a bit more, is different. They do something on their books. But with respect to all of the other classified information, classified documents that a president sees during his term, there is no clearance. So there is no clearance to suspend at the end of one's term.

THE COURT: Is there a statute that, kind of as a legal matter, nullifies or negates the preexisting clearance?

MR. BRATT: So, again, there -- there never was a preexisting clearance. And I -- I don't want to talk past Your Honor. But it's not that -- so, really, the part of the Executive Order that comes into play -- and we've mentioned this -- is Section 4.4. It addresses what a former president can do vis-á-vis classified information post-presidency. And that -- and I will just add that the fact that there was 4.4 in terms of notice, fair notice of what one can and cannot do, it actually makes a former president unique among the people whom we otherwise end up prosecuting for 793(e) -- government contractors or government employees. Because there is in the Executive Order express language limiting what he can and cannot do.

THE COURT: Do you see a problem with the fact that the statute really doesn't reference any Executive Order, and it doesn't -- it doesn't authorize rulemaking?

MR. BRATT: Well, so, two things. One, the Executive Order itself is law, and so it is -- it's law. It's on the --

THE COURT: Correct. But it's not referenced in the charge in 793(e).

MR. BRATT: And --

THE COURT: So if you're just a regular person trying to figure out if you are going to run afoul of 793(e), how

would you know that you have to go look up the Executive Order, and which one?

MR. BRATT: So, you know, as a matter of -- again, sort of the Bryan line of cases, one cannot -- if something is on the books, that awareness of it is imputed to you. That is not the type of willfulness that -- that we have to -- have to apply. So there is a law that makes it illegal, that law is informed in parts by the Executive Order, which is out there for anybody to see. In Rosen and in other cases, the Courts have upheld limiting or narrowing the statute or clarifying it by reference to the Executive Order. So all of that, that entire mixture is entirely consistent with Fifth Amendment due process jurisdiction in vagueness cases.

THE COURT: Does it reach a point where you say that it's just too much, it's just too much addition? It's okay if you are adding the closely held, because that's -- goes hand to hand with the secrecy language in Gorin. But beyond that, courts bring in the Executive Order to add content to what is otherwise not referenced. Does it reach a point, really, in the -- in the explication of the statute, where it becomes just -- just too much judicial gloss?

MR. BRATT: So as long as the glosses are narrowing the reach of the statute, no. And that actually -- and we cite Skilling for that proposition. But even, you know, they -- they spent a lot of time talking about, you know, the Davis,

Johnson, Dimaya line of cases. And just to quote from Justice Gorsuch in -- in Davis. This is at 139 Supreme Court 233: "Applying the constitutional avoidance to narrow a criminal statute, as this Court has historically done, accords with the rule of lenity."

THE COURT: So what do you say to the contrary view, which is that the Executive Order is standardless and, therefore, doesn't limit?

MR. BRATT: If you look at 4.4, that language is very clear. There is nothing standardless in that.

THE COURT: Could you walk me through the standards that you see in 4.4?

MR. BRATT: Yes.

Excuse me, Your Honor, I thought I brought everything I needed up here.

So 4.4, beginning at -- which is titled, Access by Historical Researchers and Certain Former Government Personnel.

THE COURT: Okay.

MR. BRATT: 4.4(a): The requirement in Section 4.1(a)(3) of this order that access to classified information may be granted only to individuals who have a need to know the information may be waived for persons who -- in Sub 3 -- served as president or vice president.

And then it continues in (b): Waivers under this section may be granted only if the agency head or senior agency

official of the originating agency, (1) Determines in writing that access is consistent with the interests of national security; (2) Takes appropriate steps to protect classified information from unauthorized disclosure or compromise, and ensures that the information is safeguarded in a manner consistent with this order; and then (3) Limits the access granted to former presidential appointees.

And actually, (3) really does not apply here.

So 4.4 is quite clear about how a former president has access to and, essentially, where the former president would have access to classified information post-presidency.

THE COURT: And then the "need to know" definition comes from?

MR. BRATT: So "need to know" comes from 4.1. But as it says here, the "need to know" is waived under these circumstances.

THE COURT: So you would never have to go look up the definition of "need to know" under the Executive Order, which I think is Subsection (dd), if I'm not mistaken?

MR. BRATT: You're correct, Your Honor.

So using the as-applied analysis as applied to the former president, that's correct.

THE COURT: Okay. So no -- no need to resort to (dd) under -- under this argument. Okay.

Let's say you did resort to (dd), what are the

standards in (dd) to know? If you're really trying to plan your conduct and foresee the potential for criminal liability, then how would you know?

MR. BRATT: So contrary to how Mr. Bove describes it, those words are susceptible to ordinary dictionary definitions, and, particularly, the word "need."

THE COURT: Uh-huh.

MR. BRATT: So there has to be some demonstrated reason for having it, some demonstrated justification for having it. And so I would not concede at all that those terms are vague. I think some of the arguments we've made in the motion to compel arise in a different context, and we are using that term in a different context. But that does not affect the vagueness analysis as to 793, as applied to the former president.

THE COURT: Okay. So what -- in the jury instructions, hypothetically, in this case, how would you define "unauthorized," and how would you define "entitled to receive"?

MR. BRATT: So I'm going to have to say, Your Honor, I really don't want to cobble something together as I'm just standing here.

THE COURT: Okay. Okay.

MR. BRATT: We can provide briefing for you on that, and I'm sure that we would have opportunities in the future to do that. So I would, I guess, ask the Court's --

THE COURT: Well, it -- the analysis of the vagueness

challenges kind of invariably leads me to wonder, well, okay, how will these terms be defined for the jury who will be having to apply these terms? And then, are we going to be looking at such diametrically opposed definitions of these terms that it will -- it will be hard to reach a consensus?

MR. BRATT: So we certainly will be looking at other 793(e) charges that have been given. We will look at the facts of this case. And we will brief it for the Court and come up with an instruction that we believe is legally sufficient and appropriate for the facts of this case.

THE COURT: Okay. All right. So let's make sure we haven't overlooked any of the clauses. I think we've talked about "unauthorized" and how it, on the government's view, tracks the Executive Order. Same with the "entitled" clause; is that correct?

MR. BRATT: Right. And, again, under the unique circumstances of a failure to deliver, a lot of that language, in many ways, drops out of the case.

THE COURT: But from the statutory text, why does it drop out? Because if we look at the original language that I started this hearing off with Mr. Bove, it does -- it does contain the charge, and I believe the indictment does as well.

MR. BRATT: Yes, it does. But our proof is there was a failure to return. So we don't have to postulate to whom it would have been returned to satisfy the statute.

He never did it. So we don't really get into the question of who was entitled to receive it.

THE COURT: Okay. All right. Let's see, then.

All right. So you would agree, of course, during the presidency, the access is authorized?

MR. BRATT: Yes.

THE COURT: Okay. So then it became unauthorized -- just correct me if I'm wrong -- the moment the presidency ended?

MR. BRATT: And he had removed the documents, correct.

THE COURT: Okay.

MR. BRATT: Yes.

THE COURT: So in terms of the indictment, the lack of authority, does it stem from the absence of a clearance alone, or is there some other source for the lack of authority?

MR. BRATT: So, certainly, he doesn't have a clearance. So that -- that's part of it.

THE COURT: And that's because the clearance vanishes, effectively, when the presidency ends? Is that how it works? I'm just not familiar.

MR. BRATT: I would say that -- the way I would say it is that the lawful access ends at the end of the presidency, because there is not a clearance that is granted during the course of the presidency.

THE COURT: And there is no requirement that there be a

demand for the documents in order for the retention to be unlawful; is that correct?

MR. BRATT: Unlike (d), where the unlawful activity is predicated on there being a failure to return on demand; under (e), that's correct.

THE COURT: Okay. Are you familiar with any cases where you have this, sort of, there was authority, and "then the authority was lost" type scenario?

MR. BRATT: So we have cases where individuals have taken classified with them after their employment ends, and in many instances, they no longer have a clearance. The retention is unlawful for other reasons. Keeping it in one's home -- in one's home is not a -- a lawful means of having possession of the -- of the documents in that sort of setting.

But, yes, we do prosecute people who no longer have their -- no longer have active clearances.

THE COURT: So, government employees, for example, that would have had authority but then exceeded the authority, for lack of a better term.

MR. BRATT: Right. But even when they were government employees -- and this is part of our response, the factual response to the Q clearance issue -- is that, even if you have lawful access to it under the appropriate circumstances of your job, it doesn't mean you can remove it and keep it at home. I've had an active Q clearance for about 15 years. I can view

Q-classified materials in a SCIF. I can't take them home and put them in my basement.

THE COURT: Certainly. Certainly. Okay.

Now, just again drilling down on the authority piece, are you familiar with any cases where courts have had to define the term "lack of authority" or "unauthorized" without a statutory definition?

MR. BRATT: For 793, or for any other statute --

THE COURT: Just any other case. Yes, I'm wondering -- I know, for example, in the Van Buren case, it's a CAFA decision with respect to exceeding authorized access. And I was just curious if there is any broadening beyond the 793(e) context, is there any helpful case law to address this issue of "unauthorized" when there is no statutory definition? Because I know your position is we looked at the Executive Order. That's not, of course, in the statute.

So I'm wondering what courts have done, for example, in that scenario, faced without a -- faced with no statutory definition of the term "unauthorized."

MR. BRATT: Based on the briefing that was in front of us, we didn't look for those cases. We could do an analysis for the Court, if that's what the Court would want. I'm not aware of how -- I can't draw an analogy to a similar type of statute that has "unauthorized" as part of the -- part of the element for the offense.

THE COURT: Okay. So then I guess tell me a little bit about the count -- the Count 19. What happened with that count? And why -- why was there a formal clearance on the books that had to be deactivated retroactively?

MR. BRATT: Right. So first, with respect to Count 19, we have provided them discovery on it. There are some things, as is clear from our papers that the Court has, that we have withheld. But they have the original memorandum and the original back-and-forth from, I believe it was February of 2017, when the -- when the former president was put on the database of individuals who have -- who are authorized to access Q-level material.

I believe that memorandum cites to a regulation that gives the secretary the authority to do that, wholly apart from the ordinary vetting that somebody would go through to get a Q clearance. We provided that. We provided the memoranda and some other materials related to what occurred over the last summer. That's -- that's what we have given them.

THE COURT: Uh-huh.

MR. BRATT: And that -- and based on what we have been -- has been represented to us by the Department of Energy, that is essentially the world universe of materials they have on that subject.

THE COURT: At some point, though, it was -- it was discovered, correct, that this clearance still existed

post-indictment? So walk me through factually what happened there.

MR. BRATT: So factually, somebody from the Department of Energy notified us of this fact and of what they were going to do. And, again, we produced in discovery the 302s, I believe there are two 302s, of the interview with this official from the Department of Energy -- of these two interviews with the official.

THE COURT: Are there any other documents that -- that would speak to the -- to the -- to the chronology here that there was a clearance, technically, in the Department of Energy database, but that after indictment, it was removed?

MR. BRATT: So, again, never say never because I can get a phone call from the Department of Energy, having heard about proceedings today, and said, oh, we found a few other things. But putting that aside, we have produced, other than the things that we have withheld, what the Department of Energy has represented to us is what they have on this subject.

THE COURT: And what you have withheld, just so I understand, are -- are what?

MR. BRATT: Some internal emails. There is some drafts of a memorandum that were circulated within the Department of Energy. Those are essentially it. It's really more of some communications about a draft of at least one of the memos.

THE COURT: Okay. Let's see. Let's turn to the intent

element, willfully. Is it your position that it's the standard simple willfulness that we were talking about a moment ago with no extra layer of bad faith?

MR. BRATT: So I like to refer to it as the "Bryan standard of willfulness." And that you do have to have a bad purpose; that is a common Bryan instruction. But you do not have to have the heightened mens rea of, say, a tax structuring -- or a money structuring case. That is the subject of -- it's either Ratzlafv or Cheek.

THE COURT: So in 11th Circuit pattern, is the word "bad purpose" included?

MR. BRATT: So I don't have the instruction in front of me. I know we have used that term, I think, in -- in the discussions. I think Rosen talks about Morison -- the Morison instruction. And I think at least one of the other cases references an instruction that was a 793 instruction that was given, that the bad purpose language was used.

THE COURT: Okay. No, I'm aware of B91A and 1B. One contains a bad purpose reference and the other one doesn't.

So, okay. All right. Let's see. Anything further on willfulness, in your view, as it informs the vagueness challenge?

MR. BRATT: No. I -- I think, again, when you stack everything up, the notice that the former president had, the admissions that are in the indictment, the -- and I know --

THE COURT: And the notice that you're referring to is?

MR. BRATT: Is his awareness that it was illegal to mishandle classified information. He made public comments about that several times during the course of the -- of the campaign.

THE COURT: But were those comments geared towards a -- a president's decision or a vice president's decision from -- to -- to retain documents?

MR. BRATT: They dealt with his opponent, Former Secretary of State Clinton, who was herself an original classification authority, and her having had classified information on a personal server. That was the context.

THE COURT: Okay. So you're saying there was notice based on the public comments.

MR. BRATT: Right. That's paragraphs 23 and 24 of the superseding indictment. In their reply brief --

THE COURT: But just to -- just to turn back to that point. So going through the notice, if you're a former executive, again, trying to foresee reasonably whether you would be facing criminal liability, you would see, okay, no criminal liability to date, correct, for officials that had classified information postposition?

MR. BRATT: Are you saying no prosecutions?

THE COURT: Correct.

MR. BRATT: Well, so putting aside presidents and vice

presidents, there have been prosecutions of other high-ranking officials for their mishandling of classified information. That has occurred.

THE COURT: Okay. But no prosecutions of executives or vice presidents?

MR. BRATT: That is not part of the notice for purposes of Fifth Amendment due process.

THE COURT: Well, the Ford case, for example, talks about reasonable foreseeability. And so that's why I'm kind of asking, you know, putting yourself in the -- in the position of a former executive, trying to map out your conduct, and you see sort of the constellation of what has happened historically, does that factor in at all?

MR. BRATT: I don't think that factors in. That may be relevant to willfulness, and that's certainly something that the former president could testify to, should he choose to do so. But as a legal matter, as to whether or not, as applied to him, this statute is void for vagueness, no.

THE COURT: And that's because the clauses that exist already coupled with the judicial glosses, you think, provides adequate notice in the context that we have here under the circumstances?

MR. BRATT: Correct. Provides adequate notice and also protects against arbitrary enforcement.

THE COURT: How so? Can you speak to that arbitrary

enforcement?

MR. BRATT: Yes. And that's really a corollary to fair notice, that if the criteria are clear, a prosecutor cannot charge a case that go -- that would go beyond those criteria.

THE COURT: Uh-huh.

MR. BRATT: And that's the -- the limitation on arbitrary enforcement as, you know, described in Kolender.

THE COURT: Well, there is a suggestion in the -- in the motion and in the reply that there -- that this -- that this arbitrary enforcement is featuring in this case.

MR. BRATT: They make the argument repeatedly that decisions were made for political reasons. They have their vindictive selective prosecution motion. That is wholly separate from whether or not, consistent with the Fifth Amendment, this indictment, these charges, provided the former president fair notice.

THE COURT: So you don't see any relationship to the arbitrary enforcement component of due process?

MR. BRATT: If there are knowable and clear criteria to guide the decision of what the elements are to charge, that is both adequate notice and that guards against arbitrary and capricious enforcement.

THE COURT: Okay.

MR. BRATT: And I would add one other important as-applied factor in this case, which is -- which is in the

indictment, which is that they make -- they sort of brush it off in the -- in their reply brief, but the nature of these documents, as alleged in the superseding indictment, did put -- and this is very important for an as-applied challenge -- and both Hitselberger and Kim talk about the nature of the -- of the documents, what the defendants in those cases would have seen, the top secret, and many cases here, the SCI compartments, the special access programs, all of that in an as-applied case, those are important factors in whether or not these charges are vague as to him.

THE COURT: Given the sensitivity?

MR. BRATT: Correct. Correct.

THE COURT: Okay. Does it matter, for purposes of assessing this foreseeability concept I have mentioned, that there is no criminal enforcement mechanism in the PRA itself?

MR. BRATT: No. No. Not at all. Because those are, again, entirely separate statutes. And, if anything, the PRA puts them on greater notice that what he was doing was not lawful.

THE COURT: Does it matter that there is case law -- and I know this is subject for our next motion -- but that presidential decisions with respect to designating documents as presidential or personal, in some references in case law, have been characterized as effectively unreviewable?

MR. BRATT: So we're not in a judicial review situation

here. These are charges in an indictment. And it will be for the jury to decide, based on the facts that come out and the testimony of witnesses, as to whether or not there was a violation. This is not --

THE COURT: I guess what I'm saying, though, is if -- again, if you're putting yourself in the mind of an executive trying to foresee the criminality, potentially, of conduct, and you say, okay, there has been no president or vice president ever charged with possessing classified information post-presidency, and there is no criminal enforcement mechanism in the PRA, and there is some case law that says that it is unfetterred discretion, and I was the original classification authority for the documents, is there not a point at which one would say it would not have been reasonably foreseeable, given that landscape, to expect criminal liability?

MR. BRATT: So I don't think that sort of analysis -- that goes beyond the Fifth Amendment due process.

THE COURT: That's a willfulness argument?

MR. BRATT: That's a willfulness argument; correct.

THE COURT: Okay.

All right. Now, just to be clear, there is no NDA that was signed, of course, by a former president, so you wouldn't have that sort of fact in a case?

MR. BRATT: That's correct.

THE COURT: Okay. And then -- okay, so just -- my last

question really is just walk me through the set of judicial glosses that you have to -- you have to cobble together. And I know this -- there is at least a closely held component. I want to make sure I understand the full set of extras that we're talking about.

MR. BRATT: And I guess I would not agree -- I would respectfully take issue with the term "cobbled together." But what --

THE COURT: Well, beyond the text, let's say.

MR. BRATT: Sure. There is the gloss that Gorin and Heine put on, that the -- the definition of relating to the National Defense, what National Defense information is. There is the closely held narrowing that also comes from these two cases that Campa defines as what the government endeavors to keep from the public.

And I just want to pause for one second because just because Campa arose in a context of sufficiency of the evidence, that evidence was sufficient because Campa adopted the Gorin definition.

THE COURT: I think you're correct about that.

MR. BRATT: There is also the use of the Executive Order to define entitled to receive, and it also bears on unauthorized -- unauthorized possession. There is also -- and we can discuss --

THE COURT: So without the Executive Order, would you

have a vagueness problem?

MR. BRATT: I -- I -- I don't think so. Because I think, with respect to unauthorized possession, as the Court correctly said, the starting point is the plain language of the text, and the ordinary dictionary definitions that a -- of those terms, so I don't think so.

THE COURT: So let's talk about the definitions. There is some dispute here that you've added the word "official," and that it doesn't really come from the definitions.

What is your response?

MR. BRATT: We quoted -- and I can double-check. We did cite-check our briefs. We cited from Black's Law Dictionary; I think, Random House; maybe -- I forget what the third one is. So those are -- the terms that we used, I believe, came from dictionaries.

THE COURT: I would have to go back and see whether the word "official" was there.

MR. BRATT: I think that's the Black's Law definition that we used.

THE COURT: Okay. Well, I don't want to delay things. So, okay.

All right. Going through the list. So we've talked about "closely held." There is a great bit of law on that prong.

The "entitled to receive" and the "authorized," you say

comes from the Executive Order and then, the ordinary definition --

MR. BRATT: Correct.

THE COURT: -- of lack of official permission?

MR. BRATT: Well, but also, here -- I'm looking at -- I'm looking now at our brief. So the -- we do not -- I don't -- we're not quoting. We don't have quotation marks around the Black's Law dictionary. But from Random House, we say defining "authorization" as, quote, "permission or power granted by an authority." And then from Webster's Third International, defining "authorized" -- quotes -- to quote, "endorse, empower, justify, permit by, or as if by some recognized or proper authority."

THE COURT: Permission granted by authority. Okay.

MR. BRATT: Yes.

THE COURT: All right. And then any other glosses that one would need?

MR. BRATT: There is also -- and we can put to another day and brief whether or not the Court should apply it. But there is the Morison clause, the potential for harm, which the 4th Circuit has adopted.

THE COURT: What's your view on that?

MR. BRATT: My view on that is we will -- we will give you something at a -- at a -- at a later date as to how that may or may not apply to this case.

THE COURT: How do you not have a view about that?

MR. BRATT: So some of it has to deal with a -- National Security Division policy of how we look at these cases. We have -- not -- we have advocated the courts not to use it, but there were certain circumstances about those cases where it made sense to do so. So I -- I am reluctant to commit to a position standing in front of you today, Your Honor.

THE COURT: But there is a potential for adding what language?

MR. BRATT: Potential for harm.

THE COURT: Potential for harm. And so how would that fit into the three elements?

MR. BRATT: So it would be -- it really fits into -- to all of them. It fits into the charge writ large. And it would be something else that the jury would be asked to find, that whether or not --

THE COURT: But that the -- that the release of the documents would cause potential harm or that you knew that release of the documents could cause potential harm?

How exactly is it formulated?

MR. BRATT: The former, that the documents -- the unauthorized -- the mishandling of the documents has the potential for harm.

THE COURT: And in this case, it would be the retention?

MR. BRATT: Well, retention is the crime. But the consequences of the retention has the potential for harm.

THE COURT: Okay. All right. Anything further, Mr. Bratt, on the vagueness?

MR. BRATT: I don't think so. I think Mr. Harbach will respond to some of the points that Mr. Bove made about the Presidential Records Act and the Judicial Watch and Clinton situation.

I would say, Your Honor, that we do not concede that there was classified information in The Clinton Tapes. And I actually think it's not a good example to point to the book, because those books, like any other former official's books, will go through a classification review. So if there were classified that was in the Taylor Branch book, it would have been taken out.

THE COURT: What about in the case of Former President Reagan? I think there is no dispute that his materials contained classified information.

MR. BRATT: That's correct. Yes.

THE COURT: And -- and his conduct would have been post enactment of the PRA?

MR. BRATT: He was the first president who was subject to the PRA.

THE COURT: Okay. All right.

Okay. Then let me hear any rebuttal from Mr. Bove, and

then we will, as usual, break for lunch around 12:00 or 12:15, and then resume with Motion Number 2.

MR. BOVE: Thank you, Judge.

There is just a few discrete points that I would like to make in response. One relates to the Entitlement Clause. It seemed that -- that the position from the government was that you can ignore that on these facts because they allege that President Trump did not timely return the documents. And I think that flips the standard on its head because the question is fair notice in arbitrary enforcement and what it looks like to someone in President Trump's situation on a prospective basis when you look at the terms of the statute, what's required.

And so to say that, after the fact, he never returned them, so the Court doesn't have to analyze "entitled to receive" in our vagueness challenge, that doesn't work.

With respect to the Authorization Clause, it -- the discussions seem to turn on: If there is a clearance, then authorized; if no clearance, not authorized.

That, of course, is -- is inconsistent with President Trump's statement in the indictment regarding Brennan, where he speaks to a long-term practice of former officials being permitted to have access to classified information. So that's one source of ambiguity.

And another relates to one of the witnesses that I

referenced when I was up here earlier, and the fact that prior to President Trump's taking office as a candidate, he was treated as if he had a clearance and had authorization and everything that's required by the Executive Order to have access to classified information.

And so, yes, that bears on his intent if we were ever to get to a trial, but it also bears on -- what could authorization mean if -- if an incoming president is still being offered access to classified information without a clearance?

THE COURT: And is that what you allege was going on here?

MR. BOVE: That's what the -- the government's witness makes clear happened here, that the -- that President Trump received briefings as a candidate at Trump Tower.

THE COURT: What about after the presidency ended?

MR. BOVE: We have -- we have -- I'm not aware of briefings. But what I am pointing to in the post-presidential period is the statement in the indictment that President Trump believes and understands that there is a long-standing practice of former officials having access to classified information.

So all of these things, sort of -- I call into question the scope of the term "authorization" under the statute; and, I think, strongly support our position that it can't be limited to the Executive Order.

THE COURT: You would agree, of course, that declaring a statute unconstitutionally vague is a quite extraordinary step, and that before you do that, you would -- you would have to and be obliged to consider the judicial glosses one by one. So why wouldn't that just be the appropriate course to do in this case?

MR. BOVE: Well, Judge, that's not what Davis says. Davis says that if Congress didn't get it right, the Court's job is to strike the statute. I certainly respect that this would be a significant motion to grant in the history of the case law on these issues. Most, if not all of that case law, predates the retrenchment that we've talked about in Davis. So I understand that it's significant, but it's warranted here.

And unlike -- many of these cases, when we talk about Schulte in SDNY, there -- that judge is bound by a 2nd Circuit's holding in Heine. When we talk about all of the EDVA cases, Rosen and the following, they are bound by that chain of authority I discussed from the 4th Circuit.

At most -- and I heard what Your Honor said about Campa. At most, there is 11th Circuit law about the closely-held component of the NDI Clause. There is nothing else in this circuit, and the Court must balance that against the language in Davis, emphasizing the separation of powers issue and also emphasizing the fact that constitutional avoidance, to the extent it's going to come up, can't be used

to broaden a statute. It can be -- that would be inconsistent --

THE COURT: Their point is that you don't even have to get to the arguably standardless (dd) because you just look at the waiver, which speaks directly to the presidency.

MR. BOVE: Thank you. That was one of the points that I wanted to cover.

If the Executive Order -- if the Court is going to treat that as another clause -- and we have discussed that, you understand our position -- and that analysis would have to start at 4.1, the general requirement about -- about restrictions on access. So there is three of those. Favorable determination of eligibility; that happened here, that's why President Trump has the documents. The person signed an approved nondisclosure agreement.

The government hasn't disclosed a single NDA signed by President Trump. That never happened because --

THE COURT: Well, I think they just explained that, that no such NDA would exist in the case of an executive.

MR. BOVE: I think I -- I understood what was said was that the clearance records would not exist, not that an NDA would not exist. But to the extent there is a distinction, either way, they -- the government itself did not abide by the Executive Order with respect to President Trump.

And so I'm still talking about 4.1 here. The third

part, I think, is --

THE COURT: Wait. What's the lack of compliance with the Executive Order?

MR. BOVE: That access was granted to President Trump.

THE COURT: And that happened just simply by virtue of the position, without any formal documentation?

MR. BOVE: As far as I understand it, yes, none has been disclosed.

THE COURT: Okay.

MR. BOVE: And that is inconsistent with 4.1(a)(2).

So the -- the -- in terms of what went on here and what President Trump is on notice of, what he is on notice of is that the government doesn't really mean what it says in 4.1.

But in 4.1, the third prong is "need to know." And I think the government didn't discuss the definition of "need to know" in any great detail, which is that Section 6.1(dd). And I just want to make a brief point about that.

That definition requires consideration of whether the recipient -- I'm quoting -- "requires access to specific classified information in order to perform or assist in a lawful and authorized government function."

And in terms of what type of notice in any narrowing that that definition adds to the statute, what we have here is completely circular logic. The definition uses the word "authorized." It's the same word. All that's happened here is

the government -- the prosecutors here are telling Your Honor that they should get to just decide internally what "authorized" --

THE COURT: But isn't it just, okay, you no longer are serving in a government function, so you don't have a need to know?

MR. BOVE: No, Your Honor. And that's refuted by the indictment itself, the allegation they chose to include where President Trump recites the long-standing practice of former government officials having access to classified information. So the -- and not just presidents. Mr. Brennan is the -- is who he is talking about there. And so this 4 point -- the other section relating to former presidents is not the only way in which this Executive Order applies.

Our point is that this definition simply incorporates the same word, "authorized," and just says: Don't worry. We'll decide it at DOJ.

That is not consistent with the vagueness doctrine. It's absolutely inconsistent with Davis.

The next point that I wanted to make is that the other, sort of, actual notice argument that the government presented here this morning is that President Trump was aware of the situation with Former Secretary of State Hillary Clinton. How did that bear on his actual notice? She wasn't prosecuted. So to the extent that that informed his view of how 793 applies --

and we've discussed this at length in our selective prosecution motion -- it only bears favorably on this motion.

THE COURT: Well, I think they're saying that, if anything, that just goes to willfulness, and it really wouldn't -- would not factor into the vagueness component.

MR. BOVE: Then -- and I don't understand how that could be the case. If these are part of the sequence of events leading up to his understanding of the statute, whether he is on fair notice with respect to the application of the statute, is that DOJ historically has not applied it in this way, then that -- that is relevant to: Was he on fair notice? And whether in this case, this case here today (indicating), the DOJ is applying that in an arbitrary fashion.

THE COURT: On the -- just the 793(e) cases, document alone, no transmittal, what are the most helpful cases? Because a lot of the cases describe the other components of the Espionage Act, and there is a lot of reliance on elements that don't factor into this charge.

MR. BOVE: I think that every case -- so Gorin, Heine, Morison, every case that, in order to resolve a vagueness challenge, speaks to not only willfulness but also the injury requirement that we've been talking about are favorable to us, because they demonstrate that the text of the statute alone in a documents case is not enough to pass constitutional muster on a vagueness theory.

Every one of those cases, where the Court needed to resort to that extra step -- I think it's been conceded, Morison in that way is an outlier. That's the 4th Circuit, from our view, saying there is not enough here on its face; we are going to add this to clean this up.

And I think that that is something that if a court was inclined to -- to view all of these glosses in order to save this thing and make it applicable in this case -- and we don't think that's possible, but if there is any hope of that, it would be to require the -- the injury and potential harm aspects that have been applied in other cases.

THE COURT: So is that your position, that that should be added? And, if so, how would you add it?

MR. BOVE: No. Our position is that this must be struck under Davis in the way that the Court most recently imposed all of the judicial glosses we are talking about, has discussed vagueness analysis, which is that Article III courts cannot rewrite statutes to save them.

My point is --

THE COURT: Well, there is a pattern of doing that to some extent in the Espionage Act, and I think the question that you have raised is whether the combination of the features under the current circumstances warrants a deviation from that practice of using judicial glosses.

MR. BOVE: Well -- well, I think that we have also

raised a threshold question, which is whether the judicial gloss practice is viable post-Davis, and I think that Davis is pretty clear that it's not. Davis says a vague law is not a law at all. It is void on the day it is passed. No gloss saves that.

THE COURT: I don't know if that's a fair understanding that Davis establishes a categorical rule of forever prohibiting courts from adding necessary language to save a statute from an otherwise unconstitutional presentation.

MR. BOVE: I'm quoting from page 2323. "The role of courts under our constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again."

So I -- respectfully, I think that is the message of Davis. And I do not think that pre-Davis judicial loss cases, especially when they're based on Gorin, which relates to a different statute and apply the injury prong, can be incorporated in this circuit --

THE COURT: But you still have the canon of constitutional avoidance. I mean, it can't be that Davis just eliminates the possibility to make reasonable interpretations.

MR. BOVE: But this -- this line of cases that I'm talking about, all three of them address this constitutional avoidance concept and the potential for tension with the rule of lenity. In the Skilling case that Mr. Bratt brought up, the

Court narrowed the statute to bring it within constitutional limits.

What we're talking about here is a one-of-a-kind, first-ever prosecution. They're not asking you to narrow anything. They're asking you to look at dictionary definitions that don't say what they're telling you they say, and define the statute so it fits this case. And under Davis, our position is that that -- that doesn't survive.

I would like to make one point about Count 19 and then I'm done, except to the extent the Court has a question.

Mr. Bratt's responses about, you know, factually what happened there, and are there any documents related to this, they tie right into the pending prosecution team motion. Because the only reason that he can stand up here and say, I'm not sure, maybe they will read the news about the argument and send me some things, is that they have declined their obligation under the Justice Manual and all the cases that we've cited to treat the Energy Department and the other cases cited in the indictment as part of the prosecution team, and do the case file search that the Justice Manual requires.

And they've now said in their briefing multiple times, I think, we are complying with the Justice Manual; that is not true. And it allows them to stand at a podium like this and say, gee, Judge, I'm not sure, but maybe they will send me the inculpatory information. And that can't stand.

THE COURT: Okay. All right. Thank you. It is 12:00. We will be recessing for one hour and 15 minutes, and then we will resume argument on the other motion set for today.

Thank you. Enjoy your lunch.

(A recess was taken from 12:05 p.m. to 1:19 p.m.)

THE COURT: All right. Please be seated. Good afternoon.

We are back in session. This is Case Number 23-80101. I will now hear argument on the motion docketed at 327, which is a motion to dismiss based on the Presidential Records Act. This is filed by the former president.

Let me just circle back with Mr. Irving. Were you able to determine whether you joined in this motion?

MR. IRVING: Yes, Your Honor. And I apologize for my earlier confusion. Yes, we did, and that is set forth in docket number 331.

THE COURT: Okay.

MR. IRVING: We did not join the vagueness motion, number 325.

THE COURT: All right. You need to speak with a microphone because you're not getting picked up.

MR. IRVING: Apologies, Your Honor.

So just to restate, for the record, apologies for my earlier confusion. We said in docket number 331 that we did not join in the vagueness motion, 325, because Mr. De Oliveira

is not charged in any of the Counts 1 through 32, the charge 793(e), but we did join 327, the PRA motion, which is about to be argued now.

THE COURT: Do you wish to present argument on that motion today?

MR. IRVING: I do not.

THE COURT: Okay.

MR. IRVING: Thank you.

THE COURT: All right. Well, then, who will be taking the lead on this motion?

MR. BLANCHE: Good afternoon, Your Honor. So we're jumping around and maybe going to repeat ourselves a little bit from this morning's arguments because there is certainly some overlap. But to start, it's important to understand why the PRA is relevant to a pretrial motion to dismiss.

The statute that President Trump is charged requires that -- that there be an unauthorized retention. If the Presidential Records Act authorizes President Trump to retain the records, then it's fatal and the indictment can be dismissed.

The Court asked early on this morning about whether there were any fact development that was necessary for the -- the vagueness, for the reasons that we said earlier, that there is not any -- for that motion, similarly for this one, there is not either.

THE COURT: But how can that be right? Your position depends upon a conclusion that there was, in fact, a designation of the records as personal. And that is not alleged in the indictment. So it would necessarily require or resort to materials outside the indictment.

MR. BLANCHE: Judge, not materials. Law outside of the indictment. And there is nothing wrong with the Court looking at law outside of the indictment. An easy example is the context of, for example, a 922(g), felon in possession charge. On a -- on a charge to dismiss the indictment in that case, the Court does and often will look to, for example, state law and whether -- and whether the indictment, as a matter of law, fails because of state law. And so he --

THE COURT: But this is not just a matter of referencing law. It's drawing a conclusion, applying that law to the factual designations and documents here. It's not merely a -- a legal analysis in the abstract.

MR. BLANCHE: It's not just applying -- it's not just applying the law, of which there is plenty, upon President Trump's side. It's also looking at the face of the statute. The indictment and -- and the Special Counsel's opposition brief just state as a matter of fact that the materials at Mar-a-Lago were presidential records.

THE COURT: And there is a dispute about that. So wouldn't that -- wouldn't that be something to raise in the

form of a trial defense and not in the form of a motion to dismiss the indictment?

MR. BLANCHE: We do not believe there is a dispute about that. I mean, we believe that the law is -- is crystal clear, going back from when the law was passed in -- in the '70s. I mean, if you step back for a moment, presidents since George Washington, right, have taken materials out of the White House, and -- and it was solely their discretion with what they chose, what a U.S. president or vice president chose to take out of the White House, when they left office.

The Presidential Records Act, passed in the late '70s, didn't touch that except to say -- except to say that a president, during his administration, during his administration could keep records as he saw fit. And those records, which he determined were presidential records, should be delivered to the Archives and to NARA and the other records should not. Period. They're personal.

So there is no -- there is nothing in the text of the statute that makes exceptions, like the Special Counsel wants, for documents that are affixed with any kind of classified markings. There is nothing in the statute that gives any power to the National Archives to question a president's determination of whether a particular document is personal or presidential.

And there is case law -- I mean, if you think about the

case law that talks about Congressional reasons for this, Congress knew -- Congress knew about the classification, Congress knew about the executive orders when they passed this law, and they passed the law silent on that.

And I think it's instructive when you think about what the Court said in Judicial Watch, which was that they're -- that Congress really wanted to limit the scope of any review, and that there is very little oversight authority for the president and vice president's document preservation decisions. So --

THE COURT: All of that might be right. But, again, why does it warrant dismissal of this 793(e) indictment? Doesn't your position necessarily require me to conclude that the PRA implicitly repealed the Espionage Act, at least as applied in this context?

MR. BLANCHE: Absolutely not. It doesn't require a repeal. The Espionage Act talks about unauthorized. And the bottom line is -- and this is from paragraph 4 of the indictment -- President Trump caused boxes to be transported to Mar-a-Lago when he was still president. This isn't after the fact. It's not a former president making a decision about -- about what to do with records or what to do with documents.

He had original classification authority. He had the authority to do whatever he thought appropriate with his records. He was still president when he made that decision,

and as such, they are presidential records. It doesn't require anything outside of the indictment or the case law.

I mean -- and by the way, that's the way that NARA has handled every single presidency since the PRA was passed. We're not asking the Court to do anything to -- to stretch the rules or stretch the law.

The only time, the only time that the government is taking a different position with respect to presidential records being presidential or personal -- I'm sorry, records being presidential or personal, is with President Trump. Period.

If you think about the Judicial Watch case, which involved Clinton's socks, President Clinton didn't even have to go to court in that case. I mean, so -- so think about that. There is a lawsuit that says, hey --

THE COURT: Well, he wasn't a named party.

MR. BLANCHE: Correct. Because NARA, NARA, the government, the government stood up and said there is no way -- there is no way that we, NARA, should ever ask that -- then President Clinton about what he decided in his -- in his own -- his own decision-making as president were personal records.

And, you know, again, it's instructive -- and this is in our brief, but it's instructive to say to the Court now, when considering -- when NARA was thinking about, well, how

could we possibly get these tapes back, the idea came up with how they would seize them.

And the defendant said -- and I'm citing from the -- 302 and 303 of Judicial Watch -- that the seizure would be an extraordinary request, unfounded, contrary to the PRA's express terms and contrary to traditional principles of administrative law. And that's 845 F.Supp 2d 302-03.

And if you think about that position that NARA took then, the idea that we would have any thought to go and seize President Clinton's tapes, and why did they think there was no basis to it? Because President Clinton, while president, didn't send -- send them to the National Archives. So by definition, he must have sent them to his house because he deemed them personal. Congress -- that's the way Congress wants it. And so what happened here --

THE COURT: Again, all that might be right, and I think you have some -- some -- some forceful arguments referencing Judicial Watch. But, again, I'm not seeing how any of that leads to dismissal of the indictment. Perhaps it features in the form of a defense and arguments about authority or lack of authority and unfetterred discretion in the context of willfulness and -- and perhaps the unauthorized element and the jury instructions on that point. But to get the relief you're seeking now on this motion, it seems like it would essentially require a ruling, as I said, that -- that the PRA, as applied

to this case, eliminates -- eliminates the Espionage Act possibility altogether and, therefore, requires dismissal. And that's where I think your position ultimately falters.

MR. BLANCHE: Well, when you -- when the Court talks about whether we are eliminating another statute, remember that when the PRA was passed some 30-plus years after -- after the National Defense Act, Congress was well aware of the rules and the statute that existed with respect to the NDA and the president and the vice president's exclusion from that, while president, passed the Presidential Records Act, said nothing about -- said nothing about classified documents or the executive orders which have been in existence also for decades, and passed the law that made plain exactly what the president in his authority could do with respect to -- to records that he accumulated during the White House. And, made plain, they either go to NARA -- and if they're not presidential records, that means they're either copies of records, potentially administrative records, or they're personal records. There is no discretionary function.

So it isn't -- it is proper for a motion to dismiss, Your Honor, because -- because the -- to prove Counts 1 through 32, the government has to prove that the possession was unauthorized. There is no basis in law for that. There is simply no basis in law. The opposition brief just states as a matter of fact.

THE COURT: Well, they say there is a basis in law because the statute says unauthorized. And you can -- you can borrow from the Executive Order, and you can borrow from dictionary definitions, and that's that. You don't need to resort to the Presidential Records Act at all, because we're just focused on the elements of the criminal charge.

MR. BLANCHE: That's exactly what they say, because if they were to say, Judge, let's focus on the Presidential Records Act, and the case law, and NARA's position since its passage about what constitutes personal records and, thus, lawfully -- lawfully unauthorized to obtain and to keep, if they engaged in that discussion with the Court, then the indictment is dismissed. And --

THE COURT: Your arguments might have some -- some force, perhaps in the context of, like I said, a trial defense or maybe any other motions that you have raised, but, again, it's difficult to see how this gets you to a dismissal of the indictment.

What case law can you -- can you offer that would support the notion that there is really this inherent incompatibility between the PRA and in a 793(e) charge as against a former president?

MR. BLANCHE: Well, when there is -- when there is tension, which there certainly is here, because the PRA doesn't mention anything having to do with any documents that would be

potentially classified under the National Defense Act, it -- it is -- what the -- what the Court should do is look to what the agency has done and what the Department of Justice has done for the -- since its passage. And that's instructive.

You know, we put in our brief the -- plenty of case law that talks about the absence, the absence of precedent is instructive to the Court. And that's very applicable here.

If you think about going back to the first president that -- that was bound by the PRA, President Reagan, I mean, you have a situation that directly -- directly clashes with the PRA and the National Defense Act. He had classified information in his diaries. No dispute.

I really don't think there is a dispute about the Clinton socks tape case either. But certainly, with President Reagan, there is no dispute. So when the Court asks for any kind of precedent, let's look at that case.

NARA never even considered -- considered saying, well, there might be personal records, but we have this National Defense Act, and so we are going to either -- even investigate, putting aside charge -- even investigate Former President Reagan for possession of -- of something that should be a violation of the Espionage Act. That's instructive. That's very instructive.

You can also take what Mr. Bratt and what Your -- what Your Honor asked --

THE COURT: It's -- it might be instructive, but is it worthy of dismissing an indictment?

MR. BLANCHE: Absolutely.

THE COURT: Well, why exactly? That's the --

MR. BLANCHE: Sorry.

THE COURT: It's okay.

MR. BLANCHE: And you're right. This also -- we're bleeding into vindictive and selective prosecution here, in a place that maybe the same arguments are going to apply with equal force. But -- but even short of selective and vindictive prosecution, it is helpful to look at what NARA -- what NARA did here. And you asked the government whether this crime was completed the day after President Trump left office. It -- it -- in their -- in their view, it was. And when you consider the fact that not only has the Department of Justice never even opened a criminal investigation prior to President -- or this -- the one against President Trump, and now they have opened two more and closed them both -- but they could have charged -- I mean, if you -- if you accept what they're saying as true, that the Espionage Act trumps that the materials were absolutely not personal, just by definition, then why did they wait until last summer to indict?

And Mr. Bratt, you know, prosecutors have discretion and all of that, and sure, there is a place for that at times. But the reason why is -- in our view, aside from the fact that

it was completely politically motivated, and that goes to another motion that we have pending before Your Honor -- is because there is no precedent for doing what -- doing what they did here.

And it's -- it's challenging to say, well, President Trump, you have to go to trial, or maybe there is another place where you can raise this defense -- when the Department of Justice itself has taken the position repeatedly that discretion -- that discretion around records lies with the President of the United States.

It doesn't lie with the Special Counsel. The Special Counsel should not have been authorized to just announce to themselves and announce to a magistrate judge: They're presidential records. We're going to get them.

Because under the PRA, under the PRA, by President Trump not transferring records to NARA, to the National Archives, they are personal. And, you know, it's -- it's -- you continue to see the process of Congress being played out with what President Trump did.

The reason why Congress put all that discretion into the president is because the hope was that a president, even after leaving office, would donate and send even materials he's marked as personal back to the Archives, which is exactly what we saw happen here when several boxes were transferred back to the Archives. And I -- I --

THE COURT: Well, wouldn't your position -- I mean, the Special Counsel cites case law that -- essentially, the position you're taking with respect to this unreviewable personal designation -- would effectively gut the PRA altogether, and it would just -- it would just permit unfetterred classification of, clearly, presidential records as personal without any possibility for judicial review. And then there is some indication in the cases cited that, at least with respect to the review of guidelines, that that sort of question is reviewable.

MR. BLANCHE: Well, with respect to the -- the cases that have to do with reviewing guidelines and maybe the FOIA application of PRA, or whether a document that's presidential is really an agency document, there is a whole different body of administrative law that allows that to be reviewed by the Court; but the Presidential Records Act doesn't.

And when you say, well, what's my answer to that? Congress has the ability to change the law. I mean, there is a pending bill in Congress right now that was -- was offered last March, March of 2023, to make changes to the PRA. And -- and that's pending. And that's what -- that's what's supposed to happen. It's not supposed to be that the Department of Justice can just announce that, notwithstanding what the statute says, that they could investigate because in their inherent -- I mean, think about this, Your Honor. The cases talk about the

limited judicial review, if any -- but we will say limited -- of whether a record is personal or presidential. Think about -- let's assume that that's true for a moment. Here, it's -- the Court isn't even getting the opportunity to review. The Department of Justice, again, for the first time ever, has decided: We don't even need the Court to review this. We're going to decide on our own that the records that President Trump took from the White House while authorized and while president are presidential records and not personal.

There is no case law that supports that, and there is a lot of -- well, not a lot -- there's case law that cuts against that. And it does matter the way that other presidents have --

THE COURT: But I think their argument is also, that even if you -- you conceived of these records as personal, it still wouldn't -- it still wouldn't brush aside the 793(e) charge which does not hinge or depend upon that particular designation.

MR. BLANCHE: Well, there might be some tension. But my colleague raised it this morning, and it's cited in our papers, that's -- that's the way NARA has handled this. NARA has handled -- has handled the interplay between personal material, personal material from the presidency, and potentially classified material like The Clinton Tapes, like The Reagan Diaries -- basically was saying, hey, former

president, can you take a look and please return them?

That's -- and that's -- I'm not -- that's exactly what The -- The New York Times editorial talks about. And it's not -- and it's not -- and the answer back, by the way, from -- from President Bush -- I have a copy if Your Honor would like a copy of it.

THE COURT: Of which case?

MR. BLANCHE: This is -- it's not a case. It's The New York Times.

THE COURT: Oh, okay.

MR. BLANCHE: I can give it to the Court if you'd like.

THE COURT: Okay.

MR. BLANCHE: But it's -- (tendering document.)

It completely confirms and makes plain our entire argument, our entire argument being, look --

THE COURT: Just one moment.

Just for the record, this is a January 27, 2023, New York Times article, entitled: "As Archives Leans on Ex-Presidents, Its Only Weapon Is 'Please.'"

All right. Please continue.

MR. BLANCHE: And yes, thank you.

And so what we're saying to the Court and what we said in our motion is NARA has no authority to question or investigate personal records from a former president of the United States. What NARA said, as relates to every single

president except for President Trump, is -- very much agrees with us. They said exactly the same thing. They sent a letter out to all of the ex-president's libraries and asked them to look at their personal records to see if maybe there was anything that classified.

There is no -- they didn't call Mr. Bratt. They didn't -- they did no criminal referral. And, by the way, President Bush, a spokesman for President Bush just basically replied back and said, okay, we're sure we're fine.

And so -- and so, by the way, and this is in our reply papers -- the current administration very much agrees with us as well. So in the course of the Hur investigation --

THE COURT: Right, right. But that argument doesn't seem to have gone over that well as far as the Hur Report.

MR. BLANCHE: Well, Vice President Biden -- I'm sorry. President Biden wasn't charged. So we don't know what would have happened with that argument had he been charged. But Hur was not -- didn't accept it in determining that no charge would be brought anyway.

But, again, Your Honor is asking President Trump to give you a reason why, short of trial or short some other proceeding, the Court can grant this motion, given its -- we're at the motion to dismiss stage. All those factors are -- are something the Court should take into consideration.

We don't have a lot of case law, because as Mr. Bratt

conceded this morning, this has never happened before. NARA has never given a criminal referral to the Department of Justice under any circumstances similar to this.

And, by the way, I should say -- Your Honor asked whether the criminal referral was -- whether President Trump was told about that. He was not. At some point very close to indictment, I believe, he received a -- a target letter, but he was not informed at the time. A year and a half later, he was informed.

So we're -- we're counting up the ways. And this is maybe not as much of a legal argument as we had this morning, for better or for worse. But the reason why it's not is because you have a couple of cases involving former presidents, Reagan and Clinton. And you have NARA and the Department of Justice taking a very firm position that they can have no role, that is, no say in what constitutes a personal record.

THE COURT: What about the American Historical Association case?

MR. BLANCHE: Well, I mean, that case is -- is slightly different but dealt with -- with different facts than whether a personal record of a president could be reviewed by -- in the context of whether it had to be produced and reviewed. That was -- that was having to do with something slightly different.

And, look, that's why we say limited review, and I think that's the same thing that Judicial Watch speaks to as

well.

THE COURT: So what is the limited review that you think is allowable?

MR. BLANCHE: Nothing that applies here. There is -- within the -- within the -- the PRA, there -- there are different definitions, Mr. Bratt addressed some of them, of a presidential record and then others types of records. There is potentially review about whether a document is actually an agency record, potentially, whether a document is subject to the rules of FOIA that's been marked something different. So there is another -- there is other areas of law where it potentially could apply.

But here, the facts are quite simple. While president, President Trump took records to his home, like every president before him. NARA never questioned -- and, matter of fact, not only didn't question, but affirmatively stated in court, repeatedly, that it did not have the authority to question the president's determination of such. And for the first time ever, NARA took a different view and said, no, here we're going to make a criminal -- a criminal referral.

THE COURT: All right. NARA, though, isn't the entity initiating the charges. They made the referral. And then -- and then -- and then the Department of Justice pursued charges in the investigation. And so I'm not sure how those cases involving NARA's authority necessarily foreclosed DOJ

from bringing a criminal charge with -- at least viewing this under the lens of, is dismissal of an indictment warranted?

MR. BLANCHE: Fair with the following caveat, that if -- if the referral was completely wrong and unlawful under the law, then the Court absolutely --

THE COURT: But walk me through that argument because I'm not sure -- but what exactly is your argument? That because NARA had never done this before, it creates an impermissible taint in the original referral, but then just shuts everything else down? What exactly is the argument?

MR. BLANCHE: No. No. Our argument is not that simply because they had never done it before, it tainted it. Nor is our argument that NARA could never refer anything to the Department of Justice. The examples cited last night in the response by the Special Counsel, if somebody is, you know, caught using drugs in NARA or there is a fight in NARA, that that's -- that's completely separate from what we're talking about.

It's not about whether NARA had ever done it before. It's about that NARA knew at the time, based upon a whole body of law and the statute itself, that they had no authority to question President Trump's determination that the records were personal.

So the fact that they had not done it before is not surprising because they're not allowed to, but that isn't where

the argument should end. It should also be that they knew, NARA knew, we're not allowed to question this, President Trump took it while he was president?

And then in those circumstances, the -- the referral is invalid that, the likes of which, that also case law suggests you can dismiss in those circumstances.

THE COURT: Which case would be most appropriate?

MR. BLANCHE: So there is the -- the cases that are cited involving, for example, SORNA -- the SORNA laws where afterwards there is a determination that the underlying agency determination -- interagency determination about -- a decision about suggesting a charge or referring was so flawed and so --

THE COURT: But aren't those -- aren't those cases predicated upon -- like, the indictment -- the indictment itself in those cases was rooted in the agency rule, which is not what we have here?

MR. BLANCHE: I very much agree that it's not, that there is a slightly nuanced difference. But the principle remains exactly the same. So NARA knows we cannot refer this to the Department of Justice because President Trump -- we don't have the authority to question President Trump's determination of personal versus presidential. And then they refer it anyway, sure.

THE COURT: But is that what they're referring? In other words, I think what the Special Counsel has said,

pointing to the Inspector General Act, which is that this agency, just like any other agency's IG, can refer suspected violations of criminal law to the Department of Justice.

So why wouldn't it just be that; they're referring -- referring under that standard IG power, at which point then, the Department of Justice takes the lead and moves -- moves forward, assessing whether any criminal laws are implicated?

MR. BLANCHE: Well, I mean, built into the hypo, Your Honor, was something that's -- that isn't true in this case, which is that they had -- under our argument, that they had a suspicion there was a violation of federal law. That's not -- NARA didn't have that suspicion. That's why we're saying it's a sham referral. Because NARA had occasion over the years to deal with presidential records -- excuse me -- with records that were personal that contained classified information, and took the position, very strongly, that there was nothing that could be done about that, certainly not a seizure, as was discussed in Judicial Watch.

THE COURT: Well, certainly, I think you're correct that the notion of a personal seizure from a former president, at that time at least as characterized, was deemed to be an extraordinary act, that, I think, is borne out in the opinion and in the oral argument.

So, okay.

MR. BLANCHE: So --

THE COURT: But aren't there other decisions, American Historical Association and then Armstrong, too, that seem to cut back a bit on Judicial Watch's more broad view that that -- that classification determination is unreviewable?

MR. BLANCHE: There are. I very much agree with that, that they suggest and they cut back. But -- but "Armstrong I" and Judicial Watch and CREW, their reasoning and -- as applied to President Trump and what we have here, so not talking about whether there is a discussion between the president and NARA about what -- how to designate the records or not -- talking about whether a particular record is an agency record as opposed to a personal record, those cases, they do suggest a different analysis by the Court, but we don't have those -- those facts.

When you compare our facts, which is President Trump making a decision to take records with him as personal, you -- the only -- I mean, the -- the only law that exists says that NARA has no right to -- to question that.

And I appreciate what Your Honor is saying, that there may be a better forum, notably a selective prosecution and vindictive prosecution, where this becomes very relevant to the Court's decision with what to do with this case. And we agree with that. But it still -- it's still a perfectly appropriate basis for a motion to dismiss, and here is why -- and here is

why.

President Trump -- everybody knew about the Clinton socks case. Folks knew about what had happened with even nonexecutives, vice presidents or presidents, the secretary -- Secretary Clinton, President Reagan, and that -- a lot of press, a lot of litigation around those cases.

And the decision is unequivocal that unless you're President Trump -- unless you're President Trump, NARA is not going to -- not only -- not only going to refer, but disclaim any responsibility for even doing anything but asking you to take a look. And so we're leaking back into a different --

THE COURT: Are you reaching a little bit, though? I mean, the Judicial Watch decision reserves ruling on the judicial review question and then ultimately pivots to redressability. In the context of redressability, there is then that necessary discussion about, well, there is no relief that a court can grant because NARA can't intrude in that determination.

And so I guess my question is, are you reading more into Judicial Watch than is warranted?

MR. BLANCHE: We are leaping a little bit, Judge, yes, because it's, in our view, outrageous what is going on. And I'm not trying to overread Judicial Watch. Its holding is what it is. But the facts of that case -- Mr. Bratt talked about willfulness, for example.

President Clinton hid tapes in his socks. And NARA said "nothing we can do about that." And the -- and Mr. Bove talked about this earlier, but the types of communications on those recordings were very similar to a lot of the materials that are at issue in this case, involving world leaders, one-sided communications with world leaders, Afghanistan, the war going on --

THE COURT: Do you know if any of the briefing in Judicial Watch or the oral argument or the record filed on the docket would shed light on whether the tapes contained classified information?

MR. BLANCHE: I don't, but nobody ever got the tapes. So but for the -- that's the whole point here, is they were personal. And so President Clinton didn't have to do it -- he could keep them in his sock drawer.

THE COURT: Okay.

MR. BLANCHE: And so I -- we will check the record on that. But I believe there were representations made along the way that they included recordings of one side of a conversation with foreign leaders, obviously, you know, President Clinton. And extensive discussions about the war in Afghanistan. Hard to imagine that talking to a current president of the United States about an ongoing war wouldn't be classified.

THE COURT: Do you know if there was any follow-up to the Judicial Watch litigation, any next steps, any -- any

provision of tapes or anything like that?

MR. BLANCHE: I don't know --

THE COURT: Okay.

MR. BLANCHE: -- Your Honor. I'm not aware of anything that was done. And, by the way, The Reagan Diaries are of exactly the same sort, confirmed classified information kept by a president.

THE COURT: But I think the Special Counsel says, yes, but it was in the form of a diary. And so it's more fair to characterize that, at least in terms of format or initial review, as a personal record, not a presidential, as compared with what is charged here.

MR. BLANCHE: Judge, the way this conversation started is how the interplay of the Espionage Act plays with the PRA. The Special Counsel can't say that and say, well, so it's okay that there is Espionage Act violations because it's a diary; we're okay with that. So the statute allows for that, but not under the PRA.

I mean, if there is -- if there is a personal record, which President Reagan's diary apparently was, that has classified information, it doesn't make -- there is no logic to how the Special Counsel can say, well, for President Trump, personal records, because there's classified, there is an interplay with -- with the national Espionage Act, so we're allowed to go search, but with President Reagan, it's a diary,

so it doesn't matter if there is classified information there.

I mean, there is inconsistencies -- they can't have it both ways, right, I guess is at the end of the day the point. They can't say, with respect to the Clinton -- Clinton with Judicial Watch, that it's okay that we never made any effort to investigate -- open a criminal investigation about whether there was national security information in President Clinton's socks. We don't have to do that.

And, you know, again, it's worth noting that presidents and vice presidents, including Vice President Biden, are given a lot of autonomy under the PRA to make decisions about how to manage their recordkeeping practices. And that was intentional by Congress, and that was intentional in -- in the lead-up to the PRA, and for every year thereafter, where the PRA has remained completely untouched, even after The Reagan Diaries, even after Judicial Watch, and the Clinton socks, and more recently, like I said, there is a -- a draft bill in front of Congress.

THE COURT: Does that draft bill -- this is just for my curiosity -- does that actually purport to amend the PRA or do something else?

MR. BLANCHE: I have a -- would you like a copy, Your Honor?

THE COURT: No. No. Okay.

MR. BLANCHE: Okay. Both. I mean, it -- it's in

addition to the -- to the PRA. It's called the Classified Documents Accountability Act. And it just --

THE COURT: But it amends the PRA or it just --

MR. BLANCHE: I don't know if it would technically amend the PRA, Your Honor.

THE COURT: Okay. All right. Then my last question is: In some of the FOIA documents that have been filed in this action and then cited in the amicus brief, there were FOIA assertions under Subsection (b)7, which I understand to be a law enforcement purpose shield.

Do you know sort of how it is that NARA would be asserting law enforcement privileges in the FOIA documents?

MR. BLANCHE: No. The short answer is that's -- that's not -- I wouldn't -- I don't have any idea how they would or could. Given their past practices before this investigation, that wouldn't ring true to me. But I -- but -- so I don't know, Your Honor.

THE COURT: Okay. All right. I don't have anything further for you at the moment.

So let me hear from Mr. Harbach.

MR. HARBACH: Good afternoon, Your Honor.

THE COURT: Good afternoon, Your Honor.

MR. HARBACH: It's a little difficult to know where to start, but I will make a suggestion. There are three points that I would like to make up front, and then if there are any

of them that Your Honor has follow-ups on, maybe we can -- I will go wherever you would like to lead me.

The -- the threshold -- before the three points, there's a threshold observation about what Mr. Trump is asking the Court to do here. It's asking Your Honor to find, as a matter of law, at the Rule 12 stage, that because he took these highly classified, sensitive materials relating to things like nuclear capabilities of foreign countries and American military contingency planning, stuff like that -- that because he took them, they are necessarily personal, and that because they're necessarily personal, he could retain them, he was authorized to retain them, and that, therefore, the indictment must be dismissed. And there are all sorts of reasons that's wrong, and here are the three points.

First -- and I think this is worth saying because it's a bit of an elephant in the room today.

The documents charged in the indictment are not personal records. Period. They are not. They are nowhere close to that under the definition in the Presidential Records Act. Mr. Bratt read the definition this morning. I'm not going to read it again.

More to the point for this Rule 12 proceeding, is that the only possible inference from the allegations in the superseding indictment, the descriptions in the superseding indictment of what these documents are, which must be taken as

true at this stage, the only possible inference from those allegations is that they were presidential and not personal.

Now, Your Honor questioned my friends on the other side, this morning, both of them, about whether there is a -- a fact issue baked into this question. And both Mr. -- Mr. Bove and Mr. Blanche said that the facts are uncontested.

So what we heard that to mean, what we, the government, heard that to mean, is that President Trump took the documents, he knowingly took the documents, and that he never, in fact, designated them as personal, which is to say, he never uttered the words, he never wrote on anything of them that these are personal. He never told anyone before he left the White House that these things were personal records. And that -- that -- if those are the facts that are uncontested, then we might well agree with that.

THE COURT: Well, I don't -- I don't know if that's fair. I don't believe there was an admission of guilt, certainly, if that's what you're suggesting. I think it was more that the inference to be drawn from causing the documents to go to Mar-a-Lago is that there was baked into that, as the Counselor in the Judicial Watch said -- case stated, presumably a designation of something as personal.

MR. HARBACH: Okay. And I understand Your Honor's point. I think that's -- that may be a fair characterization of their argument, and I'm going to address that very soon.

And -- and the fact that that is their contention should tell you something. They -- they put -- they don't even allege -- they don't even allege in their papers that the documents are, in fact, personal. They don't put any evidence forward that they are, because that would be fatal to their Rule 12 claim at this stage.

So instead, they rely on this presumption that you have just articulated. That presumption is premised on a single line from a transcript in a totally unrelated case, and I want to talk more about that. But I'm just flagging that that is an issue that should not -- that the Court should not treat that as anything remotely presidential, much less a binding admission by the Department of Justice.

And as Your Honor has already observed and plainly understands, our view is that President Trump's interpretation would entirely gut the PRA. So I don't need to explain that because I think you understand it.

Suffice it to say that --

THE COURT: Do you think that is what the Judicial Watch opinion essentially authorizes, though, that because there is no way to evaluate or second-guess the archivist's decision to designate something as personal or presidential --

MR. HARBACH: You mean the -- the president's decision?

THE COURT: Yes. Excuse me. That essentially, that that does -- that that is the natural consequence and logic of

the Judicial Watch decision, which is, essentially, to set up an honor system that -- that we -- we expect will be followed in good faith, but which lacks any real enforcement mechanism.

MR. HARBACH: I would like to talk about Judicial Watch. And I'm happy to pivot that right now and come back to the other two points in a little bit.

THE COURT: Okay.

MR. HARBACH: The -- I will be honest, the -- the cases that both sides cite in duelling fashion in our briefs: Armstrong I; Armstrong II; Judicial Watch; Peterson, which Your Honor raised; CREW vs. Cheney, you know, they -- and I think one of the courts even observes this, that, you know, there is language in those opinions that's -- that is favorable to both sides.

What was helpful to me in understanding them was actually reading them in sequence, in chronological sequence, and a few things stood out to me when I did that. First, Armstrong I, which is the originating case, was a case about disposal of presidential records. It had to do with President Bush 41, and others' materials being erased from a computer system, and some parties -- during the last two weeks of the Reagan administration -- and some parties sued to try and stop that.

And in Armstrong I the Court said that allowing judicial -- this is at 924 F.2d at 291 -- that allowing

judicial review of the president's general compliance with the PRA at the behest of private litigants would substantially upset Congress's carefully crafted balance of presidential control of records' creation, management, and disposal during the president's term of office, and so on.

So we think that that trio of terms --

THE COURT: What does "management" mean?

MR. HARBACH: Well, I will tell you what Armstrong II says it doesn't mean, and that is the initial classification decision in the first place.

Some of the other cases -- I think there is a pair of CREW vs. Trump cases. One is a circuit court decision; one is a district court decision. These are the ones that are most recent. One of them, if memory serves, concerned an outfit being worried that staffers in the Trump administration were using text messaging platforms that themselves, like, automatically deleted text messages or something. So that might be an example of management that the Court says, look, you know, that's not for courts to horn in on, the day-to-day operations of the White House. That might be an example.

But the reason that that trio of names is -- the trio of things is important is because what comes next in Armstrong II. This, as Your Honor has already observed, concerned the reviewability of guidelines for what counts as a presidential record in the first place.

And the quotation there that I direct Your Honor to, this is at 1 F.3d at 1294, says: The Armstrong I Court was not addressing the initial classification of existing materials. The Armstrong I Court discusses only the creation, management, and disposal -- disposal decisions, described in the provisions of the PRA. None of these decisions encompasses the initial classification of materials as presidential records.

Again, that was in the context of guidelines about what counts as presidential.

THE COURT: So does that mean that courts can, say, take a record and say, this is presidential or this is personal? Is that what it means to, quote, "review a guideline"; in other words, apply the guideline?

MR. HARBACH: In -- in -- maybe. But for present purposes, our argument is that it -- maybe not in binding fashion -- but suggests very strongly that if the -- that if a court can review the guidelines set down by the executive to govern his White House about what counts as presidential and what counts as personal -- that if that power exists in the judiciary, that it suggests strongly, if it doesn't bindingly hold, that review of presidential decisions about specific documents is authorized.

But -- but I want to add something to that, and it concerns the district court decisions that follow. So after -- after those two, the two Armstrongs, then we've got a

series of district court decisions, of which Peterson is one, Judicial Watch is one.

THE COURT: Wait. So I just want to understand.

MR. HARBACH: Yeah.

THE COURT: So you're saying courts could take a document that was deemed personal by a former president, and then challenge that and say: I'm looking at the guidelines. I have reviewed the guidelines. And I disagree; I think this is squarely a presidential record?

MR. HARBACH: I think it might depend on the procedural context in which the question is put to the Court. But, for example -- I think this gets to your question -- even the defense has acknowledged that the PRA's -- that the PRA has a self-contained apparatus, whereby the archivist can deploy the Attorney General to attempt to recover presidential records in replevin actions, okay? So --

THE COURT: Never, though, so far, at least from a former president?

MR. HARBACH: Well, is -- is your question whether that has been -- whether it's been deployed in that fashion?

THE COURT: The answer is no, but you're saying it is possible.

MR. HARBACH: My -- my precise point is that the existence of that apparatus necessarily contemplates judicial review of what is presidential versus personal. It can't be

that the PRA says, you, NARA, can -- can ask the AG to institute a civil action to recover presidential records. And in the same -- in the same instance be true that a court is powerless to opine on what is a presidential record in the first place.

THE COURT: But wouldn't it be the powerless component comes into play when the person whose documents are being seized says, no, I declared them personal, and I don't have to tell you anything more?

MR. HARBACH: Well, it -- it -- it's even -- but it's even more than that with -- with the defendant, because the defendant here has said, just by virtue of my taking them, they must be deemed personal.

If that were true, then it would be impossible for NARA ever to recover any records, presidential or personal, from a former president, because a fortiori, he's got them, which means he took them. And if that means that that -- that can't -- all we're saying is that it can't mean that there is no judicial review of that decision in the right circumstance. And none of -- none of any of the district court opinions afterwards, certainly not Judicial Watch, holds otherwise.

Now, we grant you completely, that the Judge in Judicial Watch was skeptical, but as you know, she didn't rule on that basis.

THE COURT: But I take she didn't rule on the judicial

review portion. But then, when she gets to redressability, it's almost like there is -- the same exact logic applies to the redressability holding.

MR. HARBACH: To a degree. I think I understand what you're saying. But that's where you have to remember that what we're in court here for today is not NARA versus Trump in some civil action; it isn't. And the -- whatever power NARA has or the archivist has or -- or more to the point, in a case like Judicial Watch, whatever power a private citizen has to try and force NARA to deploy its limited authorities says nothing about what the Department of Justice can do in a criminal case, surely not under circumstances like this one.

THE COURT: Do you see any constitutional concerns with the Court delving into the -- nope, former president says it's personal, but judicial review is going to conclude otherwise?

MR. HARBACH: And understandably, as I said at the outset, there is language underpinning some of these opinions we're talking about, making that very point. But as I said earlier, one of those opinions, though, is the pair of Armstrong opinions. In other words, part of the reason that the Court in Armstrong II said we're not going to get into judges regulating the creation, disposal, or management of these documents, is just because of the separation of powers concerns that you're talking about.

But when you're talking about a case like this one,

where the -- the constitutional interests aren't, you know, a -- a private litigant seeking to write a book, but you've got the PRA on the one hand, which is executed by Congress, and on the other hand, the Executive Branch itself -- itself, in this incarnation in the -- in the Department of Justice, seeking to carry out its own important executive function, namely, collecting, preserving, and protecting the nation's most closely guarded secrets. So that's the first thing.

The second thing is that -- and this is a point we -- we make in our papers -- that the logic -- the logic of Armstrong II, Peterson, and CREW vs. Cheney -- this is a -- this is our interpretation. But the logic of that is that whatever deference Congress gave to the executive in the PRA -- and there plainly is some, of course -- whatever deference Congress gave to the executive via the PRA should not be read to be carte blanche for the president to improperly designate records and thereby thwart Congress's purpose, in enacting the PRA in the first place.

And a couple of the opinions -- I think CREW vs. Cheney at one part of the opinion postulates a hypothetical where we -- the vice president were to put forward a guideline that would have effectively rendered all of his legislative records personal; I think that's what it was. And the Court says we -- that -- whatever deference we owe the executive, it can't be used for that.

And I think this is the Court that uses the phrase it would be -- it would be -- border on the absurd to effectively gut the PRA. And we think the same is true here, that it would be absurd to do that.

THE COURT: Do you view the position in the motion to rest on this implied repeal notion, that you can't have -- that the existence of the civil mechanism in the PRA displaces the executive's ability to bring criminal charges?

MR. HARBACH: Unsurprisingly, absolutely not. We think there is no -- there is no displacement there.

Give me one second.

The -- as I said a moment ago, the idea that -- that NARA's power to recover documents is limited to civil enforcement, doesn't at all even suggest, much less imply, that the agency or anybody at the agency is powerless to call up DOJ and say, I think a crime is being committed. Of course not.

And -- and another key point to remember here is NARA didn't refer the matter to the Department of Justice to recover records. NARA referred the matter to the Department of Justice for criminal investigation when it found a boatload of classified documents in what President Trump sent back to them. That was the trigger for the referral.

It wasn't that they were saying, hey, Mr. Attorney General, we really need your help getting these boxes back. Can you -- can you, you know, file a -- can you just go file a

criminal action? Uh-uh. It was, hey, we found a bunch of classified documents in here, and we need to let you guys know.

And one of the things -- on this point, one of the things we point out is in our -- our reply to the amicus that we filed last night is this regulation that suggests not only that NARA is authorized to make a referral in circumstances like that, but they're -- but that they're obliged to.

This is -- the citation, Your Honor, is at 32 CFR Section 2001.48. And as I say, this is in what -- I think we mentioned it in what we filed at, whatever, 5:30 or 6:00 last night. Sorry about that.

Do you have it or would you like me --

THE COURT: I don't have it but -- but I do remember reading that. So...

MR. HARBACH: Okay. So I will read a small portion of it into the record. Suffice it to say, it's clear that this is from the body of regulations that govern -- that governs NARA.

And it says: Any person who has knowledge that classified information has been or may have been lost, possibly compromised or disclosed to an unauthorized person shall immediately report the circumstances to an official designated for this purpose.

That's Section A.

And the other part that matters is in Section E, where it says in part: Whenever a criminal violation appears to have

occurred and a criminal prosecution is contemplated, agency heads shall use established procedures to ensure coordination with, among other things, the Department of Justice.

Why do I mention all of that? Just -- just to say that, of course, NARA could refer this to the DOJ for criminal prosecution. And -- and there is even a decent argument that the regulation obliges them to.

THE COURT: So then, I know there is a footnote in your opposition that explains that -- that a defense rooted in -- in the mens rea component could be appropriate, and I was curious if you could shed light on that. I could see this issue very much rearing its head in the form of jury instructions where the defense argument is defining the term "unauthorized" necessarily will require resort to our view on the PRA.

And so perhaps you might be right that -- that this is not worthy of dismissal. But wouldn't it, at the very least, be permissible in the form of a trial defense?

MR. HARBACH: Maybe. I don't disagree for one second that we will have a lengthy discussion at a charge conference, or maybe at the -- arguing the motions in limine before we get there. The point we were making in the footnote, and the reason I said maybe -- I'm not trying to be glib -- is that we think, at best, it is conceivable -- I'm being sincere -- it is conceivable that if Mr. Trump's defense is I, in fact, thought --

THE COURT: But what if it's not even in the form of willfulness? It's just as a matter of law, these things are personal according to our designation and, therefore, not unauthorized, then what is your position on that?

MR. HARBACH: Okay. That implicates the second part of the argument, or the second of the three points I was mentioning earlier, which is even if they are personal, does that have anything to do with whether they are authorized under 793? And we say no.

THE COURT: Hold on. I think you're talking a little fast.

MR. HARBACH: Okay.

THE COURT: Okay. Please continue.

MR. HARBACH: Sorry. I will repeat that last sentence. That goes to the second point that I put a pin in earlier, which is whether -- even assuming that they're personal, whether that has any impact or import at all into whether the possession of those documents was authorized under 793. And that -- I mean, I'm happy to talk about that, if you would like.

THE COURT: Yes.

MR. HARBACH: Okay. There are several reasons why we think that equivalency can't be true.

THE COURT: Everything is fine.

MR. HARBACH: Okay. The first is that, as we have

said, and as my colleague said earlier today, the authorization to possess classified information that matters for 793 is the one that comes from the Executive Order, not the PRA. So a fair -- well, how do you know that? How do you know that, Mr. Harbach? Well, here is the answer.

The Presidential Records Act says zero, zip about classified information, who is permitted to access it, retain it, and so forth. Both sides agree on that. The question is: What is the inference to be drawn from Congressional silence on the subject?

I'm not totally clear what the -- what the other side says it means, but I will tell you what we say it means. We say it means that the Court should not infer from silence on Congress's part an intention to disturb the framework governing the handling of classified information that was in place at the time the PRA was passed.

In other words, you should not infer any intention on Congress's part by passing the PRA to imbue all personal records of a former president with a permanent exemption for all time from the classification rules.

And another point I want to make here. There was a lot of discussion between Your Honor and Mr. Blanche about -- about tension and overriding and trumping, lowercase T, you know, which -- which wins, the Executive Order or the -- or the PRA or the Espionage Act or the PRA?

We think that that -- that is not -- that's not a question that needs to be asked here. We don't think there is any tension between the two. And the question, which is in line with a canon Your Honor actually mentioned earlier, the canon of constitutional avoidance says that when a court can, it should harmonize the provisions, it should read them, to the extent possible, to exist side by side.

So why do I say they can be read in harmony? Here is why. There is -- there is no need to read the PRA, to intrude on the Executive Branch's function or interests in protecting classified information, there is no read [sic] to read that as implicit in their decision to exclude personal records from the coverage of the PRA.

In other words, just because something is personal under the PRA -- it definitely means that it's excluded from the PRA's coverage; that's what the statute says; agreed. But that doesn't guarantee that there -- there can be no other legal constraint.

THE COURT: So, like, in the Reagan case, you had personal records that had classified information, no 793(e) charge.

MR. HARBACH: Well, yes, but there is an important point buried in there, which Your Honor sort of alluded to earlier, and this is where the notion of segregability matters, it's where it comes in. Because the fact that the definition

of personal record or even -- or presidential record includes the idea that it's not just the whole document or none of it, that there could be a segregable part of it. In other words, a segregable part of an otherwise personal record that might be presidential.

For that language to mean anything, it has to mean that much. It has to contemplate that in the case of a diary, for example, like President Reagan's diaries, you know, that there were little pieces and parts of that that might be presidential records, or in his case, presidential records that -- that were classified.

Now, on the question of, well, why wasn't he prosecuted? That's something else I would like to talk about, the import of all of these other cases, whether it's Clinton or Reagan or Biden.

THE COURT: Do you have a view on whether The Clinton Tapes had classified information based on the descriptions one can draw from the -- from the case itself?

MR. HARBACH: The view is we do not know. And I don't know if anybody knows. But it certainly cannot be said, as they said in their reply brief, that it's clear and that -- and that -- I think maybe it even said the department doesn't contest that -- that The Clinton Tapes had classified information on them. We don't know. We don't know.

THE COURT: But looking at the descriptions of

the -- of the -- of the tapes, and the fact that, as far as the record indicates, they were contemporaneous descriptions of ongoing world affairs, including military exercises, and I'm -- I'm just summarizing -- that why -- why wouldn't that quite clearly verge into the very sensitive territory?

MR. HARBACH: I suppose it -- it might, but that is one -- only one piece of the puzzle in an assessment of whether to launch a criminal investigation.

And -- but the point I would like to make, hopefully quickly, about those other cases, is there is -- there has been a lot of -- a lot of mention of these other cases, under all sorts of rubrics, and I'm going to suggest maybe a helpful way to think about it, hopefully.

As we see it, there are three places that this idea could hit the ground in the doctrine. One is in the vagueness and notice context, which is what -- which is why we were talking about it this morning. We've already talked about that.

The second is in the notion of judicial estoppel. They have mentioned that. There are lots of reasons why that doctrine has utterly no application here. And I am happy to go into that in just a moment.

And then the third potential place that it hits the ground is in the -- and Mr. Blanche alluded to this, too, quite -- quite correctly and fairly -- in the selective and

vindictive prosecution domain, potential -- some potential relevance to that discussion. But that, again, is not the motion that is on the table today.

So I would like to briefly address the estoppel point, if you would like me to.

THE COURT: Yes.

MR. HARBACH: Okay.

The -- in their reply brief, the defendants kind of took us to task a little bit for not addressing estoppel in our response. In their opening brief, they -- they alluded to it, judicial estoppel -- and you know that, but just so the record is clear. They alluded to it in one sentence followed by a single case without any exposition in their opening brief. And I'm going to address it here, and I am going to address it to -- with resort to no case other than the one they cited, the Slater opinion.

And I think it will illustrate the reason that we didn't see fit to spend any of our precious space on it in our response. Because all you have to do is read the opinion to see that it plainly --

THE COURT: Can you just explain why it doesn't apply, judicial estoppel?

MR. HARBACH: Sure, sure.

The Slater case makes clear -- is Your Honor familiar with the facts?

THE COURT: Yes.

MR. HARBACH: Okay.

THE COURT: I would just like to hear the substance.

MR. HARBACH: Sure.

THE COURT: Okay.

MR. HARBACH: There are two -- there is a two-part test for judicial estoppel that was announced in that case. This is an 11th Circuit en banc decision. And what I'm about to say is at page 1181 of the opinion, so it's 871 F.3d 1181.

And it says: Our circuit employs a two-part test to guide district courts in applying judicial estoppel. Whether, one, the party took an inconsistent position under oath in a separate proceeding; and two, these inconsistent positions were calculated to make a mockery of the judicial system.

So when I read that, I confess that I hadn't seen that standard before. And it's interesting to read the opinion, because among the things that Slater makes clear is that the mental state in part 2 is crucial. In fact, part of what they were -- what they were doing in the en banc opinion in Slater, is they were reversing prior decisions that had equated the simple failure to disclose an asset on a bankruptcy schedule. They had reversed opinions where courts had said the failure -- the failure to disclose a loan is enough to impute the mental state. And the Court here said, no, no, you need more than that.

And they elaborated on it a little bit and said that: The Court must take account of all facts and circumstances to -- quoting now -- ensure that judicial estoppel is applied only when a party acted with a sufficiently culpable mental state, and the inquiry includes assessing, quote, whether the party purposely intended to mislead the Court.

So what a -- a DOJ attorney said in an offhand remark at oral argument in an entirely different civil case is nothing like what they're talking about in Slater. And so I'm not going to elaborate on it too much. Suffice it to say that reading the factors alone makes it quite clear that that's not what was going on here.

And, by the way, they -- they mentioned the fact that the Biden Administration, in connection with the Hur investigation, took the -- a similar position to the one they've taken here. And they suggest that we should somehow be estopped from taking the position we've taken here, because the Biden Administration took that same position on behalf of President Biden in that other investigation.

Well, that is just Exhibit 110 for why we are not puppets or appendages of the Biden Administration. We're not. We're a Special Counsel's office of the Department of Justice. We have our view. We have explained our view.

It happens that the Hur Special Counsel had the exact same view about the interplay of -- of "personal" and

"unauthorized."

But the last thing I want to mention is that here is -- here is another example that really proves the point. In his very first appearance before Your Honor, one of the lawyers for President Trump, Mr. Kise -- he is here today -- said to Your Honor -- quoting from the transcript now -- this was in the special master litigation -- said: What we are talking about here in the main are presidential records in the hands of the 45th President of the United States, at a location that was used frequently during his term as president to conduct official business. This is not a case about some Department of Defense staffer stuffing military secrets into a paper bag and sneaking out in the middle of the night. This is, as I say, presidential records in the hands of the 45th President of the United States.

Now, am I mentioning that to suggest to Your Honor that they should be estopped from claiming that their records are personal? Of course not. We're not saying that. But I think it does reveal a little bit of the silliness of their argument.

THE COURT: Well, I don't know. I can't recall here, sitting here, exactly whether there was a final position there, taken on presidential versus personal, or whether it was still to be determined, given the uncertainty of the designations at that point.

But in any case, I think your judicial estoppel point

is -- is received, and I think the Slater decision is relevant. So thank you for that.

MR. HARBACH: Okay.

THE COURT: Any other points you wish to make on the Presidential Records Act?

MR. HARBACH: Can I just have a moment, please?

I don't think so, Your Honor, unless you have any other questions.

THE COURT: No, I am all set for now. Thank you.

All right. I will hear final argument on this motion, which is 327. Then I would like to wrap up, hopefully, before 3:00. And if there are any pressing other items that need to be raised before we recess, you may do so as well.

MR. BLANCHE: Very briefly, Your Honor. With respect to the way that just ended, quoting Mr. Kise from the special master's proceeding, if the Court reviews that transcript, Mr. Kise was taking the government's position at face value and assuming it to be true for purposes of the argument that was -- he was making now. It certainty wasn't President Trump or Mr. Kise even committing to what we're talking about now, that the records were, in fact, personal.

The one important part that I -- needs addressing has to do with the -- again, with the interplay between the PRA and the Espionage Act. And it's -- it's not -- it cannot be, as the Special Counsel just suggested, using the Reagan example,

that you can have a personal record with classified information on it, and that under the PRA, the way that you deal with that is you -- you possibly divide it up. Maybe you redact something or something like this.

If that's -- if that's the case, play that out. How does that happen in the context of a grand jury investigation? We're not talking -- we're not talking about anything like what happened here, right? There was no effort here to -- to use the PRA and to use the structure of the PRA as it's been used every other time with every other president to try to collect information that -- that NARA believed that they were entitled to. This was completely separate, unique, has never been done before, and hopefully will never be done again, the way that this happened.

And now the Special Counsel, again, like they did in their papers, just justifies every step they -- that they have taken without honestly representing to the Court that NARA has taken exactly the opposite position repeatedly since the passing of the PRA and --

THE COURT: Okay. But their position, and it's -- it's correct that NARA is not the one sitting on that table bringing this case, and that -- so, really, that's a red herring.

MR. BLANCHE: Your Honor, respectfully, I don't think it's a red herring, because the reason why we're making this argument is about -- is about a single word in -- in the

indictment, which is "unauthorized." And as a matter of law, we very much believe that under NARA -- and I do think it's appropriate to look at the case law and to the NARA regs and to the PRA -- President Trump, as president, had the authority to designate records as personal. Now --

THE COURT: Can you tell me what your definition of "unauthorized" would be, jumping forward to jury instruction charge conference and weaving in these PRA concepts?

MR. BLANCHE: Your Honor asked a very good question of the Special Counsel. Our definition would be consistent with what we're saying now, which is that the Presidential Records Act gives a president or vice president complete autonomy to manage records while president in a way that he or she sees fit, and that there is no Special Counsel and NARA -- no -- no way the judiciary, the legislature -- the legislative session should not in any way touch the president's decision in order to do that. And in this case, by not sending the records to NARA, President Trump was necessarily classifying them as personal. And --

THE COURT: That -- that last thing you said, that's not actually memorialized in the Judicial Watch decision, correct, that the -- the failure to send documents to NARA equals personal designation?

MR. BLANCHE: The -- the -- it's referenced but not memorialized. And the PRA doesn't describe anything else. The

PRA simply says that at the conclusion of an administration, presidential records shall be sent to NARA. It doesn't say, oh, and, by the way, personal records have to be reviewed by a NARA representative, or personal records have to be -- you know, you cannot have classified information in personal records. The PRA doesn't speak to that.

And that's intentional. I mean, if you look at the -- at the reasons for -- for enacting it, they wanted to try -- Congress wanted to try to fine-line between giving a president the authority to -- to do -- to do what he needs to do while president, but also try to maintain presidential records. So that's why the statute doesn't speak to anything else. The statute doesn't say we'll decide about personal records later. It says -- no -- it says, if it's presidential, send it -- send it to NARA.

And I do think on -- on how the PRA and the Espionage Act ultimately have an interface, we -- we don't know -- we never got that far in this case, but certainly, there is -- there is the potential that there could be discussion, potentially, between NARA and a former president or vice president about records that are deemed personal. But, again, under the PRA, that's President Trump or President Biden now, or President Reagan, President Clinton, it's their decision. And NARA has the ability to engage. And there is case law that talks about discussions that take place. But that's -- but

that's it.

And there isn't tension. If you read the statutes that way, the Espionage Act and the PRA, there is no tension there. I mean, it's not as if -- and, again, if "personal" under the PRA, then under the definition of what a record is under the applicable Executive Order, Section 61(hh), it -- if it's personal, it's not a record. So the fact that --

THE COURT: So your argument hinges on the "it is personal" designation, which is not in the indictment. I know you draw the inference from paragraph 4. But it can't reasonably be stated that the indictment endorses the view that the documents are personal.

You would have to agree with that, correct?

MR. BLANCHE: It doesn't endorse the fact, of course not. But, Judge, there is no way to endorse it. That's the -- the PRA doesn't say, here is what a president has to do to endorse it. Here is a check that has to be -- a checkmark that has to be checked on a particular filing. No. It just says, if it's presidential, send it over here.

And so how -- how is one to prove, a former president to prove that the records are personal, but for the fact they were not sent to NARA? There is no -- no court has held otherwise.

THE COURT: Is there anything to make of the fact that some items are returned in January, and so -- and there was

no -- no procedure to quash that subpoena? What do you make of that? There is some discussion in the filings.

MR. BLANCHE: No, absolutely, it's a good question, and I think there is a lot to be made of it. In the -- when the PRA was developed, this was the hope of Congress, that by giving a president the autonomy to designate records as he see fit -- sees fit, when a president leaves office, they may choose to return -- return certain materials that had previously been marked "personal" and give them to the National Archives.

I mean, you talk about -- you know, this is again from a brief. It's -- it's written by the Department of Justice.

By giving each president complete control over his personal papers, Congress hoped that it would encourage presidents to create and preserve such papers and that presidents would later voluntarily donate those papers to the National Archives.

THE COURT: Where are you reading from?

MR. BLANCHE: I'm reading from -- well, footnote 1 in our -- in our brief on page 2, Your Honor.

THE COURT: Okay.

MR. BLANCHE: But it's -- it's ECF Number 32 -- 327-1, at page 63; so it's from our -- our filing. It's a DOJ brief in -- in Judicial Watch.

THE COURT: Okay.

MR. BLANCHE: So it's -- it happened the way it's supposed to happen, which is that President Trump -- President -- President Trump made the decision to return and donate items he, in his sole discretion, determined were personal back to the -- back to the National Archives.

THE COURT: Okay.

MR. BLANCHE: It's also the footnote 1 on our -- in our reply brief, Document Number 399, Your Honor.

THE COURT: Okay. Anything else on Presidential Records Act?

MR. BLANCHE: No, Your Honor.

THE COURT: Okay. All right. Anything very pressing that would need to be addressed now?

MR. BLANCHE: No.

THE COURT: Okay.

MR. BLANCHE: Not from our side.

THE COURT: Okay. Thank you then.

Let me ask the same question of the Special Counsel. Mr. Bratt or Mr. Harbach?

MR. BRATT: No, Your Honor.

THE COURT: Okay. Well, then, thank you all for your time and attention. I know we have talked a lot about the law, and it's all very worthwhile, and I appreciate the assistance.

The Court is now in recess. I take the motions under advisement and will be ruling on them promptly. Thank you.

(These proceedings concluded at 2:42 p.m.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

DATE: 03-14-2024

/s/Laura Melton
LAURA E. MELTON, RMR, CRR, FPR
Official Court Reporter
United States District Court
Southern District of Florida
Fort Pierce, Florida

'

'70s [2]_ - 1:88:6_, 1:88:11
'Please [1]_ - 1:99:19

1

1 [9]_ - 1:11:22_, 1:40:8_, 1:40:12_, 1:56:1_, 1:86:1_, 1:92:21_, 1:117:2_, 1:139:19_, 1:140:7
1.4 [1]_ - 1:41:10
10 [1]_ - 1:36:16
110 [1]_ - 1:132:20
1181 [2]_ - 1:131:9
11th [8]_ - 1:14:24_, 1:17:13_, 1:17:19_, 1:27:10_, 1:49:6_, 1:64:10_, 1:77:20_, 1:131:8
12 [4]_ - 1:42:14_, 1:112:6_, 1:112:22_, 1:114:6
121 [1]_ - 1:32:6
1294 [1]_ - 1:117:2
12:00 [2]_ - 1:75:1_, 1:85:1
12:05 [1]_ - 1:85:5
12:15 [1]_ - 1:75:1
13526 [2]_ - 1:12:23_, 1:34:9
139 [1]_ - 1:55:2
15 [3]_ - 1:48:14_, 1:60:25_, 1:85:2
16 [1]_ - 1:42:19
18 [1]_ - 1:45:2
19 [6]_ - 1:29:6_, 1:36:18_, 1:37:16_, 1:62:2_, 1:62:5_, 1:84:9
1911 [1]_ - 1:16:10
1917 [2]_ - 1:16:10_, 1:16:16
1950 [3]_ - 1:16:11_, 1:16:23_, 1:32:20
1977 [1]_ - 1:32:6
1:19 [1]_ - 1:85:5
1B [1]_ - 1:64:18

2

2 [4]_ - 1:56:3_, 1:75:2_, 1:131:18_, 1:139:20
2001.48 [1]_ - 1:123:9
2017 [1]_ - 1:62:10
2021 [10]_ - 1:19:17_, 1:19:18_, 1:42:21_, 1:46:19_, 1:47:23_, 1:48:4_, 1:48:12_, 1:48:14_, 1:48:25
2023 [3]_ - 1:22:21_, 1:97:20_, 1:99:17
20th [2]_ - 1:19:17_, 1:46:18
21 [4]_ - 1:19:18_, 1:47:22_, 1:48:4_, 1:51:12
21st [1]_ - 1:48:24
2201(2 [1]_ - 1:44:2
2201(3 [1]_ - 1:44:13
23 [1]_ - 1:65:15
23-80101 [1]_ - 1:85:8
2323 [1]_ - 1:83:10
233 [1]_ - 1:55:3
24 [1]_ - 1:65:15
27 [1]_ - 1:99:17
291 [1]_ - 1:115:25
2:42 [1]_ - 1:141:1
2d [1]_ - 1:91:7
2nd [2]_ - 1:17:1_, 1:77:16

3

3 [3]_ - 1:55:23_, 1:56:6_, 1:56:8
30-plus [1]_ - 1:92:6
302 [1]_ - 1:91:4
302-03 [1]_ - 1:91:7
302s [2]_ - 1:63:5_, 1:63:6
303 [1]_ - 1:91:4
30th [3]_ - 1:47:1_, 1:48:12_, 1:48:25
3161(a [1]_ - 1:19:1
32 [7]_ - 1:11:22_, 1:40:8_, 1:40:12_, 1:86:1_, 1:92:22_, 1:123:8_, 1:139:22
325 [4]_ - 1:4:10_, 1:6:12_, 1:85:19_, 1:85:25
327 [11]_ - 1:4:13_, 1:4:20_, 1:5:4_, 1:5:8_, 1:5:18_, 1:6:7_, 1:6:11_, 1:85:9_, 1:86:2_, 1:134:11
327-1 [1]_ - 1:139:22
331 [4]_ - 1:4:18_, 1:5:16_, 1:85:16_, 1:85:24
35 [1]_ - 1:42:18
360-1 [1]_ - 1:5:25
399 [1]_ - 1:140:8
3:00 [1]_ - 1:134:12

4

4 [6]_ - 1:8:5_, 1:8:15_, 1:40:24_, 1:80:12_, 1:89:18_, 1:138:10
4.1 [5]_ - 1:56:14_, 1:78:11_, 1:78:25_, 1:79:13_, 1:79:14
4.1(a)(2) [1]_ - 1:79:10
4.1(a)(3 [1]_ - 1:55:20
4.4 [6]_ - 1:53:7_, 1:53:9_, 1:55:9_, 1:55:12_, 1:55:16_, 1:56:9
4.4(a [1]_ - 1:55:19
400 [1]_ - 1:6:1
41 [1]_ - 1:115:20
44 [1]_ - 1:44:2
45th [2]_ - 1:133:9_, 1:133:14
4th [5]_ - 1:25:24_, 1:26:23_, 1:72:21_, 1:77:18_, 1:82:3

5

567 [1]_ - 1:32:6
5:30 [1]_ - 1:123:10

6

6 [2]_ - 1:16:19_, 1:51:2
6(hh) [1]_ - 1:13:1
6.1(dd) [1]_ - 1:79:16
61(hh [1]_ - 1:138:6
63 [1]_ - 1:139:23
6:00 [1]_ - 1:123:10

7

793 [20]_ - 1:6:18_, 1:6:20_, 1:10:22_, 1:16:24_, 1:22:12_, 1:22:13_, 1:24:5_, 1:25:18_, 1:41:24_, 1:42:10_, 1:45:2_, 1:49:7_, 1:57:14_, 1:61:8_, 1:64:16_, 1:80:25_, 1:125:9_, 1:125:18_, 1:126:2
793(e [19]_ - 1:15:16_, 1:26:14_, 1:28:12_, 1:31:15_, 1:46:12_, 1:50:8_, 1:50:10_, 1:50:13_, 1:53:12_, 1:53:25_, 1:58:7_, 1:61:12_, 1:81:14_, 1:86:2_, 1:89:12_, 1:93:21_, 1:98:16_, 1:127:20
793(e) [2]_ - 1:50:20_, 1:53:22

8

845 [1]_ - 1:91:7
85 [1]_ - 1:42:18
871 [1]_ - 1:131:9

9

922(g [1]_ - 1:87:9
924 [1]_ - 1:115:25
9th [1]_ - 1:23:25

A

abide [1]_ - 1:78:23
ability [4]_ - 1:32:22_, 1:97:18_, 1:122:8_, 1:137:24
able [1]_ - 1:85:12
absence [4]_ - 1:48:8_, 1:59:14_, 1:94:6
absolute [1]_ - 1:32:8
absolutely [8]_ - 1:33:6_, 1:80:19_, 1:89:16_, 1:95:3_, 1:95:21_, 1:103:5_, 1:122:9_, 1:139:3
abstract [1]_ - 1:87:17
absurd [3]_ - 1:51:25_, 1:122:2_, 1:122:4
accelerated [1]_ - 1:5:24
accept [2]_ - 1:95:19_, 1:100:18
access [23]_ - 1:7:8_, 1:19:9_, 1:29:25_, 1:55:20_, 1:56:2_, 1:56:6_, 1:56:10_, 1:56:11_, 1:59:5_, 1:59:22_, 1:60:23_, 1:61:11_, 1:62:12_, 1:68:8_, 1:75:23_, 1:76:5_, 1:76:9_, 1:76:21_, 1:78:12_, 1:79:4_, 1:79:19_, 1:80:10_, 1:126:7
Access [1]_ - 1:55:16
accommodate [1]_ - 1:5:24
according [3]_ - 1:19:19_, 1:21:24_, 1:125:3
accords [1]_ - 1:55:4
account [1]_ - 1:132:2
Accountability [1]_ - 1:111:2
accumulated [1]_ - 1:92:15
acknowledged [1]_ - 1:118:13
acknowledges [1]_ -

1:12:18
acquittal [1]_ - 1:7:24
Act [42]_ - 1:4:14_, 1:7:7_, 1:16:23_, 1:18:25_, 1:23:22_, 1:25:1_, 1:31:5_, 1:32:20_, 1:33:7_, 1:74:7_, 1:81:17_, 1:82:21_, 1:85:10_, 1:86:18_, 1:88:11_, 1:89:14_, 1:89:17_, 1:92:1_, 1:92:7_, 1:92:10_, 1:93:5_, 1:93:9_, 1:94:1_, 1:94:11_, 1:94:19_, 1:94:22_, 1:95:20_, 1:97:16_, 1:105:1_, 1:109:14_, 1:109:16_, 1:109:24_, 1:111:2_, 1:112:20_, 1:126:6_, 1:126:25_, 1:134:5_, 1:134:24_, 1:136:12_, 1:137:17_, 1:138:3_, 1:140:10
act [2]_ - 1:27:13_, 1:105:23
acted [1]_ - 1:132:4
acting [1]_ - 1:31:5
action [5]_ - 1:31:13_, 1:111:8_, 1:119:2_, 1:120:7_, 1:123:1
actions [2]_ - 1:47:8_, 1:118:16
active [2]_ - 1:60:16_, 1:60:25
activities [1]_ - 1:44:10
activity [1]_ - 1:60:3
actual [3]_ - 1:29:20_, 1:80:21_, 1:80:24
actus [3]_ - 1:50:21_, 1:50:25_, 1:51:4
add [12]_ - 1:15:7_, 1:15:17_, 1:16:6_, 1:24:2_, 1:28:8_, 1:46:13_, 1:53:9_, 1:54:18_, 1:67:24_, 1:82:5_, 1:82:13_, 1:117:23
added [2]_ - 1:71:8_, 1:82:13
adding [3]_ - 1:54:16_, 1:73:8_, 1:83:8
addition [3]_ - 1:8:13_, 1:54:15_, 1:111:1
additional [6]_ - 1:4:8_, 1:26:1_, 1:26:2_, 1:26:11_, 1:26:12_, 1:33:10
address [11]_ - 1:16:9_, 1:18:21_, 1:28:13_, 1:42:6_, 1:52:16_, 1:61:13_, 1:83:23_, 1:113:25_, 1:130:4_, 1:130:14
addressed [5]_ - 1:12:17_, 1:17:13_, 1:26:16_, 1:102:6_, 1:140:13
addresses [2]_ - 1:12:18_, 1:53:7
addressing [4]_ - 1:3:3_, 1:117:3_, 1:130:9_, 1:134:22
adds [3]_ - 1:19:7_, 1:19:11_, 1:79:23
adequate [4]_ - 1:18:21_, 1:66:21_, 1:66:23_, 1:67:21
adequately [1]_ - 1:48:19
adjudicate [1]_ - 1:9:25
administering [1]_ - 1:13:22
administration [7]_ - 1:16:16_, 1:88:13_, 1:100:11_, 1:115:22_, 1:116:15_, 1:137:1
Administration [3]_ - 1:132:14_, 1:132:18_, 1:132:21
administrative [3]_ - 1:91:6_, 1:92:18_, 1:97:15
admissible [1]_ - 1:39:18
admission [2]_ - 1:113:17_, 1:114:13
admissions [1]_ - 1:64:25
admit [1]_ - 1:44:23
adopt [1]_ - 1:5:17
adopted [3]_ - 1:18:17_, 1:70:18_, 1:72:21
adoption [2]_ - 1:4:19_, 1:5:9
advance [1]_ - 1:50:24
adversary [1]_ - 1:26:4
advertently [1]_ - 1:49:15
advise [1]_ - 1:44:9
advisement [1]_ - 1:140:25
advocated [1]_ - 1:73:4
affairs [1]_ - 1:129:3
affect [1]_ - 1:57:13
affirmatively [1]_ - 1:102:16
affirming [1]_ - 1:17:20
affixed [1]_ - 1:88:20
Afghanistan [2]_ - 1:108:6_, 1:108:21
afoul [3]_ - 1:20:6_, 1:21:11_, 1:53:25
afternoon [4]_ - 1:85:7_, 1:86:11_, 1:111:21_, 1:111:22
afterwards [2]_ - 1:104:10_, 1:119:21
AG [1]_ - 1:119:1
agencies [1]_ - 1:35:4
agency [17]_ - 1:13:22_, 1:31:13_, 1:40:3_, 1:55:25_, 1:56:1_, 1:94:3_, 1:97:14_, 1:102:9_, 1:104:10_, 1:104:15_, 1:105:2_, 1:106:12_, 1:122:15_, 1:124:1
agency's [1]_ - 1:105:2
ago [2]_ - 1:64:2_, 1:122:12
agree [16]_ - 1:21:6_, 1:21:8_, 1:24:18_, 1:25:9_, 1:26:18_, 1:35:8_, 1:52:15_, 1:59:4_, 1:70:6_, 1:77:1_, 1:104:17_, 1:106:6_, 1:106:23_, 1:113:15_, 1:126:8_, 1:138:13
agreed [1]_ - 1:127:16
agreement [1]_ - 1:78:15
agrees [2]_ - 1:100:1_, 1:100:11
aides [1]_ - 1:42:23
allegation [6]_ - 1:8:6_, 1:8:9_, 1:9:3_, 1:9:5_, 1:10:18_, 1:80:8
allegations [4]_ - 1:9:18_, 1:20:11_, 1:112:23_, 1:113:2
allege [6]_ - 1:42:10_, 1:75:7_, 1:76:11_, 1:114:3
alleged [9]_ - 1:7:11_, 1:7:18_, 1:12:4_, 1:19:19_, 1:41:6_, 1:45:17_, 1:46:18_, 1:68:3_, 1:87:4
allegedly [6]_ - 1:12:2_, 1:19:22_, 1:19:23_, 1:19:24_, 1:31:20_, 1:40:10
alleges [1]_ - 1:8:4
alleging [1]_ - 1:49:2
allow [4]_ - 1:23:21_, 1:24:4_, 1:25:3_, 1:34:15
allowable [1]_ - 1:102:3
allowed [4]_ - 1:9:19_, 1:103:25_, 1:104:2_, 1:109:25
allowing [2]_ - 1:115:24_, 1:115:25
allows [4]_ - 1:12:9_, 1:84:23_, 1:97:15_, 1:109:17
alluded [4]_ - 1:127:23_, 1:129:24_, 1:130:10_, 1:130:12
almost [2]_ - 1:51:25_, 1:120:2
alone [5]_ - 1:6:22_, 1:59:14_, 1:81:15_, 1:81:23_, 1:132:11
altogether [2]_ - 1:92:2_, 1:97:5
ambassadors [1]_ - 1:32:17
ambiguity [1]_ - 1:75:24
ambiguous [3]_ - 1:12:8_, 1:12:14_, 1:27:22
amend [2]_ - 1:110:20_, 1:111:5
Amendment [4]_ - 1:54:12_, 1:66:7_, 1:67:15_, 1:69:17
amends [1]_ - 1:111:3
America [1]_ - 1:3:5
American [3]_ - 1:101:17_, 1:106:2_, 1:112:8
amicus [3]_ - 1:5:25_, 1:111:8_, 1:123:4
amount [1]_ - 1:35:9
amplify [1]_ - 1:51:3
analogy [1]_ - 1:61:23
analysis [12]_ - 1:16:25_, 1:34:9_, 1:45:10_, 1:56:21_, 1:57:14_, 1:57:25_, 1:61:21_, 1:69:16_, 1:78:10_, 1:82:17_, 1:87:17_, 1:106:14
analyze [1]_ - 1:75:15
analyzed [1]_ - 1:18:4
announce [3]_ - 1:96:12_, 1:96:13_, 1:97:23
announced [1]_ - 1:131:7
answer [11]_ - 1:30:15_, 1:32:21_, 1:37:8_, 1:38:1_, 1:41:22_, 1:46:2_, 1:97:17_, 1:99:4_, 1:111:13_, 1:118:21_, 1:126:5
anticipate [1]_ - 1:45:3
anyway [2]_ - 1:100:19_, 1:104:23
apart [1]_ - 1:62:14
apologies [2]_ - 1:85:22_, 1:85:23
apologize [2]_ - 1:4:22_, 1:85:14
apparatus [2]_ - 1:118:14_, 1:118:24
apparent [1]_ - 1:18:6

appear [1]_ - 1:36:2
appearance [2]_ - 1:3:7_, 1:133:4
appellate [1]_ - 1:32:12
appendages [1]_ - 1:132:21
applicable [6]_ - 1:10:24_, 1:33:22_, 1:47:6_, 1:82:8_, 1:94:7_, 1:138:6
application [3]_ - 1:81:9_, 1:97:13_, 1:129:21
applied [27]_ - 1:6:23_, 1:7:1_, 1:8:1_, 1:9:17_, 1:10:14_, 1:13:5_, 1:14:20_, 1:23:11_, 1:29:4_, 1:30:7_, 1:32:23_, 1:41:24_, 1:49:9_, 1:56:21_, 1:57:14_, 1:66:17_, 1:67:25_, 1:68:4_, 1:68:9_, 1:81:10_, 1:82:11_, 1:89:15_, 1:91:25_, 1:106:8_, 1:132:3
applies [5]_ - 1:12:24_, 1:80:14_, 1:80:25_, 1:102:4_, 1:120:2
apply [14]_ - 1:3:24_, 1:5:13_, 1:12:24_, 1:30:25_, 1:54:7_, 1:56:8_, 1:58:3_, 1:72:19_, 1:72:25_, 1:83:17_, 1:95:9_, 1:102:12_, 1:117:13_, 1:130:21
applying [8]_ - 1:13:13_, 1:35:7_, 1:55:3_, 1:81:13_, 1:87:15_, 1:87:18_, 1:87:19_, 1:131:11
appoint [1]_ - 1:32:17
appointees [1]_ - 1:56:7
appreciate [3]_ - 1:45:7_, 1:106:20_, 1:140:23
appropriate [10]_ - 1:8:13_, 1:56:3_, 1:58:10_, 1:60:23_, 1:77:5_, 1:89:24_, 1:104:7_, 1:106:24_, 1:124:10_, 1:136:3
appropriately [1]_ - 1:24:21
appropriateness [1]_ - 1:40:18
approved [2]_ - 1:39:17_, 1:78:15
arbitrary [16]_ - 1:12:9_, 1:14:22_, 1:14:24_, 1:15:7_, 1:21:19_, 1:30:8_, 1:34:4_, 1:34:14_, 1:66:24_, 1:66:25_, 1:67:7_, 1:67:10_, 1:67:18_, 1:67:21_, 1:75:10_, 1:81:13
Archives [10]_ - 1:88:16_, 1:88:22_, 1:91:12_, 1:96:17_, 1:96:23_, 1:96:25_, 1:99:18, 1:139:10_, 1:139:17_, 1:140:5
archivist [2]_ - 1:118:14_, 1:120:8
archivist's [1]_ - 1:114:21
area [2]_ - 1:32:8_, 1:32:19
areas [2]_ - 1:18:18_, 1:102:11
arguably [2]_ - 1:20:17_, 1:78:4
argue [2]_ - 1:23:21_, 1:39:12
argued [1]_ - 1:86:3
arguing [3]_ - 1:13:15_, 1:52:7_, 1:124:20
argument [53]_ - 1:4:3_, 1:5:18_, 1:6:14_, 1:9:7_, 1:14:14_, 1:15:15_, 1:16:2_, 1:18:3_, 1:22:11_, 1:29:10_, 1:29:19_, 1:35:6_, 1:35:25_, 1:41:5_, 1:41:16_, 1:42:5_, 1:43:15_, 1:45:12_, 1:56:24_, 1:67:11_, 1:69:18_, 1:69:19_, 1:80:21_, 1:84:15_, 1:85:3_, 1:85:9_, 1:86:4_, 1:98:14_, 1:99:15_, 1:100:13_, 1:100:17_, 1:101:11_, 1:103:6_, 1:103:7_, 1:103:10_, 1:103:11_, 1:103:13_, 1:104:1_, 1:105:11_, 1:105:24_, 1:108:9_, 1:113:25_, 1:117:15_, 1:124:6_, 1:124:13_, 1:125:6_, 1:132:8_, 1:133:19_, 1:134:10_, 1:134:18_, 1:135:25_, 1:138:8
arguments [8]_ - 1:17:14_, 1:45:7_, 1:57:11_, 1:86:13_, 1:91:17_, 1:91:20_, 1:93:14_, 1:95:9
arise [1]_ - 1:57:12
Armstrong [13]_ - 1:106:3_, 1:106:7_, 1:115:10_, 1:115:18_, 1:115:24_, 1:116:8_, 1:116:23_, 1:117:2_, 1:117:4_, 1:120:20_, 1:120:21_, 1:121:11
Armstrongs [1]_ - 1:117:25
Army [1]_ - 1:32:16
arose [1]_ - 1:70:17
article [4]_ - 1:16:19_, 1:22:25_, 1:23:6_, 1:99:18
Article [3]_ - 1:17:6_, 1:25:6_, 1:82:17
articulated [1]_ - 1:114:8
as-applied [9]_ - 1:8:1_, 1:9:17_, 1:10:14_, 1:13:5_, 1:41:24_, 1:56:21_, 1:67:25_, 1:68:4_, 1:68:9
as.. [1]_ - 1:4:17
aside [6]_ - 1:29:6_, 1:63:16_, 1:65:25_, 1:94:20_, 1:95:25_, 1:98:16
aspect [1]_ - 1:42:7
aspects [3]_ - 1:6:20_, 1:6:25_, 1:82:11
asserting [2]_ - 1:8:23_, 1:111:12
assertion [1]_ - 1:7:17
assertions [1]_ - 1:111:9
assessing [3]_ - 1:68:14_, 1:105:7_, 1:132:5
assessment [1]_ - 1:129:7
asset [1]_ - 1:131:21
assist [2]_ - 1:44:9_, 1:79:20
assistance [1]_ - 1:140:23
Association [2]_ - 1:101:18_, 1:106:3
assume [4]_ - 1:20:12_, 1:20:13_, 1:20:20_, 1:98:3
assuming [4]_ - 1:33:5_, 1:38:16_, 1:125:16_, 1:134:18
AT&T [5]_ - 1:32:5_, 1:32:9_, 1:32:10_, 1:32:12_, 1:32:15
attaches [1]_ - 1:11:12
attempt [1]_ - 1:118:15
attempted [1]_ - 1:7:1
attention [2]_ - 1:42:17_, 1:140:22
Attorney [2]_ - 1:118:15_, 1:122:23
attorney [1]_ - 1:132:7
attorneys [1]_ - 1:9:24
attribute [1]_ - 1:9:12
attributing [2]_ - 1:9:2_, 1:10:19
authorities [4]_ - 1:25:17_, 1:27:25_, 1:35:7_, 1:120:10
authority [39]_ - 1:7:4_, 1:15:6_, 1:16:18_, 1:16:21_, 1:19:2_, 1:20:15_, 1:20:16_, 1:32:14_, 1:32:18_, 1:34:3_, 1:35:13_, 1:59:14_, 1:59:15_, 1:60:7_, 1:60:8_, 1:60:18_, 1:61:4_, 1:61:6_, 1:62:14_, 1:65:11_, 1:69:13_, 1:72:10_, 1:72:13_, 1:72:14_, 1:77:18_, 1:89:8_, 1:89:23_, 1:89:24_, 1:91:20_, 1:91:21_, 1:92:14_, 1:99:23_, 1:102:17_, 1:102:25_, 1:103:21_, 1:104:21_, 1:136:4_, 1:137:10
authorization [10]_ - 1:19:25_, 1:22:10_, 1:22:14_, 1:24:1_, 1:30:5_, 1:72:9_, 1:76:3_, 1:76:8_, 1:76:23_, 1:126:1
Authorization [6]_ - 1:6:20_, 1:11:14_, 1:19:13_, 1:19:15_, 1:40:14_, 1:75:17
authorize [2]_ - 1:15:11_, 1:53:18
authorized [22]_ - 1:21:2_, 1:25:5_, 1:25:9_, 1:29:12_, 1:59:5_, 1:61:11_, 1:62:11_, 1:71:25_, 1:72:11_, 1:75:19_, 1:79:21_, 1:79:25_, 1:80:3_, 1:80:16_, 1:96:12_, 1:98:8_, 1:112:11_, 1:117:22_, 1:123:6_, 1:125:8_, 1:125:18
authorizes [2]_ - 1:86:18_, 1:114:20
automatically [1]_ - 1:116:17
autonomy [3]_ - 1:110:11_, 1:136:12_, 1:139:6
avoidance [5]_ - 1:55:3_, 1:77:25_, 1:83:20_, 1:83:24_, 1:127:5
aware [7]_ - 1:30:12_, 1:61:23_, 1:64:18_, 1:76:17_, 1:80:22_, 1:92:7_, 1:109:4
awareness [2]_ - 1:54:5_, 1:65:2

B

b)7 [1]_ - 1:111:9
B9 [3]_ - 1:27:16_, 1:27:20_, 1:49:5
B91A [1]_ - 1:64:18
back-and-forth [1]_ - 1:62:9
backed [4]_ - 1:21:15_, 1:21:16_, 1:21:17

bad [7] - 1:28:7, 1:28:12, 1:64:3, 1:64:5, 1:64:11, 1:64:17, 1:64:19
bad-faith [2] - 1:28:7, 1:28:12
bag [1] - 1:133:12
baked [2] - 1:113:5, 1:113:20
balance [2] - 1:77:22, 1:116:3
banc [2] - 1:131:8, 1:131:19
bandied [1] - 1:18:8
bankruptcy [1] - 1:131:21
based [21] - 1:4:11, 1:4:13, 1:8:15, 1:14:3, 1:14:12, 1:18:7, 1:21:21, 1:22:12, 1:30:20, 1:33:10, 1:35:12, 1:47:21, 1:61:20, 1:62:20, 1:65:14, 1:69:2, 1:83:16, 1:85:10, 1:103:20, 1:128:17
basement [1] - 1:61:2
basic [2] - 1:11:5, 1:24:1
basis [15] - 1:5:24, 1:6:19, 1:21:14, 1:24:25, 1:31:6, 1:31:10, 1:31:24, 1:35:22, 1:75:12, 1:91:11, 1:92:23, 1:92:24, 1:93:1, 1:106:25, 1:119:24
bear [4] - 1:10:15, 1:40:14, 1:47:19, 1:80:24
bears [5] - 1:13:18, 1:70:22, 1:76:6, 1:76:7, 1:81:2
became [2] - 1:21:3, 1:59:7
become [1] - 1:21:24
becomes [4] - 1:21:25, 1:47:10, 1:54:20, 1:106:22
Bedminster [2] - 1:39:17, 1:42:21
beginning [2] - 1:48:14, 1:55:16
begins [1] - 1:19:17
behalf [5] - 1:3:10, 1:3:17, 1:3:21, 1:5:1, 1:132:18
behest [1] - 1:116:2
behind [1] - 1:14:11
believes [1] - 1:76:20
benefit [4] - 1:4:7, 1:9:14, 1:16:25, 1:26:4
best [2] - 1:27:23, 1:124:23
better [4] - 1:35:22, 1:60:19, 1:101:12, 1:106:21
between [9] - 1:22:13, 1:93:21, 1:98:22, 1:106:10, 1:126:22, 1:127:3, 1:134:23, 1:137:9, 1:137:20
beyond [6] - 1:47:16, 1:54:17, 1:61:12, 1:67:4, 1:69:17, 1:70:9
bias [1] - 1:21:22
Biden [13] - 1:22:16, 1:22:22, 1:31:9, 1:46:4, 1:100:15, 1:100:16, 1:110:10, 1:128:15, 1:132:14, 1:132:18, 1:132:19, 1:132:21, 1:137:22
Biden's [1] - 1:47:15
big [2] - 1:41:4, 1:47:14
bill [5] - 1:16:17, 1:16:19, 1:97:19, 1:110:17, 1:110:19
binding [2] - 1:114:12, 1:117:15
bindingly [1] - 1:117:20
bit [12] - 1:52:21, 1:62:1, 1:71:23, 1:86:12, 1:106:4, 1:107:12, 1:107:21, 1:112:16, 1:115:6, 1:130:9, 1:132:1, 1:133:19
black [1] - 1:43:24
Black's [3] - 1:71:12, 1:71:18, 1:72:8
black-and-white [1] - 1:43:24
blanche [1] - 1:121:16
BLANCHE [52] - 1:3:12, 1:86:11, 1:87:6, 1:87:18, 1:88:3, 1:89:16, 1:90:17, 1:92:4, 1:93:7, 1:93:23, 1:95:3, 1:95:5, 1:95:7, 1:97:11, 1:98:19, 1:99:8, 1:99:11, 1:99:13, 1:99:21, 1:100:15, 1:101:19, 1:102:4, 1:103:3, 1:103:11, 1:104:8, 1:104:17, 1:105:9, 1:106:1, 1:106:6, 1:107:21, 1:108:12, 1:108:17, 1:109:2, 1:109:4, 1:109:13, 1:110:22, 1:110:25, 1:111:4, 1:111:13, 1:134:14, 1:135:23, 1:136:9, 1:136:24, 1:138:14, 1:139:3, 1:139:19, 1:139:22, 1:140:1, 1:140:7, 1:140:11, 1:140:14, 1:140:16
Blanche [5] - 1:3:12, 1:31:2, 1:113:6, 1:126:22, 1:129:24
bleeding [1] - 1:95:8
boatload [1] - 1:122:20
body [4] - 1:16:25, 1:97:14, 1:103:20, 1:123:17
book [5] - 1:14:7, 1:14:12, 1:74:11, 1:74:14, 1:121:2
books [7] - 1:37:18, 1:45:18, 1:52:22, 1:54:5, 1:62:4, 1:74:12
border [1] - 1:122:2
borne [1] - 1:105:23
borrow [2] - 1:93:3
bother [1] - 1:16:9
bottom [1] - 1:89:18
bound [3] - 1:77:15, 1:77:17, 1:94:9
Bove [9] - 1:3:14, 1:41:22, 1:52:17, 1:57:4, 1:58:21, 1:74:6, 1:74:25, 1:108:2, 1:113:5
BOVE [79] - 1:6:15, 1:6:17, 1:7:13, 1:8:3, 1:8:17, 1:9:1, 1:9:16, 1:10:2, 1:10:9, 1:11:9, 1:11:23, 1:12:4, 1:12:16, 1:13:12, 1:14:2, 1:15:13, 1:15:23, 1:17:16, 1:17:24, 1:18:2, 1:20:8, 1:20:20, 1:21:1, 1:21:6, 1:21:12, 1:22:6, 1:23:10, 1:23:18, 1:24:11, 1:24:18, 1:25:11, 1:25:17, 1:26:7, 1:26:18, 1:26:20, 1:27:19, 1:28:10, 1:28:22, 1:29:2, 1:29:8, 1:29:14, 1:29:17, 1:30:14, 1:30:20, 1:31:16, 1:33:5, 1:33:16, 1:33:24, 1:34:21, 1:34:25, 1:35:15, 1:35:21, 1:36:21, 1:37:8, 1:38:3, 1:38:8, 1:38:13, 1:38:21, 1:39:3, 1:39:24, 1:40:13, 1:40:23, 1:41:4, 1:75:3, 1:76:13, 1:76:17, 1:77:7, 1:78:6, 1:78:20, 1:79:4, 1:79:7, 1:79:10, 1:80:7, 1:81:6, 1:81:19, 1:82:14, 1:82:25, 1:83:10, 1:83:22
boxes [5] - 1:40:10, 1:48:14, 1:89:19, 1:96:24, 1:122:24
boyfriends [1] - 1:50:24
Brady [2] - 1:38:14, 1:38:19
Branch [6] - 1:16:6, 1:18:14, 1:32:2, 1:33:17, 1:74:14, 1:121:4
Branch's [2] - 1:14:6, 1:127:10
BRATT [99] - 1:3:9, 1:41:18, 1:41:20, 1:42:5, 1:45:14, 1:46:1, 1:46:8, 1:46:13, 1:46:21, 1:47:3, 1:47:9, 1:48:5, 1:48:10, 1:48:23, 1:49:13, 1:49:23, 1:50:10, 1:50:16, 1:51:9, 1:51:11, 1:51:15, 1:51:19, 1:51:22, 1:51:24, 1:52:16, 1:53:3, 1:53:19, 1:53:23, 1:54:3, 1:54:22, 1:55:9, 1:55:13, 1:55:19, 1:56:14, 1:56:20, 1:57:4, 1:57:8, 1:57:18, 1:57:22, 1:58:6, 1:58:16, 1:58:23, 1:59:6, 1:59:10, 1:59:12, 1:59:16, 1:59:21, 1:60:3, 1:60:9, 1:60:20, 1:61:8, 1:61:20, 1:62:5, 1:62:20, 1:63:3, 1:63:13, 1:63:21, 1:64:4, 1:64:12, 1:64:23, 1:65:2, 1:65:9, 1:65:15, 1:65:23, 1:65:25, 1:66:6, 1:66:14, 1:66:23, 1:67:2, 1:67:6, 1:67:11, 1:67:19, 1:67:24, 1:68:12, 1:68:16, 1:68:25, 1:69:16, 1:69:19, 1:69:24, 1:70:6, 1:70:10, 1:70:21, 1:71:2, 1:71:11, 1:71:18, 1:72:3, 1:72:5, 1:72:15, 1:72:18, 1:72:23, 1:73:2, 1:73:10, 1:73:13, 1:73:21, 1:74:1, 1:74:5, 1:74:19, 1:74:22, 1:140:20
Bratt [13] - 1:3:9, 1:29:15, 1:41:16, 1:74:4, 1:83:25, 1:94:24, 1:95:23, 1:100:6, 1:100:25, 1:102:6, 1:107:24, 1:112:20, 1:140:19
Bratt's [1] - 1:84:11
breached [1] - 1:27:18
break [1] - 1:75:1
Brennan [3] - 1:37:19,

1:75:21_, 1:80:11
Brennan's [1]_ - 1:29:21
brevity [1]_ - 1:11:11
brief [22]_ - 1:5:25_, 1:24:14_, 1:51:3_, 1:58:8_, 1:65:16_, 1:68:2_, 1:72:6_, 1:72:19_, 1:79:17_, 1:87:22_, 1:90:24_, 1:92:24_, 1:94:5_, 1:111:8_, 1:128:21_, 1:130:8_, 1:130:10_, 1:130:13_, 1:139:12_, 1:139:20_, 1:139:23_, 1:140:8
briefed [1]_ - 1:5:14
briefing [4]_ - 1:57:22_, 1:61:20_, 1:84:21_, 1:108:8
briefings [9]_ - 1:31:21_, 1:39:6_, 1:39:10_, 1:40:3_, 1:40:5_, 1:40:17_, 1:44:24_, 1:76:15_, 1:76:18
briefly [2]_ - 1:130:4_, 1:134:14
briefs [3]_ - 1:8:19_, 1:71:12_, 1:115:9
bring [5]_ - 1:21:22_, 1:39:1_, 1:54:18_, 1:84:1_, 1:122:8
bringing [2]_ - 1:103:1_, 1:135:21
brings [1]_ - 1:48:17
broad [1]_ - 1:106:4
broaden [2]_ - 1:17:23_, 1:78:1
broadened [1]_ - 1:36:10
broadening [1]_ - 1:61:12
broader [1]_ - 1:41:13
brought [3]_ - 1:55:14_, 1:83:25_, 1:100:19
brush [2]_ - 1:68:1_, 1:98:16
Bryan [8]_ - 1:49:6_, 1:49:8_, 1:49:16_, 1:49:23_, 1:50:2_, 1:54:4_, 1:64:4_, 1:64:6
built [2]_ - 1:24:7_, 1:105:9
bunch [1]_ - 1:123:1
Buren [1]_ - 1:61:10
buried [1]_ - 1:127:23
Bush [4]_ - 1:99:5_, 1:100:8_, 1:115:20
Bush's [1]_ - 1:23:5
business [3]_ - 1:5:10_, 1:22:19_, 1:133:11

C

calculated [1]_ - 1:131:14
Campa [7]_ - 1:17:17_, 1:17:19_, 1:70:14_, 1:70:17_, 1:70:18_, 1:77:20
campaign [1]_ - 1:65:5
candidate [3]_ - 1:39:6_, 1:76:2_, 1:76:15
cannot [13]_ - 1:22:14_, 1:38:14_, 1:44:25_, 1:45:1_, 1:53:10_, 1:53:15_, 1:54:4_, 1:67:3_, 1:82:18_, 1:104:19_, 1:128:20_, 1:134:24_, 1:137:5
canon [3]_ - 1:83:19_, 1:127:4_, 1:127:5
capabilities [1]_ - 1:112:8
capricious [1]_ - 1:67:22
captured [1]_ - 1:49:22
careers [1]_ - 1:50:25
carefully [1]_ - 1:116:3
Carlos [1]_ - 1:3:6
carry [1]_ - 1:121:6
carrying [2]_ - 1:44:11_, 1:44:17
carte [1]_ - 1:121:16
Case [1]_ - 1:85:8
case [118]_ - 1:3:4_, 1:6:22_, 1:6:25_, 1:9:20_, 1:12:1_, 1:13:17_, 1:14:5_, 1:14:9_, 1:17:1_, 1:17:17_, 1:18:14_, 1:22:7_, 1:22:22_, 1:23:25_, 1:24:24_, 1:26:8_, 1:26:9_, 1:28:19_, 1:29:6_, 1:32:6_, 1:32:10_, 1:35:11_, 1:35:17_, 1:35:18_, 1:37:4_, 1:39:12_, 1:50:19_, 1:51:3_, 1:51:19_, 1:51:25_, 1:52:9_, 1:52:12_, 1:57:16_, 1:58:8_, 1:58:10_, 1:58:18_, 1:61:9_, 1:61:10_, 1:61:13_, 1:64:8_, 1:66:8_, 1:67:4_, 1:67:10_, 1:67:25_, 1:68:9_, 1:68:20_, 1:68:23_, 1:69:11_, 1:69:23_, 1:72:25_, 1:73:24_, 1:74:16_, 1:77:6_, 1:77:11_, 1:78:19_, 1:81:7_, 1:81:12_, 1:81:19_, 1:81:20_, 1:81:24_, 1:82:8_, 1:83:25_, 1:84:7_, 1:84:20_, 1:87:10_, 1:88:25_, 1:89:1_, 1:90:2_, 1:90:12_, 1:90:14_, 1:92:1_, 1:93:9_, 1:93:19_, 1:94:5_, 1:94:14_, 1:94:16_, 1:97:2_, 1:98:10_, 1:98:11_, 1:99:7_, 1:99:8_, 1:100:25_, 1:101:18_, 1:101:19_, 1:104:5_, 1:104:7_, 1:105:11_, 1:106:23_, 1:107:3_, 1:107:24_, 1:108:5_, 1:113:21_, 1:114:9_, 1:115:18_, 1:120:8_, 1:120:11_, 1:120:25_, 1:127:19_, 1:128:7_, 1:128:10_, 1:128:18_, 1:130:13_, 1:130:15_, 1:130:24_, 1:131:7_, 1:132:8_, 1:133:11_, 1:133:25_, 1:135:5_, 1:135:22_, 1:136:3_, 1:136:17_, 1:137:18_, 1:137:24
cases [47]_ - 1:17:4_, 1:25:24_, 1:26:1_, 1:27:2_, 1:50:18_, 1:50:23_, 1:54:4_, 1:54:9_, 1:54:13_, 1:55:1_, 1:60:6_, 1:60:9_, 1:61:5_, 1:61:21_, 1:64:15_, 1:68:7_, 1:70:14_, 1:73:4_, 1:73:5_, 1:77:14_, 1:77:17_, 1:81:14_, 1:81:15_, 1:81:16_, 1:82:1_, 1:82:11_, 1:83:15_, 1:83:22_, 1:84:17_, 1:84:18_, 1:97:8_, 1:97:11_, 1:97:25_, 1:101:13_, 1:102:25_, 1:104:8_, 1:104:13_, 1:104:15_, 1:106:13_, 1:107:6_, 1:115:8_, 1:116:11_, 1:116:12_, 1:128:14_, 1:129:10_, 1:129:11
categorical [1]_ - 1:83:7
categories [2]_ - 1:36:16_, 1:41:11
caught [1]_ - 1:103:16
causation [2]_ - 1:9:5_, 1:10:18
caused [2]_ - 1:8:4_, 1:89:19
causing [1]_ - 1:113:19
caveat [1]_ - 1:103:3
ceased [1]_ - 1:47:24
ceremonial [2]_ - 1:44:12_, 1:44:18
certain [3]_ - 1:18:18_, 1:73:5_, 1:139:8
Certain [1]_ - 1:55:17
certainly [21]_ - 1:8:21_, 1:16:2_, 1:45:8_, 1:47:14_, 1:47:19_, 1:49:25_, 1:58:6_, 1:59:16_, 1:61:3_, 1:66:15_, 1:77:9_, 1:86:13_, 1:93:24_, 1:94:14_, 1:105:18_, 1:105:20_, 1:113:18_, 1:119:21_, 1:128:20_, 1:137:18
certainty [1]_ - 1:134:19
CFAA [1]_ - 1:61:10
CFR [1]_ - 1:123:8
chain [1]_ - 1:77:18
challenge [19]_ - 1:6:7_, 1:6:12_, 1:9:19_, 1:13:5_, 1:17:17_, 1:17:18_, 1:17:20_, 1:26:22_, 1:27:21_, 1:41:24_, 1:42:2_, 1:45:9_, 1:45:11_, 1:45:13_, 1:64:22_, 1:68:5_, 1:75:16_, 1:81:21_, 1:118:7
challenges [8]_ - 1:6:20_, 1:9:17_, 1:10:5_, 1:10:15_, 1:15:20_, 1:25:19_, 1:28:3_, 1:58:1
challenging [1]_ - 1:96:5
change [1]_ - 1:97:18
changeover [1]_ - 1:21:3
changes [1]_ - 1:97:20
character [1]_ - 1:44:16
characterization [1]_ - 1:113:24
characterize [1]_ - 1:109:10
characterized [2]_ - 1:68:24_, 1:105:22
charge [25]_ - 1:10:25_, 1:26:14_, 1:47:20_, 1:48:24_, 1:52:9_, 1:53:22_, 1:58:22_, 1:67:4_, 1:67:20_, 1:73:14_, 1:81:18_, 1:86:1_, 1:87:9_, 1:87:10_, 1:93:6_, 1:93:21_, 1:94:20_, 1:98:17_, 1:100:18_, 1:103:1_, 1:104:12_, 1:124:19_, 1:127:21_, 1:136:8
charged [18]_ - 1:10:22_, 1:11:5_, 1:11:22_, 1:11:25_, 1:19:20_, 1:21:11_, 1:46:1_, 1:46:25_, 1:47:2_, 1:50:4_, 1:69:9_, 1:86:1_, 1:86:16_, 1:95:19_, 1:100:16_, 1:100:17_, 1:109:12_, 1:112:17
charges [10]_ - 1:6:24_, 1:21:22_, 1:49:3_, 1:58:7_, 1:67:15_, 1:68:10_, 1:69:1_, 1:102:22_, 1:102:24_, 1:122:8
charging [1]_ - 1:49:24
check [5]_ - 1:4:24_, 1:71:11_, 1:71:12_, 1:108:17_, 1:138:17

checked [1]_ - 1:138:18
checkmark [1]_ - 1:138:17
Cheek [1]_ - 1:64:9
Cheney [3]_ - 1:115:11_, 1:121:11_, 1:121:19
Chicago [1]_ - 1:18:16
chief [1]_ - 1:42:22
Chief [1]_ - 1:9:8
choices [1]_ - 1:16:6
choose [2]_ - 1:66:16_, 1:139:8
chooses [2]_ - 1:9:8_, 1:17:5
chose [6]_ - 1:8:10_, 1:30:2_, 1:32:21_, 1:80:8_, 1:88:9
chosen [2]_ - 1:25:6_, 1:28:5
Chris [1]_ - 1:3:14
chronological [1]_ - 1:115:16
chronology [1]_ - 1:63:10
CIA [2]_ - 1:10:11_, 1:34:16
CIPA [1]_ - 1:18:8
circle [1]_ - 1:85:12
Circuit [17]_ - 1:14:24_, 1:17:1_, 1:17:13_, 1:17:19_, 1:23:25_, 1:25:24_, 1:26:23_, 1:27:10_, 1:31:25_, 1:32:6_, 1:32:7_, 1:64:10_, 1:72:21_, 1:77:18_, 1:77:20_, 1:82:3_, 1:131:8
circuit [5]_ - 1:25:20_, 1:77:22_, 1:83:18_, 1:116:12_, 1:131:10
Circuit's [2]_ - 1:49:6_, 1:77:16
circuits [1]_ - 1:17:10
circular [2]_ - 1:15:24_, 1:79:24
circulated [1]_ - 1:63:22
circumstance [2]_ - 1:12:19_, 1:119:19
circumstances [18]_ - 1:9:20_, 1:13:4_, 1:39:17_, 1:40:5_, 1:40:16_, 1:56:16_, 1:58:17_, 1:60:23_, 1:66:22_, 1:73:5_, 1:82:23_, 1:101:3_, 1:104:4_, 1:104:6_, 1:120:12_, 1:123:6_, 1:123:21_, 1:132:2
citation [1]_ - 1:123:8
cite [6]_ - 1:23:23_, 1:23:25_, 1:26:9_, 1:54:23_, 1:71:12_, 1:115:9
cite-check [1]_ - 1:71:12
cited [16]_ - 1:8:19_, 1:16:4_, 1:16:19_, 1:17:5_, 1:18:25_, 1:22:25_, 1:31:10_, 1:71:12_, 1:84:18_, 1:84:19_, 1:97:8_, 1:98:20_, 1:103:14_, 1:104:9_, 1:111:8_, 1:130:15
cites [4]_ - 1:15:24_, 1:27:1_, 1:62:13_, 1:97:2
citing [1]_ - 1:91:3
citizen [1]_ - 1:120:9
city [1]_ - 1:18:19
City [1]_ - 1:18:16
civil [5]_ - 1:119:2_, 1:120:7_, 1:122:7_, 1:122:13_, 1:132:8
claim [6]_ - 1:42:12_, 1:43:17_, 1:43:21_, 1:45:19_, 1:114:6
claiming [1]_ - 1:133:17
clarify [1]_ - 1:27:5
clarifying [1]_ - 1:54:10
clarity [4]_ - 1:6:5_, 1:16:12_, 1:19:11_, 1:43:20
clash [1]_ - 1:22:13
clashes [1]_ - 1:94:10
classification [17]_ - 1:7:4_, 1:13:10_, 1:15:12_, 1:20:9_, 1:20:13_, 1:41:5_, 1:65:11_, 1:69:12_, 1:74:13_, 1:89:2_, 1:89:23_, 1:97:6_, 1:106:5_, 1:116:9_, 1:117:3_, 1:117:7_, 1:126:20
Classified [1]_ - 1:111:1
classified [64]_ - 1:14:1_, 1:14:4_, 1:14:13_, 1:14:16_, 1:20:5_, 1:35:2_, 1:35:3_, 1:39:14_, 1:40:19_, 1:41:11_, 1:43:14_, 1:45:1_, 1:45:5_, 1:47:7_, 1:48:9_, 1:52:22_, 1:52:23_, 1:53:8_, 1:55:20_, 1:56:3_, 1:56:11_, 1:60:10_, 1:61:1_, 1:65:3_, 1:65:11_, 1:65:22_, 1:66:2_, 1:69:9_, 1:74:10_, 1:74:14_, 1:74:18_, 1:75:23_, 1:76:5_, 1:76:9_, 1:76:21_, 1:79:20_, 1:80:10_, 1:88:20_, 1:92:11_, 1:94:1_, 1:94:11_, 1:98:24_, 1:100:5_, 1:105:16_, 1:108:11_, 1:108:23_, 1:109:6_, 1:109:21_, 1:109:23_, 1:110:1_, 1:112:7_, 1:122:21_, 1:123:2_, 1:123:19_, 1:126:2_, 1:126:7_, 1:126:15_, 1:127:11_, 1:127:20_, 1:128:11_, 1:128:17_, 1:128:23_, 1:135:1_, 1:137:5
classifying [1]_ - 1:136:18
clause [7]_ - 1:15:10_, 1:17:4_, 1:41:3_, 1:58:14_, 1:72:20_, 1:78:9
Clause [17]_ - 1:6:21_, 1:11:11_, 1:11:12_, 1:11:14_, 1:11:15_, 1:11:17_, 1:17:15_, 1:19:13_, 1:19:14_, 1:19:15_, 1:40:14_, 1:41:4_, 1:75:5_, 1:75:17_, 1:77:21
clauses [5]_ - 1:15:3_, 1:31:15_, 1:45:11_, 1:58:12_, 1:66:19
clean [1]_ - 1:82:5
clear [17]_ - 1:4:19_, 1:55:10_, 1:56:9_, 1:62:7_, 1:67:3_, 1:67:19_, 1:69:21_, 1:76:14_, 1:83:3_, 1:88:5_, 1:123:16_, 1:126:11_, 1:128:21_, 1:130:12_, 1:130:24_, 1:131:17_, 1:132:11
clearance [39]_ - 1:28:20_, 1:28:25_, 1:29:5_, 1:29:7_, 1:29:9_, 1:29:12_, 1:29:21_, 1:33:14_, 1:36:25_, 1:37:4_, 1:37:7_, 1:37:10_, 1:37:18_, 1:38:7_, 1:47:24_, 1:47:25_, 1:52:18_, 1:52:19_, 1:52:20_, 1:52:24_, 1:53:2_, 1:53:4_, 1:59:14_, 1:59:16_, 1:59:18_, 1:59:23_, 1:60:11_, 1:60:22_, 1:60:25_, 1:62:3_, 1:62:16_, 1:62:25_, 1:63:11_, 1:75:18_, 1:75:19_, 1:76:3_, 1:76:10_, 1:78:21
clearances [7]_ - 1:32:12_, 1:34:19_, 1:34:20_, 1:37:12_, 1:37:21_, 1:37:23_, 1:60:16
clearer [1]_ - 1:83:11
clearly [3]_ - 1:21:11_, 1:97:6_, 1:129:5
client [3]_ - 1:3:13_, 1:5:13_, 1:30:25
Clinton [27]_ - 1:9:13_, 1:13:17_, 1:21:16_, 1:22:15_, 1:31:8_, 1:65:10_, 1:74:7_, 1:74:10_, 1:80:23_, 1:90:13_, 1:90:20_, 1:91:11_, 1:94:14_, 1:98:24_, 1:101:14_, 1:107:2_, 1:107:5_, 1:108:1_, 1:108:14_, 1:108:20_, 1:110:4_, 1:110:16_, 1:128:14_, 1:128:16_, 1:128:23_, 1:137:23
Clinton's [5]_ - 1:13:20_, 1:14:17_, 1:90:13_, 1:91:10_, 1:110:7
close [3]_ - 1:5:10_, 1:101:6_, 1:112:19
closed [1]_ - 1:95:18
closely [8]_ - 1:35:18_, 1:36:6_, 1:54:16_, 1:70:3_, 1:70:13_, 1:71:23_, 1:77:21_, 1:121:8
closely-held [1]_ - 1:77:21
cobble [2]_ - 1:57:19_, 1:70:2
cobbled [2]_ - 1:24:14_, 1:70:7
colleague [2]_ - 1:98:20_, 1:126:1
colleagues [1]_ - 1:47:17
collect [1]_ - 1:135:10
collecting [1]_ - 1:121:7
collectively [2]_ - 1:6:24_, 1:15:3
Columbia [1]_ - 1:10:12
combination [1]_ - 1:82:22
comfortable [1]_ - 1:39:10
Commander [1]_ - 1:9:8
comment [1]_ - 1:49:5
comments [3]_ - 1:65:3_, 1:65:6_, 1:65:14
commit [1]_ - 1:73:6
committed [1]_ - 1:122:16
committing [1]_ - 1:134:20
common [1]_ - 1:64:6
communications [8]_ - 1:31:22_, 1:36:22_, 1:37:1_, 1:38:12_, 1:38:16_, 1:63:24_, 1:108:3_, 1:108:6
compare [1]_ - 1:106:16
compared [2]_ - 1:27:24_, 1:109:11
compartments [1]_ - 1:68:8
compel [5]_ - 1:36:4_, 1:39:25_, 1:40:1_, 1:40:15_,

1:57:12
complete [10]_ - 1:18:5_, 1:19:19_, 1:20:3_, 1:20:17_, 1:21:5_, 1:46:17_, 1:47:5_, 1:48:4_, 1:136:12_, 1:139:13
completed [2]_ - 1:38:3_, 1:95:13
completely [13]_ - 1:13:21_, 1:21:18_, 1:22:18_, 1:22:19_, 1:35:23_, 1:79:24_, 1:96:1_, 1:99:14_, 1:103:4_, 1:103:17_, 1:110:15_, 1:119:22_, 1:135:12
compliance [3]_ - 1:38:18_, 1:79:2_, 1:116:1
complicit [1]_ - 1:13:21
comply [2]_ - 1:48:15
complying [1]_ - 1:84:22
component [9]_ - 1:28:7_, 1:36:7_, 1:39:24_, 1:67:18_, 1:70:3_, 1:77:21_, 1:81:5_, 1:119:6_, 1:124:10
components [1]_ - 1:81:16
compromise [1]_ - 1:56:4
compromised [1]_ - 1:123:20
computer [1]_ - 1:115:20
concede [2]_ - 1:57:10_, 1:74:9
conceded [2]_ - 1:82:2_, 1:101:1
conceivable [2]_ - 1:124:23_, 1:124:24
conceivably [1]_ - 1:46:25
conceive [1]_ - 1:13:19
conceived [1]_ - 1:98:15
concept [13]_ - 1:12:7_, 1:12:16_, 1:12:21_, 1:13:13_, 1:14:24_, 1:19:10_, 1:24:1_, 1:30:6_, 1:34:10_, 1:35:18_, 1:41:13_, 1:68:14_, 1:83:24
concepts [3]_ - 1:6:3_, 1:35:8_, 1:136:8
concern [4]_ - 1:15:1_, 1:15:9_, 1:36:7_, 1:36:8
concerned [3]_ - 1:30:8_, 1:116:14_, 1:116:24
concerns [4]_ - 1:15:13_, 1:117:24_, 1:120:13_, 1:120:24
concessions [1]_ - 1:8:17
conclude [3]_ - 1:5:5_, 1:89:13_, 1:120:15
concluded [1]_ - 1:141:1
conclusion [3]_ - 1:87:2_, 1:87:15_, 1:137:1
conditions [1]_ - 1:39:11
conduct [7]_ - 1:47:15_, 1:49:1_, 1:57:2_, 1:66:11_, 1:69:7_, 1:74:20_, 1:133:10
conducted [1]_ - 1:40:17
conducting [1]_ - 1:44:10
conference [2]_ - 1:124:19_, 1:136:8
confers [1]_ - 1:32:8
confess [1]_ - 1:131:15
confident [1]_ - 1:18:6
confidential [1]_ - 1:31:22
confirmed [1]_ - 1:109:6
confirms [1]_ - 1:99:14
confusion [5]_ - 1:15:14_, 1:35:3_, 1:35:5_, 1:85:15_, 1:85:24
Congress [33]_ - 1:15:16_, 1:15:18_, 1:16:4_, 1:16:11_, 1:16:20_, 1:17:5_, 1:17:11_, 1:17:12_, 1:25:6_, 1:32:2_, 1:32:14_, 1:32:18_, 1:77:8_, 1:83:13_, 1:89:2_, 1:89:3_, 1:89:7_, 1:91:14_, 1:92:7_, 1:96:18_, 1:96:20_, 1:97:18_, 1:97:19_, 1:110:13_, 1:110:18_, 1:121:3_, 1:121:13_, 1:121:15_, 1:137:9_, 1:139:5_, 1:139:14
Congress's [4]_ - 1:116:3_, 1:121:17_, 1:126:14_, 1:126:18
Congressional [4]_ - 1:16:15_, 1:16:24_, 1:89:1_, 1:126:9
connection [1]_ - 1:132:14
consensus [1]_ - 1:58:5
consent [1]_ - 1:32:16
consequence [1]_ - 1:114:25
consequences [3]_ - 1:17:7_, 1:45:20_, 1:74:2
consider [4]_ - 1:9:19_, 1:45:8_, 1:77:4_, 1:95:15
consideration [4]_ - 1:15:1_, 1:16:17_, 1:79:18_, 1:100:24
considered [5]_ - 1:6:24_, 1:18:16_, 1:25:25_, 1:94:17
considering [4]_ - 1:10:4_, 1:13:4_, 1:26:21_, 1:90:25
consistent [7]_ - 1:24:22_, 1:54:12_, 1:56:2_, 1:56:6_, 1:67:14_, 1:80:18_, 1:136:10
constellation [1]_ - 1:66:12
constitute [1]_ - 1:23:3
constituted [3]_ - 1:8:11_, 1:22:17_, 1:41:8
constitutes [3]_ - 1:35:4_, 1:93:10_, 1:101:16
constitution [1]_ - 1:83:11
Constitution [2]_ - 1:32:7_, 1:32:18
constitutional [13]_ - 1:9:19_, 1:10:14_, 1:44:11_, 1:44:17_, 1:55:3_, 1:77:24_, 1:81:24_, 1:83:20_, 1:83:23_, 1:84:1_, 1:120:13_, 1:121:1_, 1:127:5
constraint [1]_ - 1:127:18
contain [5]_ - 1:14:13_, 1:45:1_, 1:45:4_, 1:48:2_, 1:58:22
contained [7]_ - 1:14:1_, 1:14:6_, 1:38:17_, 1:74:18_, 1:105:16_, 1:108:10_, 1:118:14
contains [2]_ - 1:35:5_, 1:64:19
contemplate [1]_ - 1:128:7
contemplated [3]_ - 1:13:19_, 1:51:17_, 1:124:1
contemplates [1]_ - 1:118:24
contemporaneous [1]_ - 1:129:2
contemporaneously [1]_ - 1:4:7
content [11]_ - 1:14:20_, 1:14:21_, 1:15:7_, 1:15:17_, 1:16:6_, 1:18:12_, 1:19:8_, 1:24:3_, 1:33:10_, 1:41:2_, 1:54:18
contention [1]_ - 1:114:1
contentless [1]_ - 1:25:5
contest [1]_ - 1:128:23
contested [6]_ - 1:7:22_, 1:8:24_, 1:10:1_, 1:10:3_, 1:14:10
context [19]_ - 1:7:23_, 1:30:18_, 1:45:8_, 1:57:12_, 1:57:13_, 1:61:13_, 1:65:12_, 1:66:21_, 1:70:17_, 1:87:9_, 1:89:15_, 1:91:21_, 1:93:15_, 1:101:22_, 1:107:15_, 1:117:8_, 1:118:11_, 1:129:16_, 1:135:6
contexts [1]_ - 1:28:7
contingency [1]_ - 1:112:9
continue [4]_ - 1:9:15_, 1:96:18_, 1:99:20_, 1:125:13
continues [2]_ - 1:46:23_, 1:55:24
continuing [1]_ - 1:46:24
contractors [1]_ - 1:53:13
contrary [6]_ - 1:26:8_, 1:42:16_, 1:55:6_, 1:57:4_, 1:91:5_, 1:91:6
contrast [2]_ - 1:26:16_, 1:44:13
control [2]_ - 1:116:4_, 1:139:13
conversation [2]_ - 1:108:19_, 1:109:13
coordination [1]_ - 1:124:2
copies [1]_ - 1:92:17
copy [3]_ - 1:99:5_, 1:99:6_, 1:110:22
core [1]_ - 1:43:12
corners [1]_ - 1:29:24
corollary [1]_ - 1:67:2
correct [47]_ - 1:4:16_, 1:8:16_, 1:9:22_, 1:10:23_, 1:11:8_, 1:15:22_, 1:17:15_, 1:20:7_, 1:20:18_, 1:25:7_, 1:25:10_, 1:25:11_, 1:28:21_, 1:46:19_, 1:46:20_, 1:47:2_, 1:47:3_, 1:47:23_, 1:47:25_, 1:48:6_, 1:49:12, 1:51:22_, 1:53:21_, 1:56:20_, 1:56:22_, 1:58:15_, 1:59:8_, 1:59:10_, 1:60:2_, 1:60:5_, 1:62:25_, 1:65:21_, 1:65:24_, 1:66:23_, 1:68:12_, 1:69:19_, 1:69:24_, 1:70:20_, 1:72:3_, 1:74:19_, 1:90:17_, 1:105:20_, 1:135:21_, 1:136:22_, 1:138:13
correctly [2]_ - 1:71:4_, 1:129:25
Counsel [28]_ - 1:3:8_, 1:5:23_, 1:6:1_, 1:8:10_, 1:14:4_, 1:23:16_, 1:30:17_,

1:33:13_, 1:33:17_, 1:34:24_, 1:38:6_, 1:38:17_, 1:38:20_, 1:88:19_, 1:96:11_, 1:96:12_, 1:97:2_, 1:103:15_, 1:104:25_, 1:109:8_, 1:109:15_, 1:109:22_, 1:132:24_, 1:134:25_, 1:135:15_, 1:136:10_, 1:136:14_, 1:140:18
counsel [5]_ - 1:3:13_, 1:4:3_, 1:4:5_, 1:6:9_, 1:6:10
Counsel's [8]_ - 1:8:18_, 1:10:10_, 1:15:15_, 1:16:8_, 1:19:1_, 1:22:7_, 1:87:21_, 1:132:22
Counselor [1]_ - 1:113:21
count [5]_ - 1:11:6_, 1:37:14_, 1:62:2_, 1:62:3
Count [6]_ - 1:29:6_, 1:36:18_, 1:37:16_, 1:62:2_, 1:62:5_, 1:84:9
counting [1]_ - 1:101:10
countries [1]_ - 1:112:8
counts [10]_ - 1:6:18_, 1:11:13_, 1:22:12_, 1:37:6_, 1:48:19_, 1:48:20_, 1:116:24_, 1:117:9_, 1:117:18_, 1:117:19
Counts [5]_ - 1:11:22_, 1:40:8_, 1:40:12_, 1:86:1_, 1:92:21
couple [5]_ - 1:42:23_, 1:43:16_, 1:52:16_, 1:101:13_, 1:121:19
coupled [1]_ - 1:66:20
course [21]_ - 1:5:12_, 1:7:17_, 1:10:24_, 1:27:9_, 1:44:9_, 1:44:24_, 1:45:22_, 1:59:4_, 1:59:24_, 1:61:16_, 1:65:4_, 1:69:22_, 1:75:20_, 1:77:1_, 1:77:5_, 1:100:12_, 1:121:14_, 1:122:16_, 1:124:5_, 1:133:18_, 1:138:14
Court [75]_ - 1:3:1_, 1:3:3_, 1:5:4_, 1:7:21_, 1:9:17_, 1:10:6_, 1:11:10_, 1:13:3_, 1:18:20_, 1:24:4_, 1:24:25_, 1:25:23_, 1:26:17_, 1:33:25_, 1:42:8_, 1:42:11_, 1:47:13_, 1:48:5_, 1:48:10_, 1:49:25_, 1:50:17_, 1:52:17_, 1:55:3_, 1:55:4_, 1:58:8_, 1:61:22_, 1:62:7_, 1:71:3_, 1:72:19_, 1:75:15_, 1:77:22_, 1:78:8_, 1:82:1_, 1:82:15_, 1:84:1_, 1:84:10_, 1:86:21_, 1:87:7_, 1:87:11_, 1:89:6_, 1:90:5_, 1:90:24_, 1:92:4_, 1:93:12_, 1:94:2_, 1:94:7_, 1:94:15_, 1:97:16_, 1:98:4_, 1:98:6_, 1:99:11_, 1:99:22_, 1:100:22_, 1:100:24_, 1:103:5_, 1:106:14_, 1:112:5_, 1:114:11_, 1:115:24_, 1:116:18_, 1:117:2_, 1:117:4_, 1:118:11_, 1:120:14_, 1:120:21_, 1:121:23_, 1:122:1_, 1:126:13_, 1:131:24_, 1:132:2_, 1:132:6_, 1:134:16_, 1:135:17_, 1:140:24
court [25]_ - 1:4:1_, 1:13:2_, 1:17:6_, 1:18:5_, 1:18:10_, 1:25:9_, 1:25:11_, 1:26:21_, 1:30:8_, 1:34:8_, 1:82:6_, 1:90:14_, 1:102:16_, 1:107:17_, 1:116:12_, 1:116:13_, 1:117:17_, 1:117:24_, 1:118:1_, 1:119:3_, 1:119:20_, 1:120:6_, 1:127:5_, 1:138:22
COURT [277]_ - 1:3:2_, 1:3:11_, 1:3:15_, 1:3:19_, 1:3:22_, 1:4:18_, 1:4:24_, 1:5:9_, 1:5:15_, 1:5:20_, 1:6:16_, 1:7:10_, 1:7:15_, 1:8:14_, 1:8:20_, 1:9:15_, 1:9:22_, 1:10:8_, 1:10:21_, 1:11:18_, 1:11:24_, 1:12:15_, 1:13:9_, 1:13:25_, 1:15:9_, 1:15:19_, 1:17:13_, 1:17:21_, 1:17:25_, 1:19:15_, 1:20:12_, 1:20:24_, 1:21:2_, 1:21:9_, 1:21:23_, 1:23:8_, 1:23:13_, 1:24:7_, 1:24:16_, 1:25:8_, 1:25:16_, 1:26:5_, 1:26:14_, 1:26:19_, 1:27:8_, 1:28:6_, 1:28:18_, 1:28:24_, 1:29:6_, 1:29:13, 1:29:16_, 1:30:9_, 1:30:16_, 1:31:14_, 1:33:1_, 1:33:13_, 1:33:21_, 1:34:18_, 1:34:22_, 1:35:9_, 1:35:19_, 1:36:15_, 1:37:3_, 1:37:25_, 1:38:5_, 1:38:11_, 1:38:16_, 1:38:22_, 1:39:21_, 1:40:6_, 1:40:21_, 1:40:25_, 1:41:14_, 1:41:19_, 1:42:3_, 1:45:7_, 1:45:22_, 1:46:7_, 1:46:9_, 1:46:16_, 1:46:25_, 1:47:4_, 1:47:21_, 1:48:7_, 1:48:18_, 1:49:12_, 1:49:19_, 1:50:7_, 1:50:12_, 1:51:8_, 1:51:10_, 1:51:12_, 1:51:17_, 1:51:21_, 1:51:23_, 1:52:14_, 1:53:1_, 1:53:16_, 1:53:21_, 1:53:24_, 1:54:14_, 1:55:6_, 1:55:11_, 1:55:18_, 1:56:12_, 1:56:17_, 1:56:23, 1:57:7_, 1:57:15, 1:57:21_, 1:57:25_, 1:58:11_, 1:58:19_, 1:59:3_, 1:59:7_, 1:59:11_, 1:59:13_, 1:59:18_, 1:59:25_, 1:60:6_, 1:60:17_, 1:61:3_, 1:61:9_, 1:62:1_, 1:62:19_, 1:62:24_, 1:63:9_, 1:63:19_, 1:63:25_, 1:64:10_, 1:64:18_, 1:65:1_, 1:65:6_, 1:65:13_, 1:65:17_, 1:65:24_, 1:66:4_, 1:66:8_, 1:66:19_, 1:66:25_, 1:67:5_, 1:67:8_, 1:67:17_, 1:67:23_, 1:68:11_, 1:68:13_, 1:68:20_, 1:69:5_, 1:69:18_, 1:69:20_, 1:69:25_, 1:70:9_, 1:70:20_, 1:70:25_, 1:71:7_, 1:71:16_, 1:71:20_, 1:72:4_, 1:72:14_, 1:72:16_, 1:72:22_, 1:73:1_, 1:73:8_, 1:73:11_, 1:73:17_, 1:73:24_, 1:74:3_, 1:74:16_, 1:74:20_, 1:74:24_, 1:76:11_, 1:76:16_, 1:77:1_, 1:78:3_, 1:78:18_, 1:79:2_, 1:79:5, 1:79:9_, 1:80:4_, 1:81:3_, 1:81:14_, 1:82:12_, 1:82:20_, 1:83:6_, 1:83:19_, 1:85:1_, 1:85:6, 1:85:17_, 1:85:20_, 1:86:4_, 1:86:7_, 1:86:9_, 1:87:1_, 1:87:14_, 1:87:24_, 1:89:11_, 1:90:16_, 1:91:16_, 1:93:1_, 1:93:14_, 1:95:1_, 1:95:4_, 1:95:6_, 1:97:1_, 1:98:14_, 1:99:7_, 1:99:10_, 1:99:12_, 1:99:16_, 1:100:13_, 1:101:17_, 1:102:2_, 1:102:21_, 1:103:6_, 1:104:7_, 1:104:13_, 1:104:24_, 1:105:20_, 1:106:2_, 1:107:12_, 1:108:8_, 1:108:16_, 1:108:24_, 1:109:3_, 1:109:8_, 1:110:19_, 1:110:24_, 1:111:3_, 1:111:6_, 1:111:18_, 1:111:22_, 1:113:16_, 1:114:19_, 1:114:24_, 1:115:7_, 1:116:7_, 1:117:10_, 1:118:3_, 1:118:5_, 1:118:17_, 1:118:21_, 1:119:6_, 1:119:25_, 1:120:13_, 1:122:5_, 1:123:13_, 1:124:8_, 1:125:1_, 1:125:10_, 1:125:13_, 1:125:21_, 1:125:24_, 1:127:19_, 1:128:16_, 1:128:25_, 1:130:6_, 1:130:21_, 1:131:1_, 1:131:3_, 1:131:5_, 1:133:20_, 1:134:4_, 1:134:9_, 1:135:20_, 1:136:6_, 1:136:20_, 1:138:8_, 1:138:24_, 1:139:18_, 1:139:21_, 1:139:25_, 1:140:6_, 1:140:9_, 1:140:12_, 1:140:15_, 1:140:17_, 1:140:21
Court's [14]_ - 1:16:25_, 1:17:8_, 1:17:10_, 1:18:15_, 1:25:19_, 1:41:23_, 1:42:17_, 1:46:2_, 1:48:10_, 1:49:4_, 1:57:24_, 1:77:8_, 1:106:23
COURTROOM [1]_ - 1:3:5
courtroom [2]_ - 1:4:1_, 1:14:14
Courts [1]_ - 1:54:9
courts [25]_ - 1:10:14_, 1:12:17_, 1:15:19_, 1:25:7_, 1:25:12_, 1:25:13_, 1:26:10_, 1:28:3_, 1:31:25_, 1:36:8_, 1:42:1_, 1:49:7_, 1:54:18_, 1:61:5_, 1:61:17_, 1:73:4_, 1:82:17_, 1:83:8_, 1:83:11_, 1:115:12_, 1:116:19_, 1:117:10_, 1:118:5_, 1:131:11_, 1:131:22
cover [2]_ - 1:38:19_, 1:78:7
coverage [2]_ - 1:127:13_, 1:127:16
crafted [1]_ - 1:116:3
crafting [1]_ - 1:7:25
create [2]_ - 1:44:22_, 1:139:15
created [1]_ - 1:44:6
creates [1]_ - 1:103:8
creation [3]_ - 1:116:4_, 1:117:4_, 1:120:22
credited [2]_ - 1:22:18_, 1:22:19
CREW [5]_ - 1:106:8_, 1:115:11_, 1:116:12_, 1:121:11_, 1:121:19
crime [13]_ - 1:19:19_, 1:20:2_, 1:20:17_, 1:20:18_, 1:20:19_, 1:21:4_, 1:46:17_, 1:47:5_, 1:48:3_, 1:51:13_, 1:74:1_, 1:95:12_, 1:122:16
criminal [40]_ - 1:17:6_, 1:20:6_, 1:30:10_, 1:30:11_, 1:30:12_, 1:30:18_, 1:30:21_, 1:31:6_, 1:32:24_, 1:45:24_, 1:46:2_, 1:46:3_, 1:46:4_, 1:48:8_, 1:55:4_, 1:57:2_, 1:65:20_, 1:65:21_, 1:68:15_, 1:69:10_, 1:69:15_, 1:93:6

_, 1:95:16_, 1:100:7_, 1:101:2_, 1:101:5_, 1:102:20 _, 1:103:1_, 1:105:3_, 1:105:7_, 1:110:6_, 1:120:11 _, 1:122:8_, 1:122:20_, 1:123:1_, 1:123:25_, 1:124:1 _, 1:124:5_, 1:129:8
criminality [1]_ - 1:69:7
criteria [4]_ - 1:21:21_, 1:67:3_, 1:67:4_, 1:67:19
critical [1]_ - 1:23:21
cross [1]_ - 1:37:17
cross-examine [1]_ - 1:37:17
crossover [1]_ - 1:6:4
crucial [1]_ - 1:131:18
crystal [1]_ - 1:88:4
culpable [1]_ - 1:132:4
curiosity [1]_ - 1:110:20
curious [2]_ - 1:61:12_, 1:124:10
current [4]_ - 1:35:12_, 1:82:23_, 1:100:11_, 1:108:22
custody [2]_ - 1:39:21_, 1:43:13
customs [1]_ - 1:31:7
cut [2]_ - 1:106:4_, 1:106:7
cuts [1]_ - 1:98:11

D

D.C [3]_ - 1:31:25_, 1:32:6 _, 1:32:7
Dadan [1]_ - 1:3:17
data [1]_ - 1:37:2
database [2]_ - 1:62:11_, 1:63:12
date [5]_ - 1:19:17_, 1:22:4 _, 1:46:19_, 1:65:21_, 1:72:24
David [1]_ - 1:3:10
Davis [18]_ - 1:17:5_, 1:30:8_, 1:54:25_, 1:55:2_, 1:77:7_, 1:77:8_, 1:77:12_, 1:77:23_, 1:80:19_, 1:82:15 _, 1:83:2_, 1:83:3_, 1:83:7_, 1:83:15_, 1:83:20_, 1:84:7
day-to-day [1]_ - 1:116:19
dd [7]_ - 1:17:22_, 1:17:24 _, 1:56:19_, 1:56:23_, 1:56:25_, 1:57:1_, 1:78:4
De [4]_ - 1:3:6_, 1:3:21_, 1:4:15_, 1:85:25
deactivated [1]_ - 1:62:4
deal [3]_ - 1:73:2_, 1:105:15_, 1:135:2
dealt [3]_ - 1:50:19_, 1:65:9_, 1:101:20
debate [1]_ - 1:26:2
decades [1]_ - 1:92:12
decent [1]_ - 1:124:6
decide [5]_ - 1:69:2_, 1:80:2_, 1:80:17_, 1:98:7_, 1:137:13
decided [4]_ - 1:47:18_, 1:52:3_, 1:90:20_, 1:98:6
decision [29]_ - 1:18:14_, 1:19:23_, 1:37:17_, 1:61:11 _, 1:65:7_, 1:67:20_, 1:89:21 _, 1:89:25_, 1:90:21_, 1:104:11_, 1:106:17_, 1:106:23_, 1:107:7_, 1:107:13_, 1:114:22_, 1:114:23_, 1:115:1_, 1:116:10_, 1:116:12_, 1:116:13_, 1:119:19_, 1:127:12_, 1:131:8_, 1:134:1 _, 1:136:16_, 1:136:21_, 1:137:23_, 1:140:3
decision-making [1]_ - 1:90:21
decisional [1]_ - 1:35:13
decisions [15]_ - 1:21:21_, 1:25:22_, 1:27:6_, 1:34:7_, 1:67:12_, 1:68:22_, 1:89:9_, 1:106:2_, 1:110:11_, 1:117:5 _, 1:117:6_, 1:117:21_, 1:117:24_, 1:118:1_, 1:131:20
deck [1]_ - 1:4:9
declaration [1]_ - 1:48:16
declare [1]_ - 1:32:15
declared [1]_ - 1:119:8
declaring [1]_ - 1:77:1
declassified [1]_ - 1:43:6
Declassify [1]_ - 1:43:4
declined [4]_ - 1:15:18_, 1:16:20_, 1:16:21_, 1:84:16
Dedeyan [2]_ - 1:25:20_, 1:26:24
deemed [8]_ - 1:25:10_, 1:25:11_, 1:25:12_, 1:91:14 _, 1:105:22_, 1:118:6_, 1:119:13_, 1:137:21
defendant [7]_ - 1:12:2_, 1:17:7_, 1:41:7_, 1:50:3_, 1:91:3_, 1:119:11_, 1:119:12
defendant's [1]_ - 1:10:11
defendants [2]_ - 1:68:6_, 1:130:8
defense [15]_ - 1:6:8_, 1:6:9_, 1:6:10_, 1:33:11_, 1:35:10_, 1:37:11_, 1:88:1_, 1:91:20_, 1:93:15_, 1:96:7_, 1:118:13_, 1:124:9_, 1:124:13_, 1:124:17_, 1:124:24
Defense [16]_ - 1:11:15_, 1:11:20_, 1:14:5_, 1:19:25_, 1:20:14_, 1:36:9_, 1:36:14_, 1:41:13_, 1:48:2_, 1:70:12_, 1:92:7_, 1:94:1_, 1:94:11_, 1:94:19_, 1:133:12
deference [3]_ - 1:121:13 _, 1:121:14_, 1:121:24
define [11]_ - 1:15:18_, 1:16:12_, 1:27:10_, 1:32:24 _, 1:34:11_, 1:41:9_, 1:57:16 _, 1:57:17_, 1:61:5_, 1:70:22 _, 1:84:6
defined [2]_ - 1:23:13_, 1:58:2
defines [3]_ - 1:17:25_, 1:41:11_, 1:70:14
defining [4]_ - 1:34:3_, 1:72:9_, 1:72:11_, 1:124:13
definitely [1]_ - 1:127:15
definition [39]_ - 1:12:19_, 1:13:1_, 1:18:11_, 1:23:8_, 1:23:19_, 1:25:1_, 1:25:3_, 1:33:3_, 1:33:4_, 1:33:8_, 1:34:14_, 1:43:24_, 1:44:2_, 1:44:25_, 1:49:14_, 1:49:20 _, 1:56:12_, 1:56:18_, 1:61:7 _, 1:61:14_, 1:61:19_, 1:70:11_, 1:70:19_, 1:71:18 _, 1:72:2_, 1:79:15_, 1:79:18 _, 1:79:23_, 1:79:24_, 1:80:15_, 1:91:13_, 1:95:21 _, 1:112:19_, 1:112:20_, 1:127:25_, 1:136:6_, 1:136:10_, 1:138:5
definitions [15]_ - 1:13:13 _, 1:13:23_, 1:24:15_, 1:24:17_, 1:24:19_, 1:24:21 _, 1:43:20_, 1:57:5_, 1:58:4_, 1:71:5_, 1:71:7_, 1:71:9_, 1:84:5_, 1:93:4_, 1:102:6
degree [1]_ - 1:120:4
delay [1]_ - 1:71:20
delegation [4]_ - 1:15:16 _, 1:16:17_, 1:17:3_, 1:18:23
delete [1]_ - 1:37:18
deleted [1]_ - 1:116:17
deliberative [1]_ - 1:38:11
deliver [4]_ - 1:11:3_, 1:11:21_, 1:12:2_, 1:58:17
delivered [1]_ - 1:88:15
delving [1]_ - 1:120:14
demand [4]_ - 1:22:2_, 1:48:22_, 1:60:1_, 1:60:4
demonstrate [1]_ - 1:81:23
demonstrated [2]_ - 1:57:8_, 1:57:9
deny [1]_ - 1:33:1
department [1]_ - 1:128:22
Department [32]_ - 1:36:24_, 1:46:5_, 1:52:4_, 1:62:21_, 1:63:3_, 1:63:7_, 1:63:11_, 1:63:14_, 1:63:17 _, 1:63:22_, 1:84:18_, 1:94:3 _, 1:95:15_, 1:96:8_, 1:97:22 _, 1:98:5_, 1:101:2_, 1:101:14_, 1:102:23_, 1:103:14_, 1:104:20_, 1:105:3_, 1:105:6_, 1:114:13 _, 1:120:11_, 1:121:5_, 1:122:18_, 1:122:19_, 1:124:3_, 1:132:22_, 1:133:11_, 1:139:12
Department's [1]_ - 1:37:22
deploy [2]_ - 1:118:14_, 1:120:10
deployed [1]_ - 1:118:20
DEPUTY [1]_ - 1:3:5
describe [2]_ - 1:81:16_, 1:136:25
described [4]_ - 1:11:10_, 1:27:24_, 1:67:7_, 1:117:5
describes [1]_ - 1:57:4
description [1]_ - 1:20:8
descriptions [4]_ - 1:112:24_, 1:128:17_, 1:128:25_, 1:129:2
designate [5]_ - 1:106:11 _, 1:114:22_, 1:121:16_, 1:136:5_, 1:139:6
designated [8]_ - 1:7:6_, 1:13:6_, 1:18:18_, 1:22:8_, 1:42:13_, 1:43:11_, 1:113:10 _, 1:123:21
designating [1]_ - 1:68:22
designation [13]_ - 1:7:16 _, 1:8:11_, 1:9:4_, 1:13:10_,

1:22:18_, 1:33:8_, 1:87:3_, 1:97:4_, 1:98:18_, 1:113:22_, 1:125:3_, 1:136:23_, 1:138:9
designations [2]_ - 1:87:16_, 1:133:23
detail [1]_ - 1:79:16
details [1]_ - 1:39:9
determination [10]_ - 1:78:13_, 1:88:23_, 1:102:18_, 1:103:22_, 1:104:10_, 1:104:11_, 1:104:22_, 1:106:5_, 1:107:18
determine [1]_ - 1:85:13
determined [3]_ - 1:88:15_, 1:133:23_, 1:140:4
Determines [1]_ - 1:56:1
determining [1]_ - 1:100:18
developed [1]_ - 1:139:5
development [1]_ - 1:86:22
deviation [1]_ - 1:82:23
devices [1]_ - 1:3:25
diametrically [1]_ - 1:58:4
diaries [2]_ - 1:94:12_, 1:128:8
Diaries [5]_ - 1:21:17_, 1:31:9_, 1:98:25_, 1:109:5_, 1:110:15
diary [5]_ - 1:109:9_, 1:109:16_, 1:109:20_, 1:109:25_, 1:128:7
dictionaries [3]_ - 1:23:15_, 1:23:23_, 1:71:15
Dictionary [1]_ - 1:71:13
dictionary [10]_ - 1:24:15_, 1:24:17_, 1:24:19_, 1:24:21_, 1:25:1_, 1:57:5_, 1:71:5_, 1:72:8_, 1:84:5_, 1:93:4
difference [1]_ - 1:104:18
different [21]_ - 1:13:16_, 1:18:4_, 1:27:4_, 1:30:4_, 1:41:25_, 1:46:22_, 1:52:21_, 1:57:12_, 1:57:13_, 1:83:17_, 1:90:8_, 1:97:14_, 1:101:20_, 1:101:23_, 1:102:6_, 1:102:10_, 1:102:19_, 1:106:14_, 1:107:11_, 1:132:8
differentiate [1]_ - 1:49:10
differently [1]_ - 1:52:1
difficult [2]_ - 1:93:17_, 1:111:23
dignitaries [1]_ - 1:14:7
Dimaya [1]_ - 1:55:1
direct [3]_ - 1:14:9_, 1:42:17_, 1:117:1
directly [4]_ - 1:40:15_, 1:78:5_, 1:94:10
disagree [3]_ - 1:13:12_, 1:118:8_, 1:124:18
disappear [1]_ - 1:37:7
disclaim [1]_ - 1:107:9
disclose [2]_ - 1:131:21_, 1:131:23
disclosed [4]_ - 1:37:8_, 1:78:16_, 1:79:8_, 1:123:20
disclosure [1]_ - 1:56:4
disclosures [1]_ - 1:14:6
discoverable [2]_ - 1:37:10_, 1:38:1
discovered [1]_ - 1:62:25
discovery [9]_ - 1:35:2_, 1:36:19_, 1:36:21_, 1:37:9_, 1:37:21_, 1:38:6_, 1:38:25_, 1:62:6_, 1:63:5
discrete [1]_ - 1:75:4
discretion [10]_ - 1:32:8_, 1:32:13_, 1:69:12_, 1:88:8_, 1:91:21_, 1:95:23_, 1:96:9_, 1:96:20_, 1:140:4
discretionary [1]_ - 1:92:19
discuss [2]_ - 1:70:24_, 1:79:15
discussed [13]_ - 1:13:17_, 1:16:2_, 1:16:18_, 1:34:6_, 1:35:2_, 1:36:23_, 1:39:25_, 1:40:1_, 1:77:18_, 1:78:9_, 1:81:1_, 1:82:17_, 1:105:19
discusses [1]_ - 1:117:4
discussing [1]_ - 1:41:15
discussion [13]_ - 1:7:23_, 1:8:1_, 1:27:3_, 1:38:20_, 1:47:14_, 1:93:12_, 1:106:10_, 1:107:16_, 1:124:19_, 1:126:22_, 1:130:2_, 1:137:19_, 1:139:2
discussions [6]_ - 1:14:7_, 1:64:14_, 1:75:18_, 1:108:21_, 1:137:25
dismiss [11]_ - 1:4:10_, 1:4:13_, 1:6:18_, 1:85:10_, 1:86:15_, 1:87:10_, 1:88:2_, 1:92:20_, 1:100:23_, 1:104:6_, 1:106:25
dismissal [6]_ - 1:89:12_, 1:91:19_, 1:92:2_, 1:93:17_, 1:103:2_, 1:124:16
dismissed [5]_ - 1:6:25_, 1:22:12_, 1:86:20_, 1:93:13_, 1:112:13
dismissing [1]_ - 1:95:2
displacement [1]_ - 1:122:10
displaces [1]_ - 1:122:7
disposal [5]_ - 1:115:19_, 1:116:4_, 1:117:5_, 1:120:22
dispositive [1]_ - 1:19:6
dispute [9]_ - 1:9:7_, 1:20:22_, 1:71:8_, 1:74:17_, 1:87:24_, 1:88:3_, 1:94:12_, 1:94:13_, 1:94:15
disputed [2]_ - 1:8:2_, 1:14:3
disputes [2]_ - 1:9:23_, 1:32:3
dissent [1]_ - 1:35:6
distillation [1]_ - 1:49:6
distinct [1]_ - 1:7:14
distinction [1]_ - 1:78:22
District [1]_ - 1:10:12
district [5]_ - 1:116:13_, 1:117:24_, 1:118:1_, 1:119:20_, 1:131:11
disturb [1]_ - 1:126:14
divide [1]_ - 1:135:3
Division [1]_ - 1:73:3
docket [10]_ - 1:4:10_, 1:4:12_, 1:4:18_, 1:5:16_, 1:5:25_, 1:6:1_, 1:6:7_, 1:85:16_, 1:85:24_, 1:108:10
docketed [1]_ - 1:85:9
doctrine [5]_ - 1:14:25_, 1:28:15_, 1:80:18_, 1:129:15_, 1:129:21
document [23]_ - 1:7:9_, 1:11:2_, 1:11:6_, 1:11:12_, 1:11:14_, 1:11:19_, 1:29:24_, 1:30:24_, 1:34:17_, 1:35:5_, 1:36:25_, 1:37:16_, 1:44:5_, 1:81:14_, 1:88:23_, 1:89:9_, 1:97:13_, 1:97:14_, 1:99:13_, 1:102:8_, 1:102:9_, 1:118:6_, 1:128:2
Document [1]_ - 1:140:8
document-only [1]_ - 1:11:6
documentary [3]_ - 1:39:22_, 1:44:5_, 1:44:14
documentation [2]_ - 1:37:4_, 1:79:6
documented [1]_ - 1:39:9
Documents [1]_ - 1:111:2
documents [69]_ - 1:7:4_, 1:8:22_, 1:11:10_, 1:12:3_, 1:14:9_, 1:19:23_, 1:20:12_, 1:20:13_, 1:21:4_, 1:22:2_, 1:26:14_, 1:30:19_, 1:31:20_, 1:36:17_, 1:37:12_, 1:39:16_, 1:41:6_, 1:42:16_, 1:43:23_, 1:44:22_, 1:45:20_, 1:47:12_, 1:48:22_, 1:49:17_, 1:51:16_, 1:51:18_, 1:52:2_, 1:52:6_, 1:52:23_, 1:59:10_, 1:60:1_, 1:60:14_, 1:63:9_, 1:65:8_, 1:68:3_, 1:68:6_, 1:68:22_, 1:69:13_, 1:73:18_, 1:73:19_, 1:73:21_, 1:73:22_, 1:75:8_, 1:78:14_, 1:81:24_, 1:84:12_, 1:87:16_, 1:88:20_, 1:89:22_, 1:92:11_, 1:93:25_, 1:111:7_, 1:111:12_, 1:112:17_, 1:112:25_, 1:113:8_, 1:113:9_, 1:113:19_, 1:114:4_, 1:117:22_, 1:119:7_, 1:120:23_, 1:122:13_, 1:122:21_, 1:123:2_, 1:125:18_, 1:136:22_, 1:138:12
documents-only [1]_ - 1:26:14
DOE [1]_ - 1:52:20
DOJ [10]_ - 1:13:15_, 1:13:20_, 1:80:17_, 1:81:10_, 1:81:13_, 1:102:25_, 1:122:15_, 1:124:5_, 1:132:7_, 1:139:23
domain [1]_ - 1:130:1
Donald [1]_ - 1:3:5
donate [3]_ - 1:96:22_, 1:139:16_, 1:140:4
done [18]_ - 1:14:12_, 1:23:6_, 1:27:13_, 1:42:25_, 1:47:8_, 1:55:4_, 1:61:17_, 1:84:10_, 1:94:3_, 1:103:8_, 1:103:12_, 1:103:19_, 1:103:24_, 1:105:18_, 1:109:5_, 1:135:12_, 1:135:13
Donnie [1]_ - 1:3:21
double [1]_ - 1:71:11
double-check [1]_ - 1:71:11
doubt [1]_ - 1:47:16

down [3] - 1:61:4, 1:103:10, 1:117:17
draft [3] - 1:63:24, 1:110:17, 1:110:19
drafts [1] - 1:63:21
drags [1] - 1:34:8
draw [4] - 1:8:15, 1:61:23, 1:128:18, 1:138:10
drawer [1] - 1:108:15
drawing [1] - 1:87:15
drawn [2] - 1:113:19, 1:126:9
drilling [1] - 1:61:4
drop [1] - 1:58:20
drops [1] - 1:58:18
drugs [1] - 1:103:16
due [4] - 1:54:12, 1:66:7, 1:67:18, 1:69:17
duelling [1] - 1:115:9
during [11] - 1:9:6, 1:52:23, 1:59:4, 1:59:23, 1:65:4, 1:88:13, 1:92:15, 1:115:21, 1:116:4, 1:133:10
duties [2] - 1:44:12, 1:44:18
duty [1] - 1:27:15

E

early [2] - 1:22:21, 1:86:21
easy [1] - 1:87:8
ECF [2] - 1:42:18, 1:139:22
editorial [1] - 1:99:3
EDVA [2] - 1:26:9, 1:77:17
effect [2] - 1:44:11, 1:44:16
effectively [5] - 1:59:19, 1:68:24, 1:97:4, 1:121:22, 1:122:2
effort [2] - 1:110:5, 1:135:8
efforts [1] - 1:30:25
Egan [3] - 1:32:10, 1:32:11, 1:32:21
either [11] - 1:4:22, 1:5:2, 1:8:20, 1:41:16, 1:64:9, 1:78:23, 1:86:25, 1:92:16, 1:92:17, 1:94:14, 1:94:19
elaborate [1] - 1:132:10
elaborated [1] - 1:132:1
elect [1] - 1:39:6
elected [1] - 1:16:22
electronic [1] - 1:3:25
element [14] - 1:25:14, 1:26:12, 1:26:22, 1:27:5, 1:28:1, 1:35:1, 1:36:1, 1:36:6, 1:36:8, 1:41:10, 1:52:12, 1:61:25, 1:64:1, 1:91:22
elements [10] - 1:19:22, 1:26:6, 1:40:8, 1:40:11, 1:42:9, 1:48:3, 1:67:20, 1:73:12, 1:81:17, 1:93:6
elephant [1] - 1:112:16
eligibility [1] - 1:78:13
eliminates [3] - 1:83:21, 1:92:1
eliminating [1] - 1:92:5
emails [2] - 1:40:4, 1:63:21
emergency [1] - 1:4:2
emerges [1] - 1:25:23
Emil [1] - 1:3:14
emphasis [1] - 1:17:16
emphasize [1] - 1:20:21
emphasizing [2] - 1:77:23, 1:77:24
employee [3] - 1:11:3, 1:11:21, 1:11:25
employees [3] - 1:53:13, 1:60:17, 1:60:21
employment [1] - 1:60:10
employs [1] - 1:131:10
empower [1] - 1:72:12
en [2] - 1:131:8, 1:131:19
enacting [2] - 1:121:17, 1:137:8
enactment [1] - 1:74:21
encompasses [1] - 1:117:6
encourage [1] - 1:139:14
end [5] - 1:52:25, 1:53:12, 1:59:22, 1:104:1, 1:110:3
endeavors [1] - 1:70:14
ended [6] - 1:20:1, 1:21:4, 1:30:2, 1:59:9, 1:76:16, 1:134:15
endorse [4] - 1:72:12, 1:138:14, 1:138:15, 1:138:17
endorses [1] - 1:138:11
ends [6] - 1:22:1, 1:28:24, 1:51:14, 1:59:19, 1:59:22, 1:60:10
Energy [10] - 1:36:24, 1:37:22, 1:62:21, 1:63:4, 1:63:7, 1:63:11, 1:63:14, 1:63:17, 1:63:23, 1:84:18
enforcement [22] - 1:12:9, 1:14:22, 1:14:25, 1:15:8, 1:18:18, 1:21:20, 1:30:8, 1:34:4, 1:34:15, 1:66:24, 1:67:1, 1:67:7, 1:67:10, 1:67:18, 1:67:22, 1:68:15, 1:69:10, 1:75:10, 1:111:10, 1:111:12, 1:115:3, 1:122:14
engage [1] - 1:137:24
engaged [1] - 1:93:12
enjoy [1] - 1:85:4
ensure [2] - 1:124:2, 1:132:3
ensures [1] - 1:56:5
entire [4] - 1:49:1, 1:54:12, 1:99:14, 1:99:15
entirely [4] - 1:54:12, 1:68:17, 1:114:16, 1:132:8
entitled [31] - 1:11:4, 1:11:16, 1:11:21, 1:12:1, 1:12:11, 1:12:13, 1:12:19, 1:13:7, 1:14:19, 1:15:9, 1:15:20, 1:19:8, 1:33:11, 1:38:1, 1:41:2, 1:50:14, 1:50:16, 1:51:1, 1:51:4, 1:51:7, 1:51:9, 1:52:8, 1:52:10, 1:57:17, 1:58:14, 1:59:2, 1:70:22, 1:71:25, 1:75:15, 1:99:18, 1:135:11
entitled-to-receive [1] - 1:51:4
entitlement [1] - 1:12:16
Entitlement [4] - 1:6:21, 1:11:17, 1:19:14, 1:75:5
entity [1] - 1:102:21
entry [7] - 1:4:10, 1:4:13, 1:4:18, 1:5:16, 1:5:25, 1:6:1, 1:6:7
equal [1] - 1:95:10
equally [1] - 1:14:21
equals [1] - 1:136:23
equated [1] - 1:131:20
equivalency [1] - 1:125:23
erased [1] - 1:115:20
especially [3] - 1:14:3, 1:37:18, 1:83:16
Espionage [16] - 1:16:23, 1:32:20, 1:81:17, 1:82:21, 1:89:14, 1:89:17, 1:92:1, 1:94:22, 1:95:20, 1:109:14, 1:109:16, 1:109:24, 1:126:25, 1:134:24, 1:137:16, 1:138:3
essentially [10] - 1:7:21, 1:36:12, 1:56:10, 1:62:22, 1:63:23, 1:91:24, 1:97:2, 1:114:20, 1:114:24, 1:115:1
establish [1] - 1:22:14
established [2] - 1:26:3, 1:124:2
establishes [1] - 1:83:7
estopped [3] - 1:13:15, 1:132:17, 1:133:17
estoppel [9] - 1:129:19, 1:130:4, 1:130:9, 1:130:11, 1:130:22, 1:131:7, 1:131:11, 1:132:3, 1:133:25
evaluate [1] - 1:114:21
events [1] - 1:81:7
evidence [9] - 1:9:24, 1:17:18, 1:39:18, 1:39:22, 1:40:13, 1:48:17, 1:70:18, 1:114:4
evident [1] - 1:36:11
Ex [1] - 1:99:19
ex [1] - 1:100:3
ex-president's [1] - 1:100:3
Ex-Presidents [1] - 1:99:19
exact [3] - 1:43:11, 1:120:2, 1:132:24
exactly [16] - 1:15:8, 1:27:19, 1:38:6, 1:73:20, 1:92:13, 1:93:7, 1:95:4, 1:96:23, 1:99:2, 1:100:2, 1:103:7, 1:103:10, 1:104:19, 1:109:6, 1:133:21, 1:135:18
examine [1] - 1:37:17
example [20] - 1:32:5, 1:34:16, 1:39:16, 1:46:10

_, 1:60:17_, 1:61:10_, 1:61:17_, 1:66:8_, 1:74:11_, 1:87:8_, 1:87:9_, 1:87:11_, 1:104:9_, 1:107:25_, 1:116:18_, 1:116:20_, 1:118:12_, 1:128:8_, 1:133:3_, 1:134:25
examples [3]_ - 1:31:9_, 1:32:15_, 1:103:14
exceeded [1]_ - 1:60:18
exceeding [1]_ - 1:61:11
except [5]_ - 1:17:14_, 1:84:10_, 1:88:12_, 1:100:1
exceptions [1]_ - 1:88:19
exclude [1]_ - 1:127:12
excluded [1]_ - 1:127:15
excludes [1]_ - 1:19:4
exclusion [1]_ - 1:92:9
excuse [5]_ - 1:6:11_, 1:27:13_, 1:55:14_, 1:105:15_, 1:114:24
executed [1]_ - 1:121:3
Executive [63]_ - 1:12:22_, 1:12:23_, 1:14:15_, 1:15:5_, 1:15:11_, 1:15:17_, 1:15:21_, 1:16:6_, 1:17:22_, 1:18:1_, 1:18:13_, 1:18:23_, 1:19:2_, 1:19:3_, 1:24:6_, 1:24:9_, 1:25:2_, 1:32:2_, 1:32:22_, 1:33:17_, 1:33:21_, 1:33:22_, 1:33:25_, 1:34:9_, 1:34:18_, 1:38:23_, 1:40:21_, 1:41:1_, 1:41:9_, 1:41:11_, 1:44:8_, 1:50:9_, 1:50:11_, 1:50:14_, 1:52:15_, 1:53:6_, 1:53:14_, 1:53:17_, 1:53:19_, 1:54:1_, 1:54:8_, 1:54:11_, 1:54:18_, 1:55:7_, 1:56:18_, 1:58:14_, 1:61:15_, 1:70:21_, 1:70:25_, 1:72:1_, 1:76:4_, 1:76:25_, 1:78:8_, 1:78:24_, 1:79:3_, 1:80:14_, 1:93:3_, 1:121:4_, 1:126:3_, 1:126:24_, 1:127:10_, 1:138:6
executive [17]_ - 1:7:8_, 1:31:18_, 1:31:24_, 1:32:4_, 1:32:8_, 1:45:23_, 1:65:19_, 1:66:11_, 1:69:6_, 1:78:19_, 1:89:3_, 1:92:12_, 1:117:17_, 1:121:6_, 1:121:13_, 1:121:15_, 1:121:24
executive's [2]_ - 1:32:13_, 1:122:8
executives [1]_ - 1:66:4
exemption [1]_ - 1:126:19
exercise [1]_ - 1:7:3
exercises [1]_ - 1:129:3
Exhibit [1]_ - 1:132:20
exist [6]_ - 1:24:3_, 1:66:19_, 1:78:19_, 1:78:21_, 1:78:22_, 1:127:7
existed [2]_ - 1:62:25_, 1:92:8
existence [3]_ - 1:92:12_, 1:118:24_, 1:122:7
existing [2]_ - 1:34:19_, 1:117:3
exists [2]_ - 1:106:18_, 1:117:19
expect [2]_ - 1:69:15_, 1:115:2
experience [2]_ - 1:10:10_, 1:10:11
expiration [1]_ - 1:20:15
explain [3]_ - 1:28:18_, 1:114:16_, 1:130:21
explained [2]_ - 1:78:18_, 1:132:23
explains [1]_ - 1:124:9
explication [1]_ - 1:54:20
explicit [2]_ - 1:12:25_, 1:16:5
explicitly [2]_ - 1:15:10_, 1:16:20
exposed [1]_ - 1:45:24
exposition [1]_ - 1:130:13
express [2]_ - 1:53:14_, 1:91:5
expressly [1]_ - 1:19:1
extensive [1]_ - 1:108:21
extent [15]_ - 1:12:24_, 1:13:2_, 1:14:10_, 1:14:21_, 1:19:10_, 1:22:21_, 1:29:3_, 1:37:14_, 1:37:15_, 1:77:25_, 1:78:22_, 1:80:25_, 1:82:21_, 1:84:10_, 1:127:7
extra [2]_ - 1:64:3_, 1:82:2
extraordinary [3]_ - 1:77:2_, 1:91:5_, 1:105:23
extras [1]_ - 1:70:4
extremely [2]_ - 1:18:15_, 1:27:7

## F

F.2d [2]_ - 1:32:6_, 1:115:25
F.3d [2]_ - 1:117:2_, 1:131:9
F.Supp [1]_ - 1:91:7
face [3]_ - 1:82:4_, 1:87:20_, 1:134:17
faced [4]_ - 1:15:19_, 1:45:24_, 1:61:18
faces [1]_ - 1:17:8
facilities [7]_ - 1:38:22_, 1:38:24_, 1:39:4_, 1:39:5_, 1:39:22_, 1:40:7_, 1:40:22
facility [1]_ - 1:40:10
facing [2]_ - 1:17:7_, 1:65:20
fact [43]_ - 1:5:6_, 1:7:18_, 1:9:13_, 1:9:23_, 1:10:18_, 1:10:19_, 1:15:8_, 1:27:3_, 1:27:6_, 1:36:1_, 1:43:11_, 1:45:3_, 1:50:13_, 1:53:9_, 1:53:16_, 1:63:4_, 1:69:23_, 1:75:14_, 1:76:1_, 1:77:24_, 1:86:22_, 1:87:2_, 1:87:22_, 1:89:21_, 1:92:25_, 1:95:15_, 1:95:25_, 1:102:15_, 1:103:24_, 1:113:5_, 1:113:9_, 1:114:1_, 1:114:4_, 1:124:24_, 1:127:25_, 1:129:1_, 1:131:18_, 1:132:13_, 1:134:21_, 1:138:7_, 1:138:14_, 1:138:21_, 1:138:24
factor [4]_ - 1:66:13_, 1:67:25_, 1:81:5_, 1:81:18
factors [4]_ - 1:66:14_, 1:68:9_, 1:100:23_, 1:132:11
facts [25]_ - 1:7:11_, 1:7:22_, 1:8:2_, 1:9:11_, 1:10:1_, 1:10:7_, 1:10:15_, 1:20:9_, 1:27:23_, 1:42:4_, 1:47:19_, 1:51:19_, 1:58:7_, 1:58:10_, 1:69:2_, 1:75:7_, 1:101:20_, 1:102:13_, 1:106:15_, 1:106:16_, 1:107:24_, 1:113:6_, 1:113:14_, 1:130:25_, 1:132:2
factual [10]_ - 1:8:24_, 1:9:3_, 1:9:4_, 1:9:7_, 1:9:20_, 1:13:9_, 1:30:9_, 1:36:3_, 1:60:21_, 1:87:16
factually [3]_ - 1:63:1_, 1:63:3_, 1:84:11
fail [1]_ - 1:42:2
failed [2]_ - 1:51:5_, 1:51:8
fails [3]_ - 1:11:3_, 1:11:20_, 1:87:13
failure [10]_ - 1:12:6_, 1:48:15_, 1:52:13_, 1:58:17_, 1:58:24_, 1:60:4_, 1:131:21_, 1:131:23_, 1:136:22
failures [1]_ - 1:16:15
fair [19]_ - 1:10:16_, 1:12:8_, 1:28:15_, 1:28:18_, 1:30:6_, 1:35:9_, 1:45:16_, 1:53:10_, 1:67:2_, 1:67:16_, 1:75:10_, 1:81:9_, 1:81:11_, 1:83:6_, 1:103:3_, 1:109:9_, 1:113:17_, 1:113:24_, 1:126:4
fairly [1]_ - 1:129:25
faith [4]_ - 1:28:7_, 1:28:12_, 1:64:3_, 1:115:3
false [1]_ - 1:48:16
falters [1]_ - 1:92:3
familiar [4]_ - 1:59:20_, 1:60:6_, 1:61:5_, 1:130:24
far [8]_ - 1:17:14_, 1:37:25_, 1:49:24_, 1:79:7_, 1:100:14_, 1:118:17_, 1:129:1_, 1:137:18
fashion [5]_ - 1:81:13_, 1:83:11_, 1:115:9_, 1:117:16_, 1:118:20
fast [1]_ - 1:125:11
fatal [2]_ - 1:86:19_, 1:114:5
favorable [4]_ - 1:37:11_, 1:78:12_, 1:81:22_, 1:115:13
favorably [1]_ - 1:81:2
FBI [1]_ - 1:51:20
features [2]_ - 1:82:22_, 1:91:19
featuring [1]_ - 1:67:10
February [1]_ - 1:62:9
federal [1]_ - 1:105:12
felon [1]_ - 1:87:9
few [4]_ - 1:34:5_, 1:63:15_, 1:75:4_, 1:115:17
fiat [1]_ - 1:44:20
Fifth [4]_ - 1:54:12_, 1:66:7_, 1:67:14_, 1:69:17
fight [2]_ - 1:35:15_, 1:103:16
Figure [1]_ - 1:43:5
figure [2]_ - 1:43:5_, 1:53:25
file [4]_ - 1:5:4_, 1:84:20_, 1:122:25
filed [11]_ - 1:4:11_, 1:4:14_, 1:5:10_, 1:5:22_, 1:5:25_, 1:6:1_, 1:85:11_, 1:108:9_, 1:111:7_, 1:123:5_, 1:123:10

filing [3] - 1:35:3, 1:138:18, 1:139:23
filings [2] - 1:35:2, 1:139:2
fill [1] - 1:41:2
final [2] - 1:133:21, 1:134:10
finally [1] - 1:19:5
fine [3] - 1:100:9, 1:125:24, 1:137:9
fine-line [1] - 1:137:9
firm [1] - 1:101:15
first [27] - 1:4:10, 1:6:9, 1:6:10, 1:6:13, 1:7:3, 1:8:3, 1:9:2, 1:16:15, 1:30:22, 1:32:1, 1:37:24, 1:52:17, 1:62:5, 1:74:22, 1:84:4, 1:94:8, 1:98:5, 1:102:18, 1:112:15, 1:115:17, 1:116:10, 1:116:25, 1:119:5, 1:121:8, 1:121:18, 1:125:25, 1:133:4
first-ever [1] - 1:84:4
fit [6] - 1:73:12, 1:88:14, 1:130:18, 1:136:14, 1:139:7
fits [3] - 1:73:13, 1:73:14, 1:84:7
flagging [1] - 1:114:10
flawed [1] - 1:104:12
flesh [1] - 1:50:2
flips [1] - 1:75:9
focus [2] - 1:51:6, 1:93:8
focused [2] - 1:28:17, 1:93:6
FOIA [5] - 1:97:12, 1:102:10, 1:111:7, 1:111:8, 1:111:12
folks [2] - 1:14:11, 1:107:3
follow [4] - 1:17:9, 1:108:24, 1:112:1, 1:117:24
follow-up [1] - 1:108:24
follow-ups [1] - 1:112:1
followed [2] - 1:115:2, 1:130:12
following [3] - 1:22:3, 1:77:17, 1:103:3
footnote [5] - 1:51:2, 1:124:8, 1:124:21, 1:139:19, 1:140:7
forbids [2] - 1:27:15, 1:27:17
forbids.. [1] - 1:49:21
force [3] - 1:93:15, 1:95:10, 1:120:10
forceful [1] - 1:91:17
Ford [2] - 1:25:21, 1:66:8
foreclosed [1] - 1:102:25
foreign [4] - 1:14:7, 1:26:4, 1:108:20, 1:112:8
foresee [3] - 1:57:2, 1:65:19, 1:69:7
foreseeability [2] - 1:66:9, 1:68:14
foreseeable [1] - 1:69:14
foreshadowed [1] - 1:36:9
forever [1] - 1:83:7
forget [1] - 1:71:13
form [7] - 1:88:1, 1:91:20, 1:109:9, 1:124:12, 1:124:17, 1:125:1
formal [5] - 1:29:4, 1:29:7, 1:29:11, 1:62:3, 1:79:6
format [1] - 1:109:10
formed [1] - 1:50:11
former [61] - 1:10:11, 1:12:10, 1:20:4, 1:20:14, 1:28:19, 1:29:25, 1:30:12, 1:31:1, 1:33:9, 1:33:22, 1:37:20, 1:41:24, 1:42:13, 1:42:16, 1:42:20, 1:42:22, 1:43:19, 1:45:23, 1:46:10, 1:46:14, 1:47:11, 1:47:12, 1:47:17, 1:49:17, 1:51:18, 1:52:2, 1:53:7, 1:53:11, 1:56:7, 1:56:9, 1:56:10, 1:56:22, 1:57:14, 1:62:10, 1:64:24, 1:65:18, 1:66:11, 1:66:16, 1:67:15, 1:69:22, 1:73:21, 1:74:12, 1:75:22, 1:76:21, 1:80:9, 1:80:13, 1:85:11, 1:89:21, 1:93:22, 1:98:25, 1:99:24, 1:101:13, 1:105:21, 1:118:6, 1:118:18, 1:119:16, 1:120:14, 1:126:19, 1:137:20, 1:138:20
Former [9] - 1:4:12, 1:4:14, 1:46:5, 1:47:18, 1:55:17, 1:65:9, 1:74:16, 1:80:23, 1:94:20
formulated [1] - 1:73:20
Fort [1] - 1:3:24
forth [5] - 1:12:21, 1:50:19, 1:62:9, 1:85:15, 1:126:8
fortiori [1] - 1:119:16
forum [1] - 1:106:21
forward [6] - 1:33:2, 1:39:12, 1:105:7, 1:114:5, 1:121:21, 1:136:7
four [5] - 1:6:25, 1:7:14, 1:25:20, 1:29:24
fourth [1] - 1:7:8
framework [1] - 1:126:14
frequently [1] - 1:133:10
friend [1] - 1:50:23
friends [1] - 1:113:3
front [6] - 1:39:15, 1:61:20, 1:64:12, 1:73:7, 1:110:17, 1:111:25
full [1] - 1:70:4
fully [2] - 1:5:14, 1:48:15
function [6] - 1:44:9, 1:79:21, 1:80:5, 1:92:19, 1:121:6, 1:127:10
fund [1] - 1:32:16
fundamental [1] - 1:10:16
future [1] - 1:57:23

## G

gallery [1] - 1:4:4
geared [1] - 1:65:6
gee [1] - 1:84:24
General [3] - 1:105:1, 1:118:15, 1:122:24
general [5] - 1:28:12, 1:50:4, 1:50:5, 1:78:11, 1:116:1
generally [2] - 1:5:17, 1:12:7
George [1] - 1:88:7
ghost [1] - 1:42:23
Giglio [2] - 1:38:15, 1:38:19
girlfriends [1] - 1:50:24
given [13] - 1:8:1, 1:22:3, 1:42:25, 1:58:7, 1:62:18, 1:64:17, 1:68:11, 1:69:14, 1:100:22, 1:101:2, 1:110:10, 1:111:15, 1:133:23
glib [1] - 1:124:22
gloss [7] - 1:15:21, 1:17:9, 1:28:6, 1:54:21, 1:70:10, 1:83:2, 1:83:4
glosses [8] - 1:54:22, 1:66:20, 1:70:2, 1:72:16, 1:77:4, 1:82:7, 1:82:16, 1:82:24
Gorin [15] - 1:16:25, 1:17:19, 1:25:19, 1:25:24, 1:26:17, 1:26:20, 1:26:22, 1:27:4, 1:35:19, 1:36:9, 1:54:17, 1:70:10, 1:70:19, 1:81:19, 1:83:16
Gorsuch [1] - 1:55:2
govern [3] - 1:33:19, 1:117:18, 1:123:17
governed [1] - 1:19:12
governing [3] - 1:14:16, 1:18:5, 1:126:14
Government [2] - 1:12:11, 1:55:17
government [32] - 1:21:20, 1:22:13, 1:24:2, 1:26:3, 1:29:10, 1:29:19, 1:30:2, 1:35:7, 1:37:20, 1:39:17, 1:47:11, 1:53:12, 1:53:13, 1:60:17, 1:60:20, 1:70:14, 1:75:6, 1:78:16, 1:78:23, 1:79:13, 1:79:15, 1:79:21, 1:80:1, 1:80:5, 1:80:10, 1:80:21, 1:90:7, 1:90:18, 1:92:22, 1:95:12, 1:113:7
government's [6] - 1:24:13, 1:32:10, 1:36:11, 1:58:13, 1:76:13, 1:134:17
governs [3] - 1:19:12, 1:29:9, 1:123:17
grand [5] - 1:22:3, 1:48:15, 1:51:20, 1:51:21, 1:135:6
grant [5] - 1:5:5, 1:77:10, 1:100:22, 1:107:17, 1:119:22
granted [8] - 1:8:12, 1:55:21, 1:55:25, 1:56:7, 1:59:23, 1:72:10, 1:72:14, 1:79:4
great [2] - 1:71:23, 1:79:16
greater [1] - 1:68:18
ground [3] - 1:3:24, 1:129:15, 1:129:24
grounds [1] - 1:35:25
guarantee [1] - 1:127:17

guarded [1]_ - 1:121:8
guards [1]_ - 1:67:21
guess [12]_ - 1:19:18_, 1:21:23_, 1:37:3_, 1:46:10_, 1:46:16_, 1:57:24_, 1:62:1_, 1:69:5_, 1:70:6_, 1:107:19_, 1:110:3_, 1:114:21
guide [2]_ - 1:67:20_, 1:131:11
guideline [3]_ - 1:117:13_, 1:121:21
guidelines [7]_ - 1:97:9_, 1:97:12_, 1:116:24_, 1:117:8_, 1:117:17_, 1:118:7_, 1:118:8
guilt [1]_ - 1:113:17
guilty [1]_ - 1:33:20
gut [3]_ - 1:97:4_, 1:114:16_, 1:122:3
guys [1]_ - 1:123:2

H

half [2]_ - 1:5:8_, 1:101:8
Hand [2]_ - 1:17:1_, 1:36:10
hand [4]_ - 1:54:16_, 1:54:17_, 1:121:3_, 1:121:4
handle [1]_ - 1:40:19
handled [4]_ - 1:90:4_, 1:98:21_, 1:98:22
handling [4]_ - 1:39:14_, 1:39:20_, 1:43:15_, 1:126:15
hands [2]_ - 1:133:8_, 1:133:14
happy [3]_ - 1:115:5_, 1:125:19_, 1:129:21
HARBACH [33]_ - 1:111:21_, 1:111:23_, 1:113:23_, 1:114:23_, 1:115:4_, 1:115:8_, 1:116:8_, 1:117:14, 1:118:4_, 1:118:10_, 1:118:19_, 1:118:23_, 1:119:10_, 1:120:4_, 1:120:16_, 1:122:9_, 1:123:15_, 1:124:18_, 1:125:5_, 1:125:12_, 1:125:14_, 1:125:22_, 1:125:25_, 1:127:22_, 1:128:19_, 1:129:6_, 1:130:7_, 1:130:23_, 1:131:2_, 1:131:4_, 1:131:6_, 1:134:3_, 1:134:6
Harbach [7]_ - 1:3:10_, 1:41:16_, 1:43:15_, 1:74:5_, 1:111:20_, 1:126:5_, 1:140:19
hard [3]_ - 1:35:12_, 1:58:5_, 1:108:21
harder [1]_ - 1:47:10
harm [8]_ - 1:72:20_, 1:73:10_, 1:73:11_, 1:73:18_, 1:73:19_, 1:73:23_, 1:74:2_, 1:82:10
harmonize [1]_ - 1:127:6
harmony [1]_ - 1:127:8
head [4]_ - 1:34:21_, 1:55:25_, 1:75:9_, 1:124:12
heads [2]_ - 1:32:2_, 1:124:2
hear [9]_ - 1:6:8_, 1:6:12_, 1:34:24_, 1:41:16_, 1:74:25_, 1:85:9_, 1:111:20_, 1:131:3_, 1:134:10
heard [4]_ - 1:63:14_, 1:77:19_, 1:113:7_, 1:113:8
hearing [4]_ - 1:4:5_, 1:4:9_, 1:5:24_, 1:58:21
heavy [1]_ - 1:17:16
heightened [1]_ - 1:64:7
Heine [5]_ - 1:17:1_, 1:36:10_, 1:70:11_, 1:77:16_, 1:81:19
held [8]_ - 1:35:18_, 1:36:7_, 1:54:16_, 1:70:3_, 1:70:13_, 1:71:23_, 1:77:21_, 1:138:22
help [3]_ - 1:34:12_, 1:34:13_, 1:122:24
helpful [6]_ - 1:45:13_, 1:61:13_, 1:81:15_, 1:95:11_, 1:115:15_, 1:129:12
hence [1]_ - 1:21:4
herring [2]_ - 1:135:22_, 1:135:24
herself [1]_ - 1:65:10
hid [1]_ - 1:108:1
high [1]_ - 1:66:1
high-ranking [1]_ - 1:66:1
highly [1]_ - 1:112:7
Hillary [1]_ - 1:80:23
hinge [1]_ - 1:98:17
hinges [1]_ - 1:138:8
Historical [3]_ - 1:55:17_, 1:101:17_, 1:106:3
historical [1]_ - 1:46:10
historically [3]_ - 1:55:4_, 1:66:12_, 1:81:10
history [5]_ - 1:16:9_, 1:21:15_, 1:31:7_, 1:48:13_, 1:77:10
hit [2]_ - 1:34:5_, 1:129:15
hits [1]_ - 1:129:23
Hitselberger [2]_ - 1:10:12_, 1:68:5
hold [2]_ - 1:117:21_, 1:125:10
holding [4]_ - 1:18:16_, 1:77:16_, 1:107:23_, 1:120:3
holds [1]_ - 1:119:21
home [6]_ - 1:14:17_, 1:60:12_, 1:60:13_, 1:60:24_, 1:61:1_, 1:102:14
honest [1]_ - 1:115:8
honestly [1]_ - 1:135:17
Honor [68]_ - 1:3:9_, 1:3:12_, 1:3:16_, 1:3:20_, 1:4:17_, 1:4:21_, 1:5:3_, 1:5:11_, 1:5:19_, 1:7:5_, 1:7:13_, 1:18:7_, 1:21:15_, 1:35:15_, 1:41:18_, 1:44:1_, 1:45:15_, 1:52:18_, 1:53:5_, 1:55:14_, 1:56:20_, 1:57:18_, 1:73:7_, 1:74:9_, 1:77:19_, 1:80:1_, 1:80:7_, 1:85:14_, 1:85:22_, 1:86:11_, 1:92:21_, 1:94:25_, 1:96:2_, 1:97:25_, 1:99:5_, 1:100:20_, 1:101:4_, 1:105:10_, 1:106:20_, 1:109:4_, 1:110:23_, 1:111:5_, 1:111:17_, 1:111:21_, 1:111:22_, 1:112:1_, 1:112:5_, 1:113:3_, 1:114:14_, 1:115:11_, 1:116:23_, 1:117:1_, 1:123:8_, 1:126:22_, 1:127:4_, 1:127:23_, 1:130:24_, 1:133:4_, 1:133:6_, 1:133:16_, 1:134:7_, 1:134:14_, 1:135:23_, 1:136:9_, 1:139:20_, 1:140:8_, 1:140:11_, 1:140:20
honor [1]_ - 1:115:2
Honor's [3]_ - 1:20:8_, 1:37:11_, 1:113:23
hook [1]_ - 1:24:5
hope [3]_ - 1:82:9_, 1:96:21_, 1:139:5
hoped [1]_ - 1:139:14
hopefully [4]_ - 1:129:9_, 1:129:13_, 1:134:11_, 1:135:13
horn [1]_ - 1:116:19
hour [1]_ - 1:85:2
House [15]_ - 1:8:5_, 1:9:9_, 1:22:9_, 1:22:17_, 1:39:24_, 1:52:6_, 1:71:13_, 1:72:8_, 1:88:8_, 1:88:10_, 1:92:15_, 1:98:8_, 1:113:12_, 1:116:20_, 1:117:18
house [1]_ - 1:91:13
hung [1]_ - 1:26:24
Hung [1]_ - 1:25:20
Hur [8]_ - 1:21:17_, 1:47:13_, 1:47:14_, 1:100:12_, 1:100:14_, 1:100:17_, 1:132:14_, 1:132:24
hypo [1]_ - 1:105:9
hypothetical [2]_ - 1:20:21_, 1:121:20
hypothetically [2]_ - 1:19:18_, 1:57:16

I

idea [7]_ - 1:32:7_, 1:91:1_, 1:91:9_, 1:111:14_, 1:122:12_, 1:128:2_, 1:129:14
identify [1]_ - 1:12:7
IG [2]_ - 1:105:2_, 1:105:5
ignore [1]_ - 1:75:7
ignored [2]_ - 1:19:5_, 1:19:6
II [5]_ - 1:115:10_, 1:116:8_, 1:116:23_, 1:120:21_, 1:121:11
III [3]_ - 1:17:6_, 1:25:6_, 1:82:17
illegal [8]_ - 1:43:19_, 1:49:18_, 1:49:19_, 1:50:5_, 1:50:7_, 1:50:8_, 1:54:7_, 1:65:2
illustrate [1]_ - 1:130:17
imagine [1]_ - 1:108:22
imbue [1]_ - 1:126:18
immediate [1]_ - 1:44:7
immediately [1]_ - 1:123:21
immunity [1]_ - 1:7:9
impact [2]_ - 1:33:8_, 1:125:17
impermissible [1]_ - 1:103:9
impermissibly [1]_ - 1:34:1
implicated [1]_ - 1:105:8
implicates [1]_ - 1:125:5
implicit [1]_ - 1:127:12

implicitly [1] - 1:89:14
implied [1] - 1:122:6
imply [1] - 1:122:14
import [2] - 1:125:17, 1:128:14
importance [1] - 1:45:5
important [15] - 1:15:1, 1:16:8, 1:24:19, 1:28:14, 1:31:2, 1:34:6, 1:48:11, 1:67:24, 1:68:4, 1:68:9, 1:86:14, 1:116:22, 1:121:6, 1:127:22, 1:134:22
imposed [1] - 1:82:16
impossible [1] - 1:119:14
improperly [1] - 1:121:16
impute [2] - 1:24:3, 1:131:23
imputed [1] - 1:54:5
inappropriate [1] - 1:24:16
inauguration [1] - 1:39:7
incarnation [1] - 1:121:5
inclined [1] - 1:82:7
include [7] - 1:19:1, 1:23:23, 1:24:20, 1:24:22, 1:32:15, 1:33:6, 1:80:8
included [2] - 1:64:11, 1:108:19
includes [2] - 1:128:1, 1:132:5
including [3] - 1:5:18, 1:110:10, 1:129:3
incoming [1] - 1:76:8
incompatibility [1] - 1:93:21
inconsistencies [1] - 1:110:2
inconsistent [7] - 1:29:4, 1:75:20, 1:78:2, 1:79:10, 1:80:19, 1:131:12, 1:131:13
incorporate [2] - 1:15:10, 1:50:13
incorporated [1] - 1:83:18
incorporates [1] - 1:80:15
incorporating [1] - 1:34:9
incorrect [2] - 1:15:25, 1:52:11
inculpatory [1] - 1:84:25
independent [1] - 1:21:14
indicated [2] - 1:3:24, 1:38:18
indicates [1] - 1:129:2
indicating [1] - 1:81:12
indication [2] - 1:38:9, 1:97:8
indict [1] - 1:95:22
indictment [78] - 1:4:11, 1:7:12, 1:7:19, 1:8:4, 1:8:6, 1:8:15, 1:8:21, 1:9:18, 1:10:7, 1:10:15, 1:12:5, 1:12:6, 1:13:11, 1:19:16, 1:19:20, 1:20:25, 1:21:7, 1:21:10, 1:21:25, 1:22:5, 1:29:18, 1:29:23, 1:30:3, 1:30:11, 1:36:24, 1:37:5, 1:37:20, 1:40:9, 1:41:1, 1:42:4, 1:42:15, 1:42:18, 1:45:17, 1:46:12, 1:46:18, 1:47:2, 1:48:11, 1:58:22, 1:59:13, 1:63:1, 1:63:12, 1:64:25, 1:65:16, 1:67:15, 1:68:1, 1:68:3, 1:69:1, 1:75:21, 1:76:19, 1:80:8, 1:84:19, 1:86:19, 1:87:4, 1:87:5, 1:87:7, 1:87:8, 1:87:10, 1:87:12, 1:87:21, 1:88:2, 1:89:12, 1:89:19, 1:90:2, 1:91:19, 1:93:13, 1:93:18, 1:95:2, 1:101:7, 1:103:2, 1:104:14, 1:112:12, 1:112:17, 1:112:24, 1:112:25, 1:136:1, 1:138:9, 1:138:11
individual [3] - 1:12:2, 1:12:7, 1:44:8
individually [1] - 1:6:6
individuals [3] - 1:55:21, 1:60:9, 1:62:11
infer [2] - 1:126:13, 1:126:17
inference [8] - 1:8:9, 1:8:12, 1:8:14, 1:112:23, 1:113:1, 1:113:19, 1:126:9, 1:138:10
infirm [1] - 1:15:4
information [59] - 1:14:1, 1:14:4, 1:14:5, 1:14:14, 1:14:16, 1:35:10, 1:36:3, 1:36:14, 1:38:17, 1:39:9, 1:39:14, 1:40:19, 1:41:12, 1:45:1, 1:45:4, 1:47:7, 1:48:2, 1:48:9, 1:50:22, 1:52:23, 1:53:8, 1:55:21, 1:55:22, 1:56:4, 1:56:5, 1:56:11, 1:65:3, 1:65:12, 1:65:22, 1:66:2, 1:69:9, 1:70:12, 1:74:10, 1:74:18, 1:75:23, 1:76:5, 1:76:9, 1:76:21, 1:79:20, 1:80:10, 1:84:25, 1:94:12, 1:105:17, 1:108:11, 1:109:6, 1:109:21, 1:110:1, 1:110:7, 1:123:19, 1:126:2, 1:126:7, 1:126:15, 1:127:11, 1:127:20, 1:128:17, 1:128:24, 1:135:1, 1:135:11, 1:137:5
informed [5] - 1:40:18, 1:54:8, 1:80:25, 1:101:8, 1:101:9
informs [1] - 1:64:21
inherent [3] - 1:28:20, 1:93:20, 1:97:24
initial [4] - 1:109:10, 1:116:9, 1:117:3, 1:117:6
initiating [1] - 1:102:22
injected [1] - 1:28:8
injury [9] - 1:26:3, 1:26:11, 1:26:12, 1:26:23, 1:26:24, 1:27:25, 1:81:21, 1:82:10, 1:83:17
inquiry [1] - 1:132:5
insights [1] - 1:47:17
insofar [2] - 1:4:17, 1:5:4
Inspector [1] - 1:105:1
instance [2] - 1:32:1, 1:119:3
instances [1] - 1:60:11
instead [1] - 1:114:7
institute [1] - 1:119:2
instruction [10] - 1:27:20, 1:27:22, 1:28:13, 1:58:9, 1:64:6, 1:64:12, 1:64:15, 1:64:16, 1:136:7
instructions [8] - 1:7:25, 1:27:9, 1:28:11, 1:33:2, 1:50:2, 1:57:15, 1:91:23, 1:124:12
instructive [8] - 1:89:5, 1:90:23, 1:90:24, 1:94:4, 1:94:7, 1:94:22, 1:94:23, 1:95:1
insufficient [1] - 1:16:22
intend [1] - 1:5:18
intended [1] - 1:132:6
intent [5] - 1:27:14, 1:27:15, 1:49:20, 1:63:25, 1:76:6
intention [2] - 1:126:14, 1:126:17
intentional [3] - 1:110:12, 1:110:13, 1:137:7
interagency [1] - 1:104:11
interesting [2] - 1:48:20, 1:131:16
interests [3] - 1:56:2, 1:121:1, 1:127:10
interface [1] - 1:137:17
intermediate [1] - 1:11:7
internal [5] - 1:18:17, 1:18:20, 1:38:11, 1:38:16, 1:63:21
internally [1] - 1:80:2
International [1] - 1:72:11
interplay [5] - 1:98:22, 1:109:14, 1:109:24, 1:132:25, 1:134:23
interpretation [2] - 1:114:15, 1:121:12
interpretations [1] - 1:83:21
interpreted [1] - 1:18:11
interview [1] - 1:63:6
interviews [1] - 1:63:7
intrude [2] - 1:107:17, 1:127:9
invalid [1] - 1:104:5
invariably [1] - 1:58:1
invented [3] - 1:35:18, 1:35:20, 1:35:24
investigate [5] - 1:94:19, 1:94:20, 1:97:24, 1:99:24, 1:110:6
investigation [10] - 1:95:16, 1:100:12, 1:102:24, 1:110:6, 1:111:15, 1:122:20, 1:129:8, 1:132:15, 1:132:19, 1:135:6
invite [1] - 1:83:13
invoke [2] - 1:23:21, 1:31:24
invoked [1] - 1:19:11
involved [2] - 1:37:16, 1:90:13
involving [4] - 1:101:13, 1:102:25, 1:104:9, 1:108:5
IRVING [9] - 1:3:20, 1:4:17, 1:4:21, 1:5:19,

1:85:14_, 1:85:18_, 1:85:22 _, 1:86:6_, 1:86:8
Irving [4]_ - 1:3:20_, 1:4:16 _, 1:5:16_, 1:85:12
issuance [1]_ - 1:22:3
issue [29]_ - 1:7:5_, 1:10:16_, 1:11:12_, 1:12:17 _, 1:12:23_, 1:13:15_, 1:15:5 _, 1:18:21_, 1:18:22_, 1:26:1 _, 1:29:5_, 1:31:15_, 1:32:24 _, 1:34:12_, 1:36:3_, 1:36:18 _, 1:37:13_, 1:40:24_, 1:41:9 _, 1:45:16_, 1:50:12_, 1:60:22_, 1:61:13_, 1:70:7_, 1:77:24_, 1:108:5_, 1:113:5 _, 1:114:11_, 1:124:11
issued [1]_ - 1:30:17
issues [9]_ - 1:6:23_, 1:12:5_, 1:16:11_, 1:17:2_, 1:28:4_, 1:39:4_, 1:41:22_, 1:50:18_, 1:77:11
items [3]_ - 1:134:12_, 1:138:25_, 1:140:4
itself [13]_ - 1:28:20_, 1:35:14_, 1:40:22_, 1:53:20 _, 1:68:15_, 1:78:23_, 1:80:8 _, 1:96:8_, 1:103:21_, 1:104:15_, 1:121:4_, 1:128:18

J

January [12]_ - 1:19:17_, 1:19:18_, 1:46:18_, 1:47:1_, 1:47:22_, 1:48:4_, 1:48:12_, 1:48:24_, 1:48:25_, 1:51:12 _, 1:99:17_, 1:138:25
Jay [1]_ - 1:3:9
job [4]_ - 1:10:13_, 1:39:14 _, 1:60:24_, 1:77:9
John [3]_ - 1:3:20_, 1:29:21_, 1:37:19
Johnson [1]_ - 1:55:1
join [5]_ - 1:5:7_, 1:5:12_, 1:85:18_, 1:85:25_, 1:86:2
joined [4]_ - 1:3:13_, 1:4:15_, 1:5:2_, 1:85:13
joining [1]_ - 1:5:4
judge [2]_ - 1:77:15_, 1:96:13
Judge [32]_ - 1:6:15_, 1:6:17_, 1:8:3_, 1:9:16_, 1:10:9_, 1:11:23_, 1:12:23_, 1:13:18_, 1:15:23_, 1:17:1_, 1:17:16_, 1:17:24_, 1:18:2_, 1:23:10_, 1:26:8_, 1:27:19_, 1:29:17_, 1:31:17_, 1:35:1_, 1:35:22_, 1:36:10_, 1:38:21 _, 1:40:24_, 1:75:3_, 1:77:7_, 1:84:24_, 1:87:6_, 1:93:8_, 1:107:21_, 1:109:13_, 1:119:22_, 1:138:15
judges [1]_ - 1:120:22
judgment [1]_ - 1:7:24
Judicial [33]_ - 1:8:12_, 1:9:14_, 1:13:16_, 1:14:15_, 1:21:16_, 1:31:8_, 1:74:7_, 1:89:6_, 1:90:12_, 1:91:4_, 1:91:18_, 1:101:25_, 1:105:19_, 1:106:4_, 1:106:8 _, 1:107:13_, 1:107:20_, 1:107:23_, 1:108:9_, 1:108:25_, 1:110:5_, 1:110:16_, 1:113:21_, 1:114:19_, 1:115:1_, 1:115:4 _, 1:115:10_, 1:118:2_, 1:119:21_, 1:119:23_, 1:120:9_, 1:136:21_, 1:139:24
judicial [29]_ - 1:15:21_, 1:17:9_, 1:28:6_, 1:54:21_, 1:66:20_, 1:68:25_, 1:70:1_, 1:77:4_, 1:82:16_, 1:82:24_, 1:83:1_, 1:83:15_, 1:97:7_, 1:98:1_, 1:107:14_, 1:115:25 _, 1:116:1_, 1:118:24_, 1:119:19_, 1:119:25_, 1:120:15_, 1:129:19_, 1:130:11_, 1:130:22_, 1:131:7_, 1:131:11_, 1:131:14_, 1:132:3_, 1:133:25
judiciary [2]_ - 1:117:20_, 1:136:15
July [1]_ - 1:42:21
jumping [2]_ - 1:86:12_, 1:136:7
jurisdiction [1]_ - 1:54:13
jury [17]_ - 1:7:25_, 1:22:3 _, 1:27:22_, 1:28:11_, 1:33:2 _, 1:33:19_, 1:48:15_, 1:51:20_, 1:51:21_, 1:57:15 _, 1:58:2_, 1:69:2_, 1:73:15_, 1:91:23_, 1:124:12_, 1:135:6 _, 1:136:7
Justice [26]_ - 1:46:5_, 1:52:5_, 1:55:2_, 1:84:17_, 1:84:20_, 1:84:22_, 1:94:3_, 1:95:15_, 1:96:8_, 1:97:22_, 1:98:5_, 1:101:3_, 1:101:15 _, 1:102:23_, 1:103:14_, 1:104:20_, 1:105:3_, 1:105:6 _, 1:114:13_, 1:120:11_, 1:121:5_, 1:122:18_, 1:122:19_, 1:124:3_, 1:132:22_, 1:139:12
justification [1]_ - 1:57:9
justifies [1]_ - 1:135:16
justify [1]_ - 1:72:12

K

keep [8]_ - 1:28:14_, 1:43:22_, 1:45:10_, 1:60:24 _, 1:70:15_, 1:88:14_, 1:93:11_, 1:108:15
keeping [1]_ - 1:60:12
kept [2]_ - 1:40:10_, 1:109:6
key [2]_ - 1:49:3_, 1:122:17
Kim [1]_ - 1:68:5
kind [10]_ - 1:17:7_, 1:30:22_, 1:31:1_, 1:53:1_, 1:58:1_, 1:66:9_, 1:84:3_, 1:88:20_, 1:94:16_, 1:130:8
Kiriakou [1]_ - 1:26:9
Kise [5]_ - 1:3:14_, 1:133:5 _, 1:134:15_, 1:134:17_, 1:134:20
knowable [1]_ - 1:67:19
knowingly [1]_ - 1:113:9
knowledge [3]_ - 1:49:18 _, 1:50:5_, 1:123:18
known [1]_ - 1:27:14
knows [3]_ - 1:16:5_, 1:104:19_, 1:128:20
Kolender [1]_ - 1:67:7

L

lack [13]_ - 1:18:5_, 1:22:14_, 1:40:10_, 1:47:24 _, 1:47:25_, 1:59:13_, 1:59:15_, 1:60:19_, 1:61:6_, 1:72:4_, 1:79:2_, 1:91:20
lacked [2]_ - 1:33:14
lacks [1]_ - 1:115:3
Lago [4]_ - 1:39:16_, 1:87:23_, 1:89:20_, 1:113:20
laid [1]_ - 1:16:10
landscape [1]_ - 1:69:15
language [26]_ - 1:8:9_, 1:11:8_, 1:11:17_, 1:12:13_, 1:17:3_, 1:17:22_, 1:28:5_, 1:31:13_, 1:33:6_, 1:40:23_, 1:49:25_, 1:51:4_, 1:52:10_, 1:53:14_, 1:54:17_, 1:55:9_, 1:58:17_, 1:58:20_, 1:64:17 _, 1:71:4_, 1:73:9_, 1:77:23_, 1:83:8_, 1:115:13_, 1:120:17 _, 1:128:6
large [1]_ - 1:73:14
last [12]_ - 1:62:17_, 1:69:25_, 1:95:22_, 1:97:19 _, 1:103:14_, 1:111:6_, 1:115:21_, 1:123:5_, 1:123:10_, 1:125:14_, 1:133:2_, 1:136:20
late [1]_ - 1:88:11
latter [1]_ - 1:5:8
launch [1]_ - 1:129:8
Law [4]_ - 1:16:18_, 1:71:12_, 1:71:18_, 1:72:8
law [77]_ - 1:16:20_, 1:22:14_, 1:26:8_, 1:27:15_, 1:27:17_, 1:27:18_, 1:29:11 _, 1:35:11_, 1:35:17_, 1:37:7 _, 1:44:20_, 1:45:18_, 1:49:21_, 1:49:22_, 1:50:3_, 1:51:16_, 1:53:20_, 1:54:7_, 1:61:13_, 1:68:20_, 1:68:23 _, 1:69:11_, 1:71:23_, 1:77:11_, 1:77:20_, 1:83:3_, 1:83:4_, 1:83:12_, 1:87:6_, 1:87:8_, 1:87:11_, 1:87:12_, 1:87:13_, 1:87:15_, 1:87:19 _, 1:88:4_, 1:88:5_, 1:88:25_, 1:89:1_, 1:89:4_, 1:90:2_, 1:90:6_, 1:91:7_, 1:92:13_, 1:92:23_, 1:92:24_, 1:93:1_, 1:93:9_, 1:93:19_, 1:94:5_, 1:97:2_, 1:97:15_, 1:97:18_, 1:98:10_, 1:98:11_, 1:100:25 _, 1:102:11_, 1:103:5_, 1:103:21_, 1:104:5_, 1:105:3 _, 1:105:12_, 1:106:18_, 1:111:10_, 1:111:12_, 1:112:6_, 1:125:2_, 1:136:1 _, 1:136:3_, 1:137:24_, 1:140:22
lawful [5]_ - 1:59:22_, 1:60:13_, 1:60:23_, 1:68:19 _, 1:79:21
lawfully [2]_ - 1:93:11
laws [2]_ - 1:104:9_, 1:105:7
lawsuit [1]_ - 1:90:15
lawyers [1]_ - 1:133:4
layer [1]_ - 1:64:3
lead [5]_ - 1:41:17_, 1:86:10_, 1:105:6_, 1:110:13 _, 1:112:2
lead-up [1]_ - 1:110:13
leader [1]_ - 1:52:5
leaders [3]_ - 1:108:5_,

1:108:6_, 1:108:20
leading [1]_ - 1:81:8
leads [3]_ - 1:8:24_, 1:58:1_, 1:91:19
leaking [1]_ - 1:107:11
Leans [1]_ - 1:99:18
leaping [1]_ - 1:107:21
least [11]_ - 1:46:10_, 1:63:24_, 1:64:15_, 1:70:3_, 1:89:14_, 1:97:8_, 1:103:1_, 1:105:22_, 1:109:10_, 1:118:17_, 1:124:16
leaves [1]_ - 1:139:7
leaving [2]_ - 1:40:17_, 1:96:22
lectern [1]_ - 1:4:4
led [2]_ - 1:36:22_, 1:36:23
left [6]_ - 1:8:23_, 1:11:10_, 1:17:3_, 1:88:10_, 1:95:13_, 1:113:12
legal [19]_ - 1:9:2_, 1:9:3_, 1:9:7_, 1:9:12_, 1:10:3_, 1:10:19_, 1:13:13_, 1:20:11_, 1:22:19_, 1:27:14_, 1:33:10_, 1:42:8_, 1:42:11_, 1:46:22_, 1:53:1_, 1:66:17_, 1:87:17_, 1:101:11_, 1:127:18
legally [2]_ - 1:20:23_, 1:58:9
legislative [3]_ - 1:16:9_, 1:121:22_, 1:136:15
legislature [1]_ - 1:136:15
length [2]_ - 1:13:17_, 1:81:1
lengthy [1]_ - 1:124:19
lenity [2]_ - 1:55:5_, 1:83:25
lens [1]_ - 1:103:2
less [2]_ - 1:114:12_, 1:122:14
letter [2]_ - 1:100:2_, 1:101:7
level [1]_ - 1:62:12
liability [5]_ - 1:45:25_, 1:57:2_, 1:65:20_, 1:65:21_, 1:69:15
libraries [1]_ - 1:100:3
lie [1]_ - 1:96:11
lies [1]_ - 1:96:9
light [5]_ - 1:5:16_, 1:7:22_, 1:31:7_, 1:108:10_, 1:124:11
likelihood [1]_ - 1:46:11
likely [1]_ - 1:41:7
limine [1]_ - 1:124:20
limit [2]_ - 1:55:8_, 1:89:7
limitation [1]_ - 1:67:6
limited [9]_ - 1:18:12_, 1:36:1_, 1:76:24_, 1:98:1_, 1:101:24_, 1:102:2_, 1:120:10_, 1:122:13
limiting [3]_ - 1:18:18_, 1:53:14_, 1:54:10
Limits [1]_ - 1:56:6
limits [3]_ - 1:32:10_, 1:32:13_, 1:84:2
line [7]_ - 1:54:4_, 1:55:1_, 1:83:22_, 1:89:18_, 1:114:9_, 1:127:4_, 1:137:9
list [1]_ - 1:71:22
litigant [1]_ - 1:121:2
litigants [1]_ - 1:116:2
litigation [5]_ - 1:18:8_, 1:35:10_, 1:107:6_, 1:108:25_, 1:133:7
loan [1]_ - 1:131:23
location [1]_ - 1:133:9
locations [1]_ - 1:39:23
log [1]_ - 1:38:13
logic [7]_ - 1:79:24_, 1:109:21_, 1:114:25_, 1:120:2_, 1:121:10_, 1:121:12
long-standing [2]_ - 1:76:20_, 1:80:9
long-term [1]_ - 1:75:22
look [33]_ - 1:4:21_, 1:10:15_, 1:12:22_, 1:16:5_, 1:23:2_, 1:24:5_, 1:24:25_, 1:41:10_, 1:43:18_, 1:45:16_, 1:49:1_, 1:54:1_, 1:55:9_, 1:56:17_, 1:58:7_, 1:58:20_, 1:61:21_, 1:73:3_, 1:75:12_, 1:78:4_, 1:84:5_, 1:87:11_, 1:94:2_, 1:94:16_, 1:95:11_, 1:99:1_, 1:99:15_, 1:100:4_, 1:101:24_, 1:107:11_, 1:116:18_, 1:136:3_, 1:137:7
looked [4]_ - 1:13:3_, 1:25:13_, 1:31:25_, 1:61:15
looking [14]_ - 1:13:23_, 1:19:16_, 1:27:4_, 1:27:7_, 1:34:1_, 1:46:12_, 1:58:3_, 1:58:6_, 1:72:5_, 1:72:6_, 1:87:7_, 1:87:20_, 1:118:7_, 1:128:25
looks [1]_ - 1:75:11
lose [1]_ - 1:20:16
loss [1]_ - 1:83:15
lost [2]_ - 1:60:8_, 1:123:19
lowercase [1]_ - 1:126:23
lunch [2]_ - 1:75:1_, 1:85:4

M

made-up [1]_ - 1:25:2
magistrate [1]_ - 1:96:13
main [1]_ - 1:133:8
maintain [1]_ - 1:137:11
maintaining [1]_ - 1:29:25
manage [2]_ - 1:110:12_, 1:136:13
management [5]_ - 1:116:4_, 1:116:7_, 1:116:18_, 1:117:4_, 1:120:22
manner [2]_ - 1:22:19_, 1:56:5
Manual [3]_ - 1:84:17_, 1:84:20_, 1:84:22
map [1]_ - 1:66:11
Mar [4]_ - 1:39:16_, 1:87:23_, 1:89:20_, 1:113:20
Mar-a-Lago [4]_ - 1:39:16_, 1:87:23_, 1:89:20_, 1:113:20
March [2]_ - 1:97:20
marked [3]_ - 1:96:23_, 1:102:10_, 1:139:9
markings [4]_ - 1:19:24_, 1:20:10_, 1:20:13_, 1:88:21
marks [1]_ - 1:72:7
master [1]_ - 1:133:7
master's [1]_ - 1:134:16
material [4]_ - 1:62:12_, 1:98:23_, 1:98:24
materials [20]_ - 1:20:5_, 1:36:2_, 1:44:5_, 1:44:14_, 1:61:1_, 1:62:17_, 1:62:22_, 1:74:17_, 1:87:5_, 1:87:6_, 1:87:22_, 1:88:7_, 1:95:21_, 1:96:22_, 1:108:4_, 1:112:7_, 1:115:20_, 1:117:3_, 1:117:7_, 1:139:8
matter [23]_ - 1:11:9_, 1:22:14_, 1:42:8_, 1:42:11_, 1:46:22_, 1:51:15_, 1:53:2_, 1:54:3_, 1:66:17_, 1:68:13_, 1:68:20_, 1:87:12_, 1:87:14_, 1:87:22_, 1:92:25_, 1:98:12_, 1:102:15_, 1:110:1_, 1:112:6_, 1:122:18_, 1:122:19_, 1:125:2_, 1:136:1
matters [3]_ - 1:123:24_, 1:126:2_, 1:127:24
mean [37]_ - 1:24:11_, 1:24:16_, 1:27:3_, 1:60:24_, 1:76:8_, 1:79:13_, 1:83:20_, 1:88:4_, 1:88:6_, 1:88:25_, 1:90:3_, 1:90:14_, 1:94:9_, 1:95:19_, 1:97:1_, 1:97:18_, 1:97:25_, 1:101:19_, 1:105:9_, 1:106:18_, 1:107:13_, 1:109:19_, 1:110:2_, 1:110:25_, 1:113:7_, 1:113:8_, 1:114:23_, 1:116:7_, 1:116:9_, 1:117:10_, 1:119:18_, 1:125:19_, 1:128:6_, 1:137:7_, 1:138:4_, 1:139:11
meaning [5]_ - 1:23:14_, 1:23:16_, 1:24:22_, 1:28:5_, 1:50:2
meaningful [3]_ - 1:15:7_, 1:27:3_, 1:34:3
means [14]_ - 1:18:14_, 1:27:12_, 1:31:19_, 1:44:4_, 1:44:14_, 1:60:13_, 1:92:17_, 1:117:12_, 1:119:17_, 1:126:12_, 1:126:13_, 1:127:15
mechanism [6]_ - 1:28:25_, 1:34:11_, 1:68:15_, 1:69:10_, 1:115:3_, 1:122:7
memoir [1]_ - 1:42:22
memoranda [2]_ - 1:36:22_, 1:62:16
memorandum [4]_ - 1:36:22_, 1:62:8_, 1:62:13_, 1:63:22
memorialized [2]_ - 1:136:21_, 1:136:25
memory [1]_ - 1:116:14
memos [1]_ - 1:63:24
mens [5]_ - 1:25:14_, 1:27:5_, 1:28:16_, 1:64:7_, 1:124:10
mental [3]_ - 1:131:18_, 1:131:24_, 1:132:4
mention [5]_ - 1:13:18_, 1:93:25_, 1:124:4_, 1:129:11_, 1:133:2
mentioned [8]_ - 1:7:6_, 1:7:16_, 1:53:6_, 1:68:14_, 1:123:10_, 1:127:4_, 1:129:20_, 1:132:13
mentioning [2]_ - 1:125:7_, 1:133:16

merely [1] - 1:87:17
message [1] - 1:83:14
messages [1] - 1:116:17
messaging [1] - 1:116:16
microphone [1] - 1:85:21
middle [2] - 1:42:19, 1:133:13
might [15] - 1:23:3, 1:89:11, 1:91:16, 1:93:14, 1:94:18, 1:95:1, 1:98:19, 1:113:14, 1:116:18, 1:116:20, 1:118:10, 1:124:15, 1:128:4, 1:128:9, 1:129:6
military [5] - 1:14:8, 1:42:25, 1:112:8, 1:129:3, 1:133:12
mind [3] - 1:28:14, 1:40:16, 1:69:6
minimum [1] - 1:12:8
minutes [1] - 1:85:2
mishandle [1] - 1:65:3
mishandling [2] - 1:66:2, 1:73:22
mislead [1] - 1:132:6
mistake [1] - 1:49:15
mistaken [1] - 1:56:19
mitigates [1] - 1:36:7
mixture [1] - 1:54:12
mockery [1] - 1:131:14
moment [15] - 1:19:16, 1:21:3, 1:21:25, 1:30:14, 1:44:1, 1:50:16, 1:59:8, 1:64:2, 1:88:6, 1:98:3, 1:99:16, 1:111:19, 1:122:12, 1:129:22, 1:134:6
money [1] - 1:64:8
Morales [2] - 1:18:16
Morison [9] - 1:25:21, 1:26:2, 1:26:8, 1:26:25, 1:64:14, 1:72:20, 1:81:20, 1:82:3
morning [23] - 1:3:2, 1:3:9, 1:3:11, 1:3:12, 1:3:14, 1:3:15, 1:3:16, 1:3:19, 1:3:20, 1:3:22, 1:3:23, 1:10:6, 1:34:5, 1:41:18, 1:41:19, 1:80:22, 1:86:21, 1:98:20, 1:101:1, 1:101:11, 1:112:20, 1:113:4, 1:129:17
morning's [1] - 1:86:13
most [15] - 1:17:5, 1:27:2, 1:27:21, 1:30:1, 1:35:11, 1:40:15, 1:43:15, 1:77:11, 1:77:19, 1:77:20, 1:81:15, 1:82:15, 1:104:7, 1:116:13, 1:121:7
mostly [1] - 1:10:8
motion [55] - 1:4:10, 1:4:12, 1:4:13, 1:4:15, 1:5:13, 1:6:12, 1:6:14, 1:6:18, 1:6:19, 1:7:10, 1:7:20, 1:7:22, 1:7:23, 1:8:25, 1:10:17, 1:12:12, 1:14:23, 1:33:2, 1:37:14, 1:38:9, 1:39:25, 1:40:1, 1:40:14, 1:57:11, 1:67:9, 1:67:13, 1:68:21, 1:77:10, 1:81:2, 1:84:13, 1:85:3, 1:85:9, 1:85:10, 1:85:13, 1:85:18, 1:85:25, 1:86:2, 1:86:5, 1:86:10, 1:86:15, 1:86:24, 1:88:1, 1:91:24, 1:92:20, 1:96:2, 1:99:23, 1:100:22, 1:100:23, 1:106:25, 1:122:5, 1:130:3, 1:134:10
Motion [1] - 1:75:2
motions [12] - 1:4:9, 1:5:2, 1:5:17, 1:5:21, 1:6:3, 1:6:6, 1:6:8, 1:16:10, 1:36:4, 1:93:16, 1:124:20, 1:140:24
motivated [1] - 1:96:1
moves [2] - 1:105:7
MR [275] - 1:3:9, 1:3:12, 1:3:16, 1:3:20, 1:4:17, 1:4:21, 1:5:3, 1:5:11, 1:5:19, 1:6:15, 1:6:17, 1:7:13, 1:8:3, 1:8:17, 1:9:1, 1:9:16, 1:10:2, 1:10:9, 1:11:9, 1:11:23, 1:12:4, 1:12:16, 1:13:12, 1:14:2, 1:15:13, 1:15:23, 1:17:16, 1:17:24, 1:18:2, 1:20:8, 1:20:20, 1:21:1, 1:21:6, 1:21:12, 1:22:6, 1:23:10, 1:23:18, 1:24:11, 1:24:18, 1:25:11, 1:25:17, 1:26:7, 1:26:18, 1:26:20, 1:27:19, 1:28:10, 1:28:22, 1:29:2, 1:29:8, 1:29:14, 1:29:17, 1:30:14, 1:30:20, 1:31:16, 1:33:5, 1:33:16, 1:33:24, 1:34:21, 1:34:25, 1:35:15, 1:35:21, 1:36:21, 1:37:8, 1:38:3, 1:38:8, 1:38:13, 1:38:21, 1:39:3, 1:39:24, 1:40:13, 1:40:23, 1:41:4, 1:41:18, 1:41:20, 1:42:5, 1:45:14, 1:46:1, 1:46:8, 1:46:13, 1:46:21, 1:47:3, 1:47:9, 1:48:5, 1:48:10, 1:48:23, 1:49:13, 1:49:23, 1:50:10, 1:50:16, 1:51:9, 1:51:11, 1:51:15, 1:51:19, 1:51:22, 1:51:24, 1:52:16, 1:53:3, 1:53:19, 1:53:23, 1:54:3, 1:54:22, 1:55:9, 1:55:13, 1:55:19, 1:56:14, 1:56:20, 1:57:4, 1:57:8, 1:57:18, 1:57:22, 1:58:6, 1:58:16, 1:58:23, 1:59:6, 1:59:10, 1:59:12, 1:59:16, 1:59:21, 1:60:3, 1:60:9, 1:60:20, 1:61:8, 1:61:20, 1:62:5, 1:62:20, 1:63:3, 1:63:13, 1:63:21, 1:64:4, 1:64:12, 1:64:23, 1:65:2, 1:65:9, 1:65:15, 1:65:23, 1:65:25, 1:66:6, 1:66:14, 1:66:23, 1:67:2, 1:67:6, 1:67:11, 1:67:19, 1:67:24, 1:68:12, 1:68:16, 1:68:25, 1:69:16, 1:69:19, 1:69:24, 1:70:6, 1:70:10, 1:70:21, 1:71:2, 1:71:11, 1:71:18, 1:72:3, 1:72:5, 1:72:15, 1:72:18, 1:72:23, 1:73:2, 1:73:10, 1:73:13, 1:73:21, 1:74:1, 1:74:5, 1:74:19, 1:74:22, 1:75:3, 1:76:13, 1:76:17, 1:77:7, 1:78:6, 1:78:20, 1:79:4, 1:79:7, 1:79:10, 1:80:7, 1:81:6, 1:81:19, 1:82:14, 1:82:25, 1:83:10, 1:83:22, 1:85:14, 1:85:18, 1:85:22, 1:86:6, 1:86:8, 1:86:11, 1:87:6, 1:87:18, 1:88:3, 1:89:16, 1:90:17, 1:92:4, 1:93:7, 1:93:23, 1:95:3, 1:95:5, 1:95:7, 1:97:11, 1:98:19, 1:99:8, 1:99:11, 1:99:13, 1:99:21, 1:100:15, 1:101:19, 1:102:4, 1:103:3, 1:103:11, 1:104:8, 1:104:17, 1:105:9, 1:106:1, 1:106:6, 1:107:21, 1:108:12, 1:108:17, 1:109:2, 1:109:4, 1:109:13, 1:110:22, 1:110:25, 1:111:4, 1:111:13, 1:111:21, 1:111:23, 1:113:23, 1:114:23, 1:115:4, 1:115:8, 1:116:8, 1:117:14, 1:118:4, 1:118:10, 1:118:19, 1:118:23, 1:119:10, 1:120:4, 1:120:16, 1:122:9, 1:123:15, 1:124:18, 1:125:5, 1:125:12, 1:125:14, 1:125:22, 1:125:25, 1:127:22, 1:128:19, 1:129:6, 1:130:7, 1:130:23, 1:131:2, 1:131:4, 1:131:6, 1:134:3, 1:134:6, 1:134:14, 1:135:23, 1:136:9, 1:136:24, 1:138:14, 1:139:3, 1:139:19, 1:139:22, 1:140:1, 1:140:7, 1:140:11, 1:140:14, 1:140:16, 1:140:20
multiple [5] - 1:25:12, 1:25:13, 1:36:16, 1:38:18, 1:84:21
Murrell [1] - 1:3:21
must [9] - 1:5:9, 1:6:24, 1:77:22, 1:82:14, 1:91:13, 1:112:12, 1:112:25, 1:119:13, 1:132:2
muster [1] - 1:81:24

## N

named [1] - 1:90:16
namely [1] - 1:121:6
names [1] - 1:116:21
NARA [75] - 1:13:7, 1:13:22, 1:22:20, 1:22:23, 1:30:17, 1:30:20, 1:31:4, 1:46:3, 1:46:5, 1:51:11, 1:51:13, 1:51:16, 1:51:17, 1:52:4, 1:88:16, 1:90:3, 1:90:17, 1:90:19, 1:90:25, 1:91:8, 1:92:16, 1:94:17, 1:95:11, 1:96:16, 1:98:21, 1:99:23, 1:99:25, 1:101:1, 1:101:14, 1:102:15, 1:102:19, 1:102:21, 1:103:8, 1:103:13, 1:103:16, 1:103:19, 1:103:20, 1:104:2, 1:104:19, 1:105:13, 1:105:14, 1:106:10, 1:106:19, 1:107:8, 1:107:17, 1:108:1, 1:111:11, 1:119:1, 1:119:14, 1:120:6, 1:120:7, 1:120:10, 1:122:17, 1:122:19, 1:123:6, 1:123:17, 1:124:5, 1:135:11, 1:135:17, 1:135:21, 1:136:2, 1:136:3

_, 1:136:14_, 1:136:18_, 1:136:22_, 1:137:2_, 1:137:4_, 1:137:15_, 1:137:20_, 1:137:24_, 1:138:22
NARA's [4]_ - 1:31:7_, 1:93:9_, 1:102:25_, 1:122:13
narrow [4]_ - 1:17:23_, 1:27:6_, 1:55:3_, 1:84:4
narrowed [1]_ - 1:84:1
narrowing [4]_ - 1:54:10_, 1:54:22_, 1:70:13_, 1:79:22
nation's [2]_ - 1:30:1_, 1:121:7
national [7]_ - 1:32:9_, 1:32:14_, 1:32:19_, 1:32:24_, 1:56:2_, 1:109:24_, 1:110:7
National [25]_ - 1:11:14_, 1:11:20_, 1:14:5_, 1:18:25_, 1:19:25_, 1:20:14_, 1:23:22_, 1:25:1_, 1:36:9_, 1:36:14_, 1:41:13_, 1:48:2_, 1:70:12_, 1:73:3_, 1:88:22_, 1:91:12_, 1:92:7_, 1:94:1_, 1:94:11_, 1:94:18_, 1:96:17_, 1:139:9_, 1:139:17_, 1:140:5
natural [1]_ - 1:114:25
nature [3]_ - 1:40:6_, 1:68:2_, 1:68:6
Nauta [3]_ - 1:3:6_, 1:3:17_, 1:5:1
NDA [5]_ - 1:69:21_, 1:78:16_, 1:78:19_, 1:78:21_, 1:92:8
NDI [15]_ - 1:6:21_, 1:11:11_, 1:11:12_, 1:11:15_, 1:17:15_, 1:35:1_, 1:35:4_, 1:35:5_, 1:36:1_, 1:36:6_, 1:36:8_, 1:41:4_, 1:41:8_, 1:41:10_, 1:77:21
necessarily [9]_ - 1:12:6_, 1:87:4_, 1:89:13_, 1:102:25_, 1:112:10_, 1:112:11_, 1:118:24_, 1:124:14_, 1:136:18
necessary [5]_ - 1:16:12_, 1:40:12_, 1:83:8_, 1:86:22_, 1:107:16
need [42]_ - 1:17:25_, 1:18:6_, 1:18:9_, 1:18:10_, 1:19:7_, 1:19:10_, 1:19:12_, 1:25:2_, 1:30:14_, 1:33:15_, 1:33:18_, 1:33:19_, 1:33:24_, 1:34:2_, 1:34:10_, 1:34:17_, 1:47:25_, 1:50:3_, 1:55:21_, 1:56:12_, 1:56:14_, 1:56:15_, 1:56:18_, 1:56:23_, 1:57:6_, 1:72:17_, 1:79:14_, 1:79:15_, 1:80:5_, 1:85:20_, 1:93:4_, 1:98:6_, 1:114:16_, 1:122:24_, 1:123:2_, 1:127:9_, 1:131:24_, 1:134:12_, 1:140:13
needed [3]_ - 1:31:11_, 1:55:15_, 1:82:1
needs [4]_ - 1:33:13_, 1:127:2_, 1:134:22_, 1:137:10
negates [1]_ - 1:53:2
never [29]_ - 1:19:12_, 1:42:14_, 1:46:14_, 1:52:18_, 1:53:3_, 1:56:17_, 1:59:1_, 1:63:13_, 1:75:14_, 1:78:17_, 1:94:17_, 1:95:16_, 1:101:1_, 1:101:2_, 1:102:15_, 1:103:8_, 1:103:12_, 1:103:13_, 1:110:5_, 1:113:9_, 1:113:10_, 1:113:11_, 1:113:12_, 1:118:17_, 1:135:12_, 1:135:13_, 1:137:18
new [1]_ - 1:83:11
New [4]_ - 1:22:25_, 1:99:3_, 1:99:9_, 1:99:18
news [1]_ - 1:84:15
next [4]_ - 1:68:21_, 1:80:20_, 1:108:25_, 1:116:22
night [4]_ - 1:103:14_, 1:123:5_, 1:123:11_, 1:133:13
nobody [2]_ - 1:13:18_, 1:108:12
nonbinding [1]_ - 1:17:9
nondelegation [2]_ - 1:16:1_, 1:34:12
nondisclosure [1]_ - 1:78:15
none [7]_ - 1:27:3_, 1:46:1_, 1:79:7_, 1:117:6_, 1:119:20_, 1:128:2
nonexecutives [1]_ - 1:107:4
nonpublic [1]_ - 1:44:16
Nosal [1]_ - 1:23:25
notably [1]_ - 1:106:21
nothing [16]_ - 1:12:20_, 1:22:1_, 1:23:7_, 1:44:24_, 1:55:10_, 1:77:21_, 1:87:7_, 1:88:18_, 1:88:21_, 1:92:10_, 1:92:11_, 1:102:4_, 1:105:18_, 1:108:2_, 1:120:10_, 1:132:8
notice [37]_ - 1:4:19_, 1:5:4_, 1:5:9_, 1:5:14_, 1:10:16_, 1:12:8_, 1:17:2_, 1:28:15_, 1:28:18_, 1:29:20_, 1:30:6_, 1:43:18_, 1:43:22_, 1:45:16_, 1:45:21_, 1:53:10_, 1:64:24_, 1:65:1_, 1:65:13_, 1:65:18_, 1:66:6_, 1:66:21_, 1:66:23_, 1:67:3_, 1:67:16_, 1:67:21_, 1:68:18_, 1:75:10_, 1:79:12_, 1:79:22_, 1:80:21_, 1:80:24_, 1:81:9_, 1:81:11_, 1:129:16
notified [1]_ - 1:63:4
noting [1]_ - 1:110:9
notion [5]_ - 1:93:20_, 1:105:21_, 1:122:6_, 1:127:24_, 1:129:19
notwithstanding [1]_ - 1:97:23
nowhere [1]_ - 1:112:18
nuanced [1]_ - 1:104:18
nubs [1]_ - 1:18:3
nuclear [1]_ - 1:112:8
nullifies [1]_ - 1:53:2
nullity [1]_ - 1:83:12
number [4]_ - 1:10:4_, 1:85:16_, 1:85:19_, 1:85:24
Number [5]_ - 1:42:18_, 1:75:2_, 1:85:8_, 1:139:22_, 1:140:8

## O

oath [1]_ - 1:131:12
obligation [4]_ - 1:17:8_, 1:17:10_, 1:32:1_, 1:84:17
obligations [1]_ - 1:38:19
obliged [2]_ - 1:77:4_, 1:123:7
obliges [1]_ - 1:124:7
observation [1]_ - 1:112:4
observe [1]_ - 1:4:8
observed [2]_ - 1:114:14_, 1:116:23
observes [1]_ - 1:115:12
obstruction [3]_ - 1:48:17_, 1:48:19_, 1:49:3
obtain [1]_ - 1:93:11
obtained [1]_ - 1:36:19
obviously [5]_ - 1:9:21_, 1:10:4_, 1:13:3_, 1:49:24_, 1:108:20
occasion [1]_ - 1:105:14
occurred [3]_ - 1:62:17_, 1:66:3_, 1:124:1
offense [6]_ - 1:19:17_, 1:22:4_, 1:46:23_, 1:46:24_, 1:51:5_, 1:61:25
offer [1]_ - 1:93:19
offered [6]_ - 1:20:11_, 1:23:16_, 1:23:19_, 1:76:9_, 1:97:19
offhand [1]_ - 1:132:7
office [15]_ - 1:5:22_, 1:9:5_, 1:10:10_, 1:11:3_, 1:15:15_, 1:16:9_, 1:19:1_, 1:40:18_, 1:76:2_, 1:88:10_, 1:95:13_, 1:96:22_, 1:116:5_, 1:132:22_, 1:139:7
Office [1]_ - 1:44:8
officer [3]_ - 1:10:11_, 1:11:21_, 1:11:25
official [26]_ - 1:5:6_, 1:20:4_, 1:20:14_, 1:23:20_, 1:23:24_, 1:24:4_, 1:24:8_, 1:24:20_, 1:37:4_, 1:44:12_, 1:44:18_, 1:47:12_, 1:51:9_, 1:51:17_, 1:52:8_, 1:56:1_, 1:63:6_, 1:63:8_, 1:71:8_, 1:71:17_, 1:72:4_, 1:123:21_, 1:133:11
official's [1]_ - 1:74:12
officials [11]_ - 1:16:22_, 1:21:10_, 1:29:25_, 1:37:20_, 1:37:23_, 1:47:6_, 1:65:21_, 1:66:2_, 1:75:22_, 1:76:21_, 1:80:10
often [1]_ - 1:87:11
OIG [2]_ - 1:31:4_, 1:31:5
OIG's [1]_ - 1:30:20
Oliveira [4]_ - 1:3:6_, 1:3:21_, 1:4:15_, 1:85:25
once [1]_ - 1:29:18
one [86]_ - 1:4:22_, 1:7:15_, 1:12:5_, 1:12:18_, 1:13:6_, 1:13:25_, 1:14:14_, 1:14:19_, 1:15:3_, 1:15:13_, 1:18:3_, 1:19:21_, 1:20:3_, 1:20:16_, 1:20:18_, 1:20:21_, 1:23:10_, 1:27:12_, 1:29:18_, 1:31:1_, 1:31:18_, 1:32:5_, 1:35:11_, 1:39:4_, 1:46:15_, 1:46:22_, 1:48:11_, 1:51:11_, 1:53:10_, 1:53:19_, 1:54:2_, 1:54:4_, 1:60:12_, 1:63:24_, 1:64:15_, 1:64:18_, 1:64:19_, 1:67:24_, 1:69:13_, 1:70:16_, 1:71:14_, 1:72:17

_, 1:75:5_, 1:75:24_, 1:75:25 _, 1:77:4_, 1:78:6_, 1:82:1_, 1:84:3_, 1:84:9_, 1:85:2_, 1:86:25_, 1:95:17_, 1:99:16 _, 1:108:6_, 1:108:19_, 1:115:12_, 1:116:12_, 1:116:14_, 1:118:1_, 1:118:2 _, 1:120:12_, 1:120:19_, 1:120:25_, 1:121:3_, 1:121:20_, 1:122:11_, 1:123:3_, 1:124:18_, 1:126:3 _, 1:128:17_, 1:129:7_, 1:129:15_, 1:130:12_, 1:130:15_, 1:131:12_, 1:132:15_, 1:133:4_, 1:134:22_, 1:135:21_, 1:138:20
one's [2]_ - 1:52:25_, 1:60:13
one-of-a-kind [1]_ - 1:84:3
one-sided [1]_ - 1:108:6
ones [2]_ - 1:30:25_, 1:116:13
ongoing [3]_ - 1:46:23_, 1:108:23_, 1:129:3
open [1]_ - 1:110:6
opened [2]_ - 1:95:16_, 1:95:18
opening [2]_ - 1:130:10_, 1:130:13
operation [2]_ - 1:29:11_, 1:37:7
operations [2]_ - 1:14:8_, 1:116:20
opine [1]_ - 1:119:4
opinion [9]_ - 1:10:9_, 1:105:23_, 1:114:20_, 1:121:20_, 1:130:16_, 1:130:19_, 1:131:9_, 1:131:16_, 1:131:19
opinions [9]_ - 1:10:4_, 1:10:6_, 1:115:13_, 1:119:20 _, 1:120:17_, 1:120:19_, 1:120:20_, 1:121:19_, 1:131:22
opponent [1]_ - 1:65:9
opportunities [1]_ - 1:57:23
opportunity [2]_ - 1:16:12 _, 1:98:4
opposed [3]_ - 1:17:23_, 1:58:4_, 1:106:13
opposite [2]_ - 1:43:12_, 1:135:18
opposition [6]_ - 1:6:1_, 1:24:14_, 1:41:17_, 1:87:21 _, 1:92:24_, 1:124:9
oppositions [1]_ - 1:5:22
oral [3]_ - 1:105:24_, 1:108:9_, 1:132:8
Order [55]_ - 1:3:1_, 1:12:22_, 1:12:24_, 1:14:15 _, 1:15:5_, 1:15:11_, 1:15:21 _, 1:17:22_, 1:18:1_, 1:18:13 _, 1:18:24_, 1:19:4_, 1:24:6_, 1:24:9_, 1:25:2_, 1:32:23_, 1:33:21_, 1:33:22_, 1:33:25 _, 1:34:9_, 1:34:18_, 1:38:23 _, 1:40:22_, 1:41:2_, 1:41:9_, 1:41:11_, 1:50:9_, 1:50:11_, 1:50:14_, 1:52:15_, 1:53:6_, 1:53:14_, 1:53:17_, 1:53:20 _, 1:54:1_, 1:54:8_, 1:54:11_, 1:54:18_, 1:55:7_, 1:56:18_, 1:58:14_, 1:61:15_, 1:70:22 _, 1:70:25_, 1:72:1_, 1:76:4_, 1:76:25_, 1:78:8_, 1:78:24_, 1:79:3_, 1:80:14_, 1:93:3_, 1:126:3_, 1:126:24_, 1:138:6
order [11]_ - 1:24:4_, 1:31:4_, 1:41:2_, 1:41:12_, 1:55:20_, 1:56:6_, 1:60:1_, 1:79:20_, 1:81:20_, 1:82:7_, 1:136:16
ordered [1]_ - 1:5:23
Orders [2]_ - 1:15:17_, 1:19:2
orders [2]_ - 1:89:3_, 1:92:12
ordinary [5]_ - 1:23:14_, 1:57:5_, 1:62:15_, 1:71:5_, 1:72:1
organization [1]_ - 1:6:5
organized [1]_ - 1:45:10
original [8]_ - 1:7:3_, 1:58:20_, 1:62:8_, 1:62:9_, 1:65:10_, 1:69:12_, 1:89:23 _, 1:103:9
originating [2]_ - 1:56:1_, 1:115:18
others' [1]_ - 1:115:20
otherwise [9]_ - 1:28:9_, 1:50:13_, 1:53:12_, 1:54:19 _, 1:83:9_, 1:119:21_, 1:120:15_, 1:128:4_, 1:138:23
ourselves [1]_ - 1:86:12
outcome [1]_ - 1:13:21
outfit [1]_ - 1:116:14
outlier [1]_ - 1:82:3
outrageous [1]_ - 1:107:22
outset [1]_ - 1:120:17
outside [9]_ - 1:10:7_, 1:10:15_, 1:13:11_, 1:30:18 _, 1:42:4_, 1:87:5_, 1:87:6_, 1:87:8_, 1:90:2
outstanding [1]_ - 1:38:25
overflow [1]_ - 1:4:6
overlap [4]_ - 1:6:3_, 1:7:5 _, 1:14:23_, 1:86:14
overlooked [1]_ - 1:58:12
overread [1]_ - 1:107:23
overriding [1]_ - 1:126:23
oversight [1]_ - 1:89:8
overview [1]_ - 1:41:20
owe [1]_ - 1:121:24
own [6]_ - 1:9:9_, 1:15:6_, 1:90:21_, 1:98:7_, 1:121:6
ownership [1]_ - 1:51:16

P

p.m [3]_ - 1:85:5_, 1:141:1
page [6]_ - 1:42:19_, 1:42:20_, 1:83:10_, 1:131:9 _, 1:139:20_, 1:139:23
pair [2]_ - 1:116:11_, 1:120:19
paper [1]_ - 1:133:12
papers [19]_ - 1:7:18_, 1:8:18_, 1:13:18_, 1:15:14_, 1:36:12_, 1:36:23_, 1:38:9_, 1:39:25_, 1:40:1_, 1:40:15_, 1:62:7_, 1:98:21_, 1:100:11 _, 1:114:3_, 1:121:10_, 1:135:16_, 1:139:14_, 1:139:15_, 1:139:16
paragraph [5]_ - 1:8:5_, 1:8:15_, 1:42:18_, 1:89:18_, 1:138:10
paragraphs [1]_ - 1:65:15
parallel [1]_ - 1:14:8
part [38]_ - 1:16:16_, 1:17:12_, 1:20:21_, 1:25:4_, 1:29:19_, 1:36:5_, 1:37:21_, 1:38:8_, 1:41:5_, 1:47:9_, 1:47:14_, 1:50:21_, 1:50:25 _, 1:51:4_, 1:53:5_, 1:59:17_, 1:60:21_, 1:61:24_, 1:66:6_, 1:79:1_, 1:81:7_, 1:84:19_, 1:120:20_, 1:121:20_, 1:123:24_, 1:123:25_, 1:125:5_, 1:126:14_, 1:126:18_, 1:128:3_, 1:128:4 _, 1:131:6_, 1:131:10_, 1:131:18_, 1:134:22
particular [7]_ - 1:34:17_, 1:35:5_, 1:41:17_, 1:88:23_, 1:98:17_, 1:106:12_, 1:138:18
particularly [3]_ - 1:42:19 _, 1:50:19_, 1:57:6
parties [3]_ - 1:3:7_, 1:115:21_, 1:115:22
partly [1]_ - 1:48:23
parts [3]_ - 1:27:7_, 1:54:8 _, 1:128:9
party [4]_ - 1:90:16_, 1:131:12_, 1:132:4_, 1:132:6
pass [2]_ - 1:7:21_, 1:81:24
passage [2]_ - 1:93:10_, 1:94:4
passages [1]_ - 1:29:18
passed [10]_ - 1:83:4_, 1:88:5_, 1:88:11_, 1:89:3_, 1:89:4_, 1:90:4_, 1:92:6_, 1:92:10_, 1:92:13_, 1:126:16
passing [2]_ - 1:126:18_, 1:135:19
past [4]_ - 1:3:25_, 1:22:24 _, 1:53:4_, 1:111:15
pattern [3]_ - 1:27:9_, 1:64:10_, 1:82:20
Pattern [1]_ - 1:27:16
pause [1]_ - 1:70:16
pausing [1]_ - 1:26:7
Pence [3]_ - 1:22:23_, 1:46:6_, 1:47:18
pending [4]_ - 1:84:13_, 1:96:2_, 1:97:19_, 1:97:21
people [5]_ - 1:37:17_, 1:39:10_, 1:50:24_, 1:53:11 _, 1:60:15
perfectly [1]_ - 1:106:24
perform [1]_ - 1:79:20
perhaps [9]_ - 1:7:23_, 1:7:24_, 1:17:14_, 1:17:16_, 1:28:7_, 1:91:19_, 1:91:22_, 1:93:15_, 1:124:15
period [7]_ - 1:8:7_, 1:46:17_, 1:48:21_, 1:76:19 _, 1:88:17_, 1:90:11_, 1:112:18
permanent [1]_ - 1:126:19
permissible [3]_ - 1:10:20 _, 1:40:4_, 1:124:17

permission [8]_ - 1:23:17_, 1:23:20_, 1:23:24_, 1:24:8_, 1:24:9_, 1:72:4_, 1:72:9_, 1:72:14
permissions [3]_ - 1:24:20_, 1:24:23_, 1:25:4
permit [3]_ - 1:21:22_, 1:72:12_, 1:97:5
permits [3]_ - 1:14:22_, 1:21:19_, 1:23:15
permitted [6]_ - 1:37:16_, 1:37:20_, 1:39:12_, 1:47:22_, 1:75:23_, 1:126:7
person [9]_ - 1:10:13_, 1:11:16_, 1:50:22_, 1:50:25_, 1:53:24_, 1:78:14_, 1:119:7_, 1:123:18_, 1:123:20
personal [109]_ - 1:7:7_, 1:7:16_, 1:8:11_, 1:8:22_, 1:9:4_, 1:12:10_, 1:12:25_, 1:13:10_, 1:13:14_, 1:19:4_, 1:22:9_, 1:22:17_, 1:33:8_, 1:33:9_, 1:42:13_, 1:43:11_, 1:43:21_, 1:43:25_, 1:44:13_, 1:44:14_, 1:44:21_, 1:44:25_, 1:45:4_, 1:45:25_, 1:65:12_, 1:68:23_, 1:87:3_, 1:88:17_, 1:88:23_, 1:90:9_, 1:90:10_, 1:90:21_, 1:91:14_, 1:92:18_, 1:93:10_, 1:94:18_, 1:95:21_, 1:96:17_, 1:96:23_, 1:97:4_, 1:97:7_, 1:98:2_, 1:98:9_, 1:98:15_, 1:98:22_, 1:98:23_, 1:99:24_, 1:100:4_, 1:101:16_, 1:101:21_, 1:103:23_, 1:104:22_, 1:105:16_, 1:105:21_, 1:106:13_, 1:106:17_, 1:108:14_, 1:109:11_, 1:109:19_, 1:109:23_, 1:112:10_, 1:112:11_, 1:112:18_, 1:113:2_, 1:113:10_, 1:113:12_, 1:113:13_, 1:113:22_, 1:114:4_, 1:114:22_, 1:117:12_, 1:117:19_, 1:118:6_, 1:118:25_, 1:119:8_, 1:119:13_, 1:119:15_, 1:120:15_, 1:121:23_, 1:125:3_, 1:125:7_, 1:125:16_, 1:126:18_, 1:127:12_, 1:127:14_, 1:127:20_, 1:128:1_, 1:128:4_, 1:132:25_, 1:133:18_, 1:133:22_, 1:134:21_, 1:135:1_, 1:136:5_, 1:136:19_, 1:136:23_, 1:137:3_, 1:137:4_, 1:137:5_, 1:137:13_, 1:137:21_, 1:138:4_, 1:138:7_, 1:138:9_, 1:138:12_, 1:138:21_, 1:139:9_, 1:139:14_, 1:140:5
personally [1]_ - 1:13:6
Personnel [1]_ - 1:55:17
persons [2]_ - 1:4:8_, 1:55:22
persuasive [2]_ - 1:26:21_, 1:32:13
Peterson [3]_ - 1:115:10_, 1:118:1_, 1:121:11
phone [1]_ - 1:63:14
phrase [10]_ - 1:14:19_, 1:18:7_, 1:19:8_, 1:19:13_, 1:24:3_, 1:25:6_, 1:25:10_, 1:33:24_, 1:36:9_, 1:122:1
phrased [1]_ - 1:35:16
phrases [1]_ - 1:15:17
picked [1]_ - 1:85:21
piece [5]_ - 1:24:13_, 1:26:12_, 1:28:15_, 1:61:4_, 1:129:7
pieces [3]_ - 1:26:23_, 1:26:24_, 1:128:9
Pierce [1]_ - 1:3:24
pin [1]_ - 1:125:15
pivot [1]_ - 1:115:5
pivots [1]_ - 1:107:14
place [11]_ - 1:83:12_, 1:95:9_, 1:95:24_, 1:96:7_, 1:116:10_, 1:116:25_, 1:119:5_, 1:121:18_, 1:126:15_, 1:129:23_, 1:137:25
places [1]_ - 1:129:14
plain [5]_ - 1:24:22_, 1:71:4_, 1:92:13_, 1:92:15_, 1:99:14
plainly [3]_ - 1:114:14_, 1:121:14_, 1:130:20
plan [1]_ - 1:57:1
planning [1]_ - 1:112:9
platforms [1]_ - 1:116:16
play [4]_ - 1:52:10_, 1:53:6_, 1:119:7_, 1:135:5
played [1]_ - 1:96:19
plays [1]_ - 1:109:14
pled [1]_ - 1:48:19
plenty [2]_ - 1:87:19_, 1:94:5
plus [4]_ - 1:26:12_, 1:26:23_, 1:26:24_, 1:27:25
podium [1]_ - 1:84:23
point [62]_ - 1:4:4_, 1:8:21_, 1:8:22_, 1:8:24_, 1:9:2_, 1:9:16_, 1:10:16_, 1:13:12_, 1:15:25_, 1:16:1_, 1:19:7_, 1:19:21_, 1:20:6_, 1:21:15_, 1:26:20_, 1:29:17_, 1:34:25_, 1:35:1_, 1:36:13_, 1:37:11_, 1:47:23_, 1:48:21_, 1:51:2_, 1:51:13_, 1:51:14_, 1:54:14_, 1:54:19_, 1:62:24_, 1:65:18_, 1:69:13_, 1:71:4_, 1:74:11_, 1:78:3_, 1:79:17_, 1:80:12_, 1:80:15_, 1:80:20_, 1:82:19_, 1:84:9_, 1:91:23_, 1:101:6_, 1:105:6_, 1:108:13_, 1:110:3_, 1:112:22_, 1:113:24_, 1:118:23_, 1:120:8_, 1:120:18_, 1:121:9_, 1:122:17_, 1:123:3_, 1:123:4_, 1:124:21_, 1:125:15_, 1:126:21_, 1:127:23_, 1:129:9_, 1:130:4_, 1:133:3_, 1:133:24_, 1:133:25
pointing [3]_ - 1:15:5_, 1:76:18_, 1:105:1
points [12]_ - 1:16:14_, 1:31:16_, 1:46:22_, 1:74:6_, 1:75:4_, 1:78:6_, 1:111:24_, 1:112:3_, 1:112:14_, 1:115:6_, 1:125:6_, 1:134:4
police [2]_ - 1:18:17_, 1:18:20
policy [1]_ - 1:73:3
political [3]_ - 1:21:21_, 1:32:3_, 1:67:12
politically [1]_ - 1:96:1
portion [5]_ - 1:25:9_, 1:44:6_, 1:44:15_, 1:120:1_, 1:123:15
position [46]_ - 1:8:21_, 1:12:12_, 1:20:15_, 1:22:11_, 1:25:7_, 1:28:20_, 1:31:12_, 1:34:15_, 1:36:12_, 1:38:6_, 1:41:21_, 1:43:17_, 1:47:23_, 1:48:8_, 1:61:15_, 1:64:1_, 1:66:10_, 1:73:7_, 1:75:6_, 1:76:24_, 1:78:10_, 1:79:6_, 1:82:12_, 1:82:14_, 1:84:8_, 1:87:1_, 1:89:13_, 1:90:8_, 1:91:8_, 1:92:3_, 1:93:9_, 1:96:8_, 1:97:1_, 1:97:3_, 1:101:15_, 1:105:17_, 1:122:5_, 1:125:4_, 1:131:12_, 1:132:15_, 1:132:17_, 1:132:18_, 1:133:21_, 1:134:17_, 1:135:18_, 1:135:20
positions [1]_ - 1:131:13
possess [1]_ - 1:126:2
possessed [1]_ - 1:47:7
possessing [1]_ - 1:69:9
possession [14]_ - 1:3:25_, 1:11:2_, 1:11:13_, 1:11:19_, 1:20:4_, 1:20:22_, 1:48:9_, 1:60:13_, 1:70:23_, 1:71:3_, 1:87:9_, 1:92:22_, 1:94:21_, 1:125:18
possibility [3]_ - 1:83:21_, 1:92:2_, 1:97:7
possible [9]_ - 1:28:10_, 1:29:9_, 1:34:11_, 1:34:13_, 1:82:9_, 1:112:23_, 1:113:1_, 1:118:22_, 1:127:7
possibly [3]_ - 1:91:1_, 1:123:19_, 1:135:3
post [13]_ - 1:36:24_, 1:37:5_, 1:39:7_, 1:47:8_, 1:48:9_, 1:51:21_, 1:53:8_, 1:56:11_, 1:63:1_, 1:69:10_, 1:74:20_, 1:76:18_, 1:83:2
post-Davis [1]_ - 1:83:2
post-inauguration [1]_ - 1:39:7
post-indictment [3]_ - 1:36:24_, 1:37:5_, 1:63:1
post-presidency [4]_ - 1:47:8_, 1:53:8_, 1:56:11_, 1:69:10
post-presidential [1]_ - 1:76:18
postconviction [1]_ - 1:10:8
postdated [2]_ - 1:46:7_, 1:46:8
postposition [2]_ - 1:48:9_, 1:65:22
postulate [1]_ - 1:58:24
postulates [1]_ - 1:121:20
posture [2]_ - 1:7:24_, 1:9:25
potential [17]_ - 1:8:1_, 1:26:4_, 1:57:2_, 1:72:20_, 1:73:8_, 1:73:10_, 1:73:11_, 1:73:18_, 1:73:19_, 1:73:23_, 1:74:2_, 1:82:10_, 1:83:24_, 1:129:23_, 1:130:1_, 1:137:19
potentially [9]_ - 1:40:13_, 1:69:7_, 1:92:17_, 1:94:1_, 1:98:24_, 1:102:8_, 1:102:9_, 1:102:12_, 1:137:20

power [11]_ - 1:32:15_, 1:32:16_, 1:32:17_, 1:72:9_, 1:88:21_, 1:105:5_, 1:117:19_, 1:120:7_, 1:120:9_, 1:122:13

powerless [3]_ - 1:119:4_, 1:119:6_, 1:122:15

powers [2]_ - 1:77:23_, 1:120:23

PRA [87]_ - 1:9:4_, 1:10:17_, 1:13:6_, 1:13:14_, 1:13:22_, 1:19:4_, 1:22:11_, 1:22:13_, 1:31:3_, 1:33:10_, 1:42:5_, 1:42:12_, 1:43:15_, 1:43:18_, 1:43:20_, 1:44:25_, 1:45:3_, 1:45:9_, 1:45:18_, 1:51:15_, 1:68:15_, 1:68:17_, 1:69:11_, 1:74:21_, 1:74:23_, 1:86:2_, 1:86:15_, 1:89:14_, 1:90:4_, 1:91:25_, 1:92:6_, 1:93:21_, 1:93:24_, 1:94:9_, 1:94:11_, 1:96:15_, 1:97:4_, 1:97:13_, 1:97:20_, 1:102:5_, 1:109:14_, 1:109:18_, 1:110:11_, 1:110:14_, 1:110:20_, 1:111:1_, 1:111:3_, 1:111:5_, 1:114:16_, 1:116:2_, 1:117:6_, 1:118:13_, 1:119:1_, 1:121:3_, 1:121:13_, 1:121:15_, 1:121:18_, 1:122:3_, 1:122:7_, 1:124:14_, 1:126:3_, 1:126:16_, 1:126:18_, 1:126:24_, 1:126:25_, 1:127:9_, 1:127:13_, 1:127:15_, 1:134:23_, 1:135:2_, 1:135:9_, 1:135:19_, 1:136:4_, 1:136:8_, 1:136:25_, 1:137:1_, 1:137:6_, 1:137:16_, 1:137:22_, 1:138:3_, 1:138:5_, 1:138:16_, 1:139:5

PRA's [3]_ - 1:91:5_, 1:118:13_, 1:127:16

practice [7]_ - 1:29:25_, 1:31:8_, 1:75:22_, 1:76:20_, 1:80:9_, 1:82:24_, 1:83:2

practices [2]_ - 1:110:12_, 1:111:15

pre [1]_ - 1:83:15

pre-Davis [1]_ - 1:83:15

precedent [4]_ - 1:25:8_, 1:94:6_, 1:94:16_, 1:96:3

precious [1]_ - 1:130:18

precise [1]_ - 1:118:23

predates [1]_ - 1:77:12

predicated [2]_ - 1:60:4_, 1:104:14

preexisting [2]_ - 1:53:2_, 1:53:4

premature [5]_ - 1:7:20_, 1:8:25_, 1:42:3_, 1:42:7_, 1:42:14

premised [1]_ - 1:114:8

present [5]_ - 1:3:18_, 1:5:18_, 1:42:23_, 1:86:4_, 1:117:14

presentation [4]_ - 1:6:4_, 1:36:5_, 1:36:17_, 1:83:9

presented [3]_ - 1:18:22_, 1:36:13_, 1:80:21

presenting [2]_ - 1:4:3_, 1:6:14

preservation [1]_ - 1:89:9

preserve [1]_ - 1:139:15

preserving [1]_ - 1:121:7

presidency [20]_ - 1:9:6_, 1:20:1_, 1:21:3_, 1:22:1_, 1:28:24_, 1:40:20_, 1:47:8_, 1:51:14_, 1:53:8_, 1:56:11_, 1:59:5_, 1:59:8_, 1:59:19_, 1:59:22_, 1:59:24_, 1:69:10_, 1:76:16_, 1:78:5_, 1:90:4_, 1:98:23

President [134]_ - 1:3:14_, 1:4:12_, 1:4:14_, 1:5:5_, 1:6:23_, 1:7:2_, 1:7:3_, 1:7:6_, 1:7:8_, 1:8:4_, 1:8:7_, 1:9:5_, 1:9:13_, 1:12:25_, 1:13:7_, 1:13:17_, 1:13:20_, 1:14:17_, 1:14:20_, 1:15:5_, 1:16:16_, 1:17:7_, 1:18:23_, 1:22:8_, 1:22:15_, 1:22:16_, 1:22:22_, 1:22:23_, 1:23:5_, 1:23:11_, 1:29:19_, 1:29:20_, 1:29:22_, 1:30:7_, 1:31:8_, 1:31:9_, 1:31:21_, 1:32:22_, 1:34:15_, 1:36:13_, 1:36:17_, 1:39:4_, 1:39:6_, 1:39:7_, 1:39:13_, 1:39:18_, 1:40:16_, 1:46:4_, 1:46:6_, 1:47:15_, 1:47:18_, 1:74:16_, 1:75:8_, 1:75:11_, 1:75:20_, 1:76:2_, 1:76:14_, 1:76:19_, 1:78:14_, 1:78:17_, 1:78:24_, 1:79:4_, 1:79:12_, 1:80:9_, 1:80:22_, 1:86:16_, 1:86:18_, 1:87:19_, 1:89:19_, 1:90:10_, 1:90:13_, 1:90:20_, 1:91:10_, 1:91:11_, 1:94:9_, 1:94:14_, 1:94:20_, 1:95:13_, 1:95:17_, 1:96:6_, 1:96:10_, 1:96:16_, 1:96:19_, 1:98:7_, 1:99:5_, 1:100:1_, 1:100:8_, 1:100:15_, 1:100:20_, 1:101:5_, 1:102:14_, 1:103:22_, 1:104:2_, 1:104:20_, 1:104:21_, 1:106:9_, 1:106:16_, 1:107:2_, 1:107:5_, 1:107:8_, 1:108:1_, 1:108:14_, 1:108:20_, 1:109:20_, 1:109:22_, 1:109:25_, 1:110:7_, 1:110:10_, 1:113:8_, 1:114:15_, 1:115:19_, 1:122:21_, 1:128:8_, 1:132:19_, 1:133:5_, 1:133:9_, 1:133:14_, 1:134:19_, 1:136:4_, 1:136:18_, 1:137:22_, 1:137:23_, 1:140:2_, 1:140:3

president [97]_ - 1:12:10_, 1:22:16_, 1:24:10_, 1:28:19_, 1:28:23_, 1:30:12_, 1:31:1_, 1:33:9_, 1:33:15_, 1:42:13_, 1:42:16_, 1:42:20_, 1:43:6_, 1:43:19_, 1:44:7_, 1:44:8_, 1:44:9_, 1:44:12_, 1:44:18_, 1:44:20_, 1:45:23_, 1:46:10_, 1:47:11_, 1:49:17_, 1:51:18_, 1:52:2_, 1:52:18_, 1:52:23_, 1:53:7_, 1:53:11_, 1:55:23_, 1:56:9_, 1:56:10_, 1:56:22_, 1:57:14_, 1:62:10_, 1:64:24_, 1:66:16_, 1:67:16_, 1:69:8_, 1:69:22_, 1:74:22_, 1:76:8_, 1:85:11_, 1:88:9_, 1:88:13_, 1:89:9_, 1:89:20_, 1:89:21_, 1:89:25_, 1:90:21_, 1:91:11_, 1:92:9_, 1:92:10_, 1:92:13_, 1:93:22_, 1:94:8_, 1:96:21_, 1:98:9_, 1:99:1_, 1:99:24_, 1:100:1_, 1:100:16_, 1:101:21_, 1:102:13_, 1:102:14_, 1:104:3_, 1:105:21_, 1:106:10_, 1:108:22_, 1:109:7_, 1:118:6_, 1:118:18_, 1:119:16_, 1:120:14_, 1:121:16_, 1:121:21_, 1:126:19_, 1:133:10_, 1:135:10_, 1:136:4_, 1:136:12_, 1:136:13_, 1:137:10_, 1:137:11_, 1:137:20_, 1:137:21_, 1:138:16_, 1:138:20_, 1:139:6_, 1:139:7_, 1:139:13

president's [14]_ - 1:29:9_, 1:41:24_, 1:44:7_, 1:65:7_, 1:88:22_, 1:89:9_, 1:92:9_, 1:100:3_, 1:102:18_, 1:114:23_, 1:116:1_, 1:116:5_, 1:136:16

President-elect [1]_ - 1:39:6

presidential [61]_ - 1:7:9_, 1:13:14_, 1:23:4_, 1:43:12_, 1:43:13_, 1:43:21_, 1:43:25_, 1:44:3_, 1:44:4_, 1:44:21_, 1:45:5_, 1:45:25_, 1:56:7_, 1:68:22_, 1:68:23_, 1:76:18_, 1:87:23_, 1:88:15_, 1:88:24_, 1:90:1_, 1:90:8_, 1:90:9_, 1:90:10_, 1:92:16_, 1:96:14_, 1:97:6_, 1:97:13_, 1:98:2_, 1:98:9_, 1:102:7_, 1:104:22_, 1:105:15_, 1:109:11_, 1:113:2_, 1:114:12_, 1:114:22_, 1:115:19_, 1:116:3_, 1:116:25_, 1:117:7_, 1:117:9_, 1:117:11_, 1:117:18_, 1:117:21_, 1:118:9_, 1:118:15_, 1:118:25_, 1:119:2_, 1:119:4_, 1:119:15_, 1:128:1_, 1:128:5_, 1:128:9_, 1:128:10_, 1:133:8_, 1:133:14_, 1:133:22_, 1:137:2_, 1:137:11_, 1:137:14_, 1:138:19

Presidential [16]_ - 1:4:14_, 1:7:7_, 1:33:7_, 1:74:7_, 1:85:10_, 1:86:18_, 1:88:11_, 1:92:10_, 1:93:5_, 1:93:8_, 1:97:16_, 1:112:19_, 1:126:6_, 1:134:5_, 1:136:11_, 1:140:9

Presidents [1]_ - 1:99:19

presidents [20]_ - 1:19:3_, 1:22:24_, 1:33:23_, 1:37:23_, 1:46:14_, 1:65:25_, 1:66:1_, 1:66:5_, 1:80:11_, 1:80:13_, 1:88:6_, 1:98:13_, 1:101:13_, 1:107:4_, 1:110:9_, 1:110:10_, 1:139:15_, 1:139:16

press [1]_ - 1:107:6

pressing [3]_ - 1:16:1_, 1:134:12_, 1:140:12

presumably [1]_ - 1:113:21

presumption [2]_ - 1:114:7_, 1:114:8

pretend [1]_ - 1:28:11

pretrial [2]_ - 1:5:17_, 1:86:15

pretty [1]_ - 1:83:3

prevent [1]_ - 1:15:7

prevents [1]_ - 1:34:4

preview [1]_ - 1:31:4

previously [1]_ - 1:139:9

principally [1] - 1:15:24
principle [1] - 1:104:18
principles [1] - 1:91:6
private [7] - 1:23:25, 1:24:22, 1:25:4, 1:44:15, 1:116:2, 1:120:9, 1:121:2
privilege [8] - 1:7:8, 1:31:18, 1:31:24, 1:32:1, 1:32:4, 1:38:9, 1:38:13, 1:38:14
privileges [1] - 1:111:12
problem [3] - 1:27:19, 1:53:16, 1:71:1
problematic [5] - 1:14:21, 1:18:15, 1:19:13, 1:25:13, 1:28:5
problems [1] - 1:28:13
procedural [1] - 1:118:10
procedure [1] - 1:139:1
procedures [1] - 1:124:2
proceeding [7] - 1:5:6, 1:5:7, 1:13:19, 1:100:22, 1:112:22, 1:131:13, 1:134:16
proceedings [2] - 1:63:15, 1:141:1
process [8] - 1:29:3, 1:36:23, 1:38:11, 1:54:13, 1:66:7, 1:67:18, 1:69:17, 1:96:18
produced [3] - 1:63:5, 1:63:16, 1:101:22
proffers [1] - 1:9:23
programs [1] - 1:68:8
prohibiting [1] - 1:83:8
prohibition [2] - 1:20:7, 1:21:11
prohibitions [1] - 1:50:10
promptly [1] - 1:140:25
promulgate [3] - 1:15:16, 1:19:2, 1:32:22
prong [8] - 1:14:25, 1:35:10, 1:35:13, 1:50:17, 1:50:20, 1:71:24, 1:79:14, 1:83:17
prongs [2] - 1:28:14, 1:42:9
proof [5] - 1:40:12, 1:47:10, 1:49:3, 1:52:12, 1:58:23
proper [2] - 1:72:13, 1:92:20
property [1] - 1:24:1
proposed [1] - 1:16:16
proposition [1] - 1:54:24
prosecute [2] - 1:47:11, 1:60:15
prosecuted [2] - 1:80:24, 1:128:13
prosecuting [1] - 1:53:12
prosecution [16] - 1:14:23, 1:21:14, 1:32:24, 1:52:11, 1:67:13, 1:81:1, 1:84:4, 1:84:13, 1:84:19, 1:95:8, 1:95:11, 1:106:21, 1:106:22, 1:124:1, 1:124:6, 1:130:1
prosecutions [5] - 1:48:8, 1:49:7, 1:65:23, 1:66:1, 1:66:4
prosecutor [1] - 1:67:3
prosecutors [2] - 1:80:1, 1:95:23
prospective [1] - 1:75:12
protect [1] - 1:56:3
protected [2] - 1:38:23, 1:40:22
protecting [2] - 1:121:7, 1:127:10
protects [1] - 1:66:24
prove [6] - 1:47:16, 1:49:16, 1:92:21, 1:92:22, 1:138:20, 1:138:21
proves [1] - 1:133:3
provide [5] - 1:15:21, 1:16:21, 1:30:6, 1:39:5, 1:57:22
provided [11] - 1:24:10, 1:31:21, 1:39:11, 1:40:2, 1:44:23, 1:62:6, 1:62:16, 1:67:15
provides [3] - 1:12:8, 1:66:20, 1:66:23
providing [2] - 1:38:10, 1:38:13
provision [1] - 1:109:1
provisions [3] - 1:44:19, 1:117:5, 1:127:6
public [4] - 1:36:2, 1:65:3, 1:65:14, 1:70:15
publicity [1] - 1:22:21
publisher [1] - 1:42:22
puppets [1] - 1:132:21
purely [1] - 1:44:15
purport [1] - 1:110:20
purports [1] - 1:5:17
purpose [7] - 1:64:6, 1:64:11, 1:64:17, 1:64:19, 1:111:10, 1:121:17, 1:123:22
purposeful [1] - 1:19:23
purposefully [1] - 1:27:13
purposely [2] - 1:27:14, 1:132:6
purposes [6] - 1:6:5, 1:42:14, 1:66:6, 1:68:13, 1:117:15, 1:134:18
pursuant [2] - 1:7:7, 1:31:5
pursued [1] - 1:102:23
put [17] - 1:5:14, 1:16:20, 1:30:2, 1:32:2, 1:33:2, 1:61:2, 1:62:10, 1:68:4, 1:70:11, 1:72:18, 1:94:5, 1:96:20, 1:114:2, 1:114:4, 1:118:11, 1:121:21, 1:125:15
puts [1] - 1:68:18
putting [5] - 1:63:16, 1:65:25, 1:66:10, 1:69:6, 1:94:20
puzzle [1] - 1:129:7

## Q

Q-classified [1] - 1:61:1
Q-level [1] - 1:62:12
qualified [1] - 1:31:23
quash [1] - 1:139:1
questioned [2] - 1:102:15, 1:113:3
questions [3] - 1:41:23, 1:52:17, 1:134:8
quickly [1] - 1:129:10
quite [8] - 1:24:21, 1:56:9, 1:77:2, 1:102:13, 1:129:5, 1:129:25, 1:132:11
quotation [2] - 1:72:7, 1:117:1
quote [6] - 1:18:17, 1:55:1, 1:72:9, 1:72:11, 1:117:12, 1:132:5
quoted [2] - 1:23:5, 1:71:11
quotes [1] - 1:72:11
quoting [6] - 1:72:7, 1:79:19, 1:83:10, 1:132:3, 1:133:6, 1:134:15

## R

raise [3] - 1:34:25, 1:87:25, 1:96:7
raised [8] - 1:34:13, 1:41:22, 1:82:22, 1:83:1, 1:93:16, 1:98:20, 1:115:11, 1:134:13
Random [2] - 1:71:13, 1:72:8
ranking [1] - 1:66:1
rather [2] - 1:45:18, 1:52:4
Ratzlafv [1] - 1:64:9
Ratzlafv/Cheek [1] - 1:49:10
rea [5] - 1:25:14, 1:27:5, 1:28:16, 1:64:7, 1:124:10
reach [4] - 1:54:14, 1:54:19, 1:54:23, 1:58:5
reached [1] - 1:22:23
reaching [1] - 1:107:12
read [19] - 1:10:23, 1:20:2, 1:26:10, 1:44:1, 1:47:13, 1:84:15, 1:112:20, 1:112:21, 1:121:15, 1:123:15, 1:127:6, 1:127:8, 1:127:9, 1:127:11, 1:130:19, 1:131:15, 1:131:16, 1:138:2
reading [6] - 1:107:19, 1:115:16, 1:123:14, 1:132:11, 1:139:18, 1:139:19
ready [1] - 1:29:14
Reagan [18] - 1:21:16, 1:22:15, 1:31:9, 1:74:17, 1:94:9, 1:94:15, 1:94:21, 1:98:25, 1:101:14, 1:107:5, 1:109:5, 1:109:25, 1:110:15, 1:115:22, 1:127:19, 1:128:15, 1:134:25, 1:137:23
Reagan's [2] - 1:109:20, 1:128:8
real [1] - 1:115:3
realistic [1] - 1:46:11
realized [1] - 1:52:2
really [39] - 1:7:23, 1:9:25, 1:14:16, 1:17:13, 1:18:3, 1:18:13, 1:22:1, 1:28:16, 1:30:23, 1:34:6, 1:35:11, 1:35:19, 1:35:20, 1:40:2, 1:41:25, 1:47:10

_, 1:50:21_, 1:52:12_, 1:53:5_, 1:53:17_, 1:54:19_, 1:56:8_, 1:57:1_, 1:57:19_, 1:59:1_, 1:63:23_, 1:67:2_, 1:70:1_, 1:71:9_, 1:73:13_, 1:79:13_, 1:81:4_, 1:89:7_, 1:93:20_, 1:94:13_, 1:97:14_, 1:122:24_, 1:133:3_, 1:135:22
rearing [1]_ - 1:124:12
reason [16]_ - 1:22:11_, 1:22:12_, 1:26:7_, 1:31:2_, 1:37:10_, 1:57:8_, 1:84:14_, 1:95:25_, 1:96:20_, 1:100:21_, 1:101:12_, 1:116:21_, 1:120:20_, 1:124:22_, 1:130:17_, 1:135:24
reasonable [7]_ - 1:14:12_, 1:24:25_, 1:31:5_, 1:31:10_, 1:47:16_, 1:66:9_, 1:83:21
reasonably [6]_ - 1:14:3_, 1:44:5_, 1:44:15_, 1:65:19_, 1:69:14_, 1:138:11
reasoning [2]_ - 1:25:22_, 1:106:8
reasons [12]_ - 1:8:3_, 1:14:19_, 1:30:4_, 1:42:2_, 1:60:12_, 1:67:12_, 1:86:23_, 1:89:1_, 1:112:13_, 1:125:22_, 1:129:20_, 1:137:8
rebuttal [1]_ - 1:74:25
receive [25]_ - 1:9:23_, 1:11:4_, 1:11:16_, 1:11:22_, 1:12:1_, 1:13:7_, 1:14:20_, 1:15:10_, 1:15:20_, 1:19:8_, 1:41:2_, 1:50:15_, 1:50:17_, 1:51:1_, 1:51:4_, 1:51:7_, 1:51:9_, 1:52:8_, 1:52:10_, 1:52:19_, 1:57:17_, 1:59:2_, 1:70:22_, 1:71:25_, 1:75:16
received [4]_ - 1:44:6_, 1:76:15_, 1:101:7_, 1:134:1
receives [1]_ - 1:52:18
recent [2]_ - 1:27:2_, 1:116:14
recently [3]_ - 1:17:5_, 1:82:15_, 1:110:17
recess [3]_ - 1:85:5_, 1:134:13_, 1:140:24
recesses [1]_ - 1:4:1
recessing [1]_ - 1:85:2
recipient [1]_ - 1:79:19
recites [1]_ - 1:80:9
recognized [1]_ - 1:72:13
record [37]_ - 1:23:4_, 1:29:3_, 1:43:25_, 1:44:3_, 1:44:4_, 1:44:21_, 1:44:25_, 1:45:4_, 1:85:23_, 1:98:2_, 1:99:17_, 1:101:16_, 1:101:21_, 1:102:7_, 1:102:9_, 1:106:12_, 1:106:13_, 1:108:9_, 1:108:17_, 1:109:11_, 1:109:19_, 1:116:25_, 1:117:11_, 1:118:9_, 1:119:4_, 1:123:16_, 1:128:1_, 1:128:4_, 1:129:2_, 1:130:11_, 1:135:1_, 1:138:5_, 1:138:7
recordings [2]_ - 1:108:4_, 1:108:19
recordkeeping [1]_ - 1:110:12
Records [16]_ - 1:4:14_, 1:7:7_, 1:33:7_, 1:74:7_, 1:85:10_, 1:86:18_, 1:88:11_, 1:92:10_, 1:93:5_, 1:93:9_, 1:97:16_, 1:112:19_, 1:126:6_, 1:134:5_, 1:136:11_, 1:140:10
records [94]_ - 1:7:6_, 1:8:4_, 1:8:11_, 1:9:9_, 1:12:10_, 1:12:12_, 1:12:24_, 1:12:25_, 1:13:1_, 1:13:6_, 1:13:7_, 1:13:10_, 1:19:4_, 1:22:8_, 1:22:16_, 1:31:1_, 1:33:8_, 1:33:9_, 1:37:1_, 1:42:13_, 1:43:12_, 1:43:13_, 1:44:13_, 1:44:14_, 1:45:25_, 1:78:21_, 1:86:19_, 1:87:3_, 1:87:23_, 1:88:14_, 1:88:15_, 1:88:16_, 1:89:22_, 1:89:25_, 1:90:1_, 1:90:9_, 1:90:22_, 1:92:14_, 1:92:16_, 1:92:17_, 1:92:18_, 1:93:10_, 1:94:18_, 1:96:9_, 1:96:14_, 1:96:16_, 1:97:6_, 1:98:7_, 1:98:9_, 1:98:15_, 1:99:24_, 1:100:4_, 1:102:7_, 1:102:14_, 1:103:22_, 1:105:15_, 1:105:16_, 1:106:11_, 1:106:17_, 1:109:23_, 1:112:18_, 1:113:13_, 1:115:19_, 1:117:7_, 1:118:15_, 1:119:2_, 1:119:15_, 1:121:17_, 1:121:22_, 1:122:19_, 1:126:19_, 1:127:12_, 1:127:20_, 1:128:10_, 1:133:8_, 1:133:14_, 1:133:17_, 1:134:21_, 1:136:5_, 1:136:13_, 1:136:17_, 1:137:2_, 1:137:3_, 1:137:4_, 1:137:6_, 1:137:12_, 1:137:14_, 1:137:21_, 1:138:21_, 1:139:6
records' [1]_ - 1:116:4
recover [6]_ - 1:30:25_, 1:118:15_, 1:119:2_, 1:119:15_, 1:122:13_, 1:122:18
red [2]_ - 1:135:22_, 1:135:24
redact [1]_ - 1:135:3
redressability [4]_ - 1:107:15_, 1:120:1_, 1:120:3
refer [9]_ - 1:26:11_, 1:64:4_, 1:103:13_, 1:104:19_, 1:104:23_, 1:105:2_, 1:107:9_, 1:122:18_, 1:124:5
reference [5]_ - 1:15:10_, 1:50:14_, 1:53:17_, 1:54:11_, 1:64:19
referenced [5]_ - 1:30:10_, 1:53:21_, 1:54:19_, 1:76:1_, 1:136:24
references [3]_ - 1:40:9_, 1:64:16_, 1:68:23
referencing [2]_ - 1:87:15_, 1:91:17
referral [20]_ - 1:30:10_, 1:30:11_, 1:30:13_, 1:30:18_, 1:31:4_, 1:31:11_, 1:31:12_, 1:46:3_, 1:46:4_, 1:100:7_, 1:101:2_, 1:101:5_, 1:102:20_, 1:102:22_, 1:103:4_, 1:103:9_, 1:104:4_, 1:105:14_, 1:122:22_, 1:123:6
referrals [5]_ - 1:30:21_, 1:30:23_, 1:30:24_, 1:46:3_, 1:46:6
referred [1]_ - 1:122:19
referring [8]_ - 1:4:18_, 1:11:17_, 1:29:5_, 1:65:1_, 1:104:12_, 1:104:24_, 1:105:5
refers [4]_ - 1:17:19_, 1:27:22_, 1:29:24
refined [1]_ - 1:50:1
reflected [1]_ - 1:31:8
reflects [4]_ - 1:29:3_, 1:30:5_, 1:30:7_, 1:35:3
refuted [1]_ - 1:80:7
regard [1]_ - 1:16:15
regarding [2]_ - 1:29:21_, 1:75:21
regs [1]_ - 1:136:3
regular [1]_ - 1:53:24
regulating [1]_ - 1:120:22
regulation [3]_ - 1:62:13_, 1:123:5_, 1:124:7
regulations [4]_ - 1:15:11_, 1:15:17_, 1:19:2_, 1:123:17
reinforces [2]_ - 1:43:18_, 1:45:20
rejected [2]_ - 1:28:3_, 1:32:7
relate [6]_ - 1:19:24_, 1:20:13_, 1:31:20_, 1:31:21_, 1:44:10_, 1:44:16
related [4]_ - 1:39:8_, 1:39:22_, 1:62:17_, 1:84:12
relates [8]_ - 1:8:6_, 1:31:18_, 1:43:16_, 1:49:2_, 1:75:5_, 1:75:25_, 1:83:16_, 1:99:25
relating [8]_ - 1:11:14_, 1:11:19_, 1:19:3_, 1:30:24_, 1:40:4_, 1:70:11_, 1:80:13_, 1:112:7
relationship [1]_ - 1:67:17
relative [3]_ - 1:35:24_, 1:37:12_, 1:37:19
release [2]_ - 1:73:17_, 1:73:19
relevance [2]_ - 1:31:18_, 1:130:2
relevant [9]_ - 1:40:6_, 1:40:7_, 1:40:11_, 1:40:15_, 1:66:15_, 1:81:11_, 1:86:15_, 1:106:22_, 1:134:1
reliance [1]_ - 1:81:17
relied [2]_ - 1:15:20_, 1:25:18
relief [4]_ - 1:5:5_, 1:5:7_, 1:91:23_, 1:107:16
relies [3]_ - 1:10:10_, 1:29:19_, 1:42:4
reluctant [1]_ - 1:73:6
rely [2]_ - 1:32:21_, 1:114:7
relying [2]_ - 1:27:2_, 1:36:15
remain [1]_ - 1:43:14
remained [1]_ - 1:110:15
remains [1]_ - 1:104:19
remark [1]_ - 1:132:7
remedy [1]_ - 1:25:7
remember [4]_ - 1:92:5_, 1:120:5_, 1:122:17_, 1:123:13
remotely [2]_ - 1:46:15_, 1:114:12
removal [3]_ - 1:8:10_,

1:8:18_, 1:19:22
remove [2]_ - 1:9:8_, 1:60:24
removed [6]_ - 1:8:5_, 1:20:5_, 1:22:16_, 1:29:1_, 1:59:10_, 1:63:12
rendered [1]_ - 1:121:22
repeal [2]_ - 1:89:17_, 1:122:6
repealed [1]_ - 1:89:14
repeat [2]_ - 1:86:12_, 1:125:14
repeatedly [5]_ - 1:39:15_, 1:67:11_, 1:96:8_, 1:102:17_, 1:135:18
replevin [1]_ - 1:118:16
replied [1]_ - 1:100:9
replies [3]_ - 1:5:12_, 1:5:23
reply [9]_ - 1:23:1_, 1:65:16_, 1:67:9_, 1:68:2_, 1:100:10_, 1:123:4_, 1:128:21_, 1:130:8_, 1:140:8
Report [1]_ - 1:100:14
report [3]_ - 1:21:17_, 1:47:13_, 1:123:21
report's [1]_ - 1:47:14
reporter [1]_ - 1:50:23
representations [1]_ - 1:108:18
representative [1]_ - 1:137:4
represented [2]_ - 1:62:21_, 1:63:18
representing [1]_ - 1:135:17
Republicans [1]_ - 1:52:5
request [7]_ - 1:37:22_, 1:37:25_, 1:38:25_, 1:39:1_, 1:39:2_, 1:39:3_, 1:91:5
requests [1]_ - 1:39:8
require [15]_ - 1:7:2_, 1:7:21_, 1:26:12_, 1:26:16_, 1:27:25_, 1:41:1_, 1:49:16_, 1:52:14_, 1:82:10_, 1:87:4_, 1:89:13_, 1:89:16_, 1:90:1_, 1:91:25_, 1:124:14
required [3]_ - 1:26:5_, 1:75:13_, 1:76:4
requirement [9]_ - 1:23:24_, 1:24:4_, 1:25:25_, 1:26:1_, 1:26:2_, 1:55:19_, 1:59:25_, 1:78:11_, 1:81:22
requires [8]_ - 1:26:10_, 1:31:5_, 1:44:21_, 1:79:18_, 1:79:19_, 1:84:20_, 1:86:16_, 1:92:2
Researchers [1]_ - 1:55:17
reserves [1]_ - 1:107:13
residence [2]_ - 1:9:10_, 1:12:10
residences [2]_ - 1:39:5_, 1:39:23
residual [1]_ - 1:17:4
resolution [1]_ - 1:7:11
resolve [3]_ - 1:27:21_, 1:32:3_, 1:81:20
resort [10]_ - 1:23:14_, 1:41:1_, 1:52:14_, 1:56:23_, 1:56:25_, 1:82:2_, 1:87:5_, 1:93:5_, 1:124:14_, 1:130:15
resorts [1]_ - 1:10:7
respect [32]_ - 1:6:11_, 1:6:22_, 1:7:4_, 1:13:16_, 1:15:4_, 1:35:25_, 1:38:7_, 1:39:13_, 1:42:5_, 1:42:8_, 1:42:12_, 1:45:11_, 1:46:3_, 1:46:5_, 1:47:18_, 1:52:22_, 1:61:11_, 1:62:5_, 1:68:22_, 1:71:3_, 1:75:17_, 1:77:9_, 1:78:24_, 1:81:9_, 1:90:8_, 1:92:8_, 1:92:14_, 1:97:3_, 1:97:9_, 1:97:11_, 1:110:4_, 1:134:14
respectfully [6]_ - 1:13:12_, 1:15:25_, 1:23:18_, 1:70:7_, 1:83:14_, 1:135:23
respective [1]_ - 1:5:22
respects [1]_ - 1:21:13
respond [1]_ - 1:74:6
response [10]_ - 1:23:5_, 1:23:6_, 1:38:8_, 1:60:21_, 1:60:22_, 1:71:10_, 1:75:5_, 1:103:15_, 1:130:10_, 1:130:19
responses [1]_ - 1:84:11
responsibility [1]_ - 1:107:10
responsible [1]_ - 1:35:7
rest [1]_ - 1:122:6
restate [1]_ - 1:85:23
restricted [1]_ - 1:9:18
restrictions [1]_ - 1:78:12
rests [1]_ - 1:35:20
result [1]_ - 1:7:2
resume [2]_ - 1:75:2_, 1:85:3
retain [6]_ - 1:37:21_, 1:65:8_, 1:86:18_, 1:112:11_, 1:112:12_, 1:126:7
retained [2]_ - 1:11:15_, 1:47:12
retaining [1]_ - 1:45:25
retains [2]_ - 1:11:2_, 1:11:20
retention [13]_ - 1:11:6_, 1:19:19_, 1:20:17_, 1:20:22_, 1:46:23_, 1:47:2_, 1:48:20_, 1:60:1_, 1:60:11_, 1:73:25_, 1:74:1_, 1:74:2_, 1:86:17
retrenchment [1]_ - 1:77:12
retrieve [2]_ - 1:12:11_, 1:14:17
retroactively [4]_ - 1:36:25_, 1:37:5_, 1:37:18_, 1:62:4
return [13]_ - 1:48:14_, 1:49:4_, 1:51:5_, 1:51:8_, 1:52:7_, 1:52:11_, 1:58:24_, 1:60:4_, 1:75:8_, 1:99:1_, 1:139:8_, 1:140:4
returned [8]_ - 1:11:16_, 1:48:12_, 1:48:13_, 1:51:13_, 1:51:18_, 1:58:25_, 1:75:14_, 1:138:25
returning [1]_ - 1:51:20
reus [3]_ - 1:50:21_, 1:50:25_, 1:51:4
reveal [1]_ - 1:133:19
reversed [1]_ - 1:131:22
reversing [1]_ - 1:131:20
Review [1]_ - 1:16:18
review [22]_ - 1:32:12_, 1:68:25_, 1:74:13_, 1:89:7_, 1:97:7_, 1:97:9_, 1:98:1_, 1:98:4_, 1:98:6_, 1:101:24_, 1:102:2_, 1:102:8_, 1:107:14_, 1:109:11_, 1:116:1_, 1:117:12_, 1:117:17_, 1:117:21_, 1:118:25_, 1:119:19_, 1:120:1_, 1:120:15
reviewability [1]_ - 1:116:24
reviewable [1]_ - 1:97:10
reviewed [7]_ - 1:5:21_, 1:6:2_, 1:97:15_, 1:101:21_, 1:101:22_, 1:118:8_, 1:137:3
reviewing [1]_ - 1:97:12
reviews [1]_ - 1:134:16
revocation [1]_ - 1:29:21
rewrite [2]_ - 1:17:8_, 1:82:18
rights [1]_ - 1:24:1
ring [1]_ - 1:111:16
rise [1]_ - 1:16:23
role [2]_ - 1:83:10_, 1:101:15
room [3]_ - 1:4:6_, 1:52:3_, 1:112:16
root [2]_ - 1:45:12_, 1:45:14
rooted [2]_ - 1:104:15_, 1:124:9
Rosen [11]_ - 1:12:17_, 1:12:22_, 1:13:2_, 1:15:24_, 1:15:25_, 1:16:3_, 1:50:19_, 1:54:9_, 1:64:14_, 1:77:17
routinely [1]_ - 1:49:7
rubrics [1]_ - 1:129:12
rule [8]_ - 1:42:8_, 1:42:11_, 1:55:5_, 1:83:7_, 1:83:24_, 1:104:15_, 1:119:23_, 1:119:25
Rule [4]_ - 1:42:14_, 1:112:6_, 1:112:22_, 1:114:6
rulemaking [4]_ - 1:15:6_, 1:16:18_, 1:17:3_, 1:53:18
rules [7]_ - 1:3:24_, 1:18:17_, 1:18:20_, 1:90:6_, 1:92:7_, 1:102:10_, 1:126:20
ruling [4]_ - 1:25:19_, 1:91:25_, 1:107:13_, 1:140:25
rulings [1]_ - 1:25:20
run [2]_ - 1:21:11_, 1:53:25
running [1]_ - 1:20:6
runs [1]_ - 1:46:19

## S

safeguarded [1]_ - 1:56:5
sake [1]_ - 1:11:11
salient [1]_ - 1:15:1
Sasha [1]_ - 1:3:17
satisfied [2]_ - 1:48:3_, 1:52:12
satisfy [1]_ - 1:58:25
save [4]_ - 1:33:25_, 1:82:7_, 1:82:18_, 1:83:8
saves [1]_ - 1:83:5
saw [2]_ - 1:88:14_, 1:96:24
scenario [2]_ - 1:60:8_,

1:61:18
schedule [1]_ - 1:131:22
Schulte [3]_ - 1:10:9_, 1:27:2_, 1:77:15
SCI [1]_ - 1:68:8
SCIF [1]_ - 1:61:1
scope [3]_ - 1:17:23_, 1:76:23_, 1:89:7
scrutiny [1]_ - 1:22:23
SDNY [1]_ - 1:77:15
search [3]_ - 1:46:20_, 1:84:20_, 1:109:25
seated [3]_ - 1:3:3_, 1:4:1_, 1:85:6
second [12]_ - 1:4:12_, 1:7:5_, 1:9:16_, 1:70:16_, 1:114:21_, 1:121:9_, 1:122:11_, 1:124:18_, 1:125:5_, 1:125:6_, 1:125:15_, 1:129:19
second-guess [1]_ - 1:114:21
secrecy [2]_ - 1:35:20_, 1:54:17
secret [2]_ - 1:43:9_, 1:68:7
secretary [2]_ - 1:62:14_, 1:107:5
Secretary [3]_ - 1:65:10_, 1:80:23_, 1:107:5
secrets [3]_ - 1:30:1_, 1:121:8_, 1:133:12
section [2]_ - 1:55:25_, 1:80:13
Section [14]_ - 1:6:20_, 1:13:1_, 1:16:19_, 1:36:16_, 1:40:24_, 1:41:10_, 1:44:2_, 1:53:7_, 1:55:20_, 1:79:16_, 1:123:9_, 1:123:23_, 1:123:24_, 1:138:6
secure [6]_ - 1:39:4_, 1:39:22_, 1:39:23_, 1:40:6_, 1:40:10_, 1:40:22
security [9]_ - 1:29:21_, 1:32:9_, 1:32:12_, 1:32:14_, 1:32:19_, 1:32:24_, 1:33:14_, 1:56:3_, 1:110:7
Security [4]_ - 1:18:25_, 1:23:22_, 1:25:1_, 1:73:3
See [1]_ - 1:43:6
see [23]_ - 1:5:12_, 1:23:3_, 1:43:2_, 1:50:12_, 1:53:16_, 1:54:9_, 1:55:12_, 1:59:3_, 1:63:25_, 1:64:20_, 1:65:20_, 1:66:11_, 1:67:17_, 1:71:16_, 1:93:17_, 1:96:18_, 1:100:4_, 1:120:13_, 1:124:11_, 1:129:14_, 1:130:18_, 1:130:20_, 1:139:6
seeing [1]_ - 1:91:18
seeking [3]_ - 1:91:24_, 1:121:2_, 1:121:5
seem [3]_ - 1:75:18_, 1:100:14_, 1:106:3
sees [3]_ - 1:52:23_, 1:136:13_, 1:139:7
segregability [1]_ - 1:127:24
segregable [5]_ - 1:44:6_, 1:44:15_, 1:45:6_, 1:128:3_, 1:128:4
seize [2]_ - 1:91:2_, 1:91:9
seized [1]_ - 1:119:8
seizure [3]_ - 1:91:4_, 1:105:19_, 1:105:21
selective [8]_ - 1:14:23_, 1:21:13_, 1:67:13_, 1:81:1_, 1:95:8_, 1:95:10_, 1:106:21_, 1:129:25
self [1]_ - 1:118:14
self-contained [1]_ - 1:118:14
Senate [1]_ - 1:16:17
send [9]_ - 1:84:16_, 1:84:24_, 1:91:12_, 1:96:22_, 1:136:22_, 1:137:15_, 1:138:19
sending [1]_ - 1:136:17
senior [1]_ - 1:55:25
sense [4]_ - 1:14:22_, 1:29:7_, 1:50:5_, 1:73:6
sensitive [5]_ - 1:30:1_, 1:31:22_, 1:44:24_, 1:112:7_, 1:129:5
sensitivity [2]_ - 1:41:6_, 1:68:11
sent [5]_ - 1:91:13_, 1:100:2_, 1:122:21_, 1:137:2_, 1:138:22
sentence [3]_ - 1:38:3_, 1:125:14_, 1:130:12
separate [5]_ - 1:67:14_, 1:68:17_, 1:103:17_, 1:131:13_, 1:135:12
separation [2]_ - 1:77:23_, 1:120:23
sequence [3]_ - 1:81:7_, 1:115:16
series [2]_ - 1:27:1_, 1:118:1
serious [1]_ - 1:28:4
served [1]_ - 1:55:23
server [1]_ - 1:65:12
serves [1]_ - 1:116:14
serving [1]_ - 1:80:5
session [2]_ - 1:85:8_, 1:136:15
set [9]_ - 1:4:6_, 1:28:11_, 1:70:1_, 1:70:4_, 1:85:3_, 1:85:15_, 1:115:1_, 1:117:17_, 1:134:9
setting [7]_ - 1:12:21_, 1:13:5_, 1:17:18_, 1:29:6_, 1:31:20_, 1:60:14
settings [1]_ - 1:30:22
several [3]_ - 1:65:4_, 1:96:24_, 1:125:22
shall [3]_ - 1:123:20_, 1:124:2_, 1:137:2
sham [1]_ - 1:105:14
shed [2]_ - 1:108:10_, 1:124:11
shield [1]_ - 1:111:10
shift [1]_ - 1:19:15
short [4]_ - 1:95:10_, 1:100:21_, 1:111:13
show [2]_ - 1:39:18_, 1:43:10
shown [1]_ - 1:39:15
shuts [1]_ - 1:103:10
sic [1]_ - 1:127:11
side [7]_ - 1:87:20_, 1:108:19_, 1:113:4_, 1:126:11_, 1:127:7_, 1:140:16
sided [1]_ - 1:108:6
sides [3]_ - 1:115:9_, 1:115:14_, 1:126:8
signed [5]_ - 1:4:20_, 1:4:22_, 1:69:22_, 1:78:14_, 1:78:16
significance [9]_ - 1:9:3_, 1:9:8_, 1:9:13_, 1:10:3_, 1:10:19_, 1:30:3_, 1:32:9_, 1:33:7
significant [7]_ - 1:10:17_, 1:16:8_, 1:25:23_, 1:25:24_, 1:27:7_, 1:77:10_, 1:77:13
silence [2]_ - 1:126:9_, 1:126:13
silent [1]_ - 1:89:4
silliness [1]_ - 1:133:19
similar [6]_ - 1:18:22_, 1:46:15_, 1:61:23_, 1:101:3_, 1:108:4_, 1:132:15
similarly [1]_ - 1:86:24
simple [6]_ - 1:28:9_, 1:47:21_, 1:49:9_, 1:64:2_, 1:102:13_, 1:131:21
simply [6]_ - 1:44:20_, 1:79:5_, 1:80:15_, 1:92:24_, 1:103:11_, 1:137:1
sincere [1]_ - 1:124:23
single [6]_ - 1:78:16_, 1:90:4_, 1:99:25_, 1:114:8_, 1:130:13_, 1:135:25
sitting [3]_ - 1:24:10_, 1:133:21_, 1:135:21
situation [14]_ - 1:12:9_, 1:15:2_, 1:18:17_, 1:22:22_, 1:32:23_, 1:46:15_, 1:51:25_, 1:52:19_, 1:52:20_, 1:68:25_, 1:74:8_, 1:75:11_, 1:80:23_, 1:94:10
skeptical [1]_ - 1:119:23
Skilling [2]_ - 1:54:24_, 1:83:25
skip [1]_ - 1:11:7
Slater [6]_ - 1:130:16_, 1:130:24_, 1:131:17_, 1:131:20_, 1:132:9_, 1:134:1
slightly [3]_ - 1:101:19_, 1:101:23_, 1:104:18
small [1]_ - 1:123:15
sneaking [1]_ - 1:133:13
so.. [1]_ - 1:123:14
sock [1]_ - 1:108:15
socks [6]_ - 1:90:13_, 1:94:14_, 1:107:3_, 1:108:1_, 1:110:8_, 1:110:16
sole [1]_ - 1:140:4
solely [1]_ - 1:88:8
someone [1]_ - 1:75:11
sometimes [2]_ - 1:49:9_, 1:49:14
soon [2]_ - 1:4:25_, 1:113:25
SORNA [2]_ - 1:104:9
sorry [6]_ - 1:17:24_, 1:90:9_, 1:95:5_, 1:100:15_, 1:123:11_, 1:125:14
sort [18]_ - 1:28:25_, 1:34:8_, 1:42:19_, 1:49:11_, 1:49:13_, 1:54:3_, 1:60:7_, 1:60:14_, 1:66:12_, 1:68:1_,

1:69:16_, 1:69:23_, 1:76:22_, 1:80:21_, 1:97:9_, 1:109:6_, 1:111:11_, 1:127:23
sorts [2]_ - 1:112:13_, 1:129:12
sought [6]_ - 1:5:5_, 1:5:7_, 1:36:18_, 1:36:21_, 1:37:1
source [2]_ - 1:59:15_, 1:75:24
sourced [1]_ - 1:36:2
space [1]_ - 1:130:18
speaking [1]_ - 1:42:22
speaks [12]_ - 1:7:5_, 1:10:10_, 1:10:12_, 1:23:25_, 1:32:10_, 1:34:18_, 1:38:23_, 1:40:22_, 1:75:22_, 1:78:5_, 1:81:21_, 1:101:25
special [3]_ - 1:68:8_, 1:133:7_, 1:134:15
Special [36]_ - 1:3:8_, 1:5:22_, 1:6:1_, 1:8:10_, 1:8:18_, 1:10:10_, 1:14:4_, 1:15:15_, 1:16:8_, 1:18:25_, 1:22:7_, 1:23:16_, 1:30:17_, 1:33:13_, 1:33:17_, 1:34:24_, 1:38:6_, 1:38:17_, 1:38:20_, 1:87:21_, 1:88:19_, 1:96:11_, 1:97:2_, 1:103:15_, 1:104:25_, 1:109:8_, 1:109:15_, 1:109:22_, 1:132:22_, 1:132:24_, 1:134:25_, 1:135:15_, 1:136:10_, 1:136:14_, 1:140:18
specific [8]_ - 1:12:7_, 1:25:18_, 1:27:14_, 1:34:14_, 1:41:21_, 1:50:3_, 1:79:19_, 1:117:21
specifically [2]_ - 1:12:4_, 1:36:19
specified [1]_ - 1:36:16
spend [2]_ - 1:50:16_, 1:130:18
spent [1]_ - 1:54:25
sphere [1]_ - 1:32:3
spoken [2]_ - 1:14:4_, 1:32:1
spokesman [1]_ - 1:100:8
squarely [1]_ - 1:118:9
stack [1]_ - 1:64:23
staff [1]_ - 1:44:7
staff's [1]_ - 1:42:22
staffer [1]_ - 1:133:12
STAFFER [3]_ - 1:43:2_, 1:43:5_, 1:43:8
staffers [1]_ - 1:116:15
stage [5]_ - 1:49:24_, 1:100:23_, 1:112:6_, 1:113:1_, 1:114:6
stand [4]_ - 1:38:14_, 1:84:14_, 1:84:23_, 1:84:25
standard [10]_ - 1:23:16_, 1:33:19_, 1:49:6_, 1:49:8_, 1:49:16_, 1:64:1_, 1:64:5_, 1:75:9_, 1:105:5_, 1:131:16
standardless [4]_ - 1:34:2_, 1:55:7_, 1:55:10_, 1:78:4
standards [4]_ - 1:18:5_, 1:34:10_, 1:55:11_, 1:57:1
standing [4]_ - 1:57:20_, 1:73:7_, 1:76:20_, 1:80:9
stands [1]_ - 1:6:22
Stanley [1]_ - 1:3:16
start [5]_ - 1:25:19_, 1:41:20_, 1:78:11_, 1:86:14_, 1:111:24
started [3]_ - 1:22:23_, 1:58:21_, 1:109:13
starting [4]_ - 1:3:7_, 1:6:6_, 1:42:24_, 1:71:4
starts [2]_ - 1:46:18_, 1:48:21
State [2]_ - 1:65:10_, 1:80:23
state [8]_ - 1:35:13_, 1:40:16_, 1:87:11_, 1:87:13_, 1:87:22_, 1:131:18_, 1:131:24_, 1:132:5
statement [5]_ - 1:29:20_, 1:29:22_, 1:37:19_, 1:75:21_, 1:76:19
statements [1]_ - 1:42:9
States [13]_ - 1:3:5_, 1:3:10_, 1:8:8_, 1:11:4_, 1:11:25_, 1:12:11_, 1:26:3_, 1:32:5_, 1:96:10_, 1:99:25_, 1:108:23_, 1:133:9_, 1:133:15
states [2]_ - 1:48:5_, 1:92:24
status [3]_ - 1:28:20_, 1:39:2_, 1:41:5
statute [63]_ - 1:7:1_, 1:9:20_, 1:11:8_, 1:12:20_, 1:15:4_, 1:17:9_, 1:17:10_, 1:17:20_, 1:17:23_, 1:18:22_, 1:19:12_, 1:21:19_, 1:23:11_, 1:23:14_, 1:24:5_, 1:25:6_, 1:25:14_, 1:26:10_, 1:27:4_, 1:29:9_, 1:29:12_, 1:29:13_, 1:31:13_, 1:32:25_, 1:34:1_, 1:35:24_, 1:53:1_, 1:53:17_, 1:54:10_, 1:54:20_, 1:54:23_, 1:55:4_, 1:58:25_, 1:61:8_, 1:61:16_, 1:61:24_, 1:66:18_, 1:75:12_, 1:76:23_, 1:77:2_, 1:77:9_, 1:78:1_, 1:79:23_, 1:81:8_, 1:81:9_, 1:81:23_, 1:83:9_, 1:83:17_, 1:84:1_, 1:84:7_, 1:86:16_, 1:87:20_, 1:88:19_, 1:88:21_, 1:92:5_, 1:92:8_, 1:93:2_, 1:97:23_, 1:103:21_, 1:109:17_, 1:127:16_, 1:137:12_, 1:137:13
statutes [4]_ - 1:16:4_, 1:68:17_, 1:82:18_, 1:138:2
statutory [9]_ - 1:10:21_, 1:26:15_, 1:35:23_, 1:44:11_, 1:44:17_, 1:58:19_, 1:61:7_, 1:61:14_, 1:61:18
stay [2]_ - 1:4:1_, 1:9:1
stem [1]_ - 1:59:14
step [4]_ - 1:77:3_, 1:82:2_, 1:88:6_, 1:135:16
steps [3]_ - 1:25:3_, 1:56:3_, 1:108:25
still [14]_ - 1:8:23_, 1:34:12_, 1:43:9_, 1:62:25_, 1:76:8_, 1:78:25_, 1:83:19_, 1:89:20_, 1:89:25_, 1:98:16_, 1:106:24_, 1:133:22
stood [2]_ - 1:90:18_, 1:115:17
stop [2]_ - 1:46:22_, 1:115:22
stops [1]_ - 1:46:24
storage [1]_ - 1:52:3
stretch [2]_ - 1:90:5_, 1:90:6
stricken [1]_ - 1:10:24
strictly [1]_ - 1:40:11
strictness [1]_ - 1:28:8
strike [2]_ - 1:17:10_, 1:77:9
string [2]_ - 1:25:17_, 1:27:1
strongly [4]_ - 1:76:24_, 1:105:17_, 1:117:16_, 1:117:20
struck [3]_ - 1:6:24_, 1:48:20_, 1:82:15
structure [1]_ - 1:135:9
structuring [2]_ - 1:64:8
stuck [2]_ - 1:29:24_, 1:32:20
stuff [1]_ - 1:112:9
stuffing [1]_ - 1:133:12
Sub [1]_ - 1:55:23
subject [10]_ - 1:15:11_, 1:41:12_, 1:45:1_, 1:62:23_, 1:63:18_, 1:64:9_, 1:68:21_, 1:74:22_, 1:102:9_, 1:126:10
subjective [1]_ - 1:21:21
submit [2]_ - 1:32:21_, 1:40:4
submitted [1]_ - 1:48:16
subpoena [3]_ - 1:22:3_, 1:48:16_, 1:139:1
Subsection [3]_ - 1:17:22_, 1:56:19_, 1:111:9
subsection [1]_ - 1:17:24
subset [1]_ - 1:50:23
substance [1]_ - 1:131:3
substantially [1]_ - 1:116:2
suddenly [1]_ - 1:36:24
sued [1]_ - 1:115:22
suffice [3]_ - 1:114:18_, 1:123:16_, 1:132:10
sufficiency [2]_ - 1:17:18_, 1:70:17
sufficient [3]_ - 1:28:2_, 1:58:9_, 1:70:18
sufficiently [3]_ - 1:27:5_, 1:34:14_, 1:132:4
suggest [6]_ - 1:106:7_, 1:106:13_, 1:122:14_, 1:129:12_, 1:132:16_, 1:133:16
suggested [1]_ - 1:134:25
suggesting [2]_ - 1:104:12_, 1:113:18
suggestion [2]_ - 1:67:8_, 1:111:24
suggests [4]_ - 1:104:5_, 1:117:16_, 1:117:20_, 1:123:5
summarizes [1]_ - 1:14:13
summarizing [1]_ - 1:129:4
summer [3]_ - 1:42:21_, 1:62:18_, 1:95:22
superseding [15]_ - 1:7:12_, 1:7:18_, 1:8:6_,

1:8:15_, 1:8:20_, 1:13:11_, 1:19:16_, 1:22:4_, 1:29:18_, 1:40:25_, 1:42:18_, 1:65:16 _, 1:68:3_, 1:112:24
support [6]_ - 1:20:11_, 1:32:11_, 1:33:11_, 1:35:12 _, 1:76:24_, 1:93:20
supporting [1]_ - 1:45:19
supportive [1]_ - 1:13:21
supports [3]_ - 1:21:18_, 1:35:6_, 1:98:10
suppose [1]_ - 1:129:6
supposed [3]_ - 1:97:21_, 1:97:22_, 1:140:2
Supreme [6]_ - 1:16:25_, 1:18:15_, 1:25:19_, 1:25:23 _, 1:26:16_, 1:55:2
surely [1]_ - 1:120:12
surprising [1]_ - 1:103:25
surrounding [1]_ - 1:9:20
surveyed [1]_ - 1:28:11
survive [2]_ - 1:37:14_, 1:84:8
susceptible [1]_ - 1:57:5
suspected [1]_ - 1:105:2
suspend [1]_ - 1:52:25
suspended [2]_ - 1:29:1_, 1:52:20
suspending [1]_ - 1:37:5
suspension [1]_ - 1:29:7
suspensions [1]_ - 1:34:19
suspicion [2]_ - 1:105:12 _, 1:105:13
system [3]_ - 1:115:2_, 1:115:21_, 1:131:14

T

table [5]_ - 1:3:13_, 1:4:5_, 1:39:2_, 1:130:3_, 1:135:21
taint [1]_ - 1:103:9
tainted [1]_ - 1:103:12
talks [8]_ - 1:64:14_, 1:66:8 _, 1:89:1_, 1:89:17_, 1:92:4_, 1:94:6_, 1:99:3_, 1:137:25
tape [1]_ - 1:94:14
Tapes [5]_ - 1:21:16_, 1:74:10_, 1:98:24_, 1:128:17 _, 1:128:23
tapes [11]_ - 1:13:20_, 1:14:1_, 1:14:5_, 1:14:13_, 1:91:1_, 1:91:10_, 1:108:1_, 1:108:10_, 1:108:12_, 1:109:1_, 1:129:1
target [1]_ - 1:101:7
task [1]_ - 1:130:9
tax [1]_ - 1:64:7
Taylor [2]_ - 1:14:6_, 1:74:14
team [2]_ - 1:84:13_, 1:84:19
team's [1]_ - 1:23:5
technically [2]_ - 1:63:11 _, 1:111:4
tendering [1]_ - 1:99:13
tension [8]_ - 1:48:7_, 1:83:24_, 1:93:24_, 1:98:19 _, 1:126:23_, 1:127:3_, 1:138:2_, 1:138:3
term [20]_ - 1:24:22_, 1:34:2_, 1:34:3_, 1:44:4_, 1:44:14_, 1:45:6_, 1:49:9_, 1:52:24_, 1:52:25_, 1:57:12 _, 1:60:19_, 1:61:6_, 1:61:19 _, 1:64:13_, 1:70:7_, 1:75:22 _, 1:76:23_, 1:116:5_, 1:124:13_, 1:133:10
terminate [1]_ - 1:36:25
terminated [1]_ - 1:29:1
termination [1]_ - 1:34:19
terms [23]_ - 1:21:23_, 1:22:10_, 1:24:20_, 1:25:8_, 1:26:5_, 1:27:17_, 1:27:22_, 1:30:10_, 1:30:23_, 1:53:10 _, 1:57:10_, 1:58:2_, 1:58:3_, 1:58:4_, 1:59:13_, 1:71:6_, 1:71:14_, 1:75:12_, 1:79:11 _, 1:79:22_, 1:91:6_, 1:109:10_, 1:116:6
territory [1]_ - 1:129:5
test [2]_ - 1:131:6_, 1:131:10
testify [1]_ - 1:66:16
testimony [1]_ - 1:69:3
text [14]_ - 1:10:21_, 1:10:24_, 1:14:12_, 1:26:15 _, 1:26:16_, 1:35:23_, 1:44:19_, 1:58:19_, 1:70:9_, 1:71:5_, 1:81:23_, 1:88:18_, 1:116:16_, 1:116:17
textual [1]_ - 1:11:9
THE [278]_ - 1:3:2_, 1:3:11 _, 1:3:15_, 1:3:19_, 1:3:22_, 1:4:18_, 1:4:24_, 1:5:9_, 1:5:15_, 1:5:20_, 1:6:16_, 1:7:10_, 1:7:15_, 1:8:14_, 1:8:20_, 1:9:15_, 1:9:22_, 1:10:8_, 1:10:21_, 1:11:18_, 1:11:24_, 1:12:15_, 1:13:9_, 1:13:25_, 1:15:9_, 1:15:19_, 1:17:13_, 1:17:21_, 1:17:25 _, 1:19:15_, 1:20:12_, 1:20:24_, 1:21:2_, 1:21:9_, 1:21:23_, 1:23:8_, 1:23:13_, 1:24:7_, 1:24:16_, 1:25:8_, 1:25:16_, 1:26:5_, 1:26:14_, 1:26:19_, 1:27:8_, 1:28:6_, 1:28:18_, 1:28:24_, 1:29:6_, 1:29:13, 1:29:16_, 1:30:9_, 1:30:16_, 1:31:14_, 1:33:1_, 1:33:13_, 1:33:21_, 1:34:18 _, 1:34:22_, 1:35:9_, 1:35:19 _, 1:36:15_, 1:37:3_, 1:37:25 _, 1:38:5_, 1:38:11_, 1:38:16 _, 1:38:22_, 1:39:21_, 1:40:6 _, 1:40:21_, 1:40:25_, 1:41:14_, 1:41:19_, 1:42:3_, 1:43:8_, 1:45:7_, 1:45:22_, 1:46:7_, 1:46:9_, 1:46:16_, 1:46:25_, 1:47:4_, 1:47:21_, 1:48:7_, 1:48:18_, 1:49:12_, 1:49:19_, 1:50:7_, 1:50:12_, 1:51:8_, 1:51:10_, 1:51:12_, 1:51:17_, 1:51:21_, 1:51:23 _, 1:52:14_, 1:53:1_, 1:53:16 _, 1:53:21_, 1:53:24_, 1:54:14_, 1:55:6_, 1:55:11_, 1:55:18_, 1:56:12_, 1:56:17 _, 1:56:23, 1:57:7_, 1:57:15, 1:57:21_, 1:57:25_, 1:58:11 _, 1:58:19_, 1:59:3_, 1:59:7_, 1:59:11_, 1:59:13_, 1:59:18 _, 1:59:25_, 1:60:6_, 1:60:17 _, 1:61:3_, 1:61:9_, 1:62:1_, 1:62:19_, 1:62:24_, 1:63:9_, 1:63:19_, 1:63:25_, 1:64:10 _, 1:64:18_, 1:65:1_, 1:65:6_, 1:65:13_, 1:65:17_, 1:65:24 _, 1:66:4_, 1:66:8_, 1:66:19_, 1:66:25_, 1:67:5_, 1:67:8_, 1:67:17_, 1:67:23_, 1:68:11 _, 1:68:13_, 1:68:20_, 1:69:5 _, 1:69:18_, 1:69:20_, 1:69:25_, 1:70:9_, 1:70:20_, 1:70:25_, 1:71:7_, 1:71:16_, 1:71:20_, 1:72:4_, 1:72:14_, 1:72:16_, 1:72:22_, 1:73:1_, 1:73:8_, 1:73:11_, 1:73:17_, 1:73:24_, 1:74:3_, 1:74:16_, 1:74:20_, 1:74:24_, 1:76:11 _, 1:76:16_, 1:77:1_, 1:78:3_, 1:78:18_, 1:79:2_, 1:79:5, 1:79:9_, 1:80:4_, 1:81:3_, 1:81:14_, 1:82:12_, 1:82:20 _, 1:83:6_, 1:83:19_, 1:85:1_, 1:85:6, 1:85:17_, 1:85:20_, 1:86:4_, 1:86:7_, 1:86:9_, 1:87:1_, 1:87:14_, 1:87:24_, 1:89:11_, 1:90:16_, 1:91:16 _, 1:93:1_, 1:93:14_, 1:95:1_, 1:95:4_, 1:95:6_, 1:97:1_, 1:98:14_, 1:99:7_, 1:99:10_, 1:99:12_, 1:99:16_, 1:100:13 _, 1:101:17_, 1:102:2_, 1:102:21_, 1:103:6_, 1:104:7 _, 1:104:13_, 1:104:24_, 1:105:20_, 1:106:2_, 1:107:12_, 1:108:8_, 1:108:16_, 1:108:24_, 1:109:3_, 1:109:8_, 1:110:19 _, 1:110:24_, 1:111:3_, 1:111:6_, 1:111:18_, 1:111:22_, 1:113:16_, 1:114:19_, 1:114:24_, 1:115:7_, 1:116:7_, 1:117:10 _, 1:118:3_, 1:118:5_, 1:118:17_, 1:118:21_, 1:119:6_, 1:119:25_, 1:120:13_, 1:122:5_, 1:123:13_, 1:124:8_, 1:125:1 _, 1:125:10_, 1:125:13_, 1:125:21_, 1:125:24_, 1:127:19_, 1:128:16_, 1:128:25_, 1:130:6_, 1:130:21_, 1:131:1_, 1:131:3 _, 1:131:5_, 1:133:20_, 1:134:4_, 1:134:9_, 1:135:20 _, 1:136:6_, 1:136:20_, 1:138:8_, 1:138:24_, 1:139:18_, 1:139:21_, 1:139:25_, 1:140:6_, 1:140:9 _, 1:140:12_, 1:140:15_, 1:140:17_, 1:140:21
themselves [3]_ - 1:24:4 _, 1:96:13_, 1:116:16
theory [15]_ - 1:19:20_, 1:20:24_, 1:21:7_, 1:21:9_, 1:21:18_, 1:21:25_, 1:22:7_, 1:22:19_, 1:24:13_, 1:33:12 _, 1:40:14_, 1:47:2_, 1:47:5_, 1:81:25
thereafter [1]_ - 1:110:14
thereby [1]_ - 1:121:17
therefore [6]_ - 1:20:16_, 1:48:1_, 1:55:8_, 1:92:2_, 1:112:12_, 1:125:3
thereof [2]_ - 1:44:6_, 1:44:15
they've [3]_ - 1:31:25_, 1:84:21_, 1:132:16
thinking [1]_ - 1:90:25
Third [1]_ - 1:72:10
third [5]_ - 1:7:7_, 1:71:14 _, 1:78:25_, 1:79:14_, 1:129:23
three [20]_ - 1:6:20_,

1:6:23_, 1:15:3_, 1:19:22_, 1:30:23_, 1:31:15_, 1:35:11_, 1:40:7_, 1:40:11_, 1:42:8_, 1:42:9_, 1:46:21_, 1:73:12_, 1:78:12_, 1:83:23_, 1:111:24_, 1:112:3_, 1:112:14_, 1:125:6_, 1:129:14
threshold [3]_ - 1:83:1_, 1:112:3_, 1:112:4
thwart [1]_ - 1:121:17
tie [1]_ - 1:84:13
tied [1]_ - 1:36:3
timely [1]_ - 1:75:8
timing [2]_ - 1:8:18_, 1:22:4
titled [1]_ - 1:55:16
today [12]_ - 1:5:14_, 1:5:18_, 1:63:15_, 1:73:7_, 1:81:12_, 1:85:3_, 1:86:5_, 1:112:16_, 1:120:6_, 1:126:1_, 1:130:3_, 1:133:5
today's [1]_ - 1:4:9
Todd [1]_ - 1:3:12
together [5]_ - 1:24:14_, 1:32:3_, 1:57:19_, 1:70:2_, 1:70:7
tomorrow [1]_ - 1:5:10
took [18]_ - 1:22:9_, 1:48:1_, 1:49:17_, 1:91:8_, 1:98:8_, 1:102:14_, 1:102:19_, 1:104:3_, 1:105:17_, 1:112:6_, 1:112:9_, 1:113:8_, 1:113:9_, 1:119:17_, 1:130:9_, 1:131:12_, 1:132:15_, 1:132:18
top [2]_ - 1:34:21_, 1:68:7
topic [1]_ - 1:38:25
totally [2]_ - 1:114:9_, 1:126:11
touch [3]_ - 1:43:16_, 1:88:12_, 1:136:16
touches [2]_ - 1:39:3_, 1:40:24
toward [1]_ - 1:42:19
towards [1]_ - 1:65:6
Tower [1]_ - 1:76:15
trace [1]_ - 1:25:22
tracks [1]_ - 1:58:14
traditional [1]_ - 1:91:6
training [2]_ - 1:10:12_, 1:39:13
transaction [1]_ - 1:28:25
transcript [3]_ - 1:114:9_, 1:133:6_, 1:134:16
transfer [1]_ - 1:51:16
transferred [1]_ - 1:96:24
transferring [1]_ - 1:96:16
transmission [1]_ - 1:50:20
transmit [1]_ - 1:50:22
transmittal [3]_ - 1:11:7_, 1:26:15_, 1:81:15
transmitted [1]_ - 1:30:11
transmitting [1]_ - 1:4:7
transport [1]_ - 1:9:9
transportation [1]_ - 1:9:12
transported [1]_ - 1:89:19
treat [4]_ - 1:78:9_, 1:83:12_, 1:84:18_, 1:114:11
treated [1]_ - 1:76:3
treaties [1]_ - 1:32:17
treatment [1]_ - 1:37:22
trial [10]_ - 1:28:12_, 1:36:4_, 1:37:15_, 1:39:12_, 1:76:7_, 1:88:1_, 1:93:15_, 1:96:6_, 1:100:21_, 1:124:17
tricky [2]_ - 1:9:25_, 1:10:2
trigger [1]_ - 1:122:22
triggered [1]_ - 1:22:2
trio [3]_ - 1:116:6_, 1:116:21
trouble [1]_ - 1:4:5
true [12]_ - 1:9:11_, 1:84:23_, 1:95:20_, 1:98:3_, 1:105:10_, 1:111:16_, 1:113:1_, 1:119:3_, 1:119:14_, 1:122:3_, 1:125:23_, 1:134:18
truly [1]_ - 1:34:11
Trump [68]_ - 1:3:6_, 1:3:14_, 1:4:12_, 1:4:14_, 1:5:5_, 1:6:23_, 1:7:2_, 1:7:6_, 1:8:4_, 1:8:7_, 1:9:5_, 1:14:20_, 1:15:5_, 1:17:7_, 1:22:8_, 1:22:15_, 1:23:12_, 1:29:20_, 1:29:22_, 1:30:7_, 1:39:6_, 1:39:19_, 1:75:8_, 1:76:14_, 1:76:15_, 1:76:19_, 1:78:14_, 1:78:17_, 1:78:24_, 1:79:4_, 1:79:12_, 1:80:9_, 1:80:22_, 1:86:16_, 1:86:18_, 1:89:19_, 1:90:10_, 1:95:13_, 1:95:17_, 1:96:6_, 1:96:16_, 1:96:19_, 1:98:8_, 1:100:1_, 1:100:20_, 1:101:5_, 1:102:14_, 1:104:2_, 1:104:20_, 1:106:9_, 1:106:16_, 1:107:2_, 1:107:8_, 1:109:22_, 1:112:4_, 1:113:8_, 1:116:12_, 1:116:15_, 1:120:6_, 1:122:21_, 1:133:5_, 1:134:19_, 1:136:4_, 1:136:18_, 1:137:22_, 1:140:3
TRUMP [3]_ - 1:42:25_, 1:43:4_, 1:43:6
Trump's [15]_ - 1:7:3_, 1:7:8_, 1:29:20_, 1:34:15_, 1:39:4_, 1:39:13_, 1:40:16_, 1:75:11_, 1:75:21_, 1:76:2_, 1:87:20_, 1:103:22_, 1:104:21_, 1:114:15_, 1:124:24
trumping [1]_ - 1:126:23
trumps [1]_ - 1:95:20
try [9]_ - 1:9:25_, 1:43:3_, 1:83:13_, 1:115:22_, 1:120:9_, 1:135:10_, 1:137:9_, 1:137:11
trying [12]_ - 1:17:12_, 1:24:2_, 1:32:11_, 1:45:10_, 1:45:14_, 1:53:24_, 1:57:1_, 1:65:19_, 1:66:11_, 1:69:7_, 1:107:23_, 1:124:22
turn [7]_ - 1:6:10_, 1:41:15_, 1:41:21_, 1:45:9_, 1:63:25_, 1:65:17_, 1:75:18
turned [1]_ - 1:52:1
turns [1]_ - 1:35:17
two [26]_ - 1:4:9_, 1:5:2_, 1:8:3_, 1:16:14_, 1:20:18_, 1:26:24_, 1:27:10_, 1:28:14_, 1:31:16_, 1:39:3_, 1:39:8_, 1:40:2_, 1:53:19_, 1:63:6_, 1:63:7_, 1:70:13_, 1:95:18_, 1:115:6_, 1:115:21_, 1:117:25_, 1:127:3_, 1:131:6_, 1:131:10_, 1:131:13
two-part [2]_ - 1:131:6_, 1:131:10
type [8]_ - 1:11:12_, 1:26:21_, 1:30:7_, 1:37:13_, 1:54:6_, 1:60:8_, 1:61:23_, 1:79:22
types [3]_ - 1:31:22_, 1:102:7_, 1:108:3
typically [1]_ - 1:31:23

## U

U.S [2]_ - 1:11:21_, 1:88:9
U.S.C [2]_ - 1:44:2_, 1:45:2
ultimately [3]_ - 1:92:3_, 1:107:14_, 1:137:17
unauthorized [37]_ - 1:11:2_, 1:11:13_, 1:11:19_, 1:19:9_, 1:20:22_, 1:21:3_, 1:21:24_, 1:21:25_, 1:23:9_, 1:31:20_, 1:33:3_, 1:41:3_, 1:48:1_, 1:56:4_, 1:57:17_, 1:58:13_, 1:59:7_, 1:61:6_, 1:61:14_, 1:61:19_, 1:61:24_, 1:70:23_, 1:71:3_, 1:73:22_, 1:86:17_, 1:89:17_, 1:91:22_, 1:92:23_, 1:93:2_, 1:93:11_, 1:123:20_, 1:124:13_, 1:125:4_, 1:133:1_, 1:136:1_, 1:136:7
uncertainty [1]_ - 1:133:23
unconstitutional [3]_ - 1:4:11_, 1:6:19_, 1:83:9
unconstitutionally [8]_ - 1:12:13_, 1:15:4_, 1:23:11_, 1:25:10_, 1:25:12_, 1:34:1_, 1:35:14_, 1:77:2
uncontested [5]_ - 1:13:25_, 1:30:16_, 1:45:22_, 1:113:6_, 1:113:14
under [57]_ - 1:9:4_, 1:12:19_, 1:13:6_, 1:13:14_, 1:16:17_, 1:17:4_, 1:18:15_, 1:19:4_, 1:32:18_, 1:39:11_, 1:39:17_, 1:40:5_, 1:40:8_, 1:40:17_, 1:47:2_, 1:49:23_, 1:51:19_, 1:55:24_, 1:56:15_, 1:56:18_, 1:56:24_, 1:58:16_, 1:60:4_, 1:60:23_, 1:66:21_, 1:76:23_, 1:82:15_, 1:82:23_, 1:83:11_, 1:84:7_, 1:84:17_, 1:94:1_, 1:96:15_, 1:101:3_, 1:103:2_, 1:103:4_, 1:105:5_, 1:105:11_, 1:109:18_, 1:110:11_, 1:111:9_, 1:112:19_, 1:120:12_, 1:125:8_, 1:125:18_, 1:127:15_, 1:129:11_, 1:131:12_, 1:135:2_, 1:136:2_, 1:137:22_, 1:138:4_, 1:138:5_, 1:140:24
underlying [1]_ - 1:104:10
undermine [2]_ - 1:43:21_, 1:45:19
underpinning [1]_ - 1:120:17
understandably [1]_ - 1:120:16
understood [4]_ - 1:20:10_, 1:30:6_, 1:41:8_, 1:78:20

undisputed [1]_ - 1:47:7
unequivocal [1]_ - 1:107:7
unfetterred [3]_ - 1:69:12_, 1:91:21_, 1:97:6
unfounded [1]_ - 1:91:5
unique [3]_ - 1:53:11_, 1:58:16_, 1:135:12
unit [1]_ - 1:44:7
United [13]_ - 1:3:5_, 1:3:10_, 1:8:8_, 1:11:4_, 1:11:25_, 1:12:11_, 1:26:3_, 1:32:5_, 1:96:10_, 1:99:25_, 1:108:23_, 1:133:9_, 1:133:15
universe [1]_ - 1:62:22
unlawful [8]_ - 1:19:19_, 1:20:17_, 1:31:12_, 1:47:1_, 1:60:2_, 1:60:3_, 1:60:12_, 1:103:4
unless [7]_ - 1:3:3_, 1:4:2_, 1:33:23_, 1:34:22_, 1:107:7_, 1:107:8_, 1:134:7
unlike [2]_ - 1:60:3_, 1:77:14
unquestionably [1]_ - 1:21:12
unrelated [1]_ - 1:114:9
unreviewable [3]_ - 1:68:24_, 1:97:3_, 1:106:5
unspeakable [1]_ - 1:14:18
unsuccessful [1]_ - 1:42:1
unsurprisingly [1]_ - 1:122:9
untouched [1]_ - 1:110:15
up [31]_ - 1:4:6_, 1:6:6_, 1:14:6_, 1:22:25_, 1:25:2_, 1:36:3_, 1:36:24_, 1:38:14_, 1:53:12_, 1:54:1_, 1:55:15_, 1:56:17_, 1:58:8_, 1:64:24_, 1:76:1_, 1:77:25_, 1:81:8_, 1:82:5_, 1:83:25_, 1:84:14_, 1:85:21_, 1:90:18_, 1:91:1_, 1:101:10_, 1:108:24_, 1:110:13_, 1:111:25_, 1:115:1_, 1:122:15_, 1:134:11_, 1:135:3
upheld [1]_ - 1:54:10
ups [1]_ - 1:112:1
upset [1]_ - 1:116:3
uses [2]_ - 1:79:24_, 1:122:1
usual [2]_ - 1:4:6_, 1:75:1
uttered [1]_ - 1:113:10
utterly [1]_ - 1:129:21

V

vague [12]_ - 1:15:6_, 1:23:11_, 1:25:10_, 1:25:12_, 1:34:1_, 1:34:2_, 1:35:14_, 1:42:10_, 1:57:10_, 1:68:10_, 1:77:2_, 1:83:3
vagueness [36]_ - 1:4:11_, 1:6:6_, 1:6:11_, 1:6:19_, 1:10:5_, 1:14:25_, 1:17:17_, 1:17:20_, 1:18:21_, 1:25:18_, 1:26:22_, 1:27:21_, 1:28:3_, 1:28:13_, 1:28:15_, 1:35:25_, 1:43:17_, 1:45:9_, 1:45:13_, 1:54:13_, 1:57:13_, 1:57:25_, 1:64:21_, 1:66:18_, 1:71:1_, 1:74:4_, 1:75:16_, 1:80:18_, 1:81:5_, 1:81:20_, 1:81:25_, 1:82:17_, 1:85:18_, 1:85:25_, 1:86:23_, 1:129:15
value [1]_ - 1:134:17
Van [1]_ - 1:61:10
vanishes [1]_ - 1:59:18
verge [1]_ - 1:129:5
versus [4]_ - 1:104:22_, 1:118:25_, 1:120:6_, 1:133:22
vetting [1]_ - 1:62:15
via [2]_ - 1:51:20_, 1:121:15
viable [2]_ - 1:22:18_, 1:83:2
vice [16]_ - 1:22:16_, 1:22:24_, 1:45:23_, 1:55:23_, 1:65:7_, 1:65:25_, 1:66:5_, 1:69:8_, 1:88:9_, 1:89:9_, 1:92:9_, 1:107:4_, 1:110:10_, 1:121:21_, 1:136:12_, 1:137:20
Vice [5]_ - 1:22:23_, 1:46:5_, 1:47:18_, 1:100:15_, 1:110:10
view [25]_ - 1:40:18_, 1:55:6_, 1:58:13_, 1:60:25_, 1:64:21_, 1:72:22_, 1:72:23_, 1:73:1_, 1:80:25_, 1:82:4_, 1:82:7_, 1:95:14_, 1:95:25_, 1:102:19_, 1:106:4_, 1:107:22_, 1:114:15_, 1:122:5_, 1:124:14_, 1:128:16_, 1:128:19_, 1:132:23_, 1:132:25_, 1:138:11
viewed [1]_ - 1:42:16
viewing [1]_ - 1:103:1
vindictive [5]_ - 1:67:13_, 1:95:8_, 1:95:10_, 1:106:22_, 1:130:1
violate [2]_ - 1:27:14_, 1:39:19
violated [1]_ - 1:31:13
violating [1]_ - 1:50:4
violation [7]_ - 1:31:6_, 1:50:8_, 1:69:4_, 1:94:22_, 1:105:12_, 1:123:25
violations [2]_ - 1:105:3_, 1:109:16
violence [1]_ - 1:44:19
virtue [2]_ - 1:79:5_, 1:119:12
vis-á-vis [1]_ - 1:53:8
void [2]_ - 1:66:18_, 1:83:4
voluntarily [2]_ - 1:27:13_, 1:139:16
vs [7]_ - 1:3:5_, 1:18:16_, 1:32:5_, 1:115:11_, 1:116:12_, 1:121:11_, 1:121:19

W

wait [3]_ - 1:79:2_, 1:95:22_, 1:118:3
waiting [1]_ - 1:5:11
waived [2]_ - 1:55:22_, 1:56:15
waiver [2]_ - 1:24:9_, 1:78:5
waivers [1]_ - 1:55:24
walk [4]_ - 1:55:11_, 1:63:1_, 1:70:1_, 1:103:6
Waltine [1]_ - 1:3:6
wants [2]_ - 1:88:19_, 1:91:15
war [4]_ - 1:32:16_, 1:108:7_, 1:108:21_, 1:108:23
ward [1]_ - 1:34:14
warrant [1]_ - 1:89:12
warranted [3]_ - 1:77:13_, 1:103:2_, 1:107:20
warrants [1]_ - 1:82:23
Washington [1]_ - 1:88:7
Watch [32]_ - 1:8:12_, 1:9:14_, 1:13:16_, 1:14:15_, 1:21:16_, 1:31:8_, 1:74:7_, 1:89:6_, 1:90:12_, 1:91:4_, 1:91:18_, 1:101:25_, 1:105:19_, 1:106:8_, 1:107:13_, 1:107:20_, 1:107:23_, 1:108:9_, 1:108:25_, 1:110:5_, 1:110:16_, 1:113:21_, 1:114:20_, 1:115:1_, 1:115:5_, 1:115:10_, 1:118:2_, 1:119:21_, 1:119:23_, 1:120:9_, 1:136:21_, 1:139:24
Watch's [1]_ - 1:106:4
ways [4]_ - 1:51:6_, 1:58:18_, 1:101:10_, 1:110:3
Weapon [1]_ - 1:99:19
weaving [1]_ - 1:136:8
website [1]_ - 1:30:21
Webster's [1]_ - 1:72:10
week [1]_ - 1:47:1
weeks [1]_ - 1:115:21
welcome [1]_ - 1:3:23
whereby [1]_ - 1:118:14
White [12]_ - 1:8:5_, 1:9:9_, 1:22:9_, 1:22:17_, 1:39:24_, 1:88:8_, 1:88:10_, 1:92:15_, 1:98:8_, 1:113:12_, 1:116:20_, 1:117:18
white [1]_ - 1:43:24
whole [6]_ - 1:45:16_, 1:46:16_, 1:97:14_, 1:103:20_, 1:108:13_, 1:128:2
wholly [2]_ - 1:62:14_, 1:67:13
willful [5]_ - 1:19:22_, 1:47:8_, 1:47:9_, 1:47:15_, 1:47:16
willfully [9]_ - 1:11:2_, 1:11:20_, 1:20:5_, 1:21:4_, 1:27:11_, 1:27:12_, 1:39:19_, 1:48:1_, 1:64:1
willfulness [28]_ - 1:25:25_, 1:26:13_, 1:26:22_, 1:26:23_, 1:26:24_, 1:27:8_, 1:27:20_, 1:27:25_, 1:28:8_, 1:28:9_, 1:47:21_, 1:47:22_, 1:49:3_, 1:49:9_, 1:49:13_, 1:49:14_, 1:54:6_, 1:64:2_, 1:64:5_, 1:64:21_, 1:66:15_, 1:69:18_, 1:69:19_, 1:81:4_, 1:81:21_, 1:91:22_, 1:107:25_, 1:125:2
Wilson [1]_ - 1:16:16
wins [1]_ - 1:126:24
wish [4]_ - 1:4:8_, 1:8:14_, 1:86:4_, 1:134:4

withdrawn [1] - 1:33:23
withheld [3] - 1:62:8, 1:63:17, 1:63:19
witness [2] - 1:40:1, 1:76:13
witnesses [3] - 1:40:3, 1:69:3, 1:75:25
wonder [1] - 1:58:1
wondering [2] - 1:61:9, 1:61:17
WOODWARD [3] - 1:3:16, 1:5:3, 1:5:11
Woodward [2] - 1:3:17, 1:5:1
word [15] - 1:16:6, 1:23:20, 1:24:20, 1:25:2, 1:25:4, 1:27:10, 1:27:12, 1:57:6, 1:64:10, 1:71:8, 1:71:17, 1:79:24, 1:79:25, 1:80:16, 1:135:25
words [14] - 1:11:5, 1:12:1, 1:18:12, 1:25:6, 1:30:12, 1:32:20, 1:57:5, 1:104:25, 1:113:11, 1:117:13, 1:120:20, 1:126:17, 1:127:14, 1:128:3
works [1] - 1:59:19
world [4] - 1:62:22, 1:108:5, 1:108:6, 1:129:3
worried [1] - 1:116:15
worry [1] - 1:80:16
worse [1] - 1:101:12
worth [3] - 1:35:17, 1:110:9, 1:112:15
worthwhile [1] - 1:140:23
worthy [2] - 1:95:2, 1:124:16
wrap [1] - 1:134:11
writ [1] - 1:73:14
write [2] - 1:36:24, 1:121:2
writer [1] - 1:42:23
writing [1] - 1:56:1
written [5] - 1:14:6, 1:21:20, 1:22:25, 1:51:15, 1:139:12
wrote [1] - 1:113:11

Y

year [2] - 1:101:8, 1:110:14
years [3] - 1:60:25, 1:92:6, 1:105:15
York [4] - 1:22:25, 1:99:3, 1:99:9, 1:99:18
yourself [2] - 1:66:10, 1:69:6

Z

zero [1] - 1:126:6
zip [1] - 1:126:6