UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 23-80101-CR-CANNON(s)

UNITED STATES OF AMERICA,

    Plaintiff,

v.

DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVEIRA,

    Defendants.
_____/

**GOVERNMENT'S OPPOSITION TO WALTINE NAUTA'S
MOTION TO DISMISS THE INDICTMENT BASED ON
SELECTIVE AND VINDICTIVE PROSECUTION**

**TABLE OF CONTENTS**

BACKGROUND ................................................................................................................................ 1
ARGUMENT .................................................................................................................................... 5
I.     Applicable Law ................................................................................................................ 6
II.    Nauta Falls Far Short of Making a Showing of Selective or Vindictive Prosecution ......... 7
       A.    Nauta Fails to Identify a Similarly Situated Comparator as Required by the
             First Prong of the Selective-Prosecution Standard ....................................................... 7
       B.    Nauta Fails to Show Discriminatory Purpose or Actual Vindictiveness ....................... 9
CONCLUSION ................................................................................................................................ 13

Defendant Waltine Nauta seeks dismissal of the indictment or discovery based on claims of selective and vindictive prosecution. *See* Nauta's Mot. to Dismiss for Selective and Vindictive Pros. ("Mot.").[1] His claim of selective prosecution is grounded in comparison to two individuals who, like Nauta, were employed by codefendant Donald J. Trump but whose conduct was not remotely similar to his own. He therefore fails to provide apt comparators or any evidence that he was selected for prosecution over those other individuals for improper reasons. And his claim of vindictive prosecution amounts to the following: he did not accept the routine invitation in a target letter to appear before the grand jury, and thus his indictment must have been punishment for that decision. This novel and unsupported claim would render any recipient of a target letter immune from charges by the simple expedient of declining the offer. Nauta's arguments are without merit and should be denied.

## BACKGROUND

As alleged in the Superseding Indictment, during his presidency, Trump used boxes to accumulate and store records, accumulating dozens of these boxes by the end of his presidency. ECF No. 85 ¶¶ 1-3. At the end of his presidency in January 2021, scores of these boxes were removed from the White House and transported to Trump's residence at Mar-a-Lago, where they were later placed in a storage room. *Id.* ¶ 4. When the National Archives and Records Administration ("NARA") requested records from Trump's administration, Trump wanted to review his boxes before providing them to NARA, and between November 2021 and January 2022, employees (including Nauta) brought boxes to his personal residence in Mar-a-Lago for him to review. *Id.* ¶¶ 39-46. On January 17, 2022, Nauta and another Trump employee gathered 15 boxes from Trump's residence and handed them over to NARA. *Id.* ¶ 47. After NARA found highly

---

[1] Nauta's motion has not yet been docketed publicly or received an ECF number.

1

classified documents in the boxes and informed the Department of Justice, a grand jury issued a subpoena for all documents with classification markings in Trump's possession. *Id.* ¶¶ 49-53. Trump met with his lawyers to discuss the subpoena on May 23, 2023, and a lawyer returned to Mar-a-Lago on June 2, 2023, to search the boxes in the storage for responsive documents. *Id.* ¶¶ 55-65. On June 3, 2023, the lawyer provided a folder of documents with classification markings to FBI agents, along with a certification indicating that the folder contained all responsive documents. *Id.* ¶¶ 65-72. After a grand jury issued a subpoena for security footage from Mar-a-Lago, and that footage showed Nauta moving boxes out of the storage room after the grand jury issued the subpoena but before Trump's lawyer reviewed the boxes in the room for responsive documents, FBI agents obtained and executed a warrant to search Mar-a-Lago, finding more than 100 additional documents with classification markings. *Id.* ¶¶ 59, 88-90.

