**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

UNITED STATES OF AMERICA,   **Case No. 23-80101-CR**
           **CANNON/REINHART**
vs.

DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVEIRA,

    Defendants.

_____

**PRESIDENT TRUMP'S REPLY BRIEF IN FURTHER SUPPORT OF**
**MOTION TO DISMISS THE INDICTMENT BASED ON**
**SELECTIVE AND VINDICTIVE PROSECUTION**

## TABLE OF CONTENTS

I.      The Prosecution Is Motivated By Discriminatory Purpose ................................................. 1

II.     The Prosecution Has Had A Discriminatory Effect.......................................................... 4

III.    At Minimum, Discovery And A Hearing Are Necessary................................................... 9

IV.     Conclusion ....................................................................................................................... 10

President Donald J. Trump respectfully submits this reply in support of his motion to dismiss based on selective and vindictive prosecution (the "Motion"), and in response to the opposition brief filed by the Special Counsel's Office, ECF No. 375 (the "Opposition").

## I.   The Prosecution Is Motivated By Discriminatory Purpose

President Trump has identified much more than "some" evidence that the prosecution team has been motivated by improper political animus.  *United States v. Armstrong*, 517 U.S. 456, 469 (1996); *see also United States v. Steele*, 461 F.2d 1148, 1152 (9th Cir. 1972) ("An enforcement procedure that focuses upon the vocal offender is inherently suspect, since it is vulnerable to the charge that those chosen for prosecution are being punished for their expression of ideas . . . ."). President Biden's targeted leaks and public statements urging others to prosecute President Trump, coupled with NARA's declaration that the Biden Administration's "current business" was investigating President Trump, Compel Mot. Ex. 24 at 2, strongly support that inference.  *See United States v. Falk*, 479 F.2d 616, 623-24 (7th Cir. 1973) (finding *prima facie* selective-prosecution showing based on, *inter alia*, public statements by Selective Service).  The inference is even more powerful when those statements are viewed in context with other politically motivated events surrounding the Biden Administration's coordination to target President Trump:

- On January 7, 2021, former Director of National Intelligence John Ratcliffe and the Intelligence Community Analytic Ombudsman, Dr. Barry Zulauf, made submissions to Congress regarding "political considerations or undue pressure" influencing the analytic conclusions of the same Intelligence Community responsible for numerous highly subjective judgments used to support this prosecution, as discussed in our motions to compel.  Compel Mot. Ex. 65 at 3; *see also id.* Ex. 64.

- Around September 1, 2021, NARA's General Counsel "informally reached out to DOJ counsel" concerning President Trump's records and started to work directly with White House Counsel.  Compel Mot. Ex. 5.

- On September 15, 2021, the White House Counsel suggested to NARA's General Counsel that they coordinate to wrongfully evade PRA notification requirements to President Trump's PRA representatives.  Compel Mot. Ex. 6 at USA-00383678.

- On September 20, 2021, Jay Bratt personally met with Katharine Reilly, an advisor to the White House Chief of Staff.[1]

- On November 8, 2021, Bratt met with Caroline Saba, a deputy chief of staff for the White House Counsel's Office. *Id.*

- Less than three weeks after the February 9, 2022 sham referral by NARA-OIG, a NARA Official wrote in a text message that "the 15 boxes from mar-a-lago have consum[]ed all of our discussions" with the White House. Compel Mot. at 22.

- Around April 2, 2022, the Biden Administration leaked to the *New York Times* that, "as recently as late last year," President Biden had told his "inner circle that he believed former President Donald J. Trump was a threat to democracy and should be prosecuted . . . ." Compel Mot. Ex. 62. Through the article, President Biden urged Attorney General Garland to "act . . . more like a prosecutor who is willing to take decisive action . . . ." *Id.*

- On May 23, 2022, according to invoices, Nathan Wade, a disgraced former Special Assistant District Attorney in Fulton County, Georgia, spent eight hours at a "conf. with White House Counsel," which strongly suggests that the Biden Administration also supported the unlawful Fulton County prosecution. Compel Mot. Ex. 63 at 2.

- Around August 4, 2022, Deputy Assistant Attorney General George Toscas told the FBI "that 'he frankly doesn't give a damn about the optics'" of the unprecedented and illegal raid at Mar-a-Lago. Compel Mot. Ex. 35. In an FBI email memorializing that inappropriate comment, the FBI also noted Bratt's "antagonistic relationship" with President Trump's attorney. *Id.*; *accord* ECF No. 114 at 4-5 (sealed filing).

- On August 10, 2022, Austin Evers participated in communications regarding a motion to unseal the warrant relating to the Mar-a-Lago raid. Compel Mot. Exs. 36-37. Evers previously stated publicly that he had PRA-related "litigation in the can," and that Trump Administration officials had been "relying on impunity." Compel Mot. at 52.

- On August 19, 2022, the same Archivist who had run "out of patience" less than six months after President Trump left office posted an article on social media congratulating NARA for its role in causing the Mar-a-Lago raid. Compel Mot. Ex 3; Compel Reply at 3.

- On August 28, 2022, NARA's General Counsel contacted Martin Lederman of DOJ's Office of Legal Counsel to discuss "time-sensitive" questions. Compel Mot. Ex. 49. Beginning in at least 2019, Lederman had posted biased and inappropriate criticisms of President Trump on social media. *See* Compel Mot. at 52 n.22.

---

[1] Visitor Logs (2021), The White House, *available at* https://www.whitehouse.gov/disclosures/visitor-logs.

- On September 12, 2022, while classified documents sat in his private office, garage, and other unsecure locations, President Biden called President Trump "totally irresponsible" based on the unproven allegations at issue in this case during a television interview.[2]

- On November 9, 2022, President Biden stated at a press conference that he was "making sure" that President Trump "does not become the next President again."[3]

- On November 18, 2022, the same day Jack Smith was appointed, Nathan Wade's invoices indicate that he participated in an "Interview" with "DC/White House" for eight hours. Compel Mot. Ex. 63 at 2.

- In January 2024, Attorney General Garland—who personally approved the unprecedented Mar-a-Lago raid—abandoned any appearance of independence from Jack Smith and used public statements released on CNN to back the Office's demand for a "speedy trial," which is the Office's code for a trial prior to the November 2024 election.  Mot. at 18.

- In February 2024, a super PAC supporting President Biden described its plan to spend more than $40 million to "amplify" the Biden Administration's election-interference mission.[4]

There is evidence of vindictive political animosity focused on election interference in these proceedings, which is part of the reason why the Special Counsel's Office is wrong in the claim that President Trump "does not contend that the Special Counsel himself was motivated by improper considerations."  Opp'n at 21.  The vast majority of our filings in this case make the opposite point about the Office's politically motivated misconduct, which is backed by the record.

---

[2] Special Counsel's Office, U.S. Dep't of Justice, Report on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden center and the Delaware Private Residence of President Joseph R. Biden, Jr. at 227-28 (Feb. 5, 2024) (the "Hur Report"), *available at* www.justice.gov/storage/report-from-special-counsel-robert-k-hur-february-2024.pdf.

[3] Remarks by President Biden in Press Conference, The White House (Nov. 9, 2022), *available at* https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/11/09/remarks-by-president-biden-in-press-conference-8.

[4] Matt Dixon, *Pro-Biden super PAC set to spend up to $40M amplifying Trump's legal woes*, NBC NEWS (Feb. 6, 2024), https://www.nbcnews.com/politics/2024-election/biden-super-pac-40-million-ad-campaign-trump-legal-rcna135326.

The abuse of DOJ election-interference policies by the Special Counsel's Office is a prime example.  At a hearing in this case on March 1, 2024, Jay Bratt asserted that the Justice Manual's election-interference prohibition, § 9-85.500, "does not apply to cases that have already been charged." 3/1/24 Tr. 80.  That misrepresentation is contradicted by the text of the provision, which prohibits the "select[ing] the timing of *any action* . . . for the purpose of affecting any election." Bratt also asserted at the hearing that the separate "60-day rule . . . does not apply to cases that have already been charged." *Id.* at 81.  That claim is inconsistent with (1) the November 12, 2020 letter signed by Deputy Special Counsel J.P. Cooney and others, which invoked a "longstanding policy of non-interference in elections," without regard to whether or not a case had been charged, ECF No. 357 at 2; and (2) the Horowitz OIG Report, which states that the 60-day rule reflects "a general principle of avoiding interference in elections," again, regardless of whether a case is charged.[5]  The Office's ongoing violation of these separate policies is further evidence of the improper motivation driving this prosecution.  Based on all of this evidence, President Trump has made a sufficient showing on the animus and discriminatory purpose prongs.

## II.     The Prosecution Has Had A Discriminatory Effect

President Trump has also demonstrated discriminatory effect.  The Special Counsel's Office concedes that each of the nine comparators identified by President Trump bears a "slight resemblance to this case," Opp'n at 5, which is a notable concession given that President Trump is only required to proffer "some" evidence under *Armstrong*.  The Office largely ignores the additional strong support for the motion arising from the long history of Presidents and other

---

[5] Inspector General, U.S. Dep't of Justice, A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election at 17 (June 2018) (the "Horowitz OIG Report"), *available* at https://www.oversight.gov/sites/default/files/oig-reports/o1804.pdf.

officials retaining classified information when they leave their posts without consequence. *See* Mot. at 19-20. The Court referenced this history at the March 14, 2024 hearing.[6] *See Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886) (finding equal protection violation where "the facts shown establish an administration directed . . . exclusively against a particular class of persons"); *cf. Int'l Broth. Of Teamsters v. United States*, 431 U.S. 324, 342 n.23 (1977) (reasoning that, due to "the glaring absence of minority line drivers," "the company's inability to rebut the inference of discrimination came not from a misuse of statistics but from 'the inexorable zero'"). The Court also noted that, on the Office's theory of the § 793(e) violations, the alleged offenses were complete as soon as President Trump left office. 3/14/24 Tr. 47-48. As a result, the Office's emphasis on inaccurate obstruction allegations is insufficient to cure equal-protection problems with the Espionage Act counts.

Even when the inaccurate obstruction allegations against President Trump are considered, they are insufficient to defeat the motion. For example, the Special Counsel's Office omits that President Biden lied during Mr. Hur's investigation. Specifically, Mr. Hur found one of President Biden's written answers to be "not credible" and pointed out that President Biden "said something similar" during an in-person interview. Hur Report at 224 & n.870. In other words, in addition to evidence of "willful" violations of the Espionage Act by President Biden, President Biden lied to Mr. Hur—twice. Mr. Hur also found that President Biden shared classified information with a ghostwriter, the ghostwriter destroyed evidence after the investigation commenced, and a member

---

[6] 3/14/24 Tr. 118; *see also id.* at 46 (acknowledging that the only other NARA referrals "[p]ostdated" the sham referral relating to President Trump); *id.* at 21 (noting that "there would be other officials who clearly have run afoul of this prohibition as charged"); *id.* at 45 ("[I]t is uncontested, of course, that no former executive or former vice president had ever . . . been faced with or exposed to criminal liability for retaining personal or presidential records."); *id.* at 65 (confirming that there has been "no criminal liability to date . . . for officials that had classified information postposition").

of President Biden's staff had conveyed a "recollection" that was "inconsistent with e-mails and other documents," *i.e.*, he lied too.  Hur Report at 238 n.293.  Consistent with those troubling findings, the only damage assessment in the record—which is discussed in the Classified Supplements relating to the compel motions—does not support the position of the Special Counsel's Office.

