**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 23-80101-CR-CANNON(s)**

**UNITED STATES OF AMERICA**,

      Plaintiff,

v.

**DONALD J. TRUMP,**
**WALTINE NAUTA**, and
**CARLOS DE OLIVEIRA,**

      Defendants.

_____/

**GOVERNMENT'S OPPOSITION TO DONALD J. TRUMP'S**
**MOTION TO DISMISS THE INDICTMENT BASED ON**
**PROSECUTORIAL MISCONDUCT AND DUE PROCESS VIOLATIONS**

# TABLE OF CONTENTS

I.      Alleged Investigative Collusion ................................................................................. 1

        A.      Applicable Law ............................................................................................. 3

        B.      Trump's Narrative of Bad-Faith Collusion Is Baseless. .............................. 5

                1.      NARA's Efforts to Obtain Custody of Presidential Records ................ 5

                2.      NARA's Discovery of Classified Documents and Referral to DOJ ...... 10

                3.      NARA's Compliance with PRA Regulations ........................................ 11

        C.      Trump Has Not Established a Due Process Violation ................................. 13

                1.      Claims of Bad-Faith Collusion ........................................................... 13

                2.      Claims Regarding Executive Privilege ............................................... 16

II.     Alleged Preindictment Delay ................................................................................. 17

        A.      Applicable Law ........................................................................................... 17

        B.      Trump Cannot Establish Preindictment Delay .......................................... 18

III.    Alleged Misuse of the Grand Jury .......................................................................... 20

        A.      Applicable Law ........................................................................................... 20

        B.      No Abuse of the Grand Jury Occurred, and Trump Has Not Shown
                Prejudice in Any Event ............................................................................... 20

IV.     Conclusion .............................................................................................................. 25

Defendant Donald J. Trump moves for dismissal of the Superseding Indictment or, in the alternative, suppression of the documents contained in the 15 boxes that he returned to the National Archives and Records Administration ("NARA") in January 2022, on the grounds that his due process rights were violated by various forms of purported "prosecutorial misconduct." Motion to Dismiss the Indictment Based on Prosecutorial Misconduct and Due Process Violations ("Mot.") at 1.[1] Claims of this nature require rigorous factual showings and demonstrable prejudice, and Trump has shown neither. This case has been investigated and prosecuted in full compliance with all applicable constitutional provisions, statutes, rules, regulations, and policies. There has been no prosecutorial misconduct, and his motion should be denied.

## I.      Alleged Investigative Collusion

Trump claims (Mot. at 1) that "[t]he Biden Administration and NARA coordinated with DOJ and the FBI, in violation of the Due Process Clause and the Presidential Records Act ('PRA'), in order to obtain the 15 Boxes for use in a politically motivated criminal investigation used to improperly target President Trump." That claim has two components, neither of which has merit.

First, Trump asserts that "NARA, the Biden Administration, and DOJ 'collude[d] in bad faith' to deprive President Trump of his constitutional rights by using civil authorities to collect evidence for use in a criminal prosecution." Mot. at 3 (quoting *United States v. Goldstein*, 989 F.3d 1178, 1202 (11th Cir. 2021)). This claim of bad-faith collusion rests on a single sentence in an email that NARA's General Counsel sent to his colleagues on September 1, 2021, circulating a draft letter (never actually sent) asking the Attorney General to initiate a civil proceeding to recover presidential records. *See* Def. Ex. 5 to Mot. to Compel at USA-00383606-08. In the email, the General Counsel advised his colleagues that he had "informally reached out to DOJ counsel about

_____

[1] Trump's motion has not yet been docketed publicly or received an ECF number.

this issue," *id.* at USA-00383606, which Trump characterizes as proof that "by September 1, 2021," NARA was "communicating with *prosecutors*," Mot. at 5 (emphasis in original).  From that premise, he contends that NARA engaged in misconduct by "conceal[ing] the timing of prosecutors' involvement," Mot. at 3, "mislead[ing] President Trump's PRA representatives into believing that at most NARA was considering using civil recovery authorities," *id.*, and misleadingly "suggest[ing] that any communications with DOJ only concerned the use of civil authorities to recover records rather than a criminal investigation," *id.* at 5.

In fact, NARA's General Counsel did not "reach[] out" to a criminal prosecutor.  Gov't Ex. 1.  Rather, consistent with NARA's statutory duties, 44 U.S.C. § 2905(a), he conferred with a civil attorney at DOJ about the document-recovery issue discussed in the draft letter, *see* Gov't Ex. 1, just as NARA repeatedly advised Trump's PRA representatives it would do.  Trump's claims thus rest entirely on a false premise.  And even if taken at face value, his allegations would fall far short of establishing a due process violation.  At most, they would show communication between two government agencies, which is both common and proper.  *See Goldstein*, 989 F.3d at 1202.  Trump has not even alleged (much less attempted to show) the sort of extensive coordination combined with affirmative deception needed for a claim of this nature.  Accordingly, Trump's claims fail as a matter of law, quite apart from the falsity of the factual premise upon which they rest.

Second, Trump asserts (Mot. at 10) that "NARA's May 2022 coordination with the Biden Administration and DOJ to reject President Trump's executive privilege claim was a further violation of due process."  That contention, too, finds no support in the facts or the law.  NARA complied at all times with the applicable statutes and regulations.  And Trump never attempted to avail himself of the statutory remedy that explicitly permits a former President to bring an action "asserting that a determination made by the Archivist violates the former President's rights or

privileges," 44 U.S.C. § 2204(e), which, if successful, would have required NARA to "withhold the record" from the FBI, *see* 36 C.F.R. § 1270.44(f)(3). His belated challenge to the procedures NARA used in assessing his privilege claim provide no basis for suppression or dismissal.

Because Trump's claims rest on a distortion of the record, the Government will discuss the relevant facts in detail, "not because the Court needs to resolve factual disputes before denying the motion (it need not resolve the facts)," *see* ECF No. 277 at 1-2, but to dispel the false narrative that he presents. Before doing so, the Government discusses the law governing parallel criminal and civil investigations. Although there were no parallel criminal and civil investigations here, this body of law illustrates the high bar for establishing a due process violation in this context.

