**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 23-80101-CR-CANNON(s)**

**UNITED STATES OF AMERICA**,

      Plaintiff,

v.

**DONALD J. TRUMP,**
**WALTINE NAUTA**, and
**CARLOS DE OLIVEIRA,**

      Defendants.

_____/

**GOVERNMENT'S OPPOSITION TO DONALD J. TRUMP'S**
**MOTION FOR DISMISSAL OR SUPPRESSION OF EVIDENCE**
**OBTAINED FROM MAR-A-LAGO OR HIS ATTORNEYS**

## TABLE OF CONTENTS

I.      The Warrant to Search Mar-a-Lago Was Valid and Lawful ................................................. 1

    A.      Background: The Warrant to Search Mar-a-Lago ........................................................ 2

        1.      The Warrant Affidavit ....................................................................................... 2

        2.      Issuance and Execution of the Warrant ............................................................. 4

    B.      Trump's Suppression Arguments Lack Merit and He Fails to Meet the
            Heavy Burden to Obtain a *Franks* Hearing ............................................................. 5

        1.      The Warrant Affidavit Contained No Misleading Omissions, Let Alone
                Misleading Omissions that Were Intentional or Reckless and Material ............... 5

        2.      The Warrant Stated with Ample Particularity the Place to Be Searched
                and Items to Be Seized ...................................................................................... 9

II.     The Evidence from Trump's Attorneys Does Not Warrant Suppression or
        Dismissal ............................................................................................................................. 12

    A.      Background ............................................................................................................... 13

        1.      Summary of Select Evidence ........................................................................... 13

        2.      The Crime-Fraud Litigation in the District of Columbia .................................... 16

    B.      The Crime-Fraud Exception Forecloses Suppression ................................................ 17

        1.      The Evidence Readily Establishes a Prima Facie Showing of a Crime ................ 18

        2.      The Attorney-Client Communications and Work Product Furthered and
                Was Closely Related to the Crime or Fraud ...................................................... 22

        3.      Trump's Characterization of the Evidence as Opinion Work Product Does
                Not Support Suppression ................................................................................. 24

    C.      Trump Provides No Basis to Dismiss the Indictment ................................................. 25

III.    Conclusion .......................................................................................................................... 25

Defendant Donald J. Trump moves to suppress evidence seized during the execution of the warrant to search Mar-a-Lago on August 8, 2022.  He also moves to exclude evidence from his lawyers obtained through the crime-fraud exception to the attorney-client and work-product privileges, or, alternatively, to dismiss the indictment.  Motion for Dismissal or Suppression of Evidence Obtained from Mar-a-Lago or his Attorneys ("Mot.").[1]  The motion should be denied.

## I.      The Warrant to Search Mar-a-Lago Was Valid and Lawful

From the start, the investigation in this case adopted a measured, graduated approach. When the Department of Justice learned, from the National Archives and Records Administration ("NARA"), that more than 180 documents with classification markings had been stored at Mar-a-Lago prior to their transfer to NARA, the Department understandably sought to ensure that no additional classified material was being kept there, and accordingly a grand jury issued a subpoena for all documents with classification markings in Trump's possession.  Trump, through his lawyers, turned over 38 additional documents with classification markings, confirming that he continued to retain highly sensitive classified documents.  The Government then received evidence—security footage from Mar-a-Lago—showing a deliberate effort to conceal boxes of documents from the lawyer who had searched for documents to respond to the subpoena, thwarting compliance with the subpoena.  Given that obstruction and deceit, a search warrant was the appropriate next step.

The warrant was supported by a detailed affidavit that established probable cause and did not omit any material information.  And the warrant provided ample guidance to the FBI agents who conducted the search.  Trump identifies no plausible basis to suppress the fruits of that search.

---

[1] Trump's motion has not yet been docketed publicly or received an ECF number.

### A.      Background: The Warrant to Search Mar-a-Lago

### 1.      The Warrant Affidavit

The application for the warrant to search Mar-a-Lago was accompanied by a detailed affidavit from an FBI special agent.  The facts alleged in the affidavit included the following.

During his presidency, Trump used boxes to store records in an informal filing system, accumulating dozens of these boxes by the end of his presidency.  Gov't Ex. 1 (Aff.) ¶¶ 26-32.  At the end of his presidency in January 2021, around 85 to 95 of these boxes were removed from the White House and transported to Mar-a-Lago, Trump's residence in Palm Beach, Florida, where they were later placed in a storage room.  *Id.* ¶¶ 30-37.  Throughout 2021, NARA had ongoing communications with Trump representatives to obtain records from his administration.  *Id.* ¶¶ 25, 39.  Trump wanted to review his boxes before providing them to NARA, and employees brought two to four at a time to his personal residence in Mar-a-Lago for him to review.  *Id.* ¶¶ 39-42.  After the employees brought about 15 to 17 boxes, Trump instructed them to stop, and on January 17, 2022, employees handed over 15 boxes to NARA.  *Id.* at ¶¶ 41-42.  Trump indicated to his staff that the 15 boxes were the only boxes that would be going to NARA and that there were no more, and he instructed an employee to tell one of his lawyers there were no more boxes at Mar-a-Lago. *Id.* at ¶¶ 43-46.  But about 70 to 80 boxes remained in the storage room.  *Id.* ¶ 45.

NARA reviewed the 15 boxes, found highly classified documents intermixed with other records, and sent a referral to the Department of Justice on February 9, 2022.  *Id.* ¶ 24.  The FBI reviewed the 15 boxes and determined that 14 of the boxes contained a total of 184 unique documents with classification markings.  *Id.* ¶ 47.  In addition, through investigation, including witness interviews, the FBI learned about additional boxes at Mar-a-Lago that contained the same mix of documents as the 15 boxes Trump had provided to NARA.  *Id.* ¶¶ 45-46, 48.  At least since

the end of Trump's presidency on January 20, 2021, no areas within Mar-a-Lago were authorized for the storage of classified documents. *Id.* ¶¶ 61, 76.

