# EXHIBIT 11A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| v. | Criminal Action No. 23-257 (TSC) |
| **DONALD J. TRUMP**, | |
| Defendant. | |

## OPINION AND ORDER

On September 15, 2023, the government filed a Motion to Ensure that Extrajudicial

Statements Do Not Prejudice These Proceedings. ECF No. 57. Following a motion hearing on

October 16, 2023, *see* Tr. of Mot. Hr'g, ECF No. 103 ("Hr'g Tr."), the court prohibited the

parties and counsel in this matter from making certain public statements, Opinion and Order,

ECF No. 105 ("Order"). Defendant has appealed that Order, *see* ECF No. 106, and now moves

for the court to stay the Order during the pendency of that appeal, ECF No. 110 ("Motion to

Stay"). The court entered a temporary administrative stay of its Order while the parties briefed

the Motion, *see* October 20, 2023 Minute Order, but will now DENY Defendant's Motion and

lift the stay.[1]

### I.    DISCUSSION

Four factors guide the decision whether to stay an order pending appeal:

(1) whether the stay applicant has made a strong showing that he is likely to succeed
on the merits; (2) whether the applicant will be irreparably injured absent a stay;

---

[1] The government also asks the court to incorporate the Order into Defendant's conditions of
release. Resp. in Opp'n to Mot. to Stay, ECF No. 120, at 30–32. The court hereby DENIES
that request without prejudice. Even assuming that request is procedurally proper, the court
concludes that granting it is not necessary to effectively enforce the Order at this time.

(3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted).  The third and fourth factors "merge when the Government is the opposing party."  *Id.* at 435.  Here, all the factors weigh against granting a stay.

## A.  <u>Likelihood of success on the merits</u>

Defendant has not made a strong showing that he is likely to succeed on the merits.  As the court has explained, the First Amendment rights of participants in criminal proceedings must yield, when necessary, to the orderly administration of justice—a principle reflected in Supreme Court precedent, the Federal Rules of Criminal Procedure, and the Local Criminal Rules.  Order at 1–3; *see, e.g.*, Hr'g Tr. at 6–8, 16–18, 31, 34, 60, 64, 82–85.  And contrary to Defendant's argument, the right to a fair trial is not his alone, but belongs also to the government and the public.  *See, e.g.*, *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1075 (1991) (emphasizing "the State's interest in fair trials"); *United States v. Tijerina*, 412 F.2d 661, 667 (10th Cir. 1969) ("The public has an overriding interest that justice be done in a controversy between the government and individuals and has the right to demand and expect 'fair trials designed to end in just judgments.'  This objective may be thwarted unless an order against extrajudicial statements applies to all parties to a controversy.  The concept of a fair trial applies both to the prosecution and the defense." (internal citations omitted)).  Defendant's repeated appeals to broad First Amendment values therefore ignore that the court—pursuant to its obligation to protect the integrity of these proceedings—recognized those values but, in balancing them against the

potential prejudice resulting from certain kinds of statements, found them outweighed.  *See* Motion to Stay at 2–3, 10–24.[2]

Defendant's other claims also disregard the record.  To begin, he asserts that the court "cite[d] no evidence supporting its findings of risks of harassment and witness intimidation, and the prosecution provided none."  *Id.* at 8.  But several times the court and the government pointed to evidence causally linking certain kinds of statements with those risks, and Defendant never disputed it.  *See* Hr'g Tr. at 67 (The Court: "[W]hen Mr. Trump has singled out certain people in public statements in the past, hasn't that led to them being threatened and harassed, as demonstrated in the statements attached by the government?"  Mr. Lauro: "Your Honor, that's totally irrelevant."  The Court: "And the government's motion cites several of them who averred in the kinds of statements that you've asked for under oath that threats and harassment toward them had increased significantly as a result of Mr. Trump's statements about them."); Order at 2 ("Undisputed testimony cited by the government demonstrates that when Defendant has publicly attacked individuals, including on matters related to this case, those individuals are consequently threatened and harassed.  *See* ECF No. 57 at 3–5."); *see also* ECF No. 60 (failing to dispute or even discuss the testimonies cited by the government).  The evidence is in the record; Defendant simply fails to acknowledge it.

---

[2] Defendant's Motion argues that his speech restrictions are inconsistent with the "right of listeners to receive President Trump's message."  Motion to Stay at 15.  Defendant did not squarely raise that argument in his opposition brief to the government's original motion; the closest he came to identifying any authority for it was an unrelated "*see also*" citation to *United States v. Ford*, 830 F.2d 596, 598 (6th Cir. 1987), a case that he now quotes to support his right-of-listeners argument.  *Compare* ECF No. 60 at 5, *with* Motion to Stay at 16.  But the court expressly addressed and distinguished that case.  Order at 2–3.  In any event, the argument does not alter the fundamental principle that First Amendment rights, whether those of the speaker or the listener, may be curtailed to preclude statements that pose sufficiently grave threats to the integrity of judicial proceedings.

Likewise, Defendant claims that the court "g[ave] no meaningful consideration to alternative, less restrictive measures, including a narrower order." Motion to Stay at 28. Again, the record flatly contradicts that claim. During the motion hearing, the court questioned whether Defendant's existing speech restrictions, such as his conditions of release, would adequately prevent the potential dangers to these proceedings. Hr'g Tr. at 10–11, 34–35, 70. The court also considered whether alternative measures could prevent those harms—and in fact concluded that they could—with respect to certain kinds of statements, such as those disparaging the District of Columbia. *Id.* at 28, 35–36. Accordingly, the court denied the government's motion in those respects. *Id.* at 82–83; Order at 1. But the court explained that alternative measures would not sufficiently mitigate the risks flowing from other kinds of statements, such as those targeting reasonably foreseeable witnesses. *See* Order at 1–2 ("Here, alternative measures such as careful *voir dire*, jury sequestration, and cautionary jury instructions are sufficient to remedy only some of the potential prejudices that the government's motion seeks to address."); *id.* at 2 (noting that the risks created by certain statements would be irreversible); *id.* at 2–3 ("[T]his court has found that even amidst his political campaign, Defendant's statements pose sufficiently grave threats to the integrity of these proceedings that cannot be addressed by alternative means, and it has tailored its order to meet the force of those threats."). The court thus tailored its Order to prohibit statements only where less restrictive measures would be inadequate.

Defendant's final claim is that the Order is unconstitutionally vague for various reasons, none of which withstand scrutiny. First, Defendant quotes Merriam-Webster Online's definition of "interested" to conclude that the term "interested parties" includes could include "everyone 'affected' by or 'involved' in the case." Motion to Stay at 26. But "interested party" is a well-established legal term of art meaning "anyone who both is directly interested in a lawsuit and has

a right to control the proceedings, make a defense, or appeal from an adverse judgment."
*Interested Party*, *Black's Law Dictionary* (11th ed. 2019) (referencing *Party* (2), *Black's Law Dictionary* (11th ed. 2019)).  The Order confirmed that scope, defining the term as "including the parties and their counsel."  Order at 3; *see also* Hr'g Tr. at 83–84 (stating that the written order would apply to the parties and their counsel).  There is no meaningful basis to interpret "interested parties" as covering anyone else.

