**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Case No. 23-80101-CR** |
| | ) | **CANNON/REINHART** |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WALTINE NAUTA, and | ) | |
| CARLOS DE OLIVEIRA, | ) | |
| | ) | |
| *Defendants*. | ) | |


**PRESIDENT DONALD J. TRUMP'S
<u>REPLY IN FURTHER SUPPORT OF MOTION TO INTERVENE</u>**

President Trump respectfully submits this reply in further support of his Motion, Doc. 681, to intervene or, in the alternative, to participate as *amicus curiae* in support of Defendants' joint motion to enjoin the release of Volume II of Jack Smith's final report, Doc. 679 (the "Intervention Motion" in support of the "Injunction Motion").

**ARGUMENT**

**A.      Intervention Is Appropriate.**

"Intervention in criminal cases is" permitted where "a third party's constitutional or other federal rights are implicated by the resolution of a particular motion, request, or other issue during the course of a criminal case." *United States v. Carmichael*, 342 F. Supp. 2d 1070, 1072 (M.D. Ala. 2004). President Trump possesses multiple Constitutional and federal rights that will be "implicated" by the "resolution" of the Injunction Motion and warrant intervention.

*First*, under the Executive Vesting Clause, U.S. CONST. art. II, § 1, cl. 1, the President-Elect must prepare for his imminent assumption of "[t]he executive Power" of the United States. This intense period of preparation—a period that the Constitution deliberately creates, U.S. CONST. amend. XX—ensures that the incoming President will be fully equipped to fulfill his unique and extraordinary obligations as our Nation's Chief Executive. *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) ("Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'").

Arising from this Constitutional structure is an indispensable right for the President-Elect to prepare for office without interference from the outgoing administration. *See Definition of "Candidate" under 18 U.S.C. § 207(j)(7)*, 24 Op. O.L.C. 288, 292 (2000) ("The transition period insures that the candidate will be able to perform effectively the important functions of his or her

new office as expeditiously as possible" and is "one of the most important public objectives in a democratic society." (quotation marks omitted)).

Rather than respecting this Constitutional right, the government—at the direction of an Attorney General who will resign in less than four days—seeks to unlawfully transmit an unprecedented array of false and derogatory case information, compiled by an unconstitutionally appointed private citizen, to President Trump's political opponents in Congress, including individuals who have already publicly and viciously criticized President Trump and the Court *in relation to this case*.[1] The government does this despite knowing that these political actors will have every ability and incentive to use such information to undermine President Trump's transition and his ability to govern our Nation moving forward.[2] Nor is there any material doubt the ranking members will do so, given their immediate politicking on Volume I of Smith's report, including extensive and hyperbolic commentary on the contents of that Volume. *See* Raskin, *Ranking Member Raskin's Statement on Special Counsel Jack Smith's Report on President-Elect Donald Trump's Election Subversion and Incitement of Insurrectionary Violence* (Jan. 15, 2025); Durbin,

---

[1] *See* House Judiciary Committee Ranking Member Jamie Raskin, *Ranking Member Raskin's Statement on the Dismissal of the Classified Documents Case Against Donald Trump* (July 15, 2024) ("Today, a federal trial judge, who has been on the bench for less than four years but has already been upbraided by her appellate court for egregious departures from the rule of law, has tried to vaporize this long-standing institutional practice in order to benefit the President who appointed her. Former President Trump's actions require accountability—not the overthrowing of the Special Counsel on dubious constitutional grounds."); Senate Judiciary Committee Ranking Member Dick Durbin, *Durbin Statement On Federal Judge Dismissing Classified Documents Case Against Donald Trump* (July 15, 2024) ("This unprecedented decision goes far beyond this individual prosecution and undermines the entire system that our country has long relied on to protect the independence of investigations of the Executive Branch and prosecutions of political figures.").

[2] Contrary to the government's suggestion, Doc. 710 at 6, the harm that the disclosure of false and derogatory case information, and the ensuing media firestorm, would cause on the transition is self-evident. Doc. 679, Ex. A at 4. At minimum, it would cause an unacceptable burden on the President-Elect's attention, which must be fully focused on his impending duties as President during this crucial period just days before inauguration.

*Durbin Statement On Former Special Counsel Jack Smith's Report On Trump's Interference In The 2020 Election* (Jan 14, 2025).