The Superseding Indictment alleges that Nauta participated in these events at several critical moments. Nauta served as a valet for Trump during his presidency and then as Trump's "body man" post-presidency; he reported to Trump, worked closely with Trump, and traveled with Trump. *Id.* ¶ 9. Nauta helped Trump pack his boxes for his move out of the White House at the end of his presidency in January 2021. *Id.* ¶ 25. Nauta and other Trump employees moved the boxes from a ballroom in Mar-a-Lago to a business center in the main building before the boxes were later moved to the storage room. *Id.* ¶¶ 26-31. Nauta brought boxes to Trump's residence for Trump to review and then took the 15 boxes from Trump's residence to turn them over to NARA when Trump was ready there. *Id.* ¶¶ 39-47.[2] The day before Trump's meeting with lawyers on May 23, 2022, to discuss the grand jury subpoena for documents with classification markings,

---

[2] During this process, on December 7, 2021, Nauta found several of Trump's boxes fallen and their contents spilled on the floor of the storage room, and he sent a co-worker photographs, including a photograph showing a visibly marked classified document. ECF No. 85 ¶ 32.

2

Nauta retrieved one box from the storage room. *Id.* ¶¶ 54-56. After the meeting, between May 24, 2022, and June 1, 2022, Nauta removed approximately 64 boxes from the storage room. *Id.* ¶ 59. Shortly before Trump's lawyer arrived at Mar-a-Lago to review boxes in the storage room for documents responsive to the subpoena, Nauta and codefendant Carlos De Oliveira moved approximately 30 boxes into the storage room. *Id.* ¶¶ 62-63. When the lawyer arrived, Nauta escorted the lawyer to the storage room to review the boxes. *Id.* ¶¶ 64-65. After Trump learned about the grand jury subpoena for security footage from Mar-a-Lago, which would show the box movement, Trump asked to see Nauta, and Nauta then abruptly changed his travel plans and flew to Mar-a-Lago. *Id.* ¶¶ 74-81. While there, he coordinated with codefendant Carlos De Oliveira, who approached the Director of Information Technology at Mar-a-Lago and told him that "the boss" wanted the server deleted. *Id.* ¶¶ 80-87.

Nauta twice provided statements to investigators during the course of these events, and he was less than candid on both occasions. First, he submitted to a voluntary, recorded interview with FBI agents on May 26, 2023, with counsel present. *Id.* ¶¶ 48, 110-12.[3] During that interview, Nauta falsely told the agents that he was not aware that boxes had been brought to Trump at his residence before the 15 boxes were turned over to NARA; that he did not know how the boxes he took from Trump's residence to turn over to NARA had gotten to Trump's residence; and that he did not know where the boxes had been stored before they were in Trump's residence and whether they had been in a secure or locked location. *Id.* ¶ 48. Second, Nauta testified before the grand

---

[3] Nauta claims that he "cooperated" with the investigation because, in addition to the interview and grand-jury appearance described above, he "hand[ed] over two iPhones to federal authorities in response to" warrants. Mot. at 9. But Nauta obfuscated and lied to the FBI agents and the grand jury, and Nauta cannot claim that he cooperated with the investigation merely because he did not resist when agents with validly issued search warrants arrived to seize his phones.

3

jury on June 21, 2022. Ex. 1, Mar-a-Lago Search Warrant Aff. ¶ 31. Although he was asked whether he had removed anything from the storage room, he did not inform the grand jury that he had removed approximately 60 boxes between May 24 and June 1, 2022. *Id.* ¶ 69. As a result, the Government did not discover Nauta's surreptitious box movement until later, when it obtained security camera footage showing his conduct. ECF No. 85 ¶¶ 74-77, 88.

On May 24, 2023, pursuant to United States Justice Manual § 9-11.151, the Government sent a letter to Nauta's counsel informing him that Nauta was a target of a federal criminal investigation into violations of federal criminal laws, including 18 U.S.C. § 1001, § 1512, and § 1519, and that Nauta was "a putative defendant." Def. Ex. 7. The letter informed Nauta's counsel that pursuant to United States Justice Manual § 9-11.153, the letter "constitute[d] notice of your client's status as a target and is intended to afford your client an opportunity to testify before the grand jury." *Id.* The letter further stated, as relevant here, that "[y]our client is not required to accept this invitation to testify; the decision whether to do so is voluntary," but should he choose to appear before the grand jury, "[h]e may refuse to answer any question if a truthful answer to the question would tend to incriminate him." *Id.*