Mr. Hur also credited President Biden's historical arguments relating to classified-information handling and the lack of similar prosecutions.  *See* Hur Report at 249-52.  For example, as stated in a September 11, 2023 letter written on White House letterhead:

> Presidents Jimmy Carter, Ronald Reagan, George H.W. Bush, George W. Bush, and Barack Obama, and Vice Presidents Dick Cheney and Mike Pence, each had classified or national security information in their personal diaries, notes, or book manuscripts after they left office . . . . To our knowledge, the government made no efforts to secure the writings in question, determine how classified information came to be in those writings, or identify whether the classified information in those writings was shared orally or in written form with individuals without security clearances.

Ex. 1 at 1.  "The implication that [President Biden's] writings might be relevant to a criminal inquiry runs counter to decades of precedent as outlined in this letter."  *Id.* at 2.  The fact that the Special Counsel's Office has rejected President Trump's reliance on the same record is not, as the Office claimed recently, "Exhibit 110 for why we are not puppets or appendages of the Biden Administration."  3/14/24 Tr. 132.  Rather, similar to the Office's intentional violation of DOJ policies, the Office is willing to ignore powerful arguments used by the White House on behalf of President Biden, and adopted by Mr. Hur, in order to push forward on their election-inference mission against President Trump.

The Special Counsel's Office summarizes public facts relating to Mike Pence but fails to acknowledge important considerations bearing on the comparison.  Pence was motivated to break with tradition and historical norms because he had watched the unprecedented and politically

motivated actions perpetrated against President Trump in 2022. After Pence and his attorneys searched for and returned classified records, as President Trump allegedly did with the 15 Boxes and the subsequent grand jury subpoena, the FBI searched Pence's home and found more, as with the evidence allegedly recovered during the Mar-a-Lago raid. Pence was permitted to consent to a search, but President Trump was not, despite President Trump's offer of cooperation to Bratt at Mar-a-Lago in June 2022. Finally, the Office's bias is relevant to this analysis. They have a clear interest in minimizing the significance of Pence's actions to maintain his credibility as a witness in their District of Columbia case against President Trump.

No one can assess the baseless assertion of the Special Counsel's Office that Bill Clinton's tapes contain information that is "far different" from the documents at issue in this case. Opp'n at 15. The Office confirmed at the recent hearing that their "view" is "we do not know" whether the tapes contain classified information, but "suppose" that they "might." 3/14/24 Tr. 128-29. What makes Bill Clinton an apt comparator for purposes of the selective and vindicative prosecution of President Trump is that no one even checked what was on the tapes. *See* Ex. 2 at 3 & n.1 (White House Counsel noting that "former Presidents are not required to submit potential publications for preclearance review" and the National Security Council "does not have a record of the submission for prepublication review of Bill Clinton's *My Life*").

The Special Counsel's Office downplays the significance of Hillary Clinton running the State Department using a personal email account operated through three private servers stored in her residence. Mot. at 8. The first two servers were intentionally discarded and destroyed, resulting in the loss of all of the federal records they contained. *Id.* In response to a congressional inquiry, Clinton provided hard copies, only, of 30,490 emails that she claimed were "work related," and an employee deleted the rest—destroying 31,830 emails. *Id.* at 8-9. The deleted

communications included 12 classified threads.  *Id.* a 9.  In addition to liberal use of BleachBit, Clinton's staff also destroyed at least two electronic devices "by breaking them in half or hitting them with a hammer," among other methods.  Mot. at 22.  The Office's emphasis on the prosecution team's assessments of this evidence must be tempered by the fact that the team included agents who exchanged the following messages on August 8, 2016: "[Trump's] not ever going to become president, right? Right?!" // "No.  No he's not.  We'll stop it."  Horowitz OIG Report at 149; *see also United States v. Davis*, 793 F.3d 712, 720 (7th Cir. 2015) (reasoning that agency personnel such as FBI agents are "not protected" by "presumption of constitutional behavior").  Viewing the existing public evidence in context, the fact that a group of prosecutors— which also included George Toscas, whose animosity toward President Trump is part of the record—chose not to seek charges against Clinton and her staff actually supports this motion.

At the recent hearing, Bratt joked that he "can't take [classified documents] home and put them in my basement."  3/14/24 Tr. 61.  But that is essentially what Jim Comey did, among other things, with classified Memos 2 and 7.  *See* Mot. at 10.  He placed the classified documents in his "personal safe," and he did not tell FBI agents who visited his home about those documents.  *Id.* Comey did not tell the FBI that he had used a private scanner and email account to transmit the classified documents, either.  *See id.*  Thus, like Hillary Clinton, Comey engaged in obstructive behavior that investigators decided to overlook, which makes Comey's conduct appropriate for comparison in support of President Trump's motion.

Although the documents produced to date relating to Dr. Birx do not demonstrate that she engaged in obstructive conduct, the Special Counsel's Office capitalizes on its strategy of trying to exclude NARA from the prosecution team by making no new disclosures regarding NARA's discovery in September 2021 of at least one classified document in the "mix" of "boxes" she

returned to NARA that month.  Opp'n at 20-21.  NARA's apparent indifference to the discovery during the same month that the agency "informally" contacted DOJ regarding President Trump, after having run "out of patience" with him in June, is more evidence of the bias and improper motive that drove the investigation and prosecution.  The Office cannot dodge the comparison to Dr. Birx without providing more information so that the Court can evaluate it.

Finally, General Petraeus, Berger, and Deutch all mishandled extremely sensitive materials at premises much less secure than Mar-a-Lago.  Petraeus disclosed some of the materials to a "biographer," confirming that they included "highly classified," compartmented information.  Mot. at 11.  Berger stole records from NARA and destroyed some of them but faced no § 2071 charges or obstruction counts.  *Id.*  Similar to Hillary Clinton's work at the State Department, Deutch ran the CIA using unclassified systems at his house to maintain classified information regarding his agency's most closely guarded secrets.  Evidence that these three men were offered single-count misdemeanor pleas, while President Trump has been charged in 32 individual felony counts, is an additional part of President Trump's "credible showing of *different treatment* of similarly situated persons."  *Armstrong*, 517 at 469 n.3 (1996).  Collectively, the historical record and the specific comparators identified by President Trump establish, at least, a *prima facie* case of selective and vindictive prosecution.

### III.    At Minimum, Discovery And A Hearing Are Necessary

No sitting President has ever successfully pressed for the prosecution of a former President, and his chief political rival, the way that President Biden did—proudly and publicly—in 2022.  NARA has never targeted a former President in the way that the agency targeted President Trump.  No law enforcement body has ever raided a former President's home.  DOJ has never even used civil remedies against a former President.  "Such a lack of historical precedent is generally a telling

indication of a severe constitutional problem with the asserted power." *Trump v. Anderson*, 144 S. Ct. 662, 669 (2024) (cleaned up). Thus, the Court should dismiss these charges immediately.

If not now, then after discovery, as contemplated by *Armstrong*: "[T]he Government must assemble from its own files documents which might corroborate or refute the defendant's claim." 517 U.S. at 468. This includes all of the evidence sought in Discussion Part II.E of the pending motions to compel, such as emails, text messages, and all electronic communications by members of the prosecution team—including on private devices and accounts—reflecting political animus toward President Trump. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."). In addition, the Special Counsel's Office is wrong in suggesting that publicly filed reports relating to President Biden and Hillary Clinton constitute sufficient disclosures for discovery on these issues. Opp'n at 12 n.5, 17 n.12. Internal documents and communications relating to non-prosecution decisions and decisions not to make criminal referrals are discoverable under *Armstrong* and meaningfully different than news stories with unnamed sources and uncorroborated leaks. Because of the nature of the comparator cases, many of these documents are controlled by DOJ's National Security Division and the FBI, which are part of the prosecution team in this case because they participated in the improper investigation of President Trump. President Trump has made a sufficient showing to be entitled to these materials and a hearing.

## IV.  Conclusion

For the foregoing reasons, the Court should dismiss the Superseding Indictment or, at minimum, order discovery and hold a hearing on these selective and vindictive prosecution claims.

Dated: March 24, 2024                   Respectfully submitted,

*/s/ Emil Bove*
Todd Blanche (PHV)
toddblanche@blanchelaw.com
Emil Bove (PHV)
emil.bove@blanchelaw.com
BLANCHE LAW PLLC
99 Wall Street, Suite 4460
New York, New York 10005
(212) 716-1250

*/s/ Christopher M. Kise*
Christopher M. Kise
Florida Bar No. 855545
ckise@continentalpllc.com
CONTINENTAL PLLC
255 Alhambra Circle, Suite 640
Coral Gables, Florida 33134
(305) 677-2707

*Counsel for President Donald J. Trump*

**<u>CERTIFICATE OF SERVICE</u>**

I, Emil Bove, certify that on March 24, 2024, I filed the foregoing document via email to

the Court and Counsel of Record.

<u>*/s/ Emil Bove*</u>
Emil Bove

# EXHIBIT 1



**THE WHITE HOUSE**
WASHINGTON

September 11, 2023

Special Counsel Robert K. Hur
Deputy Special Counsel Marc Krickbaum
Department of Justice
145 N Street Northeast
Washington, D.C., 20503

**Re:     Presidential and Vice-Presidential Writings**

Dear Special Counsel Hur and Deputy Special Counsel Krickbaum:

We noted to you in our February 27 submission that the Department of Justice (the Department), the courts, and Congress consistently have recognized the unique status of presidential and vice-presidential writings.  In that submission, we documented that the Department has never previously reviewed a President's or Vice President's personal notes for the purpose of identifying classified information, even though the Department has long been aware both that such notes routinely describe sensitive national security matters and that such notes have been retained by Presidents and Vice President after leaving office.  We write now to elaborate on the Executive Branch's past practice with respect to such writings.

Presidents Jimmy Carter, Ronald Reagan, George H.W. Bush, George W. Bush, and Barack Obama, and Vice Presidents Dick Cheney and Mike Pence, each had classified or national security information in their personal diaries, notes, or book manuscripts after they left office.  For most of these individuals, the National Security Council (NSC) discovered the classified information when reviewing the material prior to its publication.  In the case of President Reagan and Vice President Bush, the Department became aware that their diaries contained classified or national security information during the Iran-Contra investigation.

Despite the discovery of classified information in these presidential and vice-presidential writings, none of these incidents resulted in any law enforcement action.  To our knowledge, the government made no efforts to secure the writings in question, determine how classified information came to be in those writings, or identify whether the classified information in those writings was shared orally or in written form with individuals without security clearances.

Indeed, at no time in the last thirty years has the Government, including the Department, viewed as actionable the possibility of classified information in the individual writings of a former President or Vice President.  For good reason.  A President's "diary and his own notes . . . touch the core of the presidency as well as intimate and confidential communications by the President with himself."  *United States v. Poindexter*, 727 F. Supp. 1501, 1505 (D.D.C. 1989).

1

Against this unbroken approach toward the writings of Presidents and Vice Presidents, your Office has seized former Vice President Biden's personal diaries, notebooks, and notes; you reviewed them in their entirety without prior review by the White House Counsel's Office (itself an unprecedented step); you have sent these materials for "classification review" by the Intelligence Community; and you have said that you intend to question President Biden in the context of a criminal investigation about these materials.  The implication that these writings might be relevant to a criminal inquiry runs counter to decades of precedent as outlined in this letter.