### A. Applicable Law

"It is well established that the federal government may pursue civil and criminal actions either 'simultaneously or successively.'" *United States v. Moses*, 219 F. App'x 847, 849 (11th Cir. 2007) (per curiam) (quoting *Standard Sanitary Mfg. v. United States*, 226 U.S. 20, 52 (1912)); *see United States v. Kordel*, 397 U.S. 1, 11 (1970); *United States v. Posada Carriles*, 541 F.3d 344, 354- 361 (5th Cir. 2008). "[P]arallel governmental investigations" are "common and generally proper," *Goldstein*, 989 F.3d at 1202, and often "necessary in order to protect the public interest," *SEC v. Incendy*, 936 F. Supp. 952, 955 (S.D. Fla. 1996); *see* Justice Manual ("JM") § 1-12.000 (requiring parallel-proceeding policies and encouraging such policies to "stress early, effective, and regular communication between criminal, civil, and agency attorneys"). "Where the agency has a legitimate noncriminal purpose for the investigation, it acts in good faith . . . even if it might use the information gained in the investigation for criminal enforcement purposes as well." *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1387 (D.C. Cir. 1980) (en banc).

To be sure, "[a] due process problem might arise in the context of parallel investigations if the two government arms collude in bad faith to deprive the defendant of his constitutional rights." *Goldstein*, 989 F.3d at 1202.  But the standard for establishing a due process violation of this nature is demanding and rarely satisfied.  "[B]ad faith collusion generally involves 'affirmative misrepresentations' or 'trickery or deceit' by the investigating authority to get the defendant to voluntarily turn over documentary or physical evidence relevant to the criminal investigation." *Id.* (quoting *United States v. Stringer*, 535 F.3d 929, 940 (9th Cir. 2008)).  By contrast, due process does not require authorities to "disclose the possibility or existence of a criminal investigation, so long as they [make] no affirmative misrepresentations." *Stringer*, 535 F.3d at 940.

Cases in this area generally involve agencies that are empowered to conduct investigations using legal process to further their statutory enforcement authority, such as the FDA, the SEC, the IRS, or the CFTC.  *See Kordel*, 397 U.S. at 3 (FDA); *Goldstein*, 989 F.3d at 1202 (SEC); *Stringer*, 535 F.3d at 939 (SEC); *United States v. Rhodes*, No. 18-cr-887, 2019 WL 3162221, at *1 (S.D.N.Y. July 16, 2019) (SEC); *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 302-03 (1978) (IRS); *United States v. Alexandre*, No. 22-cr-326, 2023 WL 416405, at *7 (S.D.N.Y. Jan. 26, 2023) (CFTC).  That is because the "principal objections to parallel proceedings are: (1) that they unfairly penalize a defendant's exercise of his Fifth Amendment privilege against compulsory self-incrimination; (2) that they offer an unfair opportunity for one party to expand its discovery rights in an unauthorized fashion; and (3) that they can result in prejudice to parties who are misled as to the dual nature of the proceedings."  Beale, et al. *Grand Jury Law and Practice* § 10:1 (2d ed. 2023).  And those objections typically do not arise outside the context of enforcement-related investigations involving legal process.  Trump has not identified any case in which the due process

principles he invokes have been applied to an agency like NARA that has no enforcement authority and cannot file lawsuits or issue legal process like subpoenas or civil investigative demands.

Courts have only rarely found a due-process violation and granted relief in this context. Trump cites only one such case, *United States v. Scrushy*, 366 F. Supp. 2d 1134 (N.D. Ala. 2005), and even that case (which involved the SEC) does not support a request for dismissal, *see United States v. Utsick*, No. 10-cr-20242, 2016 WL 3074316, at *8 (S.D. Fla. June 1, 2016) ("*Scrushy* has nothing whatsoever to do with the dismissal of an indictment, and as such, is completely irrelevant to [the defendant's] motion." (quotation marks omitted)); *see also Stringer*, 535 F.3d at 942 (reversing dismissal based on due-process violation); *Posada Carriles*, 541 F.3d at 354-61 (same).

## B.    Trump's Narrative of Bad-Faith Collusion Is Baseless.

### 1.    NARA's Efforts to Obtain Custody of Presidential Records

During his Presidency, Trump used boxes to accumulate and store records in an informal filing system. ECF No. 85 ¶¶ 2-4. Toward the end of his term, a career official in the White House Office of Records Management ("WHORM") expressed concerns to NARA that there were presidential records in the White House residence that had not been transferred to WHORM. There was nothing untoward about these communications; to the contrary, the WHORM official and the NARA officials were simply carrying out their assigned responsibilities. ECF No. 279 at 3.[2]

At the end of his Presidency, Trump caused scores of boxes containing presidential records to be transported from the White House to Mar-a-Lago. ECF No. 85 ¶¶ 4-5. Over the ensuing

---

[2] The PRA makes presidential records the property of the United States and gives the Archivist of the United States responsibility to take custody and control of them after the conclusion of a President's term. 44 U.S.C. § 2203; *see Trump v. United States*, 54 F.4th 689, 694 (11th Cir. 2022) (per curiam). And "the Office of Records Management supports the incumbent administration in identifying and transferring presidential records to the National Archives." https://www.archives.gov/presidential-records/support-to-the-white-house/records-management.

months, NARA officials communicated with Trump's PRA representatives to try to retrieve the missing presidential records of which they were aware.[3]  NARA officials understood there to be roughly 24 boxes unaccounted for, as well as certain prominent documents, such as the letter that former President Obama had left for President Trump in the Resolute Desk and Trump's correspondence with North Korean leader Kim Jong-un.  ECF No. 279 at 3-4.

In its efforts to retrieve presidential records, on May 6, 2021, NARA emailed Trump's PRA representatives to seek their assistance in locating and obtaining the boxes and documents. Def. Ex. 1 at USA-00384011-12.  That request was neither controversial nor unexpected.  To the contrary, the "roughly two dozen boxes" NARA sought consisted of "original Presidential records [that] were kept in the Residence of the White House over the course of President Trump's last year in office and have not been transferred to NARA, despite a determination by [Trump's White House Counsel] in the final days of the Administration that they need to be."  *Id.*  Twelve days later, Trump's PRA representative responded that they had "the original North Korea correspondence available to send to [NARA]," and were "checking on the other items and will circle back with you on those."  *Id.* at USA-00384011.  On May 26, NARA reiterated that "[i]t is vitally important that we account for [these documents], and any other Presidential records that may still be outside of our possession, as quickly as possible."  *Id.* at USA00384010-11.