A grand jury issued a subpoena for all documents with classification markings in Trump's custody or control, and on May 11, 2022, an attorney for Trump (Trump Attorney 1) accepted service of the subpoena. *Id.* ¶ 51. On June 3, 2022, FBI agents went to Mar-a-Lago to meet with Trump Attorney 1 to receive responsive documents. *Id.* ¶ 55. Trump Attorney 1 turned over a Redweld envelope, wrapped in tape, containing documents. *Id.* Trump Attorney 1 also provided a certification—signed by a second Trump attorney (Trump Attorney 3) who was serving as a custodian of records—stating that "[b]ased upon the information that has been provided to me, I am authorized to certify, on behalf of the Office of Donald J. Trump," that "[a] diligent search was conducted of the boxes that were moved from the White House to Florida," the search was conducted "in order to locate any and all documents that are responsive to the subpoena," and "[a]ny and all responsive documents accompany this certification." *Id.* Trump Attorney 1 stated that he had been advised that all the records that came from the White House were kept in the storage room at Mar-a-Lago, and he let the FBI agents see the storage room. *Id.* ¶ 56. The agents observed approximately 50 to 55 boxes in the storage room, fewer than the 70 to 80 boxes the FBI had reason to believe were remaining at Mar-a-Lago. *Id.* FBI agents later reviewed the contents of the Redweld and identified 38 documents with classification markings. *Id.* ¶ 58.

FBI agents subsequently reviewed security footage from Mar-a-Lago obtained through a subpoena. *Id.* ¶¶ 62-66. The footage showed that between May 24 and June 1, 2022, after service of the grand jury subpoena for documents with classification markings, a Trump employee—later identified as codefendant Waltine Nauta—moved approximately 64 boxes out of the storage room. *Id.* ¶¶ 66, 68. The footage further showed that on June 2, approximately three and a half hours

3

before Trump Attorney 1 arrived at the storage room to look for documents responsive to the subpoena, Nauta moved approximately 25 to 30 boxes into the storage room. *Id.* Nauta had testified in the grand jury before the FBI agents reviewed the security footage, and although he was asked whether he had removed anything from the storage room, he did not inform the grand jury that he had removed approximately 60 boxes between May 24 and June 1, 2022. *Id.* ¶ 69.

## 2. Issuance and Execution of the Warrant

The facts alleged in the warrant affidavit easily established "there [was] a fair probability that contraband or evidence of a crime [would] be found" at Mar-a-Lago. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). In short, Trump used delay and obfuscation to stymie NARA's efforts to gain custody of the presidential records in his possession. When pressed, he ostensibly agreed to comply with NARA's requests but in fact engaged in deception, returning only a fraction of the documents in his possession (15 boxes) while claiming that his production was complete. When NARA discovered that the 15 boxes contained more than 180 documents with classification markings, a grand jury issued a subpoena to Trump for any additional documents with classification markings in order to ensure the Government retrieved all such documents that might be at Mar-a-Lago. Rather than comply with the subpoena, he enlisted his trusted body man, codefendant Nauta, in a scheme to deceive the attorney tasked with reviewing the boxes to comply with the subpoena, by moving boxes to conceal his continued possession of classified documents. As a result, Trump, through his attorney, again returned only a portion of the classified documents in his possession while falsely claiming that his production was complete.

Magistrate Judge Bruce E. Reinhart accordingly found probable cause that evidence of three crimes—willful retention of national defense information (18 U.S.C. § 793), concealment or removal of government records (18 U.S.C. § 2071), and obstruction of a federal investigation (18

U.S.C. § 1519)—would be found at Mar-a-Lago.  *See* Gov't Ex. 1 at USA-00043151.  Agents executed the warrant and seized thirteen boxes or containers containing documents with classification markings, in all over 100 unique documents.  In the storage room alone, agents found 76 documents bearing classification markings.

### B.     Trump's Suppression Arguments Lack Merit and He Fails to Meet the Heavy Burden to Obtain a *Franks* Hearing

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend IV.  Trump contends (Mot. at 6-9) that the warrant to search Mar-a-Lago failed to meet the probable-cause requirement because the supporting affidavit contained omissions that were intentionally or recklessly misleading and material to the magistrate judge's probable-cause determination, warranting a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).  He also asserts (Mot. at 9-13) that the warrant failed to satisfy the Fourth Amendment's particularity requirements.  These arguments are without merit.

### 1.     The Warrant Affidavit Contained No Misleading Omissions, Let Alone Misleading Omissions that Were Intentional or Reckless and Material

"There is . . . a presumption of validity with respect to the affidavit supporting the search warrant," *Franks*, 438 U.S. at 171, but a defendant may, in "limited" circumstances, *id.* at 167, attack the validity of a warrant affidavit if the defendant (1) after a hearing, demonstrates by a preponderance of the evidence that the affiant made intentionally false or recklessly misleading statements, and (2) "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause," *id.* at 156.  To obtain a hearing to try to substantiate claims of intentional or reckless falsity in a warrant affidavit, the defendant must make a "substantial preliminary showing."  *Id.* at 155, 170.  The allegations of deliberate falsehood or

reckless disregard for the truth must be "more than conclusory" and should be "accompanied by an offer of proof." *Id.* at 171. "Allegations of negligence or innocent mistake are insufficient." *Id.* And even "if these requirements are met," a hearing is still not warranted "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause." *Id.* at 171-72.