Second, Defendant focuses on the prohibition of "targeting" certain individuals, again quoting various dictionary definitions to assert that targeting could include not only identifying those individuals, but also attacking them, subjecting them to ridicule or criticism, or otherwise attempting to affect them.  Motion to Stay at 25.  But "restating a dictionary" to "search . . . for every facet" of relevant terms is not a proper vagueness inquiry.  *United States v. Bronstein*, 849 F.3d 1101, 1108 (D.C. Cir. 2017).  "Rather, a statute is unconstitutionally vague if, applying the rules for interpreting legal texts, its meaning 'specifie[s]' 'no standard of conduct . . . at all.'"  *Id.* at 1107 (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)).  And a cardinal rule of interpretation is that context matters; "a word is known by the company it keeps."  *Id.* at 1108 (quoting *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961)).

The motion hearing and corresponding Order provide substantial context for and examples of the kinds of "targeting" statements that could result in "significant and immediate risk[s]" to "the integrity of these proceedings."  Order at 2.  Indeed, the court identified that, depending on their context, statements matching each of the definitions Defendant proffers for the term "target" could pose such risks.  *See, e.g.*, Hr'g Tr. at 50–54 (risks associated with publicly identifying court staff); *id.* at 41–43 (risks associated with attacking prosecutors); *id.* at 59–60 (risks associated with criticizing potential witnesses); *id.* at 13–14 (risks associated with

attempting to affect potential witnesses' testimony, even using praise rather than criticism).

Defense counsel also repeatedly relied on context to distinguish permissible from impermissible statements. *See, e.g.*, *id.* at 72 (The court: "Next hypothetical. 'Bill Barr is a smart guy, but he better learn to keep his mouth shut.' Permissible? Or an attempt to obstruct justice or intimidate a witness?" Mr. Lauro: "[It] depends on the context . . . . [I]f it happened the day before Bill Barr testified at trial, that might be [impermissible]."); *id.* at 71 (similar). A "term is not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'" *Bronstein*, 849 F.3d at 1107 (quoting *Roth v. United States*, 354 U.S. 476, 491 (1957)). The court's Order and the motion hearing's record sufficiently clarify the meaning of "targeting" to provide fair notice of the kinds of statements—understood in context—that it prohibits.

Two of Defendant's social media posts since the Order's entry illustrate the comprehensible difference between the statements it permits and those it proscribes. First, on October 20, 2023—after the Order was entered, but before it was administratively stayed—Defendant stated:

> Does anyone notice that the Election Rigging Biden Administration never goes after the Riggers, but only after those that want to catch and expose the Rigging dogs. Massive information and 100% evidence will be made available during the Corrupt Trials started by our Political Opponent. We will never let 2020 happen again. Look at the result, OUR COUNTRY IS BEING DESTROYED. MAGA!!![3]

This statement asserts that Defendant is innocent, that his prosecution is politically motivated, and that the Biden administration is corrupt. It does not violate the Order's prohibition of "targeting" certain individuals; in fact, the Order expressly permits such assertions. Order at 3.

---

[3] https://truthsocial.com/@realDonaldTrump/posts/111267550982205234.

By contrast, on October 24, 2023—after the Order was administratively stayed—

Defendant stated:

> I don't think Mark Meadows would lie about the Rigged and Stollen 2020 Presidential Election merely for getting IMMUNITY against Prosecution (PERSECUTION!) by Deranged Prosecutor, Jack Smith. BUT, when you really think about it, after being hounded like a dog for three years, told you'll be going to jail for the rest of your life, your money and your family will be forever gone, and we're not at all interested in exposing those that did the RIGGING — If you say BAD THINGS about that terrible "MONSTER," DONALD J. TRUMP, we won't put you in prison, you can keep your family and your wealth, and, perhaps, if you can make up some really horrible "STUFF" a out him, we may very well erect a statue of you in the middle of our decaying and now very violent Capital, Washington, D.C. Some people would make that deal, but they are weaklings and cowards, and so bad for the future our Failing Nation. I don't think that Mark Meadows is one of them, but who really knows? MAKE AMERICA GREAT AGAIN!!![4]

This statement would almost certainly violate the Order under any reasonable definition of "targeting."[5] Indeed, Defendant appears to concede as much, Reply in Support of Motion to Stay, ECF No. 123, at 10 n.3 ("If the Gag order had been in effect, President Trump would have been unable to [make the statement].")—and for good reason. The statement singles out a foreseeable witness for purposes of characterizing his potentially unfavorable testimony as a "lie" "mad[e] up" to secure immunity, and it attacks him as a "weakling[] and coward[]" if he provides that unfavorable testimony—an attack that could readily be interpreted as an attempt to influence or prevent the witness's participation in this case. The plain distinctions between this statement and the prior one—apparent to the court and both parties—demonstrate that far from

---

[4] https://truthsocial.com/@realDonaldTrump/posts/111293117150329703.

[5] Because of the administrative stay on the Order, this statement is not before the court. Before concluding that any statement violated the Order, the court would afford the parties an opportunity to provide their positions on the statement's meaning and permissibility.

being arbitrary or standardless, the Order's prohibition on "targeting" statements can be straightforwardly understood and applied.

Defendant's other assertions of vagueness boil down to similar objections that deciding whether a statement violates the Order will necessarily be a fact-bound inquiry. He contends that it may at times be difficult to tell whether an individual is a reasonably foreseeable witness, or to distinguish proclamations of innocence from attacks on prosecutors or witnesses. Motion to Stay at 26–28. But even assuming that is true, it does not follow that "men of common intelligence must necessarily guess at [the] meaning" of the Order's prohibitions. *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1976) (citation omitted). It is a "basic mistake" to derive vagueness from "the mere fact that close cases can be envisioned. . . . Close cases can be imagined under virtually any [prohibition]." *United States v. Williams*, 553 U.S. 285, 305–06 (2008). If a party or their counsel makes a statement that may have violated the Order, the court will assess its substance and context. The fact that it needs to do so with special care in close cases does not render the underlying Order unconstitutionally vague.

Consequently, Defendant has failed to make a strong showing that he is likely to succeed on the merits of his appeal.

## B. Remaining factors

The remaining factors also counsel against a stay. Defendant's brief arguments on each rely entirely on the premise that the court's Order violated his First Amendment rights. *See* Motion to Stay at 31 ("[A] showing of likelihood of success on a First Amendment claim necessarily establishes irreparable injury."); *id.* ("As for the balancing of harms and the public interest . . . the demonstration of an ongoing violation of the First Amendment rights dictates that a stay should be entered."). Having rejected that premise, the court reaches the opposite conclusions. Where "there is no showing of a likelihood of success on the merits" of a First

Amendment claim, there is no irreparable injury or public interest favoring a stay. *Archdiocese of Wash. v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 334–35 (D.C. Cir. 2018). To the contrary, "[f]ew, if any, interests under the Constitution are more fundamental than the right to a fair trial by impartial jurors, and an outcome affected by extrajudicial statements would violate that fundamental right." *Gentile*, 501 U.S. at 1075 (internal quotations omitted). As discussed above, in the Order, and during the motion hearing, the court finds that the public interest in the orderly administration of this case requires the Order's limitations on such statements.

## II.    CONCLUSION

For these reasons, Defendant's Motion to Stay, ECF No. 110, is hereby DENIED, and the administrative stay imposed by the court's October 20, 2023 Minute Order is hereby LIFTED.