Thus, the government is not seeking, as it claims, to aid Congress in exercising its "oversight functions." Doc. 703 at 3. Instead, by delivering Volume II to unashamed partisans, the government strategically aims to ensure the Volume's *public* release. Although the government claims that a purported "agree[ment] to specified conditions of confidentiality," *id*. at 4, would alleviate these concerns, it would do nothing of the sort. As the government well knows, the Constitution prohibits *any* enforceable restrictions on the ranking members' use or disclosure of information in furtherance of their official duties. The ranking members could, for example, stand on the floor of the House or Senate and disclose the entire contents of Volume II, without fear of any legal consequence. U.S. CONST. art. I, § 6, cl. 1 (providing for Speech or Debate Immunity); *Hutchinson v. Proxmire*, 443 U.S. 111, 130 (1979) ("A speech by [a Senator] in the Senate would be wholly immune and would be available to other Members of Congress and the public in the Congressional Record."). Thus, whatever "confidentiality agreement" the government purports to adopt (the terms of which the government has pointedly not provided the Court), it is entirely illusory, because no such agreement is enforceable. Disclosure to the ranking members is functionally equivalent to public disclosure. This, in turn, poses an extraordinary danger to President Trump's ability and right to prepare for the Presidency free of such unconstitutional attacks by the incumbent administration.

Thus, the Injunction Motion, which seeks to prevent the government's transmission of confidential case information to Congressmen and Senators beyond the control of the Court in the first instance, "implicate[s]" President Trump's constitutional rights and warrants his intervention. *Carmichael*, 342 F. Supp. 2d at 1072.

*Second*, for similar reasons, the Presidential Transition Act, 3 U.S.C. § 102 note (the "Act"), confers an additional "federal right[]" that the Injunction Motion "implicate[s]." *Carmichael*, 342 F. Supp. 2d at 1072. Specifically, the Act "promote[s] the orderly transfer of the executive power in connection with the expiration of the term of office of a President and the inauguration of a new President," and recognizes that "[a]ny disruption" of the transition "could produce results detrimental to the safety and well-being of the United States and its people." Act § 2. The Act charges "all officers of the Government" with obligations "to avoid or minimize disruptions that might be occasioned by the transfer of the executive power," and "otherwise to promote orderly transitions in the office of President," *id.*—the exact opposite of what the government seeks to do here.

Concomitant with these obligations is the President-Elect's right to be free of the "disruptions" that the Act prohibits. *See id*. Thus, where, as here, a party seeks to disclose case information to Congress that may "disrupt" the transition, *id.*, and thereby "infringe[] o[n] an[] interest conferred on" the President-Elect, intervention is appropriate. *Carmichael*, 342 F. Supp. 2d at 1072.

*Third*, it is inherently improper and contrary to Due Process for the government to falsely accuse President Trump of crimes in communications to members of Congress, while denying him the ability to contest those allegations and exonerate himself before a neutral adjudicator. *See Coffin v. United States*, 156 U.S. 432, 453, 460 (1895) (holding the presumption of innocence is "the undoubted law, axiomatic and elementary" and "vital and fundamental" to our Constitutional system); *see also* Justice Manual § 1-7.610 ("DOJ personnel should refrain from disclosing," *inter alia*, "[a]ny opinion as to [a] defendant's guilt" or any other "[o]bservations about a defendant's or party's character" "except as appropriate *in the proceeding or in an announcement after a*

*finding of guilt*." (emphasis added)). Indeed, "[i]n the absence of some significant justification, federal prosecutors generally should not" even "identify [alleged] unindicted co-conspirators," which President Trump now is, in statements outside the Department. *See generally* Justice Manual §§ 9-11.130; 9-27.760.

The government previously abided by these bedrock constraints in other cases, and President Trump has an undeniable Constitutional interest in ensuring the government does so in this case as well. *See, e.g., Mueller Report*, Vol. II at 2 (declining to opine on President Trump's conduct and stating "[t]he ordinary means for an individual to respond to an accusation is through a speedy and public trial, with all the procedural protections that surround a criminal case. An individual who believes he was wrongly accused can use that process to seek to clear his name. In contrast, a prosecutor's judgment that crimes were committed, but that no charges will be brought, affords no such adversarial opportunity for public name-clearing before an impartial adjudicator.").[3] This is especially true here, where the Department cannot lawfully transmit the report to anyone, given Smith's unconstitutional appointment and unlawful expenditure of unappropriated funds. *See* Doc. 681 at 4 ("There is no basis for Smith to be spending taxpayer dollars to interfere with the Presidential transition process by making false and prejudicial claims about President Trump, Nauta, De Oliveira, and other uncharged parties.").

*Fourth*, just as the Defendants may appropriately challenge the disclosure of information that "would be inconsistent with the[ir] fair trial rights," Doc. 697 at 3 (Order), so too does President Trump have the right to prevent the government from engaging in gamesmanship that could prejudice any future proceeding, no matter how unlikely, inappropriate, or unconstitutional that such a proceeding may be.