Nauta did not accept the offer to appear before the grand jury, and on June 8, 2023, a grand jury returned an Indictment charging him with violating and conspiring to violate 18 U.S.C. § 1512(b)(2)(A) and 18 U.S.C. § 1512(c)(1), and with violating 18 U.S.C. § 1519, § 1001(a)(1), and § 1001(a)(2). On July 27, 2023, a grand jury returned a Superseding Indictment containing the same charges against Nauta as in the initial Indictment, as well as a charge of violating 18 U.S.C. § 1512(b)(2)(B) and an additional charge of violating 18 U.S.C. § 1512(c)(1).

## ARGUMENT

Nauta argues that the Government selectively and vindictively prosecuted him by bringing the indictment against him to "retaliate[] against the exercise of his Fifth Amendment rights." Mot. at 9 (capitalization altered). Nauta's arguments are legally and factually flawed. Nauta's selective-prosecution claim fails for the threshold reason that he has not identified any similarly situated individuals who were not prosecuted; the two comparators he mentions are far different from him. Nor does Nauta demonstrate discriminatory purpose or vindictive animus. Nauta apparently contends that his decision not to accept the offer in the target letter to appear before the grand jury amounted to an exercise of his Fifth Amendment right against self-incrimination. And he appears to assert that the Government brought charges against him to punish him for not accepting the offer in the target letter.[4] But Nauta's failure to accept the letter's offer to appear before the grand jury was not an invocation of his right against self-incrimination, and the charges against Nauta therefore could not have been a punishment for exercising those rights. And even if the failure to accept the letter's offer to appear before the grand jury were treated as an assertion of his right against self-incrimination, Nauta provides nothing but speculation and conjecture to support the contention that the charges were brought to punish him for asserting that right. Nauta is not entitled to discovery, let alone dismissal of the indictment. The motion should be denied.

---

[4] Nauta's motion states: "While Mr. Nauta declined the prosecution's request to testify before an additional federal grand jury [cite], and such construction that his declination was anything other than cooperative would be wholly inaccurate." Mot. at 9 (no alterations; brackets in original). The motion further states: "Accordingly, Mr. Nauta's declination to testify before a federal grand jury should only be lawful assertion of his Fifth Amendment rights to which he is guaranteed by right under the U.S. Constitution." Mot. at 10.

5

I.      **Applicable Law**[5]

The decision to bring charges in a case is subject to a "presumption of regularity," and, with rare exceptions, defendants and courts are precluded from "[e]xamining the basis of a prosecution" or "subjecting the prosecutor's motives and decisionmaking to outside inquiry." *United States v. Armstrong*, 517 U.S. 456, 464-65 (1996); *see Wayte v. United States*, 470 U.S. 598, 607 (1985). Those rare exceptions include cases violating the constitutional prohibitions on selective and vindictive prosecution. Selective prosecution occurs when the decision to prosecute is "based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Armstrong*, 517 U.S. at 464 (quotation marks omitted). And vindictive prosecution occurs when a "charging decision" or other prosecutorial action is "motivated by a desire to punish [the defendant] for doing something that the law plainly allowed him to do." *United States v. Goodwin*, 457 U.S. 368, 384 (1982).

To prove a claim of selective or vindictive prosecution, a defendant must establish each of the constituent elements by "clear and convincing evidence." *United States v. Smith*, 231 F.3d 800, 808 (11th Cir. 2000) (selective prosecution); *see United States v. Simbaqueba Bonilla*, No. 07-cr-20897, 2010 WL 11627259, at *4-5 (S.D. Fla. May 20, 2010) (vindictive prosecution). A claim of selective prosecution requires a defendant to "demonstrate [1] that the federal prosecutorial policy had a discriminatory effect and [2] that it was motivated by a discriminatory purpose." *Smith*, 231 F.3d at 808 (quotation marks omitted). A vindictive prosecution claim based on a theory of actual vindictiveness requires the defendant to demonstrate "that (1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus." *United States v. Wilson*, 262 F.3d 305, 314 (4th Cir. 2001); *see United States v. Barner*,

---

[5] The applicable law has been set forth at greater length at ECF No. 337 at 3-6.