Furthermore, your treatment of these materials as the topic of a criminal inquiry runs the substantial risk of causing irreparable harm to the Offices of the President and Vice President by deterring future Presidents and Vice Presidents from using diaries and notes in the context of the most stressful and important jobs in the world—jobs that also require nearly continuous interaction with sensitive national security information.  In our February 27 submission, we explained at length that "Presidents and [V]ice [P]residents have long relied on their private notes and journals to introspect, deliberate, reflect, remember, or simply record, including on official matters," and chilling this ability "could have a long lasting impact on the Presidency and the manner in which future Chief Executives carry out their functions."  Letter from Counsel to the President Stuart F. Delery to Special Counsel Robert K. Hur (Feb. 27, 2023); Mem. in Support of Mot. to Quash Subpoena to Archivist and Statement of Interest by the DOJ on Behalf of the U.S. Addressing Defendant's Subpoena at 4, *United States v. Poindexter*, No. 88-00080-01 (HHG) (D.D.C. Dec. 6, 1989) ("DOJ Poindexter Statement of Interest").  Indeed, Presidents and Vice Presidents have long depended on the ability to take notes and the constitutional entitlement to the confidentiality of those notes.  To intrude into the confidentiality of such notes by subjecting them to scrutiny in a criminal inquiry would inevitably chill Presidents' and Vice Presidents' ability and willingness to write their notes freely, to the detriment of their Article II functions.  A similar chilling effect would occur if Presidents' and Vice Presidents' private introspections were required to become the public property of the Archives.

We outline below the history of how these materials have been treated in the last several decades and the respect given to them given their constitutional status.

***The Reagan Diaries***

President Reagan began keeping a daily diary immediately after his inauguration in January 1981.  Ronald Reagan, THE REAGAN DIARIES ix (Douglas Brinkley ed., 2007).  During his Presidency, he kept the diaries in his second-floor study in the White House residence.  *Id.* at x.  The diaries, which in redacted form were published several years after his death, contained both personal observations and detailed notes of meetings held throughout his presidency, including a host of meetings on national security and foreign affairs topics.  *See, e.g. id.* at 202 (detailing positions taken by advisors in NSC meetings on military operations in Lebanon  and NSC meetings on export policy with Libya); Ronald Reagan, *Monday, July 20, 1987*, REAGAN FOUNDATION: WHITE HOUSE DIARIES, https://www.reaganfoundation.org/ronald-reagan/white-house-diaries/diary-entry-07201987/ (discussing policy disagreements during meetings with the President between Cabinet Secretaries about providing military assistance to allies).

2

At the conclusion of his second term, Mr. Reagan brought the diaries to his Los Angeles home and kept them there until his death in 2004.  After returning to California, former President Reagan and former First Lady Nancy Reagan "would often sit together in their den after dinner, reading aloud from their diaries."  Reagan, THE REAGAN DIARIES at ix.

During that period, Mr. Reagan's former National Security Advisor, John Poindexter, who had been indicted by the Independent Counsel for his role in the Iran-Contra matter, subpoenaed excerpts from the President's diaries for his defense.  *See Poindexter*, 727 F. Supp. at 1503.  In connection with litigation over Mr. Poindexter's subpoena, the Department filed a brief (separate from the Independent Counsel) on December 6, 1989, nearly a year after the end of President Reagan's second term. In that brief, the Department acknowledged that the diaries contained classified information:

> *"We note that the diary excerpts we have seen are currently classified.*  Therefore, even if they are turned over to defendant, they are still subject to the appropriate procedures the Court is utilizing to determine whether they should remain classified, and whether the Government may need to invoke some of its rights under the Classified Information Procedures Act (18 U.S.C. App.) before the documents are used at trial."

DOJ Poindexter Statement of Interest at 17 n.8 (emphasis added).

At the time that the Department acknowledged that the diaries contained classified information, the diaries were being kept in the Reagan home in California. We are unaware of any effort made by the Department to remove the diaries from the private home and place them in a location certified to store and protect classified material.  For another 15 years, the Department did nothing with respect to what it knew to be classified information in Mr. Reagan's diaries at the Reagans' private home.

After Mr. Reagan passed away in 2004, former First Lady Nancy Reagan brought the diaries to staff at the Ronald Reagan Presidential Foundation ("Reagan Foundation") to discuss publishing them and putting them on public display in the Ronald Reagan Presidential Library ("Reagan Library").

The staff at the Reagan Foundation transcribed the handwritten diaries working in offices that were not certified for the storage or handling of classified information.  Once transcribed, the staff did their own review of the materials looking for national security information.  Using their best judgment, they tagged between 200-300 entries as related to national security and sent the diaries to the NSC to review for classified information.[1]

---

[1] The Reagan Foundation's submission to the NSC was entirely voluntary because former Presidents are not required to submit potential publications for preclearance review.  We understand that some former Presidents and Vice Presidents have submitted their manuscripts, or portions thereof, for prepublication review and others have not.  For example, NSC does not have a record of the submission for prepublication review of Bill Clinton's *My Life*; Al Gore's *An Inconvenient Truth*; George H.W. Bush's *All the Best*; Dan Quayle's *Standing Firm*; or Jimmy Carter's *Keeping Faith* and *White House Diary*.

NSC's review resulted in the diaries as a whole being classified at the Top Secret/Sensitive Compartmented Information (TS/SCI) level based on the highly classified information in some of the entries.  The NSC proposed redactions of the classified information to the Reagan Foundation officials.  Those officials contested several of the proposed redactions, pointing out that some of the information proposed for redaction had already been published and consequently was already in the public domain.  The NSC withdrew several of its proposed redactions, and the diaries were eventually published, with the classified information redacted, in 2007.  Mr. Reagan's diaries were also publicly displayed at his presidential library, with several pages "left out for national security reasons."  Anna Bakalis, *Library Gets First Look at 'Reagan Diaries,'* VENTURA COUNTY STAR (May 20, 2007).

The introduction to the published Reagan diaries states that NSC "read all five diary volumes" and redacted "about six pages of material for national security reasons." Reagan, THE REAGAN DIARIES at xiii.  In the acknowledgements section of the book, the editor of the diaries thanks a supervisory archivist with the Reagan Library for "dealing with the national security classification redactions" and thanks the Reagan Foundation Chief of Staff for responding "[w]henever I had a question pertaining to NSC concerns." *Id.* at 694-95.

At no point in this process was there any law enforcement inquiry into the fact that the diaries had been kept in a private home for decades and reviewed by individuals without security clearances.

### *The George H.W. Bush Diaries*

George H.W. Bush maintained personal diaries throughout his adult life, including while serving as Vice President and President.  *See* Lawrence Walsh, *Final Report of the Independent Counsel for Iran/Contra Matters: Volume I* at 474 (1993) ("Final Report of the Independent Counsel for Iran/Contra Matters"); George H.W. Bush & Brent Scowcroft, A WORLD TRANSFORMED (1999); George H.W. Bush, THE CHINA DIARY OF GEORGE H.W. BUSH: THE MAKING OF A GLOBAL PRESIDENT (Jeffrey A. Engel ed., 2008).  As explained below, although Mr. Bush wrote extensively about foreign affairs and national security, and although these diaries came to the attention of the Department, they were never scrutinized for classified information for law enforcement purposes.

To create his diary, Mr. Bush regularly dictated his daily experiences, along with "personal and political observations," on cassette tapes.  Final Report of the Independent Counsel for Iran/Contra Matters at 474.  A secretary in Mr. Bush's Houston, Texas office would then receive cassette tapes of Mr. Bush's dictations and transcribe them, on some occasions returning the transcript to Mr. Bush.  *Id.*  Although at times described as a "nightly dictation," staff at the Office of the Vice President observed Mr. Bush made "sporadic" dictations.  *Id.* at 474 n.10.

That practice continued into Mr. Bush's time as President.  According to President Bush's biographer, President Bush carried an audio recorder in his briefcase to enable him to dictate his diary at various locations and times throughout the day, including early in the morning

at the White House, while traveling aboard Marine One and Air Force One, and in the study off the Oval Office.[2]

Until September 1992, only a handful of then-President Bush's staff were aware that President Bush kept a daily diary. *Id.* at 474. Around that time, an administrative assistant conducting an inventory of Bush family safes at the White House residence discovered binders containing typed transcripts of the diaries. *Id.* at 477. The assistant reportedly observed that the transcripts "made repeated references to Iran/contra," which was then the subject of an ongoing investigation by Independent Counsel Lawrence Walsh—an investigation that had previously requested any of Mr. Bush's diaries during the relevant time. *Id.* at 476-77. The White House Counsel's Office ultimately reviewed and produced transcripts of the diaries in December 1992. *Id.* at 477. The Independent Counsel investigated Mr. Bush's failure to produce his diaries in response to initial requests. *Id.* at 478-79.

Vice President Bush's dictated diaries contained reflections on his official duties, including meetings regarding Iran-Contra and private conversations with President Reagan. *Id.* at 481-82. As the Independent Counsel later explained, the diary Mr. Bush kept while serving as Vice President covered sensitive issues related to national security, including details on discussions related to the Iranian hostage crisis and information like "the fact that Israeli officials were extremely upset" following certain events. *Id.* at 480 n.74, 483; *see also* Bush & Scowcroft, A WORLD TRANSFORMED at 338, 374, 459 (publishing excerpts of Mr. Bush's presidential diaries detailing meeting between Secretary of State James Baker and Soviet Foreign Minister Eduard Shevardnadze, a "horrible intelligence report" following the invasion of Kuwait by Saddam Hussein, and a briefing from the CIA on damage to Kuwaiti oil fields).

Materials prepared for Independent Counsel Walsh also suggest that Vice President Bush's diaries contained classified information. A memorandum summarizing excerpts from Vice President Bush's diary appears to have been declassified with redactions applied on June 22, 1999, pursuant to a letter from the NSC. *See* Mem. from Megan Semple to Judge Walsh and Craig Gillen 1, 7 (Jan. 13, 1993) (containing a redaction to conceal the identity of someone who called Vice President Bush, along with a handwritten note next to the redaction reading "(b)(1) (b)(3) 50 U.S.C § 403," an apparent reference to the statute that specified the authorities of the Office of the Director of National Intelligence). Given the subject matter of Mr. Bush's diaries and the sensitivity of the published excerpts, it is likely that they contained other examples of classified information.

Mr. Bush published portions of his diary excerpts and made his diaries available to biographers and authors. Michael Wines, *Bush Makes Public Iran-Contra Diary*, N.Y. TIMES (Jan. 15, 1993).[3] For instance, for the book *Destiny and Power*, Jon Meacham wrote that Mr. Bush "granted me access to his diaries," Meacham, DESTINY AND POWER at 603, with "no

---

[2] *See* C-SPAN, *Life and Presidency of George H.W. Bush* (Nov. 8, 2015), https://www.c-span.org/video/?400044-1/life-presidency-george-hw-bush; Politics and Prose, *Jon Meacham, "Destiny and Power,"* (Dec. 1, 2015), https://www.youtube.com/watch?v=7QGZ4Rhtp4s.