After delays and responses from the PRA representatives that did not address the boxes, on June 9, 2021, the Archivist told his colleagues that he was "out of patience."  Def. Ex. 3 to Mot. to Compel at USA-00383594.  Three weeks later, NARA reminded Trump's PRA representatives

---

[3] The PRA permits a President to designate representatives to have access to his records and to handle inquiries concerning access to the records by others.  44 U.S.C. § 2205(3).  Trump appointed six PRA representatives at the end of his term.  Five of them were attorneys in his administration; the sixth was his White House Chief of Staff.

that NARA still had "not received any update on the other two categories of records in the three weeks since [Trump's PRA representative] said he would get back to us soon, nor have we received the North Korea records that you located and agreed to ship to us." Def. Ex. 1 at USA-00384010. In light of these delays, NARA's General Counsel explicitly informed Trump's PRA representative that the Archivist had directed NARA personnel "to seek assistance from the Department of Justice, which is the necessary recourse when we are unable to obtain the return of improperly removed government records that belong in our custody." *Id.* Trump's PRA representative responded that "the North Korea documents" would be sent soon, but that the "Obama letter" had still not been found. Def. Ex. 1 at USA-00384009. Regarding "the possible boxes of documents," Trump's PRA representative said that he had recently spoken to ███Per. 27███ ████████████ who "asked me to let you know (and for you to let the Archivist know) that he would get personally involved and that he understood the importance of every record." *Id.*

Two more months passed without any progress on the return of the boxes or other documents. On August 30, 2021, the Archivist wrote to ███████Per. 27███████ that the "24 boxes" had "yet to be accounted for," which, among other things, hampered NARA's "ability to respond" to a recent records request from the House of Representatives. Def. Ex. 4 to Mot. to Compel at USA-00359483. The Archivist once again expressly advised Trump's PRA representative that he intended to raise this matter with the Department of Justice, stating, "At this point, I am assuming that they have been destroyed. In which case, I am obligated to report it to the Hill, DOJ, and the White House." *Id.* ██████Per. 27██████ responded, "To my knowledge, [n]othing has been destroyed," and asked to speak to the Archivist. *Id.* The Archivist later told the WHORM official that the ██████Per. 27██████ had "said they don't have 24 boxes— only a couple of boxes w[ith] news clippings." Def. Ex. 2 at USA-00815833. The Archivist also

told the WHORM official that "he would need to talk to DOJ about next steps with the assumption that these documents have been destroyed." *Id.* The next day, the Archivist reiterated to the WHORM official that if the issue of the missing boxes is "not resolved he will let Congress and DOJ know these appear to have been destroyed." *Id.* at USA-0815835.

The next day, on September 1, 2021, NARA's General Counsel internally circulated within NARA a draft letter from the Archivist to the Attorney General. Def. Ex. 5 to Mot. to Compel at USA-00383606-08. The draft letter stated, "I write pursuant to my authority as Archivist of the United States to seek your assistance for the recovery of Presidential records that may have been unlawfully removed from U.S. Government custody or possibly destroyed in violation of the Presidential Records Act (PRA), 44 U.S.C. Chapter 22." *Id.* at USA-00383607. The letter stated that while "[t]he PRA has no explicit provision on how [NARA] should address concerns about suspected removal or destruction of Presidential records," the Archivist was invoking a statute that authorized him "to 'request the Attorney General to initiate' an action 'for the recovery of records unlawfully removed and for other redress provided by law.'" *Id.* (quoting 44 U.S.C. § 2905(a)). In circulating the draft letter, NARA's General Counsel stated:

> Attached is a draft letter that we could consider sending to the Attorney General about missing Trump records. It focuses only on the paper records that we believe to be missing (subject to confirmation that they were not unknowingly sent to us). Also, I have now informally reached out to DOJ counsel about this issue.

*Id.* at USA-00383606. As noted, the final sentence of that passage—referencing NARA's informal contact with "DOJ counsel about this issue"—is the source for Trump's claims of misconduct and coordination prior to the return of the 15 boxes in January 2022, based on the unfounded supposition that NARA's General Counsel had "informally reached out" to a criminal prosecutor. *See* Mot. at 5-7. In fact, NARA's General Counsel was not in contact with a criminal prosecutor. *See* Gov't Ex. 1. Instead, he "informally reached out" to a civil attorney at DOJ to discuss the

issue raised in the letter—namely, the possibility of a request to the Attorney General to initiate a civil action.  *Id.*

NARA continued discussing the missing boxes with Trump's PRA representatives.  On September 3, 2021, Trump's PRA representatives assured NARA that the boxes they had found—which the representative said numbered 12, not 24—"consisted entirely of news clippings," rather than presidential records.  Def. Ex. 7 to Mot. to Compel at USA-00383683-84.  Trump's PRA representative also asked NARA "where the number 24 boxes had come from," to which NARA responded that the "information came from the WH Office of Records Management." *Id.*  Trump's PRA representative requested a call with NARA, the PRA representatives, and the WHORM official.  *Id.*  And because the WHORM official was a career civil servant at the White House, his participation in the call was coordinated with Deputy White House Counsel Jonathan Su, whose involvement in the process was known to and welcomed by Trump's PRA representative.  *Id.*  As the discussions continued, a NARA official asked NARA's General Counsel on September 15, "So that means we are holding off on a DOJ letter?" to which the General Counsel responded, "Correct, we cannot go to DOJ while we are engaged in ongoing discussions with the White House and the Trump reps, which could help to clarify, if not actually resolve the issue."  *Id.* at USA-00383682.[4]  Ultimately, NARA never sent the draft letter to the Attorney General.