Trump makes no claim that any of the dozens of detailed factual allegations in the affidavit were false. Instead, he bases his motion solely on the claim (Mot. at 6-9) that the affidavit omitted information that he believes should have been included. According to Trump, the affidavit was materially misleading because it did not make "complete disclosures." Mot. at 8. Although courts have extended the *Franks* standard to "omissions," *United States v. Martin*, 615 F.2d 318, 328 (5th Cir. 1980), "some care is required in applying the *Franks* intentional-or-reckless requirement" in that context, 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 4.4(b) (6th ed. 2022). "An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation," *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990), and scrutinizing an affidavit for "omission[s] potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit," *United States v. Graham*, 275 F.3d 490, 506 (6th Cir. 2001) (quotation marks omitted). A defendant must make a substantial preliminary showing that an omission was deliberately or recklessly misleading, not "made negligently or because of an innocent mistake." *United States v. Whyte*, 928 F.3d 1317, 1333 (11th Cir. 2019). And the omission must be material, which means that "inclusion of the omitted facts would have prevented a finding of probable cause." *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009) (quotation marks omitted).

6

Trump identifies (Mot. at 6-8) four alleged omissions that he claims justify a *Franks* hearing, but none of these purported omissions was misleading, let alone deliberately or recklessly misleading. Nor does he show that the alleged omissions were material—none of the information, if included, would have remotely affected the magistrate judge's probable-cause determination.

a.      Trump contends (Mot. at 6) that the affidavit should have mentioned that some individuals within the FBI recommended seeking Trump's consent to search Mar-a-Lago before seeking a search warrant. Given Trump's prior obfuscation and deception up to that point, there was ample reason to avoid seeking Trump's consent, which would simply invite more deception. But regardless, there is no support for the notion that a warrant affidavit must set forth a description of an agency's internal discussion about investigative strategy. Even if some would have preferred one investigative technique (consent) while others favored a warrant, the omission of those details would have no effect on the magistrate's common-sense determination that there was probable cause that evidence of a crime would be found in the location to be searched.

b.      Trump argues (Mot. at 6-7) that the affidavit should have stated that Presidents do not need security clearances to access classified information and that he received security briefings at Mar-a-Lago and other residences of his during and before his presidency. Regardless of Trump's authority during his presidency, he lacked authority to possess classified documents at Mar-a-Lago after it ended and he became a private citizen. Trump's authority to access or possess classified documents during his presidency was both obvious and immaterial to the probable cause determination regarding the retention of the documents after his presidency.

c.      Trump claims (Mot. at 7) that the affidavit should have disclosed that before NARA sent a criminal referral to the Department of Justice on February 9, 2022, the FBI was investigating the classified documents in the 15 boxes Trump turned over to NARA. Trump suggests (Mot. 8)

7

that the NARA referral was "improper" for that reason, but he fails to explain why information about the FBI beginning its assessments after learning of the documents but before a formal referral would have had any bearing on whether there was probable cause that Trump unlawfully retained documents containing national defense information at Mar-a-Lago or obstructed the government's efforts to retrieve documents with classification markings. The Government has addressed Trump's conspiratorial speculation in response to his motion to dismiss for alleged misconduct (filed by email today) but here it suffices that his speculation would have made no difference to the magistrate judge's probable-cause finding.

       d.     Trump finally asserts (Mot. at 7) that the affidavit—which quoted the PRA's definition of presidential records, 44 U.S.C. § 2201(2), including the subsection stating the term does not include "personal records," 44 U.S.C. § 2201(2)(B)—should have also included the PRA's definition of "personal records," 44 U.S.C. § 2201(3). As the Government explains in opposing Trump's motion to dismiss under the PRA (ECF No. 373), Trump's suggestion that he may have designated records in the boxes as personal under the PRA has no bearing on the validity of criminal charges for violating 18 U.S.C. § 793(e) after he left office. Moreover, Trump's suggestion that he designated the records as personal is flatly contradicted by his contemporaneous public pronouncement that the 15 boxes contained "Presidential Records" that he gave to NARA "in accordance with the Presidential Records Act." Aff. ¶ 25. His lawyer similarly sent a letter to the Department of Justice referring to the "Presidential Records purportedly marked as classified." *Id.* ¶ 52. The lawyer requested that the government attach the letter to any application to a judicial officer, and consistent with that request, the letter was attached to the warrant. Gov't Ex. 1 at USA-00043185. The affiant could not reasonably have been expected to anticipate and include legal arguments about a purported designation of records as personal, which would have been not

only immaterial to probable cause but also inconsistent with the contemporaneous statements from Trump and his lawyer.

*   *   *

There is no possibility that the alleged omissions would have defeated probable cause had they been included in the warrant affidavit. The affidavit establishes that Trump possessed a trove of documents with classification markings and engaged in obfuscation and deception to retain them and keep them from the government, ultimately engaging in active obstruction of a grand jury investigation. None of the omissions alleged by Trump, either singly or together, would have had an impact on the magistrate's common-sense finding of probable cause. Trump does not come close to meeting the stringent requirements for a *Franks* hearing, let alone establishing that the fruits of the search should be suppressed.

> **2.**    **The Warrant Stated with Ample Particularity the Place to Be Searched and Items to Be Seized**

A warrant "need only describe the place to be searched with sufficient particularity to direct the searcher, to confine his examination to the place described, and to advise those being searched of his authority." *United States v. Weinstein*, 762 F.2d 1522, 1532 (11th Cir. 1985) (quotation marks omitted). And a warrant describes the things to be seized with sufficient particularity "when it enables the searcher to reasonably ascertain and identify the things authorized to be seized." *United States v. Betancourt*, 734 F.2d 750, 754-55 (11th Cir. 1984). Neither "elaborate specificity" nor "technical perfection" is necessary. *United States v. Bradley*, 644 F.3d 1213, 1259 (11th Cir. 2011) (quotation marks omitted). "It is universally recognized that the particularity requirement must be applied with a practical margin of flexibility, depending on the type of property to be seized" and the nature of the investigation. *United States v. Wuagneux*, 683 F.2d 1343, 1348-49 (11th Cir. 1982). Particularly in searches for documents, the Eleventh Circuit has recognized that

9

in some circumstances it may not be possible to "give an exact description of the materials to be seized" and that a warrant is sufficiently particular if it gives a description that "is as specific as the circumstances and the nature of the activity under investigation permit." *United States v. Santarelli*, 778 F.2d 609, 614 (11th Cir. 1985) (warrant for documents evidencing loansharking).