Date: October 29, 2023

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

# EXHIBIT 11B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 59

---

THE PEOPLE OF THE STATE OF NEW YORK

- against –

DONALD J. TRUMP

Defendant

---

**DECISION and ORDER**

People's Motion for an
Order Restricting
Extrajudicial Statements

Indictment No. 71543-23

---

JUAN M. MERCHAN, A.J.S.C.:

## BACKGROUND

Defendant is charged with 34 counts of Falsifying Business Records in the First Degree in violation of Penal Law § 175.10. The charges arise from allegations that Defendant attempted to conceal an illegal scheme to influence the 2016 presidential election. Specifically, the People claim that Defendant directed an attorney who worked for his company to pay $130,000 to an adult film actress shortly before the election to prevent her from publicizing an alleged sexual encounter with Defendant. It is further alleged that Defendant thereafter reimbursed the attorney for the payments through a series of checks and caused business records associated with the repayments to be falsified to conceal his criminal conduct. Trial on this matter is scheduled to commence on April 15, 2024.

On February 22, 2024, the People filed the instant motion for an order restricting extrajudicial statements by Defendant for the duration of the trial. The restrictions sought are consistent, in part, with those upheld in the U.S. Court of Appeals for the D.C. Circuit in *United States v. Trump,* 88 F4th 990 [2023]. On March 4, 2024, Defendant filed a response in opposition, arguing that his speech may only be restricted by the application of a more strenuous standard than applied by the D.C. Circuit and that the People have failed to meet that standard in this case.

## DISCUSSION

The freedom of speech guaranteed by the First Amendment and the State's interest in the fair administration of justice are implicated by the relief sought. The balancing of these interests must come with the highest scrutiny. "Properly applied, the test requires a court to make its own inquiry into the imminence and magnitude of the danger said to flow from the particular utterance

and then to balance the character of the evil, as well as the likelihood, against the need for free and unfettered expression." *Landmark Communications, Inc. v. Virginia*, 435 US. 829, 842-843 [1978]. The Court has an obligation to prevent outside influences, including extrajudicial speech, from disturbing the integrity of a trial. *Id. at 350-351; see also Sheppard v. Maxwell,* 384 US 333 [1966].

    With the standard set forth in *Landmark,* this Court has reviewed the record of prior extrajudicial statements attributed to Defendant as documented in Exhibits 1-16 of the People's Motion for an Order Restricting Extrajudicial Statements. Notably, Defendant does not deny the utterance of any of those extrajudicial statements, or the reported effect those statements had on the targeted parties. Rather, Defendant argues that, as the "presumptive Republican nominee and leading candidate in the 2024 election" he must have unfettered access to the voting public to respond to attacks from political opponents and to "criticize these public figures." *See* Defendant's Opposition to Motion at pgs. 8-9. Yet these extrajudicial statements went far beyond defending himself against "attacks" by "public figures". Indeed, his statements were threatening, inflammatory, denigrating, and the targets of his statements ranged from local and federal officials, court and court staff, prosecutors and staff assigned to the cases, and private individuals including grand jurors performing their civic duty. *See* People's Exhibits 1-16. The consequences of those statements included not only fear on the part of the individual targeted, but also the assignment of increased security resources to investigate threats and protect the individuals and family members thereof. *See* People's Exhibits 1-16; *Trump,* at 996-998. Such inflammatory extrajudicial statements undoubtedly risk impeding the orderly administration of this Court.

    Defendant contends that continued compliance with the existing orders, referencing both this Court's admonition at the start of the proceedings (*see* court transcript dated April 4, 2023*)* and the recent Protective Order issued on March 7, 2024, with respect to juror anonymity, is an effective, less restrictive alternative. He supports this position by noting that he has generally refrained from making extrajudicial statements about individuals associated with the instant case in marked contrast from the significant volume of social media posts and other statements targeting individuals involved in every other court proceeding reflected in the People's submission.

    This Court is unpersuaded. Although this Court did not issue an order restricting Defendant's speech at the inception of this case, choosing instead to issue an admonition, given the nature and impact of the statements made against this Court and a family member thereof, the District Attorney and an Assistant District Attorney, the witnesses in this case, as well as the nature and impact of the extrajudicial statements made by Defendant in the D.C. Circuit case (which

resulted in the D.C. Circuit issuing an order restricting his speech), and given that the eve of trial is upon us, it is without question that the imminency of the risk of harm is now paramount. The Supreme Court in both *Nebraska Press Ass'n v. Stuart*, 427 US 539 [1976] and *Sheppard v. Maxwell*, 384 US 333, 363 [1966] holds that the court has the obligation to prevent actual harm to the integrity of the proceedings. When the fairness of the trial is threatened, "reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice as its inception." *Sheppard, at 363*. On the record submitted, and in keeping with its mandate, this Court need not wait for the realization of further proscribed speech targeted at the participants of this trial.[1]

The People propose an additional restriction on speech with respect to prospective and sworn jurors. The restrictions sought are an extension of the previously issued protective order regarding juror anonymity. While the D.C. Circuit decision addressed only the risks of influencing witnesses and intimidating or harassing other trial participants in accordance with the lower court's ruling, it nevertheless opined that "one of the most powerful interests supporting broad prohibitions on trial participants' speech is to avoid contamination of the jury pool, to protect the impartiality of the jury once selected, to confine the evidentiary record before the jury to the courtroom, and to prevent intrusion on the jury's deliberations." *Trump*, 88 F4th at 1020, *citing In Re Russell*, 726 F2d 1007, 1009, 1010 [4th Cir 1984]. While the protective order related to juror anonymity prevents the dissemination of certain personal information, it is not sufficient to prevent extrajudicial speech targeting jurors and exposing them to an atmosphere of intimidation. The proposed restrictions relating to jurors are narrowly tailored to obtain that result.

The uncontested record reflecting the Defendant's prior extrajudicial statements establishes a sufficient risk to the administration of justice consistent with the standard set forth in *Landmark*, and there exists no less restrictive means to prevent such risk.

---

[1] Defendant argues that references to speech targeted at individual prosecutors in the instant case do not substantiate their claims, adding that the People only cite posts which occurred in March and June 2023. *See* Defendant's Motion pg. 14. Notably, within hours of the court appearance on March 25, 2024, setting the trial date for April 15, 2024, the Defendant targeted an individual prosecutor assigned to this case, referring to him as a "radical left from DOJ put into [...] the District Attorney's Office to run the trial against Trump and that was done by Biden and his thugs" in a press conference. *C-SPAN, press conference video dated March 25, 2024, at minute 2:34.*

**THEREFORE,** it is hereby

**ORDERED**, that the People's motion for a restriction on extrajudicial statements by the Defendant is **GRANTED** to the extent that Defendant is directed to refrain from the following:

a. Making or directing others to make public statements about known or reasonably foreseeable witnesses concerning their potential participation in the investigation or in this criminal proceeding;

b. Making or directing others to make public statements about (1) counsel in the case other than the District Attorney, (2) members of the court's staff and the District Attorney's staff, or (3) the family members of any counsel or staff member, if those statements are made with the intent to materially interfere with, or to cause others to materially interfere with, counsel's or staff's work in this criminal case, or with the knowledge that such interference is likely to result; and

c. Making or directing others to make public statements about any prospective juror or any juror in this criminal proceeding.

The foregoing constitutes the Decision and Order of the Court.