---

[3] Available at https://www.justice.gov/archives/sco/file/1373816/dl

In Smith's motion to dismiss his wholly meritless appeal as to President Trump, Smith claimed that the Court's underlying dismissal (Doc. 672) was without prejudice. 11th Cir. Appeal No. 24-12311 (Doc. 79). The Court's dismissal order does not make that qualification, *see* Doc. 672 at 93 (ordering the case "DISMISSED" without any reservation), and any future attempt to indict or try President Trump in relation to this case would be the subject of vigorously contested litigation on that point. Regardless, the government wrongly believes that it may obtain another indictment and bring President Trump to trial, notwithstanding its dismissal. Although this may be exceedingly unlikely given the facts, law, procedural posture, and (most prominently) President Trump's complete innocence, the possibility still exists. Thus, President Trump has an overriding right and interest in preventing prejudice to any potential future trial, notwithstanding the unlikelihood of that trial. Stated differently, the government cannot evade the Court's jurisdiction to protect the integrity of these proceedings simply by dismissing and refiling at a later date. The possibility of the government seeking another indictment still exists; therefore, President Trump has standing to intervene. In this manner, there is little difference between the positions of President Trump (who faces the unlikely possibility of a new indictment) and Defendants (who face a similarly unlikely possibility that the 11th Circuit overturns this Court's dismissal order).

*Fifth*, President Trump has statutory rights barring the release of information identifying individuals, *see* 5 U.S.C. § 552a(b), and grand jury material, *see* Fed. R. Crim. P. 6, that he is allowed to vindicate here by intervening.

*Sixth*, this action presents the most appropriate forum for President Trump to seek relief. Unlike Volume I, which the government wrongly claimed was unrelated to these proceedings, there is no dispute that this case, and the underlying investigation that led to this case, is the subject of Volume II. Doc. 697 (Order) ("All parties agree that Volume II expressly and directly concerns

this criminal proceeding."). Thus, President Trump's arguments for relief are most sensibly presented in this case. For similar reasons, judicial economy weighs in favor of intervention. President Trump does not seek intervention to file a *new* motion. Rather, he simply seeks to support an *already pending motion*, the resolution of which implicates his rights as President-Elect and otherwise. It is, therefore, entirely reasonable that President Trump would submit his arguments for the Court's consideration in this matter, where the issue is already pending.

Given the Court's long history with this proceeding, and its deep familiarity with both the facts and legal issues, it is in the best position to weigh the Constitutionally significant arguments raised by President Trump and reach an expeditious resolution. This is particularly true given the emergency nature of the Injunction Motion, which itself arises out of the government's efforts to release Volume II in the last possible moments of the current administration.[4]

*Finally*, no party will be prejudiced by President Trump's intervention. Defendants, who filed the Injunction Motion in the first instance, do not oppose President Trump's intervention. The government, likewise, faces no harm. Apart from tautological (and obvious) assertions that non-parties are not participants in a case until the Court orders otherwise, Doc. 701 at 2, the government does not articulate any reason the Court should close its ears to President Trump's objections. Nor can it. Intervention does not materially change the underlying nature of this dispute. As noted above, the Injunction Motion will remain pending with or without President Trump's participation. Granting intervention simply allows President Trump to add his voice for the Court's consideration in deciding this enormously significant matter.

---

[4] The government complains that "[a]ny disclosure of Volume Two will be the result of action by the Department of Justice separate from the prosecution of Defendants." Doc. 710 at 8. However, by taking the Injunction Motion under advisement, Doc. 697 at 3 (Order), the Court has already determined that questions regarding the handling of the report are appropriately raised in this case.

Moreover, President Trump's voice is one the Court should hear. The People of this country overwhelmingly re-elected President Trump and entrusted him with the extraordinary responsibility of preparing for the Presidency and, at 12:01 P.M. on January 20, 2025, assuming the Oval Office. No one else in America, including Defendants, can defend the rights and interests that the People, the Constitution, and the Presidential Transition Act have all vested in President Trump. It is President Trump's solemn and individual responsibility to take all actions appropriate and necessary to prevent harm to these compelling interests. Accordingly, it is crucial that the Court allow President Trump to intervene and present argument on these topics. Alternatively, the Court may, and should, allow President Trump to participate in argument as *amicus curiae*—relief that the Court has previously granted in this case. *See* Docs. 355, 367, 411, 430.