6

441 F.3d 1310, 1322 (11th Cir. 2006) (citing *Wilson* and stating that the "elements of prosecutorial vindictiveness are animus plus causation").

To obtain discovery in support of such claims, a defendant must meet a "correspondingly rigorous standard," *Armstrong*, 517 U.S. at 468, that is "only slightly lower than for proving the claim itself," *United States v. Hare*, 820 F.3d 93, 99 (4th Cir. 2006) (quotation marks omitted); *see United States v. Bass*, 536 U.S. 862 (2002) (per curiam). That standard requires the defendant to make "a credible showing" to support his claim, by providing "some evidence tending to show the existence of the essential elements of the defense." *Armstrong*, 517 U.S. at 468, 470 (quotation marks omitted); *see United States v. Cannon*, 987 F.3d 924, 937 (11th Cir. 2021).

**II.       Nauta Falls Far Short of Making a Showing of Selective or Vindictive Prosecution**

Nauta fails to satisfy any of the requirements for claims of selective or vindictive prosecution. He is entitled to neither dismissal nor discovery.

**A.       Nauta Fails to Identify a Similarly Situated Comparator as Required by the First Prong of the Selective-Prosecution Standard**

The first prong of the selective-prosecution standard requires a showing that "similarly situated individuals were not prosecuted," which requires the defendant to identify a "comparator [who] committed the same basic crime in substantially the same manner as the defendant—so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan—and against whom the evidence was as strong or stronger than that against the defendant." *Smith*, 231 F.3d at 809-10. The comparator must "be nearly identical" to the defendant. *United States v. Brantley*, 803 F.3d 1265, 1272 (11th Cir. 2015).

Nauta proposes (Mot. at 12-13) two individuals as comparators, based on their involvement in a single incident. Specifically, in December 2022, some Trump employees, including

7

[Per. 10], [redacted], decided to organize and clean their workspace at Mar-a-Lago. Ex. 2 at USA-00817569, USA-00817572, USA-00817588-91; Ex. 3 at USA-00804285-86, USA-00804288. [Per. 10] decided that a box that had been stored under [P10] desk could go to off-site storage. Ex. 2 at USA-00817559-61, USA-00817568-69, USA-00817572, USA-00817588-89, USA-00817592-93; Ex. 3 at USA-00804285, USA-00804288. The box contained Trump's daily schedule from his presidency, and [Per. 10] had scanned the contents of the box to [P10] computer over a year earlier. Ex. 2 at USA-00817528-31, USA-00817552-53. The box was put in the trunk of a car belonging to [Per. 11]—with the expectation they it would be taken to off-site storage the next day. Ex. 2 at USA-00817589-90; Ex. 3 at USA-00804284-85. [Per. 10] later decided it would be prudent to wait to send the box to storage because [P10] knew Trump's lawyers were in the process of conducting a search related to "this . . . investigation." Ex. 2 at USA-00817591; *see* Ex. 2 at USA-00817588, USA-00817593-95; Ex. 3 at USA-00804287-88, USA-00804290. As a result, the next day, they brought the box back to the office from the trunk of the car, where it had remained overnight. Ex. 2 at USA-00817589-90. Trump's lawyers subsequently searched the office and found documents with classification markings in the box, which they produced to the Government. Ex. 2 at USA-00817561-66.

Nauta's conduct is not remotely comparable to the conduct of either [Per. 10] or [Per. 11]. Nauta moved scores of boxes *out* of the storage room before Trump's attorney conducted a search for responsive documents in the storage room, in order to keep the boxes away from the attorney so he did not search them. In the incident Nauta relies on as a basis for comparison, in contrast, [Per. 10] and [Per. 11] moved a single box back *into* the office— with no involvement from Trump—to ensure that Trump's attorneys would have access to the box.