[3] *See also* Meacham, DESTINY AND POWER at 603-04 (noting that Bush's diaries had been referenced or excerpted in three prior books) (citing Herbert Parmet, GEORGE BUSH: THE LIFE OF A LONE STAR YANKEE (1997); Bush & Scowcroft, A WORLD TRANSFORMED; George H.W. Bush, ALL THE BEST (1999)).

conditions whatsoever," Nat'l Const. Ctr., *Jon Meacham: The American Odyssey of George H.W. Bush* (Nov. 12, 2015) https://www.youtube.com/watch?v=nQIZo4lj8H4 (reflecting an interview in which Meacham says, "He gave me his vice-presidential, presidential diaries, gave me the audio with no conditions whatever.  I didn't have to ask him if I could quote something, I didn't have to show him anything.  Nothing.").[4]

We are aware of no effort made by the Independent Counsel or the Department either to assess whether Mr. Bush's diaries contained classified information given their extensive discussion of national security and foreign affairs matters for the purposes of opening a criminal inquiry or to take steps to secure Mr. Bush's copies of the diaries.  This was despite the fact that Mr. Bush's diaries themselves became a focus of a criminal investigation related to the delay in producing them to the Independent Counsel and the Department was aware that they touched upon some of the same information as Mr. Reagan's diary—which the Department recognized as classified.  *See* DOJ Poindexter Statement of Interest at 17 n.8.

### The Pence Book

Former Vice President Mike Pence published his own memoir on November 15, 2022. Mike Pence, SO HELP ME GOD (2022).  Even though Mr. Pence, as a Vice President, had not signed any agreement requiring pre-clearance review, he voluntarily submitted his manuscript to the NSC prior to publication for review for classified information.

Emmet Flood of Williams & Connolly submitted the manuscript to the NSC in June 2022.  Ryan Cole, an Indiana writer, was copied on correspondence. We are unaware of whether these two individuals possessed security clearances at the time, or whether draft manuscripts were handled in accordance with security protocols for classified information, but the manuscript was not sent to the NSC under the requirements for transmitting classified materials.

The NSC review resulted in a number of proposed redactions of presumably classified information, which Vice President Pence and his team accepted to the manuscript before it was published.

Two months after the publication date, Vice President Pence's attorneys discovered classified government documents in his home in Indiana, and the National Archives was notified two days later.  Katherine Faulders et al., *FBI finds Another Classified Document in Search of Former Vice President Mike Pence's Indiana home,* ABC NEWS (Feb. 10, 2023).  A consent search of the home was conducted by Federal Bureau of Investigation agents on February 10, 2023, during which an additional classified document was found and "six additional pages" were also seized.  *Id.*  It is unclear the nature of the additional pages.  We do not know whether the agents searched for drafts of the manuscript that the NSC had determined contained material that needed to be redacted.

But one thing is clear: the manuscript prepared by Mr. Pence with the help of Mr. Cole and Mr. Flood, which presumably also was reviewed by the publishers at Simon & Schuster, contained material that the NSC required to be redacted.  Yet, even including the later search for classified documents, we know of no law enforcement inquiry into this writing.

---

[4] We do not believe that Mr. Meacham's book was submitted for prepublication review.

### The Carter Diaries and Book

While serving as President, Jimmy Carter dictated diary entries several times throughout the day—"seldom exercis[ing] any restraint on what [he] dictated"—which were transcribed by his secretary.  Jimmy Carter, WHITE HOUSE DIARY xiii (2010); *see also* Jimmy Carter, KEEPING FAITH xiii (1982).  By the time that he left office, he had totaled approximately 5,000 pages of transcribed notes in 18 volumes.  Carter, KEEPING FAITH at xiii.  Our understanding is that the Carter diaries, like the Bush and Reagan diaries, were never scrutinized for classified information.

As Mr. Carter prepared the diaries for publication, the drafts were reviewed by numerous people, including his wife Rosalynn Carter and an editor.  Carter, WHITE HOUSE DIARY at 539.  While Mr. Carter noted that his published diary excerpts "omit about three-fourths of the diary," he "decided to make the entire diary (including [his] detailed handwritten notes) available at the Carter Presidential Library in the near future." *Id.* at xiv.

Mr. Carter's own words suggest that the diaries may well contain national security information, although they were not submitted for prepublication review.  In the published diary, he notes that his diary addresses "Middle East peace negotiations, nuclear weaponry, U.S.-China relations, [and] energy policy." *Id.* at xiv. The dust cover to the published diary notes that Mr. Carter "narrated the progress of secret negotiations such as those that led to the Camp David Accords" in his diaries.  *Id.*  In Mr. Carter's memoir, excerpted diary entries reveal his reflections on highly sensitive matters—detailing secret diplomatic engagements with foreign adversaries, international nuclear weapons negotiations, conversations with foreign heads of state, and intelligence briefings pertaining to national security, *see, e.g.*, Carter, KEEPING FAITH at 199, 205, 418, 438—illustrating the likelihood of even more sensitive matters being in the underlying unpublished diaries.

As of 2010, Mr. Carter continued to keep the entire set of diary notes in his personal residence. Carter, WHITE HOUSE DIARY at xiii.  Separately, reports have suggested Mr. Carter—like Mr. Pence—found classified materials at his Georgia home on at least one occasion after he left office, returning them to the National Archives. Zeke Miller et al., *Classified Records Pose Conundrum Stretching Back to Carter*, ASSOCIATED PRESS (Jan. 24, 2023).

We are unaware of the Department or the National Archives and Records Administration ever seeking to review former President Carter's diary notes for potentially classified information, even after the return of classified materials from his home to the Archives.

### Books by Barack Obama, George W. Bush, and Dick Cheney

Though they were not required to submit their manuscripts for pre-clearance review, Presidents Obama and Bush, along with Vice President Cheney, had representatives submit their book manuscripts to the NSC for review prior to publication.  *See* Barack Obama, A PROMISED LAND (2020); George W. Bush, DECISION POINTS (2010); Dick Cheney & Liz Cheney, IN MY TIME (2011).

In each of these three cases, representatives sent the NSC draft materials via private email for pre-clearance review.

In former President Obama's case, the NSC identified information that was still classified or not officially acknowledged, and asked Mr. Obama—through his representatives—to revise the relevant sections.  In former President Bush's case, the NSC determined that the manuscript contained information that remained currently classified and requested redactions or edits. Former Vice President Cheney's draft manuscript excerpts contained quotations from a foreign official, which the NSC treats as classified.  In each case, following NSC's review, the authors made changes to the manuscript.  President Obama, President Bush, and Vice President Cheney named and thanked NSC staff for their review of the texts.  *See* Obama, A PROMISED LAND at 704; Cheney & Cheney, IN MY TIME at 530; Bush, DECISION POINTS at 480.

Each of these processes proceeded without any law enforcement involvement or interest. The presumably uncleared ghost writers, assistants, agents, publishers, and lawyers involved with these manuscripts were not the subject of any law enforcement interest or inquiry, and there was no investigation into what underlying records had informed the authors' writings or whether drafts, notes, or other writings existed which contained the same classified information identified by the NSC.

* * *

For at least 30 years, the Government—including specifically the Department—has been aware that former Presidents and Vice Presidents frequently have possessed diaries, notes, draft manuscripts, and other writings that contained classified information. At no time has the Government sought to ensure that such material was maintained in a location certified to store classified material, much less initiated a criminal investigation into the failure to do so.

We look forward to discussing these issues in the near future, as we believe that the constitutional significance of these writings and the long uninterrupted practice of the Government treating such writings as within the constitutional prerogatives of the President and Vice President bear directly on your investigation.

Respectfully,

Richard Sauber
Special Counsel to the President

# EXHIBIT 2



**THE WHITE HOUSE**

WASHINGTON

February 7, 2024

The Honorable Merrick Garland
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530

Dear Attorney General Garland:

     We wrote to Special Counsel Robert Hur on February 5, 2024 to object to certain aspects of his draft report that violate Department of Justice policy and practice by pejoratively characterizing uncharged conduct. The comments in question mirror past prosecutor comments that have been roundly criticized and uniformly condemned, including by the Department's Inspector General. The current Special Counsel regulations were promulgated as a reaction against—and a correction for—the publication of lengthy reports containing prejudicial statements about uncharged conduct under the Independent Counsel Act.[1]

    First, we object to Mr. Hur's characterization of President Biden's practice of retaining his personal diaries in his home after he left the Vice Presidency. Despite the fact, which we explained repeatedly to Mr. Hur, that prior Presidents have done exactly the same thing, the report describes this uncharged conduct as "totally irresponsible," applying to President Biden the phrase he used to describe former President Trump's conduct in keeping more than 300 marked classified documents and refusing to turn them over to the authorities. *See* Hur Report at 228.

---

[1] As former Republican Solicitor General Ted Olson testified in opposition to the reauthorization of the Independent Counsel Act: "the final report has turned into an excuse to file long exhaustive expositions which rationalize the investigation," as well as "offer opinions regarding and/or pronounce judgments on the individuals investigated, and generally make the Independent Counsel look good." *The Future of the Independent Counsel Act: Hearings before the S. Comm. on Governmental Affairs*, 106th Cong. 231 (1999) (prepared statement of Theodore B. Olson). Former Attorney General Janet Reno similarly testified and strongly criticized the final report requirement, asserting that "the report requirement cuts against many of the most basic traditions and practices of American law enforcement." *Id.* at 252 (prepared statement of Janet Reno, Att'y General of the United States).

For your convenience, we enclose a copy of the White House Counsel's Office's detailed history and explanation about the bipartisan efforts to alter the rules governing the appropriate content for these kind of reports. *See* Letter from Richard Sauber, Special Counsel to the President, to Special Counsel Robert K. Hur (Oct. 31, 2023).

We have provided to Mr. Hur detailed history of the practice of former Presidents and Vice Presidents keeping personal materials in their homes, including the Department of Justice's explicit acknowledgment of this practice without initiating law enforcement interest.[2] So, to criticize President Biden for a practice that his predecessors openly engaged in, a practice that the Justice Department has in the past acknowledged and declined to investigate, a practice that is not charged conduct, exemplifies the reasons why a bipartisan consensus arose to change the prior report writing function.

Even more striking is the fact that Mr. Hur's criticism of President Biden mirrors one of the most widely-recognized examples in recent history of inappropriate prosecutor criticism of uncharged conduct. The FBI and DOJ personnel's criticism of uncharged conduct during investigations in connection with the 2016 election was found to violate "long-standing Department practice and protocol." *See* Office of the Inspector General, U.S. Department of Justice, A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election vi (June 2018) (finding that former FBI Director James Comey violated this practice and protocol when criticizing as "extremely careless" former Secretary of State Hillary Clinton's use of unclassified systems to transmit classified material); *see also id.* at 245 (noting that it "violat[es] longstanding Department practice" to "trash[] people we're not charging"); Letter to Chairman Charles Grassley, Senate Committee on the Judiciary, from Rod. J. Rosenstein, Deputy Attorney General, at 8-9 (June 27, 2018) ("In fact, disclosing uncharged allegations against American citizens with a law-enforcement need is considered to be a violation of a prosecutor's trust.").