As the months dragged on, Trump's PRA representatives and other former administration officials continued to urge Trump to return the missing records, even warning him that he faced

---

[4] Trump interprets this exchange as proof that "even" the General Counsel "fully understood that NARA was operating in an inappropriate and *ultra vires* fashion." Mot. at 6.  In fact, it shows the opposite: that NARA was proceeding in good faith to obtain the missing documents cooperatively before asking the Attorney General to bring civil process to recover them.  Moreover, the proposition that NARA's General Counsel considered it improper to seek the Department of Justice's assistance is entirely inconsistent with the fact that he expressly advised Trump's PRA representatives of that plan.

criminal exposure if he failed to do so.  Gov't Ex. C to Mot. to Compel Resp. at USA-00820510; Gov't Ex. D to Mot. to Compel Resp. at USA-00818227-28.  Between November 2021 and January 2022, Trump employees, at his direction, brought boxes from the storage room in Mar-a-Lago for him to review before providing them to NARA.  ECF No. 85 ¶¶ 39-47.  After reviewing a subset of the boxes, Trump arranged, on January 17, 2022, for 15 boxes of documents to be transferred to NARA.  *Id.*

## 2.    NARA's Discovery of Classified Documents and Referral to DOJ

After NARA received the 15 boxes, NARA officials reviewed their contents and found highly classified documents intermingled with other records.  The discovery prompted NARA to consult with Su, who directed NARA officials to contact officials in the Office of the Deputy Attorney General ("ODAG").  Def. Ex. 2 to Mot. to Compel at USA-00813156.  Officials at ODAG instructed NARA, on January 24, 2022, to notify its Inspector General and the Inspector General for the Intelligence Community.  *Id.* at USA-00813156.  ODAG also provided NARA with the names of two officials who had responsibility for overseeing the relevant subject matters: a section chief in the Criminal Division who oversaw offenses involving public officials, and a section chief in the National Security Division who oversaw offenses relating to the mishandling of classified materials.  *Id.*  On January 25, NARA officials passed the relevant information along to NARA's Office of Inspector General ("OIG"), which (unlike NARA itself) has the statutory authority to make criminal referrals.  *See* 5 U.S.C. § 404(d).

On February 9, 2022, NARA OIG referred three matters to the Criminal Division and the National Security Division, one of which stemmed from NARA's discovery of "15 boxes of records from Mar-a-Lago that contained highly classified information."  Def. Ex. 18 to Mot. to Compel at USA-00309423-26.

### 3.   NARA's Compliance with PRA Regulations

After receiving the referral, the FBI and Department of Justice met with a NARA official, who provided FBI agents with an inventory of the boxes that provided only generic titles for the documents, their dates (if available), the number of pages, and their classification levels.  Def. Ex. 21 to Mot. to Compel.[5]  The Department of Justice then sought access to the 15 boxes themselves. Although the PRA generally limits the disclosure of presidential records, *see* 44 U.S.C. § 2204, it also includes several exceptions that permit disclosure in appropriate circumstances, *see* 44 U.S.C. § 2205(2); 36 C.F.R. § 1270.44.  One such exception authorizes disclosure "pursuant to subpoena or other judicial process issued by a court of competent jurisdiction for the purposes of any civil or criminal investigation or proceeding."   44 U.S.C. § 2205(2)(A); *see also* 36 C.F.R. § 1270.44(a)(1).  Another exception authorizes disclosure "to an incumbent President if such records contain information that is needed for the conduct of current business of the incumbent President's office and that is not otherwise available."  44 U.S.C. § 2205(2)(B); *see also* 36 C.F.R. § 1270.44(a)(2).  Under either exception, before disclosure, the Archivist is required to notify both the former and incumbent Presidents, to allow them to assert a claim of privilege.  36 C.F.R. §§ 1270.44(c), (d); *see also* 44 U.S.C. § 2206 (directing NARA to promulgate regulations on this

---

[5] Trump suggests (Mot. at 9) that there is an inconsistency between this process—by which NARA provided a general description to the FBI without triggering the PRA's notice provisions— and an answer that NARA gave to Congress.  In fact, Congress asked NARA to "provide a detailed description of the contents of the recovered boxes, including any inventory prepared by NARA of the contents of the boxes."  Def. Ex. 5.  NARA responded that a request for detailed information of this sort "will need to be made in accordance with Section 2205(2)(C) of the PRA."  *Id.*  That is consistent with the position NARA took with the FBI: a high-level, generic description could be given without triggering the notice provisions of the PRA, while any request for the documents themselves or a detailed description thereof would have to go through the PRA.  Trump also complains (Mot. at 9) that "NARA even refused to provide the inventory [that was given to the FBI] to President Trump's representatives" in December 2022.  But the inventory—a document NARA itself created—was not a presidential record to which the PRA access provisions attached.

topic).  "If a former President asserts the claim, the Archivist consults with the incumbent President . . . to determine whether the incumbent President will uphold the claim."   36 C.F.R. § 1270.44(f)(1).   "If the incumbent President does not uphold the claim asserted by the former President," the Archivist will disclose the Presidential record "unless a court order in an action in any Federal court directs the Archivist to withhold the record, including an action initiated by the former President."  *Id.* § 1270.44(f)(3).  And while the regulations provide default time periods for some of these procedural steps, the regulations expressly authorize the Archivist to "adjust any time period or deadline" as appropriate.  *Id.* § 1270.44(g); 44 U.S.C. § 2208(e).

NARA followed those regulations here.  It notified Trump's PRA representative, who asserted a protective claim of executive privilege.  *See* Def. Ex. 24 to Mot. to Compel.  NARA then consulted with White House Counsel, who informed the Archivist "that, in light of the particular circumstances presented here, President Biden defers to [the Archivist's] determination, in consultation with the Assistant Attorney General for the Office of Legal Counsel (OLC), regarding whether" to uphold Trump's protective claim of privilege.  *Id.*  After consulting with OLC, the Archivist decided not to uphold Trump's "'protective' claim of privilege."  *Id.*  The Archivist acknowledged that there might be "circumstances in which a former President could successfully assert a claim of executive privilege to prevent an Executive Branch agency from having access to Presidential records for the performance of valid executive functions."  *Id.*[6]  But, after balancing the Executive Branch's need for the documents against the remote possibility of chilling future candid conversations, the Archivist concluded that "[t]he question in this case is not

---

[6] Contrary to Trump's assertion (Mot. at 11), the Archivist's position leaving open the possibility of a former President's successful privilege invocation prevailing over the incumbent President's objection is not inconsistent with Justice Kavanaugh's statement accompanying the denial of certiorari in *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022).

a close one." *Id.*[7] Trump did not initiate court action to enjoin disclosure, *see* 44 U.S.C. § 2204(e); 36 C.F.R. § 1270.44(f)(3), and NARA then disclosed the records to the FBI.