The warrant here went well beyond these requirements. It identified the place to be searched as Trump's office, "all storage rooms, and all other rooms or areas within [Mar-a-Lago] used or available to be used by [Trump] and his staff and in which boxes or documents could be stored," but not areas "occupied, rented, or used by third parties (such as Mar-a-Lago Members) and not otherwise used or available to be used by [Trump] and his staff, such as private guest suites." Gov't Ex. 1 (Attachment A). And it identified the items to be seized as documents and records that reflected violations of 18 U.S.C. § 793, § 2071, and § 1519, in particular (1) "[a]ny physical documents with classification markings, along with any containers/boxes (including any other contents) in which such documents are located, as well as any other containers/boxes that are collectively stored of found together with the aforementioned documents and containers/boxes," (2) "[i]nformation, including communications in any form, regarding the retrieval, storage, or transmission of national defense information or classified material," (3) "[a]ny government and/or Presidential Records created between January 20, 2017, and January 20, 2021," and (4) "[a]ny evidence of the knowing alteration, destruction, or concealment of any government and/or Presidential Records, or of any documents with classification markings." Gov't Ex. 1 (Attachment B). These descriptions "enable[d] the searcher to reasonably ascertain and identify the things authorized to be seized." *Bradley*, 644 F.3d at 1259 (quotation marks omitted).

Trump contends (Mot. at 10-11) that the warrant lacked particularity because it used the terms "national defense information" and "government and/or Presidential Records," and because

10

it authorized seizure of "containers/boxes" containing classified documents.  But the context in which these terms were used and the nature of the activity under investigation gave ample guidance.  A search for evidence of unlawful document retention, in violation of 18 U.S.C. § 793(e), will require a search for documents containing national defense information, and further guidance was provided here by connecting it to a search for "classified material."  The phrase "government and/or Presidential Records," was further defined by reference to documents created during a specific time period, between January 20, 2017, and January 20, 2021, Trump's term in office.  And the authorization to seize boxes holding classified documents, along with other boxes stored or found in the same vicinity, also provided sufficiently specific guidance to searchers.  The warrant's descriptions of the items to be seized necessarily derived from nature of the activity under investigation—unlawful document retention and obstruction of justice—and as such, the warrant was "carefully tailored to its justifications." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

Even assuming the descriptions in the warrant failed to satisfy the Fourth Amendment's particularity requirements, the good faith exception to the exclusionary rule forecloses suppression.  Insufficient particularity in a warrant can lead to suppression only when the warrant is "so facially deficient," *i.e.*, so lacking in particularity, that "the executing officers cannot reasonably presume it to be valid." *United States v. Leon*, 468 U.S. 897, 923 (1984); *see United States v. Blake*, 868 F.3d 960, 974-75 (11th Cir. 2017) (warrant lacked particularity but good-faith exception foreclosed suppression).  Nothing like that happened here.  Whatever Trump's criticisms of the warrant's particularity, it was "objectively reasonable" for agents to rely on the warrant. *United States v. Travers*, 233 F.3d 1327, 1329 (11th Cir. 2000) (quotation marks omitted).

Trump's arguments (Mot. 12-13) against the good-faith exception are likewise flawed.  He contends (Mot. 12) that he requires additional discovery to refute the good-faith exception,

including discovery about supposed "animus toward President Trump by prosecutors, agents, NARA personnel, and White House Officials," Mot. 13, but any such discovery would be legally irrelevant—the "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances," not the "subjective intent" of the searcher or of anyone else. *Herring v. United States*, 555 U.S. 135, 145-46 (2009). Trump also suggests (Mot. 12-13) that the manner in which the FBI agents executed the warrant forecloses application of the good-faith exception. The FBI agents, however, conducted the search in an entirely proper manner: The warrant authorized the agents to search all "rooms or areas" available to be used by" Trump where documents could be stored, Gov't Ex. 1 (Attachment A), which included rooms used by family members; FBI policies required the agents to carry firearms while on official business "[u]nless dictated by operational necessity," *FBI Firearms Policy Guide* 7 (June 22, 2017), https://vault.fbi.gov/firearms-policy-0888pg/firearms-policy-0888pg-part-01-of-01; and the warrant authorized the agents to seize items in the same containers commingled with classified documents and government records, Gov't Ex. 1 (Attachment A). Regardless, Trump does not—and cannot—demonstrate that suppression would be a proper remedy when there is no causal connection between the allegedly improper conduct (*e.g.*, carrying firearms) and the seizure of the evidence he seeks to suppress (the classified documents). *See Hudson v. Michigan*, 547 U.S. 586, 592 (2006) (suppression not appropriate remedy for knock-and-announce violation).

## II.    The Evidence from Trump's Attorneys Does Not Warrant Suppression or Dismissal

At trial, the Government will introduce evidence from attorneys for Trump, neither of whom currently represents Trump in this case. The record shows that Trump consulted and

corresponded with his attorneys to plan and carry out his crimes, triggering the crime-fraud exception and foreclosing Trump from excluding the evidence from trial.