Dated: March 26, 2024
      New York, New York

**MAR 2 6 2024**

_____
Juan M. Merchan
Judge of the Court Claims
Acting Justice of the Supreme Court

**HON. J. MERCHAN**

4

# EXHIBIT 11C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 59

---

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK | **DECISION and ORDER** |
| - against – | People's Motion for Clarification or Confirmation of An Order Restricting Extrajudicial Statements |
| DONALD J. TRUMP<br><br>Defendant | Indictment No. 71543-23 |

---

JUAN M. MERCHAN, A.J.S.C.:

### BACKGROUND

Defendant is charged with 34 counts of Falsifying Business Records in the First Degree in violation of Penal Law § 175.10. The charges arise from allegations that Defendant attempted to conceal an illegal scheme to influence the 2016 presidential election. Specifically, the People claim that Defendant directed an attorney who worked for his company to pay $130,000 to an adult film actress shortly before the election to prevent her from publicizing an alleged sexual encounter with Defendant. It is further alleged that Defendant thereafter reimbursed the attorney for the payments through a series of checks and caused business records associated with the repayments to be falsified to conceal his criminal conduct. Trial on this matter is scheduled to commence on April 15, 2024.

On February 22, 2024, the People filed a motion for an order restricting extrajudicial statements by Defendant for the duration of the trial. The restrictions sought were consistent, in part, with those upheld in the U.S. Court of Appeals for the D.C. Circuit in *United States v. Trump*, 88 F4th 990 [2023]. On March 4, 2024, Defendant filed a response in opposition, arguing that his speech may only be restricted by the application of a more strenuous standard than applied by the D.C. Circuit and that the People had failed to meet that standard in this case.

On March 26, 2024, this Court issued its Decision and Order Restricting Extrajudicial Statements by Defendant.

On March 28, 2024, the People filed a pre-motion letter seeking clarification or confirmation of the Order as to whether it proscribes extrajudicial speech against family members of the Court, the District Attorney, and of all other individuals mentioned in the Order. Today, April 1, 2024,

Defendant filed his opposition to the People's motion. The People have today also filed a supplement to their pre-motion letter.

## DISCUSSION

The Defendant has a constitutional right to speak to the American voters freely, and to defend himself publicly. The Order issued on March 26, 2024, was narrowly tailored to protect that right. To clarify, the Order *did not* proscribe Defendant's speech as it relates to the family members of the District Attorney or this Court. The Court now amends the March 26, 2024, Order to include the family members of this Court and of the District Attorney of New York County. This Decision and Order is equally narrowly tailored and in no way prevents Defendant from responding to alleged political attacks but does address Defendant's recent speech.

One day following the issuance of said Order, Defendant made several extrajudicial statements attacking a family member of this Court. Contrary to the position Defendant took in his opposition to the People's February 22, 2024 motion for an order restricting extrajudicial statements, i.e. that his statements "plainly constitute core political speech on matters of great public concern and criticism of major public figures," Defendant's opposition to 2/22/24 Motion, pgs. 8-9, this pattern of attacking family members of presiding jurists and attorneys assigned to his cases serves no legitimate purpose. It merely injects fear in those assigned or called to participate in the proceedings, that not only they, *but their family members as well,* are "fair game" for Defendant's vitriol.

Courts are understandably concerned about the First Amendment rights of a defendant, especially when the accused is a public figure. *U.S. v. Ford*, 830 F2d 596 [1987]. That is because "the impact of an indictment upon the general public is so great that few defendants will be able to overcome it, much less turn it to their advantage." 29 Stan.L.Rev. 607, 611. The circumstances of the instant matter, however, are different. The conventional 'David vs. Goliath' roles are no longer in play as demonstrated by the singular power Defendant's words have on countless others. The threats to the integrity of the judicial proceeding are no longer limited to the swaying of minds but on the willingness of individuals, both private and public, to perform their lawful duty before this Court. This is evidenced by the People's representations that "multiple potential witnesses have already expressed grave concerns [...] about their own safety and that of their family members should they appear as witnesses against defendant." People's 3/28/24 Pre-Motion Letter. It is no longer just a mere possibility or a reasonable likelihood that there exists a threat to the integrity of the judicial proceedings. The threat is very real. Admonitions are not enough, nor is reliance on self-

2

restraint. The average observer, must now, after hearing Defendant's recent attacks, draw the conclusion that if they become involved in these proceedings, even tangentially, they should worry not only for themselves, *but for their loved ones as we*ll. Such concerns will undoubtedly interfere with the fair administration of justice and constitutes a direct attack on the Rule of Law itself. Again, all citizens, called upon to participate in these proceedings, whether as a juror, a witness, or in some other capacity, must now concern themselves not only with their own personal safety, but with the safety and the potential for personal attacks upon their loved ones. That reality cannot be overstated.

Defendant, in his opposition of April 1, 2024, desperately attempts to justify and explain away his dangerous rhetoric by "turning the tables" and blaming those he attacks. The arguments counsel makes are at best strained and at worst baseless misrepresentations which are uncorroborated and rely upon innuendo and exaggeration. Put mildly, the assortment of allegations presented as "facts" and cobbled together, result in accusations that are disingenuous and not rational. To argue that the most recent attacks, which included photographs, were "necessary and appropriate in the current environment," is farcical.

The People argue in their submission that Defendant's attacks, which include referring to a prosecution witness last week as "death", are based on "transparent falsehoods." People's 4/1/24 Supplement at pg. 2. The People provide a plethora of compelling arguments in support of their claim that Defendant's conduct is deliberate and intended to intimidate this Court and impede the orderly administration of this trial.

The People request in their submission of April 1, 2024, "that any order this Court enters clarifying or confirming the scope of its March 26 Order should also include the relief the People requested in our February 22 Motion for a Protective Order; namely, that defendant be expressly warned that any statutory right he may have to access to juror names will be forfeited by continued harassing or disruptive conduct." People's 4/1/24 Supplement at pg. 7. The Court at that time reserved decision on the People's motion. The People's motion is now **GRANTED.**

It remains this Court's fundamental responsibility to protect the integrity of the criminal process and to control disruptive influences in the courtroom. *See Sheppard v. Maxwell,* 384 U.S. 333 [1966]. "Neither prosecutors, counsel for defense, *the accused*, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function." *Id.* at 363 (emphasis added).

Consistent with the decision dated March 26, 2024, the uncontested record reflecting the Defendant's prior (and most recent), extrajudicial statements establishes a sufficient risk to the

3

administration of justice consistent with the standard set forth in *Landmark Communications, Inc. v. Virginia*, and there exists no less restrictive means to prevent such risk. 435 US 829, 842-843 [1978].

**THEREFORE,** Defendant is hereby put on notice that he will forfeit any statutory right he may have to access juror names if he engages in any conduct that threatens the safety and integrity of the jury or the jury selection process; and it is hereby

**ORDERED,** that the People's motion for clarification is **GRANTED.** The Court's Order of March 26, 2024, did not contemplate the family members of this Court or of the District Attorney. It is therefore not necessary for this Court to determine whether the statements were intended to materially interfere with these proceedings; and it is further

**ORDERED,** that the Court's Order of March 26, 2024, is amended as indicated below. Defendant is directed to refrain from:

a. Making or directing others to make public statements about known or reasonably foreseeable witnesses concerning their potential participation in the investigation or in this criminal proceeding;

b. Making or directing others to make public statements about (1) counsel in the case other than the District Attorney, (2) members of the court's staff and the District Attorney's staff, or (3) the family members of any counsel, staff member, the Court or the District Attorney, if those statements are made with the intent to materially interfere with, or to cause others to materially interfere with, counsel's or staff's work in this criminal case, or with the knowledge that such interference is likely to result; and

c. Making or directing others to make public statements about any prospective juror or any juror in this criminal proceeding.