## B.   The Government's Responses Are Unavailing.

The government has improperly filed multiple responses in opposition to President Trump's motion to intervene. Docs. 701, 710. Regardless, the responses are unavailing. In both, the government principally argues that intervention is permitted "only where the *granting* of a motion in a criminal case would infringe on a third party's constitutional rights." Doc. 701 at 2 (emphasis added); *see also* Doc. 710 at 3–4. This is incorrect. As *Carmichael* explains, the Court may allow intervention in a criminal case when the "*resolution*" of a motion "*implicate[s]*" a third party's Constitutional or federal statutory rights. 342 F. Supp. 2d at 1072 (emphasis added). As a "resolution" may be either favorable or unfavorable, the relevant inquiry is not whether a proposed intervenor supports or opposes a motion, but rather whether the *outcome* of the Court's decision would affect the intervenor's interests. This is entirely sensible because, in many circumstances (including those presented here), the relevant harm would arise from the Court's failure to act.

For example, in *Gravel v. United States*, the government subpoenaed a witness to appear before a grand jury. 408 U.S. 606, 609 n.1 (1972). The witness filed a motion to quash, which Senator Gravel intervened to support. *Id*. The district court granted intervention, and the Supreme Court later permitted the Senator to continue his litigation in that matter, notwithstanding the fact that it would have been the *denial* of the motion to quash, rather than its *granting*, that the Senator thought would harm his rights. *See id*. Identically here, the Court's denial of the Injunction Motion would harm President Trump's Constitutional and statutory rights, and therefore provides the basis for intervention. *See id*.

The government's reliance on *United States v. Atesiano* is likewise misplaced. No. 18-20479-CR, 2018 WL 5831092, at *4 (S.D. Fla. Nov. 7, 2018). In *Atesiano*, the court distinguished between "interven[tion] for offensive reasons," which it disapproved of, and "defensive intervention," which it explained would be allowed. However, whether an intervention is "offensive" or "defensive" is conceptually separate from whether the intervenor supports or opposes a motion. In *Atesiano*, for example, the non-party sought intervention "to obtain information for use in his civil action"—an inherently "offensive" goal as it would force the government to perform an act it would otherwise not be required to perform. *Id*. Here, by contrast, President Trump seeks defensive relief, as he aims to *stop* the government from performing an act that would prejudice his rights and interests. Thus, President Trump's efforts are best characterized as "defensive intervention," and entirely consistent with *Atesiano*. *See id*.[5]

---

[5] *Atesiano* and *Carmichael* both cite *Gravel*, which again involved intervention in support of a motion, as an example of when intervention is permitted, categorizing it as a case involving intervention "to protect other rights implicated by a particular proceeding." *Atesiano*, 2018 WL 5831092, at *2 (quoting *Carmichael*, 342 F. Supp. 2d at 1072).

Regardless, neither *Atesiano* nor *Carmichael* is binding on the Court, and, as the *Atesiano* court points out, the Federal Rules are conspicuously silent on the subject . *Id*. at *2. Nor is counsel aware of any Circuit precedent that would control the Court's analysis or otherwise limit when the Court may or may not allow intervention. Here, given the very significant federal and Constitutional interests at stake—and the unique circumstance where the outgoing Executive proposes an action that materially harms the incoming Executive—the Court should not apply an overly rigid or narrow test for determining whether intervention is appropriate.[6] Rather, for all the reasons described above, the Court should permit President Trump the opportunity to argue in support of the Injunction Motion.

## CONCLUSION

The Court should grant President Trump's motion to intervene as to Volume II, Doc. 681, or alternatively allow his participation as *amicus curiae*.

---

[6] Precedent from other Circuits likewise eschews overly narrow or technical tests, instead focusing on whether an intervenor's rights would be harmed by the outcome of a motion, irrespective of the specific procedural posture. *See United States v. Blagojevich*, 612 F.3d 558, 559 (7th Cir. 2010) (permitting intervention "when the potential intervenor has a legitimate interest in the outcome and cannot protect that interest without becoming a party."); *United States v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008) (permitting intervention as "[f]ederal courts have authority to formulate procedural rules not specifically required by the Constitution or the Congress to implement a remedy for violation of recognized rights." (citations and quotation marks omitted)).

Dated: January 16, 2025

Respectfully submitted:

*/s/ John F. Lauro / Gregory M. Singer*
John F. Lauro, Esq.
Fla. Bar No. 794074
jlauro@laurosinger.com
Gregory M. Singer, Esq.
Fla. Bar No. 109267
gsinger@laurosinger.com
LAURO & SINGER
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990

*Counsel for President Donald J. Trump*

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2025, a true and correct copy of the foregoing was filed electronically with the Court's CM/ECF system to be served electronically on counsel of record for all parties who have entered in the case.

*/s/Gregory M. Singer*
Gregory M. Singer