8

In other words, whereas Nauta's conduct was intended to obstruct an attorney's review, the routine administrative conduct of ▮Per. 10▮ and ▮Per. 11▮ was intended to facilitate review. Moreover, Nauta misled and lied to investigators—in a voluntary interview and in the grand jury—and tried to get the Director of Information Technology at Mar-a-Lago to delete security footage that would show Nauta moving boxes out of the storage room. By contrast, Nauta does not even argue that ▮Per. 10▮ or ▮Per. 11▮ engaged in any obstructive conduct.

Nauta has therefore failed to identify any person who qualifies as a similarly situated comparator. Nor does he identify any improper purpose for which the Government might have selected him for prosecution rather than the other two Trump employees that he offers as comparators. His request for discovery or dismissal on the basis of selective prosecution can and should be denied on this basis alone. *See Cannon*, 987 F.3d at 939.

**B.     Nauta Fails to Show Discriminatory Purpose or Actual Vindictiveness**

Nauta appears to contend (Mot. at 9-11) that the same evidence—a series of innocuous and entirely appropriate events preceding his indictment—demonstrates both animus (for purposes of establishing vindictive prosecution) and discriminatory purpose (the second prong of a selective-prosecution claim). That evidence falls far short of showing either "animus plus causation," *Barner*, 441 F.3d at 1322 (vindictive-prosecution standard), or that the prosecutorial "decisionmaker" was "motivated by a discriminatory purpose," *United States v. Jordan*, 635 F.3d 1181, 1188 (11th Cir. 2011) (quotation marks omitted) (second prong of a selective-prosecution claim).

Nauta argues (Mot. at 9-11) that the following factual assertions support his claims. On May 8, 2023, an attorney for the Government reached out to speak with counsel for Nauta, and they arranged to meet over a cup of coffee. Def. Exs. 4, 5. They met the next day as planned, and

9

according to Nauta, they spoke about a potential violation of 18 U.S.C. § 1001, and the prosecutor said "that the prosecution would not accept anything less than Mr. Nauta's full cooperation" and declined an offer "to proffer by Mr. Woodward." Mot. at 10. Subsequently, on May 22, 2023, the prosecutor informed Nauta's counsel that, consistent with their prior conversation, he (Nauta's counsel) would soon be receiving a target letter. *See* Mot. at 5 (quoting email). As forecasted, the Government sent Nauta's counsel a target letter on May 24, 2023. Def. Ex. 7.[6] Among other things, the letter stated that Nauta was the target of a criminal investigation focused on 18 U.S.C. § 1001, § 1512, and § 1519. *Id.* Nauta did not accept the offer to appear before the grand jury, and the grand jury returned an indictment on June 8, 2023.

In Nauta's view (Mot. at 9-10), these events establish animus and discriminatory purpose because (1) his decision not to appear before the grand jury after receiving the target letter was akin to invoking his Fifth Amendment right against self-incrimination; and (2) the Government brought charges against him to punish him for invoking his Fifth Amendment rights. This argument fails both factually and legally. Nauta's failure to accept the target letter's offer to appear before the grand jury was not an assertion of his right against self-incrimination. "It has long been settled that the privilege generally is not self-executing and that a witness who desires its protection must claim it." *Salinas v. Texas*, 570 U.S. 178, 181 (2013) (quotation marks omitted). Moreover, the right against self-incrimination "may be asserted only to resist *compelled* explicit or implicit disclosures of incriminating information." *Doe v. United States*, 487 U.S. 201, 212 (1988); *see Jenkins v. Anderson*, 447 U.S. 231, 243-44 (1980) (Stevens, J., concurring) ("When a citizen is under no official compulsion whatever, either to speak or to remain silent, I see no reason why his

---

[6] The letter was sent by email at approximately 12:45 a.m. on May 24, 2023, and is dated May 23, 2023. *See* Def. Ex. 7.