Second, we object to the multiple denigrating statements about President Biden's memory which violate longstanding DOJ practice and policy. The Special Counsel can certainly and properly note that the President lacked memory of a specific fact or series of events. But his report goes further to include allegations that the President has a failing memory in a general sense, an allegation that has no law enforcement purpose. The Special Counsel offers this sweeping set of allegations after an experience with the President limited to a 5-hour interview during which the Special Counsel told the President he planned to ask questions that "relate to events that happened years ago," and then expressed his hope that the President would "put forth [his] best efforts and really try to get [his] best recollection in response to the questions we ask." *Id.* A global and pejorative judgment on the President's powers of recollection in general is uncalled for and unfounded.

Mr. Hur comments at least nine times in the report about his opinion of the president's memory. These critical comments about the President's memory stand in stark contrast to Mr. Hur's treatment of multiple other witnesses who seemed to display similar memory lapses about events from previous years. For example, the report accepts without negative comment John McGrail's failure to remember certain events while he served as then-Vice President Biden's counsel: "McGrail's memory of these events could well have faded over the course of more than 6 years." Hur Report at 238 n.923; *see also id.* at 67, 69 (noting Mr. McGrail's failure to recall events despite emails that place him in the center of various discussions). So, too, the report

---

[2] For your convenience, we enclose a copy of the White House Counsel's Office's letter to Mr. Hur on those subjects. Letter from Richard Sauber, Special Counsel to the President, to Special Counsel Robert K. Hur (Sept. 11, 2023).

accepts without criticism the memory lapse of one of the President's personal lawyers who testified that in his initial search of the Penn Biden offices certain boxes were stored in a locked closet, noting only that "his memory was fuzzy on that point." *Id.* at 265. And the events on which Mr. Hur found the lawyer's memory to be "fuzzy" occurred only a few months before his interview. *Id.*; *see also id.* at 64, 66 (noting without comment the failures of recollection by numerous staffers).[3]

Not only does Mr. Hur treat the President differently than others with understandable memory lapses, he even praises Mr. Biden's memory and clear state of mind on other occasions when it seems to advance Mr. Hur's conclusions. At one point, Mr. Hur describes anticipated testimony by the President (in a hypothetical trial, we assume) and opines that the President would give "clear forceful testimony" that would be "compelling" to a jury. *Id.* at 233. This is hardly the picture of a man struggling to recall events as Mr. Hur unfairly paints.

The report also leaves out crucial context: the five-hour interview of the President took place while he was enmeshed in a grave international crisis occurring as it did on the day after the October 7 attacks on Israel. Indeed Mr. Hur himself acknowledged the difficult circumstances, noting that he understood there were "a lot of other things in the world going on that demand your attention." Interview Transcript ("Tr."), Day I, at 3.

We are happy to discuss these issues should you wish to do so, but we would be remiss if we did not forcefully object to aspects of Mr. Hur's report that openly, obviously, and blatantly violate Department policy and practice as well as the bipartisan consensus on the appropriate limitations on Special Counsel reports. I also ask that you include a copy of this letter in the Department's files related to the investigation.

Respectfully,

Edward N. Siskel
*Assistant to the President and White House Counsel*

Bob Bauer
*Personal Counsel to Joseph R. Biden, Jr.*

Enclosures

---

[3] And, of course, not recalling the answer to a federal prosecutor's questions is entirely common. *See, e.g.*, Peter Baker, 'I Do Not Remember': Trump Gave a Familiar Reply to the Special Counsel's Queries, N.Y. TIMES (Apr. 20, 2019) (noting that, in his written questions, President Trump stated "he did not remember" or "do not recall" more than thirty times).



**THE WHITE HOUSE**
WASHINGTON

October 31, 2023

Special Counsel Robert K. Hur
Deputy Special Counsel Marc Krickbaum
Department of Justice
145 N Street Northeast
Washington, D.C., 20503

Dear Special Counsel Hur and Deputy Special Counsel Krickbaum:

In our October 18 letter to you, we asked to have the opportunity to review and comment on a draft of the "confidential" report that you are required to write under the Special Counsel regulations. We also noted that we would follow up on the subject of the Special Counsel's "final report" requirement more broadly.

This letter is that follow up. It offers a detailed history of the evolution of the final report requirement from the Independent Counsel Act to the current regulatory framework. That history makes clear that the Special Counsel regulations reflect the Department's express rejection of the drafting and publication of long, detailed reports of the type that were issued at the conclusion of investigations under the Act. Such reports departed from the Department's traditions by including extensive analysis and criticism of unindicted individuals. The Special Counsel regulations, which the Department issued after Congress refused to reauthorize the Act, were explicitly designed to eliminate these exhaustive reports. The regulations were instead intended as a return to the fundamental principle that the Department of Justice speaks through charges—which provide a forum for individuals to contest the evidence and defend themselves—or not at all.

In any event, Attorney General Garland has committed to publishing your report, and we are aware, of course, that the Department has published the reports of each of the prior three Special Counsels as well. But we do wish to underscore how important it is under these circumstances to allow the President's lawyers the opportunity to review a draft of your report to address potential inaccuracies or unfair characterizations and conclusions. Given that the President, through counsel, has no opportunity to test any of the evidence discussed in the report, the President's lawyers should have a meaningful opportunity to review and provide comment on the report before it becomes public. As we detail below, commentators from across the political spectrum have been troubled by the practice of public reports by prosecutors. It seems only fair, and a benefit to all, to allow the President's counsel this opportunity.

I.      **The Special Counsel Regulations Were Specifically Intended to End the Independent Counsel Act's Practice of Unfair Detailed Public Reports.**

The Department issued the current Special Counsel regulations, 28 C.F.R. §§ 600.1-600.10, on July 9, 1999, in the wake of the debate over the reauthorization of the Independent Counsel Act.  *See* Office of Special Counsel, 64 Fed. Reg. 37038-44.  At the time, that Act directed Independent Counsels to produce a final report "setting forth fully and completely a description of the work of the independent counsel, including the disposition of all cases brought."  28 U.S.C. § 594(h)(1)(B).

The Independent Counsel Act engendered widespread and bipartisan criticism, in large measure because the final "reports" required by the Act often served as "an unfair opportunity to publicly castigate, and to level criticisms and judgments against the targets of [the Independent Counsel's] investigation, even if the Independent Counsel was unable or unwilling to indict such persons."  *See* CONG. RESEARCH SERV., RL31246, INDEPENDENT COUNSEL LAW EXPIRATION AND THE APPOINTMENT OF "SPECIAL COUNSELS*" CRS-14 (2002).  The Special Counsel regulations, which were promulgated days after the Act lapsed, were explicitly promulgated "to replace the procedures set out" in the Act, 64 Fed. Reg. at 37038, and must be understood against this backdrop.

The Department and its leaders opposed the Independent Counsel Act's reauthorization, extensively criticizing the law's structure and procedures and, particularly, the final report requirement.  In congressional hearings addressing the reauthorization of the Act, Attorney General Janet Reno strongly criticized these final reports, asserting that "the report requirement cuts against many of the most basic traditions and practices of American law enforcement."  *The Future of the Independent Counsel Act: Hearings before the S. Comm. On Governmental Affairs*, 106th Cong. 252 (1999) (prepared statement) (Senate Hearings).  She continued:

> Under our system, we presume innocence and we value privacy.  We believe that information obtained during a criminal investigation should, in most all cases, be made public only if there is an indictment and prosecution, not in lengthy and detailed reports filed after a decision has been made *not* to prosecute.

*Id.* (emphasis in original).  On balance, she concluded, "We have come to believe that the price of the final report is often too high."  *Id.*

Deputy Attorney General Eric Holder echoed these concerns in his own testimony:

> Although there is a legitimate concern that the American people have a right to know the outcome of an investigation of their highest officials, the reporting requirement goes directly against most traditions and practices of law enforcement and American ideals.

*Reauthorization of the Independent Counsel Statute, Part I: Hearings Before the Subcomm. on Commercial and Admin. Law of the H. Comm. on the Judiciary*, 106th Cong. 79 (1999) (prepared statement) (House Hearings).  He said, among other things, that it is contrary to a

presumption of innocence, the right to privacy, "and our Departmental tradition that we reveal offenses in the courtroom during a criminal trial, not by filing a document that is never filed when we decline to prosecute ordinary criminal cases." *Id.*  And he likewise noted that the final report requirement "provides an incentive for Independent Counsel to over-investigate every detail in order to avoid criticism that their final reports missed something." *Id.*

The congressional record establishes that these concerns were broadly held—including by those previously charged with responsibilities under the Independent Counsel Act.  As Judge Kenneth Starr said, "The witnesses before this Committee have been virtually unanimous in their opposition to final reports.  I concur."  Senate Hearings at 430 (prepared statement).  Judge David Sentelle, the Presiding Judge of the Special Division for the Purpose of Appointing Independent Counsels, testified that the Independent Counsel Act's final report requirement "has no counterpart in Federal criminal law outside the Act and exposes the subjects of investigation to derogatory information that has never been tested by a trial process and was apparently not sufficient to be the foundation for an indictment."  Senate Hearings at 481 (prepared statement).  Judge Starr similarly argued that the reports create a "very unfortunate dynamic" by forcing Independent Counsels to say "'I have got to go an extra mile in order to have a report that will withstand the most searing scrutiny by individuals who would want to be quite critical of it and call the professionalism of the report into question.'"  Senate Hearings at 471-72; *see also*, *e.g.*, Senate Hearings at 33 (prepared statement of former Attorney General Griffin B. Bell arguing that a final report "can be another example of lack of due process by suggesting guilt although there was no indictment"); House Hearings at 152-53 (prepared statement of former Attorney General Benjamin Civiletti characterizing the final report as the "sort of prosecutorial behavior [that] would never be tolerated in the course of the usual criminal process" and noting that the Act was meant "to ensure that high-ranking officials did not get special treatment, not to subject them to unfair and unequal treatment").

## II.     The Special Counsel Regulations Call for a Confidential and Limited Report.

As a result of the widespread criticism of the Independent Counsel Act, it was not reauthorized.  Instead, the Department promulgated the Special Counsel regulations, which remain in effect today.[1]

---

[1] In letting the Independent Counsel Act lapse, Congress understood how the Department intended to fill the gap.  As part of the debate over reauthorizing the Act, Congress asked the Department to provide "a detailed plan addressing how the Department of Justice would handle matters that currently are addressed pursuant to the Independent Counsel Act . . . were the Act to be allowed to lapse as of June 30, 1999."  *See* Letter from Acting Assistant Attorney General Dennis K. Burke to Chairman George W. Gekas (April 13, 1999), *reprinted at* Senate Hearings at 315-322.  The Department informed Congress via letter that "a replacement set of procedures is being prepared to take effect should the Independent Counsel Act be allowed to lapse by Congress, as we believe it should."  *Id.* at 316.  The Department's letter described the "general principles" that would animate these procedures, which hewed closely to the language of the ultimate Special Counsel regulations.

Rather than requiring a final report "setting forth fully and completely a description of the work of the independent counsel," 28 U.S.C. § 594(h)(1)(B), the new Special Counsel regulations specified that, at the conclusion of their work, Special Counsels should issue only a "confidential report" to the Attorney General that would simply "explain[] the prosecution or declination decisions reached by the Special Counsel," 28 C.F.R. § 600.8(c).

These two hallmarks of the report—confidentiality and its summary nature—were intended to remedy the concerns with the final reports issued by Independent Counsel.