### C.      Trump Has Not Established a Due Process Violation

#### 1.      Claims of Bad-Faith Collusion

Trump's contention that "NARA, the Biden Administration, and DOJ 'collude[d] in bad faith' to deprive [him] of his constitutional rights by using civil authorities to collect evidence for use in a criminal prosecution," Mot. at 3 (quoting *Goldstein*, 989 F.3d at 1202), fails on both the facts and the law. First, his assertion that "by September 1, 2021" NARA "was communicating with *prosecutors*," Mot. at 5 (emphasis in original), depends entirely on a baseless inference drawn from one sentence in the September 1, 2021, email that NARA's General Counsel sent to his colleagues. Specifically, Trump speculates that when the General Counsel told his colleagues that he had "informally reached out to DOJ counsel about" the issue discussed in the draft letter to the Attorney General, *see* Def. Ex. 5 to Mot. to Compel at USA-00383606, the General Counsel was alluding to some sort of coordination between NARA and a criminal prosecutor, as part of a plan to investigate Trump for engaging in document destruction, in violation of 18 U.S.C. § 2071, and

---

[7] OLC advised the Archivist that "there is no precedent for an assertion of executive privilege by a former President *against an incumbent President* to prevent the latter from obtaining from NARA Presidential records belonging to the Federal Government where 'such records contain information that is needed for the conduct of current business of the incumbent President's office and that is not otherwise available.' 44 U.S.C. § 2205(2)(B)." Def. Ex. 24 to Mot. to Compel. Trump asserts that, when the Archivist quoted this language, with its reference to "the conduct of current business of the incumbent President's office," this was "tantamount to an admission that President Biden considered his 'current business' to be attacking his chief political rival." Mot. at 10. In truth, the "current business" referred to by the statute includes the incumbent President's constitutional responsibilities to protect the national defense and take care that the laws be faithfully executed. Authorizing disclosure to the FBI of highly classified records that had resided for nearly a year without proper security at Mar-a-Lago undoubtedly furthered those aims.

dupe him into returning the 15 boxes of presidential records that NARA had been seeking.[8] Trump's reading of that sentence was never plausible given the context provided by the draft letter (which discussed only civil remedies); NARA's statutory authorization to "initat[e] action through the Attorney General for the recovery of records," 44 U.S.C. § 2905(a); and the months of discussion with Trump's PRA representatives preceding it. But to the extent that it depended on speculation that NARA's General Counsel had "informally reached out" to a criminal prosecutor, that possibility has now been put to rest: the "reach[] out" was to a civil attorney regarding the potential civil remedies in the draft letter. *See* Govt' Ex. 1. Trump's conspiracy theory is false.

Just as importantly, his claims would fail even if his conspiracy theory were taken at face value. That is, even if NARA's General Counsel had "informally reached out" to a criminal prosecutor, Trump's request for suppression or dismissal would fail because he does not come close to alleging the sort of bad-faith collusion that could give rise to a due process violation.

For example, Trump does not suggest that the (fictitious) criminal prosecutor whose involvement he hypothesizes directed NARA to do something that it otherwise would not have done. *Cf. Scrushy*, 366 F. Supp. 2d at 1139 (emphasizing that the U.S. Attorney's Office directed the SEC to "ask[] additional questions that otherwise would not have been asked" and to change "the deposition's location for venue purposes"). Nor could he: throughout 2021, NARA was focused on fulfilling its statutory duty to obtain custody and control over presidential records, and nothing about its objective or approach changed after the September 1 email. Likewise, NARA indisputably had "a legitimate noncriminal purpose" for attempting to retrieve the presidential records, precluding Trump from showing bad faith. *See Dresser Indus., Inc.*, 628 F.2d at 1387.

---

[8] Trump appears to suggest that if he had known that he was under criminal investigation for destroying the documents contained in the boxes, then he would have refused to exonerate himself by returning those boxes, but he makes no effort to explain the logic behind this premise.

And because NARA (in contrast to agencies like the FDA, SEC, IRS, and CFTC) lacks the power to conduct investigations and pursue civil enforcement actions, it relied on informal requests, rather than legal process, to obtain the 15 boxes, dispelling any concerns about compelled self-incrimination, *see Stringer*, 535 F.3d at 938.[9]

Trump likewise fails to allege that NARA made any "affirmative misrepresentations."  *See Goldstein*, 989 F.3d at 1202.  Again, NARA twice told Trump's PRA representatives that it would be "seek[ing] assistance from the Department of Justice."  Def. Ex. 1 at USA-00384010; *see* Def. Ex. 4 to Mot. to Compel at USA-00359483 ("I am assuming that [the documents] have been destroyed[,] [i]n which case I am obligated to report it to the Hill, DOJ, and the White House.").  Trump nevertheless complains that, if NARA's "informal[]" communication with "DOJ counsel," *see* Def. Ex. 5 to Mot. to Compel at USA-00383606, had been with a criminal prosecutor, then NARA should have been explicit about that fact when corresponding with his PRA representatives.  But courts have held that suppression (and *a fortiori* dismissal) are unwarranted "even when government agents did not disclose the possibility or existence of a criminal investigation, so long as they made no affirmative misrepresentations," *Stringer*, 535 F.3d at 940; *see Goldstein*, 989 F.3d at 1202, which are entirely lacking here.