A.      **Background**

1.      **Summary of Select Evidence**

As described above, after Trump engaged in deceptive conduct to conceal his continued possession of records from NARA, the grand jury issued a subpoena for all documents with classification markings in Trump's possession.  On May 23, 2022, Trump Attorney 1 and another attorney for Trump (Trump Attorney 2) went to Mar-a-Lago to meet with Trump about responding to the subpoena.  ECF No. 85 ¶ 55; Gov't Ex. 2 at 8, 15. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

Trump Attorney 1 dictated audio notes, which were later transcribed, about this and other meetings with Trump.  *See* Gov't Ex. 2.  According to the notes, during the meeting, Trump said, "I don't want anybody looking, I don't want anybody looking through my boxes, I really don't, I don't want you looking through my boxes."  ECF No. 85 ¶ 55(a); Gov't Ex. 2 at 15.  Knowing full well that there were more boxes containing classified documents, Trump asked, "Well what if we, what happens if we just don't respond at all or don't play ball?"  ECF No. 85 ¶ 55(b); Gov't Ex. 2 at 16. ████████████████████████████████████████████████

████████████████████████████████████████.  Again, despite knowing that his suggestion was false, Trump asked, "Wouldn't it be better if we just told them we don't have anything here?" ECF No. 85 ¶ 55(c); Gov't Ex. 2 at 16.  He also asked, "Well look isn't it better if there are no documents?" ECF No. 85 ¶ 55(d); Gov't Ex. 2 at 22.  More than once, Trump mentioned that an

attorney for another individual was "great" and "did a great job" because, in Trump's telling, the attorney deleted all his client's emails so that the client "didn't get in any trouble because he [the attorney] said he was the one who deleted them."  ECF No. 85 ¶ 56; Gov't Ex. 2 at 24.

Despite Trump's effort to enlist Attorney 1 to evade the subpoena, by the end of the meeting, ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████ ████████████████████ and accordingly delayed his planned summer departure for New Jersey. ECF No. 85 ¶ 57; Gov't Ex. 2 at 22.  Security footage from Mar-a-Lago shows that beginning on May 24 (the day after Trump met with Trump Attorney 1) and continuing through June 1 (the day before Trump Attorney 1's scheduled return to Mar-a-Lago to review the boxes), Nauta moved approximately 64 boxes out of the storage room. ECF No. 85 ¶ 59.  As reflected in a text exchange between Nauta and a member of Trump's family, Nauta brought the boxes to Trump's residence within Mar-a-Lago because Trump wanted to "pick from them."  *Id.* ¶ 59.

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████ Shortly before Trump Attorney 1 arrived at Mar-a-Lago on June 2, Nauta and De Oliveira moved approximately 30 boxes into the storage room.  ECF No. 85 ¶¶ 62-63.  Trump Attorney 1 met with Trump when he arrived, and Nauta then escorted Trump Attorney 1 down to the storage room,

███████████████████████████████████████████████████

███████████████████████████████████████████  Trump Attorney

1 met again with Trump, who asked whether Trump Attorney 1 found "anything" and whether it

was "bad" or "[g]ood."  ECF No. 85 ¶ 66; Gov't Ex. 5.  According to Trump Attorney 1's notes of

the meeting, Trump "made a funny motion as though—well okay why don't you take them with

you to your hotel room and if there's anything really bad in there, like, you know, pluck it out.

And that was the motion he made.  He didn't say that."  ECF No. 85 ¶ 67; Gov't Ex. at 6.

Trump Attorney 1 arranged to meet with FBI agents the next day at Mar-a-Lago to turn

over the Redweld and certification.  ████████████████████████████

███████████████████████████████████████████████████

███████████████████  The certification from Trump Attorney 3 falsely stated that the Redweld

contained "[a]ny and all responsive documents."  ECF No. 85 ¶ 70.

The Department of Justice emailed a draft grand jury subpoena (on June 22, 2022) and then

a final subpoena (on June 24) to counsel for the Trump Organization for security footage from

Mar-a-Lago.  *Id.* ¶¶ 75, 77.  Trump spoke with De Oliveira for about 24 minutes on June 23.  *Id.* ¶

76.  On June 24, Trump Attorney 1 spoke with Trump by phone about the subpoena.  *Id.* ¶ 78.

Later that day, Trump arranged a meeting with Nauta, and afterward, Nauta—who was in New

Jersey with Trump and scheduled to travel with Trump to Illinois the next day—changed his plans

and instead traveled to Mar-a-Lago.  *Id.* ¶¶ 78-80.  Nauta coordinated with De Oliveira and met

with him in Florida.  *Id.* ¶¶ 80-82.  On June 27, De Oliveira approached the Director of Information

Technology at Mar-a-Lago, asked how long the server retained footage, and said "the boss" wanted

the server deleted.  *Id.* ¶¶ 83-84.  Nauta and De Oliveira communicated and met before and after

that incident.  *Id.* ¶¶ 85-86.  Trump also called De Oliveira after the incident.  *Id.* ¶ 87.



###   2.   The Crime-Fraud Litigation in the District of Columbia

A grand jury in the District of Columbia subpoenaed Trump Attorney 1 and Trump Attorney 2 to provide testimony and documents.  Both attorneys withheld evidence on the ground that it should be kept secret under the attorney-client and work-product privileges.

The Government filed a motion with the then-Chief Judge of the District of Columbia (Hon. Beryl A. Howell), who supervises grand jury proceedings in that district, to compel testimony and documents from Trump Attorney 1 and Trump Attorney 2 on the basis that the crime-fraud exception vitiated the attorney-client and work product privileges.  *See* Def. Exs. 15, 16.  After receiving briefing and argument, including from Trump, the court partially granted the Government's motion.  *See* Def. Ex. 18 (memorandum opinion); Def. Exs. 17, 19 (orders).  Trump and Trump Attorney 1 both filed appeals and motions for stays of the court's order pending their appeals, but both the Chief Judge of the District of Columbia (Hon. James E. Boasberg) and the D.C. Circuit denied the stay motions.  Trump Attorney 1 and Trump Attorney 2 testified before the grand jury in compliance with the court's order, and Trump Attorney 1 produced documents,

including a redacted version of his notes of meetings with Trump.  Both Trump Attorney 1 and Trump voluntarily dismissed their appeals in the D.C. Circuit.  *See* Order, *In re Sealed Case*, No. 23-3035 (D.C. Cir. May 1, 2023); Order, *In re Sealed Case*, No. 23-3036 (D.C. Cir. Oct. 4, 2023).