4

**FURTHER,** Defendant is hereby warned that any violation of this Order will result in sanctions under Judiciary Law §§ 750(A)(3) and 751.

The foregoing constitutes the Decision and Order of the Court.

Dated: April 1, 2024
New York, New York

APR 0 1 2024

Juan M. Merchan
Judge of the Court Claims
Acting Justice of the Supreme Court

**HON. J. MERCHAN**

5

# EXHIBIT 11D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 59

---

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK<br><br>- against –<br><br>DONALD J. TRUMP<br><span style="text-align:right;">Defendant</span> | **DECISION and ORDER**<br><br>Defendant's Motion to<br>Terminate Order Restricting<br>Extrajudicial Statements<br><br>Indictment No. 71543-23 |

---

JUAN M. MERCHAN, A.J.S.C.:

### BACKGROUND

On February 22, 2024, the People filed a motion for an order restricting extrajudicial statements by the Defendant. He opposed the motion on March 4, 2024. The Court granted the People's motion on March 26, 2024 (hereinafter "March 26 Order"). The Order directed Defendant to refrain from:

    a.   Making or directing others to make public statements about known or reasonably foreseeable witnesses concerning their potential participation in the investigation or in this criminal proceeding;

    b.   Making or directing others to make public statements about (1) counsel in the case other than the District Attorney, (2) members of the court's staff and the District Attorney's staff, or (3) the family members of any counsel or staff member, if those statements are made with the intent to materially interfere with, or to cause others to materially interfere with, counsel's or staff's work in this criminal case, or with the knowledge that such interference is likely to result; and

    c.   Making or directing others to make public statements about any prospective juror or any juror in this criminal proceeding.

On March 28, 2024, the People filed a motion seeking to clarify whether the Order of March 26 "protects family members of the Court, the District Attorney, and all other individuals mentioned in the Order." People's Supplemental Filing Regarding the Court's March 26, 2024, Order Restricting Extrajudicial Statements at pg. 1. Defendant opposed the People's motion on March 29, 2024. Thereafter, on April 1, 2024, this Court issued a Decision and Order (hereinafter "April 1 Order") clarifying and amending the March 26 Order to the extent that Paragraph (b), now directed the Defendant to refrain from:

> b. Making or directing others to make public statements about (1) counsel in the case other than the District Attorney, (2) members of the court's staff and the District Attorney's staff, or (3) the family members of any counsel, staff member, the Court or the District Attorney, if those statements are made with the intent to materially interfere with, or to cause others to materially interfere with, counsel's or staff's work in this criminal case, or with the knowledge that such interference is likely to result;

On April 8, 2024, Defendant filed an Article 78 petition pursuant to CPLR § 7803(2) by Order to Show Cause seeking an interim stay of the trial proceedings pending a resolution of Defendant's challenge to the April 1 Order. Specifically, Defendant argued that: "[t]he unconstitutional features of the gag order are causing ongoing, irreparable harm to Petitioner and the voting public under the New York and U.S. Constitutions." *See* April 8, 2024, Summary Statement of Application for Expedited Service and/or Interim Relief. On April 10, 2024, the Appellate Division – 1st Department heard oral argument on Defendant's request for an interim stay of the trial and that application was denied.

On April 15, 2024, jury selection commenced.

On April 23, 2024, a full panel of the Appellate Division – 1st Department denied Defendant's applications for a stay of the trial and, in the alternative, a stay of the April 1 Order.

On May 14, 2024, the Appellate Division issued its decision on the merits of the Article 78 petition and denied the relief sought by Defendant. More specifically, it held that Defendant's First Amendment Rights had been "properly weighed against the court's historical commitment to ensuring the fair administration of justice in criminal cases, and the right of persons related to

2

tangentially related to the criminal proceedings from being free from threats, intimidation, harassment, and harm." *See In the Matter of Donald J. Trump v. The Honorable Juan M. Merchan*, etc., et al., 227 AD3d 518 (2024). Thus, this Court's Decision and Order was upheld.

On May 30, 2024, Defendant was convicted of 34 counts of Falsifying Business Records in the First Degree in violation of Penal Law § 175.10 after a trial by jury. Thereafter, the jury was discharged, and the case was adjourned to July 11, 2024, for sentencing.

On June 4, 2024, the Defendant filed a pre-motion letter seeking to terminate the March 26 Order as amended by the April 1 Order. On June 10, 2024, Defendant filed a memorandum of law in support of his motion. On June 20, 2024, the People filed their opposition to Defendant's motion to terminate. In the interim, on June 18, 2024, the Court of Appeals dismissed Defendant's appeal finding that no substantial constitutional question was directly involved. *Matter of Donald J. Trump v. Juan M. Merchan, etc., et al.*, 2024 WL 3032559.

## DISCUSSION

The Defendant seeks (1) termination of the April 1, 2024, Order Restricting Extrajudicial Statements ("April 1 Order")[1] and (2) that the Court revisit the necessity and constitutionality of the April 1 Order. *See* Defendant's Memo pgs. 12-13. The main thrust of Defendant's argument is that the Orders were implemented specifically to protect the integrity of the trial proceedings and that because the trial is over, the Orders are no longer necessary. *Id.* at 11. Specifically, Defendant notes that Paragraph (a) of the Orders prohibits statements concerning witnesses' "potential participation in the investigation or in this criminal proceeding" and that since the trial has concluded, the purpose of the Orders have been satisfied. *Id.* Defendant further argues that the same reasoning applies to Paragraph (c) of the Orders regarding jurors. Finally, the Defendant makes numerous arguments in support of his second request, that the Court "revisit the necessity and constitutionality of the April 1 Order." However, this Court need not address that claim as the Court of Appeals has already determined that no substantial constitutional question is raised by the April 1 Order.

The People do not oppose termination of paragraph (a) pertaining to witnesses. However, the People do oppose termination of Paragraphs (b) and (c). Specifically, the People submit that the proceedings have not yet concluded with respect to the persons referenced in paragraph (b), namely

---

[1] In the Introduction section of Defendant's Memo, the Defendant seeks immediate termination of both the March 26 Order and April 1 Order. For clarity in the Discussion section of this Decision, the Court will refer to each of the orders collectively as "Orders," and will specify each individual Order where necessary.

the prosecution, court staff and their families. Thus, termination at this juncture would be premature. With respect to persons referenced in paragraph (c), namely jurors, the People submit that the Court should continue the restrictions on extrajudicial statements as proscribed by the Orders notwithstanding that the jury has been discharged.

### DECISION

The basis for the issuance of the Orders was to protect the integrity of the judicial proceedings. As this Court recognized in its Order of April 1, 2024, "the threats to the integrity of the judicial proceeding are no longer limited to the swaying of minds, but also to the willingness of individuals, both private and public, to perform their lawful duty before this Court." Decision and Order dated April 1, 2024, p. 2. Both Orders were narrowly tailored to address the significant concerns regarding the Defendant's extrajudicial speech. The Orders were overwhelmingly supported by the record, and it was upon that record that the Appellate Division First Department and the New York Court of Appeals kept the Orders intact. However, circumstances have now changed. The trial portion of these proceedings ended when the verdict was rendered, and the jury discharged. Therefore, Paragraph (a) is terminated without opposition by the People. As to Paragraph (c), while it would be this Court's strong preference to extend those protections, the Court cannot do so on what is now a different record than what the appellate courts relied upon when they rendered their rulings. Therefore, Paragraph (c) must be terminated. Nonetheless, there is ample evidence to justify continued concern for the jurors. Therefore, the protections set forth in this Court's Protective Order of March 7, 2024, Regulating Disclosure of Juror Information will remain in effect until further order of this Court.