10

voluntary decision to do one or the other should raise any issue under the Fifth Amendment."). Nauta was not compelled to appear before the grand jury, let alone testify. The target letter made clear that Nauta was "not required to accept this invitation to testify" and "the decision whether to do so is voluntary," and that if he should "choose to appear before the grand jury," he could "refuse to answer any question if a truthful answer to the question would tend to incriminate him." Def. Ex. 7. Even if Nauta's failure to accept the target letter's offer to appear before the grand jury could be construed as an invocation of his right against self-incrimination, there is no basis to conclude that the Government brought charges to punish him for exercising that right. The target letter itself informed Nauta that the Government had "substantial evidence linking [Nauta] to the commission" of the listed crimes, and that he was "a putative defendant." *Id.* A finding of vindictive prosecution in these routine circumstances would largely foreclose the use of target letters. But such letters are "encouraged," Justice Manual § 9-11.153, and intended for the benefit of the defendant. Nauta's being charged was not to punish him for exercising his Fifth Amendment right against self-crimination or any other constitutional right, and he provides nothing but speculation and innuendo to suggest otherwise.

Nauta's claim also fails insofar he suggests he was charged because he declined to cooperate. As the Supreme Court has explained, although the government may not retaliate against a defendant for exercising legal rights, "in the 'give-and-take' of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) (no vindictive prosecution when the prosecutor, after the defendant refused to plead guilty to the original charges carrying a sentence of two to ten years of imprisonment, indicted the defendant under a recidivist statute carrying a mandatory life term). Accordingly, "[w]hen the party refuses to cooperate, prosecution,

11

based upon probable cause to believe the defendant committed the crime charged," is not vindictive. *United States v. Boss*, 652 F.2d 36, 38 (10th Cir. 1981); *see United States v. Davis*, 854 F.3d 1276, 1291 (11th Cir. 2017) ("[The defendant] cites no authority suggesting that the government cannot use the threat of prosecution to encourage cooperation, and courts that have considered this issue have concluded otherwise."); *United States v. Oliver*, 787 F.2d 124, 125-26 (3d Cir. 1986) (no prosecutorial vindictiveness where federal charges were brought because defendant failed to cooperate satisfactorily with local authorities).

Finally, Nauta's suggestion (Mot. at 8-9) that a presumption of vindictiveness could possibly apply here must be rejected. A defendant may sometimes establish that the circumstances of the case pose a realistic likelihood of vindictiveness and therefore warrant a prophylactic presumption of vindictiveness in all cases of that type, as occurs, for example, when a prosecutor responds to a defendant's successful appeal by increasing the severity of the charges against him. *See Goodwin*, 457 U.S. at 380-81, 383-84; *Alabama v. Smith*, 490 U.S. 794, 799-800 (1989); *United States v. Kendrick*, 682 F.3d 974, 982 (11th Cir. 2012). Whether a "presumption can ever arise in a pre-trial setting" is unsettled in the Eleventh Circuit, *Barner*, 441 F.3d at 1318, but a presumption would be entirely inappropriate in the circumstances of this case, where the Government sent a putative defendant a target letter, the putative defendant did not accept the routine offer to appear before the grand jury, and the grand jury returned an indictment charging the defendant. If such circumstances were to raise a presumption of vindictiveness, a putative defendant who received a target letter could effectively immunize himself by declining to respond. A presumption of prejudice in those circumstances would be unprecedented and would effectively preclude the issuance of target letters, which are routine and intended to benefit putative defendants.

## CONCLUSION

Nauta has failed to make a showing sufficient to entitle him even to discovery or a hearing, much less dismissal, on his claims of selective and vindictive prosecution. His motion should be denied.

        Respectfully submitted,

        JACK SMITH
        Special Counsel
        N.Y. Bar No. 2678084

By:   /s/ *Jay I. Bratt*
        Jay I. Bratt
        Counselor to the Special Counsel
        Special Bar ID #A5502946

        David V. Harbach, II
        Assistant Special Counsel
        Special Bar ID #A5503068
        950 Pennsylvania Avenue, N.W.
        Washington, D.C. 20530

        John M. Pellettieri
        Assistant Special Counsel
        Special Bar ID #A5503076

March 7, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2024, I electronically transmitted the foregoing document to counsel of record for the defendants via CM/ECF.

/s/ *Jay I. Bratt*
Jay I. Bratt