A.   Confidentiality

The Department noted that the "principal source" of the problems with the Independent Counsel Act's Final Report requirement was "the fact that the Report typically has been made public, unlike the closing documentation of any other criminal investigation." 64 Fed. Reg. at 37040-41.  In the Department's view, this "single fact both provides an incentive to over-investigate, in order to avoid potential public criticism for not having turned over every stone, and creates potential harm to individual privacy interests." Id.  As a result, the Department decided, under the new regulations, the Special Counsel would submit a "summary final report" to be "handled as a confidential document, as are internal documents relating to any federal criminal investigation." Id.

Though the regulation provides that the Special Counsel's report is to be confidential, the Department took steps to "help ensure congressional public confidence in the integrity of the process," by requiring the Attorney General to report to Congress:

> These reports will occur on three occasions: on the appointment of a Special Counsel, on the Attorney General's decision to remove a Special Counsel, and on the completion of the Special Counsel's work.  These reports will be brief notifications, with an outline of the actions and the reasons for them.

64 Fed. Reg. at 37041; see also 28 C.F.R. § 600.9(a) (relevant regulatory provision).  It is these reports—i.e., the Attorney General's "brief notifications" to Congress—that are to serve "[t]he interests of the public in being informed of and understanding the reasons for the actions of the Special Counsel." 64 Fed. Reg. at 37041.

The Attorney General "may determine that public release" of the Attorney General's reports to Congress "would be in the public interest, to the extent that release would comply with applicable legal restrictions." 28 C.F.R. § 600.9(c).[2]  But "[a]ll other releases of information by

_____

[2] In isolation, the phrase "these reports," as used in subsection 600.9(c) could be seen as ambiguous.  But, in context, it is clear that the phrase refers only to the Attorney General's reports to Congress, which are discussed immediately beforehand in subsections 600.9(a) and (b). Indeed Section 600.9 as a whole is entitled "Notification and reports by the Attorney General."  The Special Counsel's confidential report is set forth in a different section, "Notification and reports by the Special Counsel." 28 C.F.R. § 600.8.  The conclusion that the Special Counsel's report is not among the reports that subsection 600.9(c) empowers the

any Department of Justice employee, including the Special Counsel and staff, concerning matters handled by Special Counsels shall be governed by the generally applicable Departmental guidelines concerning public comment with respect to any criminal investigation, and relevant law." 64 Fed. Reg. at 37041.  As Deputy Attorney General Rod Rosenstein wrote:

> Criminal *prosecutions* should be relatively transparent—because the public should know the grounds for finding a citizen guilty of criminal offenses and imposing punishment—but criminal *investigations* emphatically are not supposed to be transparent.  In fact, disclosing uncharged allegations against American citizens without a law-enforcement need is considered to be a violation of a prosecutor's trust.

Letter to Chairman Charles Grassley, Senate Committee on the Judiciary, from Rod J. Rosenstein, Deputy Attorney General at 8-9 (June 27, 2018) (Rosenstein Letter) (emphasis in original).[3]

Thus, under the Special Counsel regulations, the Special Counsel "must follow Department policies and procedures.  Under those policies and procedures, the Department should reveal information about a criminal investigation only when it is necessary to assist the criminal investigation or to protect public safety."  Rosenstein Letter at 5.

B.  Limited Scope

The Special Counsel regulations also contemplate only a summary final report.  As noted above, at the time of its expiration, the Independent Counsel Act provided that independent counsels were to "file a final report . . . *setting forth fully and completely a description of the work of the independent counsel.*"  28 U.S.C. § 594(h)(1)(B) (emphasis added).  By contrast,

---

Attorney General to make public is only reinforced by the Department's statement when promulgating the regulations that the Special Counsel's report "will be handled as a confidential document, as are internal documents relating to any federal criminal investigation.  The interests of the public in being informed of and understanding the reasons for the actions of the Special Counsel will be addressed in the final set of reporting requirements, discussed below."  64 Fed. Reg. at 37041.  The discussion then immediately moves to the Attorney General's reporting requirements.  *Id.*

[3] *See also*, *e.g.*, Office of the Inspector General, U.S. Department of Justice, A REVIEW OF VARIOUS ACTIONS BY THE FEDERAL BUREAU OF INVESTIGATION AND DEPARTMENT OF JUSTICE IN ADVANCE OF THE 2016 ELECTION vi (2018) (concluding that a 2016 public statement by then-FBI Director James Comey "violated long-standing Department practice and protocol by, among other things, criticizing [Hillary] Clinton's uncharged conduct"); Memorandum for the Attorney General from Rod J. Rosenstein, Deputy Attorney General, *Re: Restoring Public Confidence in the FBI* (May 9, 2017) (stating that Mr. Comey "ignored another longstanding principle: we do not hold press conferences to release derogatory information about the subject of a declined criminal investigation" and that the Department "never" releases derogatory information gratuitously).

under the Special Counsel regulations, the final report is meant only to "explain[] the prosecution or declination decisions reached by the Special Counsel." 28 C.F.R. § 600.8(c). The Special Counsel's final report is intended to be akin to how, "[i]n major cases, federal prosecutors commonly document their decisions not to pursue a case, explaining the factual and legal reasons for the conclusions they have reached." 64 Fed. Reg. at 37041; *see also* Justice Manual 9-27.270. As opposed to the Independent Counsel's "full" and "complete" description of their work, the Department explained that the Special Counsel's final report is a "limited reporting requirement" in the form of a "summary" final report. 64 Fed. Reg. at 37041.

The Department's decision to impose such a limited scope for the final report was presumably in response to the sharp criticism of the broad ambit of the Independent Counsel Act's final report requirement. Theodore Olson, for instance, criticized the reporting requirement as "an excuse to file long exhaustive expositions which rationalize the investigation, describe every fact investigated, witnesses interviewed and document examined, offer opinions regarding and/or pronounce judgments on the individuals investigated, and generally make the Independent Counsel look good." Senate Hearings at 231 (prepared statement); *see also id.* at 233 ("these reports have become lengthy, government-financed, self-congratulatory tomes"). Professor Ken Gormley testified that the provision "requires (in effect) that every special prosecutor, prior to leaving office, must fully explain the work history of his or her operation, and justify his or her actions." Senate Hearings at 383. He called it a "daunting, costly, and time-consuming task," noting that "[m]ost independent counsels will tend to err on the side of over-completeness, preparing vast reports that leave no stone unturned, in order to justify their work and defend their reputations in politically-charged investigations." *Id.* He argued that "Congress should dramatically shrink the scope of information that must be provided at the conclusion of the independent counsel's work," instead arguing in favor of a "short and pithy" report. *Id.* Attorney General Reno herself testified that the "unique expectations placed upon a Counsel," including "that he or she will prepare a comprehensive final report," "is a very expensive way to do business." Senate Hearings at 249.

And so, perhaps unsurprisingly, in issuing the Special Counsel regulations, the Department established only a "limited reporting requirement," transitioning from what Attorney General Reno called a "comprehensive final report" to what the Department called a "summary final report." 64 Fed. Reg. at 37041; *see also* Ken Starr, *Mueller Cannot Seek an Indictment. And He Must Remain Silent*, THE ATLANTIC (Mar. 22, 2019) (stating that the drafters of the Special Counsel regulations "set themselves firmly against the revolutionary principle of factually rich prosecutorial reports. It might seem strange for me to say, but they were right to do so.").

In creating the reporting requirement, the Department explained that "it is appropriate for any federal official to provide a written record upon completion of assignment, both for historical purposes and to enhance accountability—particularly a federal official who has functioned with substantial independence and little supervision." 64 Fed. Reg. at 37041. In other words, the Department established the Special Counsel's final report to the Attorney General as a vehicle to provide accountability *for the Special Counsel*. It is emphatically *not* meant as a vehicle to provide accountability for the subject of the investigation.

III.    **The Attorney General's Commitment to Publishing the Final Report Requires Attention to the Department's Regulations, Principles, and Traditions.**

Notwithstanding the history of the Special Counsel regulations, Attorney General Garland has expressed his commitment to making public as much as possible of your "confidential report." *See* Dep't of Justice, "Attorney General Merrick Garland Delivers a Statement" (Aug. 11, 2023) ("*As with each Special Counsel who has served since I have taken office*, I am committed to making as much of [Special Counsel Weiss's] report public as possible, consistent with legal requirements and Department policy." (emphasis added)).

We recognize that his commitment along these lines follows on decisions made for other special counsels in recent years. However, the Department's decision to publicly release the confidential report is in tension with the history of the Special Counsel regulations and means the report cannot be written as though it would be kept confidential. *Cf. Ways and Means Committee's Request for the Former President's Tax Returns and Related Tax Information Pursuant to 26 U.S.C. § 6103(f)(1)* 45 Op. O.L.C. __ (July 30, 2021), slip op. 26 ("The Executive Branch, like the Judiciary, need not 'blind' itself to 'what [a]ll others can see and understand.'").

Accordingly, that report must endeavor to be consistent with the intent of the Special Counsel regulations, the Department's longstanding policies, and principles of fundamental fairness—including the Department's "duty to prevent the disclosure of information that would unfairly tarnish people who are not charged with crimes." Rosenstein Letter at 7; *see also Finn v. Schiller*, 72 F.3d 1182, 1189 (4th Cir. 1996) ("prosecutors must not be allowed to file sweeping statements of fact alleging violations of various laws by unindicted individuals"); Justice Manual 9-27.760 ("federal prosecutors should strive to avoid unnecessary public references to wrongdoing by uncharged third parties"); Office of the Inspector General, U.S. Department of Justice, A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election 247 (2018) ("We recognize that this investigation was subject to scrutiny not typical of the average criminal case, but that does not provide a basis for violating well-established Department norms and, essentially, 'trashing' the subject of an investigation with uncharged misconduct.").

We believe that these principles of the Department—as well as basic notions of fairness—should shape both what is included in the report as well as the process of drafting it.

At a minimum, the report should adhere to the kind of product contemplated by the Special Counsel regulations. As discussed, in contrast to the detailed independent counsel reports setting forth a "full and complete" description of their work, the Special Counsel regulations contemplate only that the Special Counsel will "explain[] the prosecution or declination decisions." 28 C.F.R. § 600.8(c). We support your faithful fulfillment of this requirement. But, consistent with the Department's description of a "limited" and "summary" product, 64 Fed. Reg. at 37041, the report should be economical. It should include the factual information necessary to the charging decision, but facts or events that are not essential to the decision have no place. *See* Senate Hearings at 236 (letter from Whitewater Special Counsel Robert B. Fiske, Jr. arguing to eliminate the Independent Counsel Act's final report requirement and noting that "a report which discusses the evidence at length may be unfair to the extent that it

may, even implicitly, incriminate subjects who were nevertheless not indicted").

In the same vein, the report should stay within the bounds of the Special Counsel's limited jurisdiction.  The regulations provide that "the Special Counsel's jurisdiction will cover *only the criminal aspects* of the matters within his or her jurisdiction, unless other jurisdiction is specifically granted by the Attorney General."  64 Fed. Reg. at 37039 (emphasis added); *see also* 28 C.F.R. § 600.4(c) ("A Special Counsel shall not have civil or administrative authority unless specifically granted such jurisdiction by the Attorney General.").  The regulations make abundantly clear that the Special Counsel is a criminal prosecutor, not a supercharged inspector general.  It would be inappropriate, for instance, for the report to undertake a compliance review of the procedures for handling classified information in the executive branch, or make policy recommendations for improvements to such procedures.