The "bare conclusion" that a prosecutor "was contemplating a criminal investigation does not establish a prima facie case of government misconduct."  *Moses*, 219 F. App'x at 849.  So even if it were true (which it is not) that a criminal prosecution was being contemplated and NARA's General Counsel had "informally reached out" to a criminal prosecutor, Trump's claim would still

---

[9] As Trump noted after returning the 15 boxes, NARA was "given, upon request, Presidential Records in an ordinary and routine process to ensure the preservation of my legacy and in accordance with the Presidential Records Act."  *See* https://www.nbcnews.com/politics/donald-trump/white-house-records-taken-trump-contained-classified-information-natio-rcna16890.

lack any of the crucial ingredients of a colorable due process claim.  His requests for suppression or dismissal on this issue should be denied.

### 2.    Claims Regarding Executive Privilege

Trump's claim (Mot. at 10) that NARA violated due process in May 2022 by "reject[ing] President Trump's executive privilege claim" is likewise unavailing.  The claim appears to rest on two assertions: (1) that "[t]here was no valid basis for the Biden Administration to 'defer[]' a substantive evaluation of President Trump's executive privilege to NARA," and (2) that NARA "intentional[ly] disregard[ed] . . . its governing regulations."  Mot. at 10, 12.

For the first assertion, Trump complains that NARA improperly "departed from the [1986] OLC memorandum in [*Public Citizen v. Burke*, 843 F.2d 1473 (D.C. Cir. 1988)]."  Mot. at 11.  The 1986 OLC memorandum had concluded that "the incumbent President 'should respect a former President's claim of executive privilege without judging the validity of the claim[,]' leaving the 'judgment regarding such a claim . . . to the judiciary in litigation between the former President and parties seeking disclosure.'"  *Trump v. Thompson*, 20 F.4th 10, 29 (D.C. Cir. 2021) (quoting Mem. from Charles J. Cooper, Office of Legal Counsel, to Robert P. Bedell, Deputy Administrator, Office of Information and Regulatory Affairs, Office of Mgmt and Budget 23-26 (Feb. 18, 1986) (ellipsis in *Thompson*).  But *Burke* held that the 1986 OLC memorandum's conclusion "was neither constitutionally required nor compatible with the Preservation Act."  *Id.*  And 20 years after *Burke*, President Obama issued Executive Order 13489, which expressly authorized the procedure that NARA used here to resolve a privilege claim by a former president.  *See Thompson*, 20 F.4th at 28-31 (discussing history); Exec. Order 13489 § 4(a) ("Upon receipt of a claim of executive privilege by a living former President, the Archivist shall consult with the Attorney General (through the Assistant Attorney General for the Office of Legal Counsel), the Counsel to the

President, and such other executive agencies as the Archivist deems appropriate concerning the Archivist's determination as to whether to honor the former President's claim of privilege or instead to disclose the Presidential records notwithstanding the claim of privilege.").  There was plainly a "valid basis," Mot. at 10, for NARA and the incumbent President to proceed as they did.

With respect to the second assertion, Trump never identifies the "governing regulations" that NARA purportedly "disregard[ed]."  Mot. at 12.  As noted above, NARA followed its governing regulations by notifying Trump's PRA representative of the FBI's request for access to the 15 boxes and giving him an opportunity to assert an executive privilege claim, which NARA considered but declined to uphold.  Trump did not avail himself of the statutory remedy available to him to bring an action to prohibit disclosure on the basis of privilege, *see* 44 U.S.C. § 2204(e); 36 C.F.R. § 1270.44(f)(3), and he has offered no basis to seek suppression, much less dismissal.

## II.      Alleged Preindictment Delay

Trump next contends (Mot. at 14-17) that the ten months that elapsed between the August 2022 search of Mar-a-Lago and the original Indictment in June 2023 constitutes impermissible pre-indictment delay in violation of the Due Process Clause.  That contention lacks merit.

### A.      Applicable Law

To establish a due process violation for pre-indictment delay, a defendant bears the "very heavy burden," *Stoner v. Graddick*, 751 F.2d 1535, 1540 (11th Cir. 1985), to make the two-part showing that "pre-indictment delay caused him actual substantial prejudice and that the delay was the product of a deliberate act by the government designed to gain a tactical advantage."  *United States v. Hurtado*, 89 F.4th 881, 897 (11th Cir. 2023) (quoting *United States v. Gayden*, 977 F.3d 1146, 1150 (11th Cir. 2020).  To satisfy the first prong, a defendant cannot rely merely on "speculative allegations, such as [a] general allegation of loss of witnesses and failure of

memories," but instead must come forth with concrete "proof of substantial prejudice." *United States v. Warren*, 772 F.2d 827, 836 (11th Cir. 1985) (citation omitted).  And to satisfy the second prong, the defendant cannot rely on time that investigators and prosecutors spent determining whether the evidence establishes "probable cause to believe [that] an accused is guilty," since "investigative delay is fundamentally unlike delay undertaken by the Government solely 'to gain tactical advantage over the accused.'"  *United States v. Lovasco*, 431 U.S. 783, 791, 795 (1977) (quoting *United States v. Marion*, 404 U.S. 307, 324 (1971)).  Dismissing an indictment for impermissible pre-indictment delay is so "rare" that the Eleventh Circuit has "never" found such a dismissal to be "appropriate."  *United States v. Foxman*, 87 F.3d 1220, 1224 n.4 (11th Cir. 1996); *see United States v. Narvaez*, 16-20824-CR, 2017 WL 11496706, at *3 (S.D. Fla. Nov. 8, 2017).

### B.    Trump Cannot Establish Preindictment Delay

Trump contends (Mot. at 14-17) that the ten months between the search of Mar-a-Lago and his indictment amounted to an unconstitutional pre-indictment delay.  But he offers no support for his claim that this period constitutes cognizable delay at all.  The discovery of so many documents bearing classification markings following the August 2022 search required additional investigation to ascertain whether prosecution was warranted.  There followed additional subpoenas, search warrants, witness interviews, and grand jury testimony to determine "the nature of the classified documents, Trump's document-handling practices, the documents' journey from the White House to Mar-a-Lago, and the various places they were improperly stored there."  ECF No. 277 at 16.  Such steps, evincing caution and deliberation, were vital to discerning whether Trump's alleged unlawful retention of classified documents was willful.  *See* 18 U.S.C.  § 793(e).  Moreover, even if some of the ten-month period could be described as "delay" (which it cannot), any prejudice Trump might assert (addressed below) is readily offset by "the government's need for an

18

investigative delay." *Benson*, 846 F.2d at 1342; *see Lovasco*, 431 U.S. at 795.  The Eleventh Circuit has expressed "hesitance" about adopting a rule that would "incentivize rushing to indict defendants the moment there appears to be just enough evidence to do so" because "such a practice would 'increase the likelihood of unwarranted charges being filed' and even 'add to the time during which the defendants stand accused but untried.'"  *United States v. Oliva*, 909 F.3d 1292, 1305 n.16 (11th Cir. 2018) (quoting *Lovasco*, 431 U.S. at 791-92).