### B.      The Crime-Fraud Exception Forecloses Suppression

Trump contends (Mot. 13) that the evidence from Trump Attorney 1 and Trump Attorney 2 remains protected by the attorney-client and work-product privileges and should be excluded from trial because the crime-fraud exception does not apply.  His arguments are without merit.

As an initial matter, Trump's suggestion (Mot. 13) that the Government acted improperly in obtaining the evidence from his lawyers is baseless.  The Government obtained the evidence after it filed a motion to compel compliance with a grand jury subpoena, Trump was informed of the motion so that he could participate in the litigation, and the district court ordered Trump's lawyers to provide the evidence under the crime-fraud exception.  Those steps were not "extraordinary," let alone "unlawful."  Mot. 13.  Far from it:  the Government followed proper procedures that have long been applied in the Eleventh Circuit, the D.C. Circuit, and elsewhere. *See, e.g.*, *In re Grand Jury Subpoena*, 2 F.4th 1339, 1343 (11th Cir. 2021); *In re Sealed Case*, 754 F.2d 395, 398 (D.C. Cir. 1985).  Also misplaced are Trump's repeated claims of error in the D.C. district court's decision granting the Government's motion to compel.  The D.C. district court's decision was thorough, well-supported, and correct, as reflected by the D.C. Circuit's determination that Trump was not likely to succeed on appeal.  Order, *In re Sealed Case*, No. 23-3036 (D.C. Cir. Oct. 4, 2023).  But regardless, this motion is not a vehicle to attack the D.C. district court's disclosure order.  Trump participated in that litigation and had the opportunity to seek review of the district court's disclosure order but voluntarily dismissed his appeal in the D.C. Circuit.  Now that Trump seeks suppression of the evidence at trial, his claim must be evaluated

under governing authority.  *Cf. In re Grand Jury Proc.*, 142 F.3d 1416, 1428 (11th Cir. 1998) (after attorney is compelled to provide evidence to grand jury, defendant can seek suppression at trial).

The crime-fraud exception, where it applies, "removes the 'seal of secrecy' from attorney-client communications or work product materials."  *Drummond Co., Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1335 (11th Cir. 2018) (quoting *United States v. Zolin*, 491 U.S. 554, 563 (1989)).[2]  The proponent of the exception (here, the Government) must make a two-part showing.  *See, e.g.*, *In re Grand Jury Subpoena*, 2 F. 4th at 1345.  "First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice."  *In re Grand Jury Investigation (Schroeder)*, 842 F.2d 1223, 1226 (11th Cir. 1987).  Second, there must be a showing that the attorney-client communications "further[ed]" or were "closely related" to "the criminal or fraudulent activity."  *Id.* at 1226.  This standard applies "in the same way" to attorney work-product as it does to attorney-client communications.  *Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1422 (11th Cir. 1994).  The record here easily satisfies both prongs.

### 1.  The Evidence Readily Establishes a Prima Facie Showing of a Crime

The requirement of a prima facie showing "is satisfied by a showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed."  *In re Grand Jury Subpoena*, 2 F.4th at 1345 (quotation marks omitted).  The "prime facie showing must only have some foundation in fact."  *Id.*  For example, prior to an

---

[2] The attorney-client privilege attaches to "communications made in confidence by a client to an attorney for the purposes of securing legal advice or assistance."  *In re Grand Jury Subpoena*, 2 F.4th at 1345 (quotation marks omitted).  The attorney work-product privilege applies to material obtained or prepared by counsel in the course of carrying out their work in anticipation of litigation. *Drummond Co., Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1334-35 (11th Cir. 2018).

indictment, when a grand jury investigation is ongoing, "the government may meet its burden by providing 'a good faith statement . . . as to what evidence is before the grand jury.'" *Id.* (quoting *Schroeder*, 842 F.2d at 1226).  In short, the prima facie requirement "is a low hurdle." *Id.*

The Government has proffered evidence that amply establishes a prima facie showing. That evidence demonstrates that Trump intentionally took possession of a vast trove of some of the Nation's most sensitive documents and stored them in unsecured locations at his heavily trafficked social club.  When NARA initially sought their return (before learning that they contained classified national defense information), Trump delayed, obfuscated, and dissembled. Faced with the possibility of legal action, he ostensibly agreed to comply with NARA's requests but in fact engaged in additional deception, returning only a fraction of the documents in his possession while claiming that his production was complete.  Then, when presented with a grand jury subpoena demanding the return of the remaining documents bearing classification markings, Trump attempted to enlist Trump Attorney 1 in the corrupt endeavor, suggesting that he falsely tell the FBI and grand jury that Trump did not have any documents, and suggesting that Trump Attorney 1 hide or destroy documents rather than produce them to the government.  Failing in his effort to corrupt the attorney, Trump enlisted his trusted body man (Nauta) in a scheme to deceive Trump Attorney 1 by moving boxes to conceal his (Trump's) continued possession of classified documents.  As a result, Trump, through his attorney, again returned only a portion of the classified documents in his possession while falsely claiming that his production was complete.  And the obstructive conduct persisted.  Knowing that he had arranged for Nauta to move boxes to conceal them from Trump Attorney 1, and knowing that the government had subpoenaed the security footage that would reveal that surreptitious box movement, Trump, now joined by not only Nauta but also codefendant De Oliveira, attempted to have the information-technology manager at Mar-

a-Lago delete the video footage that would show the movement of boxes.  This evidence readily shows that Trump was engaged in criminal conduct when he sought the advice of counsel, that he was planning criminal conduct when he sought the advice of counsel, and that he committed a crime after receiving the benefit of counsel's advice.