Regarding Paragraph (b), this Court notes that while witness testimony has concluded, a verdict has been rendered, and the jury discharged - the proceedings are not concluded. This matter has been set down for the imposition of sentence on July 11, 2024. Until sentence is imposed, all individuals covered by Paragraph (b) must continue to perform their lawful duties free from threats, intimidation, harassment, and harm.

THEREFORE, it is it is hereby

**ORDERED**, that Paragraph (a) and Paragraph (c) of the Orders Restricting Extrajudicial Statements of the Defendant are terminated effective the date of this Decision and Order, and it is further

**ORDERED**, that Paragraph (b) of the April 1, 2024, Decision and Order restricting extrajudicial statements of the Defendant shall remain in effect until the imposition of sentence.

The foregoing constitutes the Decision and Order of the Court.

Dated: June 25, 2024
      New York, New York

**JUN 2 5 2024**

Juan M. Merchan
Judge of the Court Claims
Acting Justice of the Supreme Court

**HON. J. MERCHAN**

5

# EXHIBIT 11E

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

Criminal Action No. 1:23-cr-00229 (CJN)

TAYLOR TARANTO,

*Defendant*.

## <u>ORDER</u>

On July 12, 2023, Magistrate Judge Faruqui ordered the pretrial detention of Defendant Taylor Taranto, who is charged with four misdemeanor offenses for his actions on January 6, 2021, and two felony firearms offenses incident to his arrest on June 29, 2023.  Indictment, ECF No. 15; Minute Entry for July 12, 2023.  Taranto appeals that Order. *See* Appeal, ECF No. 19. Following briefing and a hearing on the matter, the Court concludes that pre-trial detention is appropriate and therefore denies Taranto's appeal.

### I.    Background

### A.    Factual Background

On January 6, 2021, Taranto entered the United States Capitol at approximately 2:38 PM. Gov't Resp. at 4, ECF No. 20.[1]   Video evidence, as the government puts it, shows Taranto "mov[ing] through various areas of the building and ultimately arriv[ing] at the entrance to the Speaker's Lobby around 2:42 [PM]." *Id.*   Around this time, another rioter attempted to jump through a glass window and was shot by a United States Capitol Police Officer. *Id.*  After the shooting, officers "arrived and began moving the crowd, including Taranto, toward the exits." *Id.*

---

[1] Except where noted, the Court finds that the government has established the following facts by clear and convincing evidence. *See United States v. Vortis*, 785 F.2d 327, 328–29 (D.C. Cir. 1986).

at 4–5.  "Next to the exit, Taranto and multiple other rioters . . . scuffled with police officers."  *Id.*

at 5.  Taranto then left the Capitol building around 2:56 PM and remained on Capitol grounds for

some time on the East side of the building.  *Id.*

Since January 6, Taranto has made many public statements about his actions at the Capitol

and his views of that day.  On July 15, 2021, Taranto posted a Facebook video of himself stating,

"So we're in the Capitol building . . . legislative building . . . we just stormed it."  *Id.*  The caption

read:  "This is me 'stormin' the capitol' lol I'm only sharing this so someone will report me to the

feds and we can get this party rolling!"  *Id.*  Taranto also gave a two-hour video interview titled

"Exclusive Taylor Taranto talks about being on scene when Ashli Babbitt got shot" on June 17,

2023.  *Id.*  "During the interview, Taranto discussed being inside the Capitol on January 6 and

reviewed video footage of himself from that day and narrated what he was doing and what was

happening around him in the footage."  *Id.*  Taranto has continued to use "multiple types of media

platforms," including Facebook, YouTube, Truth Social, Parler, and Telegram, "to express his

thoughts on a wide-ranging number of topics, most of which were focused on January 6, a belief

that the 2020 election was fraudulent, and an endorsement of theories that 'QAnon' followers

promote."  *Id.* at 5–6.  And through these platforms, "Taranto explicitly stated that he does not

believe the United States Government is legal and does not believe that his home state of

Washington has a valid constitution."  *Id.* at 6.

Sometime in May 2023, Taranto returned to Washington, D.C.  The government contends

that Taranto traveled here "in response to Speaker of the House Kevin McCarthy's offer to produce

January 6 video."  *Id.*  According to videos posted to social media, Taranto was living out of his

van during this period.  *Id.*  In arguing that pretrial detention is warranted, the government focuses

primarily on six events, several of which are captured on video that the Court has reviewed. *See* Gov't Exhibit List (Exs. 1-A–3-C), ECF No. 22.

      <u>Freedom Corner</u>. The government alleges that Taranto was a "regular fixture" at the so-called "Freedom Corner," a location near the D.C. jail where supporters of detained January 6 defendants gather. *See* Gov't Resp. at 6–7. As the government puts it, "[a]ccording to those that routinely gather there, Taranto was banned from the area for his offensive conduct toward other protestors." *Id.* at 7.

      <u>Piney Branch Elementary</u>. On June 18, 2023, Taranto used his YouTube channel to stream himself and several others at Piney Branch Elementary School in Takoma Park, Maryland. *Id.* Pursuant to a permit, Taranto and others used the school facilities to display a film related to the events of January 6. *Id.* at 7, 9. On the livestream, Taranto explained that the location was chosen for its proximity to Congressman Jamie Raskin's home and stated that Raskin is "one of the guys that hates January 6 people, or more like Trump supporters, and it's kind of like sending a shockwave through him because I did nothing wrong and he's probably freaking out and saying shit like, 'Well he's stalking me.'" *See* Ex. 1-B. Taranto further commented on the livestream "I didn't tell anyone where he lives 'cause I want him all to myself," and "[t]hat was Piney Branch Elementary School in Maryland . . . right next to where Rep. Raskin and his wife live." *Id.*

      <u>Payne Elementary</u>. On June 22, 2023, "Taranto was in his van parked outside of a second elementary school, Payne Elementary, located in Washington D.C. while an evacuation drill was conducted within the school." *See* Gov't Resp. at 8. "As elementary students were brought outside, Taranto filmed the children and stated that they were 'being removed from school because there is a violent white supremacist out somewhere.'" *Id.*; *accord* Ex. 3-A. He later commented

on the way the children were walking back into the school, remarking that it was unwise for the students to be walking together in a single route back. Ex. 3-C.

       <u>Speaker McCarthy</u>. On June 27, 2023, Taranto allegedly posted a video to YouTube of a recording of a phone call with Speaker McCarthy's officer repeatedly asking to be granted access to certain video footage of the events of January 6. Gov't Resp. at 8–9. Then on June 28, 2023, Taranto posted a livestream to his YouTube channel from his parked van. In this second video, Taranto allegedly "stated that his van was parked in Gaithersburg, Maryland" and he was headed to the National Institute of Standards and Technology. *Id.* at 2, 9; *see also id.* at 2 n.3 (the government noting that NIST has a nuclear reactor on its property). The government has proffered that Taranto made several quite concerning comments on this video, such as:

- statements that the van was "self-driving";

- a statement that he was "just going one way for this mission, to hell";

- a statement that though he had a "detonator," he did not "really need one for this";

- a statement that the van would only have to go straight, which he would accomplish with a steering wheel lock, and that he would not be near the van when it "goes off"; and

- a statement saying "Coming at you McCarthy. Can't stop what's coming. Nothing can stop what's coming."