The President should also be afforded the opportunity to review a draft of the report so that he has some ability to respond to any inaccurate allegations before they become public.  "[A] man should not be subject to a quasi-official accusation of misconduct which he cannot answer in an authoritative forum."  *United States v. Briggs*, 514 F.2d 794, 802 (5th Cir. 1975) (quoting *Application of United Electrical, Radio & Mach. Workers*, 111 F. Supp. 858, 867 (S.D.N.Y. 1953)).  President Biden should be able to raise concerns about inaccurate or incomplete information before the report is finalized rather than having to correct the record after it has been released to the public.  Courts have recognized that such situations unjustly inflict injuries that "may never be healed."  *Briggs*, 514 F.2d at 803 (quoting *People v. McCabe*, 148 Misc. 330, 334 (1933)).  Since President Biden will lack the opportunity to respond to any potential criticisms before an "authoritative forum," he at least deserves the chance to respond to you.

## IV.     Conclusion

We understand and affirm the importance of maintaining public confidence in the integrity of your investigation.  Appropriate transparency bolsters this confidence, which is vital to the rule of law.

At the same time, "no legitimate governmental interest is served by an official public smear of an individual when that individual has not been provided a forum in which to vindicate his rights."  *In re Smith*, 656 F.2d 1101, 1106 (5th Cir. 1981).  We recognize that the President will not have a "forum" of the type contemplated by the previous quote, and as a consequence the opportunity to address issues in a draft report will be his only opportunity to advocate for accuracy and fairness.

We stand ready to discuss these issues at your convenience.

Respectfully,

Richard Sauber
*Special Counsel to the President*



**THE WHITE HOUSE**
WASHINGTON

September 11, 2023

Special Counsel Robert K. Hur
Deputy Special Counsel Marc Krickbaum
Department of Justice
145 N Street Northeast
Washington, D.C., 20503

**Re:     Presidential and Vice-Presidential Writings**

Dear Special Counsel Hur and Deputy Special Counsel Krickbaum:

We noted to you in our February 27 submission that the Department of Justice (the Department), the courts, and Congress consistently have recognized the unique status of presidential and vice-presidential writings.  In that submission, we documented that the Department has never previously reviewed a President's or Vice President's personal notes for the purpose of identifying classified information, even though the Department has long been aware both that such notes routinely describe sensitive national security matters and that such notes have been retained by Presidents and Vice President after leaving office.  We write now to elaborate on the Executive Branch's past practice with respect to such writings.

Presidents Jimmy Carter, Ronald Reagan, George H.W. Bush, George W. Bush, and Barack Obama, and Vice Presidents Dick Cheney and Mike Pence, each had classified or national security information in their personal diaries, notes, or book manuscripts after they left office.  For most of these individuals, the National Security Council (NSC) discovered the classified information when reviewing the material prior to its publication.  In the case of President Reagan and Vice President Bush, the Department became aware that their diaries contained classified or national security information during the Iran-Contra investigation.

Despite the discovery of classified information in these presidential and vice-presidential writings, none of these incidents resulted in any law enforcement action.  To our knowledge, the government made no efforts to secure the writings in question, determine how classified information came to be in those writings, or identify whether the classified information in those writings was shared orally or in written form with individuals without security clearances.

Indeed, at no time in the last thirty years has the Government, including the Department, viewed as actionable the possibility of classified information in the individual writings of a former President or Vice President.  For good reason.  A President's "diary and his own notes . . . touch the core of the presidency as well as intimate and confidential communications by the President with himself."  *United States v. Poindexter*, 727 F. Supp. 1501, 1505 (D.D.C. 1989).

Against this unbroken approach toward the writings of Presidents and Vice Presidents, your Office has seized former Vice President Biden's personal diaries, notebooks, and notes; you reviewed them in their entirety without prior review by the White House Counsel's Office (itself an unprecedented step); you have sent these materials for "classification review" by the Intelligence Community; and you have said that you intend to question President Biden in the context of a criminal investigation about these materials.  The implication that these writings might be relevant to a criminal inquiry runs counter to decades of precedent as outlined in this letter.

Furthermore, your treatment of these materials as the topic of a criminal inquiry runs the substantial risk of causing irreparable harm to the Offices of the President and Vice President by deterring future Presidents and Vice Presidents from using diaries and notes in the context of the most stressful and important jobs in the world—jobs that also require nearly continuous interaction with sensitive national security information.  In our February 27 submission, we explained at length that "Presidents and [V]ice [P]residents have long relied on their private notes and journals to introspect, deliberate, reflect, remember, or simply record, including on official matters," and chilling this ability "could have a long lasting impact on the Presidency and the manner in which future Chief Executives carry out their functions."  Letter from Counsel to the President Stuart F. Delery to Special Counsel Robert K. Hur (Feb. 27, 2023); Mem. in Support of Mot. to Quash Subpoena to Archivist and Statement of Interest by the DOJ on Behalf of the U.S. Addressing Defendant's Subpoena at 4, *United States v. Poindexter*, No. 88-00080-01 (HHG) (D.D.C. Dec. 6, 1989) ("DOJ Poindexter Statement of Interest").  Indeed, Presidents and Vice Presidents have long depended on the ability to take notes and the constitutional entitlement to the confidentiality of those notes.  To intrude into the confidentiality of such notes by subjecting them to scrutiny in a criminal inquiry would inevitably chill Presidents' and Vice Presidents' ability and willingness to write their notes freely, to the detriment of their Article II functions.  A similar chilling effect would occur if Presidents' and Vice Presidents' private introspections were required to become the public property of the Archives.

We outline below the history of how these materials have been treated in the last several decades and the respect given to them given their constitutional status.

### The Reagan Diaries

President Reagan began keeping a daily diary immediately after his inauguration in January 1981.  Ronald Reagan, THE REAGAN DIARIES ix (Douglas Brinkley ed., 2007).  During his Presidency, he kept the diaries in his second-floor study in the White House residence.  *Id.* at x.  The diaries, which in redacted form were published several years after his death, contained both personal observations and detailed notes of meetings held throughout his presidency, including a host of meetings on national security and foreign affairs topics.  *See, e.g. id.* at 202 (detailing positions taken by advisors in NSC meetings on military operations in Lebanon  and NSC meetings on export policy with Libya); Ronald Reagan, *Monday, July 20, 1987*, REAGAN FOUNDATION: WHITE HOUSE DIARIES, https://www.reaganfoundation.org/ronald-reagan/white-house-diaries/diary-entry-07201987/ (discussing policy disagreements during meetings with the President between Cabinet Secretaries about providing military assistance to allies).

2

At the conclusion of his second term, Mr. Reagan brought the diaries to his Los Angeles home and kept them there until his death in 2004.  After returning to California, former President Reagan and former First Lady Nancy Reagan "would often sit together in their den after dinner, reading aloud from their diaries."  Reagan, THE REAGAN DIARIES at ix.

During that period, Mr. Reagan's former National Security Advisor, John Poindexter, who had been indicted by the Independent Counsel for his role in the Iran-Contra matter, subpoenaed excerpts from the President's diaries for his defense.  *See Poindexter*, 727 F. Supp. at 1503.  In connection with litigation over Mr. Poindexter's subpoena, the Department filed a brief (separate from the Independent Counsel) on December 6, 1989, nearly a year after the end of President Reagan's second term. In that brief, the Department acknowledged that the diaries contained classified information:

> *"We note that the diary excerpts we have seen are currently classified.*  Therefore, even if they are turned over to defendant, they are still subject to the appropriate procedures the Court is utilizing to determine whether they should remain classified, and whether the Government may need to invoke some of its rights under the Classified Information Procedures Act (18 U.S.C. App.) before the documents are used at trial."

DOJ Poindexter Statement of Interest at 17 n.8 (emphasis added).

At the time that the Department acknowledged that the diaries contained classified information, the diaries were being kept in the Reagan home in California. We are unaware of any effort made by the Department to remove the diaries from the private home and place them in a location certified to store and protect classified material.  For another 15 years, the Department did nothing with respect to what it knew to be classified information in Mr. Reagan's diaries at the Reagans' private home.

After Mr. Reagan passed away in 2004, former First Lady Nancy Reagan brought the diaries to staff at the Ronald Reagan Presidential Foundation ("Reagan Foundation") to discuss publishing them and putting them on public display in the Ronald Reagan Presidential Library ("Reagan Library").

The staff at the Reagan Foundation transcribed the handwritten diaries working in offices that were not certified for the storage or handling of classified information.  Once transcribed, the staff did their own review of the materials looking for national security information.  Using their best judgment, they tagged between 200-300 entries as related to national security and sent the diaries to the NSC to review for classified information.[1]

---

[1] The Reagan Foundation's submission to the NSC was entirely voluntary because former Presidents are not required to submit potential publications for preclearance review.  We understand that some former Presidents and Vice Presidents have submitted their manuscripts, or portions thereof, for prepublication review and others have not.  For example, NSC does not have a record of the submission for prepublication review of Bill Clinton's *My Life*; Al Gore's *An Inconvenient Truth*; George H.W. Bush's *All the Best*; Dan Quayle's *Standing Firm*; or Jimmy Carter's *Keeping Faith* and *White House Diary*.

NSC's review resulted in the diaries as a whole being classified at the Top Secret/Sensitive Compartmented Information (TS/SCI) level based on the highly classified information in some of the entries.  The NSC proposed redactions of the classified information to the Reagan Foundation officials.  Those officials contested several of the proposed redactions, pointing out that some of the information proposed for redaction had already been published and consequently was already in the public domain.  The NSC withdrew several of its proposed redactions, and the diaries were eventually published, with the classified information redacted, in 2007.  Mr. Reagan's diaries were also publicly displayed at his presidential library, with several pages "left out for national security reasons."  Anna Bakalis, *Library Gets First Look at 'Reagan Diaries*,*'* VENTURA COUNTY STAR (May 20, 2007).

The introduction to the published Reagan diaries states that NSC "read all five diary volumes" and redacted "about six pages of material for national security reasons." Reagan, THE REAGAN DIARIES at xiii.  In the acknowledgements section of the book, the editor of the diaries thanks a supervisory archivist with the Reagan Library for "dealing with the national security classification redactions" and thanks the Reagan Foundation Chief of Staff for responding "[w]henever I had a question pertaining to NSC concerns." *Id.* at 694-95.

At no point in this process was there any law enforcement inquiry into the fact that the diaries had been kept in a private home for decades and reviewed by individuals without security clearances.

### *The George H.W. Bush Diaries*

George H.W. Bush maintained personal diaries throughout his adult life, including while serving as Vice President and President.  *See* Lawrence Walsh, *Final Report of the Independent Counsel for Iran/Contra Matters: Volume I* at 474 (1993) ("Final Report of the Independent Counsel for Iran/Contra Matters"); George H.W. Bush & Brent Scowcroft, A WORLD TRANSFORMED (1999); George H.W. Bush, THE CHINA DIARY OF GEORGE H.W. BUSH: THE MAKING OF A GLOBAL PRESIDENT (Jeffrey A. Engel ed., 2008).  As explained below, although Mr. Bush wrote extensively about foreign affairs and national security, and although these diaries came to the attention of the Department, they were never scrutinized for classified information for law enforcement purposes.