Trump cannot establish the substantial prejudice necessary to satisfy the first prong of a pre-indictment-delay claim.  *See Hurtado*, 89 F.4th at 897.  His generalized assertion (Mot. at 15) that "[a]ll pre-indictment delay is to some extent prejudicial against criminal defendants" falls well short of the concrete proof required.  *See Warren*, 772 F.2d at 836.  Any suggestion (*see* Mot. at 15-16) that he suffered prejudice from a purported violation of the Department policy against interfering with his electoral prospects is profoundly mistaken: the Government has fully complied with Department policy, and the investigation and charges were driven solely by the facts and the law.  All decisions were made consistent with the Principles of Federal Prosecution, and no steps were taken to affect an election or confer an advantage on any candidate.  *See* JM § 9.85.500.[10]

Finally, Trump fails to show that any delay was for tactical advantage.  Trump focuses (Mot. at 16) on the period after indictment and complains that the Government sought to move too *fast*.  Those "conclusory assertions about the government's timeline" fail to demonstrate a "tactical delay."  *Gayden*, 977 F.3d at 1150-51.  The Government investigated and prosecuted the case consistent with "elementary standards of fair play and decency."  *Shaw*, 555 F.2d at 1299.

---

[10] Trump cites no authority for the proposition that consequences extrinsic to the criminal case can establish prejudice.  *Cf. United States v. Shaw*, 555 F.2d 1295, 1298-1300 (5th Cir. 1977) (delay resulted in unavailability of witnesses and evidence, and impairment of defendant's ability to assist in his defense); *United States v. Lindstrom*, 698 F.2d 1154, 1157 (11th Cir. 1983) (similar).

### III.    Alleged Misuse of the Grand Jury

Trump contends (Mot. 17-22) that the Government "engaged in prosecutorial misconduct that warrants dismissal by presenting evidence to a grand jury in the District of Columbia despite an obvious lack of venue."   He further contends that this purported grand jury abuse was "compounded" by three other asserted "violations," involving (1) questions asked of one of his attorneys in the grand jury; (2) ████████████████████████████████████ ████████████████████████████████; and (3) the issuance to NARA of a grand jury subpoena that, in Trump's view, did not need to be issued.  None of these episodes amounts to misconduct, let alone the sort of misconduct that could justify dismissal.

### A.    Applicable Law

"[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants."  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988).  Exceptions to this rule are rare, involving "fundamental" or "structural" errors, such as "racial and gender discrimination in the selection of grand jurors." *United States v. Graham*, 80 F.4th 1314, 1317-18 (11th Cir. 2023).  Where, as here, "this sort of structural error is not at play, courts generally consider two things to evaluate potential prejudice: whether 'it is established that the violation substantially influenced the grand jury's decision to indict' and whether there is 'grave doubt that the decision to indict was free from the substantial influence of such violations.'"  *Id.* at 1318 (quoting *Bank of Nova Scotia*, 487 U.S. at 256).

### B.    No Abuse of the Grand Jury Occurred, and Trump Has Not Shown Prejudice in Any Event

Trump principally complains (Mot. at 19-20) about the use of a grand jury sitting in the District of Columbia to investigate the facts of this case, which were ultimately presented to a grand jury in this District.  He does not identify any shortcoming in the presentation to the grand

jury that returned the indictment, and he does not identify any constitutional provision, statute, rule of procedure, or court decision that treats a venue-based objection of this sort as error, much less an error that could justify dismissal.  Instead, he relies entirely on a provision of the Justice Manual stating that "[a] case should not be presented to a grand jury in a district unless venue for the offense lies in that district."  JM § 9-11.121.  That reliance is misplaced, since the Justice Manual "provides internal DOJ guidance" and "may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party."  JM § 1-1.200; *see United States v. Cooks*, 589 F.3d 173, 184 (5th Cir. 2009); *United States v. Wilson*, 413 F.3d 382, 389 (3d Cir. 2005).

Regardless, the use of a grand jury in the District of Columbia was entirely proper.  Prompted by NARA's discovery of classified documents in the 15 boxes in January 2022 and a criminal referral from NARA in February 2022, a grand jury investigation in the District of Columbia commenced in April 2022.  ECF No. 85 ¶ 52.  When the Government started the grand jury investigation, it could not know the full scope of the evidence that would be gathered.  But from the outset, the investigation encompassed conduct that spanned the District of Columbia and the Southern District of Florida, and the investigation uncovered evidence of federal offenses in both districts.  For example, it was clear that the classified documents were removed from the District of Columbia in 2021 and returned there in January 2022, providing appropriate venue for opening an investigation.  *See* 18 U.S.C. § 3237(a) ("[A]ny offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.").

The Government's decision to ultimately bring charges in the Southern District of Florida and not in the District of Columbia does not call into question either grand jury's investigation.  Courts have long recognized that "the identity of the offender, and the precise nature of the offense,

if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning." *Blair v. United States*, 250 U.S. 273, 282 (1919).  "[H]indsight is not the proper perspective for discerning the limits of a grand jury's investigative power," for the grand jury "must pursue its leads before it can know its final decisions." *United States v. Paxson*, 861 F.2d 730, 733-34 (D.C. Cir. 1988).  This is consistent with "[t]he function of the grand jury," which "is to inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred." *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 297 (1991).  "As a necessary consequence of its investigatory function, the grand jury paints with a broad brush," and accordingly it "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Id.* (quotation marks omitted). The "scope of [the grand jury's] inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation," *Blair*, 250 U.S. at 282.  And this broad power of inquiry includes "authority and jurisdiction to investigate the facts in order to determine the question whether the facts show a case within [the grand jury's] jurisdiction." *Id.* at 282-83.