Although the Government has proffered ample evidence establishing the above facts to make a prima facie showing, and will prove the allegations at trial beyond a reasonable doubt, for present purposes, the indictment alone is enough.  The Supreme Court has explained that "an indictment fair upon its face" and "returned by a properly constituted grand jury . . . conclusively determines the existence of probable cause to believe the defendant perpetrated the offense alleged." *Kaley v. United States*, 571 U.S. 320, 328 (2014) (quotation marks omitted).  If a prosecutor's good-faith statement of what evidence is before a grand jury is sufficient, *In re Grand Jury Subpoena*, 2 F.4th at 1345, then the grand jury's determination, based on evidence before it, that there is probable cause for criminal charges "should end the matter." *United States v. Stein*, No. 21-CR-20321, 2023 WL 2585033, at *4 (S.D. Fla. Mar. 21, 2023).  The indictment is enough to "establish a *prima facie* showing sufficient to clear the first prong's low hurdle," certainly when "coupled with the Government's other proffered evidence." *Id.* at *3 (quotation marks omitted).

Trump does not address the detailed allegations in the indictment or the evidence undergirding those allegations and instead criticizes isolated portions of the D.C. district court's earlier disclosure opinion.  His arguments are without merit.

First, Trump suggests (Mot. at 19) that a prima facie showing that he willfully retained documents containing national defense information, in violation of 18 U.S.C. § 793(e), cannot support application of the crime-fraud exception because the statute is unconstitutionally vague. Trump's vagueness argument is meritless for the reasons set forth in the Government's response

to Trump's motion to dismiss on those grounds (ECF No. 377), but regardless, the existence of a potential defense "does not prevent the Government from making a prima facie showing." *Stein*, 2023 WL 2585033, at *4 (quoting *In re Grand Jury Subpoena*, 220 F.3d 406, 410 (5th Cir. 2000)). Moreover, even without the Section 793(e) charges, the separate obstruction offenses charged in the indictment support a prima facie showing and application of the crime-fraud exception.

Second, Trump contends (Mot. at 19) that the Government has not provided evidence that he knew there were documents with classification markings in the boxes Nauta removed from the storage room before Trump Attorney 1 reviewed the boxes in that room for responsive documents. To the contrary, ample evidence establishes that Trump knew that there were scores of classified documents in just the 15 boxes that he returned to NARA, and that he still had dozens more boxes, including those that Nauta removed to conceal them from Attorney 1. And Trump's coconspirator Nauta confirmed in a text that he brought the boxes to Trump's residence specifically so that Trump could "pick from them." ECF No. 85 ¶ 59. Trump is certainly entitled to challenge the facts at trial, but there is more than sufficient evidence that he knowingly and willfully retained classified documents while purporting to comply with the grand jury subpoena.

Third, Trump struggles (Mot. at 19-20) to provide innocent explanations for plainly inculpatory evidence. He suggests, for example, that an "equally available inference" from the evidence is that he believed the boxes moved by Nauta (at his direction) "contained sensitive items he had designated as Personal Records" that were not responsive to the grand jury subpoena. Mot. 20. The inferences Trump proposes are entirely implausible; contrary to his suggestion that he had designated the records in his boxes as personal records, Trump himself proclaimed that the 15 boxes he provided to NARA contained presidential records, and he made no mention of personal records in that announcement. Aff. ¶ 25. And crediting Trump's implausible speculation would

be inconsistent with the crime-fraud exception's prima facie standard, which requires the Government to present "evidence that, *if believed* by a trier of fact, would establish the elements of" a crime. *In re Grand Jury Subpoena*, 2 F. 4th at 1345 (emphasis added). Accepting Trump's entirely *unbelievable* interpretations of the evidence would turn this standard on its head.

Finally, Trump contends (Mot. at 21) that the evidence fails to link his June 24, 2022, phone call with Trump Attorney 1 to any criminal activity. Again, Trump's claims are unfounded, as outlined in detail in the Superseding Indictment. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████—and shortly thereafter, Trump schemed with his codefendants to try to get the information-technology manager at Mar-a-Lago to delete the incriminating footage. The link between the conversation and Trump's criminality is straightforward and clear.

### 2. The Attorney-Client Communications and Work Product Furthered and Was Closely Related to the Crime or Fraud

"The second prong is satisfied by a showing that the communication is related to the criminal or fraudulent activity established under the first prong." *Schroeder*, 842 F.2d at 1227. Although other circuits focus "exclusively on whether the communications at issue were made 'in furtherance' of the crime or fraud," the Eleventh Circuit takes a broader approach and has determined that the relatedness requirement "should not be interpreted restrictively." *In re Grand Jury Subpoena*, 2 F.4th at 1350 (quotation marks omitted). "[F]indings on the applicability of the exception can rest on the content of the communication itself." 2 C. Mueller & T. Kirkpatrick, *Federal Evidence* § 5:27 (4th ed. 2023).

The attorney-client communications and work product at issue here furthered and were closely related to Trump's planning and commission of crimes. Trump first attempted to enlist

Trump Attorney 1 to aid him in his corrupt obstruction and then used Trump Attorney 1 to carry out his crimes, by manipulating Trump Attorney 1 to return only a portion of the classified documents in his possession while providing a false certification that the production was complete. The relationship here between the prima facie crimes and the attorney-client communications and work product is clear, and indeed stronger than in other cases in which the Eleventh Circuit has found the "relatedness" prong to be satisfied. *See, e.g.*, *In re Grand Jury Subpoena*, 2 F.4th at 1350 (attorney provided legal advice to candidate who filed fraudulent financial disclosures); *United States v. Cleckler*, 265 F. App'x 850, 853 (11th Cir. 2008) (after attorney advised defendant that documentation would help his tax appeal, defendant fabricated documents and used his attorney to provide fabricated documents to IRS agent); *In re Grand Jury (G.J. No. 87-03-A)*, 845 F.2d 896, 897-98 (11th Cir. 1988) (trial attorneys whose clients engaged in jury tampering); *Schroeder*, 842 F.2d at 1227 ("[A]ny legal assistance Schroeder received in generating income he did not intend to report must be treated as related to his tax evasion.").