*Id.* at 9. The government has not submitted to the Court video of this incident, and Taranto disputes the government's proffer. *See* Appeal at 19–20; Def.'s Reply at 3 n.1, ECF No. 21.

       <u>Kalorama</u>. On June 29, 2023, former President Trump "posted what he claimed was the address of Former President Barack Obama" on Truth Social. Gov't Resp. at 9. According to the government, Taranto "used his own Truth Social to re-post the address." *Id.* Then, on Telegram,

Taranto stated, "We got these losers surrounded!  See you in hell, Podesta's and Obama's."  *Id.* at 9–10.

Soon after those posts, Taranto began livestreaming on YouTube from his van while he drove through the Kalorama neighborhood of Washington, D.C.—the same neighborhood in which former President Obama lives.  *Id.* at 10; *see also id.* at 7 n.8.  Taranto parked his van on the street and began walking around the neighborhood, continuing to film, making several references to the Podestas and stating that he was trying to get an interview.  *Id.*; *accord* Ex. 2-A. As the videos provided to the Court reflect, Taranto later explicitly noted that he was near the Obamas' home.  *See* Ex. 2-B.

As the video also reflect, Taranto made numerous references to supposed tunnels beneath the houses, calling sewer grates "entrance points" and making other statements such as:

- "So if you go down there, there's obviously tunnels down there.  I don't know how close they'll get you to other accesses."

- "We're gonna find a way to the tunnels, underneath their houses."

- "We're looking for tunnel access so we can get the interview, in case they try to weasel their way out.  No in or out now!  See, First Amendment, just say First Amendment, free speech.  Free, it's free."

*See* Gov't Resp. at 10; *accord* Ex. 2-A, 2-B.

When Taranto first encountered the Secret Service, Taranto stated, "Hello, just trying to get an angle, for First Amendment, free speech.  Thanks.  That's Secret Service, she's alright."  *Id.* He later stated, "I control the block, we've got 'em surrounded."  Gov't Resp. at 11; Ex. 2-B.  And he made several further comments in the video referencing getting a "shot" and an "angle," such

as, "We're gonna see what we can get, as a shot.  If I were them, I'd be watching this, [watching] my every move."  Gov't Resp. at 10–11; Ex. 2-B.

Taranto eventually headed into a wooded area and walked toward Rock Creek Parkway.

Arrest and Vehicle Search.  Taranto was then arrested by officers who apprehended him near Rock Creek Parkway.  *See* Gov't Resp. at 11.  Officers located his van, which was parked nearby, and a canine unit alerted on the van for the presence of gunpowder.  *Id.* at 3, 11.  Inside the van, officers found two firearms and hundreds of rounds of ammunition.  *Id.* at 11.

On June 30, 2023, officers executed a search warrant on Taranto's vehicle and additionally found a machete and a steering wheel lock.  *Id.* at 4.  Officers also found indications that Taranto had in fact been living in the van, including a mattress, clothing, and personal items.  *Id.*

According to the government, "[l]aw enforcement records show that Taranto has 20 firearms registered to him."  *Id.* at 3.  Two were seized from Taranto's van.  *Id.*  The government does not have custody of the remaining 18.  *Id.*

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

**B.      Procedural History**

On July 12, 2023, a grand jury returned an indictment charging Taranto with one count of Carrying a Pistol Without a License (Outside Home or Place of Business), in violation of 22 D.C. Code § 4504(a)(1); one count of Possession of a Large Capacity Ammunition Feeding Device, in violation of 7 D.C. Code § 2506.01(b); one count of Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); one count of Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); one Count of Disorderly Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D); and one Count of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  *See generally* Indictment.  The four trespassory charges are alleged to have occurred at the Capitol on January 6, 2021, while the two firearms charges are alleged to have occurred on June 29, 2023—the day Taranto was arrested in Washington, D.C. *Id.*

On June 30, 2023, the day after his arrest, Taranto appeared before Magistrate Judge Harvey, who granted the government's oral motion for temporary detention pursuant to 18 U.S.C. § 3142(f)(2)(A) (Serious Risk of Flight).  *See* Minute Entry for June 30, 2023; Appeal at 1.

Thereafter, Magistrate Judge Faruqui held detention hearings in this matter on July 5, 6, and 12, and on July 12 granted the government's motion for pretrial detention.  *See* Minute Entry for July 12, 2023; SEALED Tr., ECF No. 23.  Magistrate Judge Faruqui determined that he did not think Taranto was a flight risk, *see* SEALED Tr. at 46:5–6, but did conclude that there was clear and convincing evidence that there is no set of conditions of release that would reasonably

7

assure the safety of any other person and the community, *id.* at 56:12–16. *See* 18 U.S.C. § 3142(e). He explained that although the risk of Taranto doing something to harm other persons or the community might be low, the impact of what Taranto might do would be catastrophic. SEALED Tr. at 53:11–13. He came to this conclusion by considering the statements made by Taranto on the videos, the firearms that were found in the van, his mental health history, and his military training. *See id.* at 50–56.

Taranto appealed that decision on July 27, 2023 and the Court held a hearing on that appeal on August 7, 2023. At the end of the hearing, the Court ordered the government to submit certain video evidence for the Court's review, and ordered Taranto's counsel to submit a more concrete mental health care plan that would apply if Taranto were released. ██████████████

████████████████████████████████████████████████████████

████████████████████████████████

## II.     Legal Standards

A defendant must be detained before trial "[i]f, after a hearing . . . the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). That hearing is held "pursuant to the provisions of subsection (f)" of section 3142. *Id.*

Subsection (f), in turn, provides that a "judicial officer shall hold a hearing to determine whether any condition or combination of conditions . . . will reasonably assure the appearance of such person as required and the safety of any other person and the community" upon a motion from the government in a certain subset of cases, including felony firearm cases, *see id.* § 3142(f)(1)(E), or upon a motion from the government or the judicial officer's own motion in cases that involve "a serious risk that such person will flee" or "obstruct or attempt to obstruct justice," *see id.* § 3142(f)(2)(A)–(B). To justify detention based on risk of flight, the government's

burden of proof is preponderance of the evidence; for danger to the community, the government's burden is clear and convincing evidence.  *See Vortis*, 785 F.2d at 328–29.

To determine "whether there are conditions of release that will reasonably assure" the defendant's future appearance and the safety of the community, the "judicial officer shall . . . take into account the available information concerning" the following four factors:  (1) "the nature and circumstances of the offense charged," including whether the offense involves a firearm; (2) "the weight of the evidence" against the defendant; (3) "the history and characteristics" of the defendant; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  *Id.* § 3142(g)(1)–(4).