To create his diary, Mr. Bush regularly dictated his daily experiences, along with "personal and political observations," on cassette tapes.  Final Report of the Independent Counsel for Iran/Contra Matters at 474*.*  A secretary in Mr. Bush's Houston, Texas office would then receive cassette tapes of Mr. Bush's dictations and transcribe them, on some occasions returning the transcript to Mr. Bush.  *Id.*  Although at times described as a "nightly dictation," staff at the Office of the Vice President observed Mr. Bush made "sporadic" dictations.  *Id.* at 474 n.10.

That practice continued into Mr. Bush's time as President.  According to President Bush's biographer, President Bush carried an audio recorder in his briefcase to enable him to dictate his diary at various locations and times throughout the day, including early in the morning

at the White House, while traveling aboard Marine One and Air Force One, and in the study off the Oval Office.[2]

Until September 1992, only a handful of then-President Bush's staff were aware that President Bush kept a daily diary. *Id.* at 474. Around that time, an administrative assistant conducting an inventory of Bush family safes at the White House residence discovered binders containing typed transcripts of the diaries. *Id.* at 477. The assistant reportedly observed that the transcripts "made repeated references to Iran/contra," which was then the subject of an ongoing investigation by Independent Counsel Lawrence Walsh—an investigation that had previously requested any of Mr. Bush's diaries during the relevant time. *Id.* at 476-77. The White House Counsel's Office ultimately reviewed and produced transcripts of the diaries in December 1992. *Id.* at 477. The Independent Counsel investigated Mr. Bush's failure to produce his diaries in response to initial requests. *Id.* at 478-79.

Vice President Bush's dictated diaries contained reflections on his official duties, including meetings regarding Iran-Contra and private conversations with President Reagan. *Id.* at 481-82. As the Independent Counsel later explained, the diary Mr. Bush kept while serving as Vice President covered sensitive issues related to national security, including details on discussions related to the Iranian hostage crisis and information like "the fact that Israeli officials were extremely upset" following certain events. *Id.* at 480 n.74, 483; *see also* Bush & Scowcroft, A WORLD TRANSFORMED at 338, 374, 459 (publishing excerpts of Mr. Bush's presidential diaries detailing meeting between Secretary of State James Baker and Soviet Foreign Minister Eduard Shevardnadze, a "horrible intelligence report" following the invasion of Kuwait by Saddam Hussein, and a briefing from the CIA on damage to Kuwaiti oil fields).

Materials prepared for Independent Counsel Walsh also suggest that Vice President Bush's diaries contained classified information. A memorandum summarizing excerpts from Vice President Bush's diary appears to have been declassified with redactions applied on June 22, 1999, pursuant to a letter from the NSC. *See* Mem. from Megan Semple to Judge Walsh and Craig Gillen 1, 7 (Jan. 13, 1993) (containing a redaction to conceal the identity of someone who called Vice President Bush, along with a handwritten note next to the redaction reading "(b)(1) (b)(3) 50 U.S.C § 403," an apparent reference to the statute that specified the authorities of the Office of the Director of National Intelligence). Given the subject matter of Mr. Bush's diaries and the sensitivity of the published excerpts, it is likely that they contained other examples of classified information.

Mr. Bush published portions of his diary excerpts and made his diaries available to biographers and authors. Michael Wines, *Bush Makes Public Iran-Contra Diary*, N.Y. TIMES (Jan. 15, 1993).[3] For instance, for the book *Destiny and Power*, Jon Meacham wrote that Mr. Bush "granted me access to his diaries," Meacham, DESTINY AND POWER at 603, with "no

---

[2] *See* C-SPAN, *Life and Presidency of George H.W. Bush* (Nov. 8, 2015), https://www.c-span.org/video/?400044-1/life-presidency-george-hw-bush; Politics and Prose, *Jon Meacham, "Destiny and Power,"* (Dec. 1, 2015), https://www.youtube.com/watch?v=7QGZ4Rhtp4s.

[3] *See also* Meacham, DESTINY AND POWER at 603-04 (noting that Bush's diaries had been referenced or excerpted in three prior books) (citing Herbert Parmet, GEORGE BUSH: THE LIFE OF A LONE STAR YANKEE (1997); Bush & Scowcroft, A WORLD TRANSFORMED; George H.W. Bush, ALL THE BEST (1999)).

conditions whatsoever," Nat'l Const. Ctr., *Jon Meacham: The American Odyssey of George H.W. Bush* (Nov. 12, 2015) https://www.youtube.com/watch?v=nQIZo4lj8H4 (reflecting an interview in which Meacham says, "He gave me his vice-presidential, presidential diaries, gave me the audio with no conditions whatever.  I didn't have to ask him if I could quote something, I didn't have to show him anything.  Nothing.").[4]

We are aware of no effort made by the Independent Counsel or the Department either to assess whether Mr. Bush's diaries contained classified information given their extensive discussion of national security and foreign affairs matters for the purposes of opening a criminal inquiry or to take steps to secure Mr. Bush's copies of the diaries.  This was despite the fact that Mr. Bush's diaries themselves became a focus of a criminal investigation related to the delay in producing them to the Independent Counsel and the Department was aware that they touched upon some of the same information as Mr. Reagan's diary—which the Department recognized as classified.  *See* DOJ Poindexter Statement of Interest at 17 n.8.

### The Pence Book

Former Vice President Mike Pence published his own memoir on November 15, 2022. Mike Pence, SO HELP ME GOD (2022).  Even though Mr. Pence, as a Vice President, had not signed any agreement requiring pre-clearance review, he voluntarily submitted his manuscript to the NSC prior to publication for review for classified information.

Emmet Flood of Williams & Connolly submitted the manuscript to the NSC in June 2022.  Ryan Cole, an Indiana writer, was copied on correspondence. We are unaware of whether these two individuals possessed security clearances at the time, or whether draft manuscripts were handled in accordance with security protocols for classified information, but the manuscript was not sent to the NSC under the requirements for transmitting classified materials.

The NSC review resulted in a number of proposed redactions of presumably classified information, which Vice President Pence and his team accepted to the manuscript before it was published.

Two months after the publication date, Vice President Pence's attorneys discovered classified government documents in his home in Indiana, and the National Archives was notified two days later.  Katherine Faulders et al., *FBI finds Another Classified Document in Search of Former Vice President Mike Pence's Indiana home,* ABC NEWS (Feb. 10, 2023).  A consent search of the home was conducted by Federal Bureau of Investigation agents on February 10, 2023, during which an additional classified document was found and "six additional pages" were also seized.  *Id.*  It is unclear the nature of the additional pages.  We do not know whether the agents searched for drafts of the manuscript that the NSC had determined contained material that needed to be redacted.

But one thing is clear: the manuscript prepared by Mr. Pence with the help of Mr. Cole and Mr. Flood, which presumably also was reviewed by the publishers at Simon & Schuster, contained material that the NSC required to be redacted.  Yet, even including the later search for classified documents, we know of no law enforcement inquiry into this writing.

---

[4] We do not believe that Mr. Meacham's book was submitted for prepublication review.

### The Carter Diaries and Book

While serving as President, Jimmy Carter dictated diary entries several times throughout the day—"seldom exercis[ing] any restraint on what [he] dictated"—which were transcribed by his secretary.  Jimmy Carter, WHITE HOUSE DIARY xiii (2010); *see also* Jimmy Carter, KEEPING FAITH xiii (1982).  By the time that he left office, he had totaled approximately 5,000 pages of transcribed notes in 18 volumes.  Carter, KEEPING FAITH at xiii.  Our understanding is that the Carter diaries, like the Bush and Reagan diaries, were never scrutinized for classified information.

As Mr. Carter prepared the diaries for publication, the drafts were reviewed by numerous people, including his wife Rosalynn Carter and an editor.  Carter, WHITE HOUSE DIARY at 539.  While Mr. Carter noted that his published diary excerpts "omit about three-fourths of the diary," he "decided to make the entire diary (including [his] detailed handwritten notes) available at the Carter Presidential Library in the near future."  *Id.* at xiv.

Mr. Carter's own words suggest that the diaries may well contain national security information, although they were not submitted for prepublication review.  In the published diary, he notes that his diary addresses "Middle East peace negotiations, nuclear weaponry, U.S.-China relations, [and] energy policy." *Id.* at xiv. The dust cover to the published diary notes that Mr. Carter "narrated the progress of secret negotiations such as those that led to the Camp David Accords" in his diaries.  *Id.*  In Mr. Carter's memoir, excerpted diary entries reveal his reflections on highly sensitive matters—detailing secret diplomatic engagements with foreign adversaries, international nuclear weapons negotiations, conversations with foreign heads of state, and intelligence briefings pertaining to national security, *see, e.g.*, Carter, KEEPING FAITH at 199, 205, 418, 438—illustrating the likelihood of even more sensitive matters being in the underlying unpublished diaries.

As of 2010, Mr. Carter continued to keep the entire set of diary notes in his personal residence. Carter, WHITE HOUSE DIARY at xiii.  Separately, reports have suggested Mr. Carter—like Mr. Pence—found classified materials at his Georgia home on at least one occasion after he left office, returning them to the National Archives. Zeke Miller et al., *Classified Records Pose Conundrum Stretching Back to Carter*, ASSOCIATED PRESS (Jan. 24, 2023).

We are unaware of the Department or the National Archives and Records Administration ever seeking to review former President Carter's diary notes for potentially classified information, even after the return of classified materials from his home to the Archives.

### Books by Barack Obama, George W. Bush, and Dick Cheney

Though they were not required to submit their manuscripts for pre-clearance review, Presidents Obama and Bush, along with Vice President Cheney, had representatives submit their book manuscripts to the NSC for review prior to publication.  *See* Barack Obama, A PROMISED LAND (2020); George W. Bush, DECISION POINTS (2010); Dick Cheney & Liz Cheney, IN MY TIME (2011).

In each of these three cases, representatives sent the NSC draft materials via private email for pre-clearance review.

In former President Obama's case, the NSC identified information that was still classified or not officially acknowledged, and asked Mr. Obama—through his representatives—to revise the relevant sections.  In former President Bush's case, the NSC determined that the manuscript contained information that remained currently classified and requested redactions or edits. Former Vice President Cheney's draft manuscript excerpts contained quotations from a foreign official, which the NSC treats as classified.  In each case, following NSC's review, the authors made changes to the manuscript.  President Obama, President Bush, and Vice President Cheney named and thanked NSC staff for their review of the texts.  *See* Obama, A PROMISED LAND at 704; Cheney & Cheney, IN MY TIME at 530; Bush, DECISION POINTS at 480.

Each of these processes proceeded without any law enforcement involvement or interest. The presumably uncleared ghost writers, assistants, agents, publishers, and lawyers involved with these manuscripts were not the subject of any law enforcement interest or inquiry, and there was no investigation into what underlying records had informed the authors' writings or whether drafts, notes, or other writings existed which contained the same classified information identified by the NSC.

* * *

For at least 30 years, the Government—including specifically the Department—has been aware that former Presidents and Vice Presidents frequently have possessed diaries, notes, draft manuscripts, and other writings that contained classified information. At no time has the Government sought to ensure that such material was maintained in a location certified to store classified material, much less initiated a criminal investigation into the failure to do so.

We look forward to discussing these issues in the near future, as we believe that the constitutional significance of these writings and the long uninterrupted practice of the Government treating such writings as within the constitutional prerogatives of the President and Vice President bear directly on your investigation.

Respectfully,

Richard Sauber
Special Counsel to the President