Trump has also failed to articulate any theory for how the decision to investigate in the District of Columbia "substantially influenced the grand jury's decision to indict" or could create "grave doubt that the decision to indict was free from the substantial influence of such violations." *Graham*, 80 F.4th at 1318 (quotation marks omitted).  The fact that an independent grand jury in this District returned a valid indictment, using procedures whose propriety Trump does not challenge, fatally undermines any claim that he suffered prejudice.

Trump's other claims of misconduct are similarly unfounded.  And he has likewise failed to show prejudice from any of them.

Trump first focuses (Mot. at 20) on an exchange in the grand jury between a prosecutor and Trump's then-lawyer, who testified as a custodian of records to describe Trump's compliance with the subpoena for documents with classification markings.  The prosecutor explained to the attorney that "we are not seeking today to elicit from you privileged information," Gov't Ex. 2 at 13, and the attorney claimed privilege numerous times over the course of the 245-page grand jury transcript.  Because the attorney was offered as a records custodian, the Government could inquire into the nature and adequacy of any search for responsive documents.  Those topics were "not off limits just because an attorney play[ed] a role," and Trump could not "throw the veil of privilege over details of how files were searched, and by whom, through the expedient of involving a lawyer in the process."  *In re Feldberg*, 862 F.2d 622, 627-28 (7th Cir. 1988).

Trump focuses (Mot. at 20) on a single exchange between the attorney and the prosecutor, suggesting that the prosecutor tried to elicit privileged information by linking cooperation with waiver.  Trump does not, and could not, suggest that he was prejudiced by this exchange: the transcript shows that the exchange, near the beginning of the attorney's testimony, did not dissuade the attorney from asserting privilege repeatedly over the lengthy examination.  To be sure, no grand jury witness or subject is required to waive privilege to be deemed cooperative.  But whatever implication could be drawn from the prosecutor's question taken in a vacuum, the prosecutor quickly corrected any potential misunderstanding.   When the attorney suggested that the prosecutor's question implied that being cooperative required waiving attorney-client privilege, the prosecutor immediately made clear that she was "absolutely not saying that," Gov't Ex. 2 at 42, and that the government was not seeking "to induce any waivers . . . of attorney/client

privilege," *id.* at 43.  Trump does not suggest that the questioning of his attorney resulted in the disclosure of any privileged information, precluding any showing of prejudice.[11]

Trump next tries (Mot. at 20) to locate "misconduct" in an innocuous oversight when a

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Def. Ex. 13, at 1-2.  The Government did nothing inappropriate, and Trump does not attempt to explain how these events prejudiced him, nor could he.  *See Bank of Nova Scotia*, 487 U.S. at 262 ("Although allowing the agents to read to the grand jury in tandem was a violation of Rule 6(d), it was not prejudicial.").

Finally, Trump repeats (Mot. at 20-21) his claim that the Government "abused the grand jury by issuing one or more subpoenas to NARA" when (he insists) it was not necessary to do so. He cites no authority for the proposition that issuing a subpoena to an entity that might have provided documents without one is improper, much less that it justifies suppression or dismissal.

In any event, the issuance of the subpoena was entirely proper.  After the Department of Justice commenced a criminal investigation, NARA's involvement in the investigation consisted of providing documents and information. For some requests, NARA provided the documents voluntarily; when the Government sought PRA records, however, NARA required a grand jury

---

[11] Trump asserts that the Chief Judge in the District of Columbia "found" that the prosecutor's questions were "improper."  Mot. at 20 (citing Def. Ex. 12 at 47 n.13).  In fact, the court did not make any findings on this point; rather, the court noted the legal principle that adverse inferences should not be drawn from the assertion of a privilege, but explained that "[t]he relationship between this single exchange . . . and the instant matter is attenuated" and did "not justify the former president's request for" relief in that case.  Def. Ex. 12 at 47 n.13.  So too here.

subpoena, consistent with statute and regulation. *See* 44 U.S.C. § 2205(2)(B); 36 C.F.R. § 1270.44(a)(1). For instance, the grand jury issued a subpoena for the original documents contained within the 15 boxes of documents that Trump returned to NARA in January 2022.

Trump contends that one subpoena to NARA, issued on January 23, 2023, was "pretextual," Mot. at 17, and used to "manipulate[] the process to leave" evidence in the hands of NARA to "avoid disclosure," Mot. at 21 (quotation marks omitted). In that instance, upon receipt of a subpoena for PRA records, NARA initially identified 81 documents that were potentially responsive, but the Government reviewed those documents and determined that only 15 were actually responsive, and NARA accordingly "flagged" those 15 for production. Def. Exs. 57, 58 to Mot. to Compel. Trump's accusation that the Government attempted to avoid disclosure is unfounded. Indeed, it was through the Government's discovery productions that Trump learned about the 81 documents and the determination that 15 were responsive, hardly indicating an attempt at improper suppression of information. Moreover, because the 81 documents are PRA records, Trump has access to all of them through the PRA. Trump cannot show that the determination that 15 of the 81 PRA records were responsive to a subpoena prejudiced him, let alone that it influenced the grand jury's decision to indict. His motion should be denied.

## IV.    Conclusion

Trump's motion should be denied. As set forth in the Government's response to the defendants' hearing requests, no hearing is necessary before doing so.

Respectfully submitted,

JACK SMITH
Special Counsel
N.Y. Bar No. 2678084

By:      /s/ *Jay I. Bratt*
           Jay I. Bratt
           Counselor to the Special Counsel
           Special Bar ID #A5502946
           950 Pennsylvania Avenue, N.W.
           Washington, D.C. 20530

           David V. Harbach, II
           Assistant Special Counsel
           Special Bar ID #A5503068

           John M. Pellettieri
           Assistant Special Counsel
           Special Bar ID #A5503076

           Cecil W. VanDevender
           Assistant Special Counsel
           Special Bar ID#5503075

March 7, 2024

26

**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2024, I electronically filed the foregoing document with

the Clerk of Court using CM/ECF.

/s/ *David V. Harbach, II*
David V. Harbach, II