The evidence here would readily satisfy the second prong even in courts that apply that prong more restrictively than the Eleventh Circuit, and Trump's reliance (Mot. at 21-22) on cases from other circuits is misplaced. Contrary to Trump's suggestion (Mot. at 21), he did not receive advice from his attorney regarding the legality of a course of action and then decide not to heed that advice. Trump tried to enlist his attorney in his criminal endeavor, tested his attorney's receptiveness, and then manipulated his attorney to achieve his criminal ends when the attorney did not accept his overtures. That serious abuse of the attorney-client relationship would trigger the crime-fraud exception in any jurisdiction.

Trump identifies (Mot. at 22-23) specific documents that he contends are insufficiently related to a prima facie crime, but none of his arguments withstands scrutiny. The documents he

identifies are related to his attempts to use Trump Attorney 1 to further his criminal conduct at the May 23 meeting (an engagement letter and correspondence preceding the meeting), his use of Trump Attorney 1 to submit a false certification of compliance with the grand jury subpoena for classified documents, and his use of communications with Trump Attorney 1 to try to thwart the grand jury subpoena for security footage. The crime-fraud exception forecloses Trump's reliance on the attorney-client privilege to keep these materials secret.

### 3. Trump's Characterization of the Evidence as Opinion Work Product Does Not Support Suppression

Trump argues (Mot. at 23-24) that some of the documents from Trump Attorney 1 should be excluded from evidence at trial because they are opinion work product. But "[w]hen the crime-fraud exception applies, an attorney's opinion work product is discoverable." *Drummond Co., Inc.*, 885 F.3d at 1335. Trump's arguments are therefore entirely without merit.

To be sure, in the crime-fraud litigation in the District of Columbia, because Trump Attorney 1 opposed disclosure of his opinion work product, invoking his own privilege separate and apart from Trump's, the Government, to avoid delay and unnecessary litigation, informed the court that it sought Trump Attorney 1's fact work product but not his opinion work product, and the D.C. district court accordingly agreed to redact opinion work product from the documents it ordered to be disclosed. *See* Def. Ex. 18 at 79-80; Def. Ex. 16 at 15.[3] None of the unredacted

---

[3] Courts have determined that an attorney has an independent privacy interest in attorney work product and therefore a client and attorney can each separately invoke the work-product privilege, *see, e.g.*, *Moody v. IRS*, 654 F.2d 795, 801 (D.C. Cir. 1981), and some courts have found that when the government seeks to compel disclosure of work-product material from a blameless attorney through the crime-fraud exception, and the blameless lawyer separately asserts his privacy interest in the work product, the crime-fraud exception only covers ordinary work product and may not compel disclosure of opinion work product, *see In re Green Grand Jury Proceedings*, 492 F.3d 976, 980 (8th Cir. 2007). The Eleventh Circuit has not adopted such a rule, *see Drummond Co., Inc.*, 885 F.3d at 1335, but regardless, Trump cannot here invoke Trump Attorney 1's privilege,

materials disclosed to the Government qualifies as opinion work product, but regardless, even assuming the D.C. district court failed to redact some opinion work product, that would make no difference for purposes of Trump's present motion to exclude evidence at trial.  The Eleventh Circuit has been clear: "The crime-fraud exception presents one of the rare and extraordinary circumstances in which opinion work product is discoverable."  *Cox*, 17 F.3d at 1422.  Trump's attempt to exclude evidence based on the work-product privilege is therefore baseless.

### C.  Trump Provides No Basis to Dismiss the Indictment

Trump makes a fleeting argument (Mot. 24) that the Court should dismiss the indictment. Governmental misconduct or abuse of the grand jury process may warrant dismissal of an indictment if the defendant demonstrates prejudice.  *See United States v. Butler*, 828 F. App'x 602, 606 (11th Cir. 2020).  But Trump does not—and cannot—cite any authority for the proposition that prosecutors engage in prejudicial misconduct by presenting evidence to a grand jury pursuant to a court order, after a judicial determination that the evidence is not privileged under the crime-fraud exception.  Dismissal of an indictment would be an extraordinary and inappropriate remedy merely for obtaining a crime-fraud ruling from the district court.

## III.  Conclusion

Trump's arguments for suppression or dismissal are without merit, and no evidentiary hearing is required.  The motion should be denied.

---

separate from Trump's, to seek exclusion of evidence.  *See In re Grand Jury Subpoenas*, 561 F.3d 408, 411-12 (5th Cir. 2009) (in appeal by a client from a district court's order compelling disclosure of opinion work product under the crime-fraud exception, client could not challenge the disclosure order by invoking his attorney's privilege over the opinion work product); *cf. United States v. McKennon*, 814 F.2d 1539, 1545 (11th Cir. 1987) (defendant can seek suppression of evidence based on a violation of his own privacy rights not those of others).

Respectfully submitted,

JACK SMITH
Special Counsel
N.Y. Bar No. 2678084

By:     /s/ *Jay I. Bratt*
           Jay I. Bratt
           Counselor to the Special Counsel
           Special Bar ID #A5502946
           950 Pennsylvania Avenue, N.W.
           Washington, D.C. 20530

           David V. Harbach, II
           Assistant Special Counsel
           Special Bar ID #A5503068

           John M. Pellettieri
           Assistant Special Counsel
           Special Bar ID #A5503076

March 7, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2024, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.

/s/ *David V. Harbach, II*
David V. Harbach, II