"If a person is ordered detained by a magistrate judge . . . the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order.  The motion shall be determined promptly."  18 U.S.C. § 3145(b).  "Neither § 3142 nor § 3145 specifies the standard of review to be applied by a district court reviewing a magistrate judge's release order or detention order, and 'the D.C. Circuit has not yet addressed the issue.'"  *United States v. Crestman*, 525 F. Supp. 3d 14, 23 (D.D.C. 2021) (quoting *United States v. Hunt*, 240 F. Supp. 3d 128, 132–33 (D.D.C. 2017)).  "Nonetheless, both the [Bail Reform Act] and the Federal Magistrates Act, 28 U.S.C. § 636, support the conclusion, reached by every circuit to have considered the question, that a district court reviews a magistrate judge's release or detention order *de novo*."  *Id.* (collecting cases).  The Court will do the same.

### III.    Analysis

To determine whether there is a set of conditions that would reasonably assure Taranto's future appearance and the safety of the community,[2] the Court considers the four factors set forth in section 3142(g).

### A.  Nature and Circumstances of the Charged Offenses

The first factor the Court must consider is the nature and circumstances of the charged offenses.  Taranto faces six charges that vary in their seriousness.  Four are misdemeanors, while two—Carrying a Pistol Without a License Outside Home or Place of Business and Possession of a Large Capacity Ammunition Feeding Device—are felonies.  *See generally* Indictment.  Also relevant under 18 U.S.C. § 3142(g)(1) is whether the offenses involve firearms; both charges under the D.C. Code regard firearms and weapons.  *See* 22 D.C. Code 4504(a)(1); 7 D.C. Code 2506.01(b).  In addition, the time and place of the charged offenses raise their severity and suggests that Taranto may be a threat to individual persons and the community.  The evidence demonstrates that Taranto committed four of these offenses at the U.S. Capitol while a Joint Session of Congress

---

[2] Taranto argues that he cannot be detained based on dangerousness alone because the government moved for detention under section 3142(f)(2)(A) (Serious Risk of Flight).  *See* Appeal at 4.  This argument fails for several reasons.  First, and most importantly, the government has since raised an alternative basis for a detention hearing—that Count 1 is a "felony that is not otherwise a crime of violence . . . that involves the possession or use of a firearm."  18 U.S.C. § 3142(f)(1)(E).  Because Count 1 (Carrying a Pistol Without a License (Outside Home or Place of Business), in violation of 22 D.C. Code § 4504(a)(1)) clearly falls within section 3142(f)(1)(E), the Court need not consider the flight risk question.  Second, the Court has already concluded in *United States v. Curzio*, 21-cr-41, that the statute requires (and at the very least authorizes) the Court to consider all four section 3142(g) factors, including dangerousness of the defendant, even when the detention hearing was originally sought under section 3142(f)(2)(A).  *See Curzio* Tr. at 26, ECF No. 12-1.  And finally, section 3142(e) requires the Court to detain Taranto if there is "no condition or combination of conditions will reasonably assure the appearance of the person as required *and* the safety of any other person and the community."  18 U.S.C. § 3142(e)(1) (emphasis added).  The statute therefore explicitly requires this Court to consider, at every detention hearing, whether there is a set of conditions that will reasonably assure the safety of the community.

was meeting to certify the results of the presidential election. The other two charges occurred—intentionally—near the home of a former president, and while making repeated references to the former chief of staff. Altogether, the nature and circumstances of the charged offenses—and in particular, Taranto's firearms offenses—weigh in favor of continued detention.

### B.        Weight of the Evidence

Turning to the second factor, the weight of the evidence against Taranto is strong—in fact, many of the key facts are uncontested. For example, it is uncontested that there are videos of Taranto inside the Capitol, one of which he posted to the internet himself, explaining that he was "stormin' the Capitol." Additionally, it is uncontested that Taranto has made many statements about his involvement on January 6, even giving a long interview about his presence inside the Capitol where he pointed himself out on video. The fact that Taranto had firearms and ammunition in his van the day he was arrested—although allegedly in a locked bag, *see* Appeal at 2—is also uncontested. Nor is it contested that when he was arrested, Taranto was purposefully near the former president's home.

Taranto is of course entitled to a presumption of innocence regarding his guilt. And he may have some defense at trial that he has not yet asserted. But the weight of the evidence before the Court is against the Defendant. Overall, this factor weighs in favor of continued detention.

### C.        History and Characteristics of the Defendant

As to the third factor, the history and characteristics of the Defendant, there are facts supporting both the government's position and Taranto's position. On the one hand, Taranto has no criminal history; he has a supportive family; and he has an honorable military record. *See id.* at 6. Before coming to D.C., Taranto successfully worked for many years with a mental health therapist and a psychiatrist through the Department of Veterans Affairs and was, according to their reports, doing well. *Id.* at 12. These facts weigh against detention.

On the other hand, the Court agrees with the government that Taranto's recent behavior is increasingly erratic. He left his family in Washington state to come to D.C., and although he asserts a lawful reason for coming here, the records reflects that he has spent his time taunting politicians, making concerning statements about explosives and violence, videotaping children outside of a school, and parking himself near a former President's home while in the possession of firearms and ammunition. Taranto also has military training and a history of PTSD and mental health issues that contribute to his potential dangerousness. Taranto has not contested the government's assertion that he has "openly stated that he does not acknowledge the legitimacy of the United States Constitution," which creates some concerns for this Court as to whether he would take instructions from this Court seriously. Of course, there is also evidence that Taranto would comply with federal directives, including his lack of criminal history and his military service. But based on the evidence at this stage, Taranto's history and characteristics—apart from the charged offenses and related conduct—suggest that detention is warranted.

### D.       Danger to the Community

The fourth factor "substantially overlaps with the ultimate question" of whether any conditions of release will reasonably assure safety. *United States v. Cua*, No. 21-107, 2021 WL 918255, at *5 (D.D.C. Mar. 10, 2021). Ultimately, the Court agrees with the government that Taranto has "clearly demonstrated his dangerousness [through] his increasingly erratic and disturbing words and actions." *See* Gov't Resp. at 19. Taranto's recent commentary about explosives, targeting of certain politicians, behavior outside a former president's home, mental health, military training, and access to firearms all contribute to the Court's determination (based on clear and convincing evidence) that Taranto poses a serious risk to others and the community.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ And

Taranto's job application to NIST, combined with the video Taranto posted about the same agency, suggest that Taranto took a concrete step towards these alleged violent plans. In light of this behavior, and the corresponding risk of grave harm, the Court cannot be confident that Taranto's mental health treatment proposal of either outpatient treatment or short-term in-patient treatment, *see* ECF No. 24, provides sufficient safeguards in light of Taranto's recent escalating behavior. Additionally, defense counsel represented to the Court at the hearing that Taranto was still speaking with his therapist by phone once a week while he was in D.C., yet Taranto's behavior continued to escalate. Given his recent behavior, there do not appear to be conditions of release that would prevent him from being a danger to the community, and this factor weighs heavily in favor of detention.

## IV.    Conclusion

Upon consideration of the evidence presented, the factors set forth in 18 U.S.C. § 3142(g), and the possible release conditions set forth in § 3142(c), the Court finds by clear and convincing evidence that defendant's pretrial release would constitute an unreasonable danger to the community, and the Court finds by clear and convincing evidence that no condition or combination of conditions can be imposed that would reasonably ensure the safety of the community were Taranto to be released pending trial. Therefore, Taranto's Appeal, ECF No. 19, is **DENIED**, and it is **ORDERED** that Taranto shall remain detained pending trial.

DATE:  August 14, 2023

CARL J. NICHOLS
United